**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHRISTIE VAN, CHARMELLA LEVIEGE, MARIA PRICE, HELEN ALLEN, JACQUELINE BARRON, THERESA BOSAN, SHRANDA CAMPBELL, KETURAH CARTER, MICHELLE DAHN, TONYA EXUM, JEANNETTE GARDNER, ARLENE GOFORTH, CHRISTINE HARRIS, ORISSA HENRY, LAWANDA JORDAN, DANIELLE KUDIRKA, TERRI LEWIS-BLEDSOE, CONSTANCE MADISON, CEPHANI MILLER, MIYOSHI MORRIS, STEPHANIE SZOT, SHIRLEY THOMAS-MOORE, ROSE THOMAS, TONI WILLIAMS, BERNADETTE CLYBURN, MARTHA CORBIN, ANGELA GLENN, LADWYNA HOOVER, OGERY LEDBETTER, LATRICIA SHANKLIN, ANTOINETTE SULLIVAN, DERRICKA THOMAS, and NICHEA WALLS, each individually and on behalf of all similarly situated persons,** | Case No. 1:14-CV-08708<br><br>Honorable Robert M. Dow, Jr.<br>Honorable Sidney I. Schenkier |
| **Plaintiffs,** | |
| **v.** | |
| **FORD MOTOR COMPANY,** | |
| **Defendant.** | |

**DEFENDANT FORD MOTOR COMPANY'S INDEX OF UNPUBLISHED OPINIONS IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY, REPORTS, AND OPINIONS OF DR. LOUISE FITZGERALD**

**TAB**

*Angelopoulos v. Keystone Orthopedic Specialists, S.C.*,
    2017 WL 2178504 (N.D. Ill. May 16, 2017) ...........................................................................1

1

*Barber v. United Airlines, Inc.*,
    17 F. App'x 433 (7th Cir. 2000) ..................................................................2

*Childers v. Trustees of the University of Pennsylvania*,
    2016 WL 1086669 (E.D. Pa. Mar. 21, 2016) ...............................................3

*EEOC v. Bloomberg L.P.*,
    2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ...............................................4

*EEOC v. Dial Corp.*,
    2002 WL 31061088 (N.D. Ill. Sept. 17, 2002) ............................................5

*In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*,
    2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ...............................................6

*Johnson v. Wyeth LLC*,
    2012 WL 1204081 (D. Ariz. Apr. 11, 2012) ................................................7

*La Playita Cicero, Inc. v. Town of Cicero, Il.*,
    2017 WL 1151066 (N.D. Ill. Mar. 28, 2017) ...............................................8

*Morris v. Ford Motor Co.*,
    2012 WL 5947753 (N.D. Ind. Nov. 28, 2012) ..............................................9

*Smith v. Union Pac. R.R.*,
    2017 WL 2656583 (N.D. Ill. June 20, 2017) .............................................10

*Sullivan v. Alcatel-Lucent USA Inc.*,
    2014 WL 3558690 (N.D. Ill. July 17, 2014) .............................................11

**1**

2017 WL 2178504
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Dr. Nicholas ANGELOPOULOS, Plaintiff,

v.

KEYSTONE ORTHOPEDIC SPECIALISTS, S.C.,
Wachn, LLC, and Martin R. Hall, M.D., Defendants.

Case No. 12-cv-5836
|
Signed 05/16/2017

**Attorneys and Law Firms**

Chris C. Gair, Thomas Reynolds Heisler, Vilia Margaret
Dedinas, Gair Law Group Ltd., Chicago, IL, for Plaintiff.

Arthur M. Holtzman, Bevin Megan Brennan, Lawrence
W. Byrne, Naureen Amjad, Pedersen & Houpt, P.C.,
Kevin William Doherty, Michael Thomas Sprengnether,
Doherty & Progar LLC, Chicago, IL, Brian T. Ginley,
Skawski Law Offices, LLC, Oak Brook, IL, for
Defendants.

**Opinion**

## MEMORANDUM OPINION AND ORDER

Robert M. Dow, Jr., United States District Judge

**\*1** Before the Court are Plaintiff's *Daubert* motion
to bar certain expert testimony by Michael Pakter
[314], Defendants' *Daubert* motion to bar certain expert
testimony by Jay Sanders [309], Plaintiff's motions *in
limine* [326] and [339], Defendants' motions *in limine*
[317], and Defendants' motion to amend the final pretrial
order to include proposed supplemental agreed voir
dire questions and contested jury instructions [352]. For
the reasons set forth below, Plaintiff's *Daubert* motion
(Plaintiff's motion *in limine* No. 1) to bar expert testimony
by Michael Pakter [314] is granted in part and denied in
part. Defendants' *Daubert* motion to bar certain expert
testimony by Jay Sanders [309] is denied.

Plaintiff's motions *in limine* [326] are granted in part
and denied in part: the Court grants Plaintiff's motions
Nos. 3 and 4; the Court denies Plaintiff's motion No.

5; and the Court provisionally denies Plaintiff's motion
No. 2. Plaintiff's motion *in limine* No. 7 [339] is granted.
Defendants' motions *in limine* [317] are granted in part
and denied in part: the Court grants Defendants' motions
Nos. 6 and 8; the Court denies Defendants' motions
Nos. 1, 5, 7, 10, and 11; the Court reserves its ruling on
Defendants' motion No. 4; and the Court provisionally
grants Defendants' motions Nos. 2 and 3.[1] Defendants'
motion to amend the pretrial order [352] is granted, and
the Court will consider the proposed voir dire questions
and jury instructions that the parties submitted to the
Court on May 12, 2017. The Court will issue rulings
on Plaintiff's motion *in limine* No. 6 [326, at 10] and
Defendants' motion *in limine* No. 12 [350] in a separate
order. A final pretrial conference is set for May 18, 2017
at 10:00 a.m. This case remains set for a jury trial to
commence on May 23, 2017.[2]

[1] The Court previously granted in part and denied in
part Defendants' motion *in limine* No. 9 and denied as
moot witness Dr. Michael Hartman's motion to quash
subpoena [360]. [364.]

[2] As a reminder, the parties are to submit by 12:00 noon
on May 19, 2017 a chart of objections to exhibits
that takes into consideration the Court's rulings on
the motions *in limine*; the chart should contain the
exhibit number, a short description of the exhibit, the
objection, and the response to the objection. Plaintiff
is to submit a binder of Plaintiff's disputed exhibits;
the Court already has copies of Defendants'
disputed trial exhibits, so no additional copies are
necessary unless new objections are raised.

## I. Background

Nicholas Angelopoulos ("Plaintiff"), an anesthesiologist,
brings suit against his former business associate,
Martin R. Hall ("Hall"), and the two businesses
in which they were associates, Keystone Orthopedic
Specialists, S.C. ("Keystone"), and Wachn, LLC
("WACHN") (collectively, "Defendants"), for their
alleged participation in a fraud to deprive Plaintiff of
money to which he was entitled.[3] In his governing
Third Amended Complaint [222], Plaintiff alleges claims
against Defendants for fraudulently filing an information
return in violation of 26 U.S.C. § 7432 (Count I);
common law fraud (Count II); breach of fiduciary duty
(Count III); breach of contract (Counts V and VI);
and unjust enrichment (Count VII). Plaintiff also seeks

a determination of the fair value of his distributional interest pursuant to 805 ILCS § 180/35-65 (Count Four). Defendants bring counterclaims against Plaintiff for breach of the purported WACHN Operating Agreement (Count I) and breach of contract (Count II). On September 16, 2016, the Court denied Defendants' motion for summary judgment, noting that many facts were in dispute. [303.]

[3]     Ira K. Dubin and Ira K. Dubin Ltd. d/b/a Green Dubin & Co. were also named as defendants in this action, but were dismissed from the case with prejudice on September 10, 2014. [See 191.]

## II. *Daubert* Motions [314] and [317]

### A. Legal Standard

**\*2** Federal Rule of Evidence 702[4] and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Rule 702 requires the district court judge to act as a gatekeeper to ensure that admitted expert testimony is relevant, reliable, and has a factual basis. *Id.* at 809; see also *Daubert*, 509 U.S. at 589. The Seventh Circuit has stressed that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original).

[4]     Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or a determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied

the principles and methods to the facts of the case.

To determine whether expert testimony is admissible, the district court must ascertain (1) whether the expert is qualified, (2) whether his methodology is scientifically reliable, and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). *Daubert* sets forth the following non-exhaustive factors for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Daubert*, 509 U.S. at 593–94; see also *Bielskis*, 663 F.3d at 893. However, the test for reliability is flexible, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142; see also *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable"). In addition, the touchstone of admissibility under Rule 702 is helpfulness to the jury. *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion. *Id.* "An expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful." *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014); see also *Benson*, 941 F.2d at 604 ("[T]he jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury.").

### B. Analysis

**\*3** Many of the liability and damages issues in this case center on the accounting records kept by Defendants Keystone and WACHN under the supervision of Defendant Hall. Plaintiff and Defendants have hired

experts to assess whether Defendant Keystone's profit and loss statements and Form 1099-MISC contained false or fraudulent information and expenses, as Plaintiff contends, or instead accurately disclosed Defendant Keystone's income and expenses and calculated Plaintiff's share of the same, as Defendants contend. As the Court noted in its summary judgment opinion, the experts disagree on almost everything, including basic factual predicates, which accounting methodology is appropriate to use, whether certain of Defendant Keystone's expenses were properly disclosed to the physicians, whether those expenses were reasonable, and whether those expenses were properly attributed to Keystone rather than the other companies owned by Defendant Hall.

### 1. Defendants' Challenge to Certain Testimony by Jay Sanders [309]

Plaintiff retained as an expert Jay Sanders, an accountant with 30 years of experience providing accounting services to medical practices. Defendants move to bar three of Sanders's opinions: Opinion No. 5 in Sanders's expert report, which values Plaintiff's purported interest in WACHN; Opinion No. 6, which discusses WACHN's failure to remove Plaintiff from his personal guarantees of the WACHN loan; and Opinion No. 3, which states that Plaintiff was wrongly charged $599,168 for excess overhead as compared to industry norms.

### a. Opinion No. 5: Valuation of Plaintiff's Interest in WACHN

In his Opinion No. 5 "Damages Associated with WACHN, LLC," Plaintiff's expert Sanders valued Plaintiff's purported interest in WACHN using three different methods: (1) the initial equity approach; (2) the income approach; and (3) the cost approach. Defendants take issue with Sanders's use of the income approach, arguing that for purposes of this approach, Sanders impermissibly relied on information provided by Gary Fazio, Vice Chairman of CBRE Group, Inc. According to Sanders, the "income approach is the most commonly used method for appraising commercial and industrial real estate based on the net income the property produces to an investor." [309-1 (Sanders's Expert Report), at 43.] He explained in his expert report that the income approach is computed by taking the Net Operating Income of a real

estate asset (collected rent minus operating expenses) and dividing it by the capitalization rate, which is the rate of return a prospective investor is expecting given the current health of the economy, interest rates, geographical area, and other factors.

Sanders stated in his report that Fazio told him that (1) the net rental rate of the building in which WACHN is located was $15 to $17 per square foot per year, (2) the most recent operating expenses, including common area maintenance and real estate taxes, were $13 per square foot per year, and (3) the capitalization rate for medical office buildings in the Chicago area was 6%, but that the capitalization rate should be increased by 1% because the building is located in Hazel Crest, and it should be further increased by another 1% because the WACHN space is a condominium unit and not a fee simple transaction. [309-1, at 44.] Using these figures and the income approach, Sanders concluded that the equity value of the building was just under $954,000 and Plaintiff's purported interest in WACHN is worth $191,000.

First, Defendants argue that it is unclear what Fazio relied on to provide Sanders with figures for the net rental rate, recent operating expenses, and current capitalization rate for medical office buildings in the Chicago area. Defendants contend that Sanders improperly relied on Fazio's figures without doing any independent research or otherwise verifying the figures and neglected to consider differences between medical office suites. Second, Defendants argue that Sanders impermissibly opined that the income approach is the "most widely used and accepted valuation standard for commercial real estate," but that Sanders did not explain how he reached such an opinion and admitted that he himself has never done any real estate appraisal work and does not have a real estate appraisal license. Third, Defendants challenge Sanders's conclusion that the income method he used was "based on very recent information [from Fazio] regarding the prevailing rental rates, operating expenses, and capitalization rates for that building, locale and economic environment," without indicating what dates or years the rates are based on.

**\*4** The Court is not convinced by Defendants' arguments. An expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. In fact, "it is common in technical fields for an expert to base

119 A.F.T.R.2d 2017-1882

opinion in part on what a different expert believes[.]" *Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 309, 613 (7th Cir. 2002). For example, a physician, though not an expert in radiology, may rely on an x-ray in formulating a diagnosis. See *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005). Further, "it is apparent from the wording of Rule 703 that there is no *general* requirement that the other expert testify as well." *Dura*, 285 F.3d at 613; see also *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) (explaining that "[m]edical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions" and that "courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable").

However, expert testimony relying on the opinions of other should be rejected if the testifying expert's opinion is too speculative or if the underlying basis is faulty. *Walker*, 208 F.3d at 588. Further, "while Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule." *Loeffel Steel Prods., Inc.*, 387 F.Supp.2d at 808. Thus, an expert is "not permitted to be the mouthpiece of [an expert] in a different specialty," *Dura Automotive Sys. of Indiana, Inc.*, 285 F.3d 309, or to vouch for the truth of what another expert told him, *Loeffel Steel Prods., Inc.*, 387 F.Supp.2d at 808. Under Rule 703, an expert may rely on hearsay in formulating his opinion, but the underlying hearsay is not admissible for the truth of the matter asserted. *Loeffel Steel Prods., Inc.*, 387 F.Supp.2d 7at 808.

The Court concludes that Sanders permissibly relied on figures provided by Fazio, Vice Chairman of CBRE, one of the largest commercial real estate brokers in the United States, who has participated in more than 3,000 lease transactions and whose clients include hospitals and medical staff members. See *Walker*, 208 F.3d at 589 (holding that expert physician's opinion was not rendered unreliable by her partial reliance on another doctor's work and explaining that "[t]o the degree that she might have relied on faulty information, the matter certainly could be explored on cross-examination"); *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 516 (E.D. Pa. 2001) (holding that expert Certified Public Accountant's use of capitalization rate that defendant objected to did not destroy the reliability of expert's opinions that defendant was free to challenge expert's method for

calculating lost profits through cross examination and through its own damages expert). Further, Plaintiff asserts in his response that Defendant Hall and certain other witnesses affiliated with Keystone, including Renee Breese, may be able to testify to the rental income and capitalization rate of the WACHN building. Plaintiff also asserts that he will present at trial, separate from Fazio's data, evidence about WACHN's operating expenses and the rental income paid to WACHN through Keystone. If this evidence is indeed presented at trial, it may serve to either confirm or refute the figures used by Sanders for his valuation.

Sanders may use the figures provided by Fazio to offer an opinion within Sanders's domain of expertise in valuation—that is, he can testify that assuming a net rental income of $16 per square foot, operating expenses of $13 per square foot, and a capitalization rate of 8%, the equity value of the building would be just under $954,000 and Plaintiff's share would be worth $191,000. However, he cannot vouch for the accuracy of Fazio's figures for the net rental rate of the building, the most recent operating expenses, and the capitalization rate for medical office buildings in the Chicago area. In other words, Sanders cannot act as Fazio's spokesman. See *In re James Wilson Assocs.*, 965 F.2d 160, 172–173 (7th Cir. 1992) (explaining that the expert architect could use what a consulting engineer told him to offer an opinion in the architect's domain of expertise, but he could not testify for the purpose of vouching for the truth of what the engineer had told him); *Dura Automotive Sys. of Indiana, Inc.*, 285 F.3d at 613 (if affidavits of experts had timely been filed, expert hydrogeologist could have testified that well field was contaminated by volatile organic compounds and that if defendant's plastics plant was within the well field's capture zone, some of the contaminants may have come from that plant; however, hydrogeologist could not testify that plant was actually within well field's capture zone, as he was not an expert in mathematical models of groundwater flow and modeling on which he relied had been done by other non-testifying experts).

**\*5** Additionally, to the extent that Defendants challenge Sanders's qualifications on the basis that he has not done real estate appraisal work and does not have a real estate appraisal license, this argument fails because Sanders is a Certified Public Accountant and a Certified Valuation Analyst. As an expert in business valuation, he is sufficiently qualified to offer an opinion as to the

valuation of the WACHN business. See Fed. R. Evid. 702 (an expert may be qualified "by knowledge, skill, experience, training, or education"); *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 92 F. Supp. 2d 786, 794 (N.D. Ill. 2000) (certified public accountant who specialized in business valuation was qualified to testify as an expert on the issue of damages in breach of contract suit). Sanders's admitted lack of specialization in real estate appraisal work is not a disqualifying factor; rather, it is yet another subject for cross-examination. See *Walker*, 208 F.3d at 589 (holding that district court abused its discretion in excluding expert testimony that employee had suffered post-traumatic stress disorder and explaining that although expert physician was not a psychiatrist or psychologist, she was qualified as a physician); *Loeffel Steel Prod., Inc.*, 387 F. Supp. 2d at 802 (business appraiser's lack of specific experience with particular machines did not disqualify him from being considered an expert to offer opinion on economic loss).

Finally, Defendants challenge for the first time in their reply brief Sanders's use of the initial equity approach and the cost approach. However, arguments raised for the first time in a reply brief are waived. See *United States v. Hughes*, 970 F.2d 227, 235, n.6 (7th Cir. 1992) (arguments raised for the first time in a reply brief are waived); *Forsythe v. Rosen Med. Grp., LLC*, 2015 WL 127921, at *5 (N.D. Ill. Jan. 8, 2015) (denying motion *in limine* and explaining that argument raised for the first time in reply brief and not argued in initial motion was waived). Further, even if the Court were to consider these arguments on the merits, they are underdeveloped and do not cite any authority. Therefore, Defendants' motion to bar Plaintiff's expert Sanders's Opinion No. 5 "Damages Associated with WACHN, LLC" is denied.

### b. Opinion No. 6: WACHN Guarantee

In Defendants' *Daubert* motion [309] and motion *in limine* No. 11 [317, at 12], Defendants seek to bar Opinion No. 6 of Plaintiff's expert Sanders on the ground that he uses an unreliable methodology. Defendants contend that Sanders's Opinion No. 6 attributes Great Lakes Bank's refusal to remove Plaintiff as a personal guarantor of the WACHN $1.42 million loan balance to the actions of Defendant Hall. To reach his opinion, Sanders relies on (1) his review of two commercial guarantees signed by Plaintiff with Great Lakes Bank, (2) the bank statements

of Great Lakes Bank regarding the status of the loans as of January 2, 2014; and (3) his own "involvement with other medical practices." Defendants argue that Sanders premised his opinion on the fact that Plaintiff dissociated from WACHN but that Sanders was in fact unsure if Plaintiff had actually dissociated.

Defendants' motion to bar Sanders's Opinion No. 6 is denied. The Court agrees with Plaintiff that Defendants misapprehend Sanders's opinion. Sanders did not opine that Defendant Hall "was to blame for Plaintiff not being removed from his personal WACHN guarantees." [317, at 12.] Rather, Sanders stated his opinion that (1) "a dissociated physician who is no longer entitled to the income or ownership of a medical building partnership should be released from all liabilities associated with the investments," (2) that "WACHN should have procured a release of Plaintiff's personal guaranty of the WACHN loan," and (3) "the damage to [Plaintiff] is the full extent of the available credit on the loan." Additionally, Defendants have not shown that Sanders's reliance on his review of commercial guarantees and bank statements of Great Lakes Bank amounts to improper methodology. See Fed. R. Evid 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); *Artunduaga v. Univ. of Chicago Med. Ctr.*, 2016 WL 7384432, at *5 (N.D. Ill. Dec. 21, 2016) ("[I]t is proper for counsel to furnish factual assumptions to experts as long as the factual assumptions are supported by the record."). Finally, Defendants' argument for excluding Sanders' testimony on the guarantee because he was unsure if Plaintiff had actually dissociated from WACHN fails, as this goes to weight and not admissibility.

### c. Opinion No. 3: Excess Overhead Charges

**\*6** In Defendants' motion No. 11, they challenge Sanders's opinion No. 3 that Plaintiff was wrongly charged $599,168 for excess overhead, as compared to industry norms. Defendants argue that Sanders' reliance on Medical Group Management Association ("MGMA") statistics for this opinion was problematic for three reasons: (1) Sanders compared the average expenses for orthopedic surgeons in the MGMA Physicians Compensation and Production Survey for Single Specialty Practices 2008 Report to the actual expenses of Keystone from 2004 to 2007, yet Plaintiff was not an orthopedic

Angeropoulos v. Keystone Orthopedic Specialists, S.C., Slip Copy (2017)
119 A.F.T.R.2d 2017-1882

surgeon, and pain management specialists like Plaintiff generate less revenue than orthopedic surgeons; (2) the MGMA data Sanders used was the national mean for all single-specialty orthopedic surgery practice, and the national mean will be different from an orthopedic surgery practice in Illinois; (3) the MGMA recommends using caution in interpreting its data because the data may not be representative of all providers in medical practices. Additionally, Defendants take issue with the fact that Sanders conceded that a deviation from an industry norm is not *per se* evidence of wrongdoing or problems with the accounting systems.

Defendants' motion to bar Sanders's Opinion No. 3 is denied. Defendants have not shown that Sanders's method in calculating Plaintiff's excess overhead charges was unreliable. Rather, Defendants merely challenge the accuracy of the statistics on which Sanders relied. Experts "may rely properly on a wide variety of sources," *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000), and may rely on "experimental, statistical, or other scientific data generated by others in the field," *Abbott Labs. v. Sandoz, Inc.*, 743 F. Supp. 2d 762, 793–94 (N.D. Ill. 2010). As the Seventh Circuit has stressed, the focus of a *Daubert* inquiry is "not the ultimate correctness of the expert's conclusions," but rather "the soundness and care with which the expert arrived at her opinion[.]" *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original). To the extent that Defendants disagree with the statistics used by Sanders and the outcome of his calculation, these arguments go to the weight of Sanders's testimony, and not admissibility. Thus, Defendants are free to explore these issues on cross-examination at trial. See *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

## 2. Plaintiff's Challenge to Certain Testimony of Michael Pakter [314]

Plaintiff seeks to preclude the testimony of Defendants' expert, Michael Pakter. To begin with, Plaintiff argues that much of Pakter's testimony will not provide specialized knowledge that would assist the jury in understanding the facts at issue, but rather would simply repeat the factual contentions of Defendant Hall and

his associates. According to Plaintiff, Pakter's testimony purports to resolve issues of credibility of competing witness testimony, which invades the province of the jury and does not involve any expertise. In addition, Plaintiff contends that some of Pakter's testimony purports to advance legal opinions that would impinge upon the Court's role as the sole source of the relevant law in this case.

The Court agrees with Plaintiff that many of Pakter's proffered opinions merely parrot what Defendants have told him about disputed facts or offer opinions that state legal conclusions. As explained above, an opinion witness cannot simply vouch for the testimony of a fact witness. Nor can an opinion witness interview various fact witnesses, sift through their statements, and then purport to tell the jury what those witnesses meant, understood, believed, or agreed to. And the Seventh Circuit has explained that in considering whether an expert witness's testimony will improperly invade the judge's role as the sole source of the relevant law at a trial, courts and parties must recognize the difference between "stating a legal conclusion" (which is not permitted) and "providing concrete information against which to measure abstract legal concepts" (which is permitted). *United States v. Blunt*, 502 F.3d 674, 680 (7th Cir. 2007); *Bone Care Intern., LLC v. Pentech Pharma., Inc.*, 2010 WL 3928598, at *14 (N.D. Ill. Oct. 1, 2010). As set out below in detail, in numerous instances the opinions expressed in Pakter's report, if repeated in court, would infringe upon the role of the jury, the Court, or both.

**\*7** However, some of the challenged portions of Pakter's report properly provide the factual assumptions on which Pakter relies for his expert opinions and thus provide context for presenting those opinions for the jury's consideration. The Court sets out below its rulings on the specific challenges:

• Plaintiff's objection No. 1 (page 16) is overruled. [5] Plaintiff takes issue with part of Pakter's rebuttal of Sanders Opinion No. 1 in which Pakter states: "The revenues and expenses of the MDSC were purposely and deliberately disclosed to [Plaintiff] and other physicians when they were included in the Bucket Reports. * * * Based on my Interviews, [Plaintiff] and other physicians routinely reviewed the Bucket Reports and requested adjustments, which they were then made with revised Bucket Reports

provided." However, this statement provides part of the factual assumptions on which Pakter relied for his conclusion that followed: "Consequently, when presented quarterly to Hall, [Plaintiff] and others [the Bucket Reports] disclosed reliably, openly and completely all the revenues and expenses of the 'consolidated entity' for that financial quarter." These statements provide context for Pakter's explanation of his opinion that "Sanders elected to call certain deliberate and necessary differences between QuickBooks and the Bucket Reports errors when they were purposefully only reconciling items." [314 Exhibit A (Pakter's Expert Report), at 13.]

• Plaintiff's objection No. 2 (page 17) is overruled. Plaintiff challenges Pakter's statement that "Hall represented to me that [Plaintiff] was provided with all of the information and/or documentation he requested." However, this statement supports Pakter's opinion that "Sanders failed to acknowledge that [Plaintiff] and others were provided access to the accounting system and proper summaries thereof," [314 Exhibit A, at 13]. Further, it was in response to Sanders's opinion that "[t]here was also a lack of transparency in the accounting in that the other physicians were not provided backup for the items in the Bucket Report and did not have access to this information as the majority of Keystone's financial records and invoices were maintained at [Defendant Hall's] personal residence rather than at the Keystone's offices." [301-1 (Sanders's Expert Report), at 16.] As noted above, the experts in this case may only testify as to the facts on which they relied in formulating their opinions; they may not vouch for the accuracy of those facts. Presumably, each side will call fact witnesses (including Defendant Hall), who will testify to (and be cross-examined on) these underlying facts.

• Plaintiff's objection No. 3 (page 18) is sustained. These statements do no more than parrot facts that Defendants provided to Pakter. Additionally, Pakter's conclusion that "there are no assertions that [Plaintiff] was not credited with his revenues and billings" is improper, as that is an issue for the jury to decide at trial based on the testimony of the fact witnesses.

• Plaintiff's objection No. 4 (page 20) is sustained. These statements simply parrot what Pakter was told in interviews and do not apply any expertise. See *Benson*, 941 F.2d at 604–05 (concluding that the district court abused its discretion in admitting testimony of expert who "did not give helpful expert testimony that cast another witness's testimony in good or bad light [and] instead [ ] simply told the jury whom to believe").

**\*8** • Plaintiff's objection No. 5 (page 20) is overruled, provided that the basis of Pakter's opinion is his analysis of accounting records and does not simply repeat what others may have told him about the Bucket Reports.

• Plaintiff's objection No. 6 (page 21) is sustained. Pakter cannot give an expert opinion that Plaintiff was an employee of Defendant Keystone, as that is a legal conclusion about a contested fact for the jury to decide at trial. Plaintiff contends that he was a shareholder or partner of Keystone, whereas Defendants contend that he was an employee. However, Pakter may opine on the extent to which Plaintiff's compensation was calculated in a manner consistent with how other employees and/or partners were compensated at Keystone. Pakter also may critique Sanders's understanding of the economic structure at Keystone.

• Plaintiff's objection No. 7 (page 23) is sustained in part. Pakter cannot opine that the "the employment compensation formula" was "agreed" as that is a disputed fact issue for trial. However, Pakter can give a variation of his proposed opinion: he can testify that based on his review of the Bucket Reports and other information and documentation in discovery, the compensation formula to which Defendants' fact witnesses testified was consistently followed and that the Bucket Reports were accurately designed and implemented to specifically follow that employment compensation formula.

• Plaintiff's objections Nos. 8 and 9 (page 27) are sustained, as Pakter merely restates contested facts. To the extent that Pakter offers his opinion on these contested facts to contradict the factual assumptions underlying Sanders's opinion, the Court notes that challenges to the factual basis of Sanders's opinion are better suited for cross-examination. See *Bonner v.*

*ISP Technologies, Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (explaining that it is up to the opposing party to examine the factual basis of an expert opinion in cross-examination).

• Plaintiff's objection No. 10 (page 28) is sustained, as whether Plaintiff agreed to Defendant Hall's "management" or "franchise" fee is an issue to be resolved at trial based on fact witness testimony, and Pakter did not draw on any expertise to offer his opinion that based on his interviews, Plaintiff agreed with this fee arrangement.

• Plaintiff's objection No. 11 (page 30) is sustained. Pakter offered these statements as proposed reasons for why Sanders was incorrect that Plaintiff was wrongly charged for Roalsen's payroll and travel expenses. However, Pakter offered no expertise in stating what Plaintiff purportedly agreed to regarding an arrangement to pay Roalsen or in repeating what interviewees told him about Roalsen's work.

• Plaintiff's objections Nos. 12 (page 32), 13 (page 33), and 14 (page 35) are sustained. Whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

• Plaintiff's objection No. 15 (page 35) is sustained. Whether there was an agreement to increase Plaintiff's percentage of Keystone's expenses is a disputed fact for trial.

• Plaintiff's objection No. 16 (page 36) is sustained. Pakter did not draw on any expertise to offer his opinion that Plaintiff as covered by two medical malpractice policies at his own specific request.

**\*9** • Plaintiff's objections Nos. 17 (page 38), 18 (page 40), 19 (page 42), 20 (page 43), 21 (page 44), 22 (page 45), 23 (page 46), and 24 (page 47) are sustained, as whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

• Plaintiff's objection No. 25 (page 28) is sustained, as whether Plaintiff was an employee or partner of Defendant Keystone is a contested issue for trial. However, to the extent that Pakter can apply specialized knowledge to explain to the jury ways in which the accounting records that he examined suggest that Plaintiff was treated as (or compensated

as) an employee and not a partner, he may offer those opinions.

• Plaintiff's objection No. 26 (page 50) is sustained, as whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

• Plaintiff's objection No. 27 (page 54) is sustained, as whether Plaintiff contributed the $100,000 relating to cash reserves is a disputed issue for trial.

• Plaintiff's objections Nos. 28 (page 55) and 29 (page 55) are sustained, as whether Plaintiff agreed to certain arrangements is a disputed fact for trial.

• Plaintiff's objections Nos. 30 (page 60) and 31 (page 63) are sustained, as Pakter offered no specialized knowledge or expertise to form these opinions and merely parroted what he was told by Defendants in interviews. See *Stachniak v. Hayes*, 989 F.2d 914, 925 (7th Cir. 1993) ("We have stated that "[c]redibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury.") (citation and internal quotation marks omitted).

• Plaintiff's objection No. 32 (page 70) is sustained, as whether Plaintiff signed the Operating Agreement dated January 1, 2005 is a disputed fact for trial and Pakter is not being offered as a handwriting expert.

• Plaintiff's objection No. 33 (page 78) is sustained, as Pakter offered no specialized knowledge or expertise to form this opinion and merely parroted what he was told by Defendants in interviews.

5      The Court is referring to the numbered objections attached as Exhibit 1 to this opinion.

Plaintiff also argues that Pakter improperly seeks to offer legal opinions by stating that Defendant Hall is completely innocent of any fraudulent conduct, that there is no evidence of fraud, and that Defendants made a "good faith effort" to account for the amounts that Plaintiff allegedly failed to pay Defendant Keystone when he disassociated. As noted above, the Seventh Circuit has stressed that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

Further, expert testimony that an individual did or did not act fraudulently is inadmissible, as the fact finder, not the expert, must determine whether Plaintiff has offered sufficient evidence to show that Defendants acted fraudulently. See *Apotex Corp. v. Merck & Co.*, 2006 WL 1155954, at *8 (N.D. Ill. Apr. 25, 2006), aff'd, 507 F.3d 1357 (Fed. Cir. 2007) (holding expert testimony inadmissible under Rule 702 where expert report stated that "[i]t is my opinion based on the evidence that [defendant's conduct was] a fraud on the courts"); *Ass'n Ben. Servs., Inc. v. AdvancePCS Holding Corp.*, 2005 WL 2335484, at *4 (N.D. Ill. Sept. 23, 2005) (holding that expert's testimony that defendant committed fraud "extends beyond the permissible scope of expert testimony"). Again, the key distinction is between "stating a legal conclusion" (which is not permitted) and "providing concrete information against which to measure abstract legal concepts" (which is permitted). *Blount*, 502 F.3d at 680.

**\*10** More specifically, Plaintiff challenges Pakter's statement that "I can and have concluded that there is no proof or support for the assertion that [Plaintiff] was defrauded. Sanders has not shown—nor could he show—any evidence of fraud." [314 Exhibit A (Pakter's Expert Report), at 18.] Defendants argue that Pakter made this statement in response to Sanders's opinion that "The accounting system set up across [Defendant] Hall's various companies was not consistent with Generally Accepted Accounting Principles, was unreliable, and lacked appropriate transparency." Defendants also argue that this opinion is proper since Pakter is a Certified Fraud Examiner. Plaintiff also challenges Pakter's statement that: "As part of my review and analyze [sic] of these issues, I analyzed the above-listed financial elements of the 1099-MISC and concluded there was a good faith effort to account for the amounts that [Plaintiff] failed to pay [Defendant] Keystone when he disassociated from [Defendant] Keystone." [*Id.* at 83.] Defendants argue that this statement is in response to Sanders's statement that in his opinion, "the 1099-MISC was improperly issued."

The Court agrees with Plaintiff that, with one minor exception discussed below relating to Pakter's criticism of Sanders's work, these statements improperly offer legal conclusions as to whether or not Defendants committed fraud and whether Defendants acted in good faith. See *Richman v. Sheahan*, 415 F. Supp. 2d 929, 950 (N.D. Ill. 2006) (holding that expert was not permitted to testify that

defendants "were carrying out there [sic] lawful duties" because "[t]hat conclusion does not put the facts in context or assist the jury in understanding the facts at issue"); *Klaczak v. Consol. Med. Transp. Inc.*, 2005 WL 1564981, at *8 (N.D. Ill. May 26, 2005) (holding that expert could not testify that defendants committed fraud and stating that "proffered expert assertions about another's subjective intent or knowledge are not helpful to the jury"); *Dahlin v. Evangelical Child & Family Agency*, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002) (holding that expert could not testify that defendant's actions constituted fraud and explaining that "[t]his is a quintessential jury determination on which the Court will instruct a jury concerning the factors it is to consider"). Here is the exception: to the extent that Pakter wishes to respond to Sanders's statements, he can testify that Sanders's opinions are unsupported or testify that "there is sufficient accounting support for the inclusion of the underlying components of the $159,577.45 contained in the 1099-MISC," without using legal terms such as "fraud" and "good faith." Plaintiff also challenges Pakter's statement that "[t]here is nothing in the record in this litigation that contradicts that [sic] the overall reliability of the Bucket Reports." However, this is not a legal conclusion and Plaintiff certainly is welcome to try to establish the opposite proposition at trial.

In sum, Pakter is permitted to testify about disputed facts in order to provide the factual assumptions on which he relies for his expert opinions and thus provide helpful context for presenting his opinions to the jury. Pakter must then apply his expertise to these disputed facts in a way that is helpful to the jury. However, he is not permitted to simply recapitulate what Defendants have told him about disputed facts or endorse the testimony of a fact witness, as "the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." *Benson*, 941 F.2d at 604. Nor is Pakter permitted to opine on whether or not there is evidence of fraud or offer any other opinions that state legal conclusions. See *id.* (explaining that an expert's opinion must be "an opinion informed by the witness' expertise[ ] rather than simply an opinion broached by a purported expert").

Finally, Plaintiff objects to Pakter's opinion that Sanders's testimony would "not help the trier of fact to determine the facts at issue," is "not based on sufficient facts or data," is "not the product of reliable principles and

methods," and that Sanders "has not reliably applied the principles and methods to the facts of the case." Plaintiff contends, without citing any relevant authority, that this testimony usurps the Court's role as the gatekeeper of expert opinions. Defendants agree that Pakter will not testify in front of the jury that Sanders's opinions "will not help the trier of fact to determine the facts at issue." The Court agrees with Plaintiff that arguing the legal standard under *Daubert* to the jury would be improper; indeed, the Court already has rejected that argument in overruling Defendants' motion to exclude portions of Sanders's testimony. Nevertheless, Pakter remains free to criticize Sanders's methodology, factual assumptions, and conclusions.

### III. Motions *in Limine*

#### A. Legal Standard

**\*11** A motion *in limine* is a motion made "at the outset" or "preliminarily." BLACK'S LAW DICTIONARY 803 (10th ed. 2014). Motions *in limine* may be used to eliminate evidence "that clearly ought not be presented to the jury because [it] clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997). The party seeking to exclude evidence "has the burden of establishing the evidence is not admissible for any purpose." *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009). The power to rule on motions *in limine* inheres in the Court's role in managing trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Because motions *in limine* are filed before the Court has seen or heard the evidence or observed the trial unfold, rulings *in limine* may be subject to alteration or reconsideration during the course of trial. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989).

#### B. Defendant Hall's Alleged Prior Bad Acts (Plaintiff's Motion No. 2 and Defendants' Motions 2, 3, 8, 9, and 10)

##### 1. Cloud 1099-MISC and Roalsen K-1

The Court will first address Plaintiff's motion *in limine* No. 2 and Defendants' motions *in limine* Nos. 2, 3, 8, 9, and 10, which deal with related issues. Plaintiff moves to allow Rule 404(b) evidence of Defendant Hall's prior bad acts in retaliating against former business associates. In the current action, Plaintiff alleges that Defendants

filed a fraudulent 1099-MISC with the IRS and falsely claimed that Plaintiff owed Defendants money, when, according to Plaintiff, Defendants actually owed Plaintiff money. Plaintiff claims that these allegations are relevant to Count I (fraudulently filing an information return in violation of 26 U.S.C. § 7432) and Count II (common law fraud), which both require proof of intent. Plaintiff intends to offer evidence that Defendant Hall subjected other former business associates to "strikingly similar fraudulent filings in retaliation for their defections from Keystone right around the same time." [326, at 2.] This evidence includes an allegedly false 1099-MISC issued to former Keystone employee George Cloud and Cloud's trial testimony concerning the incident, and an allegedly false Schedule K-1 issued to Defendant Hall's brother-in-law Merritt Roalsen and Roalsen's deposition testimony concerning the incident. On the other side of the coin, Defendants' motion No. 2 seeks to exclude the 1099-MISC issued by Keystone to Cloud (Plaintiff's Exhibit No. 14), and Defendants' motion No. 3 seeks to exclude a text message from Roalsen to Plaintiff about the Schedule K-1 issued by Defendant Hall (Plaintiff's Exhibit No. 22).

Rule 404(b) prohibits the introduction of evidence of other crimes or bad acts when such evidence is offered to prove the character of a person in order to show "conduct in conformity therewith." *United States v. Robinson*, 161 F.3d 463, 466 (7th Cir. 1998); Fed. R. Evid. 404(b). That is, evidence of prior bad acts is not admissible for an impermissible propensity inference. However, Rule 404(b) expressly permits evidence of prior bad acts to be introduced for purposes other than to establish a propensity for wrongdoing, including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, *or modus operandi.* Fed. R. Evid. 404(b); *Robinson*, 161 F.3d at 466. Both parties rely on a four-part test formerly used by the Seventh Circuit to determine the appropriateness of admitting evidence of prior bad acts. However, the Seventh Circuit explicitly abandoned this four-part test in *United States v. Gomez*, in favor of a more straightforward rules-based approach. [6] 763 F.3d 845, 853 (7th Cir. 2014) ("This change is less of a substantive modification than a shift in paradigm that we hope will produce clarity and better practice in applying the relevant rules of evidence.").

[6]     Under the old four-prong test, the admissibility of evidence of prior bad acts was dependent

upon whether: (1) the evidence is direct towards establishing a matter in issue other than the defendant's propensity to commit the act accused of; (2) the evidence the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice. *Robinson*, 161 F.3d at 467. The fourth prong of this test incorporated Rule 403. *Id.*

**\*12** Under *Gomez*, the proponent of the evidence must first show "that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way." 763 F.3d at 860 (citing Fed. R. Evid. 401, 402, 404(b)). Although other-act evidence need not be excluded whenever a propensity inference can be drawn, its relevance to a permitted purpose "must be established through a chain of reasoning that does not rely on the forbidden [propensity] inference." *Id.* Thus, courts must ask not just "*whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose." *United States v. Anzaldi*, 800 F.3d 872, 882 (7th Cir. 2015) (citing *Gomez*, 763 F.3d at 856). The district court must assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice. *Gomez*, 763 F.3d at 860. The court's Rule 403 balancing should take into account the extent to which the non-propensity fact for which the other-act evidence is offered is actually contested in the case. *Id.*

Plaintiff argues that he offers the evidence involving the 1099-MISC issued to Cloud and the K-1 issued to Roalsen to show identity, *modus operandi*, intent, and absence of mistake. First, Plaintiff argues that Defendant Hall put his identity at issue by taking the position that if anyone filed the false 1099-MISC, it was not him personally. Plaintiff relies on Defendants' Proposed Final Jury Instruction No. 4, which states, in relevant part: "[Defendant Hall] denies that he filed any Form 1099-MISC regarding [Plaintiff]." However, in their response brief, Defendants take the position that identity is *not* in dispute here.[7] [331, at 3.] To the extent that identity is not in dispute, Plaintiff's argument that the evidence is relevant to show identity fails. Additionally, if identity is in dispute, Plaintiff's argument that the evidence is relevant to show *modus operandi* also fails, as *modus operandi* evidence is generally admissible only to prove the identity of the

defendants. See *Robinson*, 161 F.3d at 467 ("[evidence of *modus operandi*] may be properly admitted pursuant to Rule 404(b) to prove identity"); *Goldberg v. 401 North Wabash Venture LLC*, 2013 2013 WL 1499043, at \*6 (N.D. Ill. Apr. 11, 2013) (holding that evidence was not admissible to establish *modus operandi* and explaining that *modus operandi* evidence "is generally only admissible to prove the identity of the defendants, which here is not in dispute").

7     The Court will further explore this issue with counsel at the final pre-trial conference on May 18 to ensure a consistency of approach in regard to any issues relating to identity and the related issue of who was responsible for the filing of 1099-MISC forms on behalf of the corporate Defendants in this case.

Further, based on the current record, the Court is not convinced that the acts in question are similar enough to the case at bar for a *modus operandi* rationale to apply. Evidence of *modus operandi* shows a defendant's "distinctive method of operation." *Robinson*, 161 F.3d at 467. The Seventh Circuit has cautioned that "[i]f defined broadly enough, modus operandi evidence can easily become nothing more than the character evidence that Rule 404(b) prohibits." *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996). Thus, the similarities between the crimes must be "sufficiently idiosyncratic to permit an inference of pattern for purposes of truth." *Robinson*, 161 F.3d at 468 (citation and internal quotation marks omitted). Generic patterns are insufficient for purposes of *modus operandi* because allowing such evidence "would gut the Rule, rending it useless as a check on character evidence that would otherwise be inadmissible." *United States v. Thomas*, 321 F.3d 627, 635 (7th Cir. 2003).

Here, Defendants issued a 1099-MISC that reported payment of $159,577.45 to Plaintiff. Defendants contend that the payment reported in the 1099-MISC included $100,000 that Plaintiff owed to cash reserves and $28,000 that Plaintiff owed for his share of the WACHN down payment. Plaintiff disputed that he owed these amounts and contended that he had already made all required contributions. The parties also dispute whether $38,010.45 included in the 1099-MISC was a bonus that Defendants chose to give Plaintiff or earned income. [See 303 (Summary Judgment Opinion), at 7.] In contrast, the 1099-MISC issued to Cloud was, according to Defendants, in relation to a 2001 Dodge Ram Van that Defendants Keystone and Hall gave to Cloud, who was

at the time a Keystone staff employee. Other than the fact that a 1099-MISC was used in both scenarios, the scenarios appear to be quite different from one another based on the record before the Court. The other Rule 404(b) issue involves an allegedly fake K-1 issued to Roalsen by MedStaff, a company that is not party to this lawsuit and in which Defendants allege that Defendant Hall owns no interest. Plaintiff does not provide enough detail from which the Court can conclude that these past acts are similar enough to the case at hand (or sufficiently idiosyncratic) that they "permit an inference of pattern for purposes of truth." *Robinson*, 161 F.3d at 468.

**\*13** Plaintiff also proposes to offer the evidence involving the 1099-MISC issued to Cloud and the K-1 issued to Roalsen to show intent and absence of mistake. Plaintiff contends that Defendants are taking the position that if the filing was false, it was not intentional, and thus Plaintiff should be able to rebut this defense with evidence of Defendant Hall's prior bad acts involving information returns. However, Plaintiff does not satisfactorily explain why Defendant Hall's prior bad acts relating to the allegedly false information returns to Cloud and Roalsen are relevant to proving Defendant Hall's intent and lack of mistake as to Plaintiff's 1099-MISC. To differentiate between the "illegitimate use of a prior [bad act] to show propensity and the proper use of a prior [bad act] to prove intent, the [proponent of the evidence] must affirmatively show why a particular prior [bad act] tends to show the more forward-looking fact of purpose, design, or volition to commit the new crime." *Miller*, 673 F.3d at 699 (citation and internal quotation marks omitted). Here, Plaintiff has not shown a link between Defendant Hall's alleged involvement in issuing false information returns in the past and his state of mind was when issuing Plaintiff's 1099-MISC. Cf. *Anzaldi*, 800 F.3d at 881–82 (in tax fraud prosecution, evidence of defendant's attempt to structure her fees in a way she believed would circumvent government attention was admissible for propensity-free chain of reasoning: evidence tended to prove intent to defraud and helped negate defendant's asserted good faith defense because she would not have attempted to hide her fee activity from the government if she truly believed her tax positions were legitimate);*United States v. Urena*, 844 F.3d 681, 684 (7th Cir. 2016) (evidence of defendant's seven prior removals from U.S. was admissible in prosecution for being alien found in U.S. after deportation for non-propensity purpose: evidence

was probative of defendant's knowledge that he could not lawfully reenter U.S. without permission).

The evidence involving the Cloud 1099-MISC and the Roalsen K-1 also presents a Rule 403 issue. There is a high risk of confusing of the issues and wasting time, which may outweigh the probative value of such evidence. The Court will not permit a lengthy sideshow on these issues or "time consuming mini-trials regarding the merits of these other allegations." *Patterson v. City of Chicago*, 2017 WL 770991, at \*4 (N.D. Ill. Feb. 28, 2017); see also Fed. R. Evid. 403, 611. The jury is not being asked to decide the propriety of Defendant Hall's issuance of the 1099-MISC for Cloud's car or MedStaff's issuance of the K-1 to Roalsen, as these events are not at issue in this trial. Further, the evidence Plaintiff offers has a high risk of undue prejudice, as it may invite the jury to infer that Defendant Hall is the type of person who commits fraud against his business partners and employees using tax forms, and thus Defendant Hall is more likely to have subjected Plaintiff to fraud in the case at hand. See *United States v. Stacy*, 769 F.3d 969, 974 (7th Cir. 2014) (in prosecution for conspiracy to manufacture methamphetamine, district court erred in admitting evidence of defendant's prior possession of methamphetamine and pseudoephedrine pills because government's argument that evidence was probative of defendant's intent to use pseudoephedrine to make methamphetamine and his knowledge of the process for making methamphetamine relied on a forbidden propensity inference: that defendant's history of involvement with methamphetamine manufacturing makes it more likely that he intended to use the pseudoephedrine pills to make methamphetamine); *Gomez*, 763 F.3d at 863 (district court erred in admitting evidence that a small user quantity of cocaine of a different purity of that in the conspiracy was found in defendant's bedroom after conspiracy ended, as government's theory —that because defendant possessed a small quantity of cocaine at the time of his arrest, he must have been involved in the cocaine-distribution conspiracy—rested on pure propensity); *Miller*, 673 F.3d at 698 ("[I]ntent is the exception most likely to blend with improper propensity uses.").

Thus, the Court provisionally excludes any evidence pertaining to the 1099-MISC issued to Cloud and the K-1 issued to Roalsen. If Defendants put identity at issue, then Plaintiff may present to the Court (outside the presence

of the jury) an offer of proof with additional details as to how the proposed evidence is relevant to showing identity and *modus operandi*. See *United States v. Miller, 673 F.3d 688, 696 (7th Cir. 2012)* ("The district court wisely waited until after opening statements and cross-examination of a key witness to learn the defense theory before deciding whether to admit the details under Rule 404(b)."). If the Court does decide to admit this evidence at trial, the Court will consult with counsel about whether and when to give a limiting instruction to minimize the prejudicial effect. The Seventh Circuit has noted that appropriate jury instructions may help to reduce the risk of unfair prejudice inherent in other-act evidence, but has also cautioned against "judicial freelancing in this area," as a defendant may prefer to go without a limiting instruction to avoid highlighting the evidence. See *Gomez, 763 F.3d at 860*. Finally, the Court notes that even if this evidence does not come in as substance evidence under Rule 404(b), Plaintiff may be permitted to cross-examine Defendant Hall about the allegedly false tax returns he issued to Cloud and Roalsen under Rule 608(b) because these specific instances of conduct goes to Defendant Hall's character for truthfulness. The Court reserves ruling on this issue as well. However, to the extent that the Court may allow such cross-examination, Plaintiff would not be allowed to introduce extrinsic evidence. See Fed. R. Evid. 608(b).

### 2. Tom Boecker

**\*14** Turning to Defendants' related motions *in limine*, Defendants' motion No. 8 seeking to bar reference to documents subpoenaed from Tom Boecker is granted, as Plaintiff asserts that he does not intend to offer Plaintiff's Exhibit 27, which consists of the documents subpoenaed from Boecker. Boecker was a part owner of Midwest Diagnostics, a company in which Defendant Hall had an interest, and he worked with Defendant Hall during the same period that Plaintiff was with Keystone. Plaintiff asserts that he intends to call Boecker to testify that when he left Midwest Diagnostics to start his own company, Defendant Hall told him that he owed him money which he did not actually owe, and that according to Boecker, this was Defendant Hall's *modus operandi* with many former business associates.

The Court concludes that Plaintiff has not demonstrated how Boecker's testimony would be relevant for a specific

purpose other than propensity. Boecker's testimony is not relevant to *modus operandi* because identity is not at issue (Defendant Hall is not asserting as a defense that someone else told Plaintiff that Plaintiff owed him money), and *modus operandi* evidence is generally only admissible to prove the identity of the defendants. See *Robinson, 161 F.3d at 467; Goldberg, 2013 WL 1499043, at \*6*. Further, without additional detail, the general act of telling someone he owes money that he does not actually owe is not "sufficiently idiosyncratic to permit an inference of pattern for purposes of truth." *Robinson, 161 F.3d at 468* (citation and internal quotation marks omitted); *Miller*, 637 F.3d at 699 (explaining that prior conviction "cannot be admissible merely because it was for the same crime" and that "[p]attern evidence *is* propensity evidence, and it is inadmissible unless the pattern shows some meaningful specificity or other feature that suggest identity or some other fact at issue").

Plaintiff seems to be offering Boecker's testimony to suggest that Defendant Hall "made up phony debts" in the past and thus he is the type of person who makes up phony debts. This is an impermissible propensity inference, and thus Boecker's testimony is not admissible for this purpose. However, under Rule 608(a), Boecker may testify may testify as to opinion or reputation evidence about Defendant Hall's character for untruthfulness pursuant. Additionally, under Rule 608(b), Plaintiff may be permitted to cross-examine Defendant Hall about the alleged fraud against Boecker without introducing extrinsic evidence because the specific instance of conduct goes to Defendant Hall's character for truthfulness. This Rule 608(b) issue, too, is reserved at this time. [8]

[8]   Defendants' motion *in limine* No. 10 seeks generally to exclude prior bad acts evidence under Rule 404(b). Given the specific rulings made above, the Court denies Defendants' motion *in limine* No. 10 without prejudice to either side making a contemporaneous Rule 404(b) objection if any particularized disputes of that nature arise at trial.

### C. Plaintiff's Motions *in Limine*

### 1. Plaintiff's Motion No. 3 to Exclude Defendants' Exhibit No. 6 and Reference to a Prescription Written to Merritt Roalsen

Plaintiff seeks to exclude Defendants' Exhibit No. 6, which is a record of a pain medication prescription written in 2006 by Plaintiff to Merritt Roalsen, Defendant Hall's former brother-in-law and business manager. Defendants contend that Plaintiff testified at his deposition that Roalsen was not his patient and that he wrote him a prescription of Ultram as a courtesy. According to Defendants, the American Medical Association prohibits physicians from writing prescriptions for controlled-substances to non-patients, and thus they should be able to introduce the prescription at trial. Plaintiff argues that any reference to this prescription should be barred as irrelevant because there is no evidence that the prescription was not medically justified, and Defendants are improperly attempting to use the prescription as propensity evidence to show bad character.

*15 Plaintiff's motion is granted. Even assuming that Plaintiff's writing this prescription for a non-patient was improper under the standards of the American Medical Association, Rule 404(b) excludes evidence of prior bad acts if the purpose is to show a person's propensity to behave in a certain way. Fed. R. Evid. 404(b); Gomez, 763 F.3d at 855. Defendants have not shown that this evidence is relevant for any purpose other than for an impermissible propensity inference. Rule 403 provides an alternative basis for this ruling, as the probative value of any evidence about the Roalsen prescription would be minimal and the potential for prejudice to Plaintiff, as well as a distracting but unfruitful sideshow for the jury, would be significant. Fed. R. Evid. 403; 611. Additionally, although Rule 608(b) permits cross-examination on specific instances of conduct if the conduct is probative of the character for truthfulness or untruthfulness of the witness, Plaintiff's writing a prescription is not probative of his character for truthfulness or untruthfulness. See Fed. R. Evid. 608(b). Further, the prescription itself cannot be admitted, as extrinsic evidence is not admissible to prove specific instances of a witnesses' conduct in order to attack the witnesses' character for truthfulness. Id.; United States v. Holt, 486 F.3d 997, 1001 (7th Cir. 2007). Defendants' Exhibit No. 6 is excluded, and Defendants are not to reference Roalsen's prescription.

### 2. Plaintiff's Motion No. 4 to Exclude Defendants' Exhibit No. 8 and Preclude Mention of an Alleged Disciplinary Hearing

Plaintiff moves to exclude Defendants' Exhibit No. 8, which is a "Notice of a Disciplinary Hearing" and attached complaint issued by the State of Illinois Department of Professional Regulation to Plaintiff in 2004. Plaintiff also seeks to bar any reference to this alleged disciplinary hearing. Plaintiff contends that the complaint relates to his allegedly not having completed required "Continuing Medical Education," but that he simply had to provide evidence that he had in fact completed his continuing medical education and that there was never a hearing or a sanction. Defendants argue that Plaintiff has not offered evidence of a dismissal order and that Plaintiff became employed with Keystone in 2004, thus this notice of a disciplinary hearing is relevant.

Plaintiff's motion is granted. Defendants have not shown that this evidence is relevant for any purpose other than for an impermissible propensity inference. Moreover, the allegations regarding this alleged disciplinary hearing have little probative value, since there is no evidence that Plaintiff was ultimately subject to a disciplinary hearing or sanction, yet have high prejudicial value and risk creating an unnecessary sideshow. See Fed. R. Evid. 403, 611. Additionally, although Rule 608(b) permits cross-examination on specific instances of conduct if the conduct is probative of the character for truthfulness or untruthfulness of the witness, Plaintiff's receipt of this "Notice of a Disciplinary Hearing" is not probative of truthfulness or untruthfulness. See Fed. R. Evid. 608(b). Further, the notice itself cannot be admitted, as Rule 608(b) prohibits the use of extrinsic evidence to prove specific instances of a witnesses' conduct in order to attack the witnesses' character for truthfulness. Id.; Holt, 486 F.3d at 1001.

### 3. Plaintiff's Motion No. 5 to Exclude Defendants' Exhibit No. 42: WACHN's 2008 Amended Operating Agreement

Plaintiff seeks to bar Defendants' Exhibit No. 42, which purports to be WACHN's Amended Operating Agreement dated January 2008. Plaintiff alleges that by January 2008, he had left WACHN, along with Dr. Marc Chang and Dr. Daniel Weber, and thus the Amended Operating Agreement is signed only by Defendant Hall and one of the other WACHN doctors, Dr. Phillip Narcissi. Plaintiff contends that in January 2008, Defendants Hall and WACHN had

not paid him for his interest in WACHN, including his $111,000 cash contribution. According to Plaintiff, the Amended Operating Agreement provides that any member "vacating" the WACHN premises and "failing to monetarily contribute to the financial responsibility of WACHN * * * shall immediately forfeit any cash contribution and any share ownership set forth in this agreement. The redistribution of ownership shall be decided by remaining members." [326, at 9–10 (quoting Defendants' Exhibit 42, Article 9).] Plaintiff argues that the Amended Operating Agreement was intended to illegally divest Plaintiff of his interest but that without Plaintiff's written consent, the document is null and void according to the WACHN Operating Agreement's Section 13.10, which provides that "Amendments hereto shall require the written consent of the Members."

 **\*16** Plaintiff argues that the Amended Operating Agreement should be barred because it has no legal force and would mislead and confuse the jury. However, Plaintiff asserts that he should be able to inquire on cross-examination of Defendant Hall about his attempt to alter the agreement retroactively since it bears on Defendant Hall's credibility and on Plaintiff's claims that Defendant Hall retaliated against him for resigning from Keystone and withdrawing from WACHN. Defendants, for their part, argue that WACHN continued to operate after Plaintiff ceased being a member and that the corporate records of WACHN are relevant to its operations.

The Court concludes that the alleged Amended Operating Agreement is relevant to WACHN's operations and notes that the evidence can cut both ways. On one hand, Defendants may use the Amended Operating Agreement to argue that Plaintiff forfeited his cash contribution. On the other hand, Plaintiff may argue that Defendant Hall attempted to alter the agreement retroactively to deprive Plaintiff of his cash contribution. To the extent Plaintiff believes that the Operating Agreement was not validly amended and that it does not apply to Plaintiff, he is free to explore these issues at trial. Further, Plaintiff has not shown that the introduction at trial of the Amended Operating Agreement would be unduly prejudicial. Thus, Plaintiff's motion is denied.

### 4. Plaintiff's Motion No. 7 [339] to Exclude Defendants' Exhibit No. 32 and No. 33

Plaintiff moves to exclude Defendants' Exhibit Nos. 32 and 33, which are purportedly equipment leases for medical equipment leased by Keystone. Defendants offer these exhibits to support Defendant Hall's counterclaim that Plaintiff still owes him money for this equipment (including an OEC C-arm, C-arm radiocluent procedure table and a Smith and Nancy radio frequency ablator, which cost Defendant Keystone approximately $225,000, according to the counterclaim). Plaintiff contends that he requested production of these documents on July 3, 2013, by requesting all documents relating to the expenses that Defendant Hall claimed Plaintiff owed him, as well as all documents reflecting Keystone's purchase of medical equipment or other assets from 2001–2007. However, Defendants did not produce the documents until April 4, 2017, more than a year after fact discovery had closed.

Federal Rule of Civil Procedure 26(a) requires a party to disclose all documents that the party has in its possession, custody, or control and my use to support its claim. F.R.C.P. 26(a). A party cannot offer evidence that was not produced during discovery unless the failure to produce was harmless or substantially justified. Fed. R. Civ. P. 37(c)(1); *United States Sec. & Exch. Comm'n v. Berrettini*, 2015 WL 5159746, at \*1 (N.D. Ill. Sept. 1, 2015). The determination of "whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003) (citation and internal quotation marks omitted). The following factors guide the Court's discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

Here, Plaintiff has been prejudiced by Defendants' late disclosure of these documents because Plaintiff has not had an opportunity to explore this new evidence through depositions, interrogatories, or supplemental document requests. Plaintiff has not had an opportunity to inquire about whether these equipment expenses were paid, by whom they were paid, where and how the equipment was used, or what efforts Defendants made to sell, lease, or use the equipment. Further, Defendants cannot cure this prejudice without delaying trial, and Defendants have not made any argument that their failure to disclose these documents earlier was substantially justified.

**\*17** Defendants argue that the late disclosure is harmless because at Defendant Hall's deposition, Defendant Hall raised the topic of the equipment in response to a question about office expenses and Plaintiff's counsel asked Defendant Hall some questions about the equipment. According to Defendant, Plaintiff's counsel could have asked additional questions at that time but chose not to, thus demonstrating that Plaintiff had "minimal interest in the allegations regarding the equipment" in the counterclaim. These arguments are unavailing. As Plaintiff points out, Defendant Hall's deposition occurred eight days after the counterclaim was filed, which was the first time Defendants claimed that Plaintiff owed Defendant Keystone money for this equipment. And because Defendants had not produced any evidence supporting these allegations, Plaintiff's counsel did not ask Defendant Hall many questions about the equipment at his deposition. Plaintiff's strategy may have been different if Defendants had properly disclosed the documents. Thus, Plaintiff's motion is granted.

**D. Defendants' Motions *in Limine***

**1. Defendants' Motion No. 1 to Exclude Plaintiff's Exhibit No. 13: Centier Mortgage/Lien on the WACHN Property**

Defendants move to exclude Plaintiff's Exhibit No. 13, which is a mortgage between Centier Bank and WACHN. Defendants argue that this exhibit is irrelevant because the Center mortgage/lien was placed on the WACHN property in 2011, which is after Plaintiff allegedly disassociated with WACHN in 2007, and because a release of mortgage was entered into between Centier Bank and WACHN in 2016.

Plaintiff argues that this exhibit is relevant to the alleged scheme to defraud. According to Plaintiff, he was required in 2005 to make a $111,000 capital contribution and guarantee a $1 million loan to Great Lakes Bank in order for WACHN to purchase Keystone's office space in Hazel Crest, in exchange for 20% interest in WACHN. Plaintiff contends that when he left Keystone, Defendant Hall refused to purchase Plaintiff's interest in WACHN and prevented Great Lakes Bank from offering to release Plaintiff as a guarantor of the loan. Plaintiff further contends that in 2011, Defendant Hall pledged the WACHN building as collateral to Centier

Bank for one of Defendant Hall's other business ventures, further encumbering Plaintiff's interest in WACHN for Defendant Hall's benefit, without Plaintiff's consent. The Court concludes that Plaintiff has shown that Plaintiff's Exhibit No. 13 is relevant, and thus Defendants' motion is denied.

**2. Defendants' Motion No. 4 to Exclude Plaintiff's Exhibit No. 19: Surveillance Photos of Defendant Hall**

Defendants seek to exclude Plaintiff's Exhibit No. 19, which are surveillance photos dated February 11, 2014, of Defendant Hall in the parking lot and lobby of the medical practice where former Keystone physician, Dr. Chang, is employed. Defendants argue that the photos are irrelevant. Plaintiff argues that the photos corroborate Dr. Chang's deposition testimony that Defendant Hall came to Dr. Chang's office and threatened to sue Dr. Chang if he did not make Plaintiff drop his lawsuit against Defendant Hall. Dr. Chang testified in his deposition that Defendant Hall threatened to "drag [Dr. Chang] in" and "come after [him] for monies" that Defendant Hall claimed Dr. Chang owed him, if he did not convince Plaintiff to drop the lawsuit.

The Court reserves ruling at this time on Defendants' motion *in limine* No. 4. To be sure, the Seventh Circuit has explained, "evidence of a defendant's attempts at intimidation of a witness * * * is admissible to demonstrate a defendant's 'consciousness of guilt[.]'" *United States v. Balzano*, 916 F.2d 1273, 1281 (7th Cir. 1990). Nevertheless, provided that Defendant Hall does not deny going to Dr. Chang's offices on the date that the photographs were taken, the photos themselves would add little or nothing of probative value to Dr. Chang's testimony. If Plaintiff still wishes to admit the photographs during or at the close of Dr. Chang's direct testimony, Plaintiff may request a brief sidebar and the Court will address the issue at that time.

**3. Defendants' Motion No. 5 to Exclude Plaintiff's Exhibit No. 1: Defendant Hall's Personal Tax Returns**

**\*18** Defendants seek to exclude Plaintiff's Exhibit No. 1, which consists of Defendant Hall's and his wife's personal federal and state tax returns for years 2005–2007. Defendants argue that this exhibit is irrelevant.

Plaintiff argues that the returns contain relevant evidence that Defendant Hall owned, controlled, and profited from a network of companies that he used to funnel profits away from Keystone and into his own pocket. Plaintiff further contends that Defendant Hall's scheme to defraud involved running nearly all of his Keystone patient billing income through his S-corporation, Martin R. Hall, M.D.S.C. According to Plaintiff, Defendant Hall kept this income a secret from Plaintiff and the other Keystone partners, and the tax returns show that nearly all of Defendant Hall's income came through Martin R. Hall, M.D.S.C. Plaintiff also argues that the tax returns show that Defendant Hall received tax benefits relating to a house owned by his wife in Homewood, Illinois, which was used to store Keystone records and for the Halls for personal business, and that these tax benefits are part of the alleged scheme to defraud. The Court concludes that Plaintiff has shown that Plaintiff's Exhibit No. 1 is relevant, and thus Defendants' motion is denied. [9]

[9]    Plaintiff also argues that the tax returns are admissible as evidence of Defendant Hall's net worth, which is relevant to the computation of punitive damages. Whether or not tax records from more than a decade ago would be admissible on that basis alone is not clear to the Court without a better appreciation for the totality of Defendant Hall's financial records, which will be explored at trial.

### 4. Defendants' Motion No. 6 to Exclude Plaintiff's Exhibit No. 15: Jenner & Block Invoices

Defendants move to exclude Plaintiff's Exhibit No. 15, which consists of bills from Plaintiff's accountant, Vranas & Vlahos Accountants, and his former attorneys at Jenner & Block. Plaintiff asserts that he does not seek to introduce evidence of attorney's fees to the jury and only seeks to present this issue to the Court after trial, if the jury finds that Defendants are liable under Count I (fraudulently filing an information return in violation of 26 U.S.C. § 7432). Given that attorneys' fees will be a matter for the Court to address in the event that the jury returns a verdict for the Plaintiff and the Court cannot envision any scenario in which it would be proper for either side to raise the subject of attorneys' fees in the presence of the jury, Defendants' motion is granted.

### 5. Defendants' Motion No. 7 to Exclude Plaintiff's Exhibit No. 28: Defendant Hall's Affiliation with Hind General Hospital, LLC

Defendants move to exclude Plaintiff's Exhibit No. 28, which consists of documents showing Defendant Hall's income from Hind Hospital. Defendants argue that these documents are irrelevant. Plaintiff argues that the documents show income that Defendant Hall hid from his partners at Keystone and are relevant to Plaintiff's claim that Defendant Hall breached his fiduciary duty to his partners in charging them an inflated management fee of $140,000. Plaintiff contends that with Defendant Hall's "duties at Hind, his busy private practice, and the demands of his other businesses, [Defendant Hall] could not possibly have earned the excessive management fee. The Court concludes that Plaintiff has shown that the documents are relevant to Plaintiff's claims and Defendants have not shown that the documents are unduly prejudicial. Thus, Defendants' motion is denied.

### IV. Conclusion

**\*19** For the reasons set forth above, Plaintiff's *Daubert* motion (Plaintiff's motion *in limine* No. 1) to bar expert testimony by Michael Pakter [314] is granted in part and denied in part. Defendants' *Daubert* motion to bar certain expert testimony by Jay Sanders [309] is denied. Plaintiff's motions *in limine* [326] are granted in part and denied in part: the Court grants Plaintiff's motions Nos. 3 and 4; the Court denies Plaintiff's motion No. 5; and the Court provisionally denies Plaintiff's motion No. 2. Plaintiff's motion *in limine* No. 7 [339] is granted. Defendants' motions *in limine* [317] are granted in part and denied in part: the Court grants Defendants' motions Nos. 6 and 8; the Court denies Defendants' motions Nos. 1, 5, 7, 10, and 11; the Court reserves its ruling on Defendants' motion No. 4, and the Court provisionally grants Defendants' motions Nos. 2 and 3. [10] Defendants' motion [352] is granted, and the Court will consider the proposed voir dire questions and jury instructions that the parties submitted to the Court on May 12, 2017. The Court will issue a ruling on Plaintiff's motion *in limine* No. 6 [326, at 10] and Defendants' motion *in limine* No. 12 [350] in a separate order. A final pretrial conference is set for May 18, 2017 at 10:00 a.m. This case remains set for a jury trial to commence on May 23, 2017.

10   The Court previously granted in part and denied in part Defendants' motion *in limine* No. 9 and denied as moot witness Dr. Michael Hartman's motion to quash subpoena [360.] [364.]

## Exhibit 1: Plaintiff's Objections to Conclusions and Opinions of Michael Pakter

| Objection No. | Page of Report | Inadmissible Conclusion |
|---|---|---|
| No. 1 | 16 | The revenues and expenses of the MDSC were purposely and deliberately disclosed to Angelopoulos and other physicians when they were included in the Bucket Reports. Based on my Interviews, Angelopoulos and other physicians routinely reviewed the Bucket Reports and requested adjustments, which they were then made with revised Bucket Reports provided...Consequently, when presented quarterly to Hall, Angelopoulos and others they disclosed [sic] reliably, openly and completely all the revenues and expenses of that 'consolidated entity' for that financial quarter. |
| No. 2 | 17 | Hall represented to me that Angelopoulos was provided with all of the information and/or documentation he requested. |
| No. 3 | 18 | It is my understanding that Angelopoulos did indeed raise questions on the quarterly Bucket Report and was provided information and/or documentation responsive to his questions. During my interview of Keystone's accounting personnel, they advised me that they provided Angelopoulos with copies of all EOBs supporting patient billing...It is my understanding that Sanders was provided all of the EOBs supporting Angelopoulos' billings...Accordingly, I can conclude and have concluded that there are no assertions that Angelopoulos was not credited with all his revenues and billings between 2004 Q1 and 2007 Q3. |
| No. 4 | 20 | Based on my interviews, Angelopoulos agreed with his employee compensation formula arrangement and contemporaneously consented to all specific allocations of income and expenses when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 5 | 20 | Hall was credited in the Bucket Reports with all his patient billings and Angelopoulos was credited in the Bucket Reports with all his calculation of employee compensation with all his patient billings. |
| No. 6 | 21 | Sanders failed to understand and acknowledge Angelopoulos' agreed upon economic arrangement with Keystone. Angelopoulos was an employee of Keystone, an entity wholly owned by Hall. Angelopoulos' compensation, as an employee, followed a specific formula agreed upon by the parties - an agreement specifically described by Sanders in his Expert Report. |
| No. 7 | 23 | Based on my review of the Bucket Reports and other information and/or documentation in discovery in this litigation, this system [Pakter's characterization of the contract between Plaintiff and Keystone] was consistently followed from 2004 to 2007. The Bucket Reports were accurately designed and implemented to specifically follow the agreed employment compensation formula. |
| No. 8 | 27 | Based on my Interviews, Angelopoulos agreed with these [contractual] arrangements and contemporaneously consented to all allocations of income |

| | | |
|---|---|---|
| | | and expenses when presented, disclosed and reported to him in the Bucket Reports. |
| No. 9 | 27 | Defendants imposed no restrictions on Angelopoulos' access to back-up data including but not limited to Angelopoulos' expenses. |
| No. 10 | 28 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding Hall's "management fee"] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 11 | 30 | Based on my Interviews, Angelopoulos agreed with all arrangement regarding [Merritt "Bear"] Roalsen and consented to these specific charges when it was clearly disclosed and reported to him in the Bucket Reports...Based on my Interviews, Roalsen devoted the bulk of his efforts to Keystone, especially finding physicians to join the practice and managing Keystone's employees and facilities. |
| No. 12 | 32 | Based on my Interviews, Angelopoulos consented to this specific charge [for the 2007 Q3 Facility Fee] when it was clearly disclosed and reported to him in the Bucket Report. |
| No. 13 | 33 | Based on my Interviews, Angelopoulos agreed with the arrangement that Keystone would pay all of WACHN's expenses and consented to these specific WACHN charges when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 14 | 35 | Based on my interviews, Angelopoulos agreed with this arrangement [as to the increase in 2007 Q3 expenses] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports in 2007 Q3. |
| No. 15 | 35 | Angelopoulos' compensation agreement contemplated that Angelopoulos' percentage of Keystone's expenses would fluctuate over time depending on the number of physicians. When Dr. Change left Keystone, Angelopoulos' percentage of Keystone's expenses increased. Soon thereafter, Angelopoulos also left Keystone. |
| No. 16 | 36 | Based on my Interviews, Angelopoulos was covered by two medical malpractice policies beginning in or around 2005 at his own specific request. As this was Angelopoulos' direct expense under his employee compensation arrangement with Keystone, he consented to and was charged this amount. |
| No. 17 | 38 | Based on my Interviews, Angelopoulos agreed with the annual allocations of the costs of MedStaff employees to Keystone and non-Keystone companies including the related medical insurance and other costs of the employees when these were disclosed and reported to him in the Bucket Reports. |
| No. 18 | 40 | Based on my interviews, Angelopoulos agreed with this arrangement [as to paying for the expenses relating to Hall's home in Homewood, Illinois] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports from 2005 to 2007. |
| No. 19 | 42 | Based on my Interviews, Angelopoulos agreed to pay the costs of the Qualified Retirement Plan, as part of the overall costs of Roalsen's employment compensation package, when these were disclosed and reported to him in the Bucket Reports. |

| | | |
|---|---|---|
| No. 20 | 43 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding office function expenses] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Report during 2004 to 2007. |
| No. 21 | 44 | Hall represented to me that Angelopoulos specifically agreed to absorb these expenses of Dr. Narcissi and consented to these charges when they were disclosed and reported in the Bucket Reports. |
| No. 22 | 45 | Based on my Interviews, Angelopoulos agreed with the then-existing allocations of Missys expenses and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 23 | 46 | Based on my Interviews, Angelopoulos agreed with hourly rates at which Keystone was billed for MRI services and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 24 | 47 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding the asset acquisition expenses] and consented to these specific charges when they were clearly disclosed and reported to him in the Bucket Reports from 2004 to 2007. |
| No. 25 | 48 | Angelopoulos was an employee of Keystone. |
| No. 26 | 50 | Based on my Interviews, Angelopoulos agreed with Keystone's (and not the MGMA's) levels of expenses and consented to pay the agreed-upon percentages of Keystone's expenses when these were clearly disclosed and reported to him in the Bucket Report for 2004 to 2007. |
| No. 27 | 54 | Based on my Interviews, while Angelopoulos agreed to contribute the $100,000 cash reserves, he never did and Hall contributed on his behalf. |
| No. 28 | 55 | Based on my Interviews, Angelopoulos agreed to the 2004 financial arrangements and was aware there was little or no shared income to be had between July and December 2004. |
| No. 29 | 60 | Based on my Interviews, Angelopoulos agreed with this arrangement to account for patient receipts when collected (and not when billed) and to base Angelopoulos' employee compensation formula on collected payment receipts. |
| No. 30 | 62 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding the physical therapy adjustments] and consented to this specific adjustment when it was clearly disclosed and reported to him in the Bucket Reports...Based on my Interviews, the process the [sic] culminated with that income adjustment for physical therapy income was begun at the specific request of Angelopoulos who believed, mistakenly, that he was not given sufficient credit for physical therapy income. After the re-analysis specifically requested by Angelopoulos was completed, adjustments were made to Keystone's Bucket Reports. These adjustments, however, resulted in Angelopoulos receiving less credits than he previously received for physical therapy income. |
| No. 31 | 63 | Based on my Interviews, the process the [sic] culminated in that income adjustment for MRI income was begun at the specific request of Angelopoulos who believed, mistakenly, that he was not given sufficient credit for MRI income. After the re-analysis specifically requested by |

| | | |
|---|---|---|
| No. 32 | 70 | Angelopoulos was completed, adjustments were made to Keystone's Bucket Reports. These adjustments, however, resulted in Angelopoulos receiving less credits than he previously received for MRI income. |
| | | I have seen the original Operating Agreement dated January 1, 2005, which Angelopoulos claims he never signed, although to my eyes his signature is apparent from the face of the original Operating Agreement. Even if that were true (which Defendants dispute), Angelopoulos appeared to have participated in "ordering" a special meeting on June 29, 2007 for the purpose of, among other things, amending the original Operating Agreement. It is my understanding and I have assumed that it would make little sense that Angelopoulos would order a meeting to amend the original Operating Agreement and agree on how to amend it, if he believed there was never an enforceable Operating Agreement to begin with. Angelopoulos signed the Summary of the WACHN meeting dated June 29, 2007 which contained the amendments to the Operating Agreement discussed above. |
| No. 33 | 78 | [B]ased on my Interviews, all the other items [in the 1099-MISC] are merely charges to Angelopoulos that he should have repaid, but did not. |

## All Citations

Slip Copy, 2017 WL 2178504, 119 A.F.T.R.2d 2017-1882

**2**

KeyCite Yellow Flag - Negative Treatment

Distinguished by Kleen Products LLC v. International Paper, N.D.Ill.,
May 31, 2017

17 Fed.Appx. 433
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Seventh
Circuit Rule 32.1. (Find CTA7 Rule 32.1)
United States Court of Appeals, Seventh Circuit.

Geraldine BARBER, Plaintiff–Appellant,

v.

UNITED AIRLINES, INC. Defendant–Appellee.

No. 00–3546.
|
Argued May 15, 2001.
|
Decided Aug. 16, 2001.

**Synopsis**

Passenger brought action against airline to recover for
injuries sustained when plane encountered turbulence.
The United States District Court for the Northern District
of Indiana, Andrew Rodovich, United States Magistrate
Judge, entered judgment as matter of law in favor of
airline, and passenger appealed. The Court of Appeals
held that: (1) aviation expert was properly excluded
from testifying; (2) refusal to grant continuance was not
abuse of discretion; and (3) passenger's unsubstantiated
testimony was insufficient to create fact issue.

Affirmed.

**\*435** Appeal from the United States District Court for
the Northern District of Indiana, Hammond Division.
No. 98 C 119. Andrew Rodovich, Magistrate Judge.

Before RIPPLE, MANION, DIANE P. WOOD, Circuit
Judges.

**Opinion**

ORDER

**\*\*1** United Airlines Flight 516 from New Orleans to
Chicago encountered turbulence on May 3, 1996. One of
the passengers on board, Geraldine Barber, was injured,
and she sued United Airlines for negligence. Prior to
trial, the district court granted United Airlines' motion
in limine, barring Barber's proffered aviation expert, Dr.
Michael Hynes. The trial proceeded, but at the close
of evidence the district court granted United Airlines
judgment as a matter of law. Barber appeals, and we
affirm.

I. Background

On May 3, 1996, Geraldine Barber was returning to the
Chicago area aboard United Airlines Flight 516 from an
educational conference held in New Orleans. Flight 516
was in Captain James Kainer's charge, and First Officer
James O'Neal was second in command. The initial leg
of the flight was smooth, but about forty miles south
of St. Louis the plane encountered moderate to severe
turbulence, which caused the plane to suddenly pitch up
severely and then level off.

The incident lasted only a few moments, and the
remainder of the flight was uneventful, but at the time
the plane struck the turbulence, the "fasten seatbelt" sign
was off and Geraldine Barber, whose seatbelt was loosely
fastened, was thrown forward. She struck her head and
shoulders against the seat in front of her. Barber claims
that as a result she suffered shock, fright, and severe
pain, and that the accident tore her rotator cuff, which
required surgery. Barber also claims that while at work
the following year, she fell after having tried to lift herself
up using her injured shoulder. As a result, Barber claims
that she suffered severe damage to her knee which also
required surgery. Barber further contends that her injuries
eventually caused her to take early retirement from her job
as a school administrator.

Almost two years after the incident, Barber sued United
Airlines alleging that United Airlines was negligent
because it flew through an area where thunderstorms were
predicted, because the pilot failed to properly use the
radar, and because the pilot failed to avoid the weather
system which caused the turbulence. To support **\*436** her
case, Barber retained Dr. Michael Hynes as an aviation
expert, but prior to trial, on United Airlines' Motion
in Limine, the district court [1] barred Hynes's testimony,

concluding that Hynes's methodology was flawed because he ignored weather data and testimony given by the pilots to the extent that those facts conflicted with his opinion.

1    The parties consented to trial by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). For simplicity, we refer to the trial court as the district court.

Barber then presented her case to the jury without Dr. Hynes's testimony. At trial, Captain James Kainer testified that from the moment of takeoff in New Orleans to approximately 100 miles south of St. Louis, the flight "was smooth, visibility was good, the seatbelt sign was off, it was a routine flight." He further testified that about forty miles outside of St. Louis, he turned on the plane's radar. [2] Captain Kainer explained that it takes about ten seconds for the radar to warm up, and that after he had turned it on and it had warmed up, he had a clear picture which showed no "convective or precipitative activity." However, a few minutes later, as Captain Kainer was tweaking the radar, [3] the aircraft struck clear air turbulence, pitching up. Captain Kainer explained that clear air turbulence cannot be seen either visually or on radar. He further testified that he had flown the same route earlier in the day and had not experienced any turbulence, nor did any other pilots report incidents of clear air turbulence along that route. Additionally, Captain Kainer stated that while thunderstorms were predicted in the area for later in the day, at the time that the plane struck the turbulence there were no thunderstorms.

2    Captain Kainer explained that a plane's radar is not always kept on; rather, pilots switch the radar on only when they believe there is a need for it. Captain Kainer explained that he turned the radar on because he knew that storms were predicted for later in the evening and he wanted to see what the weather would be like on his drive home from the Chicago airport, and to get an overview of the weather coming into Illinois.

3    Captain Kainer also explained that the radar picture must be continuously "tweaked," i.e., adjusted for distance and/or intensity.

**2  Geraldine Barber then took the stand. She testified that after the plane landed, while she was waiting inside the Chicago airport to go home, Captain Kainer approached her, telling her that he had flown through a thunderstorm and that he did not have his radar on. This

was the first time that Barber made such a claim; she did not mention these statements in either her deposition or in a diary that she kept following the incident. Barber claimed that she remembered Captain Kainer's remarks after having seen him testify the previous day, which according to Barber jogged her memory.

Following the close of Barber's case, United Airlines moved for Judgment as a Matter of Law, arguing that Barber failed to present any evidence that United Airlines was negligent. Specifically, United Airlines asserted that because the undisputed evidence established that the turbulence was "clear air" turbulence which cannot be seen, and was not turbulence associated with thunderstorms, United Airlines was not liable for Barber's injuries. The district court agreed, granting United Airlines' Motion for Judgment as a Matter of Law. Barber appeals.

II. Analysis

A. Motion in Limine
On appeal, Barber initially argues that the district court erred in barring Dr. **437 Hynes's expert testimony. Federal Rule of Evidence 702 provides that

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, or training or education may testify thereto in the form of an opinion or otherwise.

[1]  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that Rule 702 "imposes on the trial court the obligation, when dealing with expert witnesses, to ensure that scientific testimony is 'not only relevant but reliable.' " *Goodwin v. MTD Products, Inc.,* 232 F.3d 600, 608 (7th Cir.2000) (quoting *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786). This requires a trial judge to determine whether an expert's opinion was grounded in the methods and procedures of science, and whether the opinion had sufficient factual underpinnings. *Id.*

**[2]** A review of Dr. Hynes's proffered expert opinion, his deposition testimony, and the overall record confirms the district court's conclusion that in formulating his opinion, "Dr. Hynes relied on weather data, but he rejected some weather data that contradicted his opinion." The district court also accurately noted that Dr. Hynes "rejected the testimony of the pilot and the copilot, which contradicted his opinion, [and][i]n formulating his opinion, Dr. Hynes did not give any additional data or information that he relied upon, which formed the basis of rejecting some of the weather data and the opinions of the copilots." Dr. Hynes also did not adequately explain why he ignored certain facts and data, while accepting others. Nor did Dr. Hynes present any other data which supported his opinion —he merely accepted some of the testimony and weather data that suited his theory and ignored other portions of it that did not. Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert,* and it thus fails to "assist the trier of fact." Fed.R.Civ.Proc. 702.

**\*\*3** **[3]** On appeal, Barber does not challenge the district court's reasoning that Dr. Hynes's proffered expert opinion failed to satisfy *Daubert* because of his selective use of data. Rather, she argues that instead of prohibiting Dr. Hynes from testifying entirely, he should have been allowed to testify about the effect of thunderstorms, namely that they are known to cause severe turbulence. She also believes that the district court should have allowed him to testify concerning the steps that United Airlines could have taken to avoid the turbulence or to warn passengers. We review the district court's decision to exclude expert testimony for an abuse of discretion. *United States v. Crotteau,* 218 F.3d 826, 831 (7th Cir.2000).

**[4]** Barber's argument ignores the fact that the pilots themselves admitted the obvious—that thunderstorms are known to cause turbulence, including severe turbulence, and that company policy is to re-route flights to avoid thunderstorms and to warn passengers to fasten their seatbelts. Because these points were already established —and by the defendants' own employees—we do not believe the district court abused its discretion by failing to allow Dr. Hynes to likewise opine on the effects of thunderstorms. Moreover, the real question was not whether thunderstorms cause turbulence or whether United Airlines could have re-routed the flight, but

whether the turbulence which Flight 516 struck was clear air turbulence or thunderstorm-related turbulence. As explained **\*438** below, the evidence presented during trial established that the turbulence was clear air turbulence. Therefore, even had Dr. Hynes been allowed to testify on more limited grounds, he would have added nothing new and United Airlines would still have been entitled to judgment as a matter of law. [4]

[4]   Barber also argues that the district court should have held an evidentiary hearing to determine whether Dr. Hynes was qualified to testify on a more limited basis. There was no need for an evidentiary hearing, however, given the extensive briefing on the issue and the district court's more than thorough review of Dr. Hynes's proffered expert opinion and deposition testimony. Also, as just noted, even if Dr. Hynes were allowed to testify on more limited grounds, that would not have altered the outcome of this case, and therefore we find no abuse of discretion in the district court's decision not to hold an evidentiary hearing.

**[5]** **[6]** Barber also argues that the district court should have granted her a continuance so as to allow her more time to retain another expert witness. A district court has broad discretion in determining whether to grant a continuance. *Brooks v. United States,* 64 F.3d 251, 256 (7th Cir.1995). In this case, the district court refused to grant a continuance, noting that the case was almost two and a half years old and that it had already been continued and delayed so as to allow the plaintiff the opportunity to obtain expert witnesses. The district court also noted that the plaintiff had plenty of time to evaluate Dr. Hynes's report and deposition and that the defendant had filed the motion in limine within the time established by the court. Under these circumstances, the district court did not abuse its broad discretion in denying Barber's request for a continuance.

B. Judgment as a Matter of Law
Following the close of Barber's case, United Airlines moved for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50, arguing that Barber had failed to present sufficient evidence to support her theory of negligence. Specifically, United Airlines asserted that while thunderstorms may cause turbulence, and while thunderstorms were predicted in the area of the flight for later in the day, there was no evidence that the turbulence which Flight 516 encountered was

caused by thunderstorms. Rather, the only evidence presented during Barber's case-in-chief established that the turbulence which caused Barber's alleged injuries was clear air turbulence, which cannot be seen visually or by radar. Thus, United Airlines could not have avoided the turbulence or warned the passengers to fasten their seatbelts. The district court agreed with United Airlines and granted it judgment as a matter of law.

**\*\*4** **[7]** We review a district court's grant of judgment as a matter of law *de novo,* "asking whether the evidence presented, combined with all the reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Lane v. Hardee's Food Systems, Inc.,* 184 F.3d 705, 707 (7th Cir.1999).

In this case, Barber did not introduce enough evidence to support her claim. Specifically, she failed to introduce any evidence demonstrating that United Airlines could have predicted (and thus either have avoided or warned passengers about) the turbulence which caused her alleged injuries. Rather, the undisputed evidence established that the turbulence which Flight 516 struck was what is called "clear air turbulence." Clear air turbulence cannot be seen either visually or by radar. Additionally, the evidence established that United Airlines had no other warning of **\*439** the clear air turbulence, as Captain Kainer had flown the same route earlier in the day and had not experienced any clear air turbulence, and no other pilots who had flown that same route had called in reports of turbulence. Because there was no way that United Airlines could have known of the presence of clear air turbulence, it could not have avoided the turbulence or warned Barber of its presence.

**[8]** Barber responds by arguing that she was entitled to get to the jury because she presented evidence that Captain Kainer had flown through a thunderstorm. The evidence she refers to is her own trial testimony; Barber testified that after the incident while she was waiting inside the airport to return home, Captain Kainer came up to her and told her that he had flown through a thunderstorm. This (i.e. at trial) was the first time that she made such a claim, having never mentioned this alleged statement in the pleadings or during discovery. In fact, she was thoroughly questioned in her pre-trial deposition about her conversation with the pilots immediately after the

flight. She then said that one pilot told her they had no prior warning of bad weather. He thought it was fog. She said nothing about the pilot telling her they flew through a thunderstorm. Barber claims that she only remembered this statement after she saw Captain Kainer testifying at trial.

Initially, we note that no other witnesses claimed that the plane flew through a thunderstorm. In fact, several of Barber's coworkers (including her sister) testified that the day was sunny and beautiful, and they mentioned nothing about a storm. Nor were there any weather reports confirming thunderstorms at that time and in that location. In fact, the weather reports for that day in St. Louis, Missouri showed only a trace of water at 3:00 p.m., and by 4:00 p.m. there was only $1/100$ of an inch of rain, and by that time Flight 516 had passed through St. Louis and had landed at O'Hare. Both pilots also testified as to the weather conditions, and stated specifically that they did not fly through a thunderstorm. Captain Kainer also testified that the weather information he had received prior to leaving New Orleans was that "there was some activity that was developing that was supposed to come into the Midwest maybe at the end of the evening, into that night," but the flight took place in the early-to-mid afternoon. Thus, Barber's last-minute recollection contradicts all of the other evidence, including her own deposition. And while we must be careful to avoid "supplanting our view of the credibility or the weight of the evidence for that of the jury," to avoid judgment as a matter of law a party must present "more than a mere scintilla of evidence." *Lane,* 184 F.3d at 706 (internal quotation omitted). In light of the entire record and the overwhelming contradictory evidence, Barber's self-serving statement that Captain Kainer had told her that he had flown through a thunderstorm constitutes, at best, a mere scintilla of evidence, and thus is insufficient to support her claim of negligence.[5]

[5] This statement also does not contradict the other trial evidence which established that the turbulence was clear air turbulence, as opposed to thunderstorm-related turbulence. Thus, even considering this statement, Barber still has not presented any evidence that thunderstorms in the area caused the turbulence which led to her alleged injuries.

**\*\*5** **[9]** Next, Barber argues that the evidence supports her theory that United Airlines was negligent in failing

to warn the passengers that it was approaching a weather system and that turbulence was possible. In support of this theory, Barber points to Captain Kainer's testimony that prior to striking the turbulence, he saw clouds and haze in front of him. Accordingly, **\*440** even if there were no thunderstorms in the vicinity, Barber asserts that because Captain Kainer saw clouds and a haze before experiencing the turbulence, he could have warned the passengers to fasten their seatbelts. While it is true that Captain Kainer stated that he saw clouds prior to striking the turbulence, he explained that they were "little cirrus type clouds, just—it might have been a haze layer," and that such clouds cannot cause the type of turbulence they experienced. Barber did not presented any evidence to the contrary. Moreover, she had the opportunity to cross-examine Captain Kainer and to ask whether it were possible that the clouds were something else or could have caused the turbulence. Yet that was not the testimony; rather, Captain Kainer explained that the clouds were unrelated to a weather system and could not have caused the turbulence they experienced. Therefore, there is insufficient evidence to support this theory as well.

**[10]** Barber further contends that the evidence created a reasonable inference that Captain Kainer failed to properly use the plane's radar, having turned it on only seconds before the incident. She argues that this constituted negligence. Initially, we note our skepticism of Barber's portrayal of the evidence. While Captain Kainer did note that he had turned on the radar only a few minutes before the plane pitched up, he definitively stated that the radar was on, warmed up, and that he had a clear picture of the flight path prior to encountering any turbulence. Barber challenges this evidence with her own last-minute recollection that Captain Kainer had told her that he did not have the radar on at all. This testimony contradicted her own diary in which she stated that Captain Kainer had told her that he got no warning from the radar. In any event, even if Captain Kainer failed to properly use the radar during the flight, Barber still could not succeed on her negligence theory because the evidence established that the turbulence which caused her alleged injuries was clear air turbulence, and that clear air turbulence can not be detected by radar. Therefore, any alleged negligence did not cause Barber's alleged injuries.

### C. Standard of Care
On appeal, Barber also argues that the district court improperly determined the appropriate standard of care.

Prior to trial, the district court concluded that 14 C.F.R. § 91.13(a) establishes the standard of care at issue: "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." Barber asserts that the appropriate standard is set forth in 49 U.S.C. § 44701(1)(A), which provides "the duty of an air carrier [is] to provide service with the highest possible degree of safety in the public interest." Barber also cites the standard of care section in Section 44702 which recognizes "the duty of an air carrier to provide service with the highest possible degree of safety in the public interest." 49 U.S.C. § 44702. Thus, according to Barber, United Airlines owed her a duty of the "highest possible" care. We need not decide this issue today, however, because no matter how high the standard of care, as discussed above, Barber has failed to present sufficient evidence to support her claim against United Airlines under any standard of care because there is no evidence from which a reasonable jury could conclude that United Airlines could have foreseen (and thus warned about or avoided) the turbulence.

### D. Missing Evidence Instruction
**\*\*6** **[11]** Finally, Barber argues that the district court erred in concluding that she was not entitled to a missing evidence instruction. Specifically, Barber contends that United Airline's failure to present certain **\*441** documents pertaining to the weather at the time of the flight justifies a missing evidence instruction. In support of her position, she cites *Niehus v. Liberio,* 973 F.2d 526, 530 (7th Cir.1992), wherein this court explained that such an instruction may be appropriate if "there is evidence that a party would surely have introduced it had it been helpful, permitting an inference that the evidence would instead have helped his opponent." First, since this case never got to the jury, any issue of jury instructions is moot. Second, to the extent that Barber is really arguing that in considering the motion for judgment as a matter of law the district court should have inferred that the weather data destroyed by United Airlines favored Barber's case, no such inference is appropriate here because the evidence established that the records were destroyed in the ordinary course of business. Moreover, the records Barber complains were destroyed consisted merely of the weather forecast provided to the pilots prior to the flight, and since Barber obtained independent reports as to the actual conditions that day, the missing reports would still be insufficient to create an issue of fact for the jury because those reports merely predicted weather

conditions. The evidence established the actual conditions the plane encountered, namely, clear air turbulence which cannot be seen and thus cannot be avoided or warned against.

### III. Conclusion

While there is no dispute that United Airlines Flight 516 struck turbulence en route from New Orleans to Chicago and that the plaintiff Geraldine Barber was injured, Barber has failed to present sufficient evidence to establish negligence on United Airlines' part, no matter how high the standard of care, because the undisputed evidence establishes that the turbulence was clear air turbulence which could not have been predicted. The district court also did not abuse its discretion in barring Barber's proffered expert because in formulating his opinion Dr. Hynes selectively considered the pilots' testimony and the weather reports and thus his opinion lacked a scientific basis. For these and the foregoing reasons WE AFFIRM.

RIPPLE, Circuit Judge. I concur in the result.

**All Citations**

17 Fed.Appx. 433, 2001 WL 950885

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**3**

Childers v. Trustees of the University of Pennsylvania, Not Reported in F.Supp.3d (2016)

2016 Fair Empl.Prac.Cas. (BNA) 85,668

2016 WL 1086669
United States District Court,
E.D. Pennsylvania.

Kristen Stromberg Childers, Ph.D, Plaintiff,

v.

Trustees of the University
of Pennsylvania, Defendant.

CIVIL ACTION No. 14-2439
|
Signed 03/21/2016

**Attorneys and Law Firms**

Ronald H. Surkin, Schoenfeld, Surkin, Chupein & Demis PC, Media, PA, Scott M. Pollins, Swarthmore, PA, for Plaintiff.

Jeffrey Alan Sturgeon, Jocelyn L. Womack, Michael L. Banks, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

**Opinion**

**MEMORANDUM**

GENE E.K. PRATTER, United States District Judge

**\*1** Kristen Stromberg Childers was an assistant professor of history at the University of Pennsylvania ("Penn") who was twice denied tenure. She claims that the second tenure denial was a result of gender discrimination, and more specifically, that she did not achieve tenure because of stereotypes relating to the career focus of women with child care responsibilities (*i.e.*, family responsibility discrimination). She filed suit against Penn under Title VII, the PHRA, and the Philadelphia Fair Practices Ordinance. Penn has moved for summary judgment, arguing that Dr. Childers has not even set forth a *prima facie* case of discrimination, let alone shown that Penn's legitimate non-discriminatory reasons for not granting her tenure were pretextual. Penn also moves to exclude one of Dr. Childers's expert witnesses. The Court heard oral argument on the motions and allowed both parties to submit supplemental briefing. After reviewing the motions and all responses and supplements thereto, the Court will grant Penn's *Daubert* motion and deny Penn's motion for summary judgment.

**BACKGROUND** [1]

[1]  Due to the parties' confidentiality agreement, portions of their summary judgment arguments and of the record have been filed under seal. The Court will avoid using specific details, so as not to disturb the parties' agreement, which was approved by the Court. *See* Docket No. 37.

The following is a general outline of the tenure process at Penn and Dr. Childers's career path, as well as a discussion of Dr. Childers's tenure applications.

Tenure Process

Penn consists of twelve schools, including the School of Arts & Sciences ("SAS"), of which the History Department is a part. Assistant professors in SAS have a seven-year probationary period, and in year six of that period there is a mandatory review for promotion. Assistant professors may extend the "tenure clock" if a child is born or adopted into the faculty member's household.

The tenure review process starts in the faculty member's department. That department solicits confidential recommendations from external reviewers, who are faculty members in the same field as the applicant at other universities. A three-person committee within the department reviews the external reviews and the candidate's dossier and then makes a recommendation concerning tenure to the department chairperson. The tenured faculty then meet to discuss the candidate and vote on a recommendation to be made to the Dean of SAS. If the vote is in the candidate's favor, the department chairperson forwards the tenure case to the Dean.

Before the Dean assesses the case, however, the SAS Personnel Committee reviews it. The SAS Personnel Committee is made up of members from three disciplines (Humanities, Social Sciences, and Natural Sciences), and has a subpanel for each of the three disciplines. The subpanel with which the department submitting the candidate is aligned (for History, that is the Humanities subpanel) reviews the tenure case first and votes on the candidate, and then the entire Personnel Committee discusses and votes on the candidate. If the Personnel Committee vote is positive, the chair of the Personnel

Childers v. Trustees of the University of Pennsylvania, Not Reported in F.Supp.3d (2016)

2016 Fair Empl.Prac.Cas. (BNA) 85,668

Committee writes to the Dean with the Committee's recommendation.

 *2  Once the Dean receives the case from both the department and the Personnel Committee, the Dean forwards the case to the Provost with the Dean's own recommendation. The Provost then meets to discuss the case with the Provost Staff Conference, which consists of the deans from Penn's four largest schools, four deans from other schools on a rotating basis, and vice provosts for education, faculty affairs, and research. At the meeting, the Dean in question presents the case to the Provost Staff Conference and then leaves the room while the Conference discusses the candidate. Following the meeting, the Provost makes a decision on tenure. If the Provost decides in favor of the candidate, the candidate is presented to the University's Trustees for the final decision on tenure.

Dr. Childers

Dr. Childers earned her Ph.D. from Penn in 1998. She then taught at area schools such as Bryn Mawr, Swarthmore, and Rutgers before becoming an assistant professor at Penn in the spring of 2002. Dr. Childers's area of specialty is 20 $^{th}$ century France, and, in particular, the Vichy period. She focuses her scholarship on gender, family history, social policy, colonialism, and decolonization. Her first book, *Fathers, Families and the State, 1914-1945*, was published by Cornell University Press in 2003. Her second, *Seeking Imperialism's Embrace: National Identity, Decolonization, and Assimilation in the French Caribbean*, is pending publication by Oxford University Press. In the spring of 2004, Dr. Childers took a leave of absence relating to the birth of her first child. She then took a full year of "junior leave" during the 2005-06 school year, meaning that she was relieved of all teaching responsibilities in order to allow her to focus on research and publication. In 2007-08, Dr. Childers took a half-time teaching arrangement due to the birth of her second child, and in 2008-09, she again took a half-time teaching arrangement due to her first child's autism diagnosis.

Dr. Childers was first considered for tenure in early 2008. The History Department faculty voted 21-11 in favor of tenure, but the Personnel Committee voted 9-0 (with one abstention) against tenure, noting concerns with Dr. Childers's scholarly productivity following the 2003 publication of her first book. After this denial,

Dr. Childers requested a one-year extension of her probationary period. The department approved that extension and allowed her to present a new tenure case in the 2009-10 academic year.

Because more than a year had elapsed since her first go at tenure, Dr. Childers prepared a completely new tenure dossier and the department also reviewed her candidacy anew. At this time, her second book, while still unpublished, had been accepted by Oxford University Press and four of six chapters had been completed. Ten external reviewers were asked to provide letters, and six of those ten submitted letters. This time, the History Department voted 26-5 in her favor, with one abstention. The Humanities Subpanel split 2-2 on the question of Dr. Childers's candidacy and expressed concern about her productivity and reputation in the field. The Subpanel was informed about Dr. Childers's leave and the reasons for that leave, and some of the questions the Subpanel submitted to the History Department Chair related to Dr. Childers's leave. The History Department Chair, Professor Peiss, responded by elaborating on the reasons for Dr. Childers's leave, including informing the Subpanel of the child's autism diagnosis. The full Personnel Committee then voted in favor of Dr. Childers's candidacy, 7-4, while still expressing concerns about her level of productivity and visibility in her field, noting in particular concerns about her lack of travel to the French and Caribbean venues important to her work.

 *3  SAS Dean Bushnell then forwarded the case to the Provost and Provost Staff Conference, with a letter of support that noted the difficulty in assessing Dr. Childers's productivity in light of her family leave. After the Dean presented the case to the Provost Staff Conference, the Conference discussed Dr. Childers's case and advised against a grant of tenure. Provost Vincent Price agreed with that recommendation and decided against granting Dr. Childers tenure.

In October 2010, Dr. Childers filed a grievance regarding the Provost's decision to deny her tenure, claiming that the decision was based on her gender and her prior family leaves and arguing that the comments regarding her leave in the various letters prepared in support of her tenure case were not in compliance with University procedures. A three-member Faculty Grievance Commission was empaneled. At first, the Commission consisted of two men and one woman, but Penn exercised a peremptory strike to

remove the female member of the Commission, who was then replaced by a man, against Dr. Childers's objections. The Faculty Grievance Commission conducted a review of the case and held a two-day hearing. They concluded that the references to leaves of absence did not comply with University policy and "unfairly amplified the issue of Dr. Childers's leave time on her productivity," but at the same time found no evidence of discrimination. Because of the irregularities, the Commission recommended that Dr. Childers's case be reevaluated. They also recommended that the ultimate decision-maker be someone other than the Provost and that the committee assisting in evaluating the dossier be composed of members who had not previously evaluated her case.

The Provost accepted the reevaluation recommendation, but did not recuse himself from the case or ensure that the Conference not contain members who had previously evaluated Dr. Childers's candidacy. After redacting references to her leave from the dossier, the Provost and the Provost Staff Conference reconsidered the case and arrived at the same conclusion, noting concerns with Dr. Childers's productivity and scholarship.

Comparators

Penn points out that in 2007-08, the year Dr. Childers was first considered for tenure, two SAS professors eligible for tenure had taken faculty parental leave and nine had received child-related tenure extensions (five men and four women). Two of those women received tenure, and two, including Dr. Childers, did not. One male candidate withdrew himself from consideration, one received tenure, and the remaining three men did not. In 2009-10, nine SAS professors eligible for tenure review took faculty parental leave (eight women and one man). The male professor achieved tenure. Three of the female professors waived review, and four of the remaining five were awarded tenure (only Dr. Childers did not). That same year, nine SAS professors eligible for tenure received child-related extensions of the tenure review period (seven women and two men). One male candidate waived review, and the other earned tenure. Three of the female candidates waived review, three achieved tenure, and the last (Dr. Childers) did not.

Dr. Childers expands the time period for comparators to the span of two years before she first sought tenure through two years after, and then refers to an expert report by Dr. Robert Kreiser examining each

potential comparator. Dr. Childers points to other history department and SAS faculty that were either women without childcare responsibilities and/or leaves or men who, according to Dr. Childers, had publishing records similar to her own and who did earn tenure. Some of these comparators also had external reviewers who declined to write letters and/or criticized the candidate's productivity and scholarship, and one (a male) received a vote in the History Department which was less favorable than Dr. Childers's second tenure vote in the department.

Procedural History

**\*4** Dr. Childers filed her Complaint in April, 2014, alleging that Penn violated Title VII, the PHRA, and the Philadelphia Fair Practices Ordinance when it failed to promote her to the position of tenured Associate Professor because of her gender. After discovery, Penn filed the instant motion for summary judgment, as well as a *Daubert* motion challenging one of Dr. Childers's experts. Dr. Childers opposes both motions.

## LEGAL STANDARD

### A. *Daubert* Motions

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court, in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), imposed upon district courts the role of a gatekeeper, charging trial courts to "ensure that any and all scientific evidence is not only relevant, but reliable." *ID Sec. Sys. Can., Inc. v. Checkpoint Sys.,*

Childers v. Trustees of the University of Pennsylvania, Not Reported in F.Supp.3d (2016)
2016 Fair Empl.Prac.Cas. (BNA) 85,668

*Inc.,* 198 F. Supp. 2d 598, 601–02 (E.D. Pa. 2002) (quoting *Daubert,* 509 U.S. at 589). When "faced with a proffer of expert scientific testimony...the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue." *Id.* at 602 (quoting *Daubert,* 509 U.S. at 592). The gatekeeping function of the district court includes not just scientific testimony but also "testimony based on...' technical' and 'other specialized' knowledge. *Id.* (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999)).

### B. Motions for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by " 'showing' –that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255.

### DISCUSSION

#### A. *Daubert* Motion

*5 Dr. Childers offers two experts, one on tenure and the other on gender stereotyping and social framework analysis. Penn challenges the report of the latter expert,

Dr. Jane Halpert. Dr. Halpert's opinion focuses on the social science of stereotyping, and in particular how stereotypes of women with childcare responsibilities affect those women in the workplace. She starts by generally setting forth a framework for what stereotypes are and how they can affect assessments of individual behavior once an individual is identified as a member of a stereotyped group. She then examines settings or conditions conducive to stereotyping and points to the characteristics of the Penn tenure process that she believes could have opened the door to stereotyping (*e.g.*, lack of Human Resources involvement in the tenure process, the voluntary nature of gender bias workshops, emphasis on leave in Dr. Childers's tenure file, a lack of specific/ objective standards for tenure).

Penn characterizes the report as general observations coupled with unfounded speculation regarding the existence of bias in this particular case. It argues that Dr. Halpert did not look at key information, including data reflecting Penn's record of promoting women with childcare responsibilities or the dossiers of Dr. Childers and her comparators, or examine what stereotypes might have been held by the Penn employees involved in Dr. Childers's tenure review, but rather only looked at documents and deposition testimony selected by Plaintiff's counsel and made assumptions about the composition of the History Department. Penn highlights uncertainties expressed by Dr. Halpert in her deposition and concludes that Dr. Halpert's report should be excluded because she does not opine as to whether Dr. Childers's gender and family status had an effect on the tenure decision in this case.[2] Penn also argues that Dr. Halpert did not rely on any particular methodology in setting forth her opinion in this case – while she reviewed the literature on stereotyping, she did not, for instance, survey the attitudes of the individuals involved in Dr. Childers's tenure decision to see if any bias was present. Instead, Penn argues, Dr. Halpert merely "dog-eared" passages from documents and depositions that supported Dr. Childers's theory of the case and raised issues with the tenure process at Penn which she was not qualified to raise, due to her lack of expertise in how tenure decisions are made. Because of all these flaws, Penn argues that Dr. Halpert's testimony will not be helpful to the jury.

2      Penn claims that Dr. Halpert stated in her report that gender may have played a significant factor in the tenure decision but then recanted at deposition. Dr.

Childers argues that Dr. Halpert merely admitted at deposition that "significant" was a term of art, that she did not intend to use it as such, and that the word "important" or something like that could be substituted for "significant."

Dr. Childers counters that testimony of this type has been admitted in many other cases, and that Dr. Halpert's failure to opine as to the ultimate issues in this case is a strength rather than a weakness of her testimony, in that the ultimate issue of whether gender bias caused Dr. Childers's tenure denial is for the jury. It notes that Penn cites to cases in which social science experts were excluded because they did try to opine as to things like the mindset of decisionmakers (*see, e.g., Chadwick v. Wellpoint, Inc.*, 550 F. Supp. 2d 140 (D. Me. 2008)), whereas Dr. Halpert rightfully leaves those issues to the jury. Dr. Childers explains that Dr. Halpert did not endeavor to provide the jury with an empirical analysis, but rather to aid the jury in explaining what stereotyping is and what factors make it more or less likely to have played a role.

Courts are divided about whether testimony of this type is admissible or not. On the one hand, those that exclude it tend to reason that general testimony on stereotyping does not "fit" the case closely enough and that laboratory findings about unconscious stereotyping are too far removed from carefully considered employment decisions to be helpful to juries. *See, e.g., Karlo v. Pittsburgh Glass Works, LLC*, 2:10-cv-1283, 2015 WL 4232600 (W.D. Pa. July 13, 2015). They also draw distinctions between unconscious stereotyping and "intentional discrimination" required to make out a Title VII claim and exclude experts who only opine as to stereotyping that may be subconscious, *see, e.g., E.E.O.C. v. Wal-Mart Stores, Inc.*, Civil Action No. 6:01-CV-339-KKC, 2010 WL 583681, at *3-4 (E.D. Ky. Feb. 16, 2010),[3] and require social framework experts to at least present a reliable methodology that consists of more than " 'dog-earing' passages from depositions that [the expert] believed supported his conclusions," *see EEOC v. Bloomberg L.P.*, No. 07-8383, 2010 WL 3466370, at *16 (S.D.N.Y. Aug. 31, 2015). On the other hand, courts that allow social stereotyping testimony note that jurors are not necessarily knowledgeable about stereotyping and what factors can facilitate impermissible stereotyping and hold that the testimony can give jurors a context within which to evaluate the evidence. *See, e.g., Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208 (D. Mass. 2009); *Merrill v. M.I.T.C.H. Charter Sch. Tigard*, 2001

WL 1457461 (D. Or. Apr. 4, 2011) (declining to exclude Dr. Halpert).

[3]     Dr. Childers argues that the emphasis in these cases on distinguishing "intentional discrimination" from unconscious stereotyping is misplaced, citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) for the proposition that employment decisions made on the basis of sex stereotypes are impermissible. While it does appear that at least some of the cases excluding social framework experts view "intentional discrimination" too narrowly, that does not mean that *any* testimony relating to stereotyping must be admissible.

**\*6** Here, the Court finds the reasoning applied in at least some of the cases excluding social framework experts compelling and the facts in cases allowing the testimony distinguishable. Without reviewing data such as information relating to similarly-situated individuals, Dr. Halpert's testimony is not based on a sufficient record to support her conclusions. Much like the expert excluded in *Bloomberg*, 2010 WL 3466370, Dr. Halpert's methodology of sifting through evidence to find passages that support the Plaintiff's theory of the case does not meet Rule 702's requirement of reliability. The Court also finds that Dr. Halpert's analysis of the tenure process at Penn to be beyond her expertise, unlike the analysis of the expert in *Tuli*, 592 F. Supp. 2d 208, who opined much more generally about stereotyping. Because of these flaws and because stereotypes of women in the workplace are well within a layperson's common knowledge, Dr. Halpert's testimony will not help the trier of fact, and may even cause confusion, given how speculative her conclusions about the tenure process at Penn, in general and as to Dr. Childers, are. Thus, the Court will grant Penn's *Daubert* motion.

### B. Motion for Summary Judgment

Because Dr. Childers does not claim to have direct evidence of gender discrimination, the case will be analyzed in the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[4] Under *McDonnell Douglas,* a plaintiff may establish a *prima facie* discrimination claim by showing that (1) she belongs to a protected class; (2) she was qualified for a position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances that raise an

inference of discrimination. *See Sarullo v. United States Postal Serv.,* 352 F.3d 789, 797 (3d Cir.2003).

4    Claims under Title VII, the PHRA, and the Philadelphia Fair Practices Ordinance are analyzed under the same burden-shifting framework. *See Gomez v. Allegheny Health Servs., Inc.,* 71 F.3d 1079, 1083–84 (3d Cir. 1995); *Hong v. Temple Univ.,* No. CIV. A. 98-4899, 2000 WL 694764, at *9 (E.D. Pa. May 30, 2000).

If a plaintiff establishes a *prima facie* case of discrimination, the defendant must "articulate some legitimate, nondiscriminatory [or non-retaliatory] reason for the adverse employment action." *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 370 (3d Cir. 2008). The plaintiff then has the burden of showing that the defendant's proffered reasons for the adverse action are pretextual. At the summary judgment stage, the plaintiff must meet this burden by submitting "evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination [or retaliation] was more likely than not a motivating or determinative cause of the employee's termination." *Id.* (citing *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)). The plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met–Pro Corp.,* 412 F.3d 463, 467 (3d Cir. 2005). Finally, in deciding a dispositive motion under the *McDonnell Douglas* framework, the Court recognizes that "evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires [the Court] to ration the evidence between one stage or the other." *Doe,* 527 F.3d at 370.

In the context of tenure decisions, the Third Circuit Court of Appeals has cautioned that district courts should not "substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure." *See Kunda v. Muhlenberg College,* 621 F.2d 532, 548 (3d Cir. 1980). However, in *Kunda* and in subsequent cases, the Third Circuit Court of Appeals has made abundantly clear that this admonition does not create a higher burden for plaintiffs complaining of discrimination in the tenure process, nor does it shield universities from the Court's scrutiny. *See, e.g., Bennun v. Rutgers State Univ.,* 941 F.2d 154 (3d Cir. 1991)

(upholding district court's finding of racial discrimination in denying the plaintiff tenure).

**\*7** Penn first argues that Dr. Childers has failed to set forth a *prima facie* case of discrimination. Penn focuses on the fourth prong of the *prima facie* case and argues that there is no evidence in this case that would create an inference of discrimination, in that there are no similarly-situated professors who were treated more favorably that Dr. Childers was. Instead of comparing Dr. Childers to SAS professors who were either women with no childcare responsibilities or men (with or without childcare responsibilities), Penn lists her comparators as only those professors who took parental leave or received child-related extensions of the tenure clock. Penn argues that other women who had childcare responsibilities in their records did receive tenure and that some men with childcare responsibilities did not receive tenure. However, Penn does not go into enough detail about these supposed comparators' qualifications in its briefing to draw meaningful comparisons between them and Dr. Childers, and it does not cite any case law for the proposition that showing that similarly-situated individuals in the *same* protected class are treated well negates a *prima facie* case or that showing that similarly-situated individuals who are not class members and are treated the same as the plaintiff has any bearing on the *prima facie* case at the summary judgment stage. Penn does point to at least two male candidates for tenure who received tenure despite child-related extensions, so without more information about why (or if) they were more qualified than Dr. Childers, these comparators alone would seem to *support* Dr. Childers's *prima facie* case.

For her part, Dr. Childers argues that she does not even need to show that similarly-situated individuals received better treatment to set out a *prima facie* case. Rather, she argues that here, there is enough evidence to raise an inference of discrimination in the many comments made in tenure-related documents about her family situation and responsibilities. Nonetheless, when discussing pretext (Penn's next argument) and in her supplemental briefing, Dr. Childers refers to the expert report of Dr. Kreiser, which proffers a variety of comparators. For example, Dr. Childers points to a male candidate for tenure who had less favorable History Department support than she did, about whom productivity concerns were raised, and who still received tenure. Other comparators, such as women without family leave who received tenure and

Case: 1:14-cv-08708 Document #: 236-1 Filed: 02/20/18 Page 36 of 173 PageID #:11302
Childers v. Trustees of the University of Pennsylvania, Not Reported in F.Supp.3d (2016)
2016 Fair Empl.Prac.Cas. (BNA) 85,668

may have been judged less harshly than Dr. Childers, are also highlighted. Between the excessive commentary about her family situation in the tenure review record and the existence of potential similarly situated comparators who were treated more favorably than Dr. Childers, the Court concludes that she has at least set forth a *prima facie* case of discrimination.

Penn also argues that it has proffered legitimate nondiscriminatory reasons for Dr. Childers's tenure denial, and that Dr. Childers cannot show that this reason was a pretext for discrimination. The legitimate reasons include insufficient productivity, scholarly impact, and visibility. More specifically, Penn cites Dr. Childers's failure to publish sufficient articles and speak at conferences, the failure of 4 of 10 external reviewers to submit reviews, the criticisms voiced by the external reviewers who did submit letters, and the lack of unequivocal support from the History Department and Personnel Committee. Penn argues that the four History Department professors who received tenure between 2006 and 2010 all had stronger records than Dr. Childers did, and that even the one other failed candidate (a male professor) had a stronger record than Dr. Childers.

Dr. Childers does not argue that Penn has failed to proffer a legitimate non-discriminatory reason for her tenure denial, but she does argue that she proffers more than enough evidence to show pretext. She points to the fact that her family situation was widely discussed throughout the process, so much so that the Grievance Commission specifically found that her leaves were discussed in an inappropriate level of detail and granted her a reevaluation with the excess discussion of leave redacted from her dossier. Penn counters that any comments about Dr. Childers's leave were there to put her productivity in context, *i.e.*, to help her, not to raise unfair stereotypes. In arguing this, however, Penn misses the point that the intentions behind the comments are not dispositive if the comments colored the process by which Dr. Childers was judged as a tenure candidate by causing those receiving the information to unfairly stereotype Dr. Childers and injecting those stereotypes into the decisionmaking process.

**\*8** As previously discussed, Dr. Childers also points to other successful tenure candidates outside of her protected class who she claims had similar publication records, and she notes that her productivity was not a concern

for external reviewers or the History Department itself, which sets standards that are more book-focused than article-focused. She points to other comparators who did not receive reviews from every external reviewer solicited, and notes that this fact was not held against them in the same way it was highlighted in her dossier, nor was the weight of external reviews discounted for candidates whose reviewers had personal relationships with them. She claims that negative criticism in other candidates' external reviews was glossed over, even when it was more damning than any of the negative commentary in her reviews.

In response, Penn argues that Dr. Kreiser's report, which Dr. Childers cites for an evaluation of comparators, does not identify which of the comparators took family leave. However, in Dr. Childers's counterstatement of facts (to which Penn never directly responded in a paragraph by paragraph fashion), Dr. Childers does at least clarify that the women she asserts are comparators did not have children at the time they were reviewed for tenure. Penn also argues in supplemental briefing that Dr. Childers failed to show that her comparators were similarly situated because she did not show that the decisionmakers were the same. Penn points to at least one of Dr. Childers's proffered comparators, who was reviewed by different professors throughout the process, including a different provost. However, whether an individual is similarly situated to a plaintiff is a fact-intensive and case-specific inquiry, and the identity of the decisionmaker(s) is but one factor in determining whether a comparator is sufficiently similarly situated or not. *See Bennun*, 941 F.2d at 178-79 (refusing to "change 'similarly situated' to 'identically situated,' " and upholding a comparison between two tenure candidates who had at least partially different reviewing committees, as well as different emphases (research-oriented versus teaching-oriented)).

The Court finds that issues of material fact, in particular whether certain individuals are similarly situated to Dr. Childers, pervade this case. Those issues have a direct bearing on the credibility of Penn's proffered legitimate non-discriminatory reason for refusing Dr. Childers's bid for tenure. Thus, the Court will deny summary judgment.

## CONCLUSION
For the foregoing reasons, the Court will grant Penn's *Daubert* motion and deny Penn's Motion for Summary Judgment. An appropriate Order follows.

2016 Fair Empl.Prac.Cas. (BNA) 85,668

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1086669, 2016 Fair
Empl.Prac.Cas. (BNA) 85,668

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**4**

2010 WL 3466370
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,
v.
BLOOMBERG L.P., Defendant.
Jill Patricot, Tanys Lancaster, Janet Loures,
Monica Prestia, Marina Kushnir and
Maria Mandalakis, Plaintiff–Intervenors,
v.
Bloomberg L.P., Defendant.

No. 07 Civ. 8383(LAP).
|
Aug. 31, 2010.

Opinion

*MEMORANDUM & ORDER*

LORETTA A. PRESKA, Chief Judge.

**\*1** Currently before the Court are the parties'
*Daubert* motions wherein Defendant Bloomberg L.P.
("Bloomberg") seeks to exclude the testimony of Dr.
Louis Lanier [dkt. no. 117], a labor economist, and Dr.
Eugene Borgida [dkt. no. 124], a social psychologist, and
Plaintiff Equal Employment Opportunity Commission
("EEOC") seeks to exclude the testimony of Dr. Michael
P. Ward and Dr. John H. Johnson, IV [dkt. no. 115],
both of whom are labor economists. For the reasons set
forth below, Plaintiff's Motion to Exclude Drs. Ward
and Johnson is DENIED, and Defendant's Motions to
Exclude Dr. Lanier and Dr. Borgida are GRANTED.

I. *BACKGROUND*

A. *EEOC's Complaint*
Thirty days prior to the filing of the Complaint, Jill
Patricot, Tanys Lancaster, and Janet Loures filed charges
with the EEOC alleging sex/pregnancy discrimination, in
violation of Title VII of the Civil Rights Act of 1964
("Title VII"). After the filing of the Complaint, Patricot,
Loures, Maria Mandalakis, and Marina Kushnir filed
charges with the EEOC alleging retaliation by Bloomberg.

(Second Amended Complaint ¶ 1.) EEOC claims that
from approximately February 2002 through the present,
Bloomberg engaged in a pattern or practice of unlawful
employment practices, including discriminating against
Claimants based on sex/pregnancy by: (1) paying them less
total compensation after they announced their pregnancy
and returned from maternity leave; (2) demoting them
in title or in the number of employees directly reporting
to them; (3) diminishing their responsibilities and/
or replacing them with male employees junior to
the Claimants; (4) excluding them from management
meetings and otherwise isolating them once they
announced their pregnancy and returned from maternity
leave; and (5) subjecting them to stereotypes regarding
female caregivers when they returned from maternity
leave. (*Id.* ¶ 7.) EEOC further claims that Bloomberg
engaged in unlawful employment practices by retaliating
against the named Claimants and other similarly
situated female employees who protested the alleged
unlawful sex/pregnancy discrimination by reducing their
compensation, criticizing their performance, reducing
their job opportunities, and threatening to terminate
them. (*Id.* ¶ 9.)

To help prove its allegations, the EEOC proposes
the testimony of Dr. Louis Lanier, a labor economist
who studied the effect that class membership and
maternity leave had on class members' compensation. The
EEOC also offers the testimony of Dr. Eugene Borgida,
a social psychologist, for the purposes of educating
the jury "about the social science on stereotyping,
the nature of the [Bloomberg] organizational structure,
practices, and culture that may lead to stereotyping, and
organizational remedies, for monitoring and reducing the
effects of stereotypes." (EEOC's Memorandum of Law in
Opposition to Defendant's Motion to Exclude the Reports
and Testimony of Dr. Eugene Borgida ("EEOC Borgida
Mem.") at 1.) In support of its defense that Bloomberg
did not engage in a pattern or practice of discrimination,
Bloomberg offers the expert testimony of Dr. Michael P.
Ward and Dr. John H. Johnson, IV, two statisticians, who
analyzed whether the data supported or refuted "EEOC's
allegations that Bloomberg paid class members less than
non-class members or demoted them." (Memorandum of
Law in Opposition to Plaintiff EEOC's Motion to Exclude
Expert Opinions of Dr. Michael P. Ward and Dr. John H.
Johnson, IV (7F'Bloomberg Mem.") at 1.)

B. *Dr. Lanier's Report*

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**\*2** Dr. Lanier is a Senior Economist and Practice Director at Econ One Research, Inc., an economic consulting firm in Los Angeles, CA. (Declaration of Raechel L. Adams in Opposition to Defendant Bloomberg L.P.'s Motion to Exclude the Reports and Testimony of Dr. Louis Lanier ("Adams' Lanier Decl."), Ex. 7 ("Lanier Report") ¶ 1.) Dr. Lanier has a Ph.D. in Applied Economics from Clemson University. (*Id.*) Dr. Lanier performed a statistical analysis of the personnel data provided by Bloomberg in order to determine if patterns related to pregnancy and/or motherhood status exist in pay decisions and to determine the extent to which any patterns exist in demotions or job changes that systematically affect class members. (*Id.* ¶ 5.)

i. *Initial Report*

Utilizing regression models, Dr. Lanier analyzed two primary components of compensation-base pay and Equity Equivalency Certificate ("EEC") grants [1]—and compared class compensation outcomes to non-class compensation outcomes. (*Id.* ¶¶ 20–21.) For purposes of the analysis, each class member's status as a class member began on her first maternity leave after February 1, 2002; prior to going on maternity leave, class members were included in the non-class member control group. (*Id.* ¶¶ 24, 29.) Based on his analysis, Dr. Lanier drew the following conclusions:

[1]     EECs are certificates that are granted either one or two years prior to their redemption dates. At the time of the grant, the value of the certificate is based solely on expectations concerning the performance of the firm. (Lanier Report ¶ 21.)

a. Class members incurred statistically significant lower base pay rate changes than similarly situated non-class members with the same company tenure, job tenure and pre-Bloomberg experience, who worked in the same job codes and business units, who previously earned the same base rate of pay, and whose most recent EEC grants were of the same value;

b. Class members were given statistically significant smaller intended EEC grants than similarly situated non-class members with the same company tenure, job tenure and pre-Bloomberg experience, who received their grants in the same month, who worked in the same job codes and business units, who earned the same base rate of pay, and whose two previous years' EEC grants had the same actual values;

c. The effect of recent job changes on class members does not statistically differ from that of non-class members with respect to base pay rate changes. However, the effect of recent job changes on class members does statistically differ from that of non-class members with respect to intended EEC grants to the detriment of class members. Specifically, class members having experienced a recent job change (in the past two years) can expect approximately $1,500 to $2,400 lower intended EEC grants than their non-class counterparts;

\* \* \*

e. Class members who have the same company tenure, job tenure and pre-Bloomberg experience, who work in the same job codes and business units, who are paid the same base rates, and who receive the same EEC grants systematically receive lower performance ratings. Also, the average performance ratings for class members drop[ ] by a statistically significant 0.1 margin between the "before" and "after" periods of pregnancy and/or maternity leave;

\* \* \*

**\*3** (*Id.* ¶ 52.)

ii. *Reply Report*

In response to the expert reports of Drs. Ward and Johnson (discussed *infra* ), Dr. Lanier submitted a Reply Report (*see* Adams' Lanier Decl., Ex. 10 ("Lanier Reply Report")) wherein he analyzed whether "there is a 'leave effect' associated with the pay outcomes of class members, as distinct from a 'class effect.' " (Lanier Reply Report ¶ 3.) In the Reply Report, Dr. Lanier controlled for leave by "including a class-leave duration interaction variable, which allows the effect of leave duration for class members (those who took maternity leave) to differ from the effect of leave duration for non-class members (those who took non-maternity leave)." (*Id.* ¶ 22.) Based on the leave modification. Dr. Lanier found that "statistically

significant disparities to the detriment of class members exist in base pay changes." [2] (*Id.* ¶ 52.)

[2]    Dr. Lanier provided a Corrected Reply Report in which he corrected his analysis due to his discovery that Bloomberg's personnel data only partially tracked leave information for Bloomberg employees who are employed in foreign offices. (Adams' Lanier Decl., Ex. 15 ¶ 2.) Dr. Lanier's outcome was not affected by the additional information. (*Id.* ¶ 34.)

### C. *Dr. Ward's Report*

Dr. Ward is the Vice President and Senior Analyst at Welch Consulting, a firm specializing in economic and statistical research. (Declaration of Raechel Adams in Support of Plaintiff EEOC's Motion to Exclude the Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV ("Adams' Ward Decl."), Ex. E ("Ward Report") at 1.) Dr. Ward holds M.A. and Ph.D. degrees in Economics from the University of Chicago. Dr. Ward was tasked with measuring the impact on compensation of maternity leaves contrasted to the impact of non-maternity leaves. (*Id.* at 3.) The statistical methodology Dr. Ward employed was a comparison of compensation changes. He compared an employee's compensation prior to taking leave to the employee's compensation after the leave ended. He also compared the changes in the number of direct reports before and after the employee took leave. (*Id.*)

Dr. Ward concluded that "women who take maternity leave fare slightly better, in terms of intended compensation, than other Bloomberg employees on leave for similar amounts of time." (*Id.* at 18.) Dr. Ward further found "no statistical evidence that Class Members' level of responsibility, as measured by direct reports, decreased to any significant degree as compared to other employees when taking time on leave into account." (*Id.*)

### D. *Dr. Johnson's Report*

Dr. Johnson is the President and CEO of Edgeworth Economics, L.L.C., a consulting firm that provides economic and financial analysis for complex litigation and public policy debates. (Adams' Ward Decl., Ex. I ("Johnson Report") ¶ 1.) Dr. Johnson has a Ph.D. in Economics from the Massachusetts Institute of Technology. Dr. Johnson "analyzed the compensation outcomes for control groups of Bloomberg employees-

in particular, employees who took non-maternity leaves." (*Id.* ¶ 14.) Dr. Johnson reviewed Bloomberg's personnel system and organized the data such that he could compare maternity leaves with other leaves and account for the timing of Bloomberg's compensation adjustments on individual employee anniversary dates. (*Id.* ¶ 15.) For class members, Dr. Johnson "compared the base salary and EEC grant value during the 12–month period starting [six] months before birth to the 12–month period starting at the return from leave." (*Id.* ¶ 17.) For non-class members, he "compared compensation during the 12–month period before the start of the leave to the 12–month period after the return from the leave." (*Id.*)

**\*4** Based on Dr. Johnson's analysis, he found that the "base salary of all Bloomberg employees taking a maternity leave which ended between February 2002 and March 2009 (the Class Members) increased an average of $8,060 (10.4 percent) in the 12–month period following each leave, compared to the 12–month period ending [six] months before birth of the child." (*Id.* ¶ 10.) By comparison, Dr. Johnson found that the base salaries of other female employees who took non-maternity leaves increased $3,316 (4.8 percent) and the base salaries for all Bloomberg employees who took non-maternity leave increased an average of $3,946 (5.1 percent) over the comparable period. (*Id.*) Dr. Johnson found that the intended value of EEC grants for "Bloomberg employees returning from maternity leave between February 2002 and March 2009 increased an average of $3,562 (11.2 percent) in the 12–month period following each leave, compared to the 12–month period ending [six] months before the birth of the child." (*Id.*) The intended value of EECs "granted to female Bloomberg employees taking non-maternity leave decreased an average of $8 (less than .1 percent)" and the intended value of EECs granted to all Bloomberg employees taking non-maternity leave increased an average of $1,678 (6.5 percent) over comparable period." (*Id.*)

### E. *Dr. Borgida's Report*

Dr. Borgida is a professor of psychology and law at the University of Minnesota (Twin Cities) and has a Ph.D. in psychology with a specialization in social psychology and psychology and law from the University of Michigan. Dr. Borgida engaged in what is called a "social framework analysis," which "uses general conclusions from tested, reliable, and peer-reviewed social science research as a context for educating fact finders about the case facts

at hand." (Declaration of Eric S. Dreiband in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Eugene Borgida ("Dreiband's Borgida Decl."), Ex. A ("Borgida Report") ¶ 8.) The analysis "provides an assessment of *general causation* in a research area in order to inform the fact finders about more *specific causation* issues associated with a particular case." (*Id.*) In conducting his analysis, Dr. Borgida reviewed several deposition transcripts as well as Bloomberg personnel materials. (*Id.,* Appendix A.) Dr. Borgida concluded that

> the stereotypes about employees who are mothers and/or pregnant more likely than not influenced the perceptions, evaluations, and decisions about them at Bloomberg. The cultural and organizational context at Bloomberg more likely than not activated the gender stereotype about mothers as less competent and as less agentic and less committed to their careers. Given the subjectivity, discretion, and lack of accountability in the Bloomberg decision making process, stereotypic perceptions more likely than not influenced employment decisions about employees who are mothers and/or pregnant.

**\*5** (*Id.* at 38–39.)

## II. *DISCUSSION*

### A. *Legal Standard*

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is

the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In order for the expert opinion to be admissible, the witness "must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact." *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 172 (S.D.N.Y.2009).

"Courts within the Second Circuit have liberally construed expert qualification requirements." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* No. 1:00–1898, 2008 WL 1971538, at \*5 (S.D.N.Y. May 7, 2008) (internal quotation marks omitted). "A witness's qualifications 'can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.' " *In re Fosamax,* 645 F.Supp.2d at 172 (quoting *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990)).

The Advisory Committee's note to Rule 702 explains that the Rule was amended to include the three reliability-based requirements in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny, *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), and *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). *See* Fed.R.Evid. 702 advisory committee's note. In *Daubert,* the United States Supreme Court interpreted Rule 702 to require district courts to act as gatekeepers by ensuring that expert scientific testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597. This requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93; *see also Kumho Tire,* 526 U.S. 137 (holding that this gate keeping function applies to all expert testimony, whether based on scientific, technical or other specialized knowledge).

To be scientifically valid, the subject of expert testimony must rest on "good grounds, based on what is known." *Daubert,* 509 U.S. at 590 (internal quotation marks omitted). In *Daubert,* the Court set forth a non-exclusive list of factors that district courts might consider in gauging the reliability of scientific testimony. *Id.* at 593–95. These factors include: (1) whether the theory has been tested;

(2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error and whether standards and controls exist and have been maintained with respect to the technique; and (4) the general acceptance of the methodology in the scientific community. *Id.* "Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony." *In re Fosamax,* 645 F.Supp.2d at 173 (citing *Kumho Tire,* 526 U.S. at 138). A district court has broad discretion both in determining the relevant factors to be employed in assessing reliability and in determining whether that testimony is in fact reliable. *Kumho Tire,* 526 U.S. at 153; *Zuchowicz v.. United States,* 140 F.3d 381, 386 (2d Cir.1998).

**\*6** Weighing whether the expert testimony assists the trier of fact goes primarily to relevance. *Daubert,* 509 U.S. at 591. Relevance can be expressed as a question of "fit"-"whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (citing *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). In addition, expert testimony is not helpful if it simply addresses " 'lay matters which a jury is capable of understanding and deciding without the expert's help.' " *United States v. Mulder,* 273 F.3d 91, 101 (2d Cir.2001) (quoting *United States v. Castillo,* 924 F.2d 1227, 1232 (2d Cir.1991)). Finally, the testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994) (quoting *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991)).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002). However, in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion. *Id.* "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from

jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 85 (1st Cir.1998) (quoting *Daubert,* 509 U.S. at 596); *see also Amorgianos,* 303 F.3d at 267. If an expert's testimony lies within "the range where experts might reasonably differ," the jury, and not the trial court, should "decide among the conflicting views of different experts." *Kumho Tire,* 526 U.S. at 153.

"The *Daubert* analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions. *In re Fosamax,* 645 F.Supp.2d at 173–74 (citing *Daubert,* 509 U.S. at 595). However, the Supreme Court in *Joiner* recognized that "conclusions and methodology are not entirely distinct from one another." 522 U.S. at 146. Therefore, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (stating that "nothing in either *Daubert* or the Federal Rules of Evidence requir[es] the admission of opinion evidence connected to existing data only by the *ipse dixit* of the expert.") The ultimate object of the court's gate-keeping role under Rule 702 is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. "The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos,* 303 F.3d at 267.

**\*7** Finally, like all evidence, expert testimony may be excluded under Rule 403 if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

### B. *Analysis*

#### i. *Drs. Ward and Johnson*

To support their arguments that Bloomberg either did or did not engage in a pattern or practice of sex/pregnancy discrimination, both sides have put forth statistical experts who opine that after reviewing Bloomberg's compensation data, the numbers conclusively prove their side's case. As

will be discussed below, the Court finds that the experts are qualified, that they utilized reliable methods in arriving at their conclusions, and that their testimony will assist the trier of fact. The parties' arguments for excluding these experts do not go towards admissibility but rather goes towards the weight that the jury should give the testimony. This is a classic "battle of the experts" situation, and it should be left to the jury to decide which expert engaged in the proper analysis to determine whether discrimination took place. Accordingly, Bloomberg's motion to exclude Dr. Lanier and EEOC's motion to exclude Drs. Ward and Johnson are denied.

a. *Dr. Ward*

EEOC concedes that Dr. Ward is qualified, that the data he used in drafting his report was reliable, and that his methodology — regression analysis [3] —was reliable. (Memorandum of Law in Support of Plaintiff EEOC's Motion to Exclude the Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV ("EEOC Ward & Johnson Mem.") at 9.) Instead, EEOC argues that as applied to the facts of this case, Dr. Ward's methodology was flawed and will not assist the trier of fact. (*Id.*) EEOC's primary argument in seeking to exclude Dr. Ward's testimony and expert report is that he studied the wrong question because he analyzed "the impact of *leave* on the compensation of Bloomberg employees, and not the impact of class status (i.e., being pregnant and/or having returned from maternity leave within the relevant time period)." (*Id.* at 10 (emphasis in original).) EEOC contends that the proper question is whether Bloomberg discriminated against employees who are pregnant or new mothers by, among other things, decreasing their compensation. (*Id.* at 11.) In addition, EEOC claims that Dr. Ward did not "sufficiently account for the fact that the pay endpoint he studied may occur shortly after an employee returns from leave or several years after the employee returns from leave-or at any point in between." (*Id.* at 15.) Despite EEOC's arguments, though, the Court finds that Dr. Ward's analysis satisfies the admissibility requirements of Rule 702.

[3]     "Multiple regression analysis is a statistical test which identifies factors, called independent variables, that might influence the outcome of an observed phenomenon, called a dependent variable. In the employment discrimination context the dependent variable is the employment decision, such as

hiring, promotion, termination. The statistician identifies legitimate factors that could have influenced the decision, e.g., education and experience, and determines via multiple regression analyses how well these legitimate factors account for the employment decision. In this manner the influence of a protected characteristic on the employment decision can be statistically isolated." *Smith v. Xerox Corp.,* 196 F.3d 358, 363 n. 3 (2d Cir.1999).

" 'It has been repeatedly affirmed that the [Pregnancy Discrimination Act] does not require the creation of special programs for pregnant women; nor does it mandate any special treatment. To the contrary, the statute specifically requires that pregnant women be treated the same as all other employees with similar disabilities.' " *Velez v. Novartis Pharmaceuticals Corp.,* 244 F.R.D. 243, 264 (S.D.N.Y.2007) (quoting *Dimino v. N.Y.C. Transit Auth.,* 64 F.Supp.2d 136, 157 (E.D.N.Y.1999)); *see also Minott v. Port Auth. of N.Y. and N.J.,* 116 F.Supp.2d 513, 521 (S.D.N.Y.2000) ("Title VII and the Pregnancy Discrimination Act do not protect a pregnant employee from being discharged for absenteeism even if her absence was due to pregnancy or complications of pregnancy, unless other employees are not held to the same attendance standards."). Here, Dr. Ward compared class members, whom he characterized as maternity leave-takers, to non-maternity leave takers to measure the impact on compensation that maternity leave may have. (Ward Report at 3.) He also compared leave-takers in general (maternity and non-maternity) to non-leave-takers to measure how leaves in general impact pay. (*Id* .) Such an analysis is appropriate here because Dr. Ward is attempting to compare the class members to similarly situated employees, *i.e.,* those who have taken a substantial amount of leave. Cf. *Fisher v. Vassar College,* 70 F.3d 1420, 1448 (2d Cir .1995) (agreeing that "the only way a claim of 'sex plus' discrimination could be predicated on the detrimental effects of prolonged professional inactivity would be by comparing (a) the tenure experience of women who took extended leaves of absence from their work (regardless of the reason), with (b) the tenure experience of men who had also taken long leaves of absence").

**\*8** Whether Dr. Ward's conclusion tends to disprove EEOC's allegations of discrimination is a question for the jury. Moreover, the fact that Dr. Ward did not, as EEOC argues, account for the difference between maternity leave and other types of leave among class members is something for the jury to take into account

in determining how much weight should it should give to Dr. Ward's conclusions. That Dr. Ward did not account for every possible variable that may have impacted the class members' compensation does not render his report inadmissible. *See Bazemore v. Friday, 478 U.S. 385, 400 (1986)* ("While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable as evidence of discrimination. Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *see also Bickerstaff v. Vassar College, 196 F.3d 435, 449 (2d Cir.1999)* (affirming district court's rejection of expert's regression analysis not because the analysis "included less than all the relevant variables; rather, [the analysis was] not probative because it omitted the major variables").

In addition to its argument that Dr. Ward's analysis is unreliable, the EEOC also claims that his expert opinions should be excluded under Rule 403 for being confusing and/or misleading. (EEOC Ward & Johnson Mem. at 24.) To support this claim, the EEOC points to the same deficiencies set forth in its Rule 702 challenge. However, as discussed above, the Court finds the EEOC's arguments to be meritless and finds that Dr. Ward's testimony will not confuse the jury but rather will assist the jury in determining whether or not Bloomberg discriminated against the class members.

Accordingly, because the Court finds that Dr. Ward's testimony and expert report: (1) will assist the trier of fact; (2) are based upon sufficient data; (3) are the product of reliable principles and methods; and (4) apply the principles and methods reliably to the facts at issue here, EEOC's Motion to Exclude the Expert Opinion of Dr. Ward is DENIED.

### b. *Dr. Johnson*

EEOC lodges many of the same criticisms against Dr. Johnson's opinion as it lodged against Dr. Ward's opinion. With respect to EEOC s arguments that Dr. Johnson's opinion should be excluded because he studied only a "pure leave effect" as opposed to studying the impact that maternity leave had on an employee's compensation versus non-maternity leave, EEOC's motion is denied. Similarly, the Court finds EEOC's contention that Dr. Johnson's opinion should be excluded because he studied

only a small period of time after an employee's return from maternity leave to be without merit. As discussed above, this alleged shortcoming in Dr. Johnson's analysis goes to its weight not its admissibility.

EEOC challenges Dr. Johnson's opinion in several other respects, each of which is insufficient to preclude admission of the opinion.

### 1. *Dr. Johnson's "Scenario 1" Does Not Compare Similarly Situated Employees*

**\*9** First, EEOC argues that Dr. Johnson's "Scenario 1" fails to compare similarly situated employees. (EEOC Ward & Johnson Mem. at 18.) In "Scenario 1" Dr. Johnson compares the compensation growth of class members from a point eighteen months before the birth of a class member's child to a point twelve months after the class member returned from leave, to the compensation growth of non-class members from a point twelve months before the start of a leave to a point twelve months after the employee's return from leave. (Johnson Report ¶¶ 16–17; Ex. 1.) EEOC argues that the results are unfairly biased in favor of class members' compensation because the "before" window extends eighteen months prior to leave as compared to only twelve months for non-class members. (EEOC Ward & Johnson Mem. at 19.) Bloomberg contends that Dr. Johnson analyzed the eighteen-month "before" window for class members because it was conceivable that a class member would begin to show that she was pregnant six months before the birth of the child and that EEOC was claiming that the discrimination began once the class member announced her pregnancy. (Bloomberg Ward & Johnson Mem. at 23.) Regardless, to account for EEOC's criticism, Dr. Johnson revised his analysis and looked at an equal window of time (a twelve month window beginning eighteen months before leave) for both maternity leave takers and non-maternity leave takers and found that "the alternate specification of the compensation window has no effect on my original findings." (Adams' Ward Decl., Ex. J ("Johnson Reply Report") ¶ 21.) Therefore, even assuming it was erroneous for Dr. Johnson to use different time frames when comparing total compensation, the error did not impact the reliability of his opinion because the results were not altered by the use of different data. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 643 F.Supp.2d 471, 481 (S.D.N.Y.2009)* ( "City's expert's method ... was sufficiently reliable to be admissible in city's action ... even though city's expert

discovered an error in his work; expert's initial testimony was reliable, as it was the same method used by one of the experts of a defendant ... and, when expert discovered his error, he double-checked his work in a timely fashion and supplemented the basis for his conclusions without altering the results."); *Wright v. Stern,* 450 F.Supp.2d 335, 362 (S.D.N.Y.2006) ("Whatever the alleged deficiencies of [the expert's] report, the rebuttal report is sufficiently reliable.").

2. *Dr. Johnson's Failure to Use Regression Analysis and Inclusion of Gender Control*

EEOC's argument that Dr. Johnson's opinion should be excluded because it used "very few multiple regression analyses" is meritless. (EEOC Ward & Johnson Mem. at 20.) As an initial matter, Dr. Johnson did in fact conduct regression analyses in his report; specifically, he looked at whether other factors such as "leave duration, performance rating before the leave, the employee's business unit and office location, and factors specific to the year in which the leave was taken." (Johnson Report ¶ 34.) "Although multiple regression analysis is not a prerequisite for the admission of statistical reports in discrimination cases," "courts have repeatedly held that statistical analyses that fail ... to control for *any* nondiscriminatory explanations are inadmissible. *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at \*4 (S.D.N.Y. Nov. 3, 2004) (emphasis in the original); *see, e.g., Bickerstaff v. Vassar College,* 196 F.3d 435, 450 (2d Cir.1999) (holding that assumption that race bias tainted professor's course evaluation scores is untenable without attempting to control for other causes for low score); *Smith v. Xerox Corp.,* 196 F.3d 358, 370–71 (2d Cir.1999) (holding that plaintiff's statistical analysis failed on its own to support an inference of discriminatory treatment sufficient to withstand a summary judgment motion because the analysis did not account for any other causes or for the fact that older workers were more likely to be terminated); *Hollander v. Am. Cyanamid Co.,* 172 F.3d 192, 203 (2d Cir.1999) (holding that expert report is inadmissible because its "inference of [age] discrimination solely on the basis of the raw numbers is impermissible in the absence of any attempt to account for other causes of the ... anomaly"); *Raskin v. Wyatt Co.,* 125 F.3d 55, 67–68 (2d Cir.1997) (holding that expert report was inadmissible in part because it "assume[d] any anomalies in the ... data must be caused by age discrimination, and [made] no attempt to account for other possible causes"). Here, because Dr. Johnson did not omit major variables from his

analysis, *see Bickerstaff,* 196 F.3d at 449, the Court finds that his opinion is sufficiently reliable to be admissible under Rule 702.

**\*10** Lastly, EEOC claims that to the extent Dr. Johnson conducts meaningful regression analyses, those analyses are flawed because he used an improper gender control. (EEOC Ward & Johnson Mem. at 21.) EEOC argues that the inclusion of a gender control was inappropriate because the class members (all of whom are women) should be compared to non-class members (both men and women); therefore, by using the gender control, Dr. Johnson only compared class members to female non-class members. (*Id.* at 22.) In controlling for gender, Dr. Johnson "deflate[d] the predicted compensation outcomes for male employees by the difference between males and females, so that there is no direct comparison between female class member compensation outcomes and male non-class member compensation outcomes." (*Id.* at 22–23.) In response, Dr. Johnson notes that in his original report he "computed values for both a female-only control group as well as a control group that includes both males and females" and "found that the class members experienced larger compensation increases following a leave than either control group." (Johnson Reply Report ¶ 26.) Regardless, in his Reply Report, Dr. Johnson stated that his original conclusions—that class members experienced larger compensation increases—was unaffected because he could still determine that class members experienced larger compensation increases as compared to non-class members. (*Id.* ¶¶ 29–30.) Therefore, even assuming Dr. Johnson erred in including a gender control, the outcome of his report was not altered by the use of the control thereby making his report reliable. *See MTBE Prods. Liab. Litig.,* 643 F.Supp. at 481; *Wright,* 450 F.Supp.2d at 362.

Accordingly, because the Court finds that Dr. Johnson's testimony and expert report satisfy the requirements set forth in Fed.R.Evid. 702 and that the probative value of his opinion is not substantially outweighed by the danger of confusion to the jury pursuant to Fed.R.Evid. 403, EEOC's Motion to Exclude the Expert Opinion of Dr. Johnson is DENIED.

ii. *Dr. Lanier*

Bloomberg challenges Dr. Lanier's analyses claiming that they are irrelevant and unreliable. (*See* Memorandum of Law in Support of Defendant's Motion to Exclude the

Reports and Testimony of Dr. Louis Lanier ("Bloomberg Lanier Mem.") at 1.) Bloomberg argues that Dr. Lanier's Report is irrelevant because he failed "to compare class members to similarly situated [Bloomberg] employees" and because he failed to show that class members suffered pay decreases upon returning from maternity leave. (*Id.*) Bloomberg also contests the reliability of Dr. Lanier's Report claiming that he "misinterpreted his final analysis, concluding that it showed a class disparity in pay growth ... when ... it [actually] show[ed] the opposite," (*id.*), and that he used a generally accepted scientific approach (an interaction model) but interpreted the results in an unorthodox and unproven manner, (Reply Memorandum in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier ("Bloomberg Lanier Reply Mem.") at 1).

**\*11** Through his regression analysis, Dr. Lanier found that the class's base pay growth was 3.73% lower than the pay increase received by non-class members and that class members received $1,514 less in expected bonus than non-class members. (Lanier Report ¶¶ 27, 31.) In conducting his analysis, Dr. Lanier defined the class as "people who took some type of maternity or pregnancy-related leave" and compared them to "anyone who didn't take a maternity leave during the class period." (Declaration of Eric S. Dreiband in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier ("Dreiband's Lanier Decl."), Ex. C ("Lanier Dep.") at 162:5–16, 9–10.) Bloomberg's expert, Dr. Ward, submitted a rebuttal report to Dr. Lanier's Report wherein he criticized Dr. Lanier for failing to control for leave and noted that had he controlled for leave, Dr. Lanier's Report would have shown that the pay disparity between class members and non-class members would be statistically insignificant. (Adams' Ward Decl., Ex. F ("Ward Rebuttal Report") at 6.) In reply to Dr. Ward's critique, Dr. Lanier performed another analysis where he added a control for leave and found that on average, class members received a 1.17% lower total intended compensation increase than what similarly situated non-class members received in the same year, in the same business unit, with the same amount of company tenure and pre-Bloomberg labor force experience, who were previously paid the same total intended compensation and EEC grants, and who took the same amount of leave in the previous year. (Adams' Ward Decl., Ex. D ("Lanier Corrected Report") ¶¶ 6–15, Table 0.)[4] Moreover, using the same controls, Dr. Lanier found that class members received .92%

lower base pay increases and $1,399 lower intended EEC grants than what non-class members received. (*Id.* at Tables 1, 2.) Therefore, EEOC contends that considering Dr. Lanier's initial Report and Reply Report together will assist the jury in determining whether Bloomberg discriminated against class members after they announced their intention to become pregnant, became pregnant, and gave birth. (EEOC Lanier Mem. at 9.)

[4]    Dr. Lanier filed the Corrected Report three days after filing his Reply Report because he became aware of the fact "that the PeopleSoft data only partially track[s] leave information for Bloomberg employees who are employed in foreign offices." (Lanier Corrected Report ¶ 2.) Therefore, Dr. Lanier had to update all of the tables and back pay damages analysis. (*Id.* ¶ 3.)

Notwithstanding its blanket objection to Dr. Lanier's failure to control for leave in his initial Report, Bloomberg argues that the Court should reject Dr. Lanier's corrected analysis (which includes a control for leave) because Dr. Lanier "reports the results of his reply analysis at the single point where this error is relevant: zero leave duration." (Bloomberg Lanier Reply Mem. at 8.) As Dr. Ward noted in his Sur–Sur Reply to Plaintiff's Corrected Report of Louis R. Lanier (Adams' Ward Decl., Ex. H ("Ward Sur–Sur Reply Report")):

> Dr. Lanier's reported effect for zero days of leave compares Class Members with no leave in the current period to all other employees who had no leave in the current period. However, all Class Members previously took a long leave while the vast majority of the Non–Class Members had no previous long leave, and many had no previous leave at all. If a long leave has some lasting effect on performance-related factors, such as productivity, and therefore on pay, employees with a recent long leave (all of the Class Members but only a small fraction of Dr. Lanier's Non–Class Members) are not similarly situated to employees who have never been on a long leave (the vast majority of Dr. Lanier's Non–Class Members).

**\*12** (*Id.* at 9.) Therefore, as Bloomberg contends, Dr. Lanier's Reply Report still fails to compare similarly situated employees because class members are, in effect, being compared to employees who took little or no leave during the class period. (Bloomberg Lanier Reply Mem. at 8.) In actuality, Bloomberg argues that "a correct comparison, with a correct interpretation, establishes that there is no evidence of a statistically significant disparity in changes in total or intended compensation that is adverse to Class Members overall, when they take leave, *or* after they return from leave. (Ward Sur–Sur Reply Report at 10.)

As discussed above, the PDA " 'specifically requires that pregnant women be treated the same as all other employees with similar disabilities.' " *Velez v. Novartis Pharmaceuticals Corp.,* 244 F.R.D. 243, 264 (S.D.N.Y.2007) (quoting *Dimino v. N.Y.C. Transit Auth.,* 64 F.Supp.2d 136, 157 (E.D.N.Y.1999); *see Smith v. Xerox Corp.,* 196 F.3d 358, 370 (2d Cir.1999) ("[A] disparate treatment claim looks at how an individual was treated compared to her similarly situated coworkers. Thus, statistical analyses that compare coworkers who competed directly against each other to receive a benefit ... are appropriate."); *Minott v. Port Auth. of N.Y. and N.J.,* 116 F.Supp.2d 513, 521 (S.D.N.Y.2000) ("Title VII and the [PDA] do not protect a pregnant employee from being discharged for absenteeism even if her absence was due to pregnancy or complications of pregnancy, unless other employees are not held to the same attendance standards."). Here, in order to prove that Bloomberg discriminated against class members on account of their gender/pregnancies, EEOC must show that Bloomberg treated class members differently from "other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). Dr. Lanier's Report fails to make this comparison because he does not accurately compare class members to other similarly situated Bloomberg employees, *i.e.,* leave takers. The Court finds his attempt to control for leave in his Reply Report to be utterly irrelevant because, as Dr. Ward demonstrated, Dr. Lanier's comparison at zero leave duration merely compared class members to other employees who, for the most part, never took leave during the entire class period. Accordingly, because he did not compare class members to other similarly situated employees, Dr. Lanier's Report cannot assist the trier of fact and is thus inadmissible pursuant to Rule 702.

In addition to finding that Dr. Lanier's Report is irrelevant, the Court also agrees with Bloomberg's argument that Dr. Lanier's use in his Reply Report of an interaction model to account for the impact of leave on compensation at Bloomberg is unreliable because, as Dr. Lanier admitted, his "interaction model differs from [the] typical interaction scenario in that there is no presumed relationship (interaction) between the alleged discrimination against mothers and the amount of leave taken." (Declaration of Dr. Louis Lanier in Opposition to Defendant Bloomberg L.P.'s Motion to Exclude the Reports and Testimony of Dr. Louis Lanier ("Lanier Decl .") ¶ 14.) Dr. Lanier acknowledged that the results of his interaction model show that "class members tend to have better pay outcomes upon return from leave than non-class members who took the same amounts of leave." (*Id.* ¶ 12.) Despite these results, though, Dr. Lanier opines that he has isolated the impact that class status has on a class member's compensation and found that "the measured fixed pay difference that is only related to class status ... is the appropriate measure of discrimination against the class." (*Id.* ¶ 30.) Only by engaging in an atypical methodology (*i.e.,* using an interaction model where the two factors-leave and class membership-do not interact) does Dr. Lanier arrive at his conclusion that class members suffer a fixed class penalty solely as a result of being a class member and not as a result of taking leave. (*Id.* ¶¶ 29–30.) What his method ultimately shows is that, at zero leave duration, class members experience lower compensation growth as compared to all other Bloomberg employees who took no leave during the current pay period. But, as discussed above, the reason class members suffer a pay disparity compared to other employees at zero leave duration is because the majority of employees who took no leave in the current pay period also took no leave during the entire class period. (*See* Ward Sur–Sur Reply Report at 2–3.) Therefore, by "isolating" what he calls the "Class Disparity," Dr. Lanier merely compared class members to other employees who took little or no leave. He was only able to isolate the "Class Disparity" by ignoring the impact of leave duration. (*Id.* at 9.) Dr. Lanier's unorthodox method of interpreting his interaction model is unsupported by any professional literature or other source that would suggest his methodology is recognized by other statisticians. *See Wills v. Amerada Hess Corp.,* 379 F.3d 32, 49 (2d Cir.2004) (affirming district court's exclusion of expert testimony where the expert conceded that his theory of causation was "controversial" and where

district court found that another theory of causation was more generally accepted in the scientific community); *Malletier v. Dooney & Bourke, Inc.,* 525 F.Supp.2d 558, 637 (S.D.N.Y.2007) (finding that expert who failed to provide "support in the literature or in any other survey for the method he used" and his "attempt to solve a problem ... with an untested theory [do] not meet the standards of Rule 702 and *Daubert*"); *see also Braun v. Lorillard Inc.,* 84 F.3d 230, 235 (7th Cir.1996) (expert testimony properly excluded where it relied on unproven methods used after the established methodology led to an inconclusive result; if an expert "proposes to depart from the generally accepted methodology of his field and embark upon a sea of scientific uncertainty, the court may appropriately insist that he ground his departure in demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry."). Therefore, the Court finds that EEOC has failed to meet its burden of showing that Dr. Lanier's methodology is reliable pursuant to Rule 702 and therefore finds that his Report is inadmissible.

**\*13** Accordingly, because the Court finds Dr. Lanier's testimony and expert report to be irrelevant and unreliable, Bloomberg's Motion to Exclude the Reports and Testimony of Dr. Lanier is GRANTED.

### iii. *Dr. Borgida*

EEOC proposes the testimony of Dr. Borgida, a social psychologist who used a "social framework analysis" to reach his conclusion that gender stereotyping was prevalent at Bloomberg. To reach this conclusion, Dr. Borgida essentially drew on his knowledge of social psychology and the established, peer-reviewed scientific research literature on gender stereotyping and gender prejudice, including [his] own contribution to this body of social scientific knowledge, to review the set of case documents provided me for review by plaintiffs' or defense counsel .... [and] used specific examples drawn from the case materials to illustrate and highlight the scientific conclusions drawn from the social scientific research that are most applicable to the case at hand.

(Borgida Report 9.) Dr. Borgida's analysis led him to conclude that

the stereotypes about employees who are mothers and/or pregnant more likely than not influenced the perceptions, evaluations, and decisions about them at Bloomberg. The cultural and organizational context at Bloomberg more likely than not activated the gender stereotypes about mothers as less competent and as less agentic and less committed to their careers. Given the subjectivity, discretion, and lack of accountability in the Bloomberg decision making process, stereotypic perceptions more likely than not influenced employment decisions about employees who are mothers and/or pregnant.

(*Id.* at 38–39.) EEOC seeks to introduce Dr. Borgida's testimony "to educate the fact-finder about the social science on stereotyping, the nature of the [Bloomberg] organizational structure, practices, and culture that may lead to stereotyping, and organizational remedies for monitoring and reducing the effects of stereotypes." (EEOC Borgida Mem. at 1.)

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 255–56 (1989), the United States Supreme Court "recognized the utility" of expert testimony concerning gender stereotyping in gender discrimination cases. *Hnot v. Willis Group Holdings Ltd.,* No. 01 Civ. 6558, 2007 WL 1599154, at \*2 (S.D.N.Y. June 1, 2007). Courts in this district have found Dr. Borgida's testimony (or similar testimony) to be "valuable in giving a jury context within which to evaluate the particular evidence relating to the workplaces at issue...." *Id.* at \*3; *see Velez v. Novartis Pharmaceuticals Corp.,* No. 04 Civ. 9194, slip op. at 7 (S.D.N.Y. Feb. 25, 2010) (permitting psychologist's testimony, based on his knowledge of "professional literature," concerning the subjectivity of defendant's performance appraisal and pay system); *E.E.O.C. v. Morgan Stanley & Co.,* 324 F.Supp.2d 451, 462 (S.D.N.Y.2004) (permitting social scientist to "testify about gender stereotypes and about how these stereotypes may have affected decisions at Morgan Stanley"); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC,* 470 F.Supp.2d 345, 355 (S.D.N.Y.2007) (denying motion to strike Dr. Borgida's testimony). As *Daubert* recognizes, and *Kumho* emphasizes, the Court's analysis under Rule 702 is "a flexible one." *Daubert,* 509 U.S. at 594. Such flexibility is necessary in the case of expert testimony based on " 'soft' social sciences":

**\*14** Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case." *Kumho Tire,* 526 U.S. at 153.

*United States v. Simmons,* 470 F.3d 1115, 1123 (5th Cir.2006) (internal quotations and citations omitted). The fact that a social scientist's approach might have "inherent methodological limitations," *id.,* and does not produce "a testable hypothesis" or a "known or potential rate of error," *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 n. 8 (3d Cir.1994), does not necessarily render the resulting testimony unreliable under Rule 702. "Instead, the Court must perform its gatekeeping assessment on measures of reliability that are appropriate to the particular testimony in question." *Bowers v. Nat'l Collegiate Athletic Ass'n,* 564 F.Supp.2d 322, 361 (D.N.J.2008); *see Milanowicz v. The Raymond Corp.,* 148 F.Supp.2d 525, 536 (D.N.J.2001) (noting that "courts should determine whether an expert has supported his conclusions through discussion of the relevant literature"); *Paoli,* 35 F.3d at 742, n. 8 ("the qualifications of the expert witness testifying based on the methodology" bear on the reliability analysis). This is not to suggest, however, that a non-scientific expert's testimony is subjected to less rigorous standards of reliability but merely emphasizes that the reliability analysis under Rule 702 must be flexible to account for different types of expertise. *See Bowers,* 564 F.Supp.2d at 361. Here, upon reviewing both Dr. Borgida's report and his deposition, the Court finds that his expert opinion lacks the reliability required under Rule 702 and therefore is inadmissible.

### a. *Sufficient Facts and Data*

Dr. Borgida's opinion must be excluded because he relied on insufficient facts and data. As he admitted in his deposition. Dr. Borgida only analyzed material provided and selected by the EEOC. (Dreiband's Borgida Decl., Ex. B ("Borgida Dep.") at 145:17–23.) He made no effort to ensure that the materials that he reviewed were representative. (*Id.* at 164:21–23 ("I do not have a sense of how representative that set of materials is with regard to whatever constitutes the entire set.").) Instead, he simply assumed the validity of the allegations of the claimants in this case. (*Id.* at 161–62

(discussing the difficulty of accounting for bias in the claimants' testimony concerning alleged discrimination at Bloomberg).) Relying solely on the information fed to him by the EEOC without independently verifying whether the information is representative undermines the reliability of his analysis. *See Rowe Entertainment, Inc. v. William Morris Agency, Inc.,* No. 98 Civ. 8272, 2003 WL 22124991, at \*3 (S.D.N.Y. Sept. 15, 2003) (finding data upon which expert relied to be insufficient because it was selected by plaintiff's counsel and "would, perforce, be biased"); *see also id.* ("[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply.")

### b. *Reliable Principles and Methods*

**\*15** By his own admission, Dr. Borgida did not conduct a scientific study that would meet peer review standards because he "[did not] know how [one] would do it with the case materials [he] had." (Borgida Dep. at 134:17–20.) Instead, Dr. Borgida "went through the material" selected by EEOC and "dog-ear [ed]" "examples that [he] thought illustrated" gender stereotyping. (*Id.* at 72–73; *see also id.* at 138, 147, 150, 156, 158.) Moreover, Dr. Borgida, although aware of countervailing examples, elected not to include "disconforming instances" of "individuals who claimed to not have ... heard comments or to taking a different point of view." (*Id.* at 170:13, 9–11.) Indeed, he "didn't systematically go through and track [counterexamples]" or "use a written coding system" for any of the materials, whether confirming or "disconfirming," because "[t]hat wasn't [his] goal." (*Id.* at 96:3–4; 151:22–23.) Dr. Borgida did acknowledge that a more systematic approach was possible but that he did not employ such an approach in this case. (*Id.* at 99 ("I'd have to go back to the materials and then systematically re-review all of those materials and take copious notes of what was said when, and then put them in a spreadsheet and then sort of rotate that so that I have some sort of, you know, printout of what was said when-what was allegedly said when, to whom, and under what circumstances.").)

Although it is not necessary that Dr. Borgida's methodology be subjected to the specific criteria set forth in *Daubert,* it is also true that "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should not be admitted. *Kumho Tire,* 526 U.S. at 157. Dr. Borgida "must provide some explanation [regarding his methodology] so that it can be evaluated

as to its reliability." *Roniger v. McCall,* No. 97 Civ. 8009, 2000 WL 1191078, at *3 (S.D.N.Y. Aug. 22, 2000) (citing *Kumho Tire,* 526 U.S. at 157). Merely touting his expertise rather than relying on "analytic strategies widely used by specialists" in the field does not make Dr. Borgida "an expert as Rule 702 defines that term." *Zenith Electronics Corp. v. WH–TV Broadcasting Corp.,* 395 F.3d 416, 419 (7th Cir.2005). Upon reviewing Dr. Borgida's report and deposition, the Court cannot discern any reliable method; rather, the opinions in the report are supported by what appears to be a "because I said so" explanation. Dr. Borgida may be a renowned social psychologist, but if he cannot explain how his conclusions satisfy Rule 702' s requirements, then he is "not entitled to give expert testimony." *Id.; see also Mid–State Fertilizer Co. v. Exch. Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

The fact that Dr. Borgida conceded that he did not employ any "specific methodology," (Borgida Dep. at 142), and instead merely engaged in "dog-earing" passages from depositions that he believed supported his conclusion, (*id.* at 72–73), underscores the Court's conclusion that Dr. Borgida's methodology is not reliable and should not be admitted.

### c. *Reliable Application of Methods to the Facts*

**\*16** In addition to finding Dr. Borgida's method to be unreliable, the Court also finds that Dr. Borgida did not apply his social framework analysis reliably to the facts here. The Court is troubled by Dr. Borgida's decision to ignore completely what he referred to as "disconforming" examples in his report. (Borgida Dep. at 170:7.) Specifically, Dr. Borgida engaged in credibility determinations, crediting testimony that supported his position while rejecting testimony that contradicted his opinion. For example, with respect to testimony concerning Bloomberg's "no-rehire" policy for employees who leave Bloomberg for a competitor, Dr. Borgida's cites the deposition testimony of Peter Grauer, a Bloomberg manager, who stated

> "The rationale in the early days was these people are part of our team. They are paid by us. They have betrayed our trust by going to work somewhere else. They don't like working in our environment and are not grateful for the benefits and the opportunities we provided them. So the hell with them." Additionally,

[Mr. Grauer] rejected "raising a family" as an exception to the no-rehire policy. [He] says he is "inclined to take it out" and thus in August 2005 rejected rehiring employees who left to care for their children.

(Borgida Report at 20–21.) However, at his deposition, Dr. Borgida conceded that he only reviewed a truncated version of an email exchange between Mr. Grauer and another Bloomberg employee and that had he reviewed the email in its entirety, it would have made him "reconsider" his conclusion and "back off ... from [this conclusion] in the report." (Borgida Dep. at 213:8, 17–18.) Moreover, in his report Dr. Borgida fails to cite the deposition testimony of Mayor Michael Bloomberg who refuted Dr. Borgida's characterization of Bloomberg's no-rehire policy. (*See* Dreiband's Borgida Decl., Ex. D at 42:16–24 ("We have always had a policy of not rehiring anybody who went to work elsewheres (sic) in the private sector. If they took time off for family things or to do public service, which includes working in the government, we've always been willing to hire them back if they want to come back. But if they go to work elsewheres (sic), no.").) An expert "should not be permitted to 'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.' " *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 541 (S.D.N.Y.2004) (quoting *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 527, *amended on reconsideration on other grounds,* 137 F.Supp.2d 438 (S.D.N.Y.2001)).

Applying his methodology to the facts, Dr. Borgida reached the conclusion that "stereotypic perceptions more likely than not influenced employment decisions about employees who are mothers and/or pregnant." (Borgida Report at 38–39.) Dr. Borgida effectively intuited this conclusion: "[I]n knowing the research as I do, and in seeing and reading what I read and saw, and in looking at the relationship between what I expected and what I saw, I attached a more likely than not expression to ... that." (*Id.* at 87.) Dr. Borgida, though, was unable to identify specific examples of gender stereotypic thinking or of decisions influenced by such thinking:

**\*17** • In each of the months or years in the class period, (*see id.* at 98–99);

• By each of the managers at Bloomberg, (*see id.* at 90);

• Within each department at the company, (*see id.* at 85–86); or

• Affecting each woman in the company, (*see id.* at 105–06, 110).

Lastly, Dr. Borgida was unable to determine how many decisions at Bloomberg were, as he believed, affected by gender stereotypic thinking. (*Id.* at 373.) To ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of Dr. Borgida's methodology.[5]

[5]     Dr. Borgida was provided a copy of Mr. Bloomberg's deposition transcript. (*See* Declaration in Opposition to Defendant's Motion to Exclude the Reports and Testimony of Dr. Eugene Borgida, Ex. 5.)

     d. *Relevance*

Finally, Dr. Borgida's proposed testimony would not assist the trier of fact with respect to EEOC's claims of a pattern or practice of sex/pregnancy discrimination. After describing the literature on gender stereotyping, Dr. Borgida set forth his characterization of the culture and organizational structure of Bloomberg-based on material selected by the EEOC-which he described as long hours, loyalty to the firm, and "subjective" decision-making processes. (*See generally* Borgida Report.) Then, Dr. Borgida recounted various snippets from several depositions (a majority of which were from claimants and all of which were selected by the EEOC) describing how they felt they were being discriminated against on the basis of their pregnancy. (*See id.* at 30–38.) From this, Dr. Borgida arrived at his conclusion that gender stereotypes "more likely than not influenced employment decisions about employees who are mothers and/or pregnant." (*Id.* at 38–39.) However, during his deposition, Dr. Borgida was unable to conclude that Bloomberg managers were intentionally stereotyping pregnant women or women returning from maternity leave. (Borgida Dep. at 443:19–444:9.) Therefore, even assuming Dr. Borgida's opinion was reliable (which, as discussed above, it is not) it would not support EEOC's allegations that the "unlawful employment practices complained of ... were intentional." (Second Amended Complaint ¶ 10.) *See E.E.O.C. v. Wal–Mart Stores, Inc.,* No. 01 Civ. 339, 2010 WL 583681, at *3 (E.D.Ky. Feb. 16, 2010) (excluding expert testimony of social psychologist who opined that gender stereotyping affected

decisions made about claimants because the expert did not provide any evidence supporting the conclusion that gender stereotyping necessarily includes intentional discrimination).

Moreover, the Court agrees with the Minnesota Court of Appeals' reasoning in *Ray v. Miller Meester Advertising, Inc.,* 664 N.W.2d 355 (Minn.Ct.App.2003) wherein the court found that the trial court abused its discretion by admitting Dr. Borgida's testimony because the opinion was unhelpful to the jury. The court noted that "[i]nformation about and commentary on gender issues is so abundant in our society that it has become a common stereotype that women receive disparate and often unfairly discriminatory treatment in the workplace." *Id.* at 365–66. In addition, the court in *Ray* observed that "[g]ender stereotypes are the stuff of countless television situation comedies and are the focus of numerous media treatments on nearly a daily basis. It is unarguable that virtually all adults in our society know about gender stereotypes." *Id.* at 366. The Court agrees. Upon reviewing Dr. Borgida's report and deposition, it becomes apparent that Bloomberg demands that its employees work hard and remain loyal to the company. The jury will have the benefit of hearing testimony from claimants, Bloomberg managers, and other Bloomberg employees and can determine based on the evidence, and with the benefit of their common sense and experience, whether the claimants suffered discrimination based on their gender/pregnancy. Accordingly, because the Court finds Dr. Borgida's proposed expert testimony is the result of an unreliable methodology and will not assist the trier of fact, his testimony is inadmissible pursuant to Fed.R.Evid. 702.

**\*18** Even assuming that Dr. Borgida's opinion is otherwise admissible under the Rule 702, however, its minimal probative value is substantially outweighed by its prejudicial effect, making it inadmissible under Fed.R.Evid. 403. Dr. Borgia's opinion focuses on factors that give rise to gender stereotyping and would serve merely to distract the jury's attention from considering the evidence as it applies to EEOC's pattern or practice claim and other causes of action alleged in the Second Amended Complaint. Accordingly, Dr. Borgida's proposed testimony is precluded under Rule 403.

*CONCLUSION*

For the foregoing reasons: (1) Plaintiff's Motion to Exclude the Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV [dkt. no. 115] is DENIED; (2) Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier [dkt. no. 117] is GRANTED; and (3) Defendant's Motion to Exclude the Reports and Testimony of Dr. Eugene Borgida is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3466370

---

**End of Document**　　　　　　　　　　　　　　　　　　© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**5**

2002 WL 31061088
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,
v.
DIAL CORPORATION, Defendant.

No. CIV.A. 99–C–3356.
|
Sept. 17, 2002.

Opinion

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION IN LIMINE TO
EXCLUDE PLAINTIFF'S EXPERT TESTIMONY

WARREN K. URBOM, Senior District Judge.

**\*1** Dr. Louise F. Fitzgerald was engaged by EEOC as an expert in this case. The Table of Contents of her report dated May 1, 2000, lists the subjects covered: I. Introduction and Overview; II. Summary of Scientific Knowledge Concerning Sexual Harassment; III. Brief description of survey; IV Analysis of Work Environment at Aurora Dial; and V. Conclusions and Opinions. (Hereafter Fitzgerald Report).

Five opinions are expressed in V., as follows:

1) *The Aurora plant of the Dial Corporation is historically permeated by a high level of hostile and degrading sexualized behavior directed towards women as a group, as well as towards individual women.* Such behavior was frequent, serious, and of long duration. It is my opinion that it was for many years virtually impossible to work "on the floor" at Dial without being exposed to these conditions on a regular basis. Although efforts have recently been made to correct the most obvious problems (e.g., pornography, sexualized visuals), such efforts are only the smallest of remedial steps, and leave untouched the more deeply rooted problems of which such materials are symptomatic.

2) *The events alleged could reasonably be expected to lead to a variety of emotional and health-related problems for women who encountered them.* Reactions ranging from anxiety, depression, decreased job satisfaction, and increased job stress to nightmares, panic attacks, and major depressive reactions are reasonably foreseeable, documented in the case materials, and consistent with those documented in the scientific literature as the outcomes of sexual harassment; they are the natural and expectable outcome of exposure to noxious sexualized behavior at work. The survey data provide further support for the contention that a substantial proportion of the female workforce at Dial Aurora was negatively affected by pervasive atmosphere of offensive sexual behavior.

3) *Dial–Aurora appears characterized by a pervasive culture of permissiveness accepted and modeled by supervisors and management up to the highest executive levels of the plant.* The documentation in the case presents considerable evidence of inappropriate behaviors engaged in, ignored by, and/or acquiesced to at every level of management. This normative culture contributed to the perception of lower level employees that such behavior was acceptable at Aurora–Dial.

4) *In addition to a permissive organizational culture and lax management norms, the Dial Corporation exhibited a high level of tolerance of sexually harassing behavior in its Aurora plant* as evidence by its minimal attempts to sensitize its employees to the issue; failure to train its HR professionals; failure to maintain adequate centralized records; failure to follow up with complainants; and reluctance to impose meaningful sanctions on offenders. There is considerable evidence, both testimony and survey, that reports of harassment were often not taken seriously and that female employees were unwilling to bring forward complaints for fear of serious consequences.

**\*2** (Fitzgerald Report, p. 83).

The report then says that the opinions are to a "reasonable degree of scientific certainty."

The defendant's Motion *In Limine* says:

Defendant, the Dial Corporation ("Dial") by its attorneys and pursuant to Federal Rules of Evidence 402, 403 and 702 moves *in Limine* to exclude the testimony of EEOC's expert, Dr. Louise Fitzgerald, arguing:

1. Dr. Fitzgerald's testimony is irrelevant, unreliable, and prejudicial and, therefore, is inadmissible under Federal Rules of Evidence 702, 704 and 703.

2. The bases for this motion are more fully set forth in Dial's accompanying Memorandum of Law.

(Hereafter Dial Memo.)

Thus, the motion asks that *all* Dr. Fitzgerald's testimony be disallowed at trial. Her deposition (Fitzgerald Dep.), which I have read, spanned three days and consumes 634 pages. The motion will be granted in part and otherwise denied.

The opinions of Dr. Fitzgerald rely heavily, although not at all exclusively, upon a Workplace Environment Survey (hereafter WES) and a Sexual Experiences Questionnaire (SEQ). Many questions about both the WES and the SEQ are appropriate and many flaws in them have been noted in the Report of Dr. Barbara A. Gutek, an expert engaged by EEOC to analyze Dr. Fitzgerald's report. I shall not recite all the criticisms that Dr. Gutek has for Dr. Fitzgerald's report and conclusions, but there are some that for the purposes of the case in its present posture are so substantial that I, as the gatekeeper, should say that the opinions resting in such significant degree upon the WES and the SEQ must be kept from the jury. Neither those surveys nor the opinions substantially based upon them are relevant or valid or useful in assisting "the trier of fact to understand the evidence or determine a fact in issue." as required in Rule 702 of the Federal Rules of Evidence.

### I. STANDARD OF REVIEW

The admissibility of testimony by experts is governed by Federal Rule of Evidence 702, which states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED.R.EVID. 702. The Advisory Committee Note accompanying Rule 702 indicates that in the year 2000, Rule 702 was amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny. FED.R.EVID. 702 advisory committee's note. In *Daubert,* the Supreme Court "held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.' " *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert,* 509 U.S. at 589). The amendment to Rule 702 affirms the Supreme Court's casting of the trial court in the role of a "gatekeeper," FED.R.EVID. 702 advisory committee's note, who must "ensure the reliability and relevancy of expert testimony" and "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The Court has listed certain factors that may be used by the trial court in connection with its reliability determination:

**\*3** -Whether a "theory or technique ... can be (and has been) tested";

-Whether it "has been subjected to peer review and publication";

-Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and

-Whether the theory or technique enjoys " 'general acceptance' " within a " 'relevant scientific community.' "

*Kumho,* 526 U.S. at 149–50 (quoting *Daubert,* 509 U.S. at 592–94). The trial court should consider these factors "where they are reasonable measures of the reliability of expert testimony," but, at the same time, the trial court is

granted "considerable leeway" to determine "how to test an expert's reliability." *Id .* at 152.

## II. ANALYSIS

Dr. Fitzgerald has prepared a report that sets forth four substantive conclusions (*see* Def.'s Mot. in Limine to Exclude Pl .'s Expert Testimony, Ex. B, "Expert Report" (hereinafter "Fitzgerald Report") at 83) that she claims are supported by her review of the "Scientific Knowledge Concerning Sexual Harassment" and her "Analysis of [the] Work Environment at Aurora–Dial," (*id .* at 2). Dr. Fitzgerald's "work environment" analysis includes a survey of women employed at the defendant's Aurora plant, which in turn contains a rather lengthy set of questions [1] that have been grouped into scales. (*See id.* at 21.) One of these scales purports to measure the survey respondent's "offensive sex-related experiences at work," (*id.* at 21), and has been dubbed the "SEQ," (*see, e.g., id.* at 27 n. 8 and accompanying text). Defendant The Dial Corporation (Dial) argues that "Dr. Fitzgerald's testimony cannot satisfy the [Rule 702] reliability requirement because her methodology is flawed." (Def.'s Redacted Mem. of Law in Supp. of Its Mot. in Limine to Exclude PL.'s Expert Testimony (hereinafter Def.'s Br.) at 10.) Specifically, the defendant argues that: 1) Fitzgerald's SEQ is not a valid measure of unlawful sexual harassment; 2) the survey sample size is too small to permit the survey findings to be generalized to the entire relevant population of female employees at Dial; 3) the survey fails to confine its focus to the relevant time frame; and 4) the survey is biased against Dial. I shall review each of the defendant's arguments in turn.

[1]    The survey was twenty-seven pages long. (*See* Fitzgerald Report at 20.)

## A. The Validity of the SEQ

The defendant first argues that because the SEQ does not measure "sexual harassment" within the meaning of Title VII, it is not valid. The first component of the defendant's argument seems to have been conceded, because the plaintiff admits that "[t]he SEQ measures sexual harassment under the social science definition...." (Pl.'s Response to Def.'s Mot. in Limine to Exclude Pl.'s Expert Testimony (hereinafter "Pl.'s Br.") at 12.) In addition, Fitzgerald recognizes in her report that "[s]exual harassment is a legal term of art," but claims that the term "is used in [her] report in its commonly

understood sense of sex-related behavior that is unwanted and unreciprocated by the recipient." (Fitzgerald Report at 5 n. 1.) However, although it is true that the SEQ does not measure "legal" sexual harassment, I do not believe that this fact, standing alone, requires a finding that the SEQ is invalid.

**\*4** Fitzgerald and the defendant's expert, Dr. Barbara Gutek, have each discussed the importance of validity in survey research. (*See* Fitzgerald Report at 21–22; Def.'s Mot. in Limine to Exclude Pl.'s Expert Testimony, Ex. D, "Report of Dr. Barbara A. Gutek" (hereinafter "Gutek Report") at 22.) Dr. Fitzgerald's report states that "[t]he issue of validity is critical in all research," and notes that collecting data within the context of a lawsuit "presents special challenges." (Fitzgerald Report at 21.) Her report also indicates that "every effort" was made to avoid biasing responses and that "objective measures" were examined "wherever possible" to provide confidence in the results. (*Id.*) However, Fitzgerald admits that a significant portion of the survey respondents are members of the class of persons with claims against Dial in the present lawsuit, and that her data collection methods may have "introduced a certain amount of nonsystemic variance into the data." (*Id.* at 22.) I take the latter statement to mean that Dr. Fitzgerald's research methods, as opposed to the variables that she attempted to measure using those methods, may have influenced the results she obtained. However, Dr. Fitzgerald opines without elaboration that her "examination of the pattern of results, the sample demographics, and the various objective measures available suggest that any such variance has minimal impact on the results reported here." (*Id.*)

Dr. Gutek's report initially presents a broad definition of "validity." (*See* Gutek Report at 22.) Specifically, it states that "[a] measure like the SEQ is valid if it measures what it claims to measure." (Def.'s Mot. in Limine to Exclude Pl.'s Expert Testimony, Ex. D, "Report of Dr. Barbara A. Gutek" (hereinafter "Gutek Report") at 22. The report then provides more detailed definitions of different types of validity (*see id.* at 22–27), which I shall address momentarily. In this case, the SEQ claims to measure "offensive sex-related experiences at work." (Fitzgerald Report at 21.) Given the general definition of validity provided by the defendant's expert, it appears that if the SEQ measures offensive sex-related experiences at work, which is what it claims to measure, it could be considered

valid. Therefore, the fact that the SEQ does not measure "legal" sexual harassment does not necessarily affect its validity. However, the fact that the SEQ measures something other than "legal" sexual harassment does raise the possibility of jury confusion. Although it is possible to define sexual harassment in its legal and its social science or non-legal meaning, the risk of the jury's failure to keep the distinction always in mind diminishes the usefulness of testimony and a survey built upon the non-legal definition. That is particularly true during a lengthy trial, which this one promises to be.

Although the fact that the SEQ purports to measure sexual harassment in some "non-legal" sense may not, in and of itself, render the SEQ invalid, it remains to be determined whether the SEQ is capable of measuring what it claims to measure-that is, whether it truly measures offensive sex-related experiences at work. My examination of the experts' reports suggests that the answer to this question is "no."

**\*5** Dr. Gutek's report describes three "kinds" of validity: content validity, construct validity, and criterion validity. (*See* Gutek Report at 22.) The SEQ's content validity can be assessed by examining the survey's questions to determine whether the content of the questions relates to the "construct being measured," (*id.*), which, in this case, is "offensive sex-related experiences at work." (Fitzgerald Report at 21.) Dr. Gutek does not argue strongly that the SEQ lacks content validity. (*See id.* at 22–24.) However, she makes other observations in her report that seem to me to raise serious concerns about whether the questions included in the SEQ truly measure "offensive sex-related experiences at work." First, it must be noted that the "offensive sex-related experiences at work" that are asked about are those of "women employed at the Aurora plant between January, 1988, and October, 1999" (Fitzgerald Report at p. 20.). No identifiable period of time when these experiences occurred is targeted. Dr. Fitzgerald's survey methods have not resulted in a valid measurement of women's sex-related experiences at Dial *during any common or meaningful frame of time.* The defendant has raised this issue in a separate section of its brief in support of its motion in limine, and I shall therefore revisit this issue below. However, it should be noted that the SEQ's questions' failure to focus on an appropriate time frame seems to qualify as a validity shortcoming.

Second, the wording of several specific SEQ items seems ill-suited to the measurement of "offensive sex-related experiences at work" during whatever time frame the survey was supposed to test. The instructions (or "lead in," (Gutek Report at 18)) preceding the SEQ read as follows:

35. Now please tell us about your experiences working at Dial Corporation. Remember that your answers are COMPLETELY CONFIDENTIAL.

**DURING THE TIME YOU WORKED AT DIAL CORPORATION, HAVE ANY OF YOUR SUPERVISORS OR COWORKERS ...**

(Def.'s Mot. in Limine to Exclude Pl.'s Expert Testimony, Ex. A at 13.)[2] This lead-in is followed by a number of separate items, such as, "told dirty stories or jokes?" (*Id.*) Accompanying each separate item is a scale ranging from zero to four, such that zero is associated with the response "Never," one with "Once or Twice," two with "Sometimes," three with "Often," and four with "Many Times." (*Id.*) The lead-in fails to limit the responses to incidents that were offensive[3] or that were performed by male supervisors or coworkers, which means that several SEQ items could be answered with "threes" and "fours" by respondents who may actually have experienced nothing offensive at work. For example, a respondent who *enjoyed* joking with her female coworkers "many times" would enter a "four" on the first item of the SEQ, even though she did not view this activity as an *offensive* sex-related experience at work. In addition, it seems that if a coworker or supervisor "tried to get [the respondent] to talk about personal ... things," (Def.'s Mot. in Limine to Exclude Pl.'s Expert Testimony, Ex. A at 13), regardless of whether his or her efforts were offensive or sexual in nature, the respondent will accumulate points on the SEQ. While I do not find that the "content validity" of each item in a lengthy survey must be facially apparent in order to render that survey "reliable" for the purposes of Rule 702, it is important to note that the accumulation of a single SEQ point means that the respondent experienced "sexual harassment" as Dr. Fitzgerald defines the term (*see, e.g.,* Fitzgerald Report at 65 (indicating that respondents "who reported at least one incident of offensive behavior (i.e., SEQ score > 0)" were "harassed" by certain supervisors or co-workers)), and this in turn raises serious doubts about the validity of her analysis and her conclusions. As Dr. Gutek points out, it is possible that a respondent who was asked "How is your family?" by a supervisor could be

identified as a victim of "offensive sexual harassment" by Dr. Fitzgerald's instrument. (*See* Gutek Report at 20.)

2    Note that the lead in defines the relevant time period as "the time you worked at Dial Corporation,' as opposed to the years from 1988 through 1999. Gutek has observed that many of the survey respondents were employed by Dial outside of this time period. (*See* Gutek Report at 49–50.) Indeed, Fitzgerald reports that the respondent's average tenure at Dial exceeded 14 years (Fitzgerald Report at 21), which clearly exceeds the twelve-year period of interest.

3    There is a separate question following the SEQ that asks respondents to indicate the extent to which "any" of the "situations" listed in the SEQ were "annoying," "offensive," "disturbing," "threatening," "embarrassing," "upsetting," or "frightening." (*See id.* at 14.) This arrangement does not appear to allow Fitzgerald to claim that every item scored with a value greater than one on the SEQ was viewed as offensive by a given respondent.

**\*6** Dr. Gutek describes two other types of validity in her report: "construct validity" and "criterion validity." Although the terms are not clearly defined in the report, it seems that in a general sense, construct validity refers to the extent to which an instrument measures the "construct" that it is designed to measure (*see* Gutek Report at 24 n. 37), while criterion validity refers to the degree to which a measure such as the SEQ relates to a "criterion question," such as, "have you ever been sexually harassed?" (*id.* at 25–26). It seems to me that Gutek's report raises a key question confronting me in my role as "gatekeeper" under Rule 702: What precisely does an SEQ score mean?

In figure 1 of Dr. Fitzgerald's report, the respondents' SEQ score is interpreted as a measure of the "Frequency of Unwanted Sexual Attention" that those respondents experienced.[4] Dr. Fitzgerald reports that the average SEQ score for the overall sample of respondents was 18.95. She does not indicate whether this is a high, low, or average frequency in any objective sense, nor does she compare this frequency to the frequencies observed in other working environments. Dr. Gutek argues rather persuasively that, for various reasons, comparisons of SEQ scores across different contexts and research studies are "impossible." (*See* Gutek Report at 17–20.)[5] This lack of comparability of SEQ scores seems problematic to me, because it seems to render the SEQ scores devoid

of any objective meaning. For example, in reviewing Dr. Fitzgerald's report, I have considered her "Figure 1" and its accompanying discussion. (*See* Fitzgerald Report at 27–28.) Here Dr. Fitzgerald divides the respondents into three groups based upon each respondent's relative score on a measure designed to assess how "male dominated" her work environment is or was. (*See id.* at 27.) She then presents each of the three groups' SEQ score on a bar graph, and notes that the mean SEQ score for members of "Group 1," who had the least "male dominated" working environment, was 11.69, while groups 2 and 3 had mean SEQ scores of 25.18 and 29.48, respectively. (*See id.* at 27–28.) Dr. Fitzgerald suggests that this analysis supports the claim that "survey respondents who were one of the first, the only, or one of a very few women in their job category at Dial Aurora experienced more offensive sex-related behavior, rated it as more severe, and considered it a bigger problem in the workplace than other female respondents." (*Id.* at 27.) The analysis associated with Figure 1 does seem to support the conclusion that survey respondents who worked in more "male dominated" working environments had *higher* SEQ scores than those respondents who worked in less "male dominated" environments. However, there is no evidence to suggest that a SEQ score of 29.48, or any other score, is *high* in any objective sense.

4    As I noted previously, the SEQ does not seem capable of indicating which incidents were "unwanted." *See supra* note 3 and accompanying text.

5    Despite acknowledging its "impossibility," Gutek has attempted a cross-contextual comparison of SEQ scores by making certain statistical assumptions and assigning weights to the respondents' scores. (*See id.* at 48–52.) Gutek admits, however, that her adjustments cannot account for the unique questions added to the SEQ by Fitzgerald in this case and do not account for the bias introduced by including class members in the survey results (*see infra* Part III.B). (*See* Gutek Report at 51–52.)

This ambiguity, along with the lack of comparability of SEQ scores across studies, limits the overall meaningfulness of Dr. Fitzgerald's conclusions. In other words, certain group comparison analyses offered by Dr. Fitzgerald, such as her opinion that survey respondents who worked in more "male dominated" working environments had "higher" SEQ scores than those respondents who worked in less "male dominated" environments, are not affected by the SEQ scores'

lack of objective meaning. However, this lack of objective meaning renders some of her overall conclusions "unreliable" within the meaning of Rule 702. For example, Fitzgerald offers the following "overall" conclusion and opinion:

> **\*7** 1) The Aurora plant of the Dial Corporation is historically permeated by a high level of hostile and degrading sexualized behavior directed towards women as a group, as well as towards individual women. Such behavior was frequent, serious, and of long duration. It is my opinion that it was for many years virtually impossible to work "on the floor" at Dial without being exposed to these conditions on a regular basis.

(Fitzgerald Report at 83.) The conclusion that the plant was "permeated by a *high level* of hostile and degrading sexualized behavior," (*id.* at 83 (emphasis added)), suggests that the extent of "hostile and degrading sexualized behavior"at Dial was compared to the extent of similar behaviors occurring at other locations and determined to be "high," when in fact no such comparison is made in the report. By claiming that Dial was permeated by a "high" level of sexual behavior, Dr. Fitzgerald is, in effect, stating that the average SEQ score of her sample (18.95) is "high." Yet Dr. Fitzgerald does not explain how an SEQ score of 18.95, 29.48, or any other value can be said to be "high" without some objective point of comparison, such as comparisons of the scores obtained in this case with those obtained in other studies. Indeed, since Dr. Gutek argues that such comparisons may be impossible (*see* Gutek Report at 17–20, 47–52), and since Dr. Fitzgerald herself testified that she does "not [make] any representations here about Dial being better or worse than anyone else," (Def.'s Mot. in Limine to Exclude Pl.'s Expert Testimony, Ex. C, Fitzgerald Dep. (hereinafter "Fitzgerald Dep.") at 566:12–14), it seems that the SEQ cannot support Fitzgerald's overall conclusion that Dial is or has been permeated by a "high level" of "sexualized behavior." This nicely illustrates the limitation caused by the SEQ scores' lack of objective meaning, or lack of "baseline," (*see* Gutek Report at 19), which seems to have been caused in part by the fact that no standard, established version of the SEQ has been developed. (*See* Gutek Report at 16–19, 52 n. 78.)

Similarly, the claim that the "sexualized behavior" was "frequent" (Fitzgerald Report at 83) is not supported by the SEQ. While the SEQ provides a measure that may allow for relative comparisons to be made among various groupings of the survey respondents, it cannot be used to support the conclusion that the behaviors occurred "frequently" for the same reasons that it cannot support the conclusion that levels of offensive behavior were "high." [6]

[6] In addition, I cannot see how the SEQ, or the survey as a whole for that matter, could reliably contribute to the conclusion that "[t]he Aurora plant of the Dial Corporation is historically permeated by a high level of hostile and degrading sexualized behavior *directed towards women as a group,*" (*id.* (emphasis added)), since Dr. Fitzgerald admits that the survey results should not be generalized to "the entire population of female employees of the Dial Aurora plant during the time at issue." (Fitzgerald Report at 20.) This means that she cannot claim that the survey results accurately reflect the responses of the entire set of relevant Dial employees. Therefore, not only is it impossible to assign an objective value or meaning to an SEQ score due to the comparability problem explained by Dr. Gutek, but the scores do not even represent the experiences of all of the female employees at Dial.

Also, I note in passing that Dr. Fitzgerald reported that of the 129 women who were included in her "final sample," (*id.* at 20), only 102 had an SEQ score greater than zero (*id.* at 65). This suggests that approximately 21% of the final sample did not report experiencing any of the "sexualized behaviors" included on the SEQ. Although Dr. Fitzgerald testified that 90% of her SEQ respondents experienced one or more of the behaviors listed in the SEQ, (*see* Fitzgerald Dep. at 565:18–20; *see also* Fitzgerald Report at 25 (indicating that 91.7% of respondents indicated that they "ever" heard a supervisor or coworker tell a dirty story or joke)), the discrepancy might be explained by "missing data," which appear to have influenced the percentages of "sex-related behavior" reported in Table 1 of Dr. Fitzgerald's report. (*See* Fitzgerald Report at 25 (noting that the number of participants included in certain calculations varied between 117 and 129 due to missing data).) At any rate, Dr. Fitzgerald's own data, which suggest that over one-fifth of her final set of respondents reported no incidents, belie

her opinion that "it was for many years virtually impossible to work 'on the floor' at Dial without being exposed to these conditions on a regular basis." (Fitzgerald Report at 83.)

In sum, it seems to me that certain inherent shortcomings in SEQ, combined with particular problems associated with the administration and use of the SEQ in this case, raise serious questions concerning the SEQ's "validity," as that term is used in the social sciences. Although the fact that the SEQ does not measure "legal" sexual harassment per se does not render it invalid, it seems to me that the wording of certain SEQ items and their instructions suggest that the SEQ does not measure the "construct" specified by Fitzgerald. The SEQ does not focus upon any particular time frame of sexual occurrences, does not ensure that only "offensive" behaviors are reported, does not ensure that only "sexualized" behaviors are reported, and yields scores that cannot support universal claims regarding the extent of the "harassment" that occurred at Dial, due to the unavailability of baseline data. I find that under Federal Rule of Evidence 702, the validity problems associated with the use of the SEQ in this case weigh against receiving into evidence the portion of Fitzgerald's report that relies upon that instrument.

### B. Sample Size

**\*8** The defendant also argues that the number of employees who responded to the survey, or sample size, is too small to allow one to draw conclusions about the experiences of all of the relevant employees based upon the results obtained from the survey. Indeed, as I have noted above, Dr. Fitzgerald admits as much in her report. (*See* Fitzgerald Report at 20.) However, despite Dr. Fitzgerald's statement that she does not use the survey to make any formal statistical generalizations, her report contains statements that call her commitment to that position into question. For example, she claims as follows:

> Length of tenure was found to be significantly associated with all forms of psychological distress, as well as with negative health status. *These results provide strong inference [sic] that the working environment at Dial Aurora had a pervasive pernicious effect on the women who worked there.*

(Fitzgerald Report at 57 (emphasis added).) The second sentence is an inappropriate generalization according to Dr. Fitzgerald herself. (*Compare id. with id.* at 20.) The sentence refers to a pervasive effect upon "the women who worked" at Dial, even though conclusions derived from the survey results are to be limited to the *subset of women who completed the survey.* Similar examples can be found at various points throughout Dr. Fitzgerald's report. Some of these generalizations seem to be based solely upon the survey results (*see, e.g., id.* at 58 ("it is reasonable to conclude that women employees as a group suffered and continue to suffer considerable emotional distress as a result of their experiences at the Aurora plant.")) while others appear to be based primarily upon Dr. Fitzgerald's review of certain claimants' depositions (*see, e.g., id.* at 62; *id.* at 64–65; *id.* at 76; *id.* at 78; *id.* at 79 ("[S]uch incidents fostered a general perception among Aurora Dial female employees that it was risky to complain about sexual harassment.")) .[7] Some of Dr. Fitzgerald's "Overall Conclusions and Opinions" also seem to disregard her earlier warning about the risks of generalizing her survey results. (*See id.* at 83.) Specifically, her first, third, and fourth set of "conclusions" appear to be phrased in a manner that suggests that the experiences of the women who participated in her research can be used to characterize the overall environment at Dial. (*See id.*)

[7]  Dr. Fitzgerald's report does not explain whether or not the information she gleaned from her review of the depositions may be "generalized," but I believe that I may safely assume that they may not be. Dr. Fitzgerald seems to use the depositions primarily to illustrate her opinions with detailed examples taken from the testimony of certain claimants, (*see, e.g.,* Fitzgerald Report at 75), and absent some explanation from Dr. Fitzgerald, I find I cannot assume that the experiences described by a single deponent allow one to draw formal conclusions about the experiences of the entire relevant population of employees. Indeed, if the combined survey results of 129 employees cannot be generalized to the entire group, it seems unlikely that the experiences of a single deponent can be so generalized.

In addition to this generalizing, which seems to be impermissible under Dr. Fitzgerald's own standards, Dr. Fitzgerald recognizes that a substantial number of claimants, or "class members" are included among the survey respondents. (*See* Fitzgerald Report at 21–22.) Dr. Gutek has responded with an analysis that demonstrates

the bias that has been introduced into the survey results due to the inclusion of the class members. (*See* Gutek Report at 27–37.) The class members are highly motivated to return surveys that enhance their chance for recovery, and it seems that they may have done precisely that. (*See id.*) The difference between the class member's responses and the other employees' responses was pronounced, and Dr. Gutek claims that the survey materials can actually be used to predict accurately whether a given respondent was a class member or not. (*See id.*)

**\*9** I find that the use to which the survey results have been put, namely, to generalize about the overall conditions at Dial, is not consistent with the inherent limitations of Dr. Fitzgerald's research design— limitations that Dr. Fitzgerald herself expressly recognizes in her own report. Furthermore, the inclusion of a large number of class members in the survey appears to have strongly influenced the overall results, which further supports the defendant's position that the survey data do not reliably reflect the views or experiences of the overall population of relevant employees. Therefore, I find that Dr. Fitzgerald's conclusions are unreliable within the meaning of Rule 702, to the extent that those conclusions are based upon generalizations.

### C. The Relevant Time Frame

The defendant next argues that Dr. Fitzgerald's survey is unreliable because it fails to focus upon a relevant time frame. The plaintiff responds only with an unsupported assertion that the defendant's argument "goes to the weight of Dr. Fitzgerald's testimony, not its admissibility." (Pl.'s Br. at 12.) I disagree with the plaintiff's response. Under Rule 702, I am charged with determining whether Fitzgerald's evidence "is the product of reliable principles and methods" and whether she has "applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702. If the plaintiff's survey fails to identify the relevant time frame, its design is flawed in a manner that directly affects its relevance to this case.

The defendant argues that no question in the entire survey limits the respondent's answers to a 1988–1999 time frame. I again note that the survey was of "*women employed ... between January, 1988, and October, 1999.*" (Fitzgerald Report at p. 20) (Emphasis added.) There is no limitation of a time frame for *occurrences* of sexual events. In addition, I have already noted that the respondents' average tenure at Dial exceeded fourteen years (*see supra*

note 2), which suggests that many respondents may have included descriptions of events and experiences in their surveys that occurred beyond 1988 and 1999 or any other identifiable time frame. The survey's failure to measure reliably the events of a relevant time frame weighs against its admissibility under Rule 702.

In addition, the defendant points out that the survey's failure to limit itself to particular years, combined with the response options available to the respondents who completed the SEQ, interferes with the survey's reliability in yet another way. For example, a respondent who worked at Dial for two years and who heard a "dirty joke" once per year would select the "once or twice" response option on the appropriate portion of question number 35. (*See* Def.'s Mot. in Limine to Exclude Pl.'s Expert Testimony, Ex. A at 13.) An employee who worked at Dial for 15 years and who heard a "dirty joke" once per year would likely select "many times" in response to the same question, even though she experienced the jokes at the same rate as the other respondent. (*See id.*) This creates an "artifact" that causes persons who worked at Dial for longer periods of time to present higher SEQ scores. (*See* Gutek Report at 29.) This artifact interferes with the survey data's ability to describe the rate at which the respondents experienced the "harassing" events listed in the survey. (*See* Gutek Report at 29–31.)

**\*10** For these reasons, the failure of the survey to confine its focus to a relevant time frame renders it unreliable and not useful to a jury in this case within the meaning of Rule 702.

### D. Bias

The defendant next argues that Dr. Fitzgerald's survey is unreliable because it is biased against Dial. Once again, the plaintiff responds only with its assertion that the defendant's argument "goes to the weight of Dr. Fitzgerald's testimony, not its admissibility." (Pl.'s Br. at 12.) I disagree with the plaintiff's response for the reasons stated above. (*See supra* Part III.C.) It seems to me that if Fitzgerald's survey is biased to a degree that renders it unreliable within the meaning of Rule 702, the bias affects the admissibility of her report.

I have already indicated that it is likely that the survey results are biased by the presence of the class members. (*See supra* Part III.B.) In addition, Dr. Gutek points out that the survey itself contains an overabundance

of negative response options and negatively worded questions, which render it difficult for respondents to express a positive view of Dial. (Gutek Report at 7–12.) For example, the survey item that purports to measure the respondents' reactions to the "sex-related experiences at work" that they reported on the SEQ contains no option that allows the respondents to indicate that the event they experienced did not bother them. (*See* Def.'s Mot. in Limine to Exclude Pl.'s Expert Testimony, Ex. A at 14.) Also, question number 24 asks the respondent to report "What are/were the PEOPLE YOU WORK WITH AT DIAL like MOST OF THE TIME?", and includes the following nine options: "boring," "slow," "stupid," "responsible," "waste of time," "lazy," "unpleasant," "bother me," and "work well together." Apparently, some of the respondents not only noticed the survey's negative slant, but wrote comments about this obvious bias on the face of the survey itself. (*See* Gutek Report at 12 n. 12 .)

Dr. Gutek also argues that the survey respondents were "primed." (Gutek Report at 12–14.) According to Dr. Gutek, "Priming refers to creating a situation that will influence someone's views or opinions." (*Id.* at 12.) "Good research avoids priming respondents, i.e., it avoids asking questions or presenting information that will influence the way respondents will answer subsequent questions." (*Id.*) Dr. Gutek claims that Dr. Fitzgerald's survey does not adequately address the priming problem. (*See id.* at 12–14. *See also* Def.s' Br. at 15.) The plaintiff does not dispute this argument.

Finally, Dr. Gutek's Report indicates that before the survey was distributed to the relevant group of employees, the EEOC sent a letter to the entire group indicating that efforts were being made to "identify any female employees who were affected by sex harassment and who may be entitled to recover in this lawsuit." (Gutek Report at 5.) It seems to me that this letter might not only have motivated respondents to complete the survey, but could have introduced an element of bias into their responses.

**\*11** There are indications of bias against Dial in the survey instrument used by Dr. Fitzgerald, and there is reason to believe that many of the actual respondents were biased against Dial as well. Since the plaintiff has chosen not to dispute the existence of this bias or to argue that its effects are not severe enough to support a finding that reliable methods were not used to obtain the survey data, I can only conclude that the presence of the bias

weighs against a finding that the survey report is reliable or helpful in assisting the factfinder within the meaning of Rule 702.

## III. CONCLUSION

In conclusion, I find that the plaintiff's survey instrument presents inherent reliability problems, and that Dr. Fitzgerald has applied it to this case in an unreliable fashion. The instrument itself and the manner in which it has been used in this case present sampling and bias problems that render it incapable of passing muster under Rule 702, and the SEQ portion of the survey lacks validity. The survey, its results, and any conclusions based upon those results shall not be admitted into evidence in this case. This includes all the findings and opinions contained in Dr. Fitzgerald's report under the headings III, IV, and V, covering the "Brief description of survey," "Analysis of Work Environment at Aurora Dial," and "Conclusions and Opinions." Such findings and opinions are so reliant upon the survey materials that they are too flawed to be useful in assisting the factfinder in this case. Also inadmissible is the material in heading I, which is identified as "Introduction and Overview," because it describes in a general way what Dr. Fitzgerald did in the "empirical survey of women employed at the Aurora Plant of The Dial Corporation between 1988 and 1999," the very material that I have concluded must be kept out of evidence.

## IV. SECTIONS OF DR. FITZGERALD'S REPORT NOT DEALING DIRECTLY WITH THE AURORA PLANT

Portions of Dr. Fitzgerald's report not relating directly to the Aurora Plant are not challenged by the defendant, except by the broad expression that "Dr. Fitzgerald's testimony is irrelevant, unreliable, and prejudicial ..." Untouched is the material in Dr. Fitzgerald's report under heading II, "Summary of Scientific Knowledge Concerning Sexual Harassment." It contains a general description of the nature, causes and consequences of harassment, together with factors and conditions that lead to psychological harm and various responses strategies. Those matters may well be helpful to the trier of fact to understand the evidence or to determine a fact in issue.

IT IS ORDERED that:

1. subjects, findings, and opinions developed and expressed in sections I, III, IV, and V of the Expert Report of Louise F. Fitzgerald, PhD, shall not be received into evidence in this case, and to that extent "the Defendant's Motion *In Limine* to Exclude Plaintiff's Expert's Testimony, filling 238, is granted; and

**\*12**  2. otherwise, the Defendant's Motion *In Limine* to Exclude Plaintiff's Expert's Testimony, filing 238, is denied.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 31061088

---

**End of Document**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**6**

2017 WL 1196990
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

IN RE: FLUIDMASTER, INC., WATER
CONNECTOR COMPONENTS
PRODUCTS LIABILITY LITIGATION

Case No. 14-cv-5696
|
MDL No. 2575
|
Signed 03/31/2017

Opinion

## MEMORANDUM OPINION AND ORDER

Robert M. Dow, Jr., United States District Judge

 *1  Before the Court are Plaintiffs' motions to exclude Defendant's experts [378; 379; 381; 382; 384; 387; 390], Plaintiffs' motion to strike declarations submitted by two of Defendant's experts [446], Defendant's motions to exclude Plaintiffs' experts [334; 336; 337; 339], and Plaintiffs' motion for class certification [284; 286]. For the reasons set forth below, Plaintiffs' motions to exclude Defendant's experts [378; 379; 381; 382; 384; 387; 390] are granted in part and denied in part, Plaintiffs' motion to strike [446] is granted in part and denied in part, Defendant's motions to exclude Plaintiffs' experts [334; 336; 337; 339] are granted in part and denied in part, and Plaintiffs' motion for class certification [284; 286] is denied. The Courtroom Deputy will contact the parties to arrange a mutually agreeable time for the next status hearing before Judge Dow and Magistrate Judge Gilbert, at which time the parties may raise any issues regarding discovery, motions for reconsideration, and future motion practice before either of the assigned judges.

## I. Background

This MDL is about a plumbing product. Defendant Fluidmaster, Inc., a California company, manufactures and designs water supply lines or "connectors" used to transport water from a supply pipe to a plumbing fixture like a toilet or a kitchen sink faucet. The product at issue here consists of a flexible inner tubing made of EPDM or Santoprene (types of polymers or rubbers), an outer braided wire made of stainless steel, and a coupling nut used to connect the supply line to a plumbing fixture. For a period of time, Defendant's toilet connector used a coupling nut made of acetal (a kind of plastic). Its other connectors use a metal coupling nut. Defendant's connector sells for about $10, and Defendant has sold more than 153 million water connectors since the 1980s.

Plaintiffs allege that Defendant's product has two design defects. First, the toilet connector's acetal coupling nut contains a notch or sharp indentation, which is a focal point for any stress that builds on the coupling nut over time. According to Plaintiffs, Defendant's design causes thin cracks known as "crazing" to form on the coupling nut. As the crazing spreads over time, the coupling nut can fail—a process known as "creep rupture." Defendant contends that the vast majority of coupling nut failures result from the improper use of a wrench or similar tool during the toilet connector's installation, which "overtightens" and places excessive stress on the coupling nut, eventually causing the connector's failure.

Second, Plaintiffs argue that the hose body comprised of a stainless steel braid plus inner tubing was defectively designed. According to Plaintiffs, the inner tubing is insufficient to withstand ordinary water pressure, which is why Defendant relies on the stainless steel braid. However, the stainless steel is thin and can degrade in the presence of chlorine. Chlorine is common in many household products. Thus, although Defendant labels its product "NO BURST," Plaintiffs contend that the hose body bursts because of the insufficient strength of the inner hose body and the propensity for the braided sheath to corrode. Defendant responds that the vast majority of hose failures occur because of improper exposure to corrosive materials, either because homeowners fail to properly close their cleaning products stored under their sinks or because they improperly clean their hoses with chlorine-containing products.

 *2  The Plaintiffs here are people who experienced property damage after Defendant's connector failed, people who did not experience any failure of Defendant's product, and subrogated insurers. Most of the Plaintiffs did not personally buy Defendant's product. Some bought a home with Defendant's product already installed. Some relied on a plumber to choose which connector to buy. At least one relied on her friend to purchase

Defendant's connector. Some, however, purchased and installed Defendant's product on their own.

Plaintiffs filed a motion for class certification [284; 286], seeking to certify a nationwide class and various state law subclasses related to these two alleged design defects. Plaintiffs seek a nationwide class under California's Consumers Legal Remedies Act ("CLRA"), which prohibits "unfair methods of competition and unfair or deceptive acts or practices" in transactions for the sale or lease of goods to consumers. Cal. Civ. Code § 1770(a). They also seek six state law subclasses for breach of warranty claims (Pennsylvania, Vermont, Alabama, Minnesota, Arizona, and Tennessee) as well as eleven state law issue subclasses for negligence and strict liability claims (Pennsylvania, Vermont, Alabama, Minnesota, Arizona, Illinois, North Dakota, Georgia, Maine, California, and New Hampshire) involving seventeen issues. In response to this class certification motion, Defendant filed two motions to exclude Plaintiffs' experts. Plaintiffs returned the favor by filing five motions of their own plus a motion to strike. The Court held a four-hour oral argument on all of the pending motions on February 22, 2017.

## II. Legal Standard

### A. *Daubert*

Federal Rule of Evidence ("Rule") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. See *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010).[1] Rule 702 permits the admission of expert opinion testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

---

[1] Seventh Circuit precedent on *Daubert* governs here. See *McMasters v. United States*, 260 F.3d 814, 819 (7th Cir. 2001) (holding that, with respect to cases transferred under 28 U.S.C. § 1404(a), "the transferee court is usually 'free to decide [federal issues] in the manner it views as correct without deferring to the interpretation of the transferor circuit' " (citation omitted)). Just like the Federal Rules of Civil Procedure, the Federal Rules of Evidence were "not intended to be geographically non-uniform." *Id.*

---

Trial courts are "tasked with determining whether a given expert is qualified to testify in the case in question."

*Gayton*, 593 F.3d at 616. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Trial courts are also obligated to act as gatekeepers to ensure that the expert testimony is both relevant and reliable. See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589. To establish relevance, the proponent must show that the expert's "reasoning or methodology properly can be applied to the facts in issue," and "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Daubert*, 509 U.S. at 593; *Smith*, 215 F.3d at 718; Fed. R. Evid. 702.

**\*3** To establish reliability, the proponent must show that the expert's testimony is based on "sufficient facts or data," that it is "the product of reliable principles and methods," and that those methods use "reliably applied \* \* \* to the facts of the case." Fed. R. Evid. 702. District courts have "latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Gayton*, 593 F.3d at 616. *Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. "[T]he test of reliability is flexible," however, "and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (internal quotation marks omitted). The overriding purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152). Expert testimony may not be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). And "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

Thus, in evaluating a motion to exclude expert testimony under Rule 702 and *Daubert*, the Court considers whether the proffered expert (1) is qualified, (2) has employed a reliable methodology, (3) offers opinions that follow rationally from the application of the expert's methodology and qualifications, and (4) presents testimony on a matter that is relevant to the case at hand. See *Kumho Tire*, 526 U.S. at 151–53; *Joiner*, 522 U.S. at 146; *Daubert*, 509 U.S. at 589–93; *Walker v. Soo Line R. R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### B. Federal Rule of Civil Procedure 23

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and one of the three alternative requirements in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) provides that a named party may sue on behalf of individuals who are similarly situated if: (1) the class is so numerous that joinder of all putative class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the putative class ("commonality"); (3) the claims or defenses of the named party are typical of the claims or defenses of the putative class members ("typicality"); and (4) the named party will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). "[A] proposed class must always meet the Rule 23(a) requirements." *Messner*, 669 F.3d at 811. "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily we * * * begin there and only turn our attention to Rule 23(b) after we [are] certain that all of Rule 23(a)'s requirements ha[ve] been met." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

When certification is sought under Rule 23(b)(3), as it is here, the proponents of the class must also show that: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods of resolving the controversy ("superiority"). *Messner*, 669 F.3d at 811. Moreover, the class must also meet Rule 23's "implicit requirement of 'ascertainability,'" meaning that the class is "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). [2]

[2]    The circuits have split over the correct legal standard for ascertainability. See *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) (summarizing the current landscape as the First, Second, Third, and Fourth Circuits require a showing of "administrative feasibility" to satisfy ascertainability while the Sixth, Seventh, Eighth, and Ninth Circuits do not).

**\*4** Plaintiffs bear the burden of proving that they are entitled to class certification. *Messner*, 669 F.3d at 811. Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *id.*, the Court does not presume that all well-pleaded allegations are true for purposes of deciding the certification question. See *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir. 2001). Rather, before the Court allows a case to proceed as a class action, it "should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811. The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. See *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

### III. Analysis

Both parties have filed several *Daubert* motions in connection with Plaintiffs' motion for class certification. [3] "[A] district court must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification," including *Daubert* motions. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010). Here, Plaintiffs have moved to exclude Scott Meek,

Dr. Sanjay K. Rao, Dale Edwards, Dr. Vijay Gupta, and Brian Palmer, Ph.D. Defendant has moved to exclude five of Plaintiffs' technical experts and two of their experts who opine on issues related to damages. The Court begins with Plaintiffs' motions.

3 Portions of nearly all of these motions and their appendices were filed under seal. Both parties agreed that this Court could freely quote their contents without requiring this opinion to be redacted or placed under seal.

### A. Plaintiffs' *Daubert* Motions

### 1. Scott Meek

Defendant retained Scott Meek to opine on the technical design of the coupling nut, whether that design is defective, and the stresses that could cause the coupling nut to fail. Meek holds a Bachelor of Science in Mechanical Engineering and a Bachelor of Arts in Materials Science. He is one of the owners of Forensic Engineering Consultants, which performs failure analyses in the field of mechanical engineering and material sciences. [386-1, at 3.] Meek has served as a consultant performing failure analyses of various products for the last 40 years, the last fifteen of which "have largely involved analyzing failures in connection with the plumbing industry." [339-15, at 3.] In that capacity, he has "evaluated hundreds of plumbing component failures on behalf of the plumbing industry and over two thousand plumbing component failures on behalf of the insurance industry." *Id.* He is a Registered Professional Engineer with the State of Texas and a member of the Society of Plastics Engineers.

Despite this extensive, highly specialized experience, Plaintiffs argue that Meek lacks the "specialized knowledge" needed to assist the jury for two reasons. [385, at 3.] First, Plaintiffs argue that Meek is "not an expert in the field of elastomers"—that is, polymers with elastic properties such as rubber. This argument rests on a single exchange from Meek's deposition:

> Q: Do you consider yourself an expert on elastomers?
>
> A: Probably not elastomers per se because I haven't done much failure analysis with those.

[386-1, at 32:8–12.] Because Meek's opinions are premised in part on the interactions between Defendant's cone washer (made of an elastomer) and its coupling nut, Plaintiffs contend that Meek's lack of qualifications precludes him from offering his opinions. Second, Plaintiffs argue that Meek cannot opine on plastic design because he lacks "formal education in plastics design," "has never taken any college level classes in plastic design," "has never designed a plastic part himself," and has never published on plastic design. [386, at 5.] Plaintiffs seek to exclude "any opinion in his report related to the design or failure of [Defendant's] coupling nut." *Id.*

**\*5** These qualifications challenges are without merit. Plaintiffs do not question Meek's qualifications as an expert in the broader field of material sciences, which encompasses polymers like elastomers. Their only argument is that he is not "an expert in the more specialized field of elastomers"—a "subset" of material sciences. [432, at 3.] "Ordinarily, courts impose no requirement that an expert be a specialist in a given field." *Gayton*, 593 F.3d at 618 (citation omitted). "The fact that an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016).

Here, Defendant does not offer Meek as an "elastomers expert" and Plaintiffs never explain why specialization in the component parts underlying Meek's failure analysis is necessary to admit his opinions. In other words, apart from this single deposition answer, Plaintiffs offer no reason to believe that Meek's relevant education and four decades of experience with material sciences and mechanical engineering would not qualify him to opine on a particular application of that education and experience to the facts of this case. Meek's unwillingness to accept Plaintiffs' framing and reluctance to describe himself as an expert in elastomers "per se" despite his extensive relevant experience with plastics and polymers is fodder for cross-examination, not a basis for exclusion under Rule 702.[4]

4 Meek's directly relevant experience with plastics and polymers distinguishes him from the experts excluded in the cases cited by Plaintiffs. See *Ancho v. Pentek Corp.*, 157 F.3d 512, 517 (7th Cir. 1998) (affirming exclusion of "mechanical engineer" who was "without any experience in the field of architectural design

relating to plants of this nature" or "familiar[ity] with the operation of this type of [machine]"); *Wintz, By & Through Wintz v. Northrop Corp.*, 1995 WL 758114, at *3 (N.D. Ill. Dec. 22, 1995) (concluding that toxicologist who lacked qualifications to offer a medical causation opinion after he admitted he was not expert in bromides, birth defects, or the specific genetic disorder at issue, had not "dealt extensively with bromide exposure throughout his career," and his testifying experience was largely from drunk driving cases).

The same is true regarding Meek's qualifications to offer design opinions. In evaluating his qualifications under *Daubert*, this Court must "consider [Meek's] *full range* of experience and training." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (emphasis added). Yet, Plaintiffs' motion largely consists of asking this Court to focus narrowly on one alleged gap in Meek's resume and ignore the rest of his experience. For example, Plaintiffs assert that Meek lacks a "formal education in plastics design," but omit any of discussion of the fact that his "formal education in material science * * * encompasses plastics," "much of his college level [training] dealt with design, engineering and material science," and he has attended "probably 20 seminars" since college involving plastics, some of which addressed design. [386-2, at 125:24–128:1.] Likewise, Plaintiffs stress that Meek "has never designed a plastic part himself" [385, at 5], but never grapple with the fact that Meek spent the last forty years analyzing the failure of products he did not personally design. While Plaintiffs dismiss as "conclusory" the claim that "assessing the conditions under which products fail inherently involves analysis of their design" [432, at 5; 415, at 13], Plaintiffs do not explain why that intuitively obvious statement is wrong. Moreover, Meek testified that his mechanical engineering and plastics background qualify him to opine on issues connected to plastic design. [See 386-1, at 31:4–13.] That Plaintiffs elicited this answer but chose not to explore his claim any further does not render this testimony "conclusory." It makes it unrebutted.

**\*6** An expert may be qualified based on experience alone. See *Trustees of Chi. Painters & Decorators Pension, Health & Welfare v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787–88 (7th Cir. 2007) ("[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." (citations and quotation marks omitted)). And "[t]he notion that [*Daubert*] requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Meek's opinions regarding the reasons for the coupling nut's failure (misuse rather than design) appear to be well within the scope of his forty years of experience working in failure analysis, material sciences, and mechanical engineering. Plaintiffs' bare assertion that Meek cannot opine on design-related issues without possessing specialized design-related formal education and particularized experience "designing plastic parts for manufacture" [386, at 5] is inconsistent with the requirements of Rule 702 and *Daubert*. Plaintiffs fail to explain why the experience that Meek actually possesses is insufficient to qualify him to offer his opinions, and that failure dooms their *Daubert* challenge.

Plaintiffs' motion to exclude Meek's opinions and testimony [385] is denied.

## 2. Dr. Sanjay K. Rao

Defendant retained Dr. Sanjay K. Rao to assess the efficacy of Plaintiffs' proposed conjoint survey sampling plan and design, which would be used to calculate classwide damages. Conjoint analysis is a statistical technique used to determine how consumers value the different individual attributes of a product. See *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014). Dr. Rao is a Vice President in Life Sciences at the consulting firm Charles River Associates and oversees the practice group's strategic marketing research, including survey modeling, design, and execution. He received his Ph.D. in Marketing from the Wharton School of the University of Pennsylvania, and his doctoral dissertation was titled, "An Empirical Appraisal of Conjoint Choice Simulators," which "studied alternative methods for simulating consumer choices and market shares from their evaluations of product features and concepts." [334-7, ¶ 2.]

Plaintiffs do not challenge Dr. Rao's qualifications. Instead, they raise two objections to the substance of Dr. Rao's opinions. First, they argue that his report is "replete" with "*ipse dixit*" conclusions." [380, at 2.] Here is one example of what Plaintiffs characterize as *ipse dixit*:

Factors such as advertising, product availability in a store, the type and amount of shelf space given to it, in-store price discounting and product promotions have an impact in influencing product choice at the actual point of purchase. Such factors are especially important to consider when a product is not directly sold to a customer by the manufacturer, but finds its way to him/her through a distribution network comprising of wholesalers and retailers, who also engage in valid marketing practices including, but not limited to, price mark ups, discounting and non-price promotional programs. These factors become so much more important in influencing customer choice at the store when the product category contains several competing brands all vying for the same customer's choice. The more differentiated a product is perceived to be relative to its competition, for example, the lower the role of product price (compared to competitors) in influencing product choice.

[334-7, ¶ 13.] Second, Plaintiffs challenge Dr. Rao's statements using the phrase "common knowledge" (or some variant) as offering improper expert testimony because they "do not provide something more than what is obvious to the layperson." [380, at 6.] This is one of the representative examples that Plaintiffs highlight: "It is commonly understood that conjoint analysis is a preference scaling methodology, i.e. it is designed and best utilized to understand respondent preferences for components of a product as presented to them through concise and realistic descriptions in a research setting." [334-7, ¶ 13.] Plaintiffs argue that Dr. Rao "does not explain how he knows this information to be 'common knowledge,' " and that this "common knowledge" is really his own knowledge. [380, at 4.]

**\*7** As both examples show, Plaintiffs' arguments miss the mark by a wide margin. In an *ipse dixit* opinion,

the expert asserts a "bottom line" conclusion, but lacks any articulable facts to substantiate that conclusion or completely fails to explain the reasoning or methods employed to reach that conclusion. *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) ("[Expert's] testimony that the photos met the definition of child pornography was a bare conclusion that provided nothing but the bottom line, i.e., that [defendant] possessed illegal photos. Had [expert] provided some basis for this explanation, perhaps her testimony would have been of some use for the jury. But she did not do so. She, in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so.' "); *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) ("[Expert] asserts that banks just don't accelerate the principal indebtedness because of shortcomings of the kind [borrower] displayed. Apparently we are supposed to take this on faith, because [expert] did not gather any data on the subject, survey the published literature, or do any of the other things that a genuine expert does before forming an opinion[.] * * * [A]n expert's report that does nothing to substantiate this opinion is worthless, and therefore inadmissible."). Some *ipse dixit* opinions are merely subjective assertions that are impermeable to challenge and incapable of repetition by anyone other than the professed expert. See, *e.g.*, *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir 2005) ("Asked repeatedly during his deposition what methods he *had* used to generate projections, [expert] repeatedly answered 'my expertise' or some variant ('my industry expertise', '[my] awareness,' and 'my curriculum vitae')—which is to say that he either had no method or could not describe one."). Others are simply bare conclusions with "no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected." *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989). In all cases, the "gap between the data and the opinion proffered" is connected only by the expert's say-so, making it insurmountable. *Joiner*, 522 U.S. at 146.

This bears no resemblance to Dr. Rao's opinions here. Dr. Rao amply explains the reasons he finds the proposed survey design insufficient to achieve its desired result. [334-7, ¶¶ 8–21.] In the example above, Dr. Rao articulates differences between estimating consumer behavior in retail versus research settings, such as "factors" that may be important influences on in-store purchasers, but

less important when a product is not sold directly to customers. After listing these factors, Dr. Rao concludes that "[a]t no point in the [Plaintiffs' expert's] Report does [she] mention these factors, let alone discuss how she would respect their influence on the two classes of customers" in her analysis. *Id.* ¶ 13. He further critiques the groups included and excluded from the survey plan (*id.* ¶¶ 8–9, 11), the failure to disclose information related to sample size calculations (*id.* ¶ 10), gaps in how the survey will address a survey respondent's familiarity with the product or attributes (*id.* ¶¶ 14–15), the survey's omission of product attributes and failure to ensure proper measurement of trade-offs between attributes (*id.* ¶¶ 16–20), and the failure to incorporate market level data to inform the survey design (*id.* ¶ 21). In other words, Dr. Rao critiques the survey design by identifying *specific* flaws in that design and connecting those flaws to his conclusion. To assert his opinions are "devoid of analysis" [433, at 4] misapprehends the substance of Dr. Rao's report and the requirements of Rule 702.

In large part, Plaintiffs' motion appears to conflate the requirement that an expert support his or her conclusions with reasons and the concept that each sentence in an expert report should have a citation. [380, at 5 ("The majority of Dr. Rao's declaration consists of numerous statements devoid of citation or substantiation.").] Rule 702 imposes no minimum citation requirement. That principle has particular purchase here because (1) many of Dr. Rao's survey critiques can be found in the Federal Reference Manual on Scientific Evidence—a source of generally accepted principles of survey research that courts routinely rely on to evaluate expert opinions;[5] (2) Dr. Rao's list of reliance materials cites a Journal of Choice Modeling article, which discusses many of the same conjoint analysis issues that Dr. Rao raised [347-7, at 32]; (3) Dr. Rao wrote his doctoral dissertation on conjoint analysis; and (4) Plaintiffs do not argue that *any* of these "unsupported" statements is contrary to well-established survey principles. See *Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 965 (N.D. Ill. 2001). Dr. Rao's relative lack of inline citations does not make his survey design critiques "subjective" or *ipse dixit.* If Plaintiffs believe his critiques are misplaced, they can attempt to show that through cross-examination.

[5] See, *e.g.*, *Wintz*, 110 F.3d at 513 (citing the manual); accord *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 246 (S.D. Ill. 2015); *LG Elecs. U.S.A., Inc. v.*

*Whirlpool Corp.*, 2010 WL 3397358, at *5 (N.D. Ill. Aug. 24, 2010); *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 2010 WL 1687883, at *3 (N.D. Ill. Apr. 26, 2010);*DeKoven v. Plaza Assocs.*, 2009 WL 901369, at *6 (N.D. Ill. Mar. 31, 2009); *In re Fedex Ground Package Sys., Inc., Employment Practices Litig.*, 2007 WL 3027405, at *5 (N.D. Ind. Oct. 15, 2007); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003); *Nat'l Football League Properties, Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 669 (E.D. Wis. 1999).

**\*8** The same result is required for Plaintiffs' challenge to Dr. Rao's "common knowledge" statements. Even a cursory reading of these statements [see 380, at 3–4] shows that Dr. Rao uses "common" or analogous language to mean generally understood by survey design experts. [See, *e.g.*, 334-7, ¶ 13 ("It is commonly understood that the results from a conjoint analysis conducted in such a setting should not be extrapolated to the real world setting such as a retail store."); *id.* ¶ 14 ("It is intuitive and reasonable to expect that consumers participating in a survey-based exercise designed to collect raw data for conjoint analysis are familiar with product brand names and other product attributes to which they are expected to respond.").] The phrase "common knowledge" is not a talismanic incantation that, when invoked, unthinkingly mandates an expert's exclusion. Plainly, these opinions derive from Dr. Rao's specialized knowledge related to survey design and are not commonplace observations governed by Rule 701.

Plaintiffs' focus on Dr. Rao's statement that, "It is common knowledge that products such as water supply lines and toilet connectors are purchased by professional plumbing specialists who are called upon by homeowners and residents to install new supply lines or connectors, or to fix damaged lines or connectors, in their places of residence" (*id.* ¶ 9) is equally misplaced. The Court does not read this prefatory statement as Dr. Rao's expert "opinion." It is a background premise to set up why Dr. Rao believes Plaintiffs' sampling plan is flawed—an opinion that turns on the application of his specialized knowledge and experience to the facts of this case.[6] This premise also appears to be undisputed, as Dr. Rao cites in his report a June 2009 survey of plumbers "actively purchasing water supply lines" that was relied on by Plaintiffs' expert. See *id.* ¶ 13 n.2. This is not an instance where the "subject matter [of Dr. Rao's opinions] *as a whole* is obvious to a lay person." *Schutt Mfg. Co. v.*

*Riddell, Inc.*, 673 F.2d 202, 205 (7th Cir. 1982) (emphasis added). And this "court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension." *Hall*, 93 F.3d at 1342. Thus, the fact that some of the underlying premises of Dr. Rao's opinions may, in part, be derived from generally known facts does not remove his opinions from the "specialized knowledge" encompassed by Rule 702.

6    Plaintiffs note that plumbers are not part of the proposed class, which they argue means that some of Dr. Rao's criticisms are "invalid." [380, at 7.] Defendant responds that plumbers' willingness to pay for certain attributes is relevant for assessing the premium passed on to consumers. [417, at 15 n.5.] The persuasiveness of an expert's critiques is not a basis for exclusion. *Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

Plaintiffs' motion to exclude Dr. Rao's opinions and testimony [378; 379] is denied.

### 3. Dale Edwards, P.E.

Defendant retained Dale Edwards to analyze eight of Plaintiffs' failed water connectors, and opine on the causes of those failures. He performed a "non-destructive" examination of these connectors that included digital photography, dimensional measurements, scanning electron microscopy, and electronic dispersive x-ray spectroscopy. Edwards's original expert report describes the physical characteristics of each of the connectors and the results of his analysis, concluding that all of the connectors exhibit some corrosion from chlorine or chloride on the surfaces of the stainless steel wire braids. [339-20, at 2–9.] He opines that the failure of the connectors was "due to exposure to corrosive chlorine-containing chemicals." *Id.* at 10.

The conclusion section of his report, however, goes significantly further. Edwards also opines that (1) all of the connectors were permanently deformed from "excessive bending" that occurred during "improper installation"; (2) the corrosion on the water connectors "would have been clearly visible for months or possibly even years," which means "the majority of the failures, which are an extremely small percentage of the number of connectors

in the field, could have and should have been detected by normal inspections"; (3) "[p]eople normally understand that they should exercise care for their stainless steel appliances by not subjecting them to corrosive cleaners or environments"; and (4) the faucet connectors that Edwards examined "were properly designed for their intended use and would not have failed in the manner observed if proper care had been exercised during their installation and use." *Id.* at 9–10. All of these opinions purport to be based on a "reasonable degree of scientific and engineering certainty." *Id.* at 10. Except for the third opinion, Edwards does not elaborate on these conclusions elsewhere in his report. Regarding the third point, Edwards includes the following discussion:

> **\*9** It is clear that the presence of chlorine on the surfaces of the connectors was likely due to improper exposure of the connectors to corrosive chlorine-containing products that were improperly stored under the sinks where the connectors were installed. The exposure may have been due to storage of open containers that caused a corrosive atmosphere in the sink cabinet or in some cases, may have been improperly applied directly to the connectors. Improper storage or application of such corrosive chlorine-containing products to the connectors for cleaning or otherwise, would contradict common warnings and/or instructions on such products. In fact, warnings on the packaging of many of these chlorine-containing cleaning products relate to it being a corrosive material and that, among other things, contact with metals should be limited to avoid pitting and corrosion. Exposure to these corrosive chemicals is not something that the product was designed for and a corrosive environment is one that should not be expected. Properly closed containers of cleaning products would not have caused contamination of the stainless steel connector surfaces

and would not have led to the failures that occurred.

*Id.*

Edwards also submitted a rebuttal report to respond to one of Plaintiffs' experts, Dr. Tim A. Osswald. [339-21.] Edwards's rebuttal report largely attempts to qualify Dr. Osswald's conclusions by pointing out why alternative materials were not superior to the materials Defendant used or, at least, do not show that the materials that Defendant used are inadequate. Edwards also analyzes the literature relied on by Dr. Osswald, which Edwards claims actually reinforces these two points.

Plaintiffs move to exclude Edwards's opinions on two grounds. First, they claim that the "great majority" of the opinions in his original expert report "lack foundation, lack a scientific basis, and are unreliable under Rule 702." [392, at 7.] Second, they claim that Edwards's rebuttal opinions are not true rebuttal and are *ipse dixit. Id.* at 11–13. Defendant's response brief focuses almost entirely on Edwards's qualifications (which, other than a cursory attempt to label him as a "professional expert" (*id.* at 6–7), were not seriously questioned) and the reliability of his inspection methodology (which appears not to have been challenged at all (*id.* at 10–11)). Defendant also explains how Edwards's opinions substantively "rebut" Dr. Osswald's conclusions, such as by pointing out how Dr. Osswald's comparisons are "misleading and irrelevant from an engineering perspective. [419, at 13.] The defense of the *relevance* of Edwards's other opinions in his original report about improper installation, inspection, and chemical storage—all purportedly "based on his vast experience"—is limited to one paragraph. *Id.* at 12. Defendant makes no attempt to defend the *reliability* of these opinions.

### i. Edwards's Original Report

The Court agrees that many of Edwards's opinions in his original expert report are unsupported and therefore unreliable. "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Here, there is a striking disconnect between the "Laboratory Investigation" section of the report and the "Conclusions" section. The investigation section includes photographs, measurements, and descriptions of the physical characteristics of the connectors as well as the chlorine measurements detected. At least three of Edwards's conclusions have no discernable link to this investigation.

First, Edwards concludes, "The faucet connectors that I examined were properly designed for their intended use and would not have failed in the manner observed if proper care had been exercised during their installation and use." [339-20, at 10 ("Conclusion 5").] Edwards's report does not say *how* he concluded that the connectors were "properly designed" or "would not have failed" had "proper care been exercised." He does not identify a method for determining a "proper" versus improper design, how he applied that method here, or even what specific facts, literature, or experience he relied on to conclude the design was proper. He does not explain how he ruled out the possibility that the connectors would still have failed even with proper care. He simply asserts this conclusion to be true without any support. Rule 702 demands more.

**\*10** Second, Edwards concludes, "The majority of the failures, which are an extremely small percentage of the number of connectors in the field, could have and should have been detected by normal inspections of the connectors." *Id.* at 10 ("Conclusion 3"). Edwards analyzed *eight* connectors, not a "majority of the failures" that occurred in the field, and thus has no factual basis to conclude whether the majority "could or should have" been uncovered through inspection. To the extent that Edwards really meant a majority of the eight connectors, this conclusion fares no better. [7] Edwards does not indicate what "normal inspections" are or how he determined what "could or should have" been uncovered by them. If this conclusion is based on Edwards's experience, he never explains "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' " Fed. R. Evid. 702, Advisory Committee note on 2000 Amendments.

[7]    According to Plaintiffs, the only factual basis for Edwards's conclusion about what percentage of Defendant's connectors failed in the field is (1) Dr. Palmer's opinion, which is excluded as described below; and (2) a prior conversation with Defendant. [392, at 10 (citing 392-1, at 69:19–71:6).] The cited

testimony also indicates that Edwards relied on his "prior knowledge" of the "failure rates or claim rates for these products." [392-1, at 70:16–21).] Defendant makes no effort to argue that Edwards has a reliable basis to offer this opinion independent of Dr. Palmer, and because Dr. Palmer cannot opine on failure rates, Edwards cannot do so either. See Fed. R. 702(b).

In connection with Conclusion 3, Edwards also states that "[m]any of the failures that were examined were grossly corroded along the entire length of the connectors and this would have been clearly visible for months and possibly years before the failures occurred." [339-20, at 10.] An opinion about the degree of corrosion on the connectors that he analyzed is within the scope of his expertise and supported by the inspection, measurements, and testing that Edwards performed. Plaintiffs do not contend otherwise. However, Edwards does not explain how he can conclude that this corrosion "would have been clearly visible for months and possibly years." Without *any* support, this opinion is unreliable under Rule 702 and cannot be considered. [8] See, *e.g.*, *Threet v. Correctional Health Care Mgmt. of Okla., Inc.*, 2009 WL 3335596, at *5 (W.D. Okla. Oct. 15, 2009) ("[I]t does not suffice for an expert to say, in effect, 'I have 30 years experience in the field. So trust me, the answer is X.' That formulation is the classic *ipse dixit* approach foreclosed by [the Supreme Court].").

[8]     Such an opinion, in theory, could have been based on Edwards's experience. For example, he could have opined (with factual support) that he has conducted X number of inspections, he typically examines Y features during inspections, his inspections are typical of other inspections, he has observed chlorine corrosion during those inspections, corrosion takes Z months to build up and become visible, and chlorine corrosion would be visible and detected based on the standard manner and frequency in which inspections are performed. His report offers nothing close to this level of substantiation for this opinion.

Third, Edwards concludes that "[p]eople normally understand that they should exercise care for their stainless steel appliances by not subjecting them to corrosive cleaners or environments. The same level of care should be used with any stainless steel product including stainless steel braided water supply connectors." [339-20, at 10 ("Conclusion 4").] Unlike Dr. Rao, Edwards advances this kind of opinion as his "conclusion." It is not apparent how this conclusion is based on any

"scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). At his deposition, Edwards testified that this opinion is "based on [his] own use of stainless steel appliances," and he has "no specific data" regarding what people normally understand about such care, "other than just conversations through the years that I've had with people and seeing the instructions that come with these products." [392-1, at 71:13–74:7.] Defendant does not argue that such undescribed hearsay conversations "through the years" with unknown people are a sufficiently reliable basis to offer expert testimony about the public's general understanding of the proper care for stainless steel appliances. Nor does Defendant argue that Edwards, with his decades of experience and materials and forensic engineering background, is representative of what "[p]eople normally understand." Whether his opinion is unsupported or offers nothing more than a lay opinion, it is inadmissible under Rule 702.

**\*11** This is also true of Edwards's opinions about improper chemical storage, which are not listed as "Conclusions" but appear in the report's terse "Discussion" section. As noted, Edwards concludes that "[i]t is clear that the presence of chlorine" was due to improperly stored chlorine-containing products "under the sinks where the connectors were installed," which may contradict the warnings on the products. [339-20, at 10.] Edwards offers *no* factual basis for this conclusion, let alone any reason to believe this conclusion is "clear." "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort." *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010) (citation omitted). And, again, if this opinion is an inference from Edwards's experience, his report does not explain what specific experience supports his conclusions or how that experience has been reliably applied here. Such unsupported speculation falls short of the reliability required under Rule 702. [9]

[9]     This is not to say that an expert like Edwards would be prohibited from opining that the corrosion is consistent with improper chemical storage based on his experience once a factual predicate for such testimony is established by other witnesses. But what an expert *cannot* do is what Edwards did in his report: speculate about possible ways the connectors "may have been" exposed to chlorine, unmoored from any reliable factual foundation. [339-20, at 10]; see *Myers*, 629 F.3d at 645.

This leaves only two of Edwards's opinions with a connection to his laboratory analysis: his unchallenged opinion regarding chlorine-caused corrosion on the connectors [339-20, at 10 ("Conclusion 1") ] and the conclusion that the "kinking" and "excessive bending" on the connectors indicate "improper installation" (*id.* at 9–10 ("Conclusion 2")). Edwards's installation opinion, however, must fall too. His report is silent as to how he determined that the bending occurred during installation rather than at some other point in time. He does not describe any tests performed, interviews conducted, testimony reviewed, specific experience relied upon, or *any* other facts or data that could lead him to exclude any other events (*e.g.*, the bursting of the connector) and time periods (*e.g.*, breakdown of the connector over time) as a cause of the kinking or bending. See *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013) ("[A] court may consider '[w]hether the expert has adequately accounted for obvious alternative explanations.' " (citation omitted)). This opinion is little more than *ipse dixit.*

Accordingly, Plaintiffs' motion to exclude Edwards's opinions and testimony [390] is granted with respect to Conclusions 2, 3, 4, and 5, including the opinions contained in the Discussion regarding improper storage, but denied as to the remainder of his original report.

### ii. Edwards's Rebuttal Report

Plaintiffs' arguments about Edwards's rebuttal report are somewhat in tension. On the one hand, they argue that Edwards does not "actually rebut" Dr. Osswald's conclusions because Edwards agrees that certain facts are "true" or "undisputed." [392, at 11.] On the other hand, they claim that Edwards "criticize[s]" Dr. Osswald's conclusions in what amounts to "cross-examination material," but those criticisms are without sufficient support. *Id.* at 12–13. Neither argument withstands scrutiny.

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) (citation omitted). Testimony offered under the guise of a rebuttal expert report that simply provides additional support for the expert's original opinions is improper. *Id.* Here, Dr.

Osswald opines that an alternative material (polyvinyl chloride or PVC) could have been used to make the water connector's hose and that PVC's properties are superior to the materials used by Defendant. Edwards attempts to "impeach" or "diffuse" these opinions in several ways. He opines on the ways in which PVC is inferior to Defendant's materials, such as temperature resistance, flexibility, and potential negative health effects. [339-21, at 2–3.] He explains that the literature relied on by Dr. Osswald concerns the wrong product (that is, not plasticized PVC). *Id.* at 4. He also includes a "detailed" section of the report analyzing the literature relied upon by Dr. Osswald, pointing out how those sources show PVC is not superior to Defendant's materials on various metrics or could be offered to support the use of Defendant's materials. *Id.* at 4–6.

**\*12** Plaintiffs are correct that Edwards agrees in passing with Dr. Osswald on certain characteristics of PVC (such as its availability, its higher short-term tensile strength, and its acceptability as a product). However, Edwards does so to contextualize Dr. Osswald's opinions and explain why these conceded facts are less important, distinguishable, or irrelevant to assessing the defectiveness of the materials used by Defendant. See, *e.g.*, *id.* at 3 ("While *it is true* that plasticized PVC has been around for several decades and has been used in various hose applications, many of these applications were not NSF-61 (National Sanitation Foundation-61) compliant for use with potable water." (emphasis added)). This is standard rebuttal.

Unlike Edwards's original report, his rebuttal report is not *ipse dixit.* Again, Plaintiffs fixate on counting citations, not on whether Edwards provided reasons for his conclusions and those reasons are sufficiently reliable. [10] Plaintiffs overlook the fact that Edwards's purpose is to use the same "handbooks and other literature" that Dr. Osswald cites to rebut his opinions. *Id.* at 5–7. In doing so, Edwards does not simply assert that Dr. Osswald is wrong, but explains why. For example, Edwards includes a page of technical reasons why he believes Defendant's materials "maintain their strength to much higher temperatures" than PVC. *Id.* at 4. His literature critiques similarly explain how, for example, some of Dr. Osswald's sources "have little to do with potable water applications that must be tested for extraction of plasticizers and other chemicals due to long-term exposure" because they relate to only "propane and butane gas, farming applications,

heating oil, gasoline and pharmaceutical applications." *Id.* at 6. Plaintiffs' belief that Edwards should have cited something else *in addition to* the sources cited by Dr. Osswald is not a valid *Daubert* challenge, since "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718. Edwards provides an independent analysis of sources relied on by an opposing expert and an explanation as to why those sources undermine the conclusions reached by that expert. Cf. *Amari Co. v. Burgess*, 2012 WL 5389787, at *15 (N.D. Ill. Nov. 2, 2012) ("Rather than independently analyzing the data to provide an alternative conclusion, the experts simply criticize [plaintiff's expert]."). This is not *ipse dixit.* See *Mid-State*, 877 F.2d at 1339; *Zenith*, 395 F.3d at 419. Accordingly, Plaintiffs' motion to exclude Edwards's rebuttal opinions and testimony [390] is denied.

10    [See 392, at 5 ("Edwards makes exactly zero citations to his own scientific sources—none."); *id.* at 12 ("no citation to any source"); *id.* ("Nor is there any citation or authority"); *id.* ("completely without citation to authority"); *id.* (not "supported by citation to scientific data analysis, to any contradictory literature, or to any authority"); *id.* ("unsupported by citation to actual facts or authority").]

### 4. Dr. Vijay Gupta

Defendant retained Dr. Vijay Gupta to opine on the existence of design, material, or manufacturing defects in the 1-304 coupling nut used in Defendant's toilet connector and whether creep rupture would occur if the coupling nut was properly installed. [423, at 4.] Dr. Gupta is a Professor of Mechanical and Aerospace Engineering at the University of California Los Angeles, with a Ph.D. in Mechanical Engineering and a M.S. in Structural Engineering. According to his expert report, "At age 31, [he] became one of the youngest Full Professors with tenure in the US, only 5 years after receiving [his] Ph.D. degree." [339-17, ¶ 2.] He has "lectured on applied mechanics, fracture mechanics, materials science, biomechanics, mechanical engineering design, and manufacturing-related courses and topics for over 25 years." *Id.* ¶ 3.

**\*13** Plaintiffs move to exclude Dr. Gupta's opinions on two grounds. First, they argue that Dr. Gupta "tested the

wrong product" because he brought the wrong coupling nut to his deposition. [389, at 2.] Second, they claim that Dr. Gupta's conclusions are unreliable because at his deposition, he testified that one part of his analysis was based on a "back-of-the envelope" calculation. *Id.* The Court takes the second argument first.

### i. Dr. Gupta's "Back-Of-The-Envelope" Statement

Plaintiffs argue that Dr. Gupta "conceded the crudeness of his calculations" to generate the "failure analysis data he relied upon in forming his opinions." [389, at 8.] Here is the relevant exchange from Dr. Gupta's deposition:

Q: What was involved in the failure analysis?

A: Well, the first step in the failure analysis is to—for whether or not the hand tightening can result in the failure, would be to look at what levels of torque one can generate using their hand. And that was the first step. Then you estimate what kind of axial force you're going to generate inside the coupling nut assembly by understanding the mechanism by which the force is generated. And then you look at what is the maximum stress you're going to generate inside the body of the nut. And then you compare that with some failure limits of the material to come to a conclusion whether or not the hand tightening torques can result in the failure of the material or not.

Q: And did you do all that in connection with your assignment for Fluidmaster?

A: I did.

Q: Is that included—are the results of your failure analysis included in your report which you filed in this case?

A: Yes, it is.

Q: Were there any other written documents created as a result of your failure analysis?

A: No.

Q: Was there data generated?

A: No. I did a back-of-the-envelope calculation, and it is something you can just do it just using a calculator. And those numbers are all within less than 800 PSI as

the highest stress levels which you will generate inside the body of the coupling nut. And so there was no calculations I provided on a piece of paper, but that is something I can do just on—

Q: The back of an envelope?

A: —the back of an envelope.

Q: Okay. How much time have you spent on you assignment for Fluidmaster since you were retained?

A: I have not added all the hours, but it is definitely well beyond 200 hours.

[389-4, at 26:8–27:23.] Plaintiffs did not seek to clarify what Dr. Gupta meant by the phrase "back-of-the-envelope," content to rest their entire *Daubert* argument on any potential ambiguity that could be read into that phrase.

The Court is not persuaded. Dr. Gupta testified that the results from his failure analysis are in his report, which is filled with charts, figures, formulas, calculations, and cited sources. Plaintiffs do not point to any specific analysis in his report that is "crude" or "off-the-cuff" [437, at 11] because his detailed, complicated calculations unquestionably are not. As the context from deposition questions shows, Dr. Gupta's answers are about written documents and data that are *not* in his report. To claim, as Plaintiffs do, that Dr. Gupta "conceded he generated *no* data or even a single document" (*id.* at 10) when he spent "well beyond 200 hours" preparing a fifty-page report is a patent misreading of his testimony.

Here, Dr. Gupta referenced one calculation he made that is not in his report, which he views as "something you can do just * * * using a calculator." [389-4, at 27:10–13.] That the fact that a Mechanical and Aerospace Engineering Professor found the calculation of pressure per square inch simple enough to do on a calculator (or even the back of an envelope) does not—without significantly more—suggest his opinions are "the antithesis of scientifically reliable expert opinion testimony." [389, at 9.] Plaintiffs did not ask him to perform those calculations or otherwise challenge his PSI calculation. They do not identify an alternative, purportedly more rigorous method for calculating PSI that they claim should have been employed here. Nor do they explain precisely how calculating PSI on a calculator, even assuming it was a rough calculation, fatally undermines the reliability of his

conclusions. Plaintiffs simply seize on Dr. Gupta's word choice—which they opted not to explore further at his deposition—and then proclaim his opinions are entirely unreliable.[11] Such a *Daubert* challenge lacks merit.

[11] Plaintiffs rely on *Henry v. St. Croix Alumina, LLC,* 572 Fed.Appx. 114 (3d Cir. 2014), but the only similarity between Dr. Gupta and the experts in *Henry* is the phrase "back-of-the envelope." In *Henry,* the plaintiffs' experts concluded that "160,000 pounds of particulates escaped" from a refinery, of which bauxite residue was a "preponderance." *Id.* at 118. Each expert, however, used a "unique, qualitative methodology to reach these conclusions." *Id.* One expert admitted that this "isn't an estimate or emission rate that you would want to take to the bank" and was not "the kind of number that he would typically include in a report like this." *Id.* at 118 n.4. The other stated that he determined the bauxite residue was a "preponderance" of the dust that escaped based on a "simple, back-of the envelope kind[ ] of thing." *Id.* Dr. Gupta's claim to calculate PSI with a calculator is in no way comparable to experts offering an admittedly unreliable estimate of proportions of dust particles based on a "qualitative methodology."

### ii. Dr. Gupta's Deposition Mistake and Subsequent Declaration

**\*14** Plaintiffs' first *Daubert* argument appears to be mainly a factual dispute. Dr. Gupta was asked to bring to his deposition the physical materials that he tested in connection with his June 29, 2016 supplemental expert report. [437, at 4.] At the deposition, he agreed that the materials he brought were representative examples of what he used in his experiments. [373-3, at 76:10–17.] The hose that Dr. Gupta brought to the deposition, however, has a "Made in China" label. *Id.* at 85:3–6, 103:18–23. The coupling nut that is relevant to this litigation —the 1-304 coupling nut—was not made in China. In 2010, Defendant started outsourcing production of its coupling nut to Coastal, a manufacturer in China, which produced a "two-winged design comprising acetal" that looks different than the 1-304 coupling nut. [389, at 5.] Plaintiffs conducted the remainder of Dr. Gupta's deposition apparently thinking that Dr. Gupta had tested the wrong coupling nut, making the opinions in his 2016 supplemental report irrelevant.

Following the deposition, Defendant did not revise Dr. Gupta's report or otherwise indicate there was any error in Dr. Gupta's testimony. Dr. Gupta submitted an errata sheet making only two minor changes to his deposition testimony, but neither correction related to the materials brought to the deposition. As a result, Plaintiffs filed their *Daubert* motion, leading off with an argument challenging this seemingly significant error in Dr. Gupta's analysis.

Defendant responds that Dr. Gupta "accidentally caused" "confusion" at his deposition by bringing the wrong product with him. [423, at 7 n.3.] Defendant attaches a declaration from Dr. Gupta dated September 9, 2016, in which he states, "I checked my laboratory records and files and confirm[ed] that I inadvertently brought the wrong hose body to the deposition." [423-1, ¶ 4.] The hose he brought to the deposition "belongs to a Coastal toilet connector that [he] had taken apart and examined at a different time and which was not the subject of [his] supplemental expert report." *Id.* Dr. Gupta reiterated that "[t]he tests [he] conducted, and which are the subject of [his] 2016 Supplemental Expert Rebuttal Report, were performed only on Fluidmaster 1-304 coupling nuts, the acetal coupling nut that is at issue in this case." *Id.* ¶ 5. His declaration includes photographs of the 1-304 coupling nut and the Coastal coupling nut and states that a "visual inspection" shows that the two products are "readily distinguishable." *Id.* ¶ 7. According to Defendant, then, "the evidence confirms that the correct and representative product was analyzed and tested" by Dr. Gupta, and Plaintiffs' Daubert arguments must fail. [423, at 11–12.]

Plaintiffs cry foul. They claim the fact that Dr. Gupta "mixed-up the hoses and coupling nuts" means he "did not maintain the parts he tested in any particular manner" and it is impossible to know which products, in fact, Dr. Gupta tested. [437, at 8–9.] They also argue that Dr. Gupta's failure to "maintain chain of custody" and "sloppy" lab practices mean that all of his opinions are unreliable. *Id.* at 9. Plaintiffs note that they "previously requested exemplar plastic nuts from [Defendant] for their own testing" but were informed none existed, which means that either Dr. Gupta tested the wrong product or Defendant violated its discovery obligations. *Id.* at 6–7. Plaintiffs also filed a motion to strike Dr. Gupta's new declaration, claiming it is a new untimely "expert report" submitted in violation of Federal Rule of Civil Procedure 26.[12] [See 450.] As a remedy for this alleged misconduct, Plaintiffs seek exclusion of Dr. Gupta's

declaration and his supplemental report or, alternatively, discovery of all documents referenced in his new report, all correspondence between Defendant's counsel and Dr. Gupta, another deposition of Dr. Gupta, and for Defendant to pay the fees and costs for Dr. Gupta's original deposition, any additional document discovery, and the *Daubert* motion. *Id.* at 16.

[12] This same motion pertains to a declaration submitted by Dr. Brian Palmer, which is discussed below.

**\*15** Defendant offers several responses. First, it points out two important facts that it neglected to emphasize in its *Daubert* response brief: (1) Dr. Gupta "clearly brought" the correct 1-304 *coupling nut* to the deposition, just not the correct *hose* [460, at 6–7]; and (2) "Dr. Gupta provided several videos and photos of the testing on the Fluidmaster 1-304 coupling nuts (clearly without 'wings'), which were produced to Plaintiffs prior to Dr. Gupta's deposition" (*id.* at 7). Thus, Dr. Gupta's declaration confirming that he tested the correct coupling nut was not a "new" expert opinion. Second, Defendant argues that parties may submit declarations attached to *Daubert* response briefs that offer limited responses to points raised by the opposing party's motion (or, alternatively, such declarations are permissible supplementation under Federal Rule of Civil Procedure 26(e)). *Id.* at 9–10, 12–13. Third, Defendant claims that there is no prejudice or unfair surprise to Plaintiffs and no bad faith by Defendant, and thus additional discovery and striking the declaration are unwarranted.

The Court finds this dispute to be significantly overstated. If Dr. Gupta brought the correct coupling nut to the deposition and Defendant disclosed video and photos of him testing the correct coupling nut, then that should be sufficient to resolve whether Dr. Gupta, in fact, tested the correct coupling nut. Plaintiffs do not contend that these videos and photos [see 464, at 2–5] show Dr. Gupta tested the Coastal coupling nut. While Plaintiffs assert in their reply that Defendant does not present "evidence" that Dr. Gupta brought the correct coupling nut to the deposition [466, at 6], this fact should be *easily* verifiable. Either the plastic bag of "exemplars" from the deposition—which apparently was not marked as a deposition exhibit—has the 1-304 coupling nut in it or it does not. If Plaintiffs do not have the bag, they could look at the video of Dr. Gupta's deposition [437, at 4] or talk with someone who attended the deposition to confirm this fact. The Court finds it inconceivable given the volume of paper that has

been filed on this issue that, if Plaintiffs were correct and Defendant had misrepresented to the Court that Dr. Gupta brought the 1-304 coupling to his deposition, Plaintiffs would not present *something*—a picture of the bag, a close-up screenshot from the deposition video, a declaration from a deposition attendee—to show that this was a lie. The fact that Plaintiffs do not is telling; it suggests that there is no genuine dispute over the fact that Dr. Gupta brought the correct coupling nut to his deposition.

In other words, Plaintiffs' *Daubert* challenge seeks to extrapolate from the fact that Dr. Gupta admittedly and mistakenly brought the wrong hose to the deposition to mean that Dr. Gupta tested the wrong coupling nut, his lab is in disarray, and all of his opinions are unreliable. Other evidence (*e.g.*, the photographs and video contemporaneous with his testing, the references to the 1-304 coupling nut in his report, the 1-304 coupling nut he brought to the deposition, and his declaration) refutes those inferences. Except for this all-but immaterial mistake, Plaintiffs do not otherwise seriously challenge the reliability of Dr. Gupta's methodology. They cite no authority holding that Dr. Gupta's opinions are unreliable unless he performed a "material analysis" on Defendant's coupling nut to verify it was "the same as the 1-304 coupling nuts at issue." [389, at 6.] And Rule 702 does not require experts to second guess whether the attorneys who retained them have supplied them with relevant materials to analyze absent some reason to believe these materials are incorrect. See *Tuf*, 223 F.3d at 591; *Walker*, 208 F.3d at 588. If Plaintiffs wanted to challenge Dr. Gupta's "chain of custody" or preservation of evidence practices, they easily could have done so during his deposition. They did not. Plaintiffs cannot layer speculation upon speculation—*e.g.*, this concession "raises more questions than it answers" [437, at 9]—to successfully challenge an expert's reliability, and doing so falls well short of persuading this Court to strike Dr. Gupta's entire 2016 supplemental report.

**\*16** Nor does Dr. Gupta's short September 2016 declaration clarifying factual issues constitute a "new" expert report that violates the expert disclosure rules. Supplemental declarations from experts that merely respond to specific *Daubert* criticisms or "harmlessly repeat information provided in the earlier reports" do not violate Rule 26. *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at \*5 (S.D. Ind. Sept. 18, 2006). Such

clarifying declarations from experts are a routine part of *Daubert* motions.[13] Here, Dr. Gupta responds to factual issues raised at his deposition that serve as the basis for Plaintiffs' motion—namely, whether he tested the coupling nut associated with the hose he brought to the deposition. Such clarification of a factual mistake does not trigger mandatory sanctions under Federal Rule of Civil Procedure 37.

13    See, *e.g.*, *In re Washington Mut. Mortg. Backed Sec. Litig.*, 2012 WL 2995046, at \*7 (W.D. Wash. July 23, 2012); *Bryant v. Wyeth*, 2012 WL 11924298, at \*3 (W.D. Wash. July 19, 2012); *Pritchard v. Dow Agro Scis.*, 263 F.R.D. 277, 285 (W.D. Pa. 2009); *City of Owensboro v. Kentucky Utilities Co.*, 2008 WL 4542706, at \*2 (W.D. Ky. Oct. 8, 2008); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 725 n.3 (E.D. Wis. 2008); see also *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 2008 WL 2428225, at \*1 n.1 (S.D.N.Y. June 13, 2008) (undisclosed expert declarations offered on summary judgment); *Murata Mfg. Co. v. Bel Fuse, Inc.*, 2008 WL 656045, at \*4–5 (N.D. Ill. Mar. 5, 2008) (same).

But this entire course of events was avoidable. After reviewing Plaintiffs' *Daubert* motion, Defendant should have contacted Plaintiffs, explained the mistake, and offered to have Dr. Gupta sit for limited deposition on this issue. Plaintiffs should have agreed and withdrawn their *Daubert* motion, enabling them to reevaluate whether to raise a reliability challenge based on Dr. Gupta's additional deposition testimony. Instead, the parties have wasted their time on a declaration from Dr. Gupta, a *Daubert* response and reply, and a full round of motion to strike briefing debating the range of possible sanctions.

The Court will order what should have been obvious and agreed upon by everyone: Dr. Gupta must sit for another deposition. This deposition will be limited to 60 minutes and the deposition's topic is limited to issues raised by Dr. Gupta's mistake in bringing the wrong hose to his August 5, 2016 deposition, including his laboratory protocols and how Dr. Gupta confirmed from his laboratory files that he tested the correct coupling nut. In advance of that deposition, Dr. Gupta will be required to produce all documents that he relied on to determine that he tested the correct coupling nut (subject to any applicable privilege or protection). Defendant must produce to Plaintiffs the 1-304 coupling nut(s) that Dr. Gupta tested. No fees and costs will be awarded.[14]

14    Subject to Plaintiffs showing otherwise, the Court does not see a reason to permit supplemental rebuttal expert reports based on what should be a limited deposition. While Plaintiffs are free to file another *Daubert* motion limited to issues arising from the deposition, Plaintiffs should think seriously about the merits of this challenge and if it will be a good use of the parties' and the Court's time and resources.

Before moving on, the Court addresses one issue raised mainly by Plaintiffs' motion to strike. Dr. Gupta's declaration tacks on a response to another issue that arose at his deposition: whether he reviewed a rebuttal report from Plaintiffs' expert, Dr. Michael Bak. Dr. Gupta stated that following his deposition, he "reviewed [his] files," found a copy of Dr. Bak's report, and confirmed that he had previously reviewed it. [408, ¶ 9.] He stated, "Nothing in the Bak Rebuttal Report changes my opinions rendered in this case," and his previously submitted report "rebuts the points made in the Bak Rebuttal report." *Id.* ¶¶ 9–10.

**\*17** Plaintiffs claim prejudice, arguing that Dr. Gupta completely changed his deposition testimony in his declaration. Here is how Plaintiffs present Dr. Gupta's testimony in their brief: Dr. Gupta "was questioned at his 2016 deposition and *confirmed he did not consider* Dr. Bak's report: Q: So you didn't consider that [October 2014 report] in preparing your supplemental report, then? A: That's correct." [437, at 7–8 (emphasis added).]

Here is Dr. Gupta's actual testimony:

Q: And with respect to the 2014 expert report of Michael Bak, is that the September 2014 expert report which would be the expert report that you had before you prepared your first report?

A: Yes.

Q: Okay. Are you aware that there's a second report by Dr. Bak?

A: These are—and I may have missed that report. I remember there was a report submitted toward the end of—after my deposition, and so I don't have a good recollection whether I saw it or not. Yeah.

Q: So you didn't consider that in preparing your supplemental report, then?

A: That's correct.

Q: Okay. Do you have—but—do you have any information or—let me start over. Do you have any recollection about what Dr. Bak addressed in the second report?

A: I have a—if I had read it, then I will—I don't have a recollection of that.

Q: And I will tell you that the report was filed in October 2014—

A: Okay.

Q: —and it was subsequent to your deposition. anD it is entitled, 'thE Rebuttal Report of Michael Bak, Ph.D.'

A: Okay.

Q: But you didn't consider it in connection with your supplemental report, correct?

A: If I read that report at some point and—because of all the opinions I've written over here are basically based on all information I have, you know, remembered from my last deposition and everything I've considered in this case.

Q: Okay. But it wasn't something you've told your lawyers to put on this list, correct?

A: This is correct. So if I read it—because there is a lot of—so even if I read it and there were certain opinions he may have expressed and if those opinions did not change my opinion, then I basically thought there was no reason to bring that in this particular list here.

[437-3, at 54:14–56:8.]

The Court should not have to fact-check whether the parties' representations are accurate. Only by ignoring all of the surrounding testimony could Plaintiffs represent that Dr. Gupta "stated clearly and unequivocally that he did not consider Bak's rebuttal report." [466, at 7.] Dr. Gupta testified repeatedly that he could not recall whether he looked at this report. He indicated that if he had and it did not change his opinions, he would not have put it on his reliance list. In his declaration, Dr. Gupta stated that he had, in fact, received the report and it did not change his opinions. Dr. Gupta's declaration is not a "new" opinion—after all, he says his opinions

are unchanged—or even inconsistent with his deposition testimony. Plaintiffs opted not to ask further questions about Dr. Bak's rebuttal report despite Dr. Gupta's uncertainty about whether he had read it. [See 437-3, at 55:25–56:12.] Plaintiffs cannot manufacture "prejudice" by offering snippets of testimony that misrepresent the testimony's substance as a whole. Questions about Dr. Bak's rebuttal report are off-limits at Dr. Gupta's next deposition.

Plaintiffs' motion to exclude Dr. Gupta's opinions and testimony [387] is denied, and Plaintiffs' motion to strike Dr. Gupta's September 9, 2016 declaration [446] is denied in part and granted in part.

### 5. Dr. Brian Palmer

**\*18** Defendant retained Dr. Brian Palmer, a Vice President of Charles River Associates with a Ph.D. in economics from the Massachusetts Institute of Technology, to "analyze Fluidmaster's claims data and other related information to assess the failure rate of Fluidmaster's 1-304 coupling nut used in connection with toilet connectors." [383-1, ¶ 1.] Plaintiffs raise a host of methodological challenges to Dr. Palmer's opinions, arguing that these flaws collectively undermine the reliability and relevance of Dr. Palmer's conclusions.

To start, Plaintiffs explain that a "failure rate" (*i.e.*, the number of products that fail divided by total sales) is not the same as a "claims rate" (*i.e.*, the number of claims filed with a company about a product's failure divided by the total sales). At his deposition, Dr. Palmer agreed that these are "two different things"—the claims rate will almost always be smaller than the failure rate. [383-3, at 17:7–17, 21:2–5.] Nevertheless, Defendant euphemistically characterizes Dr. Palmer's claims rate opinion as the "known failure rate" and insists that a claims rate is the "best proxy" for a failure rate. [411, at 5, 9.] Defendant offers no statistical, economic, scientific, or otherwise reliable basis to support that claim. Neither could Dr. Palmer at his deposition. "[A]n inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590. "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). Defendant is likely

correct that, "statistically speaking, there would need to be drastically more failures in the field than reported for any difference in the failure rate and claims rate" to matter. [411, at 10.] But that does not mean Dr. Palmer can simply assert these measures are the same without a reasoned basis for doing so. Dr. Palmer has not measured and cannot opine on the "failure rate" of Defendant's product.

Next, Plaintiffs challenge whether Dr. Palmer's "claims rate" methodology is reliable, attacking both the calculation of total sales (the denominator) and total claims (the numerator). With respect to total sales, Plaintiffs identify three alleged errors: (1) Dr. Palmer used *manufacturing* data, not sales data, to estimate total sales—meaning that he assumed that every manufactured product was sold and installed; (2) Dr. Palmer included roughly 4.6 million toilet connectors with Coastal coupling nuts, inflating his total sales of the 1-304 coupling nut by 14%; and (3) to determine the amount of United States sales, Dr. Palmer used the ratio of U.S. to non-U.S. sales in 2010 and then applied that same ratio for every year between 1993 to 2009. With respect to total claims, Dr. Palmer eliminated 22% of coupling nut claims and 13% of hose burst claims—without any decrease in total sales—because of missing data associated with those claims. Thus, Plaintiffs claim that Dr. Palmer manipulated his methodology to deflate his numerator and inflate his denominator, creating an artificially and unreliably low "claims rate."

In an effort to place Plaintiffs' criticisms in context, Defendant attaches a declaration from Dr. Palmer to its response brief. [See 411-1.] Dr. Palmer's declaration states that even if he accepted all of Plaintiffs criticisms, his analysis would be materially unchanged—mainly because the size of the denominator (total sales) is so large that it dwarfs the impact of these changes. Dr. Palmer's report indicates that the claims rate for plastic nut claims is 0.0050% and the rate for hose bursts is 0.0047%. [339-22, ¶ 4.] In other words, 99.995% and 99.9953% of products manufactured did not result in a filed claim. According to Dr. Palmer, even if he (1) assumed that 40% of the manufactured water connectors were never sold; (2) removed all of the Coastal coupling nuts claims and sales; and (3) added back in the previously excluded 22% of coupling nut claims and 13% of hose burst claims, it would only change his analysis by roughly .004% for plastic nut claims and .003% for hose burst claims. [411-1, ¶

5.] Thus, even accepting Plaintiffs' criticisms, 99.99% of Defendant's products did not result in a filed claim.

**\*19** Defendant also attempts to explain why Dr. Palmer's methodological choices are reliable. Defendant argues that Dr. Palmer used "the best data available" to reach his conclusion because this is the data that Defendant uses in the ordinary course of business. [411, at 11–12.] Dr. Palmer, in fact, used actual sales data for 2003 through 2015 and only used manufacturing data for 1993 to 2002. Regardless, "it simply defies reason and the company's profit motive to believe that Fluidmaster would manufacture goods and not sell them." *Id.* at 15. With respect to the Coastal coupling nuts, Defendant takes a position inconsistent with its argument concerning Dr. Gupta, arguing that Coastal coupling nut sales are properly counted because that product is part of the class definition. *Id.* at 7. Dr. Palmer also explained why he excluded certain claims, including that they fell outside the relevant time period or the basis for the claim was irrelevant (*e.g.*, failures caused by "abuse" or "electrical"). [15]

[15]    Defendant argues that Plaintiffs do not present "expert testimony" to challenge Dr. Palmer's methodology and "Plaintiffs' attorneys are neither statisticians nor persons who otherwise possess education and experience to qualify them to opine on the reliability of Dr. Palmer's data or methodology." [411, at 6.] That is a non-sequitur. It is *Defendant*'s burden to show the reliability of its expert's methods. *Lewis*, 561 F.3d at 705. Rule 702 does not require the moving party to offer expert testimony to challenge the admissibility of an opposing party's expert, and whether a party's attorneys are "statisticians" is not part of the Court's analysis.

The Court largely agrees with Plaintiffs' criticisms of Dr. Palmer's calculations. It is highly improbable that *every* product that Defendant manufactured was sold, and Defendant offers no reason to believe this occurred here. If the 2003 through 2015 sales data was available, Defendant could have compared those figures with the manufacturing data from those years to justify the use of manufacturing data (or some appropriate ratio) for prior years. Instead, Defendant simply assumes they are same. The fact that a party asserts data is the "best available" does not mean, absent more, it is sufficiently reliable for any purpose for which it is used. Likewise, Defendant

cannot seriously contend that the Coastal coupling nuts are part of this case given the lengths it went through to avoid exclusion of Dr. Gupta's opinions when he was thought to have tested the Coastal coupling nut (rather than the 1-304 coupling nut). Moreover, Defendant never attempts to justify why it was reliable to use the 2010 domestic to foreign sales ratio across the entire time period of sales at issue.

At the end of the day, however, these criticisms do not meaningfully impact whether Dr. Palmer's conclusions are admissible. *Daubert* demands reliability, not perfection. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. As Dr. Palmer's declaration shows, Plaintiffs' identified errors, if credited, cumulatively result in a less than .005% change in the estimated claims rate. [16] The Court does not agree that errors of this scale render his methodology fatally unreliable under Rule 702. Fluctuations at the outer margins of the claims rate do not obscure the point of Dr. Palmer's opinions: well over 99% of Defendant's products sold during the relevant time period did not result in a filed claim. Plaintiffs do not undermine the reliability of *that* conclusion (which, taking a step back, is really the level of generality that matters), and thus attacks on the precise claims rate (99.995% versus 99.991%) go to weight, not admissibility. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993) ("We adhere to the rule that an expert's lack of absolute certainty goes to the weight of his testimony, not to its admissibility.").

[16]    As with Dr. Gupta, the Court declines to strike Dr. Palmer's declaration. This five-paragraph declaration plainly does not offer "new opinions" or amount to a "wholesale revision[ ]" of his analysis [450, at 7], but merely responds to the few specific methodological arguments raised by Plaintiffs in their *Daubert* motion. Plaintiffs do not suffer unfair prejudice simply because Dr. Palmer explains why the criticisms that they raised, even if accepted, are insignificant. No additional discovery is warranted.

**\*20** Finally, Plaintiffs also seek to exclude Dr. Palmer's opinions about the percentage of claims that were filed within Defendant's 10-year warranty period. To determine the start date of the warranty period, Dr. Palmer relied on information supplied by one of Defendant's employees, a senior manager of Global Risk Management. That

employee indicated that he "believes that the connectors are generally sold * * * within a month or two of the manufacturing dates." [339-22, at 6 n.5.] Based on that information, Dr. Palmer estimated the commencement of the warranty period as within 1 month, 6 months, and 12 months from the date of manufacture. *Id.* Plaintiffs argue that calculations resting on an employee's "belief" are too speculative because there is no "scientific basis for this analysis." [435, at 10.]

These arguments miss the mark. "[E]xperts may rely on data and other information supplied by third parties." *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007). This is true "even if the data were prepared for litigation by an interested party." *Id.*; see also *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1148 (N.D. Cal. 2003) ("[W]hen the parties' experts rely on conflicting sets of facts, an expert may testify on his party's version of the disputed facts. The proper way for a party to challenge an expert in such a situation, reasoned the court, is through cross-examination of the expert."). Here, Dr. Palmer's warranty opinions are based on assumptions about when the warranty period began. "It is not improper for an expert witness to assume as true some fact that will be presented during the trial even if that fact is hotly disputed. Indeed, such happens all the time." *Wilson v. Gen. Motors Acceptance Corp. (GMAC)*, 2008 WL 2593792, at *2 (E.D. Tenn. Apr. 3, 2008). "As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility." *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005); accord *Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact."). Plaintiffs can attempt to undermine the persuasiveness of Dr. Palmer's conclusions by showing these assumptions are erroneous. But that does not render the methodology accepting those assumptions unreliable. *In re Se. Milk Antitrust Litig.*, 2010 WL 8228838, at *2 (E.D. Tenn. Dec. 8, 2010) ("[P]laintiffs are free to show that [expert] is wrong and his data flawed. This is not, however, a *Daubert* issue."); *Smith v. Bankers Life & Cas Co.*, 2008 WL 2845081, at *6 (S.D. Iowa Mar. 3, 2008) ("Indeed, Defendants' only argument is that Plaintiff will be unable to prove at trial the premise on which [expert's] report is based[.] * * * That question, however, is a factual one for the jury to decide and, simply put, does not bear

on the methodology employed by [expert] in reaching his conclusions or on the reliability of his opinions and conclusions.").

Plaintiffs' motion to exclude Dr. Palmer's opinions and testimony [381; 382] is denied in part and granted in part, and Plaintiffs' motion to strike Dr. Palmer's declaration [446] is denied.

## B. Defendant's *Daubert* Motions

### 1. Plaintiffs' "Technical" Experts

Defendant filed an omnibus motion to exclude Plaintiffs' five "technical" experts: Dr. Michael Bak, Dr. David Kazmer, Walter J. Fallows, Dr. Timothy Osswald, and Dr. David Pope. These experts opine on the various ways that Defendant's coupling nuts and hoses were defectively designed. Defendant raise one challenge common to all five experts and several others specific to each expert. The Court starts with the common *Daubert* argument.

### i. Consideration of the "Failure Rate"

**\*21** Defendant argues that all five experts' defectiveness opinions are "rendered unreasonable by the directly contradicting infinitesimal failure rate." [337-1, at 9.] According to Defendant, the "failure rate" is an "indisputable record fact[ ]" refuting any conclusion that its product was defective and these experts' failure to account for the "failure rate" in their opinions "amounts to 'cherry-picking' facts which fails to satisfy the scientific method." *Id.* at 10. Plaintiffs argue (again) that there is no evidence of a failure rate and the claims rate is "irrelevant and unreliable," spending roughly 20 percent of their response brief repeating the same arguments from their motion to exclude Dr. Palmer. [See 375, at 8–10.]

As explained above, the Court agrees that there are no "indisputable" record facts establishing a failure rate. Defendant identifies a claims rate, not a failure rate. Moreover, Defendant never explains how a claims rate is directly germane to the reliability of an opinion on, for example, how stresses impact the design and materials comprising Defendant's connectors. Said differently, a claims rate does not "contradict" whether the product's design causes sufficient stress to "exceed the creep rupture

limits." *Id.* at 3. It is simply evidence that few claims were reported. The kind of impermissible data "cherry picking" in the cases that Defendant cites involve experts who arbitrarily pick and choose among the same kind of scientific data when formulating their opinions.[17] Nor is there any obvious inconsistency between a defectively designed product and a low claims rate: a defective design could make the possibility of catastrophic failure significantly more likely without either triggering an actual failure or the filing of a claim. Defendant is certainly free to argue that the claims rate is important evidence of non-defectiveness, but a low claims rate is not a silver bullet that renders any expert who concludes a product was defective unreliable and unreasonable under Rule 702, and Defendant offers no authority to the contrary.

[17] See *Barber v. United Airlines, Inc.*, 17 Fed.Appx. 433, 437 (7th Cir. 2001) ("Dr. Hynes relied on weather data, but he rejected some weather data that contradicted his opinion."); *Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, 2003 WL 1797844, at *2 (N.D. Ill. Apr. 3, 2003) (excluding expert who purportedly relied on "numerous testing reports and data," but "failed to familiarize himself with existing data and research from prior tests regarding paint failure and to account for conclusions in such reports opposite to his own" and "could not point to one single test conducted by anyone else in support of his theories"); *LeClercq v. The Lockformer Co.*, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding expert who, without reason, ignored 17 wastewater samples that detected no containments and conflicted with his opinion that certain chemicals had contaminated the groundwater).

### ii. Dr. Michael Bak, Ph.D.

Plaintiffs retained Dr. Bak to conduct a finite element analysis (a computer-based model to evaluate how a product performs under various conditions) to opine on how Defendant's coupling nut performs during its installation and over its life cycle. Dr. Bak concludes that a particular feature of the coupling nut's design causes high stress concentration that leads to creep rupture. He also concludes that stress in a coupling nut can result in rupture based on hand tightening alone.

Defendant challenges these opinions in three ways. First, Defendant claims that visible evidence of tool marks on the coupling nuts means they were installed with a tool, which contradicts and refutes Dr. Bak's conclusion that "simple hand tightening" can cause failure. [337-1, at 11.] The Court does not see how these are mutually exclusive. Dr. Bak's conclusion that the lesser amount of stress from hand tightening can cause failure does not preclude the possibility that even greater stress from using a tool would also cause failure. Even accepting that Plaintiffs' coupling nuts reveal evidence of tool marks, this does not undermine the reliability of a computer model showing that significantly less stress would still cause Defendant's product to fail.

**\*22** Second, Defendant claims that Dr. Bak's model is "based on incorrect parameters" that inflate the amount of stress on the coupling nut. *Id.* at 11–12. In particular, Defendant states that Dr. Bak ignores significant stress relaxation in the cone washer and coupling nut and overestimates the pre-load stress by using the wrong friction coefficient values. *Id.* at 12. Defendant's sole support for these critiques comes from Dr. Gupta's expert report. *Id.* In response, Plaintiffs point to Dr. Bak's October 2014 rebuttal expert report, which responds to Dr. Gupta's criticisms [see 375-3]. In particular, Dr. Bak explains (1) how his model accounts for stress relaxation in the coupling nut, (2) why Dr. Gupta's cone washer stress relaxation estimate is "illogical" and inconsistent with "hyperelastic material law," and (3) how he researched friction coefficients of acetal materials. *Id.* Moreover, Dr. Bak's report cites the material sciences and engineering textbooks that served as the foundation of his analysis. In reply, Defendant argues that Dr. Bak ignores Dr. Gupta's 2016 supplemental report, which allegedly refutes Dr. Bak's findings.

"In essence, the defendants are asking the [C]ourt to determine which [party's stress relaxation] model is *most* accurate, which is ultimately a merits decision." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009). The Court will not accept—especially at the class certification stage—this invitation to resolve a battle between Dr. Gupta and Dr. Bak over how to properly calculate and model coupling nut stress relaxation. See *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 170–71 (S.D. Ind. 2009); *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *8 (N.D. Ill. Mar. 21, 2007) (holding that class certification is not "the right time to engage in a 'battle of experts' "). "In a case of dueling experts * * * it is

left to the trier of fact * * * to decide how to weigh the competing expert testimony." *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008). Defendant's arguments about the correctness of Dr. Bak's "parameters" are really about the correctness of his conclusions, not the reliability of his methodology. *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 808 (7th Cir. 2013) ("[A]rguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury."); *In re Zimmer Nexgen Knee Implant Prod. Liab. Litig.*, 2015 WL 3669933, at *25 (N.D. Ill. June 12, 2015) ("Rule 702 does not permit 'the district court to choose between * * * two [competing] studies at the gatekeeping stage' or evaluate the quality of an expert's data, inputs, or conclusions." (citation omitted)). But this Court's inquiry under *Daubert* is "solely on principles and methodology, not on the conclusions they generate." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).

Third, Defendant argues that Dr. Bak erroneously "selects a single factor, the notch sensitivity of acetal" in reaching his conclusions about stress concentration. [337-1, at 12.] Defendant claims that Dr. Bak should have also considered other factors, such as "the absolute value of the impact strength at a given root radius," again citing Dr. Gupta's expert report for support. *Id.* "Our case law has recognized that experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000). Defendant makes no serious attempt to show that any reliable methodology *must* include these factors, let alone articulate how Dr. Bak's methodology is unreliable because he did not consider these factors. Simply providing a "laundry list of factors" allegedly missed by an expert does not, by itself, suggest that the expert's methodology is unreliable. *Tilstra v. Bou-Matic, LLC*, 2014 WL 4662483, at *7 (W.D. Wis. Sept. 19, 2014) (holding that expert's factors "all affect the weight" of the expert's opinion, not the reliability of the "method to calculate the result he reached"). Absent a significant link to the reliability of the expert's methodology, this is plainly a matter for cross-examination, not a basis for exclusion. [18] *Daubert*, 509 U.S. at 596; *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 745 (N.D. Ill. 2005) ("[Plaintiff's] quarrels with [expert's] inclusion or rejection of certain factors or calculations (such as grip strength),

implicate his conclusions and are thus properly left for exploration through cross-examination.").

[18]    Because the Court will not exclude Dr. Bak's opinions, the Court rejects Defendant's argument that Dr. Kazmer's, Mr. Fallows's, and Dr. Osswald's opinions must be excluded because of their reliance on Dr. Bak's conclusions [337-1, at 13].

### iii. Dr. David Kazmer, Ph.D.

**\*23** Plaintiffs retained Dr. Kazmer to opine on how the coupling nut's design affects its long-term performance. Dr. Kazmer concludes that (1) the coupling nut has a sharp corner that acts as a stress concentrator; (2) the coupling nut was not designed for long-term creep, and (3) Defendant used inferior materials to make its coupling nut.

In an attempt to exclude these three opinions, Defendant argues that Dr. Kazmer "cherry-picks" facts and ignores "conflicting data." [337-1, at 14.] In connection with the first opinion, Defendant argues that Dr. Kazmer cited an irrelevant cantilever beam article in his report, used the wrong design guideline, and ignored that Defendant's thread radius is already the widest allowed by industry standards. Defendant never explains why Dr. Kazmer's mere citation to a cantilever article as an "example" of stress concentration in plastics product design renders his opinion inadmissible. See *Loeffel Steel*, 372 F. Supp. 2d at 1119 (noting that questions about the "bases and sources" of an opinion go only to weight, not admissibility). In addition, Defendant does not indicate where in Dr. Kazmer's report he used the wrong design guideline (or how this impacted his opinions) or opines on the thread radius. Defendant's only "support" for these two critiques is a citation to three paragraphs of Meek's Supplemental Report that actually relates to Fallows's opinions.

For the second opinion, Defendant argues that Dr. Kazmer failed to consider whether other factors like age or exposure to corrosive chemicals could cause failure and did not take into account the stress relaxation of the cone washer. As with Defendant's challenge to Dr. Bak's opinions, Defendant does not explain how failure to consider these factors shows Dr. Kazmer's opinions are unreliable. See *Daubert*, 509 U.S. at 596; *Cooper*, 211 F.3d at 1020; *Tilstra*, 2014 WL 4662483, at *7. Nor does Defendant explain how Dr. Kazmer's opinions

that Defendant failed to design for long-term creep is inconsistent with the possibility that other factors might *also* cause failure.

For the third opinion, Defendant argues that Dr. Kazmer considered the wrong type of acetal material—Celcon M90—which Defendant used for only a year in 1989. Defendant submits a declaration from one of its managers attesting to this point. [339-23.] According to Defendant, not only is there "nothing wrong with using Celcon M90" but its limited use "far outside any applicable warranty period" means "analysis of Celcon M90 has limited, if any, relevance." [337-1, at 9.] None of these are meritorious *Daubert* arguments. The fact that an expert's opinion has "limited" relevance does not mean it is irrelevant. Nor does simply asserting there is "nothing wrong" with the materials Defendant used demonstrate that an expert's methodology arriving at a contrary conclusion is flawed. *Paul v. Holland Am. Line, Inc.*, 2006 WL 3761368, at *3 (W.D. Wash. Dec. 21, 2006) ("[A]n opinion is not inadmissible simply because defendants disagree with its conclusion."). Finally, Plaintiffs argue that the documents attached to Defendant's employee's declaration show that Defendant switched *to* Celcon M90 in 1989 and used it until 1995. This kind of factual dispute bearing on how many putative class members would have received a coupling nut made of Celcon M90 goes to the weight of Dr. Kazmer's opinions, not their reliability under *Daubert*. *Smith*, 215 F.3d at 718; *Loeffel Steel*, 372 F. Supp. 2d at 1119.

 **\*24** In addition, Defendant seeks to exclude two of Dr. Kazmer's "ancillary non-technical opinions" based on his lack of qualifications. Dr. Kazmer states in his report that there were a "vast array of product failures in the field." [339-3, ¶ 21.] When asked about this line at his deposition, Dr. Kazmer responded that, based on his experience, "for every failure that's reported, there is typically several that are not. So if there is 3,000 reported failures, it could be much higher than that." [339, at 24:1–24.] Dr. Kazmer's opinion is essentially the flipside of Dr. Palmer's opinion that the claims rate and failure rate are the same. Neither expert's conclusion is supported by anything other than speculation. *Clark*, 192 F.3d at 759 n.5. Dr. Kazmer's lack of "qualifications" as a "consumer behavior" expert is really another way of saying that he has no basis to speculate about the vastness of Defendant's product failures in the field. Merely prefacing a deposition answer with the phrase "based on my experience" does not

save a completely unsupported opinion from exclusion. *Zenith*, 395 F.3d at 419.

Finally, Defendant seeks to exclude Dr. Kazmer's opinion that Defendant's "decision to develop and outsource a new design indicates that the previous design was inadequate." [339-3, ¶ 52.] Plaintiffs make no attempt to save this opinion, and the Court agrees that it is improper. Dr. Kazmer's engineering background gives him no expert insight into the motivations, intent, and state of mind of a corporation. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004); *Klaczak v. Consol. Med. Transp. Inc.*, 2005 WL 1564981, at *8 (N.D. Ill. May 26, 2005). The jury will not be aided by Plaintiffs' expert speculating about why Defendant made design changes and outsourcing decisions. Fed. R. Evid. 702(a).

### iv. Walter J. Fallows

Plaintiffs retained Fallows, a Mechanical Engineer with more than 35 years of experience, to test whether Defendant's coupling nut would fail from creep rupture by conducting a visual examination, photo microscopy, and scanning electron microscopy analysis of the coupling nuts. Fallows concludes that the coupling nuts consistently fail due to creep rupture. He then goes somewhat further and opines, based on Dr. Bak's and Dr. Kazmer's opinions, that this creep rupture-related failure was a caused by a "design defect."

Defendant seeks to exclude Fallows's design defect causation opinions as the "unsupported parroting of another expert's opinion." [337-1, at 16.] Plaintiffs respond that Fallows "concluded that all of the Plaintiffs' [coupling nuts] were under stress and failed as a result of creep and creep rupture," [375, at 15] but do not otherwise attempt to explain how Fallows can opine "to a reasonable degree of engineering certainty that each [coupling nut] failed as the result of defective design" [339-5, ¶ 37]. Fallows was not retained as an expert on structural analysis, finite analysis, or the design specifications of Defendant's product. Plaintiffs never explain how Fallows is qualified to testify about the analyses underlying Dr. Bak's and Dr. Kazmer's opinions or how Fallows did anything more than merely repeat their conclusions as his own. While an expert can rely on another expert's findings or opinions in developing his own opinions, he cannot simply adopt wholesale the ideas of another expert without any

independent analysis. See *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that 'an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts,' such expert must make some findings and not merely regurgitate another expert's opinion." (internal citations omitted)). This kind of impermissible bolstering is neither helpful to the trier of fact nor is it based on sufficient facts or data. *Town of Wolfeboro v. Wright-Pierce, Inc.*, 2014 WL 1806843, at *2 (D.N.H. Apr. 2, 2014) ("To the extent Moore simply parrots the conclusions of other experts' reports in his report, those are not his opinions based on facts or data appropriately relied on in his field."). Fallows cannot opine on the coupling nut's design and whether the connectors fail because of that design.

**\*25** Defendant also seeks to exclude Fallows's opinions about the cause of the creep and creep rupture on the grounds that he fails to account for overtightening as a possible alternative cause. Fallows repeatedly testified that it was impossible to measure if a coupling nut failed due to overtightening or to assign a level of torque based on tool markings on the product. According to Fallows, tool marks could be left whether the coupling nut was overtightened, tightened just right, or undertightened, and thus such marks are "meaningless." [339-8, at 46:3–15.] Defendant points out that Fallows reached the opposite conclusion in another case, concluding that tool marks on a coupling nut designed for hand installation and significant compression on the cone washer indicated improper installation. [See 339-26, at 9–11.]

This is all fodder for cross-examination. Fallows indicated that he did not believe tool marks by themselves were indicative of overtightening, and Defendant identifies no objective source showing that viewpoint is unreliable. [19] "[U]nless the expert can offer 'no explanation' as to why he concluded an alternative cause was not the sole cause," arguments about alternative explanations typically go to weight, not admissibility. *Troutner v. Marten Transp., Ltd.*, 2006 WL 3523542, at *4 (N.D. Ind. Dec. 5, 2006) (citation omitted). Defendant does not, for example, show that Fallows ignored the standard level of torque recognized by mechanical engineering experts that should be assigned if tool marks are present. Nor does Defendant point to any universally recognized methodology for assessing tool marks. Defendant's belief that Fallows ignored "visible tool marks" on Plaintiffs' coupling nuts provides grounds to cross-examine him on the support

for his conclusions. See *Pruitt v. BROC, LLC*, 2014 WL 5089115, at *3 (W.D. Va. Oct. 9, 2014); *Voter Verified, Inc. v. Election Sys. & Software, Inc.*, 2011 WL 2580786, at *3 (M.D. Fla. June 29, 2011). Simply put, Defendant's only evidence that Fallows ignored an alternative cause is the opinions offered by its own expert, Meek. The purpose of Rule 702's gatekeeping function is not to empower the Court to pick Meek's methodology over Fallows's. The fact that each party's expert reaches different conclusions about the presence and significance of tool marks on Plaintiffs' coupling nuts is a matter for the trier of fact to resolve.

19    Fallows's expert report from the prior case seems to focus on washer deformation as much as the presence of tool marks to conclude that "a large amount of compression force was developed with a tool during installation." [339-26, at 11.] This report also opines merely that a tool was used, not that the tool marks showed "overtightening" as opposed to an appropriate amount of tightening with a tool.

#### v. Dr. Tim A. Osswald, Ph.D.

Plaintiffs retained Dr. Osswald to analyze the properties of the materials used to manufacture Defendant's coupling nut and hose. According to Dr. Osswald, Defendant selected "a weak, sub-standard material" based on its notch sensitivity, and "the failures of the coupling nuts * * * could have been avoided with the use of a stronger material." [339-9, ¶¶ 34–36.] Moreover, Dr. Osswald concludes that alternative "superior" materials were available for Defendant to use to manufacture its hose.

Defendant advances a series of short arguments for excluding Dr. Osswald's coupling nut opinion. Defendant claims that Dr. Osswald "ignores other possible reasons" for the coupling nut's failure, such as age or exposure to corrosive chemicals. Just like its challenges to Dr. Kazmer, Defendant does not explain how Dr. Osswald's failure to consider these factors renders his opinions unreliable. See *Daubert*, 509 U.S. at 596; *Cooper*, 211 F.3d at 1020; *Tilstra*, 2014 WL 4662483, at *7. The fact that chlorine exposure might make Defendant's product fail does not preclude the possibility that Defendant's product is made of substandard materials. Defendant further argues that Dr. Osswald erroneously bases his conclusion on tests of the Celcon M90, but the Court has already explained that

this kind of factual dispute does not go to the reliability of an expert's opinion under Rule 702. *Loeffel Steel*, 372 F. Supp. 2d at 1119.

**\*26** Defendant also claims somewhat vaguely that Dr. Osswald "merely compared a few specific properties of acetal to polypropylene" but "did not test his conclusion" and "cites no scientific literature showing that acetal was an improper material for this application." [337-1, at 17–18.] Dr. Osswald's entire report offers detailed, substantive reasons (with sources) to show that the notch sensitivity of Defendant's acetal makes it "sub-standard." Defendant never states how the methodology that Dr. Osswald actually used—his comparison of "a few specific properties"—is unreliable, what "test" he should have performed to verify his conclusion (or why that test was required as a precondition of admissibility under Rule 702), or why the literature that he does cite is insufficient to support his conclusions. Defendant is free to probe Dr. Osswald's conclusions by cross-examining him with the tests or literature that it believes he should have considered. *Smith*, 215 F.3d at 719; *Loeffel Steel*, 372 F. Supp. 2d at 1119.

With respect to Dr. Osswald's hose opinion, Defendant argues that Dr. Osswald only compared the component parts of Defendant's product "in isolation," not the combined product as Defendant "actually used them." [337-1, at 19.] According to Defendant, this is not an "apples to apples" comparison, and thus lacks reliability. *Id.* Dr. Osswald, however, compares the same types of data about tensile strength for Defendant's materials and plasticized PVC to conclude that PVC is stronger "on its own" than either material used by Defendant. [339-11, ¶¶ 2–5; 375, at 15.] Defendant does not articulate how the data Dr. Osswald relies on to make this comparison is dissimilar. While the *relevance* of Dr. Osswald's comparison may be debatable,[20] Defendant's challenge to the *reliability* of his methodology goes, at best, to weight.

[20]    If Defendant's connector appears in the field as a combination of stainless steel braids over the hose lining, then it is unclear how Dr. Osswald's comparison of the "strength" of the hose's component parts in isolation is helpful to the trier of the fact—especially if these parts, when combined, are stronger than PVC. But Defendant does not directly challenge this opinion's relevance, and the Court cannot say at

this juncture that this opinion lacks any tendency to make a fact of consequence more or less probable.

Defendant also challenges Dr. Osswald's hose opinion on the grounds that he "failed to consider other critical factors such as health concerns with using plasticized PVC." [337-1, at 20.] Plaintiffs note that Dr. Osswald's report discusses how health concerns with PVC largely disappeared by the early 1980s [see 339-11, ¶¶ 23–24]. Thus, Dr. Osswald did consider this criticism and found it inapplicable. To the extent that Defendant believes Dr. Osswald should have considered other health concerns or evidence suggesting these concerns did not dissipate in the 1980s, Defendant can expose the shakiness of his conclusions on cross. Defendant also argues that Dr. Osswald "did not consider the relative manufacturing ease of the different materials" [337-1, at 20], but (again) does not explain why his opinion is unreliable for not doing so. That Defendant wishes Dr. Osswald would have emphasized different factors or looked at additional evidence does not mean his methodology fails Rule 702. *Smith*, 215 F.3d at 718.

### vi. Dr. David P. Pope, Ph.D.

Plaintiffs retained Dr. Pope to opine that Defendant's use of a braided stainless steel sheath is a design defect because stainless steel will corrode when it comes in contact with chlorine and chlorides, which are commonly found in household products such as table salt. Defendant does not dispute the first premise (*i.e.*, chlorides will corrode stainless steel), but challenges Dr. Pope's conclusion (*i.e.*, a product is defective for failing to account for such corrosion) as entirely unsupported and speculative. The Court agrees.

**\*27** Dr. Pope's analysis boils down to this: it is "virtually certain that some fraction of the supply lines in service will come in contact with chlorine," the stainless steel sheaths "will be compromised," and the line "will burst" if the inner lining of the hose is "insufficiently strong." [339-13, at 5–6.] Therefore, he concludes, Defendant's products were "defectively designed by not anticipating and accounting for corrosion of the braided stainless steel sheath." *Id.* at 6. Dr. Pope never indicates what "fraction" of supply lines will have chlorine contact, how this contact occurs, how much exposure to chlorine is needed to "compromise[ ]" the sheath, how much time it takes to compromise the sheath's integrity, how he determined

whether or what percentage of Defendant's hose lining would be "insufficiently strong," or the relative costs or feasibility associated with switching to a different design. Dr. Pope employs no discernable methodology for distinguishing a product that fails because of a design defect rather than consumer misuse or any other reason. His conclusion that "some [unknown] fraction" of supply lines "will burst" because of an unknown amount chlorine contact for an unknown amount of time based on an unknown reason means *ipso facto* Defendant's product was defectively designed bears no resemblance to the relevant test for determining whether a product's design is defective. See, *e.g.*, *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002) (explaining California's "consumer expectation test" and "risk-benefit test" for proving design defects). This *ipse dixit* conclusion is neither helpful nor reliable and will be excluded.

Defendant also seeks to exclude Dr. Pope's alleged opinions about "homeowner behavior," including whether homeowners fail to follow the labels on certain cleaners by using them on Defendant's connectors. [337-1, at 19.] These opinions do not appear in Dr. Pope's report. Rather, *Defendant* elicited these opinions during Dr. Pope's deposition. If Defendant did not think he was qualified to offer such opinions, it should not have directly asked him to do so. [See 339-14, at 132:10–14 (Q: "So would you expect a homeowner to use this [cleaner] to clean a connector." A: "Again, we're getting out of my area of expertise, but I would not be surprised if a homeowner did do that.").] The Court will not strike such deposition testimony simply because Defendant does not like his answers.

Accordingly, Defendant's motion to exclude Plaintiffs' technical experts' opinions and testimony [337] is denied in part and granted in part.

### 2. Dr. Melissa Pittaoulis and Frank Bernatowicz

Plaintiffs retained Dr. Melissa Pittaoulis to develop a conjoint study to assess the impact that two attributes—the "NO BURST" representation and 10-year warranty—have on consumers' willingness-to-pay ("WTP") for Defendant's product. [377, at 4.] Dr. Pittaoulis' conjoint study will include 400 participants who bought a water supply line within the past year or intend to do so next year. [318, ¶ 16.] Her survey targets ordinary consumers,

not plumbers or other professionals. Survey respondents will be shown a set of products, each described in terms of five "attributes" or product characteristics, and asked to select which product they would be likely to purchase. *Id.* ¶ 12. Dr. Pittaoulis aims to measure how consumers trade-off different features of Defendant's product, so that one can "estimate the increase (or decrease) in value associated with" these attributes. [377, at 5.] These attributes will, in theory, serve "as a proxy to measure consumers' perceived difference in value between defective and non-defective connectors." *Id.* at 4–5.

Dr. Pittaoulis has not carried out her planned study yet, but once she does, Frank Bernatowicz will then use the WTP measurement that results from Dr. Pittaoulis' study to calculate the damages. Specifically, Bernatowicz will use the average WTP coefficient for the warranty and no-burst attributes to determine how much a consumer "overpaid" for products that did not have these attributes, and multiply that number by the total number of connectors sold. [336-1, at 8.] Under this measurement, every purchaser of Defendant's product was injured when they received a defective product "without regard to later manifestation of the defect" [71, ¶ 37] and thus "damages" are the "difference between the market value of the products as promised (i.e.—non-defective) versus the value of the products as delivered at the point of sale (i.e.—defective)" [377, at 6.] Plaintiffs rely on this Pittaoulis–Bernatowicz combination to show that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

**\*28** Defendant raises two main challenges to Dr. Pittaoulis's conjoint study: (1) it does not measure damages for any relevant or legally cognizable theory of liability, and thus fails to satisfy *Comcast*; and (2) its methodology and assumptions are unreliable under *Daubert*. [See 334.] Defendant also contends that Bernatowicz's calculation incorrectly assumes that damages for a "defective" product would be the absence of these attributes at the point of sale. The Court defers discussion of Defendant's first and third arguments, which are more appropriately directed to Plaintiffs' class certification motion, and instead turns to Defendant's methodological challenge to Dr. Pittaoulis's proposed study. See *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015) (discussing how *Comcast* arguments are not *Daubert* arguments).

"Courts have generally found consumer survey evidence admissible under *Daubert* if a qualified expert testifies that the survey was conducted according to generally-accepted principles of survey research." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003). A court assessing whether a survey employs a reliable methodology examines whether "(1) the 'universe' was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was assured." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952 (N.D. Ill. 2009) (citation omitted). "Although these criteria generally address the weight a fact finder should give the survey, a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant—and thus inadmissible." *Id.*; *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007) ("[S]urvey evidence in debt-collection as in trademark cases must comply with the principles of professional survey research; if it does not, it is not even admissible."). Nonetheless, only in "rare" situations will a proffered survey be "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co.*, 1 F.3d 611, 618 (7th Cir. 1993).

Because Dr. Pittaoulis's survey has not been conducted yet, most of these metrics do not apply to assessing the reliability of her proposed study.[21] Defendant's methodological challenge focuses on the first two of these metrics. First, Defendant argues that Plaintiffs' survey selects an unrepresentative sample of respondents because it measures only ordinary consumer preferences. It is undisputed that the vast majority of Defendant's products are purchased by plumbing professionals for subsequent installation in the end-user's home or business. Specifically, from 2009 to 2015, "approximately 66 to 76 percent of the U.S. connector sales were made in the wholesale channel." [334-8, ¶ 13.] Ten out of the fourteen class representatives did not purchase Defendant's products directly—instead purchasing a home with Defendant's product already installed or relying on a plumber to purchase the product for them.

[340, at 29.] Because the majority of consumers purchase Defendant's products "indirectly through a plumber," a survey directly measuring the price premium that an ordinary consumer might pay for a "missing attribute" is unrepresentative and irrelevant. [403, at 9.]

[21]   To the extent Defendant challenges Dr. Pittaoulis's survey as unreliable because she "has not performed a survey or even conducted any preliminary testing to ensure that the survey she designed will be meaningful" [336-1, at 7], the Court disagrees that *Daubert* imposes such a requirement. See *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *9 (C.D. Cal. July 24, 2014) ("*Daubert* does not require plaintiffs to actually run their damages models to make [expert's] testimony admissible for purposes of class certification."); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) ("[T]he Court disagrees with Defendant that [expert] must have already performed his proposed conjoint analysis for the Court to consider the proffered methodology."). If the survey, once conducted, does not generate a WTP coefficient for these attributes, then this fact will go to the merits of Plaintiffs' claims.

**\*29** Plaintiffs respond by arguing that professional plumbers are not part of the proposed class definition—only "consumers" are—and so Dr. Pittaoulis plans to survey only ordinary consumers "who have or will purchase" Defendant's products. [377, at 9.] Plaintiffs argue that these consumers are the correct population to sample "because it is consumers who are the ultimate users of the products and consumers who bear the burden of the defects." *Id.* Thus, Defendant's concerns are "highly academic" and irrelevant. *Id.*

The Court disagrees. "For a survey to be valid, 'the persons interviewed must adequately represent the opinions which are relevant to the litigation.' " *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) (citation omitted). If Dr. Pittaoulis is seeking to "examine the trade-offs that consumers make among different features *when buying a product* or service," then she needs to identify a representative sample of those who buy Defendant's products. [334-3, ¶ 11 (emphasis added).] In the clear majority of cases, that purchaser is a plumber, plumbing professional, or wholesale buyer. Just because end-users will "bear the burden" of any alleged defect does not make their preferences representative if 99 percent of the time a plumber with potentially different preferences

is making the purchasing decision.[22] Dr. Pittaoulis does not evaluate whether the preferences of plumbers and ordinary consumers are the same or account for any differences if they are not. She simply ignores the majority of typical purchasers in her survey. That significantly undermines the relevance of her survey.[23] See *LG Elecs.*, 661 F. Supp. 2d at 952 ("A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant." (citation omitted)); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010) (finding survey's relevance "greatly harmed" by "failure to focus the study on the consumers in the market at issue in this case").

[22]    [See, *e.g.*, 334-4, at 178:8–18 (Q: "If 99 percent of the actual purchasers are professionals, all you're measuring in your survey is the one percent, correct? A: My survey results apply to just that one percent of consumers." Q: "And did you do anything to determine whether the group you proposed studying is one percent of the market, ten percent of the market, 50 percent of the market? A: No.").]

[23]    Plaintiffs argue that Dr. Rao "conceded" at his deposition that plumbers did not need to be surveyed. [377, at 9.] Dr. Rao was asked—confusingly—if plumbers "should" be the "target" of a survey if they were "not part of the class definition" [380-2, at 58:3–8], which is not the same as asking if a survey that entirely excludes plumbers is reliable. The question seems to presume that the class definition establishes whose preferences matter. It does not speak to the test for admissibility under Rule 702, and the Court is not persuaded that this single answer from Dr. Rao satisfies Plaintiff's burden under *Daubert*.

Nor do Plaintiffs explain how a conjoint study will reliably measure the WTP for consumers who indirectly acquire a toilet connector through a third-party. In fact, Plaintiffs' class certification motion relies heavily on the fact that Defendant sells predominately to wholesalers and "does not sell 'No Burst Connectors' directly to consumers." [See 371, at 16–18 (arguing that California law should apply nationwide).] All of the cases cited by Plaintiffs on conjoint studies involve products that almost always are directly purchased by consumers.[24] Plaintiffs never explain why the WTP of a consumer purchasing a home with hundreds of products already installed (including a toilet connector) is comparable to a consumer making an isolated purchase of a toilet

connector presumably for home repairs.[25] Likewise, Plaintiffs offer the Court no reason to equate the WTP of a consumer who directly purchases a toilet connector with one who outsources that decision to a plumber but never personally evaluates the significance of the "NO-BURST" statement or warranty. While it is possible that the price premium that a plumber paid for that attribute was not absorbed by the plumber and was passed along undiluted to the ultimate consumer, Plaintiffs have no reliable basis for making this assumption. The failure to address *any* of these methodological issues raises reliability and relevance concerns under Rule 702.

[24]    See *ConAgra*, 90 F. Supp. 3d at 939 (cooking oil); *Sanchez-Knutson*, 310 F.R.D. at 533 (automobiles); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1072 (D. Minn. 2015) (anti-virus software "download insurance"); *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 45 F. Supp. 3d 724, 730 (N.D. Ohio 2014) (washing machines); *Guido*, 2014 WL 6603730, at *1 (hair care products); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020 (N.D. Cal. 2013) (video players and video game consoles); *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1112 (W.D. Wash. 2012) (video game consoles); *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 368 (N.D. Cal. 2010) (beverages).

[25]    When asked at oral argument for Plaintiffs' best case where a court admitted a conjoint study that measured the "preferences" of the "ultimate users of the products" who were not direct users [486, at 1 (Question 4)], Plaintiffs offered *Intel Corporation v. Advanced Micro Devices, Incorporated*, 756 F. Supp. 1292 (N.D. Cal. 1991). This microprocessor trademark infringement case analyzes whether end users or direct purchasers are the appropriate group of purchasers to test "purchaser perception on the issues of purported genericness." *Id.* at 1293. The court chose the direct purchasers (the "usual buyers"). *Id.* at 1294–95. Thus, Plaintiffs' best case does not address the survey's admissibility under Rule 702 (it predates *Daubert*), it does not test consumer preferences, and it comes out in favor of surveying the direct purchasers rather than the ultimate users. Furthermore, the court in *Intel*'s reasoning was that a microprocessor is "an ingredient of another product" like a computer and not "a single product" that passes unchanged to the consumer (which *Intel* reasoned could warrant measuring the end user). Defendant's connector is much more like a microprocessor than

a "single product, complete in itself" like a Teflon frying pan. *Id.* at 1294. Most consumers buy a finished product (a new house, a remodeled bathroom, a fixed toilet, etc.) that contains Defendant's product as a component part, just like a microprocessor is a component part of the computer purchased by the consumer.

**\*30** Second, Defendant advances several challenges to whether Dr. Pittaoulis's survey will reliably measure purchasers' WTP. Most of Defendant's arguments—the survey's small sample size,[26] unrepresentative sample composition,[27] whether the results of conjoint studies can be adequately extrapolated to the retail setting, whether "price" is an appropriate attribute to measure, and whether her study adequately accounts for various supply side factors like shelf space, market share, competition, and retailer discounts—go to weight, not admissibility. One other aspect of Dr. Pittaoulis's survey design, however, merits further discussion.

[26] Defendant argues that the 400-person sample size of Pittaoulis's study is too small to provide meaningfully reliable results. Plaintiffs respond that sample size challenges go to weight, courts have admitted conjoint studies with sample sizes as small as 309 respondents, and Dr. Pittaoulis asserts that her survey population "is large enough that the results will be statistically meaningful." [377, at 9.] While the Court is not required to take Dr. Pittaoulis's assertion "on faith," *Minasian, 109 F.3d at 1216*, and Dr. Pittaoulis does not explain how she selected a 400-person sample size, how she verified this will produce statistically meaningful results, or how she confirmed that splitting her sample into two groups of 200 respondents will still produce statistically meaningful results, the Court cannot say that Defendant's sample size challenge goes to more than the weight of Dr. Pittaoulis's opinions.

[27] While Dr. Pittaoulis's survey design states that "[g]ender and age quotas will be used to ensure that the sample does not over or under-represent any particular gender or age category" [334-3, ¶ 18], Defendant argues that 70 percent of homeowners who purchase plumbing parts are male (while 92 percent of plumbers are male and between 25 and 64 years old). [336-1, at 11 n.7.] Dr. Pittaoulis testified at her deposition, however, that she meant that the starting pool of 4,800 respondents would be balanced through gender and age quotas, and she would rely on the survey screening questions (such as whether they are

likely to purchase a water supply line) to determine the ultimate age and gender makeup of the 400-person sample. [334-4, at 85:2–20.] Defendant does not explain why that methodology is unreliable.

Dr. Pittaoulis plans to measure five attributes: brand name, tubing material (*e.g.*, PVC, copper, stainless steel), package phrase (*e.g.*, "No Burst"), warranty length, and total price. [334-3, ¶ 21.] Her report does not state why she chose these particular attributes. Cf. *ConAgra, 90 F. Supp. 3d at 954* ("Contrary to [defendant's] suggestion, moreover, [expert] does explain why she chose to limit her analysis to six attributes and why she chose the attributes she did."). Plaintiffs simply assert—without support—that this proposed study "contains a sufficient number and appropriate mix of product attributes." [377, at 10.] Dr. Pittaoulis's report indicates that "[t]o the extent that there is any other feature that may have an impact on consumers' preferences for water supply lines (other than size specifications), I will consider adding a sixth attribute." [334-3, ¶ 21 n.21.] Neither Dr. Pittaoulis nor Plaintiffs explain how she how she will identify this "feature" or ultimately decide whether to add another attribute.

In other conjoint analyses cases, experts first "ask[ ] respondents to prioritize 18 attributes of each accused product to come up with a list of six attributes that have similar values," and then attempt to estimate an attribute's relative value through a second survey. See *TVI, 929 F. Supp. 2d at 1021; see also Oracle Am., Inc. v. Google Inc., 2012 WL 850705, at \*10 (N.D. Cal. Mar. 13, 2012)* (finding that expert performing a conjoint analysis "had no reasonable criteria for choosing the four non-patented features to test; instead, he picked a low number to force participants to focus on the patented functionalities, warping what would have been their real-world considerations"). Here, two of the studies on Dr. Pittaoulis's reliance list state that factors influencing the purchasing decisions for water supply lines include "quality, strength/durability, appearance, specificity in product specifications/features, promotions, counter recommendations, * * * ease and quickness of installation, reliability, universal fit, availability in a variety of lengths, ability to stop leaks, corrosion resistance material, and easy to follow instructions." [334-7, ¶ 17.] One of those studies indicates "quality, availability, and accessibility are more important reasons for purchase than price." *Id.* ¶ 13 n.2.

**\*31** In response, Plaintiffs argue that "several" of these metrics "do not translate into concrete features" [377, at 11]—a point they immediately undermine by stating that terms like "No Burst" or a warranty serve as "proxies that customers may use to gauge" these features (*id.*). Dr. Pittaoulis does not indicate how she decided these other attributes were unimportant, how she determined they could not be measured, or whether she attempted to come up with a proxy for these other attributes. It appears she simply disregarded them.[28] By selecting these four non-price attributes without determining if they play an important role in real-world consumers' preferences, Dr. Pittaoulis's survey potentially elevates the two attributes linked to Plaintiffs' damages claims and inflates respondents' WTP estimate for these attributes.

[28]  Plaintiffs argue that Defendant "fails to present any credible evidence—other than Dr. Rao's personal opinion—that the attributes Dr. Rao suggests are somehow more important than the ones proposed by Dr. Pittaoulis." [377, at 11.] That largely misses the point. Defendant is arguing that Dr. Pittaoulis arbitrarily and unreliably chose which attributes she would measure. *Plaintiffs* have the burden to show why Dr. Pittaoulis's selection of certain attributes makes her methodology sufficiently reliable.

While any one of these methodological issues, standing alone, might not be fatal, the Court is sufficiently concerned that their combination renders Dr. Pittaoulis's proposed survey unreliable. Asking an unrepresentative group of purchasers to artificially assign values among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate class-wide damages. Indeed, Plaintiffs conceded at oral argument that asking the wrong people the wrong questions would pose admissibility issues under *Daubert*. While the Court does not hold that no reliable conjoint study could be developed here, Plaintiffs have failed to show that Dr. Pittaoulis's proposed study as presently designed is sufficiently reliable to satisfy Rule 702. Accordingly, Defendant's motion to exclude Dr. Pittaoulis's proposed survey [334; 336] is granted.

**C. Preliminary Issues Regarding Class Certification**

In their motion for class certification [284], Plaintiffs seek to certify a Rule 23(b)(3) class with the following definition:

- Class 1—Nationwide class under California CLRA: All persons who purchased or leased a No-Burst Line, not for resale, or sustained damage from the failure of a No-Burst Water Supply Line, between April 24, 2011, and the date of certification.

[286, at 27.] Plaintiffs also propose three state subclasses:

- Subclass 1: Pursuant to Rule 23(b)(3), breach of warranty on behalf of all persons who purchased or acquired a No-Burst Line, or sustained damage from the failure of a No-Burst Line, between April 24, 2004, and the date of certification in Pennsylvania, Vermont, Alabama, Minnesota, Arizona, and Tennessee.

- Subclass 2: Pursuant to Rule 23(c)(4), negligence on behalf of all persons who sustained damage from the failure of a No-Burst Line, between April 24, 2012 [or applicable statute of limitation], and the date of certification in Pennsylvania, Vermont, Alabama, Minnesota, Arizona, Illinois, North Dakota, Georgia, Maine, California and New Hampshire.

- Subclass 3: Pursuant to Rule 23(c)(4), strict liability on behalf of all persons who sustained damage from the failure of a No-Burst Line, between April 24, 2012 [or applicable statute of limitation], and the date of certification in Pennsylvania, Vermont, Alabama, Minnesota, Arizona, Illinois, North Dakota, Georgia, Maine, California and New Hampshire.

*Id.* Plaintiffs also seek certification of 17 issues for the state subclasses. [See 286-72, at 5–7.]

**\*32** Before the Court can turn to the viability of these classes, it must first address the choice of law issues presented by Plaintiffs' nationwide class and the application of the Federal Rules of Evidence to Plaintiffs' class certification motion.

**1. Choice of Law**

Plaintiffs seek to certify a nationwide class based on violations of California's CLRA. The parties agree there is a potential conflict between the laws of California and other states. [286, at 28; 340, at 19–20.] Accordingly, whether CLRA can apply nationwide turns on choice of law principles, which begs another question: *Which* state's choice of law principles apply? "When cases are based on diversity of citizenship, the transferee court [in an MDL proceeding] must apply the state laws that the transferor forums would have, according to that forums' choice-of-law rules." *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 852 (N.D. Ill. 2010); see also *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010). Here, there are five transferor forums: Arizona, California, Illinois, New Hampshire, and Pennsylvania. [See 35.] Neither party argues that any other forum's laws should be analyzed.

Plaintiffs' opening brief addresses choice of law principles from only four of these states, omitting New Hampshire. They then change course in their reply, arguing that their "initial choice of law analysis was over inclusive" because their CLRA class only has two class representatives: Steve Rensel, whose original forum was the Central District of California, and Karen Rhyne, whose original forum was the Northern District of Illinois. [371, at 13 n.23.] As a result, only Illinois's and California's choice of law rules should be considered. Plaintiffs cite nothing to show that the choice of law principles from only the class representatives' transferor fora should be analyzed to determine if one state's law may apply nationwide in a class action.

Nevertheless, the Court need not decide whether Plaintiffs are correct because Illinois's choice of law principles are effectively identical to Arizona, Pennsylvania, and New Hampshire. Both parties agree that Illinois, Arizona, and Pennsylvania adopt the choice of law analysis of the Restatement (Second) of Conflicts of Laws ("Second Restatement"). [See 286, at 28; 340, at 21.] The Second Restatement adheres to the "most significant relationship" test for torts involving property damage. Second Restatement § 147. That test, described in greater detail below, applies the "local law of the state where the injury occurred" unless another state "has a more significant relationship," which is determined by weighing seven factors. *Id.*

Although Plaintiffs ignore New Hampshire's choice of law rules, Defendant does not do much better. Defendant states that "the place of injury is the controlling factor" under New Hampshire law. [340, at 24.] The New Hampshire Supreme Court case that Defendant cites for that proposition shows that the law is exactly the opposite: "[T]his court has *rejected* the traditional *lex loci delicto* rule that the law of the forum where the injury occurs is paramount." *LaBounty v. Am. Ins. Co.*, 122 N.H. 738, 741 (1982) (emphasis added). Instead, New Hampshire applies a five factor "choice influencing" test: "(1) the predictability of results; (2) the maintenance of reasonable orderliness and good relationships among the States in the federal system; (3) simplification of the judicial task; (4) advancement of the governmental interest of the forum; (5) the court's preference for what it regards as the sounder rule of law." *Id.*

**\*33** Numerous courts have recognized New Hampshire's test to be substantially similar to the "most significant relationship" test. See *Gray v. St. Martin's Press, Inc.*, 1999 WL 813970, at \*1 (D.N.H. June 8, 1999); *Baum v. Centronics Computer Corp.*, 1986 WL 15784, at \*5 (D.N.H. May 15, 1986); *Wise v. Kentucky Fried Chicken Corp.*, 555 F. Supp. 991, 994 (D.N.H. 1983); *Dunlap v. Aulson Corp.*, 90 F.R.D. 647, 650 n.5 (D.N.H. 1981). Others courts view these two tests as compatible, but continue to apply the five factor test. See, *e.g.*, *Glowski v. Allstate Ins. Co.*, 134 N.H. 196, 198 (1991). Still others apply the "choice influencing" test to tort claims and the "most significant relationship" test to contract claims. *See Aftokinito Properties, Inc. v. Millbrook Ventures, LLC*, 2010 WL 3168295, at \*3 (D.N.H. Aug. 9, 2010); *Smith v. Morbark Indus., Inc.*, 733 F. Supp. 484, 487 (D.N.H. 1990). The Court agrees with those who have treated New Hampshire's test as similar to the Second Restatement test. To the extent there are any differences, the Court will discuss them in the context of its analysis below.

### i. The "Most Significant Relationship" Test

The parties agree that Section 147 of the Second Restatement is the starting point for a choice-of-law analysis under Illinois's choice of law rules. Section 147 states that:

> In an action for an injury to land or other tangible thing, the local law of

the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence, the thing and the parties, in which event the local law of the other state will be applied.

The same test applies "[w]hen the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received." Second Restatement § 148.

These sections raise a "rebuttable presumption" that " 'the law to be applied is that of the state where the injury occurred.' "[29] *Fed. Ins. Co. v. J.K. Mfg. Co.*, 933 F. Supp. 2d 1065, 1074 (N.D. Ill. 2013) (citation omitted); *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 865 (7th Cir. 2010) (the "most significant relationship" test "points presumptively to the law of the jurisdiction in which the tort occurred" and "a tort can't be said to occur until an injury is produced—the place where the injury was inflicted."). In other words, "the Second Restatement contemplates a two-step process in which the court (1) chooses a presumptively applicable law under the appropriate jurisdiction-selecting rule [such as Sections 147 or 148], and (2) tests this choice against the principles of § 6 in light of relevant contacts identified by general provisions like § 145 (torts)." *Townsend*, 227 Ill. 2d at 164.

[29]  To be clear, the Second Restatement does not follow the simpler "place-of-the-injury" rule. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 157 (2007) ("[T]he First Restatement of Conflict of Laws directed a court to apply the *lex loci delicti* to a choice-of-law issue in a tort case, regardless of the nature of the contacts the parties may have possessed with other states."); *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 61 (2007) ("We have jettisoned the *lex loci delicti* rule—also termed the place-of-the-injury rule—and do not merely count contacts, recognizing that other jurisdictions may have an interest in the controversy that are not adequately reflected by a simple tally." (internal citation omitted)). Nevertheless, the Second Restatement provides "specific presumptive

rules" that give weight to the location of the injury. *Barbara's Sales*, 227 Ill. 2d at 62.

**\*34**  In the instant case, Plaintiffs were injured in their respective home states—whether because this is the state where they acquired Defendant's product or where Defendant's product allegedly failed. Thus, for all putative class members who are not California residents, the presumption is that their home state's law, not California law, should apply. "This presumption is a strong one that is difficult to overcome." *Fed. Ins.*, 933 F. Supp. 2d at 1074; see also *Townsend*, 227 Ill. 2d at 163 (rejecting the argument that this presumption is " 'evanescent' and 'easily overcome' by any contact with another state"). It can be "overcome only by showing a *more* or *greater* significant relationship to another state." *Townsend*, 227 Ill. 2d at 163.

To see if this presumption is overcome, a court tests "the presumptive choice * * * against the principles of § 6 of the Second Restatement in light of the contacts identified in § 145(2) of the Second Restatement." *Fed. Ins.*, 933 F. Supp. 2d at 1074–75. The Court starts with Section 145(2), which states that the relevant contacts are the place where the injury occurred, the place where the conduct causing the injury occurred, "the domicil, residence, nationality, place of incorporation and place of business of the parties," and "the place where the relationship, if any, between the parties is centered." Second Restatement § 145(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* "Generally, in a tort case, the two most important contacts are the place where the injury occurred and the place where the conduct causing the injury occurred." *Miller v. Long-Airdox Co.*, 914 F.2d 976, 978 (7th Cir. 1990). The Court analyzes these contacts one at a time.

First, both sides agree that the "place of the injury" is each consumer's home state. Plaintiffs, however, argue that this contact is irrelevant and the presumption in favor of applying the place of the injury should not apply "in light of the fortuitous nature of the place of injury." [371, at 17.] The Second Restatement states that there will be situations "where the place of injury will not play an important role in the selection of the state of the applicable law" because "the place of injury can be said to be fortuitous" or it otherwise "bears little relation to the occurrence and the parties with respect to the particular issue." Second Restatement § 145, comment e. Plaintiffs argue that this situation is present here because

"a large portion" of Defendant's sales were to wholesalers and Defendant has "no control over where the end of the distribution chain, where the ultimate retailer or where the ultimate consumer and subsequent injury would be," which means the place of a consumer's injury was "unpredictable and fortuitous." [371, at 16–17.] Thus, this case is not like *Townsend* or *Federal Insurance* because those cases involve products "directly sold to a single individual" and the parties "knew with certainty or could foresee where the product would be used." *Id.* at 17 n.32.

"Although there is indeed a line of cases dismissing the place of the injury as 'fortuitous,' these cases typically involve automobile or airplane accidents that occurred while the vehicle was in transit." *Hernandez v. Cottrell, Inc.*, 2014 WL 1292336, at *4 (N.D. Ill. Mar. 31, 2014) (collecting cases); accord *Labuda v. Schmidt*, 2005 WL 2290247, at *5 (N.D. Ill. Sept. 19, 2005) (discussing fortuity cases); *Fisher v. Brilliant World Int'l*, 2011 WL 3471222, at *2 (N.D. Ill. Aug. 4, 2011) ("Cases in which an injury's location was deemed merely fortuitous usually concerned accidents occurring during interstate travel."). [30] This case has "none of the trappings of a 'flyover' case." *Jaurequi v. John Deere Co.*, 986 F.2d 170, 175 (7th Cir. 1993). During oral argument, Plaintiffs were given an opportunity to identify cases applying this fortuity doctrine outside of the interstate travel context [see 486, at 2 (Question 12) ]. They did not do so.

[30]  For that reason, Plaintiffs' reliance on car accident cases like *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 2012 WL 6964868 (Ill. App. Ct. Aug. 6, 2012), is misplaced. [See 371, at 17 n.33.]

**\*35**  Plaintiffs and the products they bought have a "settled connection with the state" where the injury occurred. Second Restatement § 147, comment e ("The local law of the state where the injury occurred is most likely to be applied when the injury is done to * * * a chattel that has a settled connection with the state, which means that it is located in the state for other than a temporary purpose. The same law will usually be applied even though the chattel has no settled connection with the state, if the person seeking recovery * * * has a settled relationship to the state, either because he is domiciled or resides there."). Simply put, Plaintiffs live in the state where they were injured. See *Quaid v. Baxter Healthcare Corp.*, 392 Ill. App. 3d 757, 774 (2009) ("The fact that the injury occurred in California is not fortuitous, since that is where plaintiffs live."); *Hammond v. Sys. Transp., Inc.*, 2012 WL 3234865,

at *12 (C.D. Ill. Aug. 6, 2012) ("[T]he place of injury here is not fortuitous: decedents were driving on the roads of their home state when their Jeep was struck."). They also purchased and installed the connector in their home states. *Townsend*, 227 Ill. 2d at 168. Nothing about Plaintiffs' injury from an allegedly defective product bought and used in their homes makes their home states "fortuitous."

Plaintiffs cite nothing to support their claim that the place of the injury is fortuitous (and thus less important) unless the defendant selling the product controls the entire distribution chain. [31] Plaintiffs pled that Defendant "conducts substantial business in Illinois and throughout the United States, including the sale and distribution of its water supply lines." [127, ¶ 95.] The fact that Defendant intended to sell its products to nationwide stores like "Home Depot, Lowe's, Menards, TrueValue, Walmart, and Ace Hardware" (*id.*) demonstrates that it intended to sell their connectors in states like Illinois where those stores were located. That Plaintiffs acquired Defendant's product through an intermediary in their home states does not make Plaintiffs' home states a fortuity.

[31]  Accepting Plaintiffs' argument that Defendant had "little, or no, reason to foresee that his act would result in injury in the particular state" [371, at 17 n.33] begs the question of whether any federal court outside of California could exercise specific personal jurisdiction over Defendant in a consumer product defect case. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) ("[D]efendant [can]not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts.").

The second contact—the place where the conduct causing the injury occurred—is a wash. When evaluating this contact, "[t]he Illinois Supreme Court instructs courts to consider 'all conduct from any source contributing to the injury,' including affirmative defenses." *Fisher*, 2011 WL 3471222, at *3 (quoting *Townsend*, 227 Ill. 2d at 169). Plaintiffs argue that Defendant's "decisions regarding the design, manufacture, distribution, and labeling" of its products occurred in California. [286, at 29.] Defendant argues that Plaintiffs' comparative fault during installation and alleged misuse occurred in their respective homes. [340, at 23.]

To avoid this outcome, Plaintiffs responded in their briefs that contacts based on affirmative defenses "should have no bearing" in cases dealing with a latent defect. [371, at

17.] They offer no support for that rule—likely because the law is otherwise. See, *e.g.*, *Fed. Ins.*, 933 F. Supp. 2d at 1075. [32] Plaintiffs also sought to emphasize California's significance at oral argument by describing this case as one where "all of the key decisions * * * emanate from the State of California" and there is "absolute and truly undisputed centralization of conduct emanating from the state of California." For this reason, according to Plaintiffs, this is a "unique case where you can thread the needle" on choice of law issues to find for Plaintiff. The Illinois Supreme Court has rejected this very argument. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 189 (2005) ("The appellate court's conclusion that a scheme to defraud was 'disseminated' from [defendant's] headquarters is insufficient."); see also *Barbara's Sales*, 227 Ill. 2d at 70 ("Plaintiffs' further attempt to tie this case to California law because Intel's representation emanated from there does not accord with any previous precedent of any Illinois court."). No "state has applied a uniform place-of-the-defendant's-headquarters rule to products-liability cases." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016 (7th Cir. 2002). [33] Indeed, the fact that Plaintiffs describe their *own* claims as requiring needle threading shows just how shaky their choice-of-law argument is.

[32] At oral argument, counsel for Plaintiffs acknowledged that "the Court does get to take affirmative defenses into account" in its choice of law analysis.

[33] This one-size-fits-all choice of law rule could exist, of course. It is just not the Second Restatement's rule. While Plaintiffs believe that this rule would aid consumers in this case, such a one-way ratchet could just as easily harm consumers in the next one, depending on the defendant's headquarters.

**\*36** The third contact—the parties' domicile or place of business—is also a wash. Plaintiffs emphasize that Defendant is headquartered and incorporated in California, where it conducts its "sales, marketing, product development, engineering, and research, for the products at issue." [286, at 30.] Defendant has "more employees" in California than other states, "all of the design and labeling decisions" are made in California, the department that responds to customer complaints is located in California, and Defendant either manufactured or oversaw the manufacturing of its product from California. *Id.* [34] According to Plaintiffs, "No conduct concerning [Defendant's] potential liability occurred

outside of California." *Id.* Plaintiffs, however, ignore the respective domiciles of the putative class members, which are also the states where each class member purchased, installed, used, and maintained Defendant's product. Both Plaintiffs' and Defendant's contacts matter in the Court's analysis. *Townsend*, 227 Ill. 2d at 169.

[34] The evidence on this last point is somewhat in conflict. [Compare 340-2, ¶ 5 (stating Defendant manufactured its products in Mexico from 2001 to 2010), with 286, at 30 ("[Defendant] also manufactured the defective products in California until 2010").]

The fourth relevant contact is where the relationship between the parties is centered, but this factor is less important in a case like this one. "[P]roduct liability arises out of the most casual 'relationship' imaginable, the one-time purchase and sale of the product." *Ness v. Ford Motor Co.*, 1993 WL 996164, at \*3 (N.D. Ill. July 20, 1993). "The relationship between the Plaintiff and Defendant is, at best, second-hand and impersonal." *Piska v. Gen. Motors Corp.*, 2004 WL 2423830, at \*6 (N.D. Ill. Oct. 28, 2004). Whether one accepts that the relevant relationship "arise[s]" from each Plaintiffs' acquisition of Defendant's product, *Townsend*, 227 Ill. 2d at 169, or that the alleged injury "was caused by an act done prior to any relationship formed," [286, at 30], the Court does not view this factor as significant in the instant case.

In sum, the place of the injury favors the Plaintiffs' respective home states, the place of the conduct and location of the parties are a wash, and the center of the parties' relationship is a non-factor. None of these factors points to California having a more significant relationship to this case than Plaintiffs' home states. [35] But courts should not simply "count contacts." *Barbara's Sales*, 227 Ill. 2d at 61. Instead, they must consider those contacts in light of the principles of Section 6 of the Second Restatement. *Townsend*, 227 Ill. 2d at 169.

[35] Neither side invests much effort in analyzing Second Restatement Section 148, which Plaintiffs invoke in their opening brief. [See 286, at 28.] That may be because Section 148 does not apply "where the false representations result in physical injury to * * * tangible things," deferring to Section 147. See Second Restatement § 148, comment a. Even so, Section 148 points more emphatically away from California. "[T]he Illinois Supreme Court has endorsed the

Restatement's position that the plaintiff's domicile or residence is 'of substantial significance' because a financial loss usually will be of greatest concern to the state to which the person suffering the loss has the greatest relationship." *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 925 (N.D. Ill. 2016); *Barbara's Sales*, 227 Ill. 2d at 68 (" '[A] financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship. * * * The domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant.' " (quoting Second Restatement § 148, comment i)). The Illinois Supreme Court has also rejected the argument that the law of the defendant's headquarters controls simply because the "scheme to defraud" or misrepresentations "emanated" from there. *Barbara's Sales*, 227 Ill. 2d at 68. Moreover, "where a plaintiff relies on a representation in the same state where that representation was made and received, the law of that state applies." *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008). Any alleged injury here occurred in the state where each plaintiff received the alleged misrepresentation (Second Restatement § 148(2)(b)) and relied on it (*id.* § 148(2)(a)), which occurred when that plaintiff acquired Defendant's product (*id.* § 148(2)(e)). See also *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) ("If recovery for breach of warranty or consumer fraud is possible, the injury is decidedly where the *consumer* is located, rather than where the seller maintains its headquarters."); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 214–15 (E.D. Pa. 2000) (holding that the "putative class members' residence is a contact of greater significance than defendant's principal place of business" and concluding that "each putative class member's claim arises under the consumer fraud act of his or her state of residence or the state in which his or her [product] was purchased"). That means the Plaintiffs' home states have a more significant relationship to this action than California.

**\*37** The principles identified in Section 6 direct the Court to consider: (a) the needs of the interstate systems; (b) the forum's relevant policies; (c) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue"; (d) "the protection of justified expectations"; (e) "the basic policies underlying the particular field of law"; (f) "certainty, predictability and uniformity of result"; and (g) "ease in the determination and application of the law

to be applied." Second Restatement § 6(2). Three of these factors (b, c, and e) are most relevant in tort cases. *Fed. Ins.*, 933 F. Supp. 2d at 1076; *Fisher*, 2011 WL 3471222, at \*4. The needs of the interstate system, the protection of "justified expectations," and the "predictability and uniformity" of the result have little relevance in product defect cases like this one. See *Dougherty v. Lincare, Inc.*, 2011 WL 1361553, at \*3 (D. Ariz. Apr. 11, 2011) ("In this negligence case, it is highly unlikely that the parties gave any thought to the tort consequences of their transaction.").[36]

[36] New Hampshire's choice of law analysis is the same here, see *LaBounty*, 122 N.H. at 742–43, effectively leaving "advancement of the governmental interest of the forum" and "the court's preference for what it regards as the sounder rule of law" as the only other two factors.

Defendant provides a nationwide survey of the consumer protection laws of all fifty states and the District of Columbia. [See 342-31.] "State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *Bridgestone*, 288 F.3d at 1018. All fifty-one jurisdictions' consumer protection laws differ significantly on procedural (length and accrual of the statute of limitations, statutory standing, and notice) and substantive (reliance, causation, state of mind, and remedies) dimensions. [See 342-31.]

"[T]he State with the strongest interest in regulating such conduct is the State where the consumers—the residents protected by *its consumer*-protection laws—are harmed by it." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) (applying the Second Restatement); *Clark v. Experian Info. Sols. Inc.*, 2005 WL 1027125, at \*4 (N.D. Ill. Apr. 26, 2005) ("The primary purpose of consumer-protection statutes is to protect consumers from fraudulent sales. The focus of the statutes is protecting the consumer."). Plaintiffs' home states have "an interest in ensuring that safe products are used within [their] borders," "deterring the use of defective products within [their] borders," and "protecting [their] citizens * * * whose property is injured within [their] borders." *Fed. Ins.*, 933 F. Supp. 2d at 1076; see also *Jaurequi v. John Deere Co.*, 986 F.2d 170, 175 (7th Cir. 1993). "[T]here does not appear to be any interest on the part of Illinois in the application of its standards in preference or deference to California's

standards to protect Illinois consumers." *Barbara's Sales,* 227 Ill. 2d at 63.

It is "undoubtedly true that California has an interest in regulating [Defendant], as its principal place of business is located there." *Id.* "[I]t is also true that California has a consumer-friendly consumer protection law * * * which may inure to the benefit of plaintiffs." *Id.* But California consumers can still sue Defendant in California and "neither California consumers, nor the interests of California in regulating [Defendant], will necessarily suffer" if other states apply their own laws in cases involving their own citizens and injuries that occurred in their own states. *Id.* "While, to be sure, [California] has an interest in deterring misconduct by corporations headquartered within its borders, it is far from clear that this interest would be sufficient to outweigh other significant contacts with a plaintiff's home state." *Maniscalco v. Brother Int'l ( USA ) Corp.,* 709 F.3d 202, 210 (3d Cir. 2013) (applying Second Restatement).

**\*38** Plaintiffs argue that "application of a single state's law to a nationwide class would be simple and ensure certainty, predictability, and a uniform result." [286, at 31.] But the relevant choice of law issue is whether the particular foreign state's law is easy to apply, not whether it is easier to apply one state's law rather than all fifty states' laws. See *Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 594 (9th Cir. 2012) ("Plaintiffs' argument that California law is the best choice for this nationwide class is based on a false premise that one state's law must be chosen to apply to all 44 jurisdictions."). A court cannot disregard federalism "in order to facilitate class treatment." *Id.*; *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 570–71 (1996). Here, "while use of California law may not be difficult, the use by a forum of its own laws does not present any further difficulty." *Barbara's Sales,* 227 Ill. 2d at 64. "California's stated interest in applying its laws outside of its borders does not override" the contacts of Plaintiffs' home states. *Clark,* 2005 WL 1027125, at *5.

While most of the Section 6 factors are either irrelevant or neutral in this case, one factor—the relevant policies of the forum—strongly suggests that each consumer's home state has a stronger interest in protecting its own consumers

than California. In light of the Section 147 contacts described above, the Section 6 analysis also favors the consumer's home state. [37] Therefore, each Plaintiff's home state has the most significant relationship to his or her claims.

[37]  Plaintiffs cite several cases [see 286, at 31–32 nn.178–182], but none bear any resemblance to this one because they either do not apply the Second Restatement's test or their facts are not analogous. See *Mann v. GTCR Golder Rauner, L.L.C.,* 351 B.R. 685, 695 (D. Ariz. 2006) (applying law of state where conduct causing injury occurred because most parties were located there, the parties' contractual relationship was based in that state, and there were no significant differences on the relevant liability issues between the various fora); *Wolph v. Acer Am. Corp.,* 272 F.R.D. 477, 485 (N.D. Cal. 2011) (analyzing whether application of California law satisfies due process and applying the California choice of law test because "the parties have an agreement that another jurisdiction's law will govern their disputes"); *Rutledge v. Hewlett-Packard Co.,* 238 Cal. App. 4th 1164, 1187–89 (applying California choice of law test and, ultimately, California law after concluding injuries occurred in California); *Clark v. TAP Pharm. Prod., Inc.,* 343 Ill. App. 3d 538, 547 (2003) (relying on analysis from *Avery v. State Farm Mut. Auto. Ins. Co.,* 321 Ill. App. 3d 269 (2001) that was subsequently reversed and vacated by the Illinois Supreme Court in *Avery,* 216 Ill. 2d at 189–190); *Donovan v. Idant Labs.,* 625 F. Supp. 2d 256, 70–71 (E.D. Pa. 2009) (finding contract claims weighed in favor of New York law, and then adopting the same conclusion with little analysis for tort claims).

### ii. California's "Governmental Interest" Test

California undertakes a "two-step" choice of law analysis. *Arroyo v. TP-Link USA Corp.,* 2015 WL 5698752, at *3 (N.D. Cal. Sept. 29, 2015). Plaintiffs must first show that the application of California law comports with due process, meaning that "California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza,* 666 F.3d at 589 (citation omitted). Once that showing is made, "the burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should apply to class claims.' " *Id.* at 590 (citation omitted). That second step is decided based on the three-factor "government interest"

test, which directs a court to (1) determine if there are differences between the "potentially affected jurisdictions with regard to the particular issue in question"; (2) examine "each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists"; and (3) "compare[ ] the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* (citation omitted). Ultimately, the Court is to apply "the law of the state whose interest would be more impaired if its law were not applied." *Id.* (citation omitted).

**\*39** Plaintiffs do not conduct any specific analysis of California's contacts for each class member's claims. [See 286, at 32.] At oral argument, Defendant conceded that this requirement was met (at least with respect to Defendant's due process rights). Defendant is headquartered and incorporated in California, its marketing, design, and labeling decisions occur there, and the alleged misrepresentations appear on Defendant's product itself, whose sale originated from California. *Id.* at 30. In these circumstances, "application of the California consumer protection laws would not be arbitrary or unfair to [D]efendant[ ]," and thus, substantive due process is satisfied. *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010); accord *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 485 (N.D. Cal. 2011).

Moving to the second step, Plaintiffs do not dispute that Defendant comprehensively and "exhaustively detail[s]" the ways that all fifty-one jurisdictions' consumer protection laws differ. [340, at 18–19; 342-21]; *Mazza*, 666 F.3d at 591 (outlining the differences in consumer product statutes); see also *Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096, 1100 (C.D. Cal. 2012) (summarizing the "differences among the states' consumer protection laws"); *In re Hitachi Television Optical Block Cases*, 2011 WL 9403, at \*6 (S.D. Cal. Jan. 3, 2011) ("[T]here are material conflicts between California's consumer protection laws and the consumer protection laws of the other forty-nine states."). [38] Nor do Plaintiffs dispute that these differences are material—involving the "essential requirements to establish a claim" and "the types of relief or remedies available to a plaintiff." *Gianino*, 846 F. Supp. 2d at 1102. "Many of them will mean the difference between success and failure" for Plaintiffs' claims. *Id.* [39]

[38] The cases cited by Plaintiffs [286, at 32 n.186] all involve defendants who failed to offer any analysis of states' laws. *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 658 (C.D. Cal. 2014) (Defendants "fail to provide *any case-specific analysis* addressing the differences among the state laws at issue." (emphasis added)); *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012) ("Defendants do not even discuss the differences between the consumer protection laws of [different states], let alone address whether these differences are material based on the facts and circumstances of *this* case." (emphasis in original)); *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 549–550 (C.D. Cal. 2012) (same).

[39] For example, "CLRA claims * * * benefit [from] the discovery rule[, which] * * * does not apply to delay commencement of the limitations period on Florida [or New York] consumer protection claims." *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 543–44 (C.D. Cal. 2012) (collecting cases). Applying CLRA to "New York and Florida plaintiffs whose claims are time-barred under their own states' laws * * * would expand defendants' liability beyond the liability they would face if Florida and New York plaintiffs sued under the laws of those states." *Id.* at 544–45. New York's consumer protection law also requires "proof of malfunction." *In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006). As another example, Plaintiffs' "benefit of the bargain" damages theory fails to state a claim under Pennsylvania's statute because of the economic loss doctrine. See *Whitaker v. Herr Foods, Inc.*, 2016 WL 4060127, at \*9 (E.D. Pa. July 29, 2016).

Likewise, Plaintiffs do not contest that there is a "true conflict" here between California and the interests of the other 49 states (plus the District of Columbia). "[E]ach state has a strong interest in applying its own consumer protection laws to" the purchases of products within its borders. *Mazza*, 666 F.3d at 592; *Gianino*, 846 F. Supp. 2d at 1102. "[E]ach state has an interest in setting the appropriate level of liability for companies conducting business within its territory" and " 'assur[ing] individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future.' " *Mazza*, 666 F.3d at 592–93 (citation omitted). And each state has an interest in balancing "its duty to protect its consumers from injuries caused by out-of-

state businesses with its duty to shield those businesses from what the state may consider excessive regulation or litigation." *Gianino*, 846 F. Supp. 2d at 1102. "These interests are squarely implicated in this case." *Mazza*, 666 F.3d at 593.

 **\*40** The only dispute here is over the nature and strength of each state's interest, which determines the state's interest that is most impaired. California law answers that question in Defendant's favor. Each consumer's home state "ha[s] a compelling interest in protecting their consumers from in-state injuries caused by an out-of-state company doing business within their borders, and in setting the scope of recovery for consumers under their own laws." *Darisse v. Nest Labs, Inc.*, 2016 WL 4385849, at \*15 (N.D. Cal. Aug. 15, 2016). Although "California has a significant interest in applying its laws to the consumer transactions that took place within its borders," its "interest in applying its laws to residents of other states who purchased and used the [connectors] in those other states is much more attenuated." *Id.*; *Mazza*, 666 F.3d at 594 ("California's interest in applying its law to residents of foreign states is attenuated."). "[A]pplying California law to the claims of foreign residents concerning acts that took place in other states where [the connectors] were purchased or [acquired]" is not necessary to achieve California's interest in protecting its own citizens and regulating its own corporate citizen, Defendant. *Mazza*, 666 F.3d at 594.

Plaintiffs argue that because most of Defendant's sales were to "plumbers, contractors, and wholesalers," and "[a]ll of those sales were direct sales that occurred in California," the policies of foreign jurisdictions in balancing consumer protection and encouraging business are not served here. [371, at 15.] In other words, because Plaintiffs purchased Defendant's products through intermediaries in their home states rather than directly from Defendant, their home states' interests in shielding an out-of-state business like Defendant from "excessive litigation" will not be impaired. *Id.* at 14–15 ("[T]he policies of foreign jurisdictions (to encourage commerce by enacting more lenient consumer protection statutes) is not served in this instance."). In contrast, California's interests in regulating its corporate citizens will be impaired if its law is not applied here. *Id.*

Even assuming that all of Defendant's sales to wholesalers and plumbers occurred in California—and Plaintiffs

cite nothing to show that is true—Plaintiffs' argument actually emphasizes the weakness of California's interest. First, CLRA regulates only sales to a "consumer"—that is, one who buys a good for a "personal, family, or household purpose." Cal. Civ. Code § 1770(d). Thus, Defendant's direct sales to California wholesalers and plumbers are excluded from CLRA coverage. Whatever interest California has in regulating Defendant's sales to California plumbers, it is not a "consumer protection" interest and so that particular interest is not "impaired" by applying another state's consumer protection law.

Second, "California recognizes that 'with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest.' " *Mazza*, 666 F.3d at 593 (citation omitted). Under California law, the "place of the wrong" is the "state where the last event necessary to make the actor liable occurred." *Id.* at 593–94 (citing California case law showing that the "geographic location of an omission is the place of the transaction where it should have been disclosed" and the "place of the wrong" for a misrepresentation is the state "where the misrepresentations were communicated to the plaintiffs"). Here, no wrong implicated by a consumer protection law could have occurred until the consumer purchased Defendant's product in their home state. Cal. Civ. Code § 1770(a) (requiring a "transaction" to sue under CLRA). "These foreign states have a strong interest in the application of their laws to transactions between their citizens and corporations doing business within their state." *Mazza*, 666 F.3d at 594. Since the requisite "transaction" that could trigger application of CLRA occurred outside of California and involved a non-California citizen, California's interest is, at best, attenuated. *Id.*

Third, the Court does not see why another state's interest in limiting excessive litigation is implicated only when a company sells products directly to the end-user in the state. As the Ninth Circuit in *Mazza* explained, "states may permissibly differ on the extent to which they will tolerate a degree of lessened protection for consumers to create a more favorable business climate for the companies that the state seeks to attract to do business in the state." *Mazza*, 666 F.3d at 592. If in-state intermediaries (like Home Depot) depend on products from a foreign supplier (like Defendant), then allowing the foreign supplier to be sued based on in-state sales through the intermediary would disincentive business in state. The

foreign supplier might elect not to do business with the in-state intermediary (and thus in-state consumers) at all, raise its prices directly, secure an indemnity from the in-state intermediary, or purchase additional insurance. *Id.* ("More expansive consumer protection measures may mean more or greater commercial liability, which in turn may result in higher prices for consumers or a decrease in product availability."). All of these actions potentially undermine the state's interest in a "more favorable business climate." *Id.* Plaintiffs also fail to cite anything showing that—let alone explaining why—states would choose to offer "lessened protection for consumers" when buying a business's product directly rather than through an intermediary. And, even if Plaintiffs were correct, they pled that Defendant "conducts substantial business in Illinois and throughout the United States." [127, ¶ 95.] They offer nothing to explain why this "substantial business" is not the kind of "business in the state" described by *Mazza* and undermined by their request to apply California law nationwide.

**\*41** Plaintiffs also argue the Court should apply California law because "all consumers affected by [Defendant's] conduct will benefit from California's consumer protection law." [371, at 15.] However, a court cannot " 'weigh' the conflicting governmental interests in the sense of determining which conflicting law manifested the 'better' or the 'worthier' social policy on the specific issue." *Mazza,* 666 F.3d at 593. [40] Instead, courts must "recognize the importance of federalism and every state's right to protect its consumers and promote those businesses within its borders." *Darisse,* 2016 WL 4385849, at \*14. In similar circumstances, courts have found that consumers' home state laws should not be subordinated to California law. [41] As a result, the Court concludes that for non-California class members, their home states' interests would be more impaired if California law were applied nationwide. Accordingly, each class member's claims must be governed by the laws of their respective home state.

[40] This might be the one area where New Hampshire choice of law analysis differs, since the fifth choice influencing factor is "the Court's preference for what it regards as the sounder rule of law." *LaBounty,* 122 N.H. at 741. "It is not uncommon for a court to conclude after conscientious consideration, * * * 'that its local rules of law are wiser, sounder, and better calculated to serve the total ends of justice under law in the controversy before it than are the

competing rules of the other state' involved in the case." *Benoit v. Test Sys., Inc.*, 142 N.H. 47, 53 (1997). The Court follows the same path here by deferring to the local laws of each consumer's home states rather than California's competing rules.

[41] See, *e.g.*, *Mazza,* 666 F.3d at 594 (vacating class certification order and holding that "each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place"); *Glenn v. Hyundai Motor Am.*, 2016 WL 3621280, at \*9–10 (C.D. Cal. June 24, 2016) (explaining that "[w]hile it is true [Defendant] is headquartered in California, and Plaintiffs allege the fraudulent omissions originated in California, the transactions at issue took place in [other states and] * * * Plaintiffs are residents of those states" and thus "each of Plaintiffs' individual claims must be governed by the consumer protection laws of their home states," not CLRA); *Cover v. Windsor Surry Co.*, 2016 WL 520991, at \*7–8 (N.D. Cal. Feb. 10, 2016) ("Although [Defendant's] marketing materials and warranty emanated from California, the company is headquartered in California, and it designs its products in California," the "last events necessary for liability in this case—the communication of the marketing materials, the purchase of the products, and product deterioration —all occurred in Rhode Island," which meant Rhode Island's interest outweighed California's interest); *Davison v. Kia Motors Am., Inc.*, 2015 WL 3970502, at \*3 (C.D. Cal. June 29, 2015) ("Plaintiff's home state of Washington and other states have a compelling interest in protecting their consumers from in-state injuries caused by a California corporation doing business within their borders and in delineating the scope of recovery for the consumers under their own laws."); *Frezza v. Google Inc.*, 2013 WL 1736788, at \*7 (N.D. Cal. Apr. 22, 2013) (although Defendant was headquartered in California, "the last events necessary for liability—the communication of the advertisements to the plaintiffs and their reliance thereon in signing up for the trial period—took place in North Carolina, not in California," which meant North Carolina law applied over California law); *Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997) (rejecting the argument that Michigan law applied under the governmental interest test, notwithstanding the fact that "Ford's headquarters are located in Michigan, the vehicles in question were manufactured there, decisions relating to the allegedly defective ignition switches were made

there, and any misrepresentations, statements or advertisements regarding the Ford vehicles originated in Michigan," as well as that "Michigan has an interest in regulating Ford's behavior and in making sure that it adheres to minimum levels of care expected of Michigan corporations," because "[e]ach plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws").

### 2. Federal Rules of Evidence and Class Certification

**\*42** Defendant attaches to its response brief a set of "objections" to the "Non-Expert Evidence" Plaintiffs cite in their class certification motion. Almost every single objection is that Plaintiffs mischaracterize the evidence. [See 342-1.] In addition, Defendant makes hearsay, personal knowledge, expert knowledge, authentication, and the rule of completeness objections. *Id.* They also object that Plaintiffs rely on deposition testimony that exceeds the scope of a Federal Rule of Civil Procedure 30(b)(6) topic (*id.* at 2), although they do not explain how that it is an evidentiary objection. Notably, Defendant does not cite a single case in support of its objections. Plaintiffs filed an opposition brief [372], responding to the "objections" and arguing that the Federal Rules of Evidence do not apply as strictly when considering a class certification motion. Saving any case law support until its reply (after Plaintiffs had responded), Defendant argues that strict application of the rules of evidence is necessary even for class certification motions [402].

The Court is not persuaded. Class certification must be decided "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1), often before merits discovery has occurred. Setting aside *Daubert* and Rule 702, a rigid application of the Federal Rules of Evidence for evaluating the authenticity and admissibility of deposition testimony and affidavits attached to a motion for class certification is not required, as numerous courts have found. [42] The Seventh Circuit permits the same relaxation of the Federal Rules of Evidence for other preliminary motions, like preliminary injunctions. See *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010).

[42]   See, *e.g.*, *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562 n.14 (8th Cir. 1982); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, 2016 WL 3579953, at

\*2 (E.D. Wis. June 24, 2016); *Flores v. Anjost Corp.*, 284 F.R.D. 112, 124 n.3 (S.D.N.Y. 2012); *Sherman v. Am. Eagle Exp., Inc.*, 2012 WL 748400, at \*3 (E.D. Pa. Mar. 8, 2012); *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 459 (S.D. Cal. 2012); *Heffelfinger v. Elec. Data Sys. Corp.*, 2008 WL 8128621, at \*2 n.18 (C.D. Cal. Jan. 7, 2008); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 279 (S.D. Ala. 2006); *Charleswell v. Chase Manhattan Bank, N.A.*, 223 F.R.D. 371, 378 (D.V.I. 2004); *Blihovde v. St. Croix Cty., Wis.*, 219 F.R.D. 607, 618 (W.D. Wis. 2003);*Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 582 (W.D. Mich. 2001);*Vinson v. Seven Seventeen HB Philadelphia Corp.*, 2001 WL 1774073, at \*20 n.28 (E.D. Pa. Oct. 31, 2001);*In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 597 (D. Minn. 1999); *Dicker v. Allstate Life Ins. Co.*, 1990 WL 106550, at \*6 (N.D. Ill. July 12, 1990). Courts in this Circuit have generally followed the same approach for evaluating Fair Labor Standards Act collective actions. See *Quality Mgmt. & Consulting Servs., Inc. v. SAR Orland Food Inc.*, 2013 WL 5835915, at \*3 (N.D. Ill. Oct. 30, 2013); *Howard v. Securitas Sec. Servs., USA Inc.*, 2009 WL 140126, at \*3 (N.D. Ill. Jan. 20, 2009);*Molina v. First Line Sols. LLC*, 566 F. Supp. 2d 770, 788 n.20 (N.D. Ill. 2007); *Coan v. Nightingale Home Healthcare, Inc.*, 2005 WL 1799454, at \*1 n.1 (S.D. Ind. June 29, 2005).

Defendant argues that such a result ignores Seventh Circuit cases like *Messner* or *Szabo* [402, at 2–6], but those cases do not address the application of the Federal Rules of Evidence to class certification. Defendant more properly directs the Court to *Mars Steel Corporation v. Continental Bank N.A.*, where the Seventh Circuit stated that "fairness hearings conducted under Fed. R. Civ. P. 23(e) are not among the proceedings excepted from the Rules of Evidence." 880 F.2d 928, 938 (7th Cir. 1989). What Defendant leaves out is any context. *Mars Steel* concerned whether the district court abused its discretion in imposing sanctions against the class's attorneys under Rule 11 for filing a motion to strike affidavits submitted at a fairness hearing. The Seventh Circuit affirmed the sanction, but noted that simply because the attorneys "did not construct a plausible legal argument" does not mean they "couldn't have." *Id.* The Seventh Circuit then posited one such "plausible" argument: the Federal Rules of Evidence apply to a fairness hearing. *Id.* The court stated, "No case of which we are aware holds that Rule 1101(d) suspends the usual rules of evidence for fairness hearings; no case expressly holds that affidavits are admissible in such hearings, although several cases mention their use

without deciding the propriety of that use." *Id.* From that context, it is clear the Seventh Circuit reached no "decision" that the Federal Rules of Evidence apply in full force to all issues related to class certification. Even if this statement were not dicta, *Mars Steel* did not hold that courts should rigidly apply the rules of evidence to a class certification *motion*, rather than a live hearing. [43]

[43]    The Court notes that preliminary injunctions are not specifically excepted from Rule 1101(b) either. Moreover, the purpose of a class action fairness hearing is to reject or approve a settlement, which terminates the litigation. Cases are not terminated *ipso facto* by the grant or denial of class certification, since it is necessarily preliminary to and separate from deciding the merits of the underlying claim.

**\*43** That does not mean that the Court adopts a "mere pleading standard" to evaluate the parties' evidence submitted with class certification. *Comcast,* 133 S. Ct. at 1432 (citation omitted). As will be clear below, the Court has engaged in a "rigorous analysis" to evaluate if Plaintiffs have "affirmatively demonstrate[d]" compliance with Rule 23's requirements by a preponderance of the evidence. *Id.*; *Wal-Mart,* 564 U.S. at 350; *Messrs,* 669 F.3d at 811. The Court has not presumed something is true merely because one party asserts it to be—a rule that applies equally to Defendant's assertions. And the volume of exhibits and deposition testimony attached to the briefs shows the parties have gone well beyond the four corners of any pleading. The Court has considered this evidence and given it appropriate weight, including by evaluating if the characterizations and interpretations of that evidence offered by the parties are supported by the evidence— which, again, relates to the bulk of Defendant's objections. To the extent Defendant intends its "objections" to serve as a motion to strike [see 342-1, at 2], it is denied.

### D. Class Certification

After much ado, the Court can now turn to class certification. Plaintiffs must meet the implicit requirement of ascertainability, the four Rule 23(a) prerequisites (numerosity, commonality, typicality, and adequacy), the two Rule 23(b)(3) requirements (predominance and superiority), and the requirements for issue certification under Rule 23(c)(4). Leaving nothing to chance (and as will surprise no reader by now), the parties dispute whether Plaintiffs have satisfied any of these requirements.

Based on the outcome of the Court's choice of law analysis, Plaintiffs cannot pursue a class action applying California CLRA nationwide and must instead apply the laws of all fifty states. As explained in greater detail below, this means that nationwide class certification must be denied. "[A] failure in any one of the requirements of Rule 23 results in a denial of class certification." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 644 (N.D. Ill. 2002). At a minimum, the different legal issues arising out of the claims of class members from all 50 states will eclipse any common issues of law or fact. Nevertheless, the Court will also address if Plaintiffs' proposed nationwide CLRA class could be certified had Plaintiffs prevailed in their argument that California law should be applied nationwide under choice-of-law principles. Likewise, the Court will address the various subclasses that Plaintiffs propose in their motion.

The Court starts with ascertainability, then takes the Rule 23(a) requirements in turn, followed by the Rule 23(b) requirements, and ends with the Rule 23(c) requirements.

### 1. Ascertainability

To show ascertainability, the class must be "defined clearly and based on objective criteria." *Mullins,* 795 F.3d at 659. "There can be no class action if the proposed class is amorphous or imprecise." *Id.* (citation omitted). A vague definition is problematic "because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment." *Id.* at 660. "To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.*

### i. Nationwide Class of All Fifty States' Laws

Plaintiffs did not offer an alternative class definition in the event that all fifty states' laws had to be applied instead of California's CLRA. Each state's statute of limitations, applicability of the discovery rule, and definition of who can sue under the various consumer protection laws (individuals or businesses) all would impact how such a class should be defined. Because Plaintiffs bear the burden to show ascertainability, their failure to make this showing

is fatal to their nationwide class action claim based on all fifty states' laws. *Messner*, 669 F.3d at 811.

### ii. Nationwide CLRA Class

Even if the CLRA class were viable, Plaintiffs' proposed class definition would need some tweaking. Plaintiffs' proposed nationwide CLRA class is defined as "[a]ll persons who purchased or leased a No-Burst Line, not for resale, or sustained damage from the failure of a No-Burst Water Supply Line, between April 24, 2011, and the date of certification." [286, at 27.] This definition identifies a particular group (all purchasers or leasers of a "No-Burst Line" [44] or all persons who sustained damage from the failure of this product), a particular time period (between April 24, 2011 and certification), and a particular location (nationwide). Defendant does not specifically argue that these requirements have not been satisfied. Instead, Defendant argues that this definition must be modified because it exceeds CLRA's scope.

---

[44]  The definitions of "No-Burst Lines" and "No-Burst Water Supply Lines" appear to be identical. [See 286, at 8.] Plaintiffs' inclusion of both phrases in their proposed class definition is (or at least could be) confusing. This appears to have been an oversight, not an attempt to delineate different products.

**\*44** Specifically, Defendant argues that (1) the definition "all persons who purchased" Defendant's products "not for resale" includes people who are not "consumers" under CLRA; (2) the definition "all persons who * * * sustained damage from the failure" of Defendant's product includes anyone who was damaged regardless of whether they are "consumers" (such as a consumer's neighbor who suffered property damage when Defendant's product failed); and (3) those who purchased Defendant's product before April 2011, but were injured afterwards, should be excluded from the class definition. [340, at 14–15.] Plaintiffs respond that they "are open to an alternative class definition" and "do not seek more than what is permitted under California law." [371, at 11.] They also argue that putative class members injured after April 2011 are properly included in the class definition because the delayed discovery rule tolls the running of California's three-year statute of limitations until after the consumer discovered the defect, which could not have occurred before the connector failed. *Id.* at 12; see *Yumul*

*v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1141 (C.D. Cal. 2010).

Both sides' arguments have some merit here. Plaintiffs' class definition could be more precise regarding CLRA standing. And some class members whose connectors failed after April 2011 but were purchased before then may still recover from Defendant under the CLRA based on California's delayed discovery rule. *Yumul*, 733 F. Supp. 2d at 1141 (explaining that consumers pursuing CLRA claims can invoke the delayed discovery rule by pleading facts that "show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence"). But that does not mean a consumer whose connector failed in 2012 but purchased Defendant's product in the 1980s is properly included within the class. Plaintiffs' damages theory for its CLRA claim purports to measure and seek recovery for the price premium that consumers overpaid for a 10-year warranty. [336-5, ¶ 35.] Accordingly, only consumers whose connectors failed within the life of their 10-year warranty should be putative class members.

"[A] district court has the authority to modify a class definition." *In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011); accord *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) ("Litigants and judges regularly modify class definitions."); *Streeter v. Sheriff of Cook Cty.*, 256 F.R.D. 609, 611 (N.D. Ill. 2009) ("A district court has broad discretion to certify a class and may modify a proposed class definition if modification will render the definition adequate."). In an effort to address Defendant's CLRA standing and overbreadth concerns, the Court proposes the following class definition, which it will use for assessing whether Plaintiffs have satisfied Rule 23:

> (1) All persons who purchased or leased a No-Burst Line for personal, family, or household purposes and not for resale ("Consumers"), between April 24, 2011, and the date of certification, and (2) all Consumers who sustained damage from the failure of a No-Burst Line between April 24, 2011, and the date of certification, if their No-Burst Line was acquired by the Consumer

within ten years of the date of that
failure.

Assuming Plaintiffs offer a definition of "No-Burst
Line" that specifically and clearly delineates which
of Defendant's products fall within and outside of
the class, [45] this class definition provides the level of
ascertainability required under *Mullins*.

[45] The closest they come is the first footnote of
their opening brief [286, at 8 n.1], but even that
definition includes other undefined terms (*e.g.*,
"Toilet Supply Line") and appears to be further
refined by qualifications referenced in their reply brief
[371, at 18–19].

### iii. State Subclasses

Defendant does not challenge the ascertainability of
the subclass definitions, and Plaintiffs did not devote
any attention specifically to the ascertainability of the
subclasses. The Court does not see any obvious problems
with the ascertainability of the negligence or strict liability
state subclass definitions, both of which turn on the failure
of Defendant's product, the date, and require a person in
that state to have sustained damage from the failure of the
product.

**\*45** The Alabama, Arizona, Pennsylvania, Minnesota,
Tennessee, and Vermont warranty subclasses are more
challenging because so many issues are conflated in
Plaintiffs' class definition. Like the CLRA class, the
warranty subclasses includes people who "purchased or
acquired" Defendant's product or those who "sustained
damage" from the product's failure. As best the Court can
tell, Plaintiffs pursue express warranty claims for all of
these state subclasses except Tennessee and Pennsylvania.
[286, at 27 n.160, 38–39; 371 at 27.] It is unclear whether
the express warranty claims are based on the Uniform
Commercial Code. [46]

[46] [Compare 286, at 38 ("All of these states have adopted
the U.C.C.'s definition of an express warranty."),
with *id.* at 39 ("[T]he 'lack of privity between a
manufacturer and retail purchaser does not preclude
a claim *outside the U.C.C.* for breach of express
warranty.' " (citation omitted)) ].

Moreover, Plaintiffs seek two types of damages for their
warranty claims: the "loss of the benefit of their bargain"
and "property damage." [286, at 38.] The "benefit of the
bargain" damages are economic losses—that is, they do
not relate to personal injuries or damage to property
other than the product itself, but concern a product not
performing as expected. See, *e.g.*, *Americoach Tours, Inc.
v. Detroit Diesel Corp.*, 2005 WL 2335369, at \*2 (W.D.
Tenn. Sept. 23, 2005). These six states all vary on who
can bring a warranty claim. In Tennessee, a breach of
implied warranty claim requires privity of contract for
an economic loss, but not other losses like property
damage. [47] In Alabama and Vermont, there is no privity
requirement. [48] In Arizona, it depends on whether the
claims are based on the U.C.C. or not. [49] In Minnesota,
third parties can only bring an express warranty claim
for economic losses if they have property damage. [50]
In Pennsylvania, " '[t]hird parties may enforce express
warranties only under circumstances where an objective
fact-finder could reasonably conclude that: (1) the party
issuing the warranty intends to extend the specific terms
of the warranty to the third party (either directly or through
an intermediary); and (2) the third party is aware of the
specific terms of the warranty, and the identity of the
party issuing the warranty.' " *Am. Stores Properties, Inc.
v. Spotts, Stevens & McCoy, Inc.*, 678 F. Supp. 2d 328, 332
(E.D. Pa. 2009) (citation omitted).

[47] *Messer Griesheim Indus., Inc. v. Cryotech of
Kingsport, Inc.*, 131 S.W.3d 457, 473 (Tenn. Ct. App.
2003) ("Tennessee law does not allow recovery of
economic losses under a breach of warranty theory
absent privity," but plaintiff "is entitled to pursue
its claim for property damage under a breach of
warranty theory in Tennessee even in the absence of
privity.).

[48] *Hobbs v. Gen. Motors Corp.*, 134 F. Supp. 2d 1277,
1284 (M.D. Ala. 2001) ("non-privity consumer buyer
must timely notify a remote manufacturer of alleged
defects, at least when the buyer seeks recovery for
economic loss" for an express warranty claim); *Vt.
Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 280 (2d
Cir. 1996) ("[P]rivity of contract is not required to
recover contractual damages for breach of an express
warranty when the manufacturer expressly warrants
its goods to the consumer and the ultimate consumer
brings an action for breach of express warranty under
the Magnuson-Moss Warranty Act" but "[Vermont

law] does not dispense with the need for privity" in other circumstances.).

49    *Flory v. Silvercrest Indus., Inc.*, 129 Ariz. 574, 580 (1981) ("No privity of contract [is] required for recovery based on * * * non-U.C.C. express warranties" but privity is required for economic losses for U.C.C. based claims.)

50    *Minnesota Min. & Mfg. Co. v. Nishika Ltd.*, 565 N.W.2d 16, 21 (Minn. 1997) ("Those who lack any such connection to the warranted goods must demonstrate physical injury or property damage before economic losses are recoverable.").

**\*46** Plaintiffs' proposed subclass definitions do not address *any* of these issues. Rather, their subclass definitions for each state would sweep in countless people who would never have standing to pursue a "warranty" claim on their own. See *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (denying class certification where proposed class definition was "not sufficiently definite" because it included "millions who were not deceived and thus have no grievance under the ICFA"); *Messner*, 669 F.3d at 825 (distinguishing "between class members who *were not* harmed and those who *could not* have been harmed," and explaining that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant"); *In re McDonald's French Fries Litig.*, 257 F.R.D. 669, 673 (N.D. Ill. 2009) (denying certification for class that "is both overinclusive and too indefinite for certification"). Equally problematic, the subclass definitions do not weed out class members with products that lack a warranty or whose products failed after the warranty expired—a group that Plaintiffs conceded at oral argument should not be able to recover damages. Defendant maintains that it did not offer any warranty between 2004 and 2007, and offered a five-year or ten-year warranty thereafter. [340, at 33–34.] Plaintiffs label that claim a "sham," and submit discovery responses from Defendant where it appears to state that some warranty remained in effect between 2004 and 2007. [371, at 10.] Whichever party is right, Plaintiffs do not explain how their warranty subclasses could properly include purchasers or acquirers with products not covered by any warranty or people who sustained damage from a product not covered by a warranty. Neither group is excluded from the subclass definitions.

In short, the Court does not know who Plaintiffs really intend to cover in these subclasses or which claims they intend to pursue, which prevents the Court from fashioning its own subclass definitions on Plaintiffs' behalf. Accordingly, the Court finds that Plaintiffs have failed to satisfy the ascertainability requirement for their warranty subclasses.

## 2. Numerosity

Numerosity is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). " 'Impracticable' does not mean 'impossible,' but rather, extremely difficult and inconvenient." *Fields v. Maram*, 2004 WL 1879997, at \*3 (N.D. Ill. Aug. 17, 2004) (citation omitted). "When determining whether joinder is impracticable, the court considers not only the size of the class, but also its geographic dispersion, the relief sought, and the ability of individuals to bring their own claims." *Id.* (citation omitted). "Generally, where the membership of the proposed class is at least 40, joinder is impracticable and the numerosity requirement is met." *Pope v. Harvard Banshcares, Inc.*, 240 F.R.D. 383, 387 (N.D. Ill. 2006). "[A] plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good-faith estimates." *Barragan v. Evanger's Dog & Cat Food Co., Inc.*, 259 F.R.D. 330, 333 (N.D. Ill. 2009). Courts rely on "common sense" to determine whether an estimate of class size is reasonable and estimates "may not be based on pure speculation." *Murray v. E\*Trade Fin. Corp.*, 240 F.R.D. 392, 396 (N.D. Ill. 2006).

### i. Nationwide Classes

Plaintiffs argue that they satisfy numerosity for their nationwide class because there are roughly 1,400 pending claims for damages related to Defendant's products. [286, at 33.] Defendant offers several responses. First, they argue that 99% of the filed claims are held by insurance companies. [340-2, ¶ 27(a).] Because, according to Defendant, "insurance companies cannot possess CLRA claims," and there are fewer than 10 pen claims held by a non-insurance company, numerosity has not been satisfied. [340, at 24–25.] Plaintiffs respond that insurers who have paid part of an insured's loss are only subrogated to that part of the loss, while the insured

remains the real party in interest for any unreimbursed losses. [371, at 19–20.] They also point out that insurers are subrogated to the rights of insured (here, consumer who acquired Defendant's product) and can seek to recoup their payments in tort directly against Defendant. *Id.* Defendant cites no case law showing that insurers subrogated to the rights of insured-consumers cannot pursue the consumer's claim under CLRA or that the hundreds of consumers with partial subrogation [see 371-1] should not be counted for numerosity purposes. And, given that Defendant has sold "more than 153 million water connectors" since 1980 [340, at 9], it is reasonable to estimate that there are more than forty purchasers of Defendant's product—including some who did not file claims—who would be members of a nationwide class.

**\*47** Second, Defendant argues that Plaintiffs fail to satisfy numerosity for every "cause of action" asserted and "product type" that Defendant sold. [340, at 25.] Defendant states that there are six types of connectors (toilets, dishwashers, ice makers, washing machines, water heaters, and faucets) that were "manufactured using different materials," with "different warnings," and made for "different use environments." [340, at 11.] But Defendant offers no reason why these differences defeat *numerosity.* Presumably, Defendant believes there must be separate subclasses for each product type for each cause of action for each state, which could theoretically raise numerosity issues for the subclasses. That, however, is not the class action that Plaintiffs seek to certify. Defendant does not identify a single court that has agreed with its approach or explain why these are sensible requirements to impose here. See *Butler v. Sears, Roebuck & Co.,* 702 F.3d 359, 361 (7th Cir. 2012) (certifying class action despite the fact that defendant sold 27 different models that involved five design changes), *judgment reinstated,* 727 F.3d 796 (7th Cir. 2013). And, regardless, Defendant does not articulate how any design defects related to the coupling nut and hose or any owner misuse would vary by product type.

### ii. State Subclasses

Third, Defendant argues that Plaintiffs fail to satisfy numerosity for their identified state subclasses for Alabama, Arizona, California, Georgia, Illinois, Maine, Minnesota, New Hampshire, North Dakota,

Pennsylvania, Tennessee, and Vermont. "Subclasses must satisfy the class action requirements before they may be certified." *Retired Chi. Police Ass'n v. City of Chi.,* 7 F.3d 584, 599 (7th Cir. 1993). Defendant submits a declaration showing the number of open claims in Alabama is 10, Georgia is 17, Illinois is 9, Maine is 3, Minnesota is 17, New Hampshire is 7, North Dakota is 2, Tennessee is 17, and Vermont is 3. [340-2, ¶ 27(c).] Plaintiffs' opening brief makes no effort to satisfy numerosity for their subclasses, their reply fails to respond to Defendant's argument, and they made no specific showing at oral argument to address this issue. While the Court "may draw reasonable inferences about the size of the subclass" and the number of claims likely underrepresents the number of failures in the field, the Court would only be speculating that there are sufficient class members to satisfy numerosity for every putative state subclass. *Gentry v. Floyd Cty.,* 2016 WL 4088748, at \*4 (S.D. Ind. July 25, 2016); *Hill v. Gateway 2000, Inc.,* 1996 WL 650631, at \*3 (N.D. Ill. Nov. 7, 1996). Because it is Plaintiffs' burden to show numerosity, their failure to do so for these particular state subclasses precludes certification for those subclasses. [51] The only exceptions relate to the Arizona, California, and Pennsylvania subclasses. Defendant omitted these states from its declaration [see 340-2, ¶ 27(c) ] and the Court can readily determine that numerosity is satisfied based on Plaintiffs' exhibits on partial subrogation [see 371-1].

[51] This outcome is more straightforward for the negligence and strict liability subclasses, which require proof of property damage. The warranty subclasses also include claims without property damage, but Plaintiffs raise so many distinct warranty theories that it is unclear who should be counted for numerosity. In theory, a subclass of purchasers without property damage whose warranties were breached at the time of sale (instead of, for example, when they requested but were denied a replacement product) and whose claims are still within the statute of limitations might satisfy numerosity. It is not clear which if any, of the warranty subclasses might fit this description and, again, Plaintiffs never made this showing.

### 3. Typicality

Claims of the class representative and the class members are "typical" if the class representative's claim " 'arises from the same event or practice or course of conduct

that gives rise to the claims of other class members and his or her claims are based on the same legal theory.' " *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (citation omitted). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). It requires "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). While "some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims 'have the same essential characteristics as the claims of the class at large.' " *Oshana*, 472 F.3d at 514 (citation omitted).

### i. Nationwide Class of All Fifty States' Laws

**\*48** As a threshold matter, Plaintiffs makes no attempt to show that any class representative's claim could be typical for a nationwide class that applies every state's consumer protection law. See, *e.g.*, *Block v. Abbott Labs.*, 2002 WL 485364, at \*5 (N.D. Ill. Mar. 29, 2002) (finding typicality not satisfied for nationwide class based on state consumer fraud statutes and describing such a class as a "logistical and procedural nightmare"). Accordingly, Plaintiffs have failed to show typicality for a nationwide class action claim based on all fifty states' laws.

### ii. Nationwide CLRA Class

Plaintiffs do offer one brief paragraph in support of their contention that typicality is satisfied for its nationwide CLRA class and its state subclasses, stating that the named Plaintiffs' claims "are substantially the same as the classes' claims and arise from the same course of conduct" as the absent class members, and Defendant's "defenses to the claims are also the same: the No-Burst Lines are not defective and they only fail because of so-called misuse." [286, at 34.] Defendant challenges typicality for both the nationwide class and the subclasses.

With respect to the nationwide CLRA class, Defendant argues that the claims of the two class representatives—Steven Rensel (Arizona) and Karen Rhyne (Tennessee)—are not typical of *every* class member's claims because they experienced only a coupling nut failure, not a hose

failure. [286, at 22-23.] The Court agrees. Plaintiffs allege "two" defects. *Id.* at 8. [52] They have not alleged "*a* defect common to all instances of a consumer product." *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014) (emphasis added); see also *Baker v. Microsoft Corp.*, 797 F.3d 607, 611 (9th Cir. 2015) ("[R]egardless of when the premature tire wear was experienced, the fact remained that all class members at some point experienced the same injury *due to the same defect.*" (emphasis added)). In fact, Plaintiffs' opening brief sorts their class representatives by defect under the headings "Coupling Nut" or "Hose Burst." *Id.* at 21–25. Even Dr. Pittaoulis divides her 400-person sample size into a "toilet connectors" group (for coupling nut issues) and a "water supply lines" group (for hose failure issues). [334-3, ¶ 18.]

[52]   Plaintiffs describe *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), as involving "a single product with two independent discernible defects" and claim this posed no obstacle to certifying a single class [286, at 33–34]. But the Seventh Circuit stressed that "this class action [in *Butler*] is really two class actions" and "the classes have different members and different claims." *Butler*, 727 F.3d at 797, 801.

Each defect involves different parts (coupling nut versus hose), different materials (plastic versus rubber and stainless steel), different flaws (creep rupture versus corrosion), different environments (an open area versus an enclosed cabinet), and different labels tailored to different warnings (overtightening versus exposure to corrosive chemicals). [340, at 26–27.] These are not minor factual differences. These claims lack the "same essence," and do not "stand or fall" together. Cf. *Suchanek*, 311 F.R.D. at 255, 257 (claims "all * * * stand or fall on the issue of whether a reasonable consumer was likely to be misled by the overall packaging, not any one particular attribute or omission").

Plaintiffs seek to overcome that obstacle by arguing that "all Class Members were injured in the same way * * * when they were relieved of their money by [Defendant's] deceptive conduct." [53] [371, at 23.] But not every class member claims to have experienced the *same* deceptive conduct. Rensel's and Rhyne's hoses did not fail. [286, at 22–23.] They have not suffered property damage from a defective hose. *Id.* They do not claim to have relied on hose-related representations or omissions or that these representations or omissions caused their actual losses.

*Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1145 (N.D. Cal. 2005) ("Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof."). Their claims do not depend on the accuracy of labels regarding exposure to corrosive materials. Nor do Defendant's defenses concerning improper cleaning or chemical storage impact Rensel's and Rhyne's recovery. If the factfinder concludes that the coupling nut was not defective, Rensel and Rhyne cannot merely swap out their defective design claims for an entirely unrelated alleged defect. The incentive that Rensel and Rhyne have to show the coupling nut was defective does not sufficiently overlap with consumers who were injured only by a hose failure. See *Czuchaj v. Conair Corp.*, 2016 WL 4272374, at *3 (S.D. Cal. Aug. 15, 2016) ("[Plaintiff's] claims are not typical of unnamed class members who suffered a cord defect because the evidence needed to prove her coil claim is not probative of unnamed class members' cord claims. [Plaintiff] does not need to present evidence of the cord defect to prevail on her coil claim. She never had a cord defect and could not have had a cord defect. Therefore, [Plaintiff] has no incentive to represent unnamed class members who suffered from cord defects."). Therefore, while Rensel's and Rhyne's coupling nut claims are typical of absent class members who experienced coupling nut-related failures (and Defendant does not argue otherwise), they are not typical of the absent class member with hose-related claims.[54]

[53]    In the next paragraph, Plaintiffs chastise Defendant for " 'urg[ing] the Court to focus on the injury' caused by the defective connectors," claiming that this "is not what typicality requires." [371, at 23.]

[54]    Plaintiffs asserted at oral argument that any of the other subclass representatives (with one exception) could serve as named representatives of the nationwide CLRA class in place of Rensel or Rhyne. However, the time for identifying class representatives for the instant motion was before oral argument.

### iii. State Subclasses

**\*49**  Defendant raises a similar objection to the putative state subclass representatives: they suffered either a coupling nut failure or a hose body failure, but not both, and cannot represent subclass members with a different

defect. [340, at 28.] And, for the same reasons regarding the proposed nationwide class, the Court agrees. Subclass representatives asserting one defect type are only typical of absent class members claiming the same alleged defect.

One unique exception involves Minnesota.[55] It is undisputed that the only proposed class representative for a Minnesota subclass, Steve Larson, has not experienced any product failure. [286, at 22.] Minnesota's "economic-loss doctrine precludes 'product defect tort claim[s]' alleging damage to a defective product unless the product caused harm to the buyer's additional personal property or real property." *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 815 (Minn. Ct. App. 2010). Because he has suffered no property damage, Larson plainly cannot pursue strict liability or negligence claims under Minnesota law, and thus he cannot satisfy typicality for any Minnesota negligence or strict liability subclass.

[55]    Defendant frames this as an "adequacy" challenge [340, at 31], but it is really a typicality argument.

Plaintiffs argue that "Larson's role in the negligence and strict liability claims is solely for purposes of issue certification pursuant to Rule 23(c)(4)." [371, at 25.] But Rule 23(c)(4) does not exempt class representatives from the threshold requirements of Rule 23(a). *Retired Chi. Police*, 7 F.3d at 599 ("Subclasses must satisfy the class action requirements before they may be certified."); *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 325 (N.D. Ill. 2010) (applying Rule 23(a) to class action pursued under Rule 23(c)(4)). Without meeting typicality, Larson cannot be the class representative for any Minnesota "issue certification" subclass.

Plaintiffs also argue that Larson is an appropriate class representative for a Minnesota breach of warranty subclass because this cause of action does not require property damage. See *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 53 (Minn. 1982) (explaining that the Minnesota Uniform Commercial Code provides "three types of damages for the kinds of harm caused by a breach of warranty" including general damages, which are "the difference in value between the goods as accepted and what they would have been worth as warranted"). But Plaintiffs gloss over the fact that their warranty subclasses definition encompasses class members who sustained damage from the failure of Defendant's product. [See 286, at 7.] "When there is a claim by a buyer for

damage to the defective product itself (and this includes consequential damages), the U.C.C. remedy is exclusive and tort will not lie." *Lloyd F. Smith Co. v. Den-Tal-Ez, Inc.*, 491 N.W.2d 11, 15 (Minn. 1992). Based on this exclusivity, Larson's warranty claims do not have the "same essential characteristics" as the claims of absent class members with property damage. *Oshana*, 472 F.3d at 514. Plaintiffs have not attempted to certify—or establish any of the Rule 23(a) requirements for—a Minnesota U.C.C.-exclusive subclass for product owners who lack other property damage, and the Court cannot find on this record that Larson's claims are typical.

### iv. Defendant's Other Typicality Arguments

Defendant's remaining "typicality" arguments seem to be more appropriately directed to other Rule 23 requirements. Defendant argues that none of the class representatives for the nationwide class or the state subclasses satisfy typicality because each "has a different story as to who purchased and installed their respective Connectors." [340, at 28–29.] Only three Plaintiffs personally purchased their connectors. *Id.* at 28. According to Defendant, this matters because it determines who is a "consumer" under CLRA. *Id.* But Defendant does not actually argue that any particular class representative is not a "consumer" and therefore his or her claim is not typical. In fact, Defendant ignores the Court's motion to dismiss opinion, which already addressed who is a "consumer" at least for pleading purposes. [231, at 11–14.] Defendant's cursory and conclusory assertion that these "gatekeeping issues as to liability * * * vary by individual plaintiff" adds nothing to that legal analysis. [340, at 29.]

**\*50** Likewise, Defendant argues that only four Plaintiffs installed their own connectors, which will raises issues related to causation and consumer misuse. [340, at 29.] Defendant makes similar arguments about reliance, claiming that thirteen out of fourteen Plaintiffs "either did not see the Connector before it was installed or were not aware of any labels or advertising related to [Defendant] and *never* inspected the label or relied on any warranty in the selection of the product." *Id.* "To be typical, a class member need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails." *Keegan*, 284 F.R.D. at 525. "Instead, she must establish

that she is not subject to a defense that is '[a]typical of the defenses which may be raised against other members of the proposed class.'" *Id.* (citation omitted); accord *J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("[T]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation."). Here, Defendant argues that "the vast majority [of connectors fail] due to improper installation and misuse." [340, at 12.] Thus, if most consumers *did not* install their own connectors and will face a consumer misuse defense, then these facts appear to support the proposition that Plaintiffs' claims are typical of the absent class members. To the extent that reliance is even an element of state warranty claims [see 286, at 38–39], most consumers likely used someone else to purchase and install their connector, which means they will face the same arguments from Defendant as Plaintiffs do here. See *Suchanek*, 764 F.3d at 758 ("If very few members of the class were harmed, that is 'an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate' [defendant]." (citing *Butler*, 727 F.3d at 799)).

Finally, to the extent Defendant believes that the differences among its products require different state subclasses for each *product type* for each alleged defect, the Court also is not persuaded. The existence of "some factual variations" among Defendant's products does not defeat typicality. *Oshana*, 472 F.3d at 514. For example, all of the hoses within the class definition used an EPDM or Santoprene inner-hose body. [342-32.] Plaintiffs complain that both materials "had insufficient bursting strength to withstand ordinary household water pressure." [286, at 17.] Defendant does not explain how a claim involving a hose connected to a faucet would fare differently than a claim involving a hose connected to a washing machine. Defendant asserts a common defense to *all* hose-related claims—insisting that 97 percent of these claims involved failures due to "improper exposure to corrosive materials." [340, at 13.] The mere fact that a similarly designed product connects to different appliances or fixtures does not preclude typicality in a product defect case, and Defendant cites nothing to the contrary. See *Butler*, 702 F.3d at 361 (certifying class for 27 different models of product with five design changes because "[t]he basic question in the litigation—were the machines

defective in permitting mold to accumulate and generate noxious odors?—is common to the entire mold class, although the answer may vary with the differences in design").

To sum up, Plaintiffs' nationwide class action claim based on all fifty states' consumer protection laws does not satisfy typicality. Alternatively, Plaintiffs' class representatives for a nationwide CLRA claim could satisfy typicality for coupling nut-related defects, but not hose-related defects. Plaintiffs would need to identify a suitable class representative for any nationwide class for hose-related defects. Furthermore, the class representatives for the state law subclasses for Vermont, Alabama, Arizona, and Tennessee are typical of only coupling nut-related claims, not hose-related claims. The class representatives for the state law subclasses for Pennsylvania, Illinois, North Dakota, Georgia, Maine, New Hampshire, and California [56] are typical of hose-related claims, but not coupling nut-related claims. Likewise, Plaintiffs would need to identify suitable class representatives in these states for the other alleged defect to advance further. Plaintiffs also fail to satisfy typicality for their Minnesota state law subclasses.

[56]    Defendant argues that there is no class representative for a California subclass [340, at 24 n.18], but apparently overlook Plaintiff Kevin Smith [286, at 25].

### 4. Adequacy

Rule 23(a)(4) requires a plaintiff to show that "the representative parties will fairly and adequately protect the interests of the class." To satisfy adequacy, Plaintiffs must demonstrate: (1) the class representative lacks conflicting or antagonistic interests compared with the class; (2) the class representative is sufficiently interested in the outcome of the case to ensure vigorous advocacy; and (3) class counsel is experienced, competent, qualified, and able to conduct the litigation vigorously. See *Retired Chi. Police*, 7 F.3d at 598; *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 392–93 (N.D. Ill. 2006). In some ways, typicality overlaps with adequacy: "if [a named plaintiff's] claim is atypical, he is not likely to be an adequate representative; his incentive to press issues important to the other members of the class will be

impaired." *Robinson v. Sheriff of Cook Cty.*, 167 F.3d 1155, 1157 (7th Cir. 1999).

**\*51** Defendant does not contest that Plaintiffs have demonstrated the latter two aspects of adequacy. The class representatives are sufficiently interested in the outcome in this case, evidenced by their retention of experienced counsel, production of documents, and active participation in discovery. [286, at 35.] Plaintiffs' class counsel has sufficient experience bringing class actions and acting as class counsel [see 286-66]. Defendant's only challenge to this requirement is whether there are conflicts of interest that defeat adequacy.

Defendant argues that "individual factual variances" will require the class representatives to "tailor their arguments to their respective highly-specific factual circumstances." [340, at 30.] But Defendant does not explain why those variances will create a conflict with any of the absent class members. Again, most class members did not directly purchase or install their connectors, which means the class representatives' incentives to disprove the significance of those facts aligns with the interests of the absent class members. Similarly, Defendant claims that Rhyne's coupling nut "shows signs of nicks and chips consistent with tool installation, requiring significant focus on contributory negligence for failure to comply with instructions." *Id.* But Defendant also maintains that 95 percent of claims involving coupling nut failures are "due to provable over-tightening." [340, at 13.] The Court does not see how Defendant's contributory negligence defense will be "unique to the named Plaintiff or a small subclass," and thus Defendant fails to undermine Plaintiffs' showing of adequacy—at least for those claims where Plaintiffs could satisfy typicality (*e.g.*, named plaintiffs with hose-related claims seeking to represent absent class members with hose-related claims). *Id.* (citation omitted). [57]

[57]    As discussed *supra*, the incentives of Plaintiffs who argue that one of the alleged defects caused their property damage do not align with absent class members who suffered no damages or claim damages were caused by a different alleged defect.

### 5. Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." "Commonality demands more than a

showing that the class members 'have all suffered a violation of the same provision of law' at the hands of the same defendant." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014) (citation omitted). "What matters to class certification * * * [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. "Even a single common question will do." *Id.* at 359 (internal punctuation omitted); see also *Walker v. Bankers Life & Cas. Co.*, 2007 WL 2903180, *4 (N.D. Ill. Oct. 1, 2007)* ("Not all factual or legal questions raised in a lawsuit need be common so long as a single issue is common to all class members."). A question is common if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Plaintiffs seemingly argue that commonality is satisfied whenever "the claim at issue relate[s] to a defective product design." [286, at 33.] The law is not so uniform; commonality is present in some product defect cases, but not others. Compare *IKO Roofing*, 757 F.3d at 603 (commonality shown where the issue was whether the product conformed to a particular industry standard), with *Bridgestone*, 288 F.3d at 1018 (no commonality because of significant variations in the product design and state law requirements). In fact, "the Ninth Circuit," where most of the CLRA case law cited by Defendant comes from, "has acknowledged the danger of *per se* class certification of defect claims." *McVicar v. Goodman Glob., Inc.*, 2015 WL 4945730, at *13 (C.D. Cal. Aug. 20, 2015)* (citing *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010), and *Baker*). When commonality is not satisfied in product defect cases, it is often because of one of two reasons.

**\*52** First, where the putative class's product defect claims are governed by many different states' laws, commonality is often lacking. See, *e.g., Bridgestone*, 288 F.3d at 1015 ("No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality" requirement.); *Szabo*, 249 F.3d at 674 ("Differences of [state law] cut strongly against nationwide classes."); *Miller v. Gen. Motors Corp.*, 2003 WL 168626, at *2 (N.D. Ill. Jan. 26, 2003)* ("No court has held that the fifty states' consumer fraud statutes, or common laws of fraudulent omission, are so similar that a single forum state's law could be applied to a multi-state class. In fact, virtually every court to face the

issue has steadfastly refused to certify nationwide class actions due to variance in states' laws." (collecting cases)); *Siegel*, 256 F.R.D. at 585 (collecting cases). This same concept is also analyzed—maybe more properly—in terms of predominance. See, *e.g., Bridgestone*, 288 F.3d at 1018.

Second, where the class seeks to include materially different products under an overarching product defect theory, commonality can be lacking. *Bridgestone*, 288 F.3d at 1019 ("The six trade names listed in the class certification order comprise 67 master tire specifications * * * [that] come in multiple diameters, widths, and tread designs; their safety features and failure modes differ accordingly. Plaintiffs say that all 67 specifications had three particular shortcomings that led to excess failures. But whether a particular feature is required for safe operation depends on *other* attributes of the tires, and as these other attributes varied across the 67 master specifications it would not be possible to make a once-and-for-all decision about whether all 60 million tires were defective, even if the law were uniform."); *In re Gen. Motors Corp. Dex-Cool Prod. Liab. Litig.*, 241 F.R.D. 305, 326 (S.D. Ill. 2007)* (collecting cases).

### i. Nationwide Class of All Fifty States' Laws

Because the Court has concluded that Plaintiffs' nationwide class action must be based on the consumer protection laws of all fifty states, there is no common issue of law. See *Bridgestone*, 288 F.3d at 1015–18. Plaintiffs vaguely assert that there is a "single, significant common issue of liability" [286, at 34], but "liability," of course, depends on the elements of a cause of action. "[S]tate consumer fraud laws differ with regard to several key issues—the type of prohibited conduct, proof of injury-in-fact, available remedies, scienter, statute of limitations, and reliance." *Siegel*, 256 F.R.D. at 585. The Court cannot frame a question that turns on application of fifty state's different laws in a way that will generate an answer that is "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

### ii. Nationwide CLRA Class

If the nationwide CLRA class is viable, Plaintiffs can establish at least one common legal question. *Wal-Mart*, 564 U.S. at 359 ("Even a single common question will

do."). For example, "[u]nder the CLRA, causation can be shown as to an entire class by proving materiality." *Keegan*, 284 F.R.D. at 530. "A misrepresentation or omission is material under California law 'if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.' " *Id.* at 529. Whether an objective "reasonable man" would consider Defendant's alleged representations or omissions about the product important to purchasing Defendant's product is a question common to the CLRA class. See *Suchanek*, 764 F.3d at 758 (holding that district court abused its discretion in failing to recognize an "objective question"—whether the defendant's packaging "was likely to mislead a reasonable consumer"—that satisfied the commonality requirement of Rule 23(a)(2)). Defendant does not argue otherwise.

**\*53** Defendant's only argument concerns whether the variability in its product precludes commonality. [340, at 32.] But here too Defendant does not explain *how* these product differences matter to commonality. In *Bridgestone*, whether a tire's design feature caused the tire to fail was too dependent on "*other* attributes of the tires," which "varied across the 67 master specifications" of the tire. 288 F.3d at 1019. Putting aside Defendant's customer misuse defense, Defendant does not identify any attribute of the connector itself that would preclude a common determination of whether hose or coupling nut design would cause the product to fail. If an EPDM inner-hose body with a braided stainless steel sheath was insufficiently strong and constitutes a defect, why does it matter for commonality whether that hose was connected to a washing machine or a water heater? Defendant does not articulate this reason if it exists or attempt to square its position with its consumer misuse defense. And, to the extent Defendant contends that the existence of a customer misuse affirmative defense precludes commonality [340, at 32], it is unclear why that is true and Defendant does not cite anything to support that argument. Such an argument is more properly directed to whether predominance is satisfied. In short, Defendant has failed to show what prevents a finding that its coupling nut or hose is defective or not from driving the resolution of the litigation. See *Wal-Mart*, 564 U.S. at 350.

### iii. State Subclasses

Defendant does not raise any challenge to whether commonality is satisfied for the state law subclasses. As with the CLRA claim, each subclass requires application of only a single state's law and the product differences do not vary to defeat commonality. For the negligence and strict liability issue subclasses, the existence of inherent defects is a question of fact and law that is sufficiently common for all class members per state. See *In re Gen. Motors Corp. Dex-Cool Prod. Liab. Litig.*, 241 F.R.D. 305, 312 (S.D. Ill. 2007). For the warranty claim, while Defendant argues that the length of the warranty varied, it does not contend that its content varied. [See 340, at 33–34.] Accordingly, the legal question of whether the warranty is properly read to contain a promise as to the "quality and characteristics of the connectors" is common to the class. [371, at 26]; see *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) ("[T]he legal question of whether the warranty contract is properly read to contain a promise to repair the type of common 'defect' in all the 1999 or 2000 throttle body assemblies (regardless of whether or not manifested during the warranty period) is also common to the class.").

### 6. Predominance

The Court now turns to the first requirement of Rule 23(b)(3): predominance. Although related to the commonality requirement, "the predominance criterion is far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). It requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Plaintiffs satisfy predominance requirement only if they can show that " 'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.' " *Messner*, 669 F.3d at 815 (citation omitted). " 'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.' " *Id.* (citation omitted); see also *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (Common questions are where "the same evidence will suffice for

each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.").

As the Supreme Court recently explained, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' " *Tyson Foods*, 136 S. Ct. at 1045 (citation omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.' " *Id.* (citation omitted).

### i. Nationwide Class of All Fifty States' Laws

**\*54** Plaintiffs make no attempt to show that predominance could be satisfied if all fifty states' consumer protection laws applied to a nationwide class. Thus, Plaintiffs fail to sustain their burden on predominance for that proposed class—a result in accordance with courts from this Circuit and across the country. See, *e.g.*, *Bridgestone*, 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); *Pilgrim*, 660 F.3d at 947 ("[I]n view of plaintiffs' appropriate concession that the consumer-protection laws of the affected States vary in material ways, no common legal issues favor a class-action approach to resolving this dispute."); *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189–90 (9th Cir. 2001) ("The complexity of the trial would be further exacerbated to the extent that the laws of forty-eight states must be consulted to answer such questions" about causation); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law," which defeats predominance.); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); *Gianino*, 846 F. Supp. 2d at 1103 ("Considering that the laws of 50 states will have to be applied in this case, the Court concludes that the common questions of law do not predominate over the questions affecting individual class members.");

*Marshall v. H & R Block Tax Servs. Inc.*, 270 F.R.D. 400, 407 (S.D. Ill. 2010) ("Application of multiple states' laws to class members' claims may eliminate common questions among the class members." (collecting cases)); *McDonald's*, 257 F.R.D. at 673–74 (denying certification of consumer protection class action because of "material conflicts among the fifty states' laws"); *Siegel*, 256 F.R.D. at 585 (denying certification for 45-state consumer protection class action). "[O]nly 'a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions' will yield the information needed for accurate evaluation of mass tort claims." *Bridgestone*, 288 F.3d at 1020.

### ii. Nationwide CLRA Class

The parties mainly focus their attention on whether predominance has been shown for a nationwide CLRA class. One challenge to answering this question is pinning down what exactly Plaintiffs' CLRA liability theory is.

From the briefs, Plaintiffs' theory appears to be that Defendant "omitted material information about the propensity" of its product to fail because of design defects. [286, at 37.] But Plaintiffs often describe their theory in terms of representations, not omissions. [See, *e.g.*, 286, at 10 ("Due to the defects, none of these representations were true."); *id.* at 28 (describing this case as "an action where the plaintiff has suffered purely pecuniary harm on account of false representations" as part of the choice of law inquiry).] This conflation of omissions and representations is most apparent in Plaintiffs' pursuit of the same "price premium" damages methodology for its breach of *express* warranty claim and CLRA "omission" claim. [See 336-5, ¶¶ 35–36, 51–52; 377, at 15 n.21.] Plaintiffs plan to use their conjoint study to "estimate the increase (or decrease) in value associated with the *representations* that the No-Burst Lines are covered by a 10-year warranty and that they will not burst," and then use that estimate to calculate damages. [286, at 40 (emphasis added); see also *id.* at 40 n.35 ("Dr. Pittaoulis's analysis uses the 10-year *representation* in order to show that the survey methodology is workable." (emphasis added)).] Said differently, Plaintiffs argue that Defendant made an express representation that its products would not burst (*e.g.*, "NO BURST") for purposes of the warranty claim, but its failure to disclose that its products might have some "propensity" to burst is an actionable

omission, but not a representation, for the CLRA claim. Plaintiffs never explain how the same fact is an omission for one claim but a misrepresentation for another while the damages for both claims are measured the same way. [58]

[58]    Despite arguing in their briefs that Defendant "misstate[d]" Plaintiff's CLRA theory as involving misrepresentations when it is an "omissions" theory [371, at 29], Plaintiffs shifted slightly at oral argument and described their claim as a "blended omissions and misrepresentation" theory. Of course, "[e]very misrepresentation, to some extent, involves an omission of the truth." *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 401 (D. Del. 2016) (citation and internal quotation marks omitted). Purporting to advance a "blended" theory does not clarify much.

**\*55** Even accepting that Plaintiffs' CLRA theory is one of omissions still encounters predominance problems. To the extent Plaintiffs argue that there is no need to show reliance under an omissions theory [286, at 37; 371, at 29], that is not the law. "An essential element for a fraudulent omission claim [under CLRA] is actual reliance." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). In fact, "actual reliance must be established for an award of damages under the CLRA." *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009).

"To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct." *Daniel*, 806 F.3d at 1225. The nondisclosure must be a "substantial factor" in the decision to purchase the product. *Id.* Reliance can be "presumed, or at least inferred, when the omission is material," which is based on the objective reasonable consumer standard. *Id.* However, it is "necessary for everyone in the class to have viewed the allegedly misleading" information to invoke this presumption. *Mazza*, 666 F.3d at 596. A presumption of reliance does not arise when class members "were exposed to quite disparate information." *Id.*

Here, most class members did not directly purchase Defendant's product—either because they outsource that responsibility to a plumbing professional or because they purchased their home with Defendant's product already installed. [371, at 15; 340, at 37.] If these class members were not the direct purchasers of Defendant's product,

then it is at best an open question—and more likely a dubious proposition—whether they ever saw Defendant's product labeling or marketing. That makes this case much more like *Mazza*, where the Ninth Circuit reversed class certification for an omissions theory because many class members were not exposed to the defendant's misleading advertisements. 666 F.3d at 595–96. While Plaintiffs assert that "all Class members were injured in the same way * * * when they were relieved of their money by [Defendant's] deceptive conduct" [371, at 23], that presumes that (1) all class members were exposed to Defendant's conduct and (2) this conduct caused their alleged loss.

Without a presumption of reliance, individual issues of who was exposed to statements about Defendant's product and what they knew about the product predominate over common issues. See *Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 538 (S.D. Cal. 2011) ("Many putative class members, in fact, may not have even seen the home warranty plans before acquiring them. Thus, an inference of reliance on behalf of the proposed class is not permissible, and individual issues would once again overwhelm any common issues."); *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 646 (C.D. Cal. 2014) (finding no commonality and predominance on CLRA claim where "Plaintiff cannot show that all class members suffered the same injury because he cannot show that all class members relied on the alleged misrepresentation"); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011) ("Claims requiring individual proof of reliance are generally not amenable to class certification."); see also *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1193 (2013) ("Absent the fraud-on-the-market theory, the requirement that Rule 10b–5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."). [59]

[59]    At oral argument, Plaintiffs relied heavily on *Suchanek*, in which the Seventh Circuit rejected the district court's "supposed rule that individual issues necessarily predominate" in cases involving "subjective inquiries into causality" or a showing of "reliance or causation * * * that requires an investigation of each purchaser." 764 F.3d at 759. The Seventh Circuit explained that such a "rule" was an "error of law." *Id.* What the Seventh Circuit did not do, however, was adopt the mirror-image of

the district court's rule: that reliance issues can *never* predominate in a consumer fraud case. Otherwise, there would have been no need for the Seventh Circuit to remand with anything other than instructions to certify a class. *Id.* at 761 ("All of that said, we are not holding that the district court must certify the class on remand."). Instead, the Seventh Circuit required that the district court undertake "rigorous" and nuanced analysis of these issues, rather than relying on a blanket "rule." *Id.* at 760. This Court has endeavored to do precisely that.

**\*56** Plaintiffs rely on *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012), but that case involved consumers who purchased washing machines and the representations "on the product itself" were allegedly misleading. *Id.* at 486. Plaintiffs never explain why *Tait*'s reasoning should apply to consumers who did not purchase a product directly and never saw the statements on the product itself. See also *Cohen*, 178 Cal. App. 4th at 979 (no predominance because class included subscribers who never saw the offending advertisements before purchasing services, saw different advertisements without the allegedly misleading information, or purchased the services "based on word of mouth" or because they saw the service in a store or another person's home).

The same is true of *Keilholtz v. Lennox Hearth Prod. Inc.*, 268 F.R.D. 330 (N.D. Cal. 2010). In *Keilholtz*, a class action of homeowners with glass-enclosed fireplaces was certified against the fireplace manufacturers on a single uniform omissions theory—that the fireplaces may reach over 475 degrees Fahrenheit. The court explained that "as long as Plaintiffs can show that material misrepresentations were made to the class members, an inference of reliance arises as to the entire class." *Id.* at 343. The court anticipated that defendants might only be able to "defeat the showing of causation as to a few individual class members," but that this would not overwhelm the common issues of law and fact. *Id.* Here, Plaintiffs point to several advertising statements beyond the label terms that also purportedly are express warranties and false "representations." [See 371, at 26; 286 at 10.] Thus, there is no single uniform omission (or misrepresentation) in this case and no basis to assume that the alleged misrepresentations reached the class members in any event, which means that reliance cannot be presumed on a classwide basis. See *Campion*, 272 F.R.D. at 538 ("Even if it were permissible to infer common reliance in a CLRA claim, * * * an inference of reliance would only

be permitted when a specific material misrepresentation of a particular fact was made to each class member and the claims of all the class members stem from this source.").

That brings us to the second obstacle to predominance: Plaintiffs' CLRA damages theory. As a reminder, Plaintiffs plan to conduct a conjoint study to estimate the "impact that a NO BURST representation and representation of a 10-year warranty have on consumers' preferences for" connectors [334-3, ¶ 14], and then use the output of that study to calculate the "difference between the market value of the products as promised and as delivered," which is equal to each class member's damages since every consumer "overpaid" for their defective product [334-5, ¶ 37]. The Court excluded Dr. Pittaoulis's proposed survey [334] as presently constructed. Because Bernatowicz's damages formula depends on that survey, Plaintiffs do not have a common damages formula that they can rely on for class certification. Nevertheless, the Court will assume that some version of this survey is salvageable and could be input into Bernatowicz's damages formula.

Defendant argues that Plaintiffs' common damages theory is fatally disconnected from their CLRA theory and fails *Comcast*. In *Comcast*, the Supreme Court explained that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." 133 S. Ct. at 1433. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* "[F]or purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Id.* (citation and internal quotation marks omitted).

**\*57** To be clear, this does not mean that commonality of damages is essential. *IKO Roofing*, 757 F.3d at 602. If that were true, "then class actions about consumer products [would be] impossible." *Id.* What is necessary is that the "theory of loss" matches the "theory of liability." *Id.* Thus, this Court must determine "if there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact." *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016).

A damages calculation that reflects the difference between the market price of the product as represented and

as delivered is neither novel nor problematic from a class certification perspective. See *IKO Roofing*, 757 F.3d at 603. In fact, that is a standard remedy for buyers provided by the U.C.C. for a breach of warranty. See Uniform Commercial Code § 2–714(2). Moreover, a "price premium" theory based on a conjoint analysis has been accepted by several courts. See, *e.g.*, *ConAgra*, 90 F. Supp. 3d at 953–54. Courts have even sanctioned a price premium damages theory related to a failure to disclose a product's propensity for non-conformance. See *Tait*, 289 F.R.D. at 479; *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013).

The problem for Plaintiffs, however, is that their Pittaoulis–Bernatowicz price premium damages model does not measure damages attributable to their liability theory. If class members were injured by the fact that Defendant "omitted material information about the propensity" of its product to fail [286, at 37], then damages should be the difference in the market price for a product with and without this "propensity" to fail. Yet, even a non-defective product would still have a propensity to fail sometimes. [60] For example, if the non-defective version of Defendant's product as represented would fail one percent of the time and Defendant's product as delivered fails five percent of the time, then damages should be the difference in market price between those two products. The Court does not see how measuring a consumer's preference for a ten-year warranty or a "No Burst" representation has anything to do with an "omission of failure propensity" theory. Why does it matter whether that the survey participants prefer the attribute "NO BURST" over "Fits All"? Even assuming that the "NO BURST" is somehow connected to Defendant's failure to disclose its product's propensity to fail, determining the WTP for that attribute provides no insight into the value of the product that consumers ultimately received.

[60] Plaintiffs expressly reject the implication that they are arguing that Defendant represented that its products are perfect. [376, at 16.] If Defendant did not promise perfection, then there must be some baseline "propensity to fail" rate to measure against. Plaintiffs do not direct the court to any such baseline, and Bernatowicz does not incorporate one into his damages formula. Even if one accepts that this difference in propensity should be measured by the number of failures per million compared with

Defendant's standard recall rate [see 286, at 20], this difference in propensity is exceptionally small. A difference between the baseline rate and the omitted "propensity" that is close to zero makes it hard to see how materiality, causation, or reliance can be satisfied.

Similarly, no expert opines that Defendant's product typically fails after a certain length of time (*e.g.*, the product has a "propensity" to fail in the ninth year). Again, one would need to know the baseline age of failure for a non-defective version of Defendant's product—the product as represented—for any meaningful comparison. Maybe Plaintiffs think that the benchmark should be ten years because that is the length of the warranty. If that is true, then it is unclear why that would not be a misrepresentation, rather than an omission. Even so, how will measuring the WTP for warranty durations of "None, 1 year, 5 years, 10 years, [and] Lifetime" provide an answer to the damages question? Bernatowicz measures damages by assuming that the ten-year warranty attribute was "missing" at the point of purchase. [334-4, ¶ 36.] Unless the product had a propensity to fail immediately, this "attribute" was not missing entirely. If Defendant's product fails after nine years, then the consumer's WTP for a ten-year warranty would still need to be reduced by the WTP for a product that lasts nine years—the product that the consumer actually received—before any damages are calculated. This is simply not the class-wide damages model that Plaintiffs submit for class certification. [61]

[61] Defendant advances (and repeats) several arguments about the meaning of its warranty (that it is one for repair and replacement, not design defects) and that its "No Burst" statements are non-actionable puffery. [340, at 33–35; 336-1, at 10–12; 403, at 9.] These arguments go to the merits of Plaintiffs' claims, not the propriety of class certification. To the extent that is the basis for Defendant's *Daubert* motion against Bernatowicz, it is denied without prejudice to later renewal.

**\*58** Defendant also challenges the appropriateness of averaging WTP for all class members based on any overpayment theory, arguing that class members with *no* WTP for the missing attributes will still be awarded damages under this theory. [334-1, at 17–18.] Plaintiffs respond that the "use of statistical sampling to determine averages is a concept accepted by the courts," citing *Tyson Foods*. [377, at 14.] But *Tyson Foods* held only that class action plaintiffs may use averages based on a

representative sample "to establish classwide liability." 136 S. Ct. at 1049. The Supreme Court expressly declined to address whether "uninjured class members" can share in the class's recovery where liability is established through averages or whether there must be " 'some mechanism to identify the uninjured class members prior to judgment and ensure that uninjured members (1) do not contribute to the size of any damage award and (2) cannot recover such damages.' " *Id.* at 1049–50 (citation omitted). As Chief Justice Roberts stated in his concurrence, "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. * * * Therefore, if there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand." *Tyson Foods,* 136 S. Ct. at 1053 (Roberts, C.J., concurring).

In the instant case, Plaintiffs do not seek to establish liability through averages. Instead, they skip that step and try to prove damages through averages. This is not merely an incidental aspect of their damages theory, but an intentional design choice that Plaintiffs have made to create a "common" damages formula. [See 286, at 40.] *Tyson Foods* does not speak to such an expansive theory as a means to manufacture predominance. And it runs afoul of the Seventh Circuit's distinction between certifying classes where "class members who *were not* harmed and those who *could not* have been harmed." *Messner,* 669 F.3d at 825. Courts do not require "proof * * * that every [class] member has been harmed"—an issue related to the claim's outcome that should be decided after certification. *Suchanek,* 764 F.3d at 757; *Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014) ("How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified."). They do require, however, that the class members *could have* pursued a claim. *Suchanek,* 764 F.3d at 757–78. Certifying a class based on a common damages model that is designed to award damages to millions of absent class members who "could not [have] br[ought] a valid [CLRA] claim even under the best of circumstances" is inconsistent with these mandates. *Messner,* 669 F.3d at 825.

Plaintiffs do not identify any other court that has accepted an average WTP price premium theory in similar circumstances. Cf. *Opperman v. Path, Inc.,* 2016 WL 3844326, at *14–15 (N.D. Cal. July 15, 2016) (rejecting at class certification a conjoint damages theory predicated on averages).[62] "[C]onsumers do not have identical

preferences." *Id.* at 14. Plaintiffs claim to measure the "loss of the benefit of each class member's bargain" [286, at 40], but some consumers may place no value on a 10-year warranty and thus lose nothing in this bargain. See *Opperman,* 2016 WL 3844326, at *14 ("No damages number arising from this model will apply to all class members, particularly since some of the class members, by this measure, will not have been injured at all, *i.e.,* they would have not have required any premium to allow [defendant] to access their contacts, because they don't attach any value to them."). Such a consumer might include those who plan on moving out of their house before 10 years or plan to remodel their homes within that time period. "It may be that the average damages that [the Pittaoulis–Bernatowicz] model would predict will be very close to the damages actually suffered by every class member, but there is no way of knowing this. It is equally or more likely that [their] model would overcompensate some class members, while undercompensating others." *Id.*

62      Where the claim is that the product received is worthless, no WTP needs to be calculated and there are no predominance problems. See *Doster Lighting, Inc. v. E-Conolight, LLC,* 2015 WL 3776491, at *18 (E.D. Wis. June 17, 2015) ("As for damages, [plaintiff] contends that they can be calculated by a common methodology—subtracting the value of the defective LED products (which [plaintiff] claims to be zero) from the value of the LED products as warranted, i.e., the sale price."). In *In re: Syngenta AG MIR 162 Corn Litigation,* the court allowed the class to use averages to calculate the "general market price decrease" for sales of corn, which would be used to show "liability *and* damages." 2016 WL 5371856, at *5 (D. Kan. Sept. 26, 2016) (emphasis added). In that case, no *Daubert* motion was filed and plaintiffs' theory would not have compensated class members who suffered no damages. Plaintiffs also cite *Fleisher v. Fiber Composites, LLC,* 2012 WL 5381381 (E.D. Pa. Nov. 2, 2012), which addresses a motion to dismiss, not class certification, and does not discuss the specific damages methodology at issue.

**\*59** Moreover, a theory that awards damages to people who were not damaged seems to be foreclosed by the CLRA. "[I]n order to bring a CLRA action, not only must a consumer be exposed to an unlawful practice, but some kind of damage must result." *Meyer v. Sprint Spectrum L.P.,* 45 Cal. 4th 634, 641 (2009). "If the [California] Legislature had intended to equate 'any

damage' with being subject to an unlawful practice by itself, it presumably would have omitted the causal link between 'any damage' and the unlawful practice, and instead would have provided something like 'any consumer who is subject to a method, act, or practice declared to be unlawful by Section 1770 may bring an action' under the CLRA." *Id.* Courts are equally skeptical that a class member whose product has functioned properly and warranty has run still can recover under CLRA absent some safety concern. See *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2006); *Wilson v. Hewlett-Packard Co.*, 2009 WL 3021240, at *1 (N.D. Cal. Sept. 17, 2009). Even assuming that Plaintiffs could overcome the Article III issues presented by their damages theory, awarding damages to people without "some kind of damage" caused by the "deceptive conduct" or after expiration of a ten-year warranty does not measure damages attributable to any actionable theory of liability. *Comcast*, 133 S. Ct. at 1433.

Without a common "price premium" damages theory, Plaintiffs are left with their effort to recover property damages caused by the failure of Defendant's product.[63] And here is where individualized issues overwhelm the common ones. Defendant's claims rate shows that 99.9% of Defendant's sold products do not result in a claim of failure being reported (and the potential number of unreported failures does not appear to meaningfully change this percentage). Once the parties wade through the class members to find roughly 0.1% of claims that experienced a failure, individualized inquiries into each consumer's installation, maintenance, misuse, causation, and the damages attributable to the failure would be required.[64] "[W]here the portion of the proposed class that even suffered malfunctions appears to be tiny, plaintiffs' proposal to certify the class of all [purchasers], then determine which few suffered [failures], and then determine which few of those few even arguably can attribute the [failures] to the design defect here alleged, would render the class action device nothing more than a facade for conducting a small number of highly individualized cases." *Canon*, 237 F.R.D. at 360; accord *Payne v. FujiFilm U.S.A., Inc.*, 2010 WL 2342388, at *6 (D.N.J. May 28, 2010) ("Because the great majority of the proposed class has not experienced any malfunction with the [product] and because individual issues of causation will still need to be adjudicated, the question of whether a defect exists in this case will need to be determined based

on facts that are particular to each individual proposed class member.").

[63] At oral argument, Plaintiffs belatedly proposed a third damages theory: replacement damages. That theory does not appear in Plaintiffs' class certification motion [see 286, at 38–39, 40 (raising two damages theories) ], and the Court will not address it other than to say that Plaintiffs' ability to pursue classwide replacement damages for people who never requested a replacement connector is not obvious.

[64] Plaintiffs cite the Ninth Circuit's decision in *Baker* as standing for the proposition that "a class could be certified where only '0.4%' of owners reported defects. [371, at 7 n.1] However, *Baker* addressed the district court's decision to strike class action allegations from the plaintiffs' complaint, not a motion for class certification. The Ninth Circuit "express[ed] no opinion on whether the specific common issues identified in this case are amenable to adjudication by way of a class action, or whether plaintiffs should prevail on a motion for class certification if such a motion is filed." *Baker*, 797 F.3d at 615.

Plaintiffs argue that "multiple courts have held [that] the 'consumer misuse' defense in design defect cases is not a bar to certification" [371, at 24], but none of the three cases they cite reached any such broad holding. One refused to consider an argument not addressed by the district court and for which no details were provided. See *Butler*, 702 F.3d at 363 ("[Defendant] also makes arguments that were not considered by the district court, such as that mold problems may reflect how the owner of a washing machine uses it. That would be a defense of mishandling to the charge of breach of warranty. [Defendant] offers no details."). One found that "individual factors such as driving habits or weather" that might cause the manifestation of a defect did not predominate over the common question that the defendant's product was sold with a design defect. *Wolin*, 617 F.3d at 1173. Issues related to weather and driving habits implicate generalized questions about causation, not a consumer misuse defense. The last case on which Plaintiffs rely cited *Wolin* for the proposition that a class may be certified even if the defect has not caused the problem to manifest in all consumers, but did not specifically discuss any consumer misuse defense. *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 678 F.3d 409, 420 (6th Cir. 2012). Other courts have found that misuse can be a reason for failing to satisfy predominance. See *Am.*

*Honda Motor Co. v. Superior Court*, 199 Cal. App. 4th 1367, 1378 (2011); *Canon*, 237 F.R.D. at 360; *Galitski v. Samsung Telecomms. Am., LLC*, 2015 WL 5319802, at *6 (N.D. Tex. Sept. 11, 2015). Because customer misuse will be directly relevant to Plaintiffs' efforts to recover property damages under their CLRA claim, these issues present predominance problems. And because these varied individualized issues will swamp any common questions of law or fact, Plaintiffs have failed to show predominance for their nationwide CLRA claim.

### iii. Warranty Subclasses

**\*60** The parties devote very little attention to whether Plaintiffs satisfy predominance for their state law warranty subclasses. Plaintiffs assert that "the same common evidence and expert analysis" will be used to show Defendant's product is defective at the point of sale and damages will be established through their experts' "common" Pittaoulis–Bernatowicz damages formula or "by individual proof of property damages." [286, at 38–40.] Defendant argues that warranty claims require individualized inquiries into whether consumer misuse voids the warranty and whether the warranty was in effect at the time of the failure. [340, at 31–32.]

Plaintiffs' failure to provide a clear class definition presents a significant obstacle to determining predominance. As drafted, Plaintiffs' warranty subclasses definition includes class members who: (1) personally purchased Defendant's product; (2) acquired Defendant's product because someone else (*e.g.*, a plumber, home builder, friend, or family member) decided to buy it; (3) saw Defendant's "No-Burst" and ten-year "express warranties" before purchasing Defendant's product; (4) saw one of these warranties before acquiring Defendant's product; (5) saw neither of these warranties before acquiring Defendant's product; (6) saw the other "statements" about Defendant's product that Plaintiffs claim rise to the level of "express warranties as to the quality and characteristics of the connectors" [371, at 26]; (7) did not see these other "express warranties"; (8) suffered property damage; (9) suffered no property damage; (10) suffered property damage even though they never bought or acquired Defendant's product (*e.g.*, a neighbor or house guest); (11) renters (since they "acquire" the product); (12) owned a connector that failed because of a coupling nut-related issue; (13) owned a

connector that failed because of a hose-related issue; (14) owned a connector that did not fail; (15) have an unexpired warranty; (16) sold their house (and connector) within the life of the warranty; (17) have an expired warranty; and (18) never had a warranty. Some of the claims are based on express warranties. Others are based on implied warranties. Some are based on the U.C.C. Some are not. Sweeping all these disparate claims and class members together under a breach of warranty umbrella —even if there are six separate state subclasses—creates predominance problems.

Let's just take Pennsylvania as an example. An express warranty can be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." 13 Pa. Stat. and Cons. Stat. Ann. § 2313(a)(1). "A promise becomes the basis of the bargain if the plaintiff can prove 'that she read, heard, saw or knew of the advertisement containing the affirmation of fact or promise.' " *Starks v. Coloplast Corp.*, 2014 WL 617130, at *6 (E.D. Pa. Feb. 18, 2014). The Court can only determine whether Defendant's other "repeated and continuing statements" [371, at 26] outside of anything appearing on the product became part of the "basis of the bargain" through individual inquiries into whether the class member "read, heard, saw, or knew of" those statements. A similar rule applies to any third party recipient of an express warranty—which, presumably, would be most of the class members. In that case, "the third party recipient of an express warranty must be aware of the *specific terms* of the warranty in order to sustain a claim for breach of that warranty." *Penn. Employees Ben. Trust Fund v. Astrazeneca Pharm. LP*, 2009 WL 2231686, at *4 (M.D. Fla. July 20, 2009); see also *Peters v. LG Elecs. USA, Inc.*, 2007 WL 4591405, at *4 (D.N.J. Dec. 28, 2007). Plaintiffs do not explain how the Court can answer this basic question without individualized inquiries.

**\*61** Moreover, "defects discovered after the term of the warranty are not actionable * * * even where the defect may have existed at the time of purchase but did not manifest itself until after the expiration of the warranty period." *Osness v. Lasko Prod., Inc.*, 868 F. Supp. 2d 402, 410–11 (E.D. Pa. 2012) (citations and internal quotation marks omitted). Individual inquiries into whether each class member's warranty has expired or whether they suffered property damage before this expiration are required. Furthermore, Plaintiffs propose including both

those seeking economic losses and those seeking property damages in the same warranty subclasses. For the same reasons as Plaintiffs' CLRA theory, the Pittaoulis–Bernatowicz price premium damages model does not "measure only those damages attributable" to a breach of warranty theory. *Comcast*, 133 S. Ct. at 1433. That leaves, as Plaintiffs concede, only property damages claims that must be established by "individual proof." [286, at 39.] Those claims, which are shared by only a subset of class members, will all trigger individualized inquiries into each consumer's installation, maintenance, misuse, causation, and the damages attributable to the failure. Because similar issues will crop up in every warranty subclass, the Court finds that predominance has not been satisfied for the warranty subclasses.

### 7. Superiority

The second *Rule 23(b)(3)* requirement is that the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Fed. R. Civ. P. 23(b)(3)*. Issues relevant to superiority include (1) the class members' interests in individually controlling their cases; (2) "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class"; (3) whether it is desirable to concentrate "litigation of the claims in the particular forum"; and (4) "the difficulties likely to be encountered in the management of a class action." *Szabo*, 249 F.3d at 676. "[W]hen a separate evidentiary hearing is required for each class member's claim, the aggregate expense may, if each claim is very small, swamp the benefits of class-action treatment. And that is the case here." *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007).

Plaintiffs did not even attempt to show that the Court could efficiently resolve this dispute in the event that all fifty states' consumer protection laws had to be applied. *Bridgestone*, 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."). Nor have Plaintiffs identified a sensible and "practicable way for the court to resolve efficiently the individual factual issues that bear on liability" such as reliance, causation, and damages "without conducting hundreds or thousands of mini-trials." *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 463 (N.D. Ill. 2013). The Court does not see how bifurcation, creating even more subclasses, or appointing a special

master would make classwide treatment *more* efficient. Considering the differing incentives of class members without and with property damage, the two distinct defects alleged by Plaintiffs, the fractional difference in price for the product that Plaintiffs allegedly received, and the need for individualized hearings for the absent class members to establish their injuries, share of responsibility, and damages, the Court does not see the efficiency gains for classwide treatment. That is true even if the Court needs to apply *only* seven states' laws (California and the six states in the warranty subclasses). Plaintiffs have failed to show that a class action is superior to other methods of adjudication.

### 8. Issue Certification: Negligence and Strict Liability Subclasses

*Rule 23(c)(4)* provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Courts differ over whether plaintiffs pursuing an issue certification under *Rule 23(c)(4)* must also satisfy predominance under *Rule 23(b)(3)*. The Fifth Circuit at least arguably appears to require predominance. See *Castano*, 84 F.3d at 745 n.21. The Second, Third, and Ninth Circuits do not. See *In re Nassau County Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006); *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169, 200–02 (3d Cir. 2009); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). The Seventh Circuit has not expressly picked a side. See *Jacks v. DirectSat USA, LLC*, 2015 WL 1087897, at \*4 (N.D. Ill. Mar. 10, 2015). And district courts in this circuit have divided. See *Gen. Motors*, 241 F.R.D. at 314 (predominance required); *Hamilton v. O'Connor Chevrolet, Inc.*, 2006 WL 1697171, at \*6 (N.D. Ill. June 12, 2006) (predominance required); *Jacks*, 2015 WL 1087897, at \*4 (no predominance); *Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, 296 F.R.D. 587, 596 (N.D. Ill. 2013) (no predominance); *Fedex*, 2010 WL 1652863, at \*2 (no predominance); *In re Factor VIII or IX Concentrate Blood Prod. Litig.*, 2005 WL 497782, at \*2 (N.D. Ill. Mar. 1, 2005) (no predominance).

**\*62** The Court believes that the Seventh Circuit likely would follow the trend of authority holding that a court may employ *Rule 23(c)(4)* "to certify a class as to liability regardless of whether the claim as a whole satisfies *Rule 23(b)(3)*'s predominance requirement." *Nassau County*, 461 F.3d at 227. As other courts have recognized, this

approach aligns with the Seventh Circuit's efforts to "devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); accord *Jacks*, 2015 WL 1087897, at *4 (collecting Seventh Circuit authority). As the Seventh Circuit has stated, "a class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed." *Butler*, 727 F.3d at 800.

The main problem for Plaintiffs is that even if they do not have to satisfy predominance, their negligence and strict liability issue subclasses are not a viable path forward. Plaintiffs submit *seventeen* issues for certification, the answers to which will turn on applying *eleven* states' laws. That is 187 distinct legal issues for certification under Rule 23(c)(4). Plaintiffs do not direct the Court to any case that certified so many issues, and the Court cannot see how consolidated oversight of so many disparate factual and legal issues is sensible. See *McDaniel v. Qwest Comm'ns Corp.*, 2006 WL 1476110, at *16 (N.D. Ill. May 23, 2006) (declining to certify issue subclasses because of "the breadth of the six issues upon which Plaintiffs request certification vis-a-vis the underlying cause of action"). Of course, "merging the negligence" and strict liability standards of these eleven states to create "a kind of Esperanto instruction" is a non-starter. *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995).

Furthermore, many of these issues are designed to preempt Defendant's affirmative defenses. [See 286-72, at 6 ("Issue Four: Whether [Defendant] is barred from asserting an affirmative defense to any claim from an acetal coupling nut failure based on 'over tightening' because the coupling nut cannot withstand the 12 ft-lbs of installation torque"; "Issue Five: Whether [Defendant] possessed knowledge of the defect in workmanship and material of the acetal coupling no later than 2003; and therefore, all warranty periods are tolled as of that date.").] The factual circumstances in which a defendant could be "barred" from asserting a defense or every consumer's warranty period could be "tolled" are complex, varied, and potentially dependent on the actions of the consumer. [65] Likewise, Plaintiffs seek to certify as an issue "Whether the No-Burst Water Lines were expected to and did reach the user or consumer without

substantial change in the condition in which [they were] sold." *Id.* at 6 (Issue Eight). Whether the end-user, in fact, received Defendant's product "without substantial change in the condition in which it was sold" seems to require individualized determinations into how each consumer's connector was installed. These are not the kind of discrete factual or legal matters amenable to classwide issue certification.

[65]    Plaintiffs do not cite any case law related to the tolling of a warranty. Case law addressing the tolling of a statute of limitations based on fraudulent concealment "focus[es]" on the actions of the plaintiff. See, *e.g.*, *Knopick v. Connelly*, 639 F.3d 600, 607 (3d Cir. 2011).

Even Issues One, Two, and Three—all of which relate to the different ways in which Defendant's product is allegedly "defective"—are not proper issues for certification. In *Rhone-Poulenc*, the Seventh Circuit addressed the interplay between proximate cause, negligence, and contributory negligence in a product defect case. The Court explained that "the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." 51 F.3d at 1303. "The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact." *Id.* In *Rhone-Poulenc*, the first jury was not asked to determine liability, but "merely whether one or more of the defendants was negligent under one of the two theories." *Id.* The Court explained:

> **\*63** The first jury may go on to decide the additional issues with regard to the named plaintiffs. But it will not decide them with regard to the other class members. Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members * * *, such issues as comparative negligence * * * and proximate causation. Both issues overlap the issue of the defendants' negligence.

Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant. Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant. It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence. A second or subsequent jury might find that the defendants' failure to take precautions * * * could not be thought the *proximate* cause of the plaintiffs' [injury]. How the resulting inconsistency between juries could be prevented escapes us.

*Id.* (citations omitted). The same kind of inescapable inconsistency and inefficiency is present with Plaintiffs' negligence and strict liability issue subclasses. This is not a case where Plaintiffs request certification of an issue that will establish "liability," leaving only damages to be decided by individual inquiries. Cf. *Butler*, 727 F.3d at 800. Rather, Plaintiffs have sought piecemeal certification of aspects of their negligence, strict liability, and warranty claims that will lead to classwide determination of one issue by one jury followed by the inevitable partial re-litigation of that same issue by subsequent juries. *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011) (citing "the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)" as one of the factors courts should consider before certifying an issue subclass).

"The district court is not obligated to grant partial certification if particular issues are common to a class," but may do so in its discretion. *Clark v. Experian Info. Sols., Inc.*, 256 Fed.Appx. 818, 822 (7th Cir. 2007). Here, "little efficiency would be gained by certifying a class for only particular issues." *Id.* Accordingly, Plaintiffs' request for issue certification under Rule 23(c)(4) is denied.

### E. *Pella* Subclasses

For the first time at oral argument, Plaintiffs proposed that, if they did not prevail on choice of law, the Court should consider certifying consumer protection subclasses like the ones described in *Saltzman v. Pella Corporation*, 257 F.R.D. 471 (N.D. Ill. 2009). In *Pella*, the plaintiff moved to certify six Rule 23(b)(3) statutory consumer fraud subclasses from California, Florida, Illinois, Michigan, New Jersey, and New York. *Id.* at 476. The court ultimately certified a liability-only class, excluding issues of causation and damages from the class. *Id.* at 479. Moreover, the court specified that "the six statutory consumer fraud subclasses will consist only of plaintiffs with manifest defects" because "[d]amages are an essential element of the claim, and it is clear * * * that a latent defect does not qualify." *Id.* In distinguishing *Bridgestone*, the court explained:

> Defendants point to [*Bridgestone*] for the proposition that latent defect members and manifest defect members should not recover alongside one another. The court in *Bridgestone* noted that a mixed system, compensating buyers for the risk of a latent defect and buyers who have a manifest defect overcompensates buyers and may lead to excess precaution by the manufacturer. However, in this case, class members whose defect has not yet manifested are included in the damages class. Only those class members who have experienced a manifest defect and have paid to repair or replace these windows may be entitled to damages. Those class members whose windows have not manifested any defect may be entitled to declaratory and injunctive relief. Only once their windows experience any manifest defect, if indeed they ever do, then those members will be able to submit a claim to Pella for repair. There is no side-by-side recovery here.

**\*64** *Id.* at 486–87 (internal citations omitted). The Court then certified "a Rule 23(b)(3) statutory consumer fraud

class, consisting of the following six state subclasses: California, Florida, Illinois, Michigan, New Jersey, and New York, for all members whose windows have exhibited wood rot and who have replaced the affected windows." *Id.* at 487. Finally, in affirming the district court's certification order, the Seventh Circuit explained, "[t]he narrow way in which the district court defined the classes here eliminates concern that the definitions are overbroad or include a great many people who have suffered no injury." *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010).

Without question, Plaintiffs did not properly move for certification of state-specific consumer protections subclasses, and they do not meet their burden under Rule 23 by simply raising this idea as an afterthought at oral argument. Indeed, the district court opinion from *Pella* is cited in one footnote (out of 248) in Plaintiffs' opening brief [286, at 26 n.157] and is absent from their reply. Moreover, Plaintiffs do not have class representatives from four of these states (Florida, Michigan, New Jersey, and New York), and so at present *Pella* is unquestionably a non-starter as a fallback for Plaintiffs. But all those issues aside, it is obvious that the classes certified in *Pella* bear practically no resemblance to this case. *Pella excluded* consumers with latent defects from the 23(b)(3) classes, while Plaintiffs' classes are intentionally designed to include them. [66] The *Pella* classes are limited to those who have manifested the defect *and* "replaced" the affected product, while Plaintiffs' classes do not require any consumer to have made a request to Defendant for replacement of their connector. The *Pella* classes do not include issues related to damages, while Plaintiffs propose certification of their class-wide damages theory. Based on the parties' current submissions, the Court does not see how *Pella* provides Plaintiffs any sanctuary.

[66] *Pella* only included these latent defect consumers in the Rule 23(b)(2) declaratory and injunctive relief class. 257 F.R.D. at 480–81. Plaintiffs here do not pursue such a class.

### F. Further Reflections

At the beginning of oral argument on the parties' motions, one of Plaintiffs' attorneys succinctly articulated what appears to have been their approach to class certification. He said, "There is a class in here somewhere." What that class is, however, has changed from brief to brief, and sometimes paragraph to paragraph within briefs. At

oral argument, the class changed yet again. Plaintiffs proposed a new class (a six-state subclass of consumer protection laws), new class representatives (any of the 14 class representatives besides Larson for the CLRA class), and a new damages theory (replacement costs). To say that Plaintiff's class certification arguments have been a moving target would be an understatement.

The Court has also continued to receive supplemental authority from Plaintiffs that raise additional questions about the class they seek. Just last week, they submitted a fourth notice of supplemental authority [491] from a court in this district that *denied* certification of a nationwide consumer protection class, but subsequently granted certification of a liability-only class after renewed and focused briefing where the plaintiffs "narrowed their proposed class to residents of five states" (California, Illinois, Missouri, New Jersey, New York, and New York). [See 491-1, at 5–6, 35 (*Mednick v. Precor, Inc.*, 2017 WL 1021994, at *1–2, 12 (N.D. Ill. Mar. 16, 2017)).] It is hard to know what to make of this submission. Maybe Plaintiffs are implicitly acknowledging that their present motion cannot succeed, but another one could. Or maybe Plaintiffs are asking this Court to certify a five-state consumer fraud liability-only subclass even though they never briefed that request and they lack class representatives from Missouri, New Jersey, and New York. Or maybe Plaintiffs thought the Court needed to see how one of the non-precedential cases that Defendant submitted as supplemental authority [477-4] turned out, regardless of whether the facts or arguments advanced there fit this case in its present posture. None of these reasons bolster the prospects for the present motion.

**\*65** Whether refinement of Plaintiffs' opaque liability theories and indefinite class contours will ultimately show that a class *is* in here somewhere, the Court cannot say. It can only decide that, on the present motion, Plaintiffs have failed to show that *these* proposed classes satisfy every requirement of Rule 23. The motion for class certification [284; 286] therefore must be denied.

### IV. Conclusion

For the foregoing reasons, Plaintiffs' motions to exclude Defendant's experts [378; 379; 381; 382; 384; 387; 390] are granted in part and denied in part, Plaintiffs' motion to strike [446] is granted in part and denied in part, Defendant's motions to exclude Plaintiffs' experts [334; 336; 337; 339] are granted in part and denied in part,

and Plaintiffs' motion for class certification [284; 286] is denied. The Courtroom Deputy will contact the parties to arrange a mutually agreeable time for the next status hearing before Judge Dow and Magistrate Judge Gilbert, at which time the parties may raise any issues regarding discovery, motions for reconsideration, and future motion practice before either of the assigned judges.

**All Citations**

Slip Copy, 2017 WL 1196990

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

7

2012 WL 1204081
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Catherine JOHNSON, Plaintiff,

v.

WYETH LLC; Pfizer Inc., individually and as
successor in interest to Pharmacia & Upjohn
Co.; Wyeth Pharmaceuticals, Defendants.

No. CV 10–02690–PHX–FJM.
|
April 11, 2012.

**Attorneys and Law Firms**

Ellen Presby, Lawrence R. Lassiter, Miller Weisbrod,
Dallas, TX, Lisa Gay Lewallen, Lisa G. Lewallen PLLC,
Phoenix, AZ, for Plaintiff.

Darolyn Y. Hamada, Shook Hardy & Bacon LLP, Irvine,
CA, Jennise Walker Stubbs, Shook Hardy & Bacon
LLP, Houston, TX, Julie B. Dupont, Kaye Scholer LLP,
Catherine B. Stevens, Skadden Arps Slate Meagher &
Flom LLP, New York, NY, Kelly Wilkins Machenry,
Sara Marie Athen, Snell & Wilmer LLP, Phoenix,
AZ, Mark C. Hegarty, Jeremiah S. Wikler, Micah L.
Hobbs, Shook Hardy & Bacon LLP, Kansas City, MO,
James Albert Frederick, Goodell Devries Leech & Dann
LLP, Baltimore, MD, Kathy A. Cochran, Wilson Smith
Cochran Dickerson, Seattle, WA, Lee A. Mickus, Snell &
Wilmer LLP, Denver, CO, Lori B. Leskin, Kaye Scholer
LLP, New York, NY, for Defendants.

**Opinion**

### ORDER

FREDERICK J. MARTONE, District Judge.

**\*1** The court has before it defendants' motion to
exclude opinions of plaintiff's experts Drs. Parisian,
Blume, and Austin (doc. 79), plaintiff's response (doc.
99), and defendants' reply (doc. 109). This action arises
from plaintiff's ingestion of hormone replacement drugs
Premarin and Provera between 1982 and 1998, which she
alleges caused her to develop breast cancer.[1]

[1] This action was formerly part of a multidistrict
litigation ("MDL") in the Eastern District of
Arkansas. Plaintiff initiated an individual action here
pursuant to the MDL judge's order.

### I

To be admissible, expert testimony must "help the trier
of fact to understand the evidence or to determine a
fact in issue," must be "based on sufficient facts or
data," must be "the product of reliable principles and
methods," and must be "reliably applied ... to the facts
of the case." Fed.R.Evid. 702. The testimony must go
beyond "subjective belief or unsupported speculation" to
be reliable. See Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579, 590, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469
(1993).

### II

Defendants move to exclude Dr. Austin's failure to test
opinions. Plaintiff stipulates that Dr. Austin's testimony
will be limited to a discussion of evidence concerning
the link between certain hormone replacement therapy
("HRT") drugs and cancer and the kinds of studies
that can be performed on drugs, their risks, and the
information that the studies can reveal. Defendants
concede that their motion is moot with respect to Dr.
Austin.

### III

Next, defendants move to exclude Dr. Parisian and
Dr. Blume's opinions that defendants failed to act as a
reasonable pharmaceutical company by failing to perform
additional tests on their HRT drugs. They argue that there
are no objective standards that required defendants to
perform additional testing. Without an objective standard
to which to point, defendants contend that Dr. Parisian
and Dr. Blume merely offer personal opinions that
defendants acted unreasonably.

Dr. Parisian's 2007 report opines that defendants
breached the standard of a "responsible United
States pharmaceutical manufacturer" by not voluntarily
conducting studies to investigate the risks of breast

cancer and update their product warnings. *Mot.*, ex. 20 at 16. Similarly, Dr. Blume's report states that a "reasonable pharmaceutical company would have conducted a definitive study examining the breast cancer risk associated with hormone replacement and provided these results in the product labeling." *Id.,* ex. 21 at 29. Plaintiff was unable to point to anywhere in Dr. Blume's report or anywhere in Dr. Parisian's multiple reports that identify any FDA regulations or rules requiring defendants to test their HRT drugs after they were released on the market. By contrast, Dr. Parisian acknowledges that the "FDA was not given authority to require a company to perform safety studies for an already marketed drug." *Id.,* ex. 20 at 9.

Alternatively, plaintiff argues that the opinions are based on experience. While expert opinions can be based on personal experience, plaintiff has not pointed to any experience cited in the reports that the experts relied on in concluding that there is an objective standard of care for post-market testing. Indeed, both experts admitted that there is no set standard of care, because each company makes a subjective judgment as to the appropriate level of testing for its products. *See Mot.,* ex. 15, Parisian Dep. 571:15–572:8, July 20, 2007; *id.,* ex. 16, Blume Dep. 225:9–11, Apr. 7, 2006. Next, plaintiff argues that Drs. Parisian and Blume relied on defendants' admissions that they have a responsibility to make sure drugs are safe and appropriately tested. What plaintiff has not pointed to, however, is Dr. Blume or Dr. Parisian's identification of any internal company standard that required defendants to test their HRT products after market release.

**\*2** Plaintiff also contends that she has uncovered new evidence in the form of three FDA guidances issued in 1995, 2001, and 2005 that "clearly establish how FDA expects manufacturers to react to safety signals." *Response* at 12. Plaintiff alleges that she stopped taking Premarin and Provera in 1998, so guidances released in 2001 and 2005 are inapplicable to the facts of this case. Even if they were issued while plaintiff was still taking HRT drugs, neither guidance demands that manufacturers must conduct further testing. The 2001 FDA guidance outlines the kind of adverse events that drug manufacturers must report to the FDA, but it does not require further testing of drugs already on the market. *Id.,* ex. 55. The 2005 guidance provides suggestions for good practices, including investigation of safety signals through studies. Every page of the guidance, however, is marked "Contains

Nonbinding Recommendations." *Id.,* ex. 56. It is unclear whether either Dr. Parisian or Dr. Blume relied on the 1995 guidance. In any case, the guidance is similarly unhelpful. It details recommendations for conducting studies when developing combination HRT drugs. It does not, however, require manufacturers to perform additional tests on drugs already on the market. *Id.,* ex. 54. Accordingly, Dr. Parisian and Dr. Blume cannot reliably base their opinions that defendants should have conducted additional tests on Premarin and Provera on either the 1995, 2001, or 2005 FDA guidances.

Plaintiff's next argument, that FDA regulations "establish a duty to study, if not an absolute statutory requirement for study," *response* at 12, is unpersuasive. To support this point, plaintiff points to Dr. Parisian's observation that FDA regulations require drug companies to alter label warnings once an association between a drug and cancer is revealed, and that a company must study its products before applying for a labeling change. These concepts do not, without a further link, establish a basis for Dr. Parisian's opinion that defendants were required to perform further testing in this case. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) (*Daubert* does not require courts to admit opinion testimony if there is "too great an analytical gap between the data and the opinion proffered"). Finally, plaintiffs contend that the PhRMA Code of Pharmaceutical Marketing Practices constitutes a written industry standard. Although this code addresses ethical interactions between pharmaceutical manufacturers and healthcare professionals, it does not establish industry standards for post-market drug testing.[2]

2    For example, the code discusses appropriate items that manufacturers can give to healthcare professionals. *Reply,* ex. 4.

An expert witness cannot opine that defendants breached a standard of care unless that standard exists. Because plaintiff cannot point to any objective standard relied on by Dr. Parisian or Dr. Blume that required defendants to perform additional testing, plaintiff has not shown that the failure to test opinions are anything more than "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. Consequently, they are unreliable and inadmissible. We join several courts —including the MDL court-that have excluded Dr. Parisian and Dr. Blume's failure to test opinions in HRT litigation. *See, e.g., Hines v. Wyeth,* 2:04–0690,

2011 WL 2680842, at *6 (S.D.W.Va. July 8, 2011) (excluding Dr. Parisian's failure to test opinion); *Rivera Adams v. Wyeth,* 03–1713(JAF), 2010 WL 5072061, at *3 (D.P. R. Dec. 3, 2010) (excluding Drs. Parisian and Austin's failure to test opinions); *In re Prempro Prods. Liab. Litig.,* 4:03CV01507–WRW, 4:05CV00718–WRW, 2010 WL 5663003, at *3 (E.D.Ark. Sept.16, 2010) (excluding Drs. Parisian, Blume, and Austin's failure to test opinions).

## IV

**\*3** Defendants argue that we should exclude Dr. Parisian and Dr. Blume's testimony entirely. They complain that, based on experiences in other HRT trials, "their testimony amounts to little more than reading portions of documents and offering personal commentary untethered to any objective standard." *Mot.* at 8. Plaintiff responds that these experts will offer testimony in other areas, including FDA regulation, types of available studies, drug labeling standards and whether defendants' drug labels were accurate, and the scope of the FDA's authority. Defendants acknowledge that this type of testimony "ordinarily would not be objectionable, if that were in fact what these witnesses did." *Reply* at 9.

We are unwilling to exclude helpful expert testimony in its entirety based on conjecture about what might happen at trial. The FDA drug approval process, FDA regulations, and protocols of drug labeling are topics that are likely unfamiliar to a layperson, and expert testimony on these topics will be helpful to the jury's understanding of the complex issues in this case. To be clear, this court will not permit either Dr. Parisian or Dr. Blume to merely recite or summarize documents. *See In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 192 (S.D.N.Y.2009) (limiting Dr. Parisian's commentary on documents and exhibits

to "explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge."). They must provide some analysis, opinion, or expertise when testifying about the FDA regulatory process and drug labeling. Objections to narrative testimony, however, are best made at trial.

Finally, defendants object to portions of Dr. Parisian and Dr. Blume's expert reports that offer opinions on defendants' corporate intent, motive, and knowledge. Both expert reports frequently and improperly opine about Wyeth's intent. *See, e.g., Mot.,* ex. 20 at 28 ("[t]he intent of Wyeth's paper was ..."); *id.,* ex. 21 at 23 ("[i]nternal Wyeth documents demonstrate that the company did not intend ..."). Dr. Parisian and Dr. Blume may not offer opinions concerning defendants' motive, intent, knowledge, or other state of mind.

## V

**IT IS ORDERED GRANTING IN PART** defendants' motion to exclude opinions of plaintiff's experts Drs. Parisian, Blume, and Austin (doc. 79). Defendants' motion to exclude Dr. Austin's testimony is **DENIED** on grounds of mootness. Defendants' motion to exclude Dr. Parisian and Dr. Blume's failure to test opinions is **GRANTED.** Defendants' motion to exclude all of Dr. Parisian and Dr. Blume's testimony is **DENIED.** Our ruling is without prejudice to defendants making appropriate objections at trial.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1204081

---

**End of Document**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

8

2017 WL 1151066
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

LA PLAYITA CICERO, INC., d/b/a Serenata
Restaurant and Bar, and Gerardo Meza, Plaintiffs,
v.
TOWN OF CICERO, ILLINOIS, a municipal
corporation, Larry Dominick in his official
and individual capacities, Paul Dembowski,
Larry Polk, and Serge Rocher, Defendants.
La Playita Cicero, Inc., d/b/a Serenata Restaurant
and Bar, and Gerardo Meza, Plaintiffs,
v.
Town of Cicero, Illinois, a
municipal corporation, Defendant.

No. 11-cv-1702, No. 11-cv-5561
|
Signed 03/28/2017

**Attorneys and Law Firms**

Dana L. Kurtz, Heidi Karr Sleper, Kurtz Law Offices, Ltd., Hinsdale, IL, James G. Vanzant, Evanston, IL, for Plaintiffs.

K. Austin Zimmer, Cynthia Sara Grandfield, Eric T. Stach, Del Galdo Law Group, LLC, Berwyn, IL, Michael James Kasper, Fletcher Topol & O'Brien, James Bryan Novy, Theresa Berousek Carney, Rock Fusco & Connelly, LLC, Chicago, IL, Michael J. McGrath, Michael Kevin Smith, Odelson & Sterk, Ltd., Evergreen Park, IL, for Defendants.

**Opinion**

## MEMORANDUM OPINION AND ORDER

John Z. Lee, United States District Judge

**\*1** From 2005 to 2009, Gerardo Meza owned La Playita Cicero, Inc., d/b/a Serenata Restaurant and Bar ("Serenata"), a restaurant in Cicero, Illinois, that is now closed. Beginning in 2006, municipal officials from the Town of Cicero cited, fined, and summarily closed Serenata numerous times. Meza and Serenata allege that these officials targeted them because Meza is Hispanic

and was politically unsupportive of Larry Dominick, who was the Town President and Liquor Commissioner. By contrast, the Town of Cicero and its officials claim that the citations and fines were merely the legal consequences of local liquor code violations.

Plaintiffs Meza and Serenata have sued the Town of Cicero under 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments of the federal Constitution (Case No. 11-cv-5561). [1] They have also brought these same constitutional claims against the Town of Cicero in a separate lawsuit in which they further allege several state law claims and add Larry Dominick, Paul Dembowski, Larry Polk, and Serge Rocher as individual defendants (Case No. 11-cv-1702). [2]

[1]  Docket entries cited herein correspond to Case No. 11-cv-5561 unless otherwise noted.

[2]  For summaries of the labyrinthine procedural history of these two cases, *see La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-1702, 2014 WL 944859, at *1 (N.D. Ill. Mar. 11, 2014); *La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-5561, 2013 WL 309089, at *1 (N.D. Ill. Jan. 24, 2013).

In anticipation of trial, Plaintiffs have offered expert witnesses Dr. Gregory Green and Dr. Louise Fitzgerald, and Defendants have offered expert witness Dr. Alan Jaffe. The parties have filed motions *in limine* to bar or strike the opposition's expert testimony. [3] For the reasons set forth below, Defendants' motions to bar Green [123] [154] are denied. Plaintiffs' cross-filed motions to bar Jaffe in Case No. 11-cv-5561 [133] and Case No. 11-cv-1702 [399] are granted in part and denied in part. Defendants' motion to bar Fitzgerald [131] is also granted in part and denied in part.

[3]  All of Defendants' motions *in limine* have been filed in Case No. 11-cv-5561, in which only the Town of Cicero is named as a Defendant. The Court's rulings on these motions, however, shall apply equally to the evidence in both Case No. 11-cv-1702 and Case No. 11-cv-5561, in light of the Court's prior ruling —and counsels' agreement—to consolidate the cases for pretrial purposes. *See* Case No. 11-cv-1702, ECF No. 386; Case No. 11-cv-5561, ECF No. 111; *see also* Case No. 11-cv-1702, ECF No. 387; Case No. 11-cv-5561, ECF No. 112 (setting forth identical briefing schedules for the parties' motions *in limine*). As such,

to facilitate readers' understanding of the scope of this Memorandum Opinion and Order, the Court will refer to "Defendants" collectively throughout, even though many of the filings referenced herein were filed only in Case No. 11-cv-5561 by the Town of Cicero.

## Legal Standard

Although the Federal Rules of Evidence do not explicitly authorize the practice of making *in limine* rulings, "the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions *in limine* allow courts to "ensure the expeditious and evenhanded management of the trial proceedings" by barring evidence that will be clearly inadmissible for any purpose. *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). Rulings on motions *in limine* are "subject to change when the case unfolds." *Luce*, 469 U.S. at 41; *see also Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 565 (7th Cir. 2006). Indeed, "even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce*, 469 U.S. at 41–42.

**\*2** The admissibility of expert testimony is governed by Federal Rule of Evidence (FRE) 702 and the Supreme Court's seminal decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate."). FRE 702 allows the admission of testimony by an expert—that is, someone with the requisite "knowledge, skill, experience, training, or education"—to help the trier of fact "understand the evidence or [ ] determine a fact in issue." Fed. R. Evid. 702. An expert witness is permitted to testify when (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.*

Under *Daubert*, the district court must act as the evidentiary gatekeeper, ensuring that FRE 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

147–49 (1999). District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). In considering whether to admit expert testimony, district courts employ a three-part framework that inquires whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893–94 (7th Cir. 2011).

With regard to the reliability of an expert's methodology, courts consider factors such as whether the methodology can and has been tested, whether it has been subject to peer review, whether it has a known or potential rate of error, and whether it is generally accepted among the relevant community. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Daubert*, 509 U.S. at 593–94). Under this framework, "shaky expert testimony may be admissible, assailable by its opponents through cross-examination," and criticisms of the testimony's quality speak not to admissibility but to the weight that the testimony should be accorded by the trier of fact. *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (quoting *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)).

The proponent of an expert witness bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

## Analysis

### I. Defendants' First Motion to Bar Damages Expert Dr. Gregory Green

Plaintiffs have offered economist Dr. Gregory Green to opine on the economic damages sustained by Serenata as a result of Defendants' conduct. In his Initial Report from September 2011, Green offers two principal opinions. First, he opines on Serenata's lost business profits from 2007 until 2009. Green's calculation of these lost profits is based on estimates of Serenata's expected revenues and costs, which in turn are based on Serenata's actual

revenues and costs from 2005 to 2009 as well as comparisons to the revenues and costs of Dona Cuca, Inc., a similar restaurant owned by Meza's niece and located approximately 1.5 miles from Serenata. *See* Def.'s Mot. Bar Green, Ex. A ("Green Initial Report"), at 1, 6–8, ECF No. 123. Second, because Serenata ceased operations in December 2009, Green opines on the lost value of Serenata's business as a going concern from 2010 forward. This opinion is based on Green's use of the Capital Asset Pricing Model, which Green describes as "a method for determining the risk-adjusted discount rate to be used to reduce Serenata's estimated lost profits to their 2011 present value." *Id.* at 1, 10–13.

**\*3** In response to Green's Initial Report, Defendants obtained rebuttal experts, who criticize Green's Initial Report. *See* Def.'s Mot. Bar Green, Ex. B. Green then prepared a second report, entitled "Rebuttal Report." *See id.*, Ex. C ("Green Rebuttal Report"). Green's Rebuttal Report is dated December 2011.

Defendants' first motion *in limine* seeks to bar Green's Initial Report and Rebuttal Report. Primarily, Defendants challenge Green's use of the Capital Asset Pricing Model. They also argue that Green lacks qualifications to testify as an expert. Lastly, they contend that Green's Rebuttal Report should be barred because it is a sur-rebuttal report that is not permitted under the Federal Rules of Civil Procedure. For the reasons explained below, the Court rejects these arguments and denies Defendants' motion.

### A. Capital Asset Pricing Model

In challenging Green's use of the Capital Asset Pricing Model (CAPM), Defendants first argue that the model is methodologically unsound. Relatedly, they challenge the factual assumptions underlying Green's application of the CAPM as unreliable. They also argue that Green's discussion of the CAPM reveals that his testimony will not assist the trier of fact as required by FRE 702. The Court finds none of these arguments persuasive.

### 1. Reliability of the Methodology

As explained in Green's Initial Report, the CAPM is an economic model that can be used to estimate a company's going-concern value.[4] The CAPM estimates

this value as a function of (1) the rate of return on default-free assets, such as U.S. Treasury securities, (2) the risk measure of the company, (3) the expected risk premium on the overall market portfolio, and (4) the company's size premium. Green Initial Report at 11–13. Courts have long recognized the reliability of the CAPM as a valuation methodology and have routinely permitted expert witnesses to rely upon the CAPM. *See, e.g., Fish v. Greatbanc Trust Co.*, No. 09 C 1668, 2016 WL 5923448, at \*28, \*35 (N.D. Ill. Sept. 1, 2016) (discussing expert witnesses' use of the CAPM); *In re Bachrach Clothing, Inc.*, 480 B.R. 820, 869 (Bankr. N.D. Ill. 2012) (same); *In re Pullman Constr. Indus. Inc.*, 107 B.R. 909, 921 (Bankr. N.D. Ill. 1989) (same); *see also Buchwald v. Renco Grp.*, 539 B.R. 31, 44 (S.D.N.Y. 2015) ("[I]t is undisputed that the Capital Asset Pricing Model generally, and the use of company-specific risk premium in general, are part of accepted methodologies in corporate valuation."). Tellingly, Defendants cite no case law to the contrary. The Court therefore finds that the CAPM is a sufficiently reliable and well-accepted methodology to form the basis of Green's opinions.

[4]    "Going-concern value" is "[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power." *Black's Law Dictionary* (10th ed. 2014).

Defendants nevertheless argue that even if the CAPM can reliably estimate the going-concern value of publicly held companies, it is an unreliable method of valuating privately held companies like Serenata because it is impossible to calculate precise risk measures for such companies. Indeed, Green's Initial Report acknowledges this weakness, explaining that "[b]ecause Serenata is not and never has been a publicly traded entity, no [ ] risk measure can be calculated directly for Serenata." Green Initial Report at 11. To work around this issue, Green estimates Serenata's risk measure by averaging the risk measures of three publicly traded but otherwise comparable restaurant businesses: Chipotle Mexican Grill (whose risk measure is 0.95), Chili's Restaurants (whose risk measure is 1.25), and Texas Roadhouse, Inc. (whose risk measure is 1.00). The average of these businesses' risk measures is 1.07, which Green then rounds to 1.15 in order to make his final estimate more conservative. *Id.* at 11–13.

**\*4** Contrary to Defendants' assertion, Green's methodology appears to be an accepted means of using the CAPM to estimate a privately held company's

going-concern value. *See, e.g., Pullman*, 107 B.R. at 921 (describing use of CAPM by expert witnesses and noting that, because it is impossible to obtain the risk measure of a privately held company, the risk measure must be estimated by way of comparison to publicly traded companies). To the extent Defendants believe that Green's estimate is unsound or contend that the three restaurants used by Green are not comparable to Serenata, they can explore these issues on cross-examination. *Cf. LoggerHead Tools, LLC v. Sears Holdings Corp.*, No. 12-CV-9033, 2016 WL 5112025, at *4 (N.D. Ill. Sept. 20, 2016) ("[T]he fact that [an expert witness] cannot calculate the specific amount of lost profits goes to weight, not admissibility."); *Davis v. Duran*, 277 F.R.D. 362, 366 (N.D. Ill. 2011) ("Vigorous cross examination, presentation of contrary evidence and careful jury instructions, *Daubert* stressed, are the traditional and appropriate means of attacking shaky but admissible evidence."). Green is therefore permitted to give testimony based on his use of the CAPM.

**2. Reliability of Underlying Factual Assumptions**

Defendants also argue that Green's testimony regarding the CAPM should be barred as unreliable because his opinions are based on unsupported factual assumptions that constitute hearsay. For example, Defendants take issue with Green's assumption that Serenata's earnings would have grown by 30 percent per year until reaching normal operating capacity, as well as his assumption that normal operating capacity would have brought in $1.4 million to $1.5 million in annual revenues. *See* Reply Supp. Mot. Bar Green at 4–5, ECF No. 167 (citing Green Initial Report at 6).

The reliability of such factual assumptions, however, is not to be weighed by the Court *in limine*, but rather is to be "tested by the adversarial process and determined by the jury." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013); *see also Wilbern v. Culver Franchising Sys., Inc.*, No. 13 C 3269, 2015 WL 5722825, at *11–12 (N.D. Ill. Sept. 29, 2015) (denying motion to strike damages expert and noting that "the validity of the expert's factual assumptions is not the focus under a pre-trial *Daubert* inquiry"). And it is well established that an expert witness may base an opinion on otherwise inadmissible facts, including hearsay. Fed. R. Evid. 703; *Daubert*, 509 U.S. at 595. As such, Defendants' challenges

to Green's underlying assumptions are not a basis for barring Green's testimony.

**3. Assisting the Trier of Fact**

In addition, Defendants argue that Green's testimony is unnecessary to assist the trier of fact because his Initial Report demonstrates that damages can be calculated simply by plugging numbers into a formula using the CAPM. This argument is meritless. As explained above, the methodologies that Green employs to estimate Serenata's going-concern value from 2010 forward, as well as to calculate its lost profits from 2007 to 2009, require the use of numerous steps and the input of multiple variables. The Court thus finds that expert testimony explaining the application of these methodologies will clearly assist the jury in determining the issue of damages in this case.

**B. Green's Qualifications**

Next, Defendants challenge Green's qualifications to testify as an expert witness. Because Green's expertise focuses on macro-level economic analysis, Defendants argue, he is unqualified to conduct the type of micro-level analysis involved in valuing an individual business such as Serenata. In response, Plaintiffs assert that Green is indeed qualified, pointing out that he has provided consulting services as an economist and taught university courses in macro- and microeconomics since 1997. *See* Pls.' Resp. Mot. Bar Green, Ex. 3, ECF No. 140.

As the Seventh Circuit has warned, "[t]he notion that *Daubert* ... requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). A witness is qualified to testify as an expert as long as he has "relevant expertise enabling him to offer responsible opinion testimony helpful to the judge or jury." *Id.* (citing Fed. R. Evid. 702). As such, an expert witness is not required to have an academic degree in economics, statistics, or mathematics—much less a specialization in a specific subfield of those areas—to be qualified to opine on the calculation of damages. *See id.* Here, Green has relevant expertise as an economist that enables him to opine on Plaintiffs' economic damages. The Court therefore concludes that Green is qualified to testify regarding the opinions he has offered.

### C. Whether Green's Report Is an Improper Sur-rebuttal Report

**\*5** As a procedural matter, Defendants seek to bar Green's Rebuttal Report on the ground that, notwithstanding its title, the report is a sur-rebuttal responding to Defendants' rebuttal to Green's Initial Report. According to Defendants, sur-rebuttal reports are not contemplated by the Federal Rules of Civil Procedure and should therefore be barred. Defendants relatedly argue that allowing Plaintiffs to use a sur-rebuttal report would be prejudicial.

In support of this argument, Defendants fail to cite any case law from this jurisdiction holding that sur-rebuttal reports are procedurally forbidden. In fact, relevant case law suggests that sur-rebuttal reports are permissible, as long as they remain within the scope of proper rebuttal testimony, as is the case here. *See Ernst v. City of Chi.*, No. 08 C 4370, 2013 WL 4804837, at \*1 (N.D. Ill. Sept. 9, 2013) (permitting use of sur-rebuttal expert report); *City of Gary v. Shafer*, No. 2:07-CV-56-PRC, 2009 WL 1370997, at \*6 (N.D. Ind. May 13, 2009) (same); *cf. Shen Wei (USA) Inc. v. Sempermed USA, Inc.*, No. 05 C 6004, 2009 WL 674364, at \*2 (N.D. Ill. Mar. 12, 2009) (striking sur-rebuttal report only because it exceeded the scope of proper sur-rebuttal testimony, not because sur-rebuttal reports are categorically barred as a matter of procedure). And although the Federal Rules of Civil Procedure do not make explicit reference to sur-rebuttal reports, neither do they appear to forbid them. *See, e.g.*, Fed. R. Civ. P. 26(a)(2)(D)(ii) (addressing rebuttal expert testimony in general and imposing no prohibition on evidence that in turn rebuts an opposing party's rebuttal evidence).

Furthermore, Defendants fail to explain why they would be unfairly prejudiced by the admission of Green's sur-rebuttal report. Indeed, such prejudice seems unlikely, given that Defendants have had the report since 2011 and thus cannot suddenly now claim that the report comes as a surprise. *See* Pls.' Resp. Mot. Bar Green at 1. As such, the Court sees no basis for barring Green's Rebuttal Report on grounds of unfair prejudice.

In sum, none of Defendants' arguments in support of their first motion to bar Green provides a sufficient basis to bar Green's testimony. The motion is therefore denied.

### II. Defendants' Second Motion to Bar Damages Expert Dr. Gregory Green

In July 2016, Green supplemented his Initial Report with a two-page document that converts the economic damages estimated in his Initial Report from 2011 dollar values to 2016 dollar values. Def.'s Mot. Strike Supp. Report, Ex. A, ECF No. 154. Additionally, in their brief responding to Defendants' first motion to bar Green, Plaintiffs attached a two-page declaration in which Green briefly addressed some of the criticisms that Defendants had leveled at his use of the CAPM. Pls.' Resp. Mot. Bar Green, Ex. 1 ("Green Decl.").

Defendants' second motion to bar Green objects to his July 2016 two-page supplement and the two-page declaration attached to Plaintiffs' response brief. Defendants seek to bar these documents on the grounds that (1) the supplement was tendered to Defendants long after the close of discovery and (2) the supplement and declaration improperly include new expert opinions. In the event that the Court declines to bar these documents, Defendants alternatively seek permission to re-depose Green and to file a reply brief fourteen days after Green's second deposition or the Court's adjudication of this motion. [5]

[5] In addition, Defendants' brief in support of this motion attempts to supplement Defendants' first motion to bar Green by raising a new challenge to the assumptions underlying Green's Initial Report. Specifically, Defendants challenge the Initial Report's use of comparisons to the revenues and costs of the restaurant Dona Cuca, Inc. *See* Def.'s Mot. Strike Supp. Report at 6–7. Because this argument was inappropriately raised in a brief on a separate and unrelated motion, the Court is not obligated to address it. In any event, the argument is unpersuasive for the same reasons discussed above regarding Defendants' other challenges to Green's underlying assumptions.

**\*6** As an initial matter, Plaintiffs maintain that Green's two-page supplement was appropriately and timely tendered to Defendants under Federal Rule of Civil Procedure (FRCP) 26. The Court agrees. Under FRCP 26, an expert report must be supplemented with any additional or corrective information at least thirty days before trial. Fed. R. Civ. P. 26(e)(2) (incorporating by reference the thirty-day pretrial deadline set forth under FRCP 26(a)(3)). Green's supplement, which provided

additional or corrective information by converting the figures in Green's Initial Report from 2011 dollar values to 2016 dollar values, was timely provided to Defendants under this rule. *See* Def.'s Mot. Strike Supp. Report, Ex. A.

Furthermore, because Green's supplement merely performed a mechanical conversion of dollar values to account for the changing time value of money, the Court finds that the supplement did not improperly include new expert opinions. Neither did Green's two-page declaration, which merely restated key points of information that had already been incorporated in Green's Initial Report. *See* Green Decl. ¶¶ 3–7. The Court thus denies Defendants' motion to strike the supplement and declaration.

The Court is unpersuaded that the admission of Green's supplement and declaration warrants a second deposition of Green, given these documents' nature and limited scope. Defendants' request for leave to re-depose Green is therefore also denied. To the extent Defendants' motion requests an extension of time to file a reply brief, the motion is denied as moot.

### III. Plaintiffs' Motion to Bar Psychologist Dr. Alan Jaffe

Plaintiffs and Defendants have offered competing experts to opine on the extent of the emotional pain and suffering Meza has experienced as a result of Defendants' conduct. First, Plaintiffs offer a report by psychologist Dr. Robert Marshall. In 2010 and 2011, Marshall conducted psychological evaluations of Meza that included administration of a test called the Minnesota Multiphasic Personality Inventory, Second Edition ("MMPI-2"). *See* Def.'s Resp. Mot. Bar Jaffe, Ex. D ("Marshall Report"), ECF No. 143. In turn, Defendants offer psychologist Dr. Alan Jaffe as a rebuttal witness. In conducting his own evaluation of Meza, Jaffe administered the Personality Assessment Inventory and two sets of Sentence Completion tests. He also re-administered the MMPI-2 test that Marshall used. *See* Pls.' Mot. Bar Jaffe, Ex. A ("Jaffe Report"), at 2, ECF No. 133.

Plaintiffs have moved to bar Jaffe on multiple grounds. First, they attack the reliability of Jaffe's methodology, challenging aspects of the MMPI-2 and Sentence Completion tests and further challenging Jaffe's failure to use alternative evaluative methods. Second, Plaintiffs

contend that Jaffe's conclusions will not assist the jury because they are speculative, inflammatory, and unsupported. The Court will address these arguments below. [6]

[6]     Plaintiffs' motion to bar Jaffe also attempts to incorporate by reference the report of another one of Plaintiffs' experts, Dr. Louise Fitzgerald, "as though fully set forth herein as additional reasons Jaffe's opinions should be bar[red]." Pls.' Mot. Bar Jaffe at 2 n.1. Parties are not permitted to circumvent the page limits imposed by Local Rule 7.1 by incorporating other documents by reference in this manner, and the Court is in any event not obligated to construct legal arguments not presented in the parties' briefs. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010). The Court therefore declines to consider or construct any additional arguments from Fitzgerald's report in ruling on Plaintiffs' motion to bar Jaffe.

### A. Jaffe's Methodology

#### 1. MMPI-2 Test and the "Faking Bad Scale"

**\*7**  MMPI testing is a widely accepted form of psychological evaluation that is used to "assess multiple dimensions of personality and mental state." Federal Judicial Center, *Reference Manual on Scientific Evidence* 836, 886 (3d ed. 2011). In particular, the MMPI-2 test comprises a number of "scales," and an individual's scores along these scales may correlate with various personality traits or mental states. Included among these scales is the "faking bad scale," or "FBS." An individual's score on the FBS may indicate whether the individual is "faking bad" (*i.e.*, malingering by fabricating or exaggerating his symptoms) or "faking good" (*i.e.*, hiding or understating his symptoms). *See id.* at 836, 841.

In objecting to Jaffe's use of the MMPI-2 test, Plaintiffs focus on the FBS, arguing that the FBS is an unreliable and controversial component of the MMPI-2 test and that Jaffe should therefore be barred from testifying about the FBS test results. The Court disagrees. While the FBS is "not without controversy," "the bulk of the psychological literature appears to support [its] validity." *Id.* at 841 n.150 (citing Nathaniel W. Nelson, et al., *Meta-analysis of the MMPI-2 Fake Bad Scale: Utility in Forensic Practice*, 20 Clin. Neuropsych. 39 (2006)). Moreover, numerous federal courts have recognized the reliability of

the FBS and have admitted expert testimony regarding FBS testing. *See Johnson v. BAE Sys. Land & Armaments, L.P.*, No. 3:12-CV-1790-D, 2014 WL 1714487, at *34 (N.D. Tex. Apr. 30, 2014) (denying motion *in limine* to exclude testimony regarding the FBS on grounds of unreliability); *Johnson v. Rockwell Automation, Inc.*, No. 1:06CV00017JLH, 2009 WL 1748344, at *4 (E.D. Ark. June 17, 2009) (same); *Shea v. Long Island R.R. Co.*, No. 05 CIV 9768 (LLS), 2009 WL 1424115, at *3 (S.D.N.Y. May 21, 2009) (same); *Reiner v. Warren Resort Hotels, Inc.*, No. CV 06-173-M-DWM, 2008 WL 5120682, at *15 (D. Mont. Oct. 1, 2008) ("The Court will deny the motion to exclude the evidence of FBS testing. The test is recognized as valid within the neuropsychology profession. While the test is controversial, Plaintiff can argue the weight of the evidence to the jury."); *see also Kendrick v. Shalala*, 998 F.2d 455, 457–58 (7th Cir. 1993) (discussing testimony from an administrative hearing regarding FBS testing). The Court accordingly declines to bar Jaffe from testifying about the FBS.

### 2. Sentence Completion Tests

Next, Plaintiffs challenge the Sentence Completion tests that Jaffe administered in evaluating Meza. Jaffe's report discusses the Sentence Completion test in only two paragraphs, which read in their entirety as follows:

> Mr. Meza was administered the Sentence Completion —Adult Form on November 2, 2011. Mr. Meza's responses held one major theme throughout the majority of the form. The majority of his responses were in regards to justice and his current litigation. This type of preservation throughout her [sic] answers indicates that he had a clear agenda with an obsessional quality. Additionally, some of his answers were concrete in nature without any level of abstraction. For example, for the sentence stem "Spiritual matters," he responded "God first."

> Mr. Meza was administered the Sentence Completion— Work Form on November 2, 2011. As with the Sentence Completion—Adult Form, the majority of Meza's responses on the Sentence Completion—Work Form were in regards to his current litigation. Furthermore, his responses on the Work form appear to lack a level of abstraction. For example, for the sentence stem "Socializing with co-workers," he responded, "Never do."

Jaffe Report at 17–18. Plaintiffs argue that testimony about the Sentence Completion tests should be barred because the tests are unreliable and because it is unclear what Jaffe concludes from Meza's response to the test questions.

**\*8** In their response brief, Defendants have made no attempt to defend Jaffe's use of the Sentence Completion tests. Where a party fails to advance arguments in support of expert testimony, the party cannot bear its burden of proving the testimony's admissibility. *Lewis*, 561 F.3d at 706. Here, Defendants have provided the Court with no information about the Sentence Completion tests, such as the method employed in conducting the tests or the content and number of questions that the tests comprised. Without such information, the Court has no means of assessing whether the Sentence Completion tests were based on reliable principles or methodologies as required by FRE 702. By failing to defend or explain Jaffe's use of the Sentence Completion tests, Defendants have not carried their burden of proving the admissibility of testimony regarding these tests. *See id.* Jaffe is thus barred from offering such testimony.

### 3. Failure to Use Alternative Methods

Finally, Plaintiffs argue that Jaffe's testimony should be barred as unreliable because Jaffe failed to use various alternative methods of evaluating Meza. Specifically, Plaintiffs criticize Jaffe because he did not conduct a SIRS-2 test, a Structured Clinical Interview for DSM-IV, or an interview assessment for depression or psychological harm. In response, Defendants argue that Jaffe did in fact use a Structured Clinical Interview and also conducted an interview assessment for depression. *See* Def.'s Resp. Mot. Bar Jaffe at 4–6.

Even assuming *arguendo* that Jaffe did not use these alternative methods, as Plaintiffs allege, Jaffe's decision not to use those methods does nothing to undermine the reliability of the methods he did rely upon. The rule that an expert's testimony must be "the product of reliable principles and methods," Fed. R. Evid. 702, does not amount to a requirement that the expert use all methods or even the best methods available. Recognizing as much, the Seventh Circuit has cautioned district courts against choosing between competing methods when determining

whether to admit expert testimony. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013). Jaffe's failure to use the alternative methods that Plaintiffs list is therefore not a basis for excluding his testimony. To the extent that the results of alternative evaluative methods would have cast doubt upon Jaffe's conclusions, Plaintiffs are free to raise this issue on cross-examination, and it will be "the role of the jury to weigh these sources of doubt." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

### B. Jaffe's Conclusions

#### 1. Interpretation of the MMPI-2 Test Results

In addition to challenging the reliability of Jaffe's methodology, Plaintiffs challenge the reliability of Jaffe's conclusions. First, Plaintiffs argue that Jaffe's interpretations of the MMPI-2 test results are too speculative. By way of example, Plaintiffs point to statements in Jaffe's report such as: "Meza's profile indicates that he may have some concerns regarding somatic functioning," and "Meza's score indicates that he may be experiencing a moderate degree of stress as a result of difficulties in some major area of life." Pls.' Mot. Bar Jaffe at 10–11 (quoting Jaffe Report). According to Plaintiffs, such interpretations of Meza's test results are purely speculative because Jaffe has not explained how likely it is that these interpretations accurately describe Meza. Second, Plaintiffs take issue with a portion of Jaffe's report in which Jaffe expresses disagreement with Marshall's interpretation of Meza's score on the "L scale" of the MMPI-2 test.

These arguments are unpersuasive. "Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce." *Manpower*, 732 F.3d at 806 (quoting *Stollings*, 725 F.3d at 765). A district court accordingly "usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's ... conclusions rather than the reliability of the methodology the expert employed." *Id.* The Seventh Circuit has also held that an expert is not required to interpret test results to a degree of scientific certainty in order for his testimony to be admissible. *See Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993).

**\*9** In light of these principles, Jaffe is permitted to testify about his interpretations of what Meza's scores may indicate about Meza's psychological and emotional health. To the extent the accuracy of these interpretations may be uncertain, Plaintiffs can take the opportunity at trial to test "the accuracy of the actual evidence ... with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596).

#### 2. Conclusions in the Summary of Jaffe's Report

Lastly, Plaintiffs seek to bar certain statements made in the summary at the end of Jaffe's report. They contend that these statements will not assist the jury as required by FRE 702 because they are inflammatory and unsupported.

In his summary, Jaffe opines in part: "[I]t is clear from the discrepancy in the test result data given by Dr. Marshall and this examiner that Mr. Meza is attempting to fake bad on the assessments. This ... severely calls into question the accuracy of [Meza's] reporting. This is someone who is obviously trying to manipulate the interpretation of these results." Jaffe Report at 18. In these statements, Jaffe is opining on the credibility or accuracy of Meza's answers to questions that Marshall and Jaffe asked him during their psychological evaluations. Because these statements are based on the results of MMPI-2 and FBS testing, the Court finds that they are sufficiently supported to assist the jury in determining the issue of damages with regard to Meza's emotional pain and suffering.

But other statements in Jaffe's summary fare differently. For example, Jaffe states that Meza has made "outlandish claims" and "on several occasions has blatantly misrepresented the truth." *Id.* Jaffe further states that he "questions the validity of Mr. Meza's character as an individual." *Id.* Having closely reviewed Jaffe's report, the Court agrees with Plaintiffs that these overbroad statements about Meza's general credibility and character are not supported by the evaluations Jaffe conducted. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146.

Because these generalized criticisms of Meza's credibility and character constitute such *ipse dixit* assertions, the Court finds that they are inadmissible under FRE 702.

In addition, Jaffe's statements about Meza's general credibility—as opposed to his statements about the credibility of the answers that Meza gave specifically in the context of Marshall's and Jaffe's psychological evaluations—will not help the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Instead, such statements are more likely to confuse the trier of fact. The jury might misunderstand Jaffe to be opining not merely on Meza's credibility in answering questions during the psychological evaluations, but rather on Meza's credibility in giving testimony during the trial itself. This is another reason why Jaffe's statements about Meza's general credibility are inadmissible under FRE 702.

In sum, as a means of criticizing Marshall's conclusions, Jaffe is permitted to testify about the credibility of Meza's responses to questions that he was asked during Marshall's and Jaffe's psychological evaluations. Similarly, Jaffe may opine as to Meza's psychological and emotional health, to the extent his opinions are based on the results of the psychological evaluations, again as a means of rebutting Marshall's conclusions. But Jaffe is not permitted to testify more generally about Meza's credibility outside the context of the psychological evaluations. Nor is Jaffe permitted to make overbroad statements about Meza's character untethered from the results of those evaluations, such as his statement in the summary of his report that Meza's purported misrepresentations generally call into question "the validity of Mr. Meza's character as an individual." Such overbroad, unsupported statements about Meza's credibility and character shall be barred.

### IV. Defendants' Motion to Bar Psychologist Dr. Louise Fitzgerald

**\*10** To contradict the conclusions set forth in Jaffe's expert report, Plaintiffs have offered psychologist Dr. Louise Fitzgerald as a rebuttal expert. *See* Def.'s Mot. Bar Fitzgerald, Ex. C ("Fitzgerald Report"), ECF No. 131. Defendants have moved to bar Fitzgerald on the grounds that: (1) Plaintiffs failed to timely disclose Fitzgerald's report; (2) Fitzgerald's report is an improper sur-rebuttal report that is not contemplated by the Federal Rules of Civil Procedure; and (3) Fitzgerald's report will not assist the jury because it is confusing, irrelevant, and duplicative.

#### A. Timeliness of Plaintiffs' Disclosure
Plaintiffs disclosed Fitzgerald's report to Defendants on December 26, 2012. Defendants argue that Fitzgerald should be barred because this disclosure was untimely under FRCP 26(a)(2)(D)(ii). For the reasons explained below, the Court disagrees.

FRCP 26(a)(2) requires parties to disclose the written reports of their expert witnesses. An expert's written report must contain a complete statement of the opinions the witness will express, the facts or data considered by the witness in forming those opinions, any exhibits the witness will use, the witness's qualifications, a list of other cases in which the witness has testified as an expert, and a statement of the compensation to be paid for the witness's study and testimony. Fed. R. Civ. P. 26(a)(2)(B). Absent a stipulation or court order, a party must disclose the report of a rebuttal expert witness no later than thirty days after the opposing party discloses the report of the expert witness whose testimony is to be rebutted. Fed. R. Civ. P. 26(a)(2)(D)(ii).

Defendants disclosed Jaffe's expert report on December 19, 2011. They therefore argue that Plaintiffs were required to disclose Fitzgerald's report no later than January 19, 2012, thirty days after Defendants' disclosure. There are two reasons, however, why Plaintiffs were not required to disclose Fitzgerald's report by that date.

First, Plaintiffs' thirty-day disclosure period did not begin to run when Defendants tendered Jaffe's report on December 19, 2011, because Jaffe's report did not disclose all of the information required under FRCP 26(a)(2)(B) at that time. Indeed, after failed attempts to obtain Defendants' cooperation in this regard, Plaintiffs filed a motion seeking in part to compel the completion of Defendants' disclosures under FRCP 26(a)(2)(B)(ii). *See* Mot. Compel at 2–3, No. 11-cv-1702, ECF No. 241. The Court granted this motion during a hearing on December 12, 2012, ordering Defendants to complete their expert disclosures by December 19, 2012. Defendants complied, and Plaintiffs then disclosed Fitzgerald's report on December 26, 2012—well within thirty days after December 19, 2012.

Second, even if Jaffe's report had fully complied with all disclosure requirements from the outset, the record suggests that Plaintiffs were not bound to the default

thirty-day deadline because Defendants agreed to give Plaintiffs an extension of time to disclose Fitzgerald's report. *See* Fed. R. Civ. P. 26(a)(2)(D) (allowing parties to stipulate deadlines for expert disclosures). Defendants now deny ever having made such an agreement. Def.'s Reply Supp. Mot. Bar Fitzgerald at 4, ECF No. 156 ("[D]efense counsel has no recollection of agreeing to give [Plaintiffs] additional time to disclose a rebuttal report."). Yet Plaintiffs' filings and representations to the Court repeatedly suggest that the parties had reached such an understanding, and Defendants have never before objected to these representations. *See* Hr'g Tr. 12/12/12 at 10, Case No. 11-cv-1702, ECF No. 416; Pls.' Mot. Compel at 2, Case No. 11-cv-1702, ECF No. 241; Hr'g Tr. 1/25/12 at 4, Case No. 11-cv-1702, ECF No. 218; Pls.' Mot. Bar Jaffe or Show Cause at 1, Case No. 11-cv-1702, ECF No. 215. Given that these representations were made as late as December 12, 2012, the Court finds that Defendants either agreed to Plaintiffs' request for additional time or, at the very least, did not object to it. For these reasons, the Court declines to bar Fitzgerald's report on grounds of untimeliness.

### B. Whether Fitzgerald's Report Is an Improper Sur-rebuttal Report

**\*11** Defendants also argue that Fitzgerald's report is a sur-rebuttal report to Jaffe's report (which in turn is a rebuttal to Marshall's report) and that such sur-rebuttal reports are not permitted under the Federal Rules of Civil Procedure. The Court rejects this argument for the same reasons it rejected this argument *supra* in connection with Defendants' motion to bar Green. Case law shows that sur-rebuttal expert reports are permissible, *see, e.g.*, Ernst, 2013 WL 4804837, at \*1; Shafer, 2009 WL 1370997, at \*6, and Defendants fail to cite authorities from within the Seventh Circuit suggesting otherwise. Nor have Defendants articulated any undue prejudice that they would suffer if Fitzgerald's report were permitted. The Court therefore declines to bar Fitzgerald on this basis.

### C. Assisting the Trier of Fact

Finally, Defendants contend that Fitzgerald's report should be barred because it is too confusing, irrelevant, and duplicative to assist the trier of fact as required by FRE 702. According to Defendants, the report is confusing and irrelevant because it focuses exclusively on rebutting Jaffe's report, and it is duplicative because it merely restates information already included in Marshall's

report. Defendants also take issue with portions of Fitzgerald's report in which she opines as to the reliability of Jaffe's methodology and the admissibility of expert testimony based on the FBS.

As an initial matter, the fact that Fitzgerald's report is devoted to contradicting Jaffe's report is grounds for admitting it as proper rebuttal evidence, not grounds for excluding it as confusing or irrelevant. Such rebuttal evidence is routinely admitted under the Federal Rules of Evidence. *See* Peals v. Terre Haute Police Dep't, 535 F.3d 621, 630 (7th Cir. 2008). The Court also disagrees that Fitzgerald's report is duplicative of Marshall's report. Even though both reports speak to the issue of Meza's damages for emotional pain and suffering, Marshall's report was prepared before Jaffe's report was made available to Plaintiffs, and Marshall's report therefore could not have included the rebuttal evidence that is offered in Fitzgerald's report.

That said, some portions of Fitzgerald's report are indeed rendered irrelevant by this Court's decision, discussed *supra*, to bar certain portions of Jaffe's report. Specifically, because Jaffe is barred from giving testimony about the Sentence Completion tests and from making generalized statements about Meza's credibility and character outside the context of Marshall's and Jaffe's psychological evaluations, Fitzgerald's rebuttal testimony with regard to these matters is no longer relevant and will not assist the trier of fact. Fitzgerald is therefore barred from testifying about them.

Moreover, Fitzgerald is barred from opining on the admissibility of Jaffe's testimony, as well as from opining that Jaffe's methodology is unreliable for purposes of the *Daubert* standard. Expert witnesses are generally prohibited from offering legal opinion testimony. *See, e.g.*, United States v. Sinclair, 74 F.3d 753, 757 n.1 (7th Cir. 1996) (collecting cases); Sullivan v. Alcatel-Lucent USA Inc., No. 12 C 07528, 2014 WL 3558690, at \*8–9 (N.D. Ill. July 17, 2014). In addition, even if such legal opinion testimony were permissible as a general matter, Fitzgerald is unqualified to give such testimony because she is not, and does not purport to be, a legal expert. *See* Willis v. Sears Holdings Mgmt. Corp., No. 10 C 5926, 2012 WL 3915333, at \*7–9 (N.D. Ill. Sept. 7, 2012) (barring legal opinion testimony in part because expert was not a lawyer and was thus unqualified to give the legal opinions he offered). As such, Fitzgerald may not

opine on the admissibility of Jaffe's testimony or on the reliability of his methodology for *Daubert* purposes. [7] She may, however, testify as to the reliability of the *conclusions* that Jaffe draws, including his interpretations of the test results from his and Marshall's psychological evaluations of Meza. Furthermore, in the course of critiquing the reliability of Jaffe's conclusions, Fitzgerald may also discuss weaknesses in Jaffe's underlying methodology, because such weaknesses speak to the weight that the trier of fact should ultimately give to Jaffe's conclusions. Again, however, she may not opine that Jaffe's methodology is wholly unreliable or otherwise suggest that Jaffe's testimony is inadmissible under *Daubert*.

[7]    For example, in her report, Fitzgerald writes: "Considering the current controversy within the scientific community, it is prudent at this point not to rely on [the FBS] scale.... In addition, controversy exists in the courts considering whether testimony of expert witnesses is admissible if based on the FBS." Fitzgerald Report at 6. Such testimony states a legal opinion and speaks to the reliability of Jaffe's methodology under *Daubert*. It is therefore inadmissible.

**\*12** In sum, Fitzgerald is barred from testifying on matters that are rendered irrelevant by the Court's rulings on Plaintiffs' motion to bar Jaffe. She is also barred from giving legal opinions regarding the admissibility of Jaffe's testimony or regarding the reliability of Jaffe's methodology under the *Daubert* standard. In all other respects, Defendants' motion to bar Fitzgerald is denied.

### Conclusion

For the reasons stated herein, the motions to bar Green in Case No. 11-cv-5561 [123] [154] are denied. The cross-filed motions to bar Jaffe in Case No. 11-cv-5561 [133] and Case No. 11-cv-1702 [399] are granted in part and denied in part. Jaffe is permitted to testify about the reliability of Marshall's conclusions, to the extent they are affected by the truthfulness of Meza's responses to questions asked during Marshall's and Jaffe's psychological evaluations. Jaffe may also opine as to Meza's psychological and emotional health, to the extent his opinions are based on the results of psychological evaluations, again for the purposes of rebutting Marshall's conclusions. But Jaffe is barred from opining as to Meza's credibility outside the context of his answers to questions asked during Marshall's and Jaffe's psychological evaluations. He is also barred from making overbroad statements about Meza's character in general, because such statements are not based on the results of the psychological evaluations. In all other respects, the motions to bar Jaffe are denied. The motion to bar Fitzgerald in Case No. 11-cv-5561 [131] is also granted in part and denied in part. Fitzgerald is barred from testifying about Jaffe's Sentence Completion tests or about Jaffe's opinions regarding Meza's credibility or character in general, in light of the fact that Jaffe's opinions on these matters are barred. She is also barred from testifying about the admissibility of Jaffe's testimony or the reliability of Jaffe's methodology for purposes of *Daubert*. In all other respects, the motion to bar Fitzgerald is denied.

### IT IS SO ORDERED.

### All Citations

Slip Copy, 2017 WL 1151066

---

**End of Document**                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**9**

2012 WL 5947753
Only the Westlaw citation is currently available.
United States District Court,
N.D. Indiana,
Fort Wayne Division.

Thomas L. MORRIS and Karin Morris, Plaintiffs,
v.
FORD MOTOR COMPANY, Defendant.

Civil No. 2:10cv504.
|
Nov. 28, 2012.

**Attorneys and Law Firms**

David W. Holub, Law Offices of David W. Holub PC, Merrillville, IN, for Plaintiffs.

Christopher R. Whitten, Whitten Law Office, Greenwood, IN, Michael T. Terwilliger, Whitten Law Office, Valparaiso, IN, for Defendant.

**Opinion**

*OPINION AND ORDER*

WILLIAM C. LEE, District Judge.

**\*1** This matter is before the court on a motion for summary judgment filed by the defendant, Ford Motor Company ("Ford"), on June 26, 2012. The plaintiffs, Thomas L. Morris and Karin Morris (collectively "Morris"), filed their response on August 10, 2012, to which Ford replied on August 24, 2012. On this same date, Ford filed a Supplemental Designation of Evidence. However, on September 5, 2012, Morris filed a motion to strike Ford's Supplemental Designation of Evidence, to which Ford responded on September 12, 2012.

Also before the court is a motion to strike evidentiary submissions filed by Ford on August 24, 2012. Morris filed his response on September 4, 2012, to which Ford replied on September 11, 2012. Morris filed a surreply on September 14, 2012. However, on September 14, 2012, Ford filed a motion to strike Morris' surreply. Morris responded to the motion to strike surreply on October 30, 2012, to which Ford objected (on grounds of untimeliness)

on November 2, 2012. Morris then replied to Ford's objection on November 5, 2012.

*Summary Judgment*

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Not every dispute between the parties precludes summary judgment, however, since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" warrant a trial. *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir.2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir.2010).

*Discussion*

The following facts are recited by Ford in support of its motion for summary judgment, and do not appear to be disputed. Morris, a truck driver, alleges that on September 21, 2010, he was injured in the State of Ohio when a load of skids fell on him after he opened the trailer doors on the trailer he was transporting. At the time of the accident Morris held a Commercial Driver's License. Morris was employed by Williams, which contracted with Ford Motor Company to transport slip racks[1] between AAP St. Marys Corp (located in St. Marys Ohio) and Ford's Chicago Assembly. Williams was a for-hire motor carrier that operated in interstate commerce under USDOT identification number 344454 and operating authority number MC–216904 issued by the Federal Motor Carrier Safety Act ("FMCSA") or predecessor agencies at the time of the incident on September 21, 2010.

1    The slip racks are also referred to as skids, pallets or, more commonly, as dunnage.

**\*2** After the rims are removed from the slip racks, the empty slip racks are loaded by forklift onto the trailer by Ford employees. As part of his route, after having made a delivery of a trailer containing slip racks with rims, Morris would connect to a trailer loaded with the empty slip racks (dunnage). Before Morris would pick up the trailer with the dunnage, he would inspect the trailer and the dunnage. Before the doors were closed on the trailer, Morris had the opportunity to observe the condition of the load. Drivers of Williams are instructed that if there is a load that is not safe, they are not to take the load, and are to call the Williams dispatcher. Morris was specifically informed of this policy. According to Wayne Miller [2], it was the responsibility of the driver of the tractor to secure the load.

2    Wayne Miller was, at that time, the safety director at Williams.

Before addressing the merits of Ford's motion for summary judgment, the court will first consider Ford's motion to strike Morris' evidentiary submissions. [3] In ruling on a motion for summary judgment, the court should only consider properly designated evidence that would be admissible at trial. *Fed.R.Civ.P. 56(e)*; *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921 n. 2 (7th Cir.1994); *Colan v. Cutler–Hammer, Inc.,* 812 F.2d 357, 365 (7th Cir.1987) (confirming that a district court in a federal summary judgment proceeding may "only consider evidence and statements that would be admissible at trial and that have probative force.").

3    There are two other motions to strike which do not deal specifically with evidence. Morris filed a motion to strike Ford's supplemental reply to its summary judgment motion, and Ford filed a motion to strike Morris' supplemental reply to Ford's motion to strike evidence. Both of these motions are denied, and the court will consider all the briefs that have been submitted.

The Seventh Circuit is clear on the following point: summary judgment may not be defeated by evidence that is not admissible at trial. *Medina v. City of East Chicago, Indiana,* 184 F.Supp.2d 805, 814 (N.D.Ind.2001). Rule 56(e) demands something more than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the truth of the matter asserted. *Cusson–*

*Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992). Thus, designated materials that include legal conclusions, hearsay, irrelevant or immaterial matter, and opinions without an underlying factual basis should be excluded from consideration. *Bradley v. Work,* 154 F.3d 704, 707 (7th Cir.1998) (holding district court was correct in deciding to strike inadmissible hearsay, lay opinions, speculation and conclusions); *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir.1998) (noting that testimony containing inferences and opinions without factual basis, bald assertions and conclusory assertions should be disregarded).

Ford first argues that Morris' Exhibit F, which consists of emails, should be stricken because they have not been authenticated, are irrelevant, and constitute inadmissible hearsay. Before evidence may be admitted, it must be authenticated. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the matter in question is what its proponent claims." *Fed.R.Evid. 901(a).* In *Rogers v. Ford Motor Co.,* 952 F.Supp. 606, 610–11 (N.D.Ind.1997), this court noted that "[i]t is well established that materials submitted for summary judgment must be otherwise admissible." In response to Ford's motion for summary judgment in this case, Morris designated "Exhibit F", which is titled "Emails regarding incident". Ford contends that the designated emails have not been properly authenticated or "otherwise verified". Ford further contends that the emails are not relevant to any of the issues presently before the court.

**\*3** Exhibit F consists of four emails which appear to be from St. Mary's Corp. to Ford, and reference photos of the accident scene, and requests that in the future dunnage be secured with straps to avoid further accidents, as is usually done with their other customers. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Ford argues that the emails designated by Morris say nothing about what Ford knew or should have known regarding the safety of its cargo loading practices. Clearly, the emails at issue were sent after the subject accident and, as such, they have no bearing on what Ford "knew or should have known" before the accident. Morris, however, claims that the emails are relevant in that they show industry practice by another motor company shipper of securing the cargo,

safety concerns, and feasibility at the time of the accident. The relevant issue, however, is whether Ford knew or should have known that its cargo loading practices were unsafe. All the emails show is that another motor carrier is known by Dan Danaher of St. Marys Corp. to secure their loads with straps. The emails do not show or tend to show that it was more or less probable that Ford knew its practices were unsafe. Therefore, Exhibit F will be stricken.

Ford next argues that Exhibit N, which is titled "The Employer's First Report of Injury Form" should be stricken because it is inadmissible hearsay [4] (and double hearsay). Morris is using the report to prove that the cause of the injury was "IMPROPER LOADING BY FORD", as stated in the report. [5] Ford also points out that the injury report is not a Ford document, but a document of a non-party that was prepared for purposes of workers' compensation. Morris counters that the injury report falls within the business records exception to the hearsay rule, Rule 803(6). Morris contends that the report was kept in the regular course of business at Williams, Morris' employer, and that report was completed whenever an employee was injured at Williams. Williams employee, Wayne Miller, authenticated his own words and signature on the report in his deposition.

[4]     Hearsay is a statement, other than one made by the declarant while testifyiing at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(a).

[5]     The same report lists "FAILURE TO FOLLOW DOOR OPENING PROCEDURES" as an unsafe act by the driver (Morris) that caused the injury.

Ford points out that the injury report makes clear that it is a workers' compensation document and the Seventh Circuit has repeatedly held that "reports prepared with an eye toward litigation, even though made in the course of the business' operations, are not admissible under Rule 803(6)." *Thakore v. Universal Mach. Co. of Pottstown, Inc.,* 670 F.Supp.2d 705, 725 (N.D.Ill.2009). However, there is no evidence that the report was prepared with an eye toward litigation, and on its face shows that it was prepared in support of a workers' compensation claim, which is not necessarily "litigation". Moreover, the author of the report, who investigated the accident, testified that he wrote the report in his own words and signed it. Thus, this court finds that the report is admissible as it is not

hearsay, and even if it was hearsay, it appears to meet the business record exception to the hearsay rule. Exhibit N will not be stricken.

**\*4** Next, Ford requests that Exhibit O, an affidavit and expert report by Sterling Anthony, be stricken. Ford argues that Anthony is not qualified to offer expert testimony, that the opinions he has offered are not based upon reliable methodology and that his opinions invade the province of the court. The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the standards set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007). Under Rule 702, "[t]he district court is a 'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru–Con Inc.,* 498 F.3d 734, 741–52 (7th Cir.2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com,* 471 F.3d 745, 749 (7th Cir.2006)). The court's task "is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharm., Inc. (Daubert II),* 43 F.3d 1311, 1316 (9th Cir.1995). Courts are warned against the blind acceptance of a scientific expert's assurance that his conclusions are supported by reliable science. "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method be deemed conclusive.' " *Daubert II,* 43 F.3d at 1315–1316. Courts use a three-step analysis to determine the admissibility of expert testimony: (1) whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education," (2) whether the subject of an expert's testimony is "scientifically reliable," and (3) whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin,* 492 F.3d at 904; *see also Myers v. Illinois Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir.2010).

A witness is only qualified as an expert if the "area in which the witness has superior knowledge, skill, experience, or education," matches the "subject matter of the witness's testimony ." *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990). In examining whether the expert is qualified in the relevant field, the court should consider a proposed expert's "full range

of practical experience as well as academic or technical training." *Smith v. Ford Motor Co.,* 215 F.3d 713, 717 (7th Cir.2000). The proponent of expert testimony has the burden of proving their compliance with Fed.R.Evid. 702. *Daubert,* 509 U.S. at 592.

The issue in the case at bar is whether Ford was responsible for the securement of a load inside a commercial motor vehicle. Ford argues that Anthony simply is not qualified to offer opinions with respect to commercial motor vehicles, the Federal Motor Carrier Safety Regulations or the industry practices with respect to commercial motor vehicles.

**\*5** According to Anthony's curriculum vitae (CV), he received his degree in "packaging engineering". Ford contends that this case clearly does not involve any issues related to the manner in which an item was packaged, but rather, with how a load of cargo was secured in a commercial motor vehicle. Ford also argues that Anthony's "industry experience" is in the areas of packaging, marketing and logistics and experience in these areas is not relevant to the issues in this case.

Morris insists that Anthony's CV shows that he is fully qualified. This CV shows that Anthony received a B.S. in Packaging Engineering, and an M.B.A. in Marketing and Finance, and also took doctoral courses in International Marketing and Logistics. Morris has not explained how any of this education renders Anthony an expert in loading and securing cargo in a commercial motor vehicle. Anthony's CV states that his "Expert Witness Experience" includes actions involving "product liability/ personal injury, failure to warn, regulatory violations, and intellectual property infringement." Again, Morris fails to explain how this experience shows that Anthony is qualified to testify regarding the issues in this case.

In any event, Ford has also argued that there is no way to ascertain the reliability of Anthony's opinions. Ford notes that, by Anthony's own admission, his opinions are based upon nothing more than his review of the discovery in this case and his claimed experience "in packaging, marketing and logistics". Anthony failed to rely upon any independent authority to support his opinions.

The Advisory Committee's note to Fed.R.Evid. 702 provides that "in certain fields, experience is the predominant, if not sole, basis for a great deal of reliable

expert testimony." Nevertheless, the note also provides that "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed.R.Evid. 702 advisory committee's note ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' ")

In the present case, the court agrees with Ford that Anthony fails to provide an explanation for his opinions in conformance with the framework provided by the Advisory Committee's note. Anthony fails to cite to a single authority or describe how he formulated his opinions through his experience. For example, Anthony stated that, "For Ford to have loaded dunnage within a truck without adequately securing the load against in-transit movement was a violation of industry standards; consequently, the load was rendered unreasonable dangerous". The only analysis provided in advance of the conclusory statement is to explain what dunnage is and to state that it can move within a truck if not secured. This is not enough. *See Reed v. City of Chicago,* 2006 WL 1543928, 2–3 (N.D.Ill.2006) (excluding expert's opinion that was based upon his knowledge and the "usual and customary" practices in the industry because he "does not cite to any authority or describe how he formulated his opinions"). By simply invoking his claimed experience without explaining how his expertise led him to reach his opinions, Anthony fails to provide the Court with any means to assess the reliability of his opinions. *See Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.,* 2007 WL 1850858, 7 (N.D.Ind.2007), citing *Zenith Elecs. Corp. v. WH–T Broad. Corp.,* 395 F.3d 416, 419 (7th Cir.2005) (noting that an expert "who invokes 'my experience'... is not an expert as Rule 702 defined that term ..."). Thus this court finds that Anthony's opinions and conclusions are not based upon a reliable methodology.

**\*6** Moreover, Anthony's opinions do not assist the trier of fact and are, rather, impermissible legal opinions and conclusions. Anthony has offered the following opinions in his affidavit and expert report:

A. The injuries suffered by Thomas Morris, when cargo fell on him when he opened the rear door of his truck, were the direct and proximate results of the loading practices at Ford Motor Company Chicago Assembly Plant ("Ford").

B. Ford's loading practices did not utilize adequate load securement methods; therefore, the load was free to shift during transit, an ability that makes the load unreasonably dangerous.

C. By failing to adequately secure the load, Ford violated industry standards that require loads to be rendered immobile within a vehicle.

D. Ford exclusively undertook to load the cargo, and thus, was obligated to use care and skill, as is reasonable as is called for in this industry.

E. Ford failed to use care and skill in securing the load and in fact took no steps to secure the load.

F. Had Ford secured the load and rendered it immobile, per industry standards, Thomas Morris would not have been injured.

G. Ford knew of the foreseeable consequences of inadequately secured loads, including the possibility of injuries stemming from falling cargo, evidenced by a Ford Safety Single Point Lesson, Topic: Trailer Door Opening.

H. Ford knew that common-sense, self-suggesting means of preventing falling cargo is to adequately secure it within the truck, such that the cargo remains immobile throughout transit.

I. I have no criticism of Thomas Morris's behavior in opening the rear door of the truck; in that I have no basis for opining that he was reckless.

Whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide. *N. Ind. Pub. Serv. Co. v. Sharp,* 790 N.E.2d 462, 466 (Ind.2003). "[T]he question of whether a duty to exercise care arises is governed by the relationship of the parties and is an issue of law within the province of the court." *Merrill v. Knauf Fiber Glass Gmbh,* 771 N.E.2d 1258 (Ind.Ct.App.2002). Accordingly, Indiana courts have held that an expert witness was not permitted to testify that the defendant was responsible for a defective condition and owed the plaintiffs a duty. *Merrill,* 771 N.E.2d at 1263, citing *Harman v. C.E. & M, Inc.,* 493 N.E.2d 1319, 1321 (Ind.Ct.App.1986), reh'g denied, trans. denied.

Ford has directed the Court's attention to *Pawlik v. Indus. Engr. & Equip. Co., Inc.,* 2009 WL 857476 (N.D.Ind.2009), supplemented 2009 WL 5341658 (N.D.Ind. Apr.15, 2009), where the Court addressed very similar opinions offered by Anthony. In *Pawlik,* the Court struck many of Anthony's opinions, reasoning as follows:

> In statements 1–3, 5–15, 17–24, and 31–32, Anthony asserts improper legal definitions or asserts legal conclusions. Whether a duty exists is a matter of law, not a matter for a packaging expert. Statements 1, 10, 12 and 14 assert that the crate was defective and "unreasonably dangerous," and that Industrial breached its duty. Statements 2, 5, 6, 8, 9, and 20 label Pawlik's use of force "a reasonably foreseeable act" or "foreseeable." Statement 3 calls any assumption that pallets/crates such as the one here would be handled only mechanically "unreasonable." Statement 7 concludes that Pawlik's actions "were neither reckless nor assumptive of a known (or even believed) risk." Statement 11 asserts a causation argument that but for the defects of the crate, the accident would not have occurred. Statement 13 makes the legal conclusion that Industrial is a seller of crates that puts them "into the commercial stream." Statement 15—clearly without knowledge of the IPLA's legal definitions of "sellers" and "manufacturers"—labels Industrial a crate manufacturer. Statements 17–19 conclude that Industrial breached a reasonable standard of care or express or implied warranties. Statements 21–23 assert that the "open and obvious" defense "is not applicable to the incident crate." Statement 24 asserts that Industrial "knew, or should have known" that its crates would be moved manually. Finally, Statement 32 concludes that Pawlik "was not reckless nor unreasonable in manhandling the crate." All of these statements cross the line from an expert opinion to either legal definitions, legal conclusions, or ultimate questions of fact better left for the jury. As the Seventh Circuit forewarned in Zenith, Anthony is just giving the "bottom line," which is not helpful to the process here, and all these statements are excluded.

**\*7** *Id.* at 10.

In the case at bar, Anthony's opinions likewise cross the line from an expert opinion to either legal definitions, legal conclusions, or ultimate questions of fact better left for the jury. Opinions 'A' and 'F' assert causation arguments that Morris's injuries were the "proximate"

result" of Ford's loading practices or that, but for Ford's failure to render the load immobile, Morris would not have been injured. Opinions 'B', 'C' and 'E' assert that the load was "unreasonably dangerous" and that Ford breached its duty. Opinion 'D' asserts that Ford had a duty, which is again a matter of law for the Court to decide, not a matter for a packaging expert. Opinion 'G' asserts that Ford knew of "foreseeable" consequences of inadequately secured loads. Opinion 'I' asserts that Morris's behavior was not "reckless". Opinion 'H' addresses what Ford knew about "common-sense" and "self-suggesting" means of preventing falling cargo. Clearly, matters that are "common-sense" and "self-suggesting" are not proper matters for expert testimony because they could easily be understood by the average juror. "Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under [Federal Rule of Evidence] 403." *U.S. v. Hall,* 93 F.3d 1337, 1343 (7th Cir.1996).

In the case at bar, as in *Pawlik,* Anthony is providing legal conclusions and invading the province of the Court. For this additional reason Anthony's affidavit, expert report and all references to either, will be stricken.

Next, Ford seeks to strike evidence relating to Morris' damages. Ford argues that such evidence is irrelevant to the issues before the court, as the basis for Ford's motion for summary judgment is that it did not owe a duty to ensure that the load was properly secured. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Although Morris contends that it was necessary to detail his injuries because injury is one of the elements of the tort of negligence, this court agrees with Ford that the extent of the injuries sustained by Morris is not a fact of consequence in determining the motion for summary judgment. In fact, it appears to be undisputed (at least for purposes of the pending motion) that Morris suffered an injury. Accordingly, Morris' damage/injury evidence will be stricken.

Lastly, Ford requests that Exhibit P, titled "Ford Safety Single Point Lesson" be stricken. Ford argues that the document has not been authenticated by affidavit or otherwise verified. Morris claims that the document is self-authenticating pursuant to Fed.R.Evid. 902(7) because

the safety lesson contains Ford's logo at the top left hand corner of the document. However, Rule 902(7) simply provides that the inscription, sign, tag or label, itself, is authenticating, but not the entirety of every item, book, etc., to which it is attached. *See Whitted v. General Motors Corp.,* 58 F.3d 1200 (7th Cir.1995).

**\*8** Morris has also attempted to authenticate the document by designating external evidence in the form of a letter from Ford's former counsel and additional deposition testimony of Steven Knaak. Ford objects, and argues that it is improper and untimely for Morris to now attempt to designate additional evidence in response to a motion to strike. Local Rule 56.1 requires a party responding to summary judgment to designate, within 28 days, any materials that the party contends raise a genuine dispute. After an extension of time, Morris filed his designated materials on August 10, 2012, which did not include the additional testimony and documents he now cites to in order to authenticate his evidence. Then, on September 14, 2012, Morris filed a surreply to Ford's motion to strike, which included the additional evidence (to which Ford now objects). The court, in its discretion, accepts Morris' untimely evidence, and will not strike Exhibit P.

The court will now turn to the motion for summary judgment. Ford argues that it did not owe a duty to Morris to ensure the safety of the load transported by Morris. Ford contends that Federal regulations impose a non delegable duty upon a carrier to secure all loads safely. The FMCSA and regulations promulgated under the Act provide in pertinent part as follows:

Section 392.9 Inspection of cargo, cargo securement devices and systems:

**(a) General.** A driver may not operate a commercial motor vehicle and a motor carrier may not require or permit a driver to operate a commercial motor vehicle unless—

(1) The commercial motor vehicle's cargo is properly distributed and adequately secured as specified in §§ 393.100 through 393.136 of this subchapter.

(2) The commercial motor vehicle's tailgate, tailboard, doors, tarpaulins, spare tire and other equipment used in its operation, and the means of

fastening the commercial motor vehicle's cargo, are secured; ...

**(b) Drivers of trucks and truck tractors.** Except as provided in paragraph (b)(4) of this section, the driver of a truck or truck tractor must—

(1) Assure himself/herself that the provisions of paragraph (a) of this section have been complied with before he/she drives that commercial motor vehicle;

(2) Inspect the cargo and the devices used to secure the cargo within the first 50 miles after beginning a trip and cause any adjustments to be made to the cargo or load securement devices as necessary, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from the commercial motor vehicle; and

(3) Reexamine the commercial motor vehicle's cargo and its load securement devices during the course of transportation and make any necessary adjustment to the cargo or load securement devices, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from, the commercial motor vehicle. Reexamination and any necessary adjustments must be made whenever—

   **\*9** (I) The driver makes a change of his/her duty status; or

   (ii) The commercial motor vehicle has been driven for 3 hours; or

   (iii) The commercial motor vehicle has been driven for 150 miles, whichever occurs first.

In order to clarify Section 392.9 of the FMCSR, an interpretation was issued by the Federal Motor Carrier Safety Administration which states "It is the responsibility of the motor carrier and the driver to ensure that any cargo aboard a vehicle is properly loaded and secured." This interpretation was issued in response to the question: "Does the Federal Highway Safety Administration have authority to enforce the safe loading requirements against a shipper that is not the motor carrier?" Ford was the shipper of the racks and was not acting as a motor carrier. A carrier or its driver must ensure that his "vehicle's cargo is properly distributed and adequately secured." 49 C.F.R. § 392.9(a)(1). Moreover, a shipper cannot force a carrier to haul an unsafe load. *Decker v. New England Public*

*Warehouse, Inc.,* 749 A.2d 762, 766 (Me.2000); 49 C .F.R. § 392.9(a). Therefore, a carrier is required to take steps to prevent or protect cargo from shifting or falling. *See id.* §§ 393.100–393.136. As the Court in *Decker* observed, the nature of the trucking industry suggests that carriers "should have the final responsibility for the loads they haul" because no shipper can force a carrier to accept an unsafe load. *Id.*

Under Indiana law, carriers generally have a duty to load and unload freight that they are responsible for transporting. *See Standard Oil v. Soberly,* 112 Ind.App. 437, 42 N.E.2d 373 (Ind.Ct.App.1942). Although no Indiana appellate court has had an opportunity to rule on a case with facts substantially similar to the present case, courts from other jurisdictions have held that the general rule that carriers are responsible for the safe loading of their trucks extends to preclude personal injury claims filed by drivers against the one who loaded the driver's truck or trailer. *See Decker v. New England Public Warehouse, Inc.,* 749 A.2d 762 (Me.2000).

In *Decker,* the plaintiff driver was injured when a load of pulp bales loaded on his semitrailer shifted and allegedly caused an accident. *Id.* The Plaintiff brought suit against the shipping company that loaded the semi-trailer, and the shipping company moved for summary judgment. *Id.* The trial court granted summary judgment for the shipping company on the basis that it did not owe the plaintiff a duty, and the plaintiff appealed. *Id.* On appeal, the Maine Supreme Court affirmed the trial court's entry of summary judgment and held as follows:

> When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper. The policy behind the *Savage* rule (shown above) is well founded. The everyday practice and understanding in the trucking industry, as aptly reflected in the federal regulations on the subject, reflect that carriers logically should

have the final responsibility for the loads they haul. No shipper ... can force a driver to accept a load that the driver believes is unsafe. By the same token, a driver must take responsibility for the safety of his or her cargo by inspecting and securing the load ... The *Savage* rule simply extends the industry's reasonable understanding to negligence suits involving carriers and shippers ... Most courts now accept the rationale of *Savage* and require carriers to take responsibility for the loads they carry, even if those loads have been improperly loaded by others. Here, the carrier has the opportunity to intercept any problem through inspection. In fact, the carrier's driver is under the obligation to conduct such a safety inspection pursuant to federal law. Carriers, through their drivers, must ensure the safety of their own loads, even when cargo is loaded by shippers. The *Savage* rule that imposes liability on carriers for the loading done by shippers, even when negligent, has been accepted by the majority of modern courts and by federal regulators. After considering both industry practice and traditional duty of care jurisprudence, we accept its reasoning as well. [The shipping company] may only be liable if [the plaintiff's] tractor trailer was loaded negligently and that negligence was undiscoverable through a reasonable safety inspection.

**\*10** *Id.* at 765–67 (citations omitted) (emphasis added).

Under Indiana law, a latent defect is a defect which is not discoverable through reasonable inspection. *Deckard v. Ratcliff,* 553 N.E.2d 523, 524 (Ind.Ct.App.1990). The undisputed evidence in this case is that Morris had the opportunity to observe and inspect his load prior to transport, and again at the security gate at Ford. If the load were not properly loaded as he alleges, or was unsafe,

he was not only *not* compelled to transport the load if he deemed the load unsafe, but could contact the dispatcher at his employer, Williams, to have the load adjusted. Morris could have observed any issues with the load, such as if it had not been loaded in the nose of the trailer, to clearly observe any such condition, which would then by definition be observable and not a latent defect.

Morris does not deny that he had multiple opportunities to inspect the load. Rather, he argues that Ford assumed the duty of properly securing the load by virtue of its "no touch" loading policy. The "no touch" loading policy provided that Ford employees would load the trailer, so that Williams' drivers would not have to touch the load. Ford also did not permit anyone other than a Ford employee to use the forklifts which were necessary to move the load.

This court agrees with Ford that a "no touch" policy does not trump the FMCSA's regulation requiring drivers to inspect cargo and adequately secure the cargo. If, as Morris alleges, the cargo was improperly loaded such that the dunnage did not interlock properly, then it was Morris' duty to point that out and insist that the cargo be loaded properly. Likewise, if Morris believed that straps were needed to properly secure the load it was his duty to note that and request that the straps be secured.

In a case substantially similar to this one, *Hardesty v. American Seating Co.,* 194 F.Supp.2d 447 (Dist.Md.2002), the federal district court in Maryland dealt with a case wherein a commercial truck driver pursued a negligence claim against a shipper for injuries he suffered after he was injured when cargo loaded by the shipper fell on him after arriving at his destination and opening the trailer doors. In *Hardesty,* not only did the shipper exclusively load the cargo onto the subject trailer (the argument made by Morris here), but its employees also took the additional steps of installing metal bracing to retard movement of the cargo while in transit. *Id.* at 449. The driver checked the load after it was loaded, but ignored it while it was being loaded. *Id.* The driver argued that the shipper had improperly loaded the cargo and caused his injury.

The *Hardesty* court rejected the driver's negligence argument. The court ruled that federal law required the driver "to exercise reasonable care for his own safety, in conformity with commonsense federal regulations requiring that before starting on his journey he 'assure

himself ... that the ... commercial motor vehicle's cargo is properly distributed and adequately secured.' " *Id.* at 451.

**\*11** Like the driver in *Hardesty,* Morris had multiple opportunities to inspect the cargo that was loaded by Ford and assure himself that it was properly distributed and adequately secured as he was required to do by the FMCSA. However, despite all of these opportunities to observe and inspect the cargo, and despite the requirements imposed by the FMCSA, Morris accepted the cargo from Ford without any devices used to secure the cargo and delivered it to its destination. The responsibility for securing the cargo in this circumstance is squarely upon the commercial motor vehicle's driver, as required by the FMCSA. The *Hardesty* court ruled that this duty was inescapably the driver's, and the driver could not even rely on the shipper's installation of bracing to protect the load from movement in transit under the FMCSA. In this case, Morris' constrained argument that Williams' "no touch" policy, or the fact that only Ford forklift operators load trailers at Ford's facility, somehow negates Morris' duty to assure himself that the cargo was properly distributed and adequately secured, is without merit.

Morris has attempted to shift the duty to Ford by arguing that the cargo was negligently loaded or loaded in such a way that it created a latent defect. The cargo in this case consisted of plastic trays that have been referred to as "dunnage". These plastic trays are designed so that they interlock when stacked on top of each other. These plastic trays are interlocked and nested on top of each other before the forklift operator picks up a stack of them and loads them on the trailer. The stacks of interlocking trays are loaded in the front of the trailer first, and then the forklift operators work their way toward the back of the trailer.

Morris argues that the photographs of the accident scene, taken after several of the plastic trays fell out of the trailer and onto the ground, are evidence of improper loading by Ford or somehow establish a latent defect. Morris argues that negligence can be inferred based on the appearance of the plastic trays after they had fallen out of the trailer. Morris' counsel asked witnesses during depositions if the photographs of the fallen plastic trays indicated how they were positioned in the truck before they fell out, but omitted that testimony in his response brief. Notably, Morris' counsel had the following exchange with Daniel Danaher, an employee of the consignee who was at the

scene soon after the accident happened and whom Morris relied upon to authenticate the photographs for use in the summary judgment context:

> Q: Can you tell by looking at the photograph or from your recollection whether the dunnage inside the truck was stacked up, upside down, or right side up?
>
> A: I cannot tell. I have no way of telling that.

(Danaher dep., p. 23, lns 12–17.)

Ford notes that Morris has not identified one witness that has testified that the post-accident photographs are indicative of: (1) the manner in which the trailer was originally loaded; (2) the positioning of the plastic trays just before the right trailer door was opened by Morris at the consignee in St. Marys, Ohio; or (3) latent defects caused by the manner in which the trailer was loaded.

**\*12** Ford correctly points out that common law prevents the court from inferring that the post-accident photos are indicative of how the cargo was stacked inside the truck prior to the accident. In *Anderson v. Grifin,* 397 F.3d 515 (7th Cir.2005), the Court ruled that it was a fundamental proposition of tort law that just because "an accident occurs and someone is injured does not establish liability under a negligence standard; the plaintiff has to show that the injury resulted from the defendant's failure to exercise due care". *Id.* at 519. A jury may not infer negligence from the fact that an accident occurred. *Id.* (citing *Perry v. Goss,* 255 N.E.2d 922, 926 (Ind.1970); *Kostidis v. General Cinema Corp.,* 754 N.E.2d 563, 571–74 (Ind.Ct.App.2001)). Negligence on the part of the defendant "can neither be supported by mere speculation or conjecture, nor can they be inferred by the mere fact that an accident occurred which resulted in an injury to a person". *Carter v. John Hennes Trucking Co.,* 210 F.2d 443, 445 (7th Cir.1954).

Morris also argues that Ford's defective loading was somehow latent and prevented Morris from having the opportunity to observe the defects. (Opposition Brief, p. 21) Morris relies on the rule in *U.S. v. Savage Truck Line,* 209 F.2d 442, 445 (4th Cir.1953) to argue that liability falls upon the shipper when it assumes the responsibility of loading cargo. However, the same case stands for the proposition that if any improper loading is apparent, then liability rests with the carrier notwithstanding any negligence of the shipper. *Id.* "Responsibility for

obviously improper loading generally rests on the carrier, even though the shipper loaded the truck." *Franklin Stainless Corp. v. Marlo Transport Corp.,* 748 F.2d 865–868 (4th Cir.1984).

Morris suggests that there may have been some plastic trays upside down or not properly nested which he would not have been able to see. (Opposition Brief, p. 21) Ford counters that this is a speculative assertion because Morris has submitted no evidence of any latent defect caused by the manner in which the plastic trays were loaded. The photographs make plain that the last row of plastic trays on the right side of the trailer fell out of the trailer when the right trailer door was opened. Ford claims that if the plastic trays that fell on Morris were loaded upside down, or were not nested properly, such problems would have been clearly visible to Morris prior to driving off with the load.[6] Also, the absence of devices used to secure the cargo from rearward movement (something Morris is required to assure himself of before driving the tractor-trailer), whether or not the cargo is upside down or interlocked, cannot be said to be latent.

[6]    Curiously, neither party has submitted evidence, such as a photo, showing what the stack of dunnage looks like in a trailer when improperly stacked.

Further, Morris admits he had the opportunity to inspect the cargo and he transported it anyway. Following the accident, Miller, the Safety Director at Williams, investigated the circumstances.[7] As a part of that investigation, Miller had a conversation with Morris and Morris indicated to Miller that he was present when the trailer was loaded and that he preferred that the cargo be pushed more toward the front of the trailer. (Miller dep., p. 35, lns 20–24; p. 36, lns 1–6.) Miller asked Morris about the photographs that indicated that the cargo was toward the back end of the trailer. (Miller dep., p. 36, lns 16–21.) Miller testified that Morris indicated Ford refused to push the cargo forward, but that Morris did not take any affirmative steps to address the problem. (Miller dep., p. 36, lns 23–24, p. 37, lns 1–16.) Therefore, despite the fact that the cargo was not distributed in the trailer in the manner preferred by Morris, he decided to operate the tractor-trailer anyway.

[7]    As noted earlier with respect to the motion to strike evidence, Miller stated on a worker's compensation form that one cause of the accident was improper loading by Ford, and that another cause of the accident was driver error as Morris did not open the doors properly. As there is no evidence to support either statement (as Miller seemed to have assumed that if the load fell it was partly Ford's fault), the statements are not entitled to much, if any, weight. Even if the statements were given weight, they counter each other and Morris is left with a wash.

**\*13** This court finds that there is no admissible evidence of improper loading by Ford. There is also no admissible evidence of any latent defect caused by the manner in which the cargo was loaded. In any event, if there was any defect in the manner in which the trailer was loaded, it was not a latent defect but, rather, one of which Morris had full knowledge and yet Morris transported the load anyway. Under the *Savage* rule, Morris' decision to go ahead and transport the cargo, despite knowledge of improper loading by Ford, imposes liability on the motor carrier and Morris. *U.S. v. Savage Truck Line, Inc.,* 209 F.2d 442, 445 (4th Cir.1953). Accordingly, as Ford has shown that it did not have a duty to Morris to ensure the safety of the load, Ford's motion for summary judgment will be granted.

Ford has also requested summary judgment on Morris' claim that Ford was negligent in hiring its employees and on Morris' request for attorney fees. In his response brief, Morris has agreed to withdraw these two claims.

### Conclusion

On the basis of the foregoing, Ford's motion for summary judgment [DE 35] is hereby GRANTED. Further, Ford's motion to strike [DE 53] is hereby GRANTED IN PART AND DENIED IN PART.

Morris' motion to strike [DE 57] and Ford's motion to strike [DE 61] are both hereby DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5947753

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**10**

2017 WL 2656583
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Stanley SMITH, Plaintiff,
v.
UNION PACIFIC RAILROAD, Defendant.

Case No. 11–cv–986
|
Signed 06/20/2017

**Attorneys and Law Firms**

John Christopher Mullen, Jr., Mullen Law Offices,
Chicago, IL, Amir R. Tahmassebi, Konicek & Dillon,
P.C., Geneva, IL, for Plaintiff.

Tracy Bradford Farley, Brian A. Hartstein, Quarles &
Brady LLP, Chicago, IL, for Defendant.

Opinion

### MEMORANDUM OPINION AND ORDER

Robert M. Dow, Jr., United States District Judge

 **\*1** Before the Court is Defendant Union Pacific
Railroad's motion [112] to exclude the testimony of
Plaintiff Stanley Smith's expert, Timothy Lalk. For the
reasons set forth below, Defendant's motion [112] is
granted. This case is set for status hearing on July 12, 2017
at 9:30 a.m.

## I. Background [1]

[1]      The facts set forth below are drawn primarily from
        Defendant's filing and exhibits. See [113], [113–1]
        through [113–9]. Plaintiff's response does not include
        a statement of facts or any objections to the facts as
        set forth in Defendant's filing.

In September 2005, while Plaintiff was employed by
Defendant as a locomotive engineer, Plaintiff's driver's
license was revoked for driving under the influence.
Plaintiff reported the incident to Defendant, and he
thereafter received a leave of absence through Defendant's
Employee Assistance Program ("EAP"). In October
2005, the EAP referred Plaintiff to a clinician at Rush

University Medical Center ("Rush"), John Houlihan, who
oversaw Plaintiff's voluntary participation in both offsite
inpatient and onsite outpatient treatment for chemical
dependency. The Rush outpatient program specifically
treated alcohol and cocaine abuse, and it was facilitated by
Edward Lynch, a behavioral health clinician. On May 26,
2006, Lynch discharged Plaintiff from Rush's outpatient
program and recommended that he "return to full work
responsibilities, without restrictions, in conjunction with
EAP, and employer." See [117–1] (Lalk Deposition) at
69; see generally [113–5] (Lynch Deposition Excerpts)
at 7–10. Mr. Houlihan thereafter recommended that
Defendant engage another doctor, psychiatrist Stafford
Henry, to conduct a full fitness-for-duty evaluation of
Plaintiff, which Dr. Henry performed in August 2006. Dr.
Henry ultimately recommended that Plaintiff complete
additional items before being permitted to return to work,
including at least one year of documented abstinence from
alcohol and other mood-altering substances and the use
of a C–Pap machine for Plaintiff's sleep apnea. See [113–
4] at 15–16 (9/3/2006 Report of Dr. Henry). Accordingly,
Defendant did not clear Plaintiff to return to work at that
time.

Plaintiff went on to participate in a one-year inpatient
treatment program in Texas from January 2007 to
January 2008. In June 2008, Dr. Henry conducted a re-
evaluation of Plaintiff. Dr. Henry again recommended
that Plaintiff complete additional items before returning
to work, again including a four-to-six month period of
documented abstinence and the use of a C–Pap machine.
See [113–4] at 27–28 (7/5/2008 Report of Dr. Henry).
Defendant began processing Plaintiff for return, but
Plaintiff was not cleared for return by Defendant until
July 2010, due to a delay in scheduling a required sleep
study for Plaintiff and his difficulty in procuring a C–Pap
machine.

In 2011, Plaintiff filed this action against Defendant,
alleging that it discriminated against him in violation of
the Americans with Disabilities Act, 42 U.S.C. § 12101
et seq., on account of his alcoholism because Defendant
did not allow Plaintiff to return to work in 2006 after his
completion of the Rush outpatient program. See [37] at ¶¶
15–18, 21, 31–40.

 **\*2** In support of his claims, Plaintiff has retained
Lalk, a vocational rehabilitation counselor, to render
an opinion as to (1) when Plaintiff was fit to

return to work, and (2) Plaintiff's damages. Lalk is a certified rehabilitation counselor and a Missouri-licensed professional counselor. See [117–2] (Lalk Expert Report) at 7. Lalk received a Master's degree in counseling from the University of Missouri-Columbia in 1979. *Id.* While working towards this degree, Lalk received instruction on chemical dependency counseling and he completed an internship that involved training in the subject area. See [117–1] at 32–37. He has worked in both public and private settings as either a vocational rehabilitation counselor or a vocational services specialist since 1979. [117–2] at 6. In his current position, which he has held since 1995, Lalk primarily conducts vocational rehabilitation evaluations for use in litigation. Specifically, Lalk reviews medical documentation and information regarding an individual's skills, training, and experience to determine that individual's employability and any needed accommodations. See [117–1] at 29. Lalk mainly testifies or otherwise offers opinions in Missouri workers' compensation lawsuits, civil cases in which an individual has sustained an injury that reduces his or her earning capacity, and marriage dissolution matters (where he evaluates the earning capacity of a spouse). See *id.* at 28–29. Lalk also has experience opining on disability-related matters before the Social Security Administration. *Id.* at 18–19. Since 2012, Lalk has offered testimony in more than 140 matters. See [117–2] at 8–19.

Here, Lalk reviewed selected case documents in rendering his opinions, which are laid out in a four-page report. In particular, Lalk's report notes that he relied on: (1) Plaintiff's deposition and the exhibits thereto, (2) the deposition of EAP Director Dr. Mark Jones and the exhibits thereto, (3) "Rush Behavioral Records," (4) the September 3, 2006 Report of Dr. Henry, (5) the July 9, 2008 Report of Dr. Henry,[2] (6) "Union Pacific Progress Notes [ ]," and (7) "Union Pacific Manual."[3] See [117–2] at 5. Lalk's deposition testimony confirms that he did not independently interview or evaluate the Plaintiff in forming his opinions, and neither his report nor his deposition indicate that he consulted or relied on any specific industry or other materials in generating his opinions.[4] See [117–1] at 7; see generally [117–2]. His overall opinions are as follows:

> Based on the materials reviewed referenced in the attachment and my education and experience[,] I have formed the following opinions.

First, [Plaintiff] successfully completed the intensive inpatient [sic] program at Rush Behavioral in May of 2006. At that time, he was fit to return to work and the Defendant should have undertaken [sic] measures to return [Plaintiff] to work in May of 2006. Second, that even after [Plaintiff's] continued treatment[,] the Defendant failed to allow [Plaintiff] to return to work. In late 2008, [Plaintiff] completed further treatment including that which Dr. Henry recommended. [Plaintiff] was fit to return to work at that time and was still not allowed to return. Finally, it is my opinion that the Defendant's failure to allow [Plaintiff] to return to work proximately caused damage to [Plaintiff] in the form of unpaid wages, medical bills[,] and unnecessary professional fees.

[117–2] at 2. Defendant seeks to preclude Lalk from testifying as to all three opinions, arguing that (1) he is not qualified to opine on Plaintiff's fitness to return to work at any point; (2) his opinions are not based on a reliable principles, scientific method, or reliable data; and (3) his testimony will not assist the jury. See [113].

[2]     For clarity, Dr. Henry's report is dated July 5, 2008. He sent the report to Defendant on July 9, 2008. See [113–4] at 17–28.

[3]     Lalk's expert disclosure does not indicate whether these documents were produced in litigation or whether they contain Bates numbering. See [117–2] at 5.

[4]     Lalk indicated in his deposition that he may have reviewed Lynch's deposition, but he could not recall if that was before or after he drafted his expert report. In addition, at times, Lalk testified that he was aware of or had read certain unspecified articles, studies, or other literature. But Lalk failed to name any such sources as materials upon which he relied in drafting his report or to identify them by name or title at any point, and the parties have not provided any indication that Lalk revised his expert report to name

or reference any additional materials following his deposition.

## II. Legal Standard

**\*3** Federal Rule of Evidence ("Rule") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. See *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 permits the admission of expert opinion testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting Fed. R. Evid. 702). Trial courts are obligated to act as a "gatekeeper" to ensure that the expert testimony is both reliable and relevant. See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589. The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152).

To determine reliability, the proponent must show that the expert's testimony is based on "sufficient facts or data" and that it is "the product of reliable principles and methods." Fed. R. Evid. 702. The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *Kumho Tire Co.*, 526 U.S. at 147–49. Expert testimony may not be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; see also *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). District courts have "great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Pansier*, 576 F.3d at 737. And "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

To determine relevance, the proponent must show that the expert's "reasoning or methodology properly can be applied to the facts in issue" and "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Daubert*, 509 U.S. at 592–93; *Smith*

*v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); Fed. R. Evid. 702.

Thus, in evaluating a motion to exclude expert testimony under Rule 702 and *Daubert*, the Court considers whether the proffered expert (1) is qualified, (2) has employed a reliable methodology, (3) offers opinions that follow rationally from the application of the expert's methodology and qualifications, and (4) presents testimony on a matter that is relevant to the case at hand. See *Kumho Tire*, 526 U.S. at 151–53; *Gen. Elec. Co.*, 522 U.S. at 146; *Daubert*, 509 U.S. at 589–93; *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Still, the Court is mindful that question of whether the expert is credible or whether his theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based. *Smith*, 215 F.3d at 719.

## III. Analysis

### A. Lalk's Qualifications

**\*4** The first issue the Court must address is whether Lalk possesses the necessary qualifications to offer an expert opinion in this case. Rule 702 permits a witness to testify in the form of an opinion or otherwise if qualified as an expert by knowledge skill, experience, training or education. An expert is not entitled to offer opinions outside of his or her realm of expertise. See *United States v. Pree*, 408 F.3d 855, 871 (7th Cir. 2005) (citing *United States v. Benson*, 941 F.2d 598, 605 (7th Cir. 1991)).

Defendant argues that Lalk's opinions in this case are outside the scope of his expertise. In particular, Defendant asserts that Lalk cannot opine on when Plaintiff was able to return to work because (1) he is not a doctor; (2) he does not diagnose or treat alcoholism, drug abuse, or other conditions; (3) he has never conducted a return-to-work or fitness-for-duty examination; and (4) he has "zero relevant experience with locomotive engineers." See [113] at 8. In short, Lalk lacks direct experience with the

narrow vocational issues involved in this case. [118] at 2–3. Plaintiff responds by generically emphasizing Lalk's long career as a vocational rehabilitation counselor and his "extensive experience" in evaluating whether a person is capable of performing a particular job or task or returning to work, and by arguing that Lalk is being offered to provide a vocational opinion, not a medical diagnosis. See [117] at 2–4.

A review of Lalk's resume and deposition testimony demonstrates that he is qualified to render an opinion as a vocational expert in this matter. Lalk is a licensed and certified counselor with approximately 38 years of experience as a vocational counselor or specialist, and he has offered vocational opinions in more than 140 matters in the last five years. He testified that he has significant experience with return-to-work and other employment considerations by way of his work on workers' compensation cases. See [117–1] at 19. Accordingly, Lalk's opinions on Plaintiff's ability to return to work are within the realm of his experience in evaluating the vocational capabilities. *Pree*, 408 F.3d at 871. Defendant's argument that Lalk should be disqualified from testifying in this particular case because he is not a doctor with expertise in substance abuse is inconsistent with the liberal approach to expert witness qualification taken by Rule 702. See *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 801 (N.D. Ill. 2005). Further, Plaintiff has confirmed that Lalk is not being offered to diagnose Plaintiff's substance abuse, but instead to opine on Plaintiff's ability to return to work. See [117] at 3. "While making objective medical findings and diagnoses may be medical issues, once an individual's capabilities are defined, matching those abilities to a particular profession is not a medical matter or opinion." *Brewer v. Cuyahoga Valley Railway Co.*, 2004 WL 5508630, at *1 (N.D. Ohio Oct. 14, 2004) (finding vocational expert qualified to testify about a plaintiff's capabilities to return to work as a locomotive engineer). The same can be said about Defendant's overly restrictive argument that Lalk should be disqualified because he has not previously worked with locomotive engineers. See *id.* (finding the suggested requirement that vocational expert have previous experience with locomotive engineers too restrictive); see also *Smith*, 215 F.3d at 720 (district court erred in concluding that experts were not qualified in a relevant field solely because their expertise related to an area other than the one concerning the ultimate issue to be decided by the trier of fact).

**\*5** Although Defendant rightly points out that Lalk lacks experience in performing specific return-to-work evaluations and that his experience with chemical dependency issues is thin and arguably out-of-date, the Court believes that disqualifying Lalk on these bases would amount to too narrow of a reading of Rule 702. As the Court finds that Lalk has the requisite foundation to offer opinions on Plaintiff's vocational abilities, Lalk's lack of specialization goes to the weight of his testimony, but does not disqualify him.

**B. Lalk's Opinions**

Finding that Lalk is qualified to offer vocational opinions in this case, the Court next analyzes whether the opinions offered by Lalk are sufficiently reliable and relevant to be presented to a jury. The reliability analysis focuses on the methodology of the expert. See *Clark v. Takata Corp.*, 192 F.3d 750, 756–57 (7th Cir. 1999). The relevance inquiry focuses on the application of the methodology and whether the expert testimony will assist the trier of fact with its analysis of any of the issues involved in the case. *Id.* at 757; *Smith*, 215 F.3d at 718.

1. Opinion that Plaintiff Was Fit
to Return to Work in May 2006

The parties do not dispute that Plaintiff completed Rush's intensive outpatient treatment program in May 2006. In his first opinion, Lalk uses this fact to draw the conclusion that, at the time of completion, Plaintiff was "fit to return to work." See, *e.g.*, [117–2] at 3 ("The discharge report from Rush Behavioral establishes that [Plaintiff] was fit to return to work."). Defendant argues that Lalk's opinion both is not based on a reliable method and is irrelevant. The Court agrees.

Turning first to Lalk's methodology, an expert must substantiate his opinion, and not simply provide the ultimate conclusion without analysis. *Clark*, 192 F.3d at 757 (citation omitted). The entirety of Lalk's "analysis" of whether Plaintiff was "fit to return to work" following his completion of the Rush outpatient treatment program hinges on Lalk's discussion of "two central criteria looked at when determining whether an individual is fit to return to work after treatment for substance abuse." [117–2] at 2. Lalk's report does little more than reference these general

"criteria" and then conclusively set forth Lalk's subjective belief that their application proves that Plaintiff was fit to return to work in May 2006.

Specifically, the report states that these criteria are: (1) "whether the individual's job will invoke stress that would cause or trigger [him] to abuse drugs or alcohol," and (2) "whether that person will put others in danger if he is returned to work." *Id.* Through his report and deposition, Lalk fails to elaborate on these criteria, stating amorphously that they are drawn from "primarily overall training review of various pieces of literature on the subject and basically [Lalk's] own experience working with individuals with alcohol and drug dependencies" from 1979 to 1990. See [117–1] at 72–74. Lalk does not explain how to apply, analyze, or interpret the criteria. It appears from Lalk's report that the simple answers (1) "it will not" and (2) "he will not" could equal fitness to return to work, but this is not clearly set forth by Lalk in either his report or testimony.

In applying the first criterion, Lalk states that Plaintiff's "return to work in May of 2006 would not have put in him a position of stress so much as it would have resulted in him falling into substance abuse." [117–2] at 2–3. Lalk concedes that this conclusion is based on the absence of what he might consider relevant information in the records he reviewed. See [117–1] at 75 ("[T]here never seemed to be any issue in any of the records that I reviewed of [Plaintiff] ever abusing alcohol or drugs related to his job."); see also [117–2] at 3 ("there was no record of [Plaintiff] ever abusing alcohol or drugs while working for the Defendant[ ]"). In addition, Lalk explains that his conclusion regarding Plaintiff's stress levels rested on his unspecified "experience" "that a person that is working is usually under less stress than a person that's unemployed," not on any information specific to Plaintiff. See [117–1] at 75; see also *id.* at 76 ("there was never any indication" of Plaintiff's tolerance for stress in his work environment), 77–78 (explaining that some individuals derive stress from a fast-paced work environment and others thrive in that environment; "I don't know which—which type [Plaintiff] is."). For the second criterion, Lalk again relies on the lack of "evidence that [Plaintiff] would be a danger to himself or others or that he could not perform his job duties" in the documents he reviewed in this case. *Id.* at 3; see also [117–1] at 85 ("There was nothing in the record that suggested to me that his abuse of alcohol or drugs was in any way connected directly with performance at work.").

**\*6** Defendant argues that the two criteria discussed by Lalk are not adequately established and were not reliably applied. [113] at 9–10. The Court agrees on both counts. First, Lalk has not provided any industry support as to how the criteria have been established—or any citation to where these criteria can be found—nor does he describe whether these criteria have been tested or subjected to peer review. In his deposition, Lalk again failed to explain where these criteria are found or how they are utilized by vocational counselors. See *Elcock v. Kmart Corp.*, 233 F.3d 734, 749 (3d Cir. 2000) (finding methodology of vocational rehabilitationist unreliable where she failed to introduce any evidence that the method was used by other experts or even referenced in vocational literature). What is more, Lalk does not describe any standards controlling this methodology, and in applying the criteria himself, Lalk relied only on speculation drawn from: (1) the absence of explicit statements in the limited records he reviewed and (2) his subjective and uninvestigated beliefs regarding Plaintiff's stress levels and tolerance. With these flaws, Lalk's "analysis" of Plaintiff's fitness to return to work in May 2006 is unreliable. See *Myers v. Ill. Central Railroad Co.*, 629 F.3d 639, 645 (7th Cir. 2010) (expert opinions that were based on a "hunch or an informed guess" were properly excluded); see also *Brown v. Burlington N. Santa Fe Railway Co.*, 765 F.3d 765, 773 (7th Cir. 2014) (affirming the exclusion of expert testimony that was premised on faulty methods and lack of investigation).

*Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809 (7th Cir. 2004), cited by Defendant, [113] at 15, supports this result. There, the Seventh Circuit affirmed the exclusion of expert testimony from a vocational rehabilitation counselor that the district court found to be speculative. Specifically, the proffered expert opined that plaintiff was capable of performing his job duties while acknowledging that she could offer no opinion on whether the plaintiff could perform specific job-related tasks. *Ammons*, 368 F.3d at 816. Similarly, in formulating his first opinion, Lalk states that Plaintiff was fit to return to work in May 2006 because a return would not have caused him stress, all the while acknowledging that he could not testify as to Plaintiff's work-related stress or tolerance thereof. [5]

[5]    Given that Lalk's report states that the Rush discharge report itself "establishes that [Plaintiff was

fit to return to work," it is unclear whether Lalk's "analysis" of the two above-described criteria played any real role in his conclusions. See [117–1] at 91 ("If [Lynch is] indicating that [Plaintiff] could return to work at full responsibilities without restriction, then I'm not sure what else the EAP was looking for. He had met the requirements of the treatment program, so I would certainly accept the opinion of the discharge summary."). Giving Plaintiff the benefit of the doubt, the Court has analyzed Lalk's "application" of the criteria as his methodology, but the Court notes that Lalk's testimony obscures whether he even relied on his own criteria in rendering his opinion or whether he simply came to the conclusion on the face of the Rush discharge report alone. Either way, the only thing connecting the data and Lalk's opinion is his own say-so, which is unacceptable. See *Gen. Elec. Co.*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

In response, Plaintiff, who bears the burden of establishing that Lalk's testimony satisfies the *Daubert* standard, argues that Lalk's extensive expertise is the basis of his methodology and that courts have found the simple application of expertise to case documents to be an acceptable methodology. [6] See [117] at 5. The Court acknowledges that an expert's reliance on experience alone does not render his opinion unreliable, see 2000 Advisory Committee Notes to Rule 702, but both Plaintiff and Lalk fail to sufficiently explain how he has applied his extensive expertise to the facts of this case. His report only offers factual recitations and conclusions without any tangible substantiation. *Clark*, 192 F.3d at 757. The Seventh Circuit is clear: "[t]alking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (citation omitted); see also *Zenith Elecs. Corp. v. WH–TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) (" 'expert intuition[ ]' is neither normal among social scientists nor testable—and conclusions that are not falsifiable aren't worth much to either science or the judiciary").

[6] Plaintiff cites *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 71 F. Supp. 3d 866 (S.D. Ind. 2014) in support, but the Court finds the expert analysis in that case distinguishable. That expert (who was designated to provide testimony on the protectability of a trade dress) derived his opinion from his expertise, the facts of the case, and his "extensive review of the MP5 in comparison to other guns of similar type available in the market." *Id.* at 907–08. And in presenting his opinion, he provided sufficient factual discussion and analysis to enable the fact finder to infer that the MP5 at issue in the litigation had acquired a secondary meaning, rather than merely presenting the conclusion that it had acquired a secondary meaning.

*7 The Court further disagrees with Plaintiff's suggestion that vocational experts are not suited to the use of scientifically reliable methods in generating their opinions. To this point, other courts have found the well supported opinions of vocational experts to be reliable and scientifically sound, unlike the speculative and conclusory opinion Lalk offers here. See, *e.g.*, *Hale v. Gannon*, 2012 WL 3866864, at *4–*5 (S.D. Ind. Sept. 5, 2012) (finding vocational expert's methodology to be scientifically reliable where expert derived plaintiff's functional limitations from medical records; applied light work limitations from the Dictionary of Occupational Titles; used the Bureau of Labor Statistics to determine wages; utilized a scientific report regarding work-life expectancy; and cited all of these sources in her report); *Orner v. Nat'l Beef Packaging Co., LLC*, 2015 WL 8334544, at *9–*10 (M.D. Pa. Dec. 9, 2015) (vocational rehabilitation expert's methodology was reliable where he reviewed ADA treatises, met with and evaluated the plaintiff, inspected the plaintiff's work area, observed the plaintiff's work environment, and researched potential tools to assist the plaintiff at work; "importantly, [this methodology] can be replicated, tested, verified, or debunked"); *Brewer*, 2004 WL 5508630, at *2 (regarding the reliability of a locomotive-engineer return-to-work opinion offered by a vocational expert, noting, without deciding, that the expert relied on a treatise, plaintiff's medical records, job descriptions in the Dictionary of Occupational Titles, an interview regarding the plaintiff's job responsibilities, and other things); see also *Elcock*, 233 F.3d at 747 (a vocational rehabilitationist assessing an expert's determinations would want to be able to test the underlying hypotheses and review the standards controlling the operation of the techniques applied in an attempt to reproduce the results).

The Court simply cannot discern the requisite link between the records on which Lalk relied and his conclusion that Plaintiff was fit to return to work upon his completion of the Rush outpatient treatment program in 2006. *United States v. Mamah*, 332 F.3d 475, 478

(7th Cir. 2003) ("It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support."); *Gen. Elec. Co.*, 522 U.S. at 146. In formulating his opinion, Lalk does little more than review Plaintiff's discharge statement from Rush, note the absence of certain information in the documents reviewed, impute unsupported generalities to Plaintiff, and reach a bottom line conclusion. In so doing, Lalk provides nothing more than subjective assertions that are impermeable to challenge and incapable of repetition by anyone other than himself. In short, Lalk's opinion that Plaintiff was fit to return to work in May 2006 amounts to the kind of *ipse dixit* that the Supreme Court has prohibited (see *Gen. Elec. Co.*, 522 U.S. at 146) and is therefore inadmissible. [7]

[7]   Plaintiff argues that the medical records Lalk reviewed in forming his opinions are reliable, and he cites *Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000), for the proposition that "[m]edical professionals reasonably may be expected to rely on self-reported patient histories." (Citation omitted). This argument misses the point. Not only is Lalk, by Plaintiff's own admission, not a medical professional so as to be covered by this proposition, but Defendant has not argued at any point to date that Lalk's review and reliance on Plaintiff's medical records renders his opinions unreliable. True, Defendant argues that Lalk did not rely on sufficient facts or data to support his opinions, but that is not the same. Further, the use of a permissible or reliable source cannot save Lalk's speculative and conclusory opinion here, which lacks the connective reasoning that ties those records—or any other supporting data—to the expert's ultimate opinions.

As an additional point, Lalk's opinion that Plaintiff was fit to return to work in May 2006 is also irrelevant. The relevance inquiry focuses on the application of an expert's methodology to the facts of the case and the overall helpfulness to the jury. *Daubert*, 509 U.S. at 593; *Smith*, 215 F.3d at 718. First, as already discussed, Lalk "methodology" is all but non-existent. Second, to the extent that Lalk's opinion merely notes that Defendant did not accept the discharge report at face value, this is readily apparent from the face of the documents in this case and Lalk does not offer any specialized knowledge in highlighting the dispute. See, *e.g.*, [117–1] at 70 ("I'm just pointing out that [Dr. Henry's] conclusions seemed to be different than the opinions of the treating personnel, the

medical personnel at Rush."), 91 ("If [Lynch is] indicating that [Plaintiff] could return to work at full responsibilities without restriction, then I'm not sure what else the EAP was looking for."); see also *Benson*, 941 F.2d at 604 (it was an abuse of discretion to admit expert testimony that, in part, drew inferences the jury was qualified to draw). Third, "[a]n expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful." *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014); see also *Benson*, 941 F.2d at 604 ("[T]he jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury."). Lalk's opinion at times parrots the Rush discharge report completed by Lynch, while at the same time discrediting the conclusions reached by Dr. Henry. For example, Lalk's report states that Plaintiff denies making certain statements to Dr. Henry in 2006, and that it is Lalk's opinion that "[i]f the jury were to accept [Plaintiff's] testimony there is absolutely no basis for any further treatment." [117–2] at 3. Not only does this opinion border on an impermissible credibility determination, *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("[A]n expert cannot testify as to credibility issues."), in opining as to whether additional medical treatment was required, it also pushes Lalk's opinions beyond the bounds of his vocational expertise and purports to offer a medical opinion that he is not qualified to give. For all of these reasons, Lalk's opinion that Plaintiff was fit to return to work in May 2006 does not satisfy *Daubert*.

### 2. Opinion that Defendant Improperly Denied Plaintiff the Opportunity to Return to Work in 2008

**\*8** The Court also finds Lalk's second opinion, that "Defendant[ ] again improperly denied [Plaintiff] the ability to return to work" at some indefinite point in 2008, unreliable. Lalk's report indicates that this opinion is supported by (1) Plaintiff's completion of additional treatment and (2) Defendant's improper "stalling" or "unnecessary delay." [117–2] at 3. To the extent that Lalk opines that Plaintiff was able to return to work in 2008, this opinion is *ipse dixit* like his first opinion. To the extent that Lalk offers an opinion on Defendant's motives and rationale, this opinion is again speculative and it also improperly opines on matters outside of Lalk's expertise.

First, in discussing Plaintiff's abilities, Lalk jumps from facts to conclusions with even less "analysis" than his first opinion. Lalk's report states that Plaintiff had completed "nearly two (2) years of additional treatment," he had "a period of sobriety since 2006," and at one point, he "successfully completed" certain requirements set forth by Dr. Henry. See *id.* Despite listing these factors, Lalk does not explain what about the additional treatment, period of sobriety, or completion of Dr. Henry's requirements qualified Plaintiff to return to work. In fact, he does not even attempt to (1) apply the two aforementioned "criteria" Plaintiff's situation in 2008, (2) analyze Plaintiff's fitness or abilities by any other method or rubric, or (3) discuss Plaintiff's job requirements or work environment. Again, *Daubert* requires that an expert's opinion must be grounded in "methods and procedures," and must consist of more than simply "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589. It may well be that this opinion lacks analysis because it is inherently reliant on Lalk's first opinion that Plaintiff was fit to return to work as of May 2006. As the Court already explained, that opinion is unreliable, and as such, any subsequent opinion predicated on that opinion, without any independent methodology or analysis, is also unreliable. See *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 745.

Second, to the extent that this opinion discusses Defendant's "improper denial" instead of Plaintiff's vocational fitness, Lalk concedes that it is based entirely on speculation. See *Ammons*, 368 F.3d at 815 (affirming the exclusion of expert testimony that was not based on any specific methodology applied to the facts but was only unsupported speculation). Specifically, at his deposition, Lalk conceded that he did not know why Defendant "stalled" Plaintiff's return to work: "I don't know if [Defendant was] doing that because [it was] following the advice of Dr. Henry, somebody misfiled paperwork, somebody had a grudge against [Plaintiff]. I can figure out all sorts of things that might be happening but I don't have the records of the decision makers at that time or what exactly was going on. So I'm just concluding that this may have been the reason why he was not reinstated in 2008." See [117–1] at 107. Moreover, in this opinion, Lalk again steps beyond the realm of his expertise in vocational matters to opine on the propriety of Defendant's actions. See, *e.g.*, [117–2] at 3 (discussing the sleep study and C–Pap machine issues, and opining that Defendant should have "addressed this issue in 2006, while [Plaintiff] still had

insurance."). These are not opinions that Lalk is qualified to provide, as they have nothing whatsoever to do with Plaintiff's vocational rehabilitation or abilities. See [117] at 3. Accordingly, the Court finds that Lalk's second opinion is unreliable and inadmissible.

### 3. Opinion on Damages

In his third opinion, Lalk concludes that "Defendant's failure to allow [Plaintiff] to return to work proximately caused damage to [Plaintiff] in the form of unpaid wages, medical bills and unnecessary professional fees." [117–2] at 2. Specifically, Lalk notes that Plaintiff made $72,000 as an engineer in 2005, and he therefore opines that Defendant's failure to return Plaintiff to work "resulted in an approximately $360,000.00 loss in wages and earnings." *Id.* at 3–4. Lalk's report does not specify the amount of medical and professional fees that Plaintiff "had to pay," although it notes that Defendant "cover[ed] the costs of treatment by way of Plaintiff's insurance." *Id.* at 2, 4. At his deposition, Lalk testified that the basis for his opinion on Plaintiff's damages was "a gross estimate of what [he] was told [Plaintiff's] wages were and the amount of time that he was not working"; Lalk testified that he procured this information from Plaintiff's deposition. [117–1] at 119. Lalk confirmed that in coming up with his damages amount, he performed a "straight back pay calculation," simply multiplying Plaintiff's yearly wages ($72,000) by the amount of time he was out of work (four years). *Id.* at 119–20. Defense counsel pointed out that $72,000 multiplied by four equals $288,000, not $360,000. Lalk agreed that he had miscalculated Plaintiff's back pay. *Id.* In addition, Lalk testified that he did not consider benefits in his calculation, and he confirmed that he did not consider mitigation, even though he agreed that any back pay wages should be reduced by the amount of mitigation. *Id.* at 120–22. Finally, as to the medical and professional fees Lalk mentioned in his damages opinion, Lalk conceded that he did not have dollar amounts for either, and he confirmed that the "professional fees" referenced are attorneys' fees. *Id.* at 122–23.

**\*9** Defendant argues that Lalk's damages opinion is not reliable or relevant. See [113] at 11–12, 14. Plaintiff does not offer a specific response to Defendant's arguments on Lalk's opinion on damages. The Court again agrees with Defendant. [8] As to Lalk's opinion on Plaintiff's back-pay damages, his "gross estimate" is speculative and does not

demonstrate the level of "intellectual rigor" envisioned by *Daubert*. In addition, his report contains a mathematical error in the straightforward back pay calculation, and Lalk admittedly did not consider any other information or items other than Plaintiff's annual wages in forming this opinion. He does nothing to analyze or include mitigating factors or benefits paid by Defendant. Perhaps even more strikingly, Lalk does nothing to analyze or even attempt to estimate the non-back pay damages on which he purports to opine. As such, Lalk's damages opinion is not based on "sufficient facts or data" as required by Rule 702, and it is not reliable. [9]

[8] Lalk's opinion on damages is also impermissible to the extent that it states a legal conclusion, *i.e.*, that Defendant "proximately caused" Plaintiff's damages. See *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (excluding expert testimony that consisted of legal conclusions).

[9] Lalk's opinion that Plaintiff's damages include his attorneys' fees also is impermissible. Although the ADA permits an award of "reasonable attorney's fees" to the prevailing party, 42 U.S.C. § 12205, Lalk is neither qualified to opine on this topic in general nor does he have any personal knowledge of the actual fees or work involved. This is apparent through the absence of any attempt in his report to quantify the total amount of attorneys' fees, let alone "reasonable" attorneys' fees.

Further, Lalk's simple back pay calculation based on figures supported only by testimony elicited in Plaintiff's deposition does not involve the application of specialized knowledge to the facts of the case. Because any layperson can grasp the simple concept and conduct the same analysis employed by Lalk here, his opinion on Plaintiff's damages in this case also is inadmissible because it is not relevant. See *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 329 (N.D. Ill. 2008) ("[N]o expert testimony is needed when the subject matter of the testimony is clearly within the average person's grasp."). Not only that, Lalk's statement that Plaintiff has some unspecified amount of non-back pay damages provides nothing of use to the jury.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to exclude Lalk's testimony in this case [112] is granted. This case is set for status hearing on July 12, 2017 at 9:30 a.m.

**All Citations**

Slip Copy, 2017 WL 2656583

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**11**

**2014 WL 3558690**
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

John P. Sullivan, D.D.S., J.D.,
and Stephen D. Helm, Plaintiffs,
v.
Alcatel–Lucent USA Inc., a
Delaware Corporation, Defendant.

No. 12 C 07528
|
Signed July 17, 2014

**Attorneys and Law Firms**

James Michael Wagner, Steve Helm & Associates, Mary Elizabeth Damitio, Patrick John Kelly, Stephen Douglas Helm, Helm & Wagner, Naperville, IL, John P. Sullivan, Sullivan Law Firm, Warrenville, IL, for Plaintiffs.

Gary L. Taylor, Abigail Jane Jung, Kaitlyn Anne Wild, Polina Arsentyeva, Rathje & Woodward LLC, Wheaton, IL, Gregory Wheeler Jones, Greg Jones, Attorney at Law, Chicago, IL, for Defendant.

**Opinion**

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

**\*1** Defendant Alcatel–Lucent USA, Inc. ("Lucent" or "Defendant") has moved to strike portions of the written report of Plaintiffs' expert, Brian P. Liston, and to bar related testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). For the reasons discussed below, the Court grants Lucent's motion.

### BACKGROUND

Lucent owns commercial property in Naperville, Illinois ("Naperville Property") (R. 93, Pls.' Rule 56.1 Stmt. Facts ¶ 3) and decided, in late 2010 or early 2011, to contest the 2010 real estate tax assessment of that property. (R. 104, Def. Rule 56.1 Stmt. Add'l Facts ¶

3). Following an unsuccessful appeal on the 2010 tax assessment, Plaintiff John Sullivan, an attorney who had assisted with the processing of Lucent's appeal, had a discussion with the Lisle Township Assessor, John Trowbridge ("Trowbridge"), who proposed a settlement offer reducing the 2010 and 2011 tax assessment for the Naperville Property. (Def. Stmt. Add'l. Facts ¶ 7.) Sullivan recommended to Lucent's in-house counsel, Lewis Lefkowitz ("Lefkowitz"), that Lucent decline the offer and file an appeal of the 2010 assessed valuation of the Naperville Property with the state review board. (R. 104–1, Feb. 6, 2011 Email.) Sullivan wrote to Lefkowitz that "Steve Helm and I would negotiate a contingent fee agreement to represent ALU on this (similar to the Forest Preserve agreement but with the % fee based on the 1st year savings only)." (*Id.*)

Lefkowitz retained Sullivan and Plaintiff Stephen Helm to prosecute the appeal in front of the Illinois Tax Appeal Board ("PTAB"). (Pl. Stmt. Facts ¶ 8.) The parties entered into a contingent fee agreement which provided that Plaintiffs' fee "will be structured as a fee contingent on savings on the current year's taxes in these actions as follows: (a) 25% of such amount if the matter is settled or otherwise resolved prior to trial; or (b) 30% of such amount if the matter is settled or otherwise resolved after trial." (R. 89–7, Contingent Fee Agreement.)

On April 18, 2011, Plaintiffs filed before the PTAB a Commercial Appeal for Assessment Year 2010 for the Naperville Property on behalf of Lucent. (Pl. Stmt. Facts ¶ 27.) The City of Naperville and School District 203 intervened in the PTAB Appeal because they already had received funds from Lucent's 2010 real estate taxes on the Naperville Property. (Pl. Stmt. Facts ¶ 41.) On or about October 27, 2011, the Lisle Township Assessor assessed the value of the Naperville Property for the 2011 calendar year at $42,829,710, which represented an increase of the $160 over the 2010 assessed value. (*Id.* ¶¶ 29–31.) On November 21, 2011, Sullivan executed a "Letter of Authority to Act in Matters of Property Taxation" that appointed Sullivan to represent Lucent as its property tax agent with respect to the Naperville Property. (R. 89–16, Letter of Authority.) Pursuant to that Letter of Authority, on November 23, 2011, Plaintiffs filed an appeal for Tax Year 2011 with the DuPage County Board of Review ("2011 Assessment Appeal"). (Pl. Stmt. Facts ¶ 35.) The parties did not execute a new agreement to

address Plaintiffs' work negotiating the 2011 Assessment. (Pl. Stmt. Facts ¶ 58.)

**\*2** After filing the 2011 Assessment Appeal, Plaintiffs began negotiating with Trowbridge regarding the 2010 PTAB Appeal and the 2011 Assessment Appeal. (*Id.* ¶ 37.) Plaintiffs successfully negotiated a comprehensive settlement agreement ("Comprehensive Settlement") that traded reduced stipulated assessments for the Naperville Property for Assessment Years 2011, 2012, and 2013 in return for Lucent's agreement to withdraw the pending 2010 PTAB Appeal. (*Id.* ¶ 40.) The parties intended for the Comprehensive Settlement to satisfy the City of Naperville and School District 203. (*Id.* ¶ 41.)

Lucent approved the Comprehensive Settlement and accepted the 2011, 2012, and 2013 stipulations of agreed assessed value for the Naperville Property in return for its agreement to withdraw the 2010 PTAB appeal. (R. 105, Def. Resp. to Pl. Stmt. Facts ¶ 52.) Plaintiffs estimate that the Comprehensive Settlement saved Lucent $910,999.90 for the 2011 tax year and $1,100,028 for the 2012 tax year, and that it would save Lucent $1,100,028 for the 2013 tax year. (*Id.* ¶¶ 53, 54.) Additionally, the Comprehensive Settlement also provided Lucent with stipulated assessed values for the Naperville Property that were 38% lower in 2012 and 40% lower in 2013 than the most recent assessed value. (Pl. Stmt. Facts ¶ 56)

Internal discussions between Lucent employees acknowledged Plaintiffs' entitlement to 25% of Lucent's 2011 tax savings. (*See* Pl. Stmt. Facts ¶¶ 63, 69; R. 89–30, Feb. 12, 2012 Email.) Internal discussions, however, also acknowledged uncertainty with respect to Plaintiffs' entitlement to the 2012 and 2013 tax savings. (*See* R. 89–30, Feb. 12, 2012 Email; R. 89–32, May 29, 2012 Email; R. 89–31.) In July 2012, Lucent notified Plaintiffs that the 2011, 2012, and 2013 tax savings were not governed by the contingent fee structure in the original Engagement Agreement, and rejected Plaintiffs' proposed fee of $500,000. (R. 89–36, July 12, 2012 Letter)

On September 7, 2012, Plaintiffs filed their original three-count complaint in this matter. (Def. Stmt. Add'l Facts ¶ 24.) In Count I, Plaintiffs alleged a breach of contract claim for the 2011 tax savings based on the contingent fee agreement ("Agreement") with Lucent. In Count II, Plaintiffs alleged an anticipatory breach of contract claim for the 2012 and 2013 tax savings based on work they

performed on Lucent's behalf pursuant to the Agreement. In the alternative, in Count III, Plaintiffs alleged an unjust enrichment claim for tax savings that Plaintiffs secured for Lucent for tax years 2011, 2012, and 2013.

Plaintiffs and Defendant filed competing motions for summary judgment on each of the three counts. On May 6, 2014, the Court granted Plaintiffs' motion for summary judgment as to Count I in the amount of $227,749.97, finding that the undisputed facts established that the parties intended for the Agreement to entitle Plaintiffs to 25% of the tax savings they negotiated for the Lucent for the 2011 tax year. (R. 149.) The Court denied summary judgment on Counts II and III because issues of fact exist. Plaintiffs subsequently moved to voluntarily dismiss Count III, and the Court granted the motion. (R. 178.)

Plaintiffs engaged Brian P. Liston as one of their two burden-of-proof experts. (R. 131–1, Liston Expert Rep.) Liston, along with attorney Gregory J. Lafakis, submitted an expert report regarding the dispute at issue here. Liston is an attorney who has experience in the fields of eminent domain and property tax appeals. (R. 131–1, Liston CV.) The report consists of their summary of the dispute as well as six opinions and the underlying bases for those opinions. (*Id.* ¶ 7.) After submitting the joint expert report, Plaintiffs withdrew Mr. Lafakis as an expert. (R. 131–2, Nov. 5, 2013 email.)

## LEGAL STANDARD

**\*3** "The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact[,] ... a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion...." *Id. See also Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 824 (7th Cir. 2010). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis,* 561 F.3d. at 705.

Under the expert-testimony framework, courts perform the gate-keeping function of determining whether the expert testimony is both relevant and reliable prior to its admission at trial. *See id.*; *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: first, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees v. Carthage College,* 714 F.3d 516, 521–22 (7th Cir. 2013); *see also Stollings v. Ryobi Tech., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013); *Pansier,* 576 F.3d at 737.

In assessing the admissibility of an expert's testimony, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate." *Winters v. Fru–Con Inc.,* 498 F.3d 734, 742 (7th Cir. 2007) (quoting *Chapman v. Maytag Corp.,* 297 F.3d 682, 687 (7th Cir. 2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumbo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999)). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012).

## ANALYSIS

Defendant challenges specific statements and opinions in Mr. Liston's report on two grounds: (1) that they are unrelated to his expertise, and (2) that they are legal opinions and conclusory in nature.

### I. Brian Liston

#### A. Qualifications
Brian Liston is a licensed attorney in the state of Illinois, and has been practicing since 1991. (Liston CV.) He

is currently a partner in The Law Offices of Liston & Tsantilis, P.C. in Chicago Illinois, and focuses his practice on the areas of eminent domain litigation, property tax appeals and incentives for land use. (*Id.*) Liston represents large companies and landowners in eminent domain and property tax litigation matters in suits filed by local, municipal and state agencies throughout the United States.

#### B. Opinions
**\*4** Defendant challenges the following statements as being unrelated to Liston's expertise:

**Expert Report at 2:** A review of Mr. Lefkowitz's correspondence in July 2012 to Attorney Sullivan clearly shows that it was Lucent's and Lefkowitz's position that the fee agreement did not cover any work on the 2011, 2012, and 2013 tax savings.

**Expert Report at 4:** Furthermore, Lucent's own internal documents clearly show that Lucent's control group checked Plaintiffs' figures and agreed with them. Internally, Mr. Cameron, Attorney Lefkowitz, and Mr. Morrison were all acknowledging that Sullivan's May 28, 2012 invoice in the amount of $227,749.97 should be paid.

**Expert Report at 7:** Even though internal emails of Lucent admitted full responsibility to pay the 2011 tax savings component in the amount of $227,749.97, [Lucent refused to pay the invoice, arguing that the fee agreement only covered tax savings for 2010.]

Lefkowitz's email to co-counsel Mendoza on February 9, 2012 indicts Lucent as having predetermined to negotiate down whatever fee claim the Plaintiffs might make related to the $3.0 million plus tax savings.

**Expert Report at 9:** Opinion No. l. The March 7, 2011 Engagement Letter was intended to cover all the work that Sullivan and Helm were performing related to the negotiated settlement between 'Lucent and Assessor Trowbridge.

**Expert Report at 10:** Lucent's own internal documents showed $400,000 as an accrued expense, for fees owed, and various internal documents reflected acknowledgement that the fee agreement did cover the services performed by Sullivan and Helm.

Lucent had determined internally that at least this much was owed and that the statement reflected the proper amount owed for 2011 tax savings component.

**Expert Report at 12:** Lucent's own memo regarding the establishment of a $400,000 accrual for liability to Sullivan and Helm shows recognition by Lucent that it had, in fact, obtained a significant tax savings and that at least $400,000 would be owed to Sullivan and Helm under the terms of the contingent fee agreement.

**Expert Report at 12–13:** Sullivan's and Helm's testimony clearly support the fact that Lucent received the benefit of a substantial tax savings for tax years 2011, 2012, and 2013 that is expected expected to total in excess of $3 million which will be fully realized by Lucent in 2014.

**Expert Report at 13:** Opinion No. 5. Lucent's own internal documents and deposition testimony of Lucent personnel clearly support the conclusion that: (a) Lucent understood that it was fully obligated under the fee agreement to pay Sullivan and Helm for tax savings at 25% for tax years other than for 2010; (b) at least $400,000 in fees had been "accrued" by Lucent for Sullivan's and Helm's services; (c) Lucent had predetermined to negotiate Sullivan's and Helm's fees down before Lucent had even discussed the fees with either Sullivan or Helm; and (d) Lucent obtained a very clear tax benefit on tax savings for years 2011, 2012, and 2013 and made a business decision to dismiss the 2010 appeal as a quid pro quo for what it perceived as 'great news,' being the projected tax savings for 2011, 2012, and 2013.

**\*5** Defendant additionally challenges the following statements made by Liston as being improper legal opinions and conclusions:

**Expert Report at 4:** It is our opinion that there is no basis for any dispute as to either liability or the amount owed for 2011 tax savings obtained by Sullivan and Helm for Lucent. Whether based upon the written fee agreement or upon principles of unjust enrichment, Lucent received a tax savings of $910,999.90 in May 2012 on 2011 taxes as a direct result of Sullivan's and Helm's efforts.

**Expert Report at 5:** It appears to the undersigned that there is clear liability under Count I of the Complaint.

Regardless of whether the March 7, 2011 fee agreement covered the tax savings for 2011, 2012, and/or 2013, there is clear liability against Lucent under either Count II (the fee agreement) or Count III (unjust enrichment), and the amount due and owing should be the same under either Count.

**Expert Report at 5–6:** It is our opinion that there is no difference in either liability or in the amount of money that Lucent owes the Plaintiffs. If liability and recovery is to be based on principles of unjust enrichment, it is our opinion that Lucent is clearly liable to Plaintiffs under Count I and III.

**Expert Report at 10:** The May 2012 invoice from Sullivan for the 2011 tax savings component accurately sets for the amount of fees due under the Agreement.

**Expert Report at 12:** Whether the bases for the favorable tax savings of approximately $3.0 million is based upon the March 2011 Engagement Letter or upon principals of unjust enrichment, the fee entitlement for Sullivan and Helm would be the same.

**Expert Report at 13:** The 'benefit' to Lucent was a tax savings of approximately $3.0 million plus deferred through the payment date of 2014. The written agreement between Lucent and Plaintiffs showed that Lucent and Plaintiffs were in agreement on a 25 percent factor to be applied times the savings/benefit, thus, the fees are identical under Counts II and III of the Complaint.

[Lucent understood that] it was fully obligated under the fee agreement to pay Sullivan and Helm for tax savings at 25% for tax years other than for 2010.

## II. Liston Does Not Draw on Any Expertise When Reading and Interpreting Lucent's Internal Documents and Correspondences

In many of Liston's opinions, he simply reads and interprets documents. In doing so, he does not draw on any expert qualifications or experience. As such, his readings and interpretations are merely gratuitous, and would be unhelpful to a prospective jury. "[T]he crucial question is, 'On *this subject* can a jury from *this person* receive appreciable help?' " *Cage v. City of Chicago,* 979 F.Supp.2d. 787, 834 (N.D.Ill.2013). "[E]xpert testimony is helpful to the jury if it concerns a matter beyond the

understanding of the average person." *Davis v. Duran,* 276 F.R.D. 227, 231 (N.D.Ill.2011). Moreover, "[a]n expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *United States v. Benson,* 941 F.2d 598, 604 (7th Cir. 1991), *amended on unrelated grounds,* 957 F.2d 301 (7th Cir. 1992).

**\*6** "Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury ..." *United States v. Hall,* 93 F.3d 1337, 1343 (7th Cir. 1996). "[E]xpert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Aponte v. City of Chicago,* No. 09 C 8082, 2011 WL 1838773, at \*2 (N.D.Ill. May 12, 2011).

The following are examples of Liston merely reading and interpreting documents without drawing on any additional expertise:

**Expert Report at 2:** A review of Mr. Lefkowitz's correspondence in July 2012 to Attorney Sullivan clearly shows that it was Lucent's and Lefkowitz's position that the fee agreement did not cover any work on the 2011, 2012, and 2013 tax savings.

**Expert Report at 4:** Furthermore, Lucent's own internal documents clearly show that Lucent's control group checked Plaintiffs' figures and agreed with them. Internally, Mr. Cameron, Attorney Lefkowitz, and Mr. Morrison were all acknowledging that Sullivan's May 28, 2012 invoice in the amount of $227,749.97 should be paid.

**Expert Report at 7:** Even though internal emails of Lucent admitted full responsibility to pay the 2011 tax savings component in the amount of $227,749.97, [Lucent refused to pay the invoice, arguing that the fee agreement only covered tax savings for 2010.]

Lefkowitz's email to co-counsel Mendoza on February 9, 2012 indicts Lucent as having predetermined to negotiate down whatever fee claim the Plaintiffs might make related to the $3.0 million plus tax savings.

**Expert Report at 10:** Lucent's own internal documents showed $400,000 as an accrued expense, for fees owed, and various internal documents reflected acknowledgement that the fee agreement did cover the services performed by Sullivan and Helm.

Lucent had determined internally that at least this much was owed and that the statement reflected the proper amount owed for 2011 tax savings component.

**Expert Report at 12:** Lucent's own memo regarding the establishment of a $400,000 accrual for liability to Sullivan and Helm shows recognition by Lucent that it had, in fact, obtained a significant tax savings and that at least $400,000 would be owed to Sullivan and Helm under the terms of the contingent fee agreement."

**Expert Report at 13:** Opinion No. 5. Lucent's own internal documents and deposition testimony of Lucent personnel clearly support the conclusion that: (a) Lucent understood that it was fully obligated under the fee agreement to pay Sullivan and Helm for tax savings at 25% for tax years other than for 2010; (b) at least $400,000 in fees had been "accrued" by Lucent for Sullivan's and Helm's services; (c) Lucent had predetermined to negotiate Sullivan's and Helm's fees down before Lucent had even discussed the fees with either Sullivan or Helm; and (d) Lucent obtained a very clear tax benefit on tax savings for years 2011, 2012, and 2013 and made a business decision to dismiss the 2010 appeal as a quid pro quo for what it perceived as 'great news,' being the projected tax savings for 2011, 2012, and 2013.

Liston does not rely on nor does he bring any additional expertise in his reading and interpretation of these documents. Average jurors are capable of reading such documents and determining for themselves their meaning and significance. Although Liston is a purported expert in the field property tax appeals, these interpretations do not require such expertise and he does not bring any expert analysis to them. *See In re Prempro Products Liability Litig.,* 586 F.3d 547, 570 (8th Cir. 2009). He simply reads some of them. Liston invades the province of the jury by opining that various documents "show" (Expert Report at 12), "clearly show" (Expert Report at 2 and 4), "reflect acknowledgement of" (Expert Report at 10), and "clearly support" (Expert Report at 13) certain conclusions. These opinions are merely gratuitous and hence improper.

## III. Liston Improperly Comments on and Interprets Testimony

**\*7** Liston also invades the province of the jury by improperly commenting on and interpreting testimony. It is a fundamental premise of the trial system that "determining the weight and credibility of witness testimony ... 'belongs to the jury who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' " *Davis* 277 F.R.D. at 370 (quoting *United States v. Scheffer,* 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)). "[A]n expert witness may not usurp the jury's function to weigh evidence and make credibility determinations." *United States v. Farrell,* 563 F.3d 364, 377 (8th Cir. 2009). Furthermore, "expert witnesses are not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears." *Duran,* 277 F.R.D. at 370.

Examples of Liston improperly commenting on and interpreting witness testimony include:

> **Expert Report at 12–13:** Sullivan's and Helm's testimony clearly support the fact that Lucent received the benefit of a substantial tax savings for tax years 2011, 2012, and 2013 that is expected to total in excess of $3 million which will be fully realized by Lucent in 2014.

> **Expert Report at 13:** Opinion No. 5. Lucent's own internal documents and deposition testimony of Lucent personnel clearly support the conclusion that: (a) Lucent understood that it was fully obligated under the fee agreement to pay Sullivan and Helm for tax savings at 25% for tax years other than for 2010; (b) at least $400,000 in fees had been "accrued" by Lucent for Sullivan's and Helm's services; (c) Lucent had predetermined to negotiate Sullivan's and Helm's fees down before Lucent had even discussed the fees with either Sullivan or Helm; and (d) Lucent obtained a very clear tax benefit on tax savings for years 2011, 2012, and 2013 and made a business decision to dismiss the 2010 appeal as a quid pro quo for what it perceived as 'great news,' being the projected tax savings for 2011, 2012, and 2013.

An expert's testimony must "assist the trier of fact in determining a relevant fact at issue in the case." *Lees,*

714 F.3d at 521. By sorting out and opining on witness testimony, Liston attempts to usurp the traditional role of the jury to determine "the weight and credibility" of witness testimony. It is the jury's role to assess a witness's credibility and to determine what weight to give that testimony. Liston may not offer these improper opinions.

## IV. Liston Improperly Remarks on the Intentions of the Parties Involved

Liston also improperly opines on Lucent's intentions. An expert "must refrain from giving an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." *Pansier,* 576 F.3d at 738 (citation and quotations omitted). *See also DePaepe v. Gen. Motors Corp.,* 141 F.3d 715, 720 (7th Cir. 1998) ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive."); *Johnson v. Wyeth LLC,* No. 10–C–2690, 2012 WL 1204081, at *3 (D.Ariz. Apr. 11, 2012) (precluding plaintiff's experts from offering "opinions concerning defendants' motive, intent, knowledge, or other state of mind"); *George v. Kraft Foods Global, Inc.,* 800 F.Supp.2d 928, 932–33 (N.D.Ill.2011) (excluding expert's state of mind opinion as speculative and unhelpful).

Opinion No. 1 (Expert Report at 9) purports to opine on the work that the March 7, 2011 Engagement Letter "intended" to cover. It reads as follows:

> **\*8** **Expert Report at 9:** Opinion No. l. The March 7, 2011 Engagement Letter was intended to cover all the work that Sullivan and Helm were performing related to the negotiated settlement between 'Lucent and Assessor Trowbridge.

Liston has no basis to opine on the parties' intentions or motives when entering into the agreement. To state outrightly that the Engagement Letter was intended to cover all the work related to the negotiated settlement is speculative and unhelpful given the ultimate responsibility of the jury to make that determination. The witnesses at trial will testify regarding their intentions, and the jury will evaluate that evidence and draw its own conclusions.

### V. Liston Improperly Offered Legal Opinions and Conclusions

Lastly, several of the Mr. Liston's opinions are inadmissible legal conclusions. As a general rule, an expert may not offer legal opinions. *Jiminez v. City of Chicago,* 732 F.3d 710, 721 (7th Cir. 2013). "Where the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact." *U.S. Gypsum Co. v. Lafarge North America Inc.,* 670 F.Supp.2d. 748, 765 (N.D.Ill.2010) (quoting *Clark v. Tanaka Corp.,* 192 F.3d 750, 759 (7th Cir. 1999)). As such, "expert testimony that contains a legal conclusion that determines the outcome of a case is inadmissible." *RLJCS Enterprises, Inc. v. Prof'l Ben. Trust Multiple Welfare Ben. Plan & Trust,* 487 F.3d 494, 498 (7th Cir. 2007). Experts "cannot testify about legal issues on which the judge will instruct the jury." *United States v. Sinclair,* 74 F.3d 753, 757 n. 1 (7th Cir. 1996). Courts will not admit testimony on purely legal matters and comprised solely of legal conclusions. *Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003).

The following statements and opinions have been identified as inadmissible legal conclusions and merely present Mr. Liston's beliefs as to how the fact finder should rule on the questions of liability and damages:

**Expert Report at 4:** It is our opinion that there is no basis for any dispute as to either liability or the amount owed for 2011 tax savings obtained by Sullivan and Helm for Lucent. Whether based upon the written fee agreement or upon principles of unjust enrichment, Lucent received a tax savings of $910,999.90 in May 2012 on 2011 taxes as a direct result of Sullivan's and Helm's efforts.

**Expert Report at 5:** It appears to the undersigned that there is clear liability under Count I of the Complaint.

Regardless of whether the March 7, 2011 fee agreement covered the tax savings for 2011, 2012, and/or 2013, there is clear liability against Lucent under either Count II (the fee agreement) or Count III (unjust enrichment), and the amount due and owing should be the same under either Count.

**Expert Report at 5–6:** It is our opinion that there is no difference in either liability or in the amount of money that Lucent owes the Plaintiffs. If liability and recovery

is to be based on principles of unjust enrichment, it is our opinion that Lucent is clearly liable to Plaintiffs under Count I and III.

**Expert Report at 10:** The May 2012 invoice from Sullivan for the 2011 tax savings component accurately sets for the amount of fees due under the Agreement.

**\*9 Expert Report at 12:** Opinion No. 4. Whether the bases for the favorable tax savings of approximately $3.0 million is based upon the March 2011 Engagement Letter or upon principals of unjust enrichment, the fee entitlement for Sullivan and Helm would be the same.

**Expert Report at 13:** The 'benefit' to Lucent was a tax savings of approximately $3.0 million plus deferred through the payment date of 2014. The written agreement between Lucent and Plaintiffs showed that Lucent and Plaintiffs were in agreement on a 25 percent factor to be applied times the savings/benefit, thus, the fees are identical under Counts II and III of the Complaint.

By making explicit conclusions about the various elements of the dispute between Lucent and Plaintiffs, Liston acts as an auxiliary advocate for Plaintiffs and usurps the role of the jury. It is inappropriate for Liston to opine, for example, that "there is clear liability against Lucent under either Count II (the fee agreement) or Count III (unjust enrichment)," and that "if liability and recovery is to be based on principles of unjust enrichment, it is our opinion that Lucent is clearly liable to Plaintiffs under Count I and III." (Expert Report at 5–6). In submitting these opinions, Liston has done exactly what the Seventh Circuit prohibits. Mr. Liston, therefore, cannot testify regarding these opinions.

### CONCLUSION

For the reasons discussed above, the Court grants Lucent's Motion to Strike Plaintiffs' Expert Testimony and Bar Expert Testimony. Mr. Liston may not testify regarding the opinions and statements that Lucent identified in its Motion.

### All Citations

Not Reported in F.Supp.2d, 2014 WL 3558690

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.