# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| CHRISTIE VAN et al., | : |
| Plaintiffs, | : |
| vs. | : Case No. 14 CV 08708 |
| FORD MOTOR COMPANY, | : |
| Defendant. | : |

Expert Report of Gregory Mitchell, Ph.D.

## I.      BACKGROUND INFORMATION AND REQUIRED DISCLOSURES

1.      I hold a Ph.D. in psychology and a J.D. from the University of California, Berkeley.  I am a tenured professor at the University of Virginia, where I am the Joseph Weintraub-Bank of America Distinguished Professor of Law.

2.      I am a social psychologist by training, and I regularly conduct research on intergroup relations and discrimination, bias in judgment and decision-making, organizational measures aimed at reducing bias and preventing discrimination, expert evidence, and the proper use of social science research and methods for litigation and policy-making purposes.  In my capacity as a consultant, I regularly advise organizations on ways to promote fair and effective decision-making and behavior.  In addition, I regularly advise students and colleagues on research methods, teach classes involving social science research and methods, and give presentations on social science research.

3.      I have served as a member of the Advisory Panel for the National Science Foundation's Law and Social Science Program, and I often serve as a referee for research grant organizations and for peer-reviewed social science journals such as *Group Processes and Intergroup Relations*, *Journal of Empirical Legal Studies, Journal of Experimental Social Psychology*, *Law & Human Behavior*, *Law & Social Inquiry*, *Law & Society Review*, *Perspectives on Psychological Science*, *Psychological Science*, and *Social Justice Research*.

4.      I have published numerous articles in both peer-reviewed social science journals and law reviews, including a number of articles on the uses of social science research in the law. One of my articles on the appropriate uses and limits of social scientific expert evidence, which was written with my colleagues John Monahan and Laurens Walker (Monahan, Walker & Mitchell, 2008), was cited approvingly by the U.S. Supreme Court in its decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).

1

5. Through my education, research, and experience, I am very familiar with the methods and norms of the social sciences and with proper social scientific techniques for studying intergroup bias and discrimination.

6. My curriculum vitae, which is attached as Exhibit A, provides detailed information about my publications and other academic achievements and about my educational and employment background.

7. My hourly rate in this case is $600.

8. Within the last four years, I have given deposition or trial testimony as an expert in the following cases: (a) *Sambou v. University of Washington*, Case No. 15-2-00864-1 (King County Superior Court of the State of Washington) and (b) *Rumble v. Fairview Health Services & Emergency Physicians, P.A.*, Case No. 0:14-cv-02037-SRN-FLN (District of Minnesota).

9. With respect to case materials considered to form my opinions, I reviewed the Expert Report of Louise F. Fitzgerald, Ph.D., dated September 8, 2017 ("Fitzgerald Report"), and the transcript of the deposition of Dr. Fitzgerald conducted on October 11, 2017 ("Fitzgerald Deposition").

## II. OPINIONS

### A. Summary of Opinions

10. Dr. Fitzgerald provides no scientifically reliable opinions regarding the existence, prevalence, or causes of sexual discrimination at Ford Motor Company's Chicago Assembly Plant ("CAP") or Chicago Stamping Plant ("CSP").

11. Dr. Fitzgerald did not gather a representative and unbiased sample of data regarding conditions and behavior within the CAP and CSP over the putative class period. Instead, Dr. Fitzgerald relied on allegations provided by the Plaintiffs along with an undisclosed set of keyword searches to find discovery materials for her review. Dr. Fitzgerald took no steps

2

to test the accuracy or representativeness of the Plaintiffs' allegations or the assertions contained in whatever other discovery materials she reviewed.

12.     In addition to relying on data with no demonstrated representativeness, Dr. Fitzgerald did not employ any objective, scientific approach to analyze the Plaintiffs' allegations and the other unspecified documents that serve as the basis for her opinions.  She did not analyze those materials using researchers who were blind to the Plaintiffs' theory of the case and who were following a clear codebook that contained operational definitions of the many theoretical constructs implicated by Dr. Fitzgerald's opinions.  Nor did Dr. Fitzgerald conduct any survey of employees, any observational study, or any structured interviews.  Dr. Fitzgerald simply read some documents and then speculated about behaviors and conditions at CSP and CAP that may be occurring if the Plaintiffs allegations are true and speculated that Ford management must have been aware of but unconcerned about the harassment to allow it to occur.   The only link between Dr. Fitzgerald's interpretation of the facts of this case and the social science research that she cites is her personal judgment and conjecture—there are no objective measures or scientific test results that Dr. Fitzgerald can cite to defend and justify her opinions.

13.     Dr. Fitzgerald characterizes her report as a "social framework" report (Fitzgerald Report at 4), but Dr. Fitzgerald's report is not what is known within the law and social science literature as a social framework report.  A proper social framework report summarizes, in an objective and non-misleading way, general social science research on a topic to provide information that would not be known by most jurors and that could help the jurors when considering admissible evidence at trial (Monahan, Walker & Mitchell, 2008).  Dr. Fitzgerald's report goes far beyond a social framework report, because she purports to apply general social science research to the evidence in the case as presented by the plaintiffs.  The originators of the

3

"social framework" concept have specifically stated that a subjective "read the case file" approach of the sort that Dr. Fitzgerald used here is not a reliable methodology and should not be accepted by courts (e.g., Monahan, Walker & Mitchell, 2008, 2009).

**B. Dr. Fitzgerald Relied on Inadequate Data and an Unscientific Method to Formulate Her Opinions**

14.     The bulk of Dr. Fitzgerald's report consists of her repetition of allegations from the Plaintiffs, which Dr. Fitzgerald treats as "if" premises for "then" conclusions that serve as her opinions in this case (Fitzgerald Report at 4).  At her deposition, Dr. Fitzgerald took issue with the characterization that she assumed the truth of the Plaintiffs' allegations or made any credibility determinations and instead characterized her approach as treating the allegations as "ifs" in "if, then" statements (Fitzgerald Deposition at 125, 185-186, 189-190).  Whether one understands this approach to be assuming the truth of the Plaintiffs' allegations or merely treating the allegations as givens with no truth value, as a matter of logic, if Dr. Fitzgerald's "ifs" turn out to be "not-ifs," then her "thens" do not follow.  Therefore, by Dr. Fitzgerald's own account, all that Dr. Fitzgerald offers here is speculation about what conditions might have existed at the Ford plants if the allegations of the Plaintiffs are true and representative of women across plants, shifts, jobs, and time periods.

15.     In order to generate her "then" conclusions based on the Plaintiffs' "ifs," Dr. Fitzgerald stated that she "applied general principles [from social science research] to this particular case" (Fitzgerald Deposition at 94).  She admitted at her deposition that she "did not measure" any of the variables that she would need to measure to determine whether risk factors for sexual harassment were actually present and at what levels, but rather just "made inferences [about those variables] based on the data available to [her]" (Fitzgerald Deposition at 93-94).

These inferences were not guided by any objective coding system that specifies how she decided whether variables were present and at what levels.

16.     Dr. Fitzgerald did not conduct any interviews to gather data (Fitzgerald Deposition at 29, 48), did not conduct any forensic examinations of any of the Plaintiffs (Fitzgerald Deposition at 31), and did not administer any survey instrument to measure employees experiences at either plant or to measure management's awareness and tolerance of sexual harassment (Fitzgerald Deposition at 53, 58, 88).  Dr. Fitzgerald did not visit either plant (Fitzgerald Deposition at 88) and did not conduct any empirical study to gather data from either plant for her analysis (Fitzgerald Deposition at 58, 116).

17.     At her deposition, Dr. Fitzgerald acknowledged that organizational climates may differ by shift and geographic location (Fitzgerald Deposition at 91, 91).  Yet she revealed in her report no effort to ensure that she considered reliable data on employee experiences across time periods and plant locations.

18.     At her deposition, Dr. Fitzgerald had no idea how many women were in the putative class, but she thought maybe over 1,000 or around 2,000 (Fitzgerald Deposition at 14, 145).  She had no idea how much time was spent by the Plaintiffs at which plant (Fitzgerald Deposition at 96-98), and she did not know what percentage of the proposed class that the named plaintiffs constituted (Fitzgerald Deposition at 109).

19.     Ensuring that a sample of data is unbiased and representative of the larger population is essential to reaching reliable inferences from a data set (Firebaugh, 2008).  Where there are concerns that a data selection technique may be biased, researchers should be particularly wary of treating data as if it is representative of a larger population.  Dr. Fitzgerald acknowledged at her deposition that persons who complain about sexual harassment within an

organization may well have had different experiences from those who do not complain (Fitzgerald Deposition at 198, 200). Moreover, she acknowledged in her report that males, whom she assumes were more likely to harass, differ in their likelihood to harass (Fitzgerald Report at 18, note 4), yet she took no steps to determine what percentage of males were accused of harassment or to determine what percentage of male employees had any propensity to harass. Thus, Dr. Fitzgerald had reason to believe that the information she focused on was not representative of the experiences of all female workers within CAP and CSP, and she knew that it was inappropriate to assume that those who were accused of harassment were representative of all male employees at the plants.

20.     Notwithstanding her knowledge that the allegations she took as givens could well be false and that persons who complained were likely to have had different experiences or otherwise be different from than those who did not complain, Dr. Fitzgerald did not conduct a research study to determine whether the any of the allegations were true or were similar to experiences of other women in either plant (Fitzgerald Deposition at 98). Accordingly, Dr. Fitzgerald stated that she did not treat the Plaintiffs' allegations as if they were a sample of experiences from the plants (Fitzgerald Deposition at 116). However, she did acknowledge that she extrapolated from experiences she read about in the discovery materials to other women (i.e., she apparently assumed others had similar experiences), but she could not say how many she believed may have had similar experiences because she did no research study that would allow her to ascertain that number (Fitzgerald Deposition at 143-144).[1] Thus, despite knowing that she

---

[1] Given Dr. Fitzgerald's lack of knowledge of how many people are involved in this case and how representative the experiences of any of the complainants were, Dr. Fitzgerald obviously had no objective basis for her many claims about how pervasive behaviors were or how high the levels of harassment and tolerance of harassment were (e.g., Fitzgerald Report at 67-68).

did not have a proper sample across persons, time, jobs, or locations, Dr. Fitzgerald nonetheless

drew sweeping conclusions from the limited set of case materials she read (e.g., she asserts that

harassment permeates both plants; Fitzgerald Report at 13, 68).

21.    Dr. Fitzgerald used no systematic system for sampling documents from the large

amount of discovery material produced in the case.  Rather, she read the Plaintiffs' allegations

and used search terms to find other documents to look at in the discovery database, but she could

not remember what search terms she used (Fitzgerald Deposition at 182), and she did not provide

a record of those terms or explain how they were chosen in her report.

22.    In sum, Dr. Fitzgerald forthrightly acknowledged that she has no idea whether the

allegations she relied on are true or representative of any percentage of members of the proposed

class.  She forthrightly acknowledged that she conducted no scientific study of behavior and

conditions at CAP or CSP and that she made no measurements of the many variables implicated

by her opinions.

23.    As a scientific matter, Dr. Fitzgerald's "if, then" opinions are nothing more than

untested hypotheses.  Dr. Fitzgerald may sincerely believe that problems exist at the Ford plants,

but Dr. Fitzgerald's personal opinions and speculation have no scientific basis.  Training as a

social scientist and experience conducting empirical research does not provide any special

expertise to read documents and know what actually happened in a case.  Training as a social

scientist does empower a researcher to use scientific methods to collect and analyze data to reach

reliable inferences about the relations among variables, but it is the use of the scientific methods

and not the credentials of the researcher typing up a research report that accounts for the

reliability of those inferences (Kincaid, 1996; Ziman, 2000).  Using validated and verifiable

metrics to measure variables and assess their relations—and not simply relying on private,

personal judgments—is a basic requirement of scientific reasoning and is essential to reduce the risk of researcher bias and error (see, e.g., Creswell, 2003; Faust, 1984; Firebaugh, 2008; Hodson, 1999; King et al., 1994; Mitchell et al., 2011b; National Research Council, 2009; Neuendorf, 2002). Science is reliable precisely because it does not make the truth-value of claims dependent on the acceptance of private, personal judgments: an expert who cannot "show her work" cannot claim that her opinions are scientifically reliable.

24. These concerns are not just theoretical concerns. A large body of empirical research shows that case-file judgments of the kind that Dr. Fitzgerald offers here—that do not involve application of any scientific methods, tools, or principles—are subject to biases and errors, due to the overweighting of salient evidence, selection and confirmation biases, and perceptions of illusory relationships among variables (as opposed to real relationships among variables)[2] (see, e.g., Dawes, 1989, 2001; Faust, 1984; King et al., 1994; MacCoun, 1998; Meehl, 1954; Munro et al., 2004; Oskamp, 1965; Sadler, 1981). In science, speculation and subjective judgments about what may have happened, even when offered by scientific experts, count as nothing more than hypotheses awaiting testing by valid and reliable means.

## C. Dr. Fitzgerald's Report is Not a Social Framework Report

25. Rather than offer a scientific defense of her "I know it when I see it" method, Dr. Fitzgerald claims that her approach produces what is known as "social framework evidence" (Fitzgerald Report at 4), and is "generally accepted" (Fitzgerald Deposition at 300). At her

---

[2] Given Dr. Fitzgerald's prior beliefs about Ford from her participation in the Rapier case, it was particularly important that Dr. Fitzgerald follow the scientific method here to limit the influence of this prior information and her pre-existing views on her opinions in this case. Dr. Fitzgerald characterizes her conclusions from the Rapier case as "prescient" (Fitzgerald Report at 65); alternatively, one might characterize Dr. Fitzgerald's opinions as the predictable result of processes of biased assimilation of evidence to pre-existing views and confirmation bias in the selection and interpretation of evidence.

deposition, she cited my colleague John Monahan as the originator of the "social framework evidence" concept (Fitzgerald Deposition at 300).[3]

26.     It is true that John Monahan, along with my colleague Laurens Walker, did coin the phrase "social framework evidence" to refer to the use of social science evidence to aid a jury in its fact-finding role.  It is not true that Dr. Fitzgerald's report is social framework evidence or that Monahan and Walker would endorse her approach.  In fact, Monahan and Walker have expressly stated that the kind of opinions that Dr. Fitzgerald seeks to offer here are not proper and should not be accepted by courts.

27.     "Social framework" evidence is a term coined by Professors Walker and Monahan in 1987 to describe how social science evidence had been used in some lawsuits to provide factfinders with background information that might counter possibly erroneous lay beliefs about behavior (Walker & Monahan, 1987; see also Monahan & Walker, 1988).  For instance, a psychologist who studies eyewitness identifications might testify to research showing that the correlation between eyewitness accuracy and confidence is lower than many people expect.  The psychologist would not apply the social science research to the case or tell the jury how it should interpret the evidence in the case.  The psychologist summarizes the social science research just to provide a "social framework" that may help the jury evaluate or make sense of the evidence admitted in that case.

28.     In a number of articles, Monahan, Walker and I (Mitchell, Monahan & Walker, 2011a, 2011b; Mitchell, Walker & Monahan, 2011; Monahan, Walker & Mitchell, 2008, 2009; see also Mitchell, 2010) explain why it is scientifically inappropriate, and inconsistent with Walker and Monahan's original conception of social framework evidence, for an expert to link

---

[3] Dr. Monahan's first name is "John" rather than "David" (see Fitzgerald Deposition at 301).

general social science research to specific cases based on only the expert's subjective review of the case file.

29.     The Supreme Court, in its decision in the Wal-Mart Stores, Inc. v. Dukes decision, cited Monahan, Walker and Mitchell (2008) in its discussion of problems with the plaintiffs' social science expert evidence in that case, and the Court specifically quoted the part of our 2008 article in which we discuss the impropriety of a subjective, read-the-file method such as that used by the plaintiffs' expert in the Wal-Mart case and as used by Dr. Fitzgerald in this case. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2553 n.8 (2011).

30.     In that article we explained why the opinions of the plaintiffs' expert, Dr. William Bielby, who said his opinions were based on "social framework analysis," were not social framework evidence and were not reliable opinions:

> Rather than conduct an audit study (in which persons of different sexes with matching qualifications pose as applicants for the same job), a controlled experiment into the effects of stereotyping on managerial decisions at Wal-Mart, or an objective observational study of conditions at Wal-Mart, Dr. Bielby simply reviewed the litigation record in light of his understanding of what social science research shows about stereotyping.  Dr. Bielby's report provides no verifiable method for measuring and testing any of the variables that were crucial to his conclusions and reflects nothing more than Dr. Bielby's "expert judgment" about how general stereotyping research applied to all managers across all of Wal-Mart's stores nationwide for the multi-year class period. Social framework analysis, as exemplified by Dr. Bielby's testimony in *Dukes v. Wal-Mart,* fails as social frame-work, due to its improper linkage of general research to specific facts, and fails as social fact, due to its reliance on methodologically inadequate subjective judgments to make case-specific factual determinations (Monahan et al., 2008, pp. 1747-1748, footnotes omitted).

> [T]he scientific method places emphasis on transparent methods and seeks to limit the subjective judgment of the scientist. Dr. Bielby's "read the file" approach to organizational assessment does not satisfy basic requirements for valid and reliable quantitative or qualitative research (Monahan et al., 2008, p. 1748, n. 87).

31.     Dr. Fitzgerald and other experts have misused the social framework evidence concept in an effort to justify their use of unscientific methods to formulate opinions.  In our

view, if an expert seeks to opine on the facts of a case, then the expert needs to use proper data and methods to formulate those opinions. Many experts can follow proper social scientific methods even in the context of litigation, which produces what Walker and Monahan (1988) call "social fact" evidence, such as when labor economists analyze personnel data using appropriate statistical techniques to examine whether employee race or gender affects employee outcomes.[4] "We recognize that 'social fact' studies of the kind that would survive Rule 702 scrutiny might be costly and might require judicial involvement to ensure access to company personnel. But this possibility does not, in our view, justify the acceptance of unscientific speculation . . . ." (Monahan et al., 2008, p. 1748, footnote omitted).

32.     As further support for her approach, Dr. Fitzgerald also cites Weiner (1995) (Fitzgerald Report at 4), but contrary to Dr. Fitzgerald's suggestion, Weiner (1995) does not endorse an expert taking general social science research and applying it to the particular facts of a case based on nothing more than the expert's subjective review of litigation materials. In fact, Weiner follows Walker and Monahan's distinction between "social framework" evidence and "social fact" evidence, with the latter involving the use of empirical studies conducted to address questions specific to cases (see Weiner, 1995, pp. 171-172).

33.     As Saks (1993) explained long ago, experts making proper use of Walker and Monahan's social framework approach to social science evidence refrain from making any case-specific assertions regarding the applicability of the cited social science research or the

---

[4] Dr. Fitzgerald herself has conducted what we would call "social fact" studies. For instance, when Dr. Fitzgerald has conducted a psychological evaluation of a plaintiff using scientifically-validated assessment tools or has surveyed employees of a company using a validated instrument to assess their experiences, as Dr. Fitzgerald has done before (Fitzgerald Deposition at 30-31, 101), then she generates "social fact" evidence that might be admissible if the studies were done properly. (Mitchell, Walker and Monahan, 2011 at 1131, discuss one of Dr. Fitzgerald's survey studies that was excluded because it used a biased sample.) Dr. Fitzgerald did not conduct a social fact study here by her own admission (Fitzgerald Deposition at 58), which means she did not follow proper empirical research techniques to gather and analyze case data.

consistency of that research with the facts of the case. Such case-specific assertions are improper because general social science research involves general findings or propositions that do not necessarily hold for any particular person or situation (i.e., general social science research cannot be assumed to "fit" the case at hand). Until research is conducted using reliable data and methods, experts have no scientific basis for opining on organizational climate, the prevalence and severity of harassment within an organization, or managerial disregard of workplace conditions.

**III.    CONCLUSION**

34.    Dr. Fitzgerald's opinions are not scientifically reliable and are not based on data adequate to form reliable opinions about behavior and conditions at CAP and CSP from 2012 until the present.

35.    Dr. Fitzgerald's opinions are not a proper form of social framework evidence. Law and social science scholars, including the originators of the social framework concept, have rejected the subjective "read the file" approach used by Dr. Fitzgerald.

Date:   November 17, 2017

## REFERENCES

Cresswell, J. W. (2003). *Research design* (2d ed.). Thousand Oaks, CA: Sage Publications.

Dawes, R. M. (2001). *Everyday irrationality*. Boulder, CO: Westview Press.

Dawes, R. M. (1989). Experience and validity of clinical judgment: The illusory correlation. *Behavioral Sciences and the Law*, *7*, 457-467.

Faust, D. (1984). *The limits of scientific reasoning*. Minneapolis, MN: University of Minnesota Press.

Firebaugh, G. (2008). *Seven rules for social research*. Princeton, NJ: Princeton University Press.

Hodson, R. (1999). *Analyzing documentary accounts*. Thousand Oaks, CA: Sage Publications.

King, G., Keohane, R. O., & Verba, S. S. (1994). *Designing social inquiry: Scientific inference in qualitative research*. Princeton, NJ: Princeton University Press.

Kincaid, H. (1996). *Philosophical foundations of the social sciences*. Cambridge: Cambridge University Press.

MacCoun, R. (1998). Biases in the interpretation and use of research results. *Annual Review of Psychology*, *49*, 259-287.

Meehl, P. E. (1954). *Clinical vs. statistical prediction: A theoretical analysis and a review of the evidence*. Minneapolis, MN: University of Minnesota Press.

Mitchell, G. (2010). Good causes and bad science. *Vanderbilt Law Review En Banc*, *63*, 133-147.

Mitchell, G., Monahan, J., & Walker, L. (2011a). The ASA's missed opportunity to promote sound science in court. *Sociological Methods & Research*, *40*, 605-620.

Mitchell, G., Monahan, J., & Walker, L. (2011b). Case-specific sociological inference: Meta-norms for expert opinions. *Sociological Methods & Research*, *40*, 668-680.

Mitchell, G., Walker, L., & Monahan, J. (2011). Beyond context: Social facts as case-specific

evidence. *Emory Law Journal*, *60*, 1109-1155.

Monahan, J., & Walker, L. (1988). Social science research in law: A new paradigm. *American Psychologist*, *43*, 465-472.

Monahan, J., Walker, L., & Mitchell, G. (2008). Contextual evidence of gender discrimination: The ascendance of "social frameworks." *Virginia Law Review*, *94*, 1705-1739.

Monahan, J., Walker, L., & Mitchell, G. (2009). The limits of social framework evidence. *Law, Probability & Risk*, *8*, 307-321.

Munro, G., Leary, S. P., & Lasane, T. P. (2004). Between a rock and a hard place: Biased assimilation of scientific information in the face of commitment. *North American Journal of Psychology, 6*, 431-444.

National Research Council. (2009). *Strengthening forensic science in the United States: A path forward*. Washington, DC: National Academies Press.

Neuendorf, K. A. (2002). *The content analysis guidebook*. Thousand Oaks, CA: Sage Publications.

Oskamp, S. (1965). Overconfidence in case-study judgments, *The Journal of Consulting Psychology*, *2*, 261–265 [Reprinted in D. Kahneman, P. Slovic & A. Tversky (Eds.), 1982, *Judgment under uncertainty: Heuristics and biases* (pp. 287-293). Cambridge: Cambridge University Press].

Sadler, D. R. (1981). Intuitive data processing as a potential source of bias in naturalistic evaluations. *Educational Evaluation and Policy Analysis*, *3*, 25-31.

Saks, M. J. (1993). Improving APA science translation amicus briefs. *Law and Human Behavior*, *17*, 235-247.

Walker, L., & Monahan, J. (1987). Social frameworks: A new use of social science in law.

*Virginia Law Review*, *73*, 559-598.

Weiner, R. (1995). Social analytic jurisprudence in sexual harassment litigation: The role of social framework and social fact. *Journal of Social Issues*, *51*, 167-180.

Ziman, J. (2000). Real science: What it is, and what it means. Cambridge: Cambridge University Press.

**Exhibit A: Curriculum Vitae**

Gregory Mitchell
University of Virginia School of Law
580 Massie Road
Charlottesville, Virginia 22903-1738
434-243-4088
greg.mitchell@law.virginia.edu

## Academic Appointments

University of Virginia, May 2006 to Present
Joseph Weintraub–Bank of America Distinguished Professor of Law, Fall 2013 -Present
Thomas F. Bergin Teaching Professor of Law, 2014-2017
Mortimer M. Caplin Professor of Law, 2010-2013
Class of 1948 Research Professor, 2010-2013
Daniel Caplin Professor of Law, 2008-2010
E. James Kelly, Jr.-Class of 1965 Research Professor, 2006-2009
Visiting Associate Professor of Law, Spring 2005

Florida State University, 2002-Spring 2006
Sheila M. McDevitt Professor of Law, 2005-2006
Associate Professor of Law, 2004-2005
Assistant Professor of Law, 2002-2004
Courtesy Professor of Psychology, 2002-2006

Vanderbilt University, Fall 2004
Visiting Associate Professor of Law, Fall 2004

Michigan State University, 2000-2002
Adjunct Professor of Psychology, 2001-2002
Assistant Professor of Law, 2000-2002

## Education

Boalt Hall School of Law
University of California, Berkeley
J.D., 1993
Executive Editor, California Law Review
Member, Industrial Relations Law Journal, Spring 1991

Graduate Program in Psychology
University of California, Berkeley
Ph.D., 1994, M.A., 1990 - Emphasis in Social Psychology (Dissertation Committee:  Philip E. Tetlock, Tom R. Tyler and Franklin Zimring)
Jacob K. Javits Fellow, 1988-1992
MacArthur Foundation Fellow in Political Psychology, 1988-1989
Teaching Assistant, Course on Attitudes and Persuasion, Spring 1990

University of Arkansas
B.A., 1988 - Psychology, magna cum laude
Phi Beta Kappa

16

## Publications

**2018**

Gregory Mitchell, *An Implicit Bias Primer*, Virginia Journal of Social Policy and the Law (forthcoming 2018)

Gregory Mitchell, *External Validity*, *in* Bruce Frey (ed.), The Sage Encyclopedia of Educational Research, Measurement, and Evaluation (forthcoming 2018)

Gregory Mitchell, *Judicial Decision Making: Individual and Situational Differences*, *in* Neil Brewer & Amy Bradfield Douglass (eds.), Psychology and Law (forthcoming 2018)

**2017**

Brandon Garrett & Gregory Mitchell, *The Proficiency of Experts*, 166 University of Pennsylvania Law Review (forthcoming 2017)

Gregory Mitchell, *Jumping to Conclusions:  Advocacy and Application of Psychological Research*. In L. Jussim & J. Crawford (Eds.), The Politics of Social Psychology (pp. 139-155) (2017)

Gregory Mitchell, *Measuring Situational Bias or Creating Situational Bias?*, Psychological Inquiry (forthcoming 2017)

Gregory Mitchell, *Libertarian Nudges*, 82 Missouri Law Review 695 (2017) (Symposium Issue on Evaluating Nudge: A Decade of Libertarian Paternalism)

Gregory Mitchell & Philip E. Tetlock, *Popularity as a Poor Proxy for Utility: The Case of Implicit Prejudice*. In S.O. Lilienfeld & I. Waldman (Eds.), Psychological Science Under Scrutiny: Recent Challenges and Proposed Solutions. New York: Wiley (pp. 164-195) (2017)

**2016**

Brandon L. Garrett & Gregory Mitchell, *Forensics and Fallibility: Comparing the Views of Lawyers and Jurors*, 119 W.V.L. Rev. 100 (2016)

Jonathan Klick & Greg Mitchell, *Infantilization by Regulation*, 39 Regulation 32-37 (2016)

Gregory Mitchell, *External Validity*, in B. Frey (Ed.), The Sage Encyclopedia of Educational Research, Measurement, and Evaluation (forthcoming 2016)

Gregory Mitchell, *The Price of Abstraction*, in Joshua C. Teitelbaum & Kathryn Zeiler (Eds.), Research Handbook on Behavioral Law and Economics (forthcoming 2016)

Gregory Mitchell & David Klein, American Courts Explained: A Detailed Introduction to the Judicial Process Using Real Cases (West Academic Press, 2016)

Gregory Mitchell & Philip E. Tetlock, *Experimental Political Philosophy: Justice Judgments in the Hypothetical Society Paradigm*, *in* New Explorations in Political Psychology (Jon A. Krosnick & I-Chant A. Chiang eds., 2016)

**2015**

Hart Blanton, James Jaccard, Erin Strauts, Gregory Mitchell & Philip E. Tetlock, *Toward a Meaningful Metric of Implicit Prejudice*, 100 Journal of Applied Psychology 1468–1482 (2015)

Gregory Mitchell & Philip E. Tetlock, *Implicit Attitude Measures*, in R.A. Scott & S.M. Kosslyn (Eds.), Emerging Trends in the Social and Behavioral Sciences (2015) (available at: http://onlinelibrary.wiley.com/book/10.1002/9781118900772?campaign=rdtwol-42073.671909722&elq_mid=3751&elq_cid=1424663)

Frederick L. Oswald, Gregory Mitchell, Hart Blanton, James Jaccard & Philip E. Tetlock, *Predicting Ethnic and Racial Discrimination with the IAT: Small Effect Sizes of Unknown Societal Significance*, 108 Journal of Personality and Social Psychology 562-571 (2015)

William T. Self, Gregory Mitchell, Barbara A. Mellers, Philip E. Tetlock & J. Angus D. Hildreth, *Balancing Fairness and Efficiency: The Impact of Identity-Blind and Identity-Conscious Accountability on Applicant Screening*, PLoS ONE, DOI:10.1371 (2015)

Philip E. Tetlock & Gregory Mitchell, *Why So Few Conservatives and Should We Care?*, 52 Society 28-34 (2015)

**2014**

Allan G. King, Gregory Mitchell, Richard W. Black, Catherine A. Conway & Julie A. Totten, *Discovery and the Evidentiary Foundations of Implicit Bias*, 40 Employment Relations Law Journal 4-33 (2014) [reprinted at 66 Labor Law Journal 49-64 (2015)]

Gregory Mitchell, *Alternative Behavioral Law and Economics*, in Eyal Zamir & Doron Teichman (Eds.), The Oxford Handbook of Behavioral Economics and the Law (pp. 167-191) (2014)

**2013**

Brandon Garrett & Gregory Mitchell, *How Jurors Understand Fingerprint Evidence: The Relative Importance of Match Language, Method Information, and Error Acknowledgement*, 10 Journal of Empirical Legal Studies 484-511 (2013)

Fred Oswald, Gregory Mitchell, Hart Blanton, James Jaccard & Philip E. Tetlock, *Predicting Ethnic and Racial Discrimination: A Meta-analysis of IAT Criterion Studies*, 105 Journal of Personality and Social Psychology 171-192 (2013)

Philip E. Tetlock, Gregory Mitchell & L. Jason Anastasopoulos, *Detecting and Punishing Unconscious Bias*, 42 Journal of Legal Studies 83-110 (2013)

**2012**

Allan G. King, Jeffrey S. Klein & Gregory Mitchell, *Effective Use and Presentation of Social Science Evidence*, 37 Employment Relations Law Journal 3-21 (2012)

Gregory Mitchell, *The Importance of Replication in the Field*, 25 The Psychologist 361-362 (2012)

Gregory Mitchell, *Revisiting Truth or Triviality: The External Validity of Research in the Psychological Laboratory*, 7 Perspectives on Psychological Science 109-117 (2012)

Gregory Mitchell, *What Is Wrong With Social Psychology?*, 26 Dialogue 12-17 (Fall 2012)

**2011**

Mary R. Baker, Hunter D. Hughes, III, Gregory Mitchell & Philip E. Tetlock, *Proactive Approaches to Second-Generation Risks in Labor and Employment Cases*, 37 Employment Relations Law Journal 28-53 (2011)

Hart Blanton & Gregory Mitchell, *Reassessing the Predictive Validity of the IAT: II. Reanalysis of Heider & Skowronski (2007)*, 13 North American Journal of Psychology 99-106 (2011)

Gregory Mitchell, *Should It Be Easier to Get Married?*, 2011 Michigan State Law Review 215-226 (Symposium: E-marriage)

Gregory Mitchell, John Monahan & Laurens Walker, *The ASA's Missed Opportunity to Promote Sound Science in Court*, 40 Sociological Methods & Research 605-620 (2011)

Gregory Mitchell, John Monahan & Laurens Walker, *Case-Specific Sociological Inference: Meta-norms for Expert Opinions*, 40 Sociological Methods & Research 668-680 (2011)

Gregory Mitchell, Laurens Walker & John Monahan, *Beyond Context: Social Facts as Case-Specific Evidence*, 60 Emory Law Journal 1109-1155 (2011)

**2010**

Philip E. Tetlock & Gregory Mitchell, *Situated Identities Constrain Morally-Defensible Choices*, 5 Perspectives on Psychological Science 206-208 (2010)

David Klein & Gregory Mitchell, Editors, The Psychology of Judicial Decision Making (Oxford University Press, 2010)

Gregory Mitchell, *Evaluating Judges*, *in* The Psychology of Judicial Decision Making (pp. 221-248) (David Klein & Gregory Mitchell eds., 2010)
Gregory Mitchell, *Good Causes and Bad Science*, 63 Vanderbilt Law Review En Banc 133-147(2010)

Gregory Mitchell, *Good Scholarly Intentions Do Not Guarantee Good Policy*, 95 Virginia Law Review In Brief 109-115 (2010)

Gregory Mitchell & Philip E. Tetlock, *Cognitive Styles and Judging*, *in* The Psychology of Judicial Decision Making (pp. 279-284) (David Klein & Gregory Mitchell eds., 2010)

**2009**

Hart Blanton, James Jaccard, Jonathan Klick, Barbara A. Mellers, Gregory Mitchell & Philip E. Tetlock, *Strong Claims and Weak Evidence: Reassessing the Predictive Validity of the IAT*, 94 Journal of Applied Psychology 567-582 (2009)

Hart Blanton, James Jaccard, Jonathan Klick, Barbara A. Mellers, Gregory Mitchell & Philip E. Tetlock, *Transparency Should Trump Trust: Rejoinder to McConnell and Leibold (2009) and Ziegert and Hanges (2009)*, 94 Journal of Applied Psychology 598-603 (2009)

Ronald Fisher, Neil Brewer & Gregory Mitchell, *The Relation Between Consistency and Accuracy of Witness Testimony*, *in* Handbook of Psychology of Investigative Interviewing:

Current Developments and Future Directions (pp. 121-136) (Tom Williamson, Ray Bull & Tim Valentine eds., 2009).

Daniel J. Meador & Gregory Mitchell, American Courts, Third Edition (West Group, 2009).

Gregory Mitchell, *Second Thoughts*, 40 McGeorge Law Review 687-722 (2009) (invited lecture)

Gregory Mitchell & Philip E. Tetlock, *Facts Do Matter: A Reply to Bagenstos*, 37 Hofstra Law Review 737-761 (2009)

Gregory Mitchell & Philip E. Tetlock, *Disentangling Reasons and Rationalizations: Exploring Fairness in Hypothetical Societies*, *in* Social and Psychological Bases of Ideology and System Justification (pp.126-157) (John Jost, A.C. Kay & H. Thorisdottir eds., 2009)

John Monahan, Laurens Walker & Gregory Mitchell, *The Limits of Social Framework Evidence*, 8 Law, Probability & Risk 307-321 (2009)

Philip E. Tetlock & Gregory Mitchell, *Implicit Bias and Accountability Systems: What Must Organizations Do to Prevent Discrimination?*, 28 Research in Organizational Behavior 3-38 (Barry Staw & Arthur Brief eds., 2009)

Philip E. Tetlock & Gregory Mitchell, *A Renewed Appeal for Adversarial Collaboration*, 28 Research in Organizational Behavior 71-72 (Barry Staw & Arthur Brief eds., 2009)

Philip E. Tetlock & Gregory Mitchell, *Adversarial Collaboration Aborted But Our Offer Still Stands*, 28 Research in Organizational Behavior 77-79 (Barry Staw & Arthur Brief eds., 2009)

**2008**

Adam J. Hirsch & Gregory Mitchell, *Law & Proximity*, 2008 University of Illinois Law Review 557-598.

John Monahan, Laurens Walker & Gregory Mitchell, *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks"*, 94 Virginia Law Review 1705-1739 (2008)

Philip E. Tetlock & Gregory Mitchell, *Calibrating Prejudice in Milliseconds*, 71 Social Psychology Quarterly 12-16 (2008)

Philip E. Tetlock, Gregory Mitchell & Terry L. Murray, *The Challenge of Debiasing Personnel Decisions: Avoiding Both Under- and Over-Correction*, 1 Industrial and Organizational Psychology: Perspectives on Science and Practice 439-443 (2008)

**2006**

Gregory Mitchell & Philip E. Tetlock, *Antidiscrimination Law and the Perils of Mindreading*, 67 Ohio State Law Journal 1023-1121 (2006)

Gregory Mitchell & Philip E. Tetlock, *An Empirical Inquiry into the Relation of Corrective Justice to Distributive Justice*, 3 Journal of Empirical Legal Studies 421-466 (2006)

Jonathan Klick & Gregory Mitchell, *Government Regulation of Irrationality: Moral and Cognitive Hazards*, 90 Minnesota Law Review 1620-1663 (2006)
**2005**

Gregory Mitchell, *Libertarian Paternalism Is an Oxymoron*, 99 Northwestern University Law Review 1245-1277 (2005)

Gregory Mitchell, *Empirical Legal Scholarship as Scientific Dialogue*, 83 North Carolina Law Review 167-204 (2005)

Gregory Mitchell, *Beyond Fireside Inductions*, 32 Florida State University Law Review 315-321 (2005) (Symposium: The Behavioral Analysis of Legal Institutions)

Gregory Mitchell, *Asking the Right Questions About Judge and Jury Competence*, 32 Florida State University Law Review 519-527 (2005) (Symposium: The Behavioral Analysis of Legal Institutions)

**2004**

Gregory Mitchell, *Case Studies, Counterfactuals, and Causal Explanations*, 152 University of Pennsylvania Law Review 1517-1608 (2004)

**2003**

Gregory Mitchell, *Tendencies Versus Boundaries: Levels of Generality in Behavioral Law and Economics*, 56 Vanderbilt Law Review 1781-1812 (2003)

Gregory Mitchell, *Mapping Evidence Law*, 2003 Michigan State Law Review 1065-1148 (Symposium: Visions of Rationality in Evidence Law)

Gregory Mitchell, Philip E. Tetlock, Daniel G. Newman & Jennifer S. Lerner, *Experiments Behind the Veil: Structural Influences on Judgments of Social Justice*, 24 Political Psychology 519-547 (2003)

**2002**

Gregory Mitchell, *Why Law and Economics' Perfect Rationality Should Not Be Traded for Behavioral Law and Economics' Equal Incompetence*, 91 Georgetown Law Journal 67-167 (2002)

Gregory Mitchell, *Taking Behavioralism Too Seriously? The Unwarranted Pessimism of the New Behavioral Analysis of Law*, 43 William and Mary Law Review 1907-2021 (2002)

**Pre-2000**

Tom R. Tyler & Gregory Mitchell, *Legitimacy and the Empowerment of Discretionary Legal Authority: Abortion and the United States Supreme Court*, 43 Duke Law Journal 703-815 (1994)

Gregory Mitchell, Comment, *Against "Overwhelming" Appellate Activism: Constraining Harmless Error Review*, 82 California Law Review 1335-1369 (1994)

Gregory Mitchell, Philip E. Tetlock, Barbara Mellers & Lisa Ordóñez, *Judgments of Social Justice: Compromises Between Equality and Efficiency*, 65 Journal of Personality and Social Psychology 629-639 (1993)

Philip E. Tetlock & Gregory Mitchell, *Liberal and Conservative Approaches to Justice: Conflicting Psychopolitical Portraits*, *in* Psychological Perspectives on Justice 234-255 (Barbara Mellers & Jonathon Baron eds., 1993)

Philip E. Tetlock, Charles McGuire, Jr. & Gregory Mitchell, *Psychological Perspectives on Nuclear Deterrence*, 42 Annual Review of Psychology 239-276 (1991)

## Works in Progress

Comparing Categorical and Probabilistic Fingerprint Evidence (with Brandon Garrett & Nicholas Scurich)

The Impact of Proficiency Information on the Weight Given to Fingerprint Evidence (with Brandon Garrett)

The Indeterminacy of Implicit Bias (with Hart Blanton and Christopher Burrows)

Simulating the Cumulative Impact of Gender Discrimination in Large Organizations (with Fred Oswald)

Reflection, Rationality and Morality

## Grants

Co-Principal Investigator, *Peer Review of Social Framework Analysis*, Searle Freedom Trust, $50,000, May 2010-April 2011 (with Christopher Winship, Department of Sociology, Harvard University)

Co-Principal Investigator, *What Companies Need to Do to Curb Bias in Employment Practices: A Multi-Method Exploration of the Perceived and Actual Efficacy of Process Versus Outcome Accountability*, Society for Human Resource Management Foundation, $50,000, December 2009-December 2010 (with Philip E. Tetlock, University of Pennsylvania)

Co-Principal Investigator, *Taking a Careful Scientific Second Look Before Making a Big Policy Leap: An Epistemic Audit of the Unconscious-Bias Research Program*, Searle Freedom Trust, $250,000, August 2009-July 2011 (with Philip E. Tetlock, University of Pennsylvania)

Funding for conference on "The Psychology of Judging," National Science Foundation, $32,781, March, 2007 (with David E. Klein, University of Virginia Department of Politics; peer-reviewed)

Co-Principal Investigator, *The Development and Maintenance of Legal Reasoning*, Michigan State University Intramural Research Grant Program New Faculty Grant, $50,000, January 2002-June 2003 (with David Z. Hambrick, Michigan State University Department of Psychology, Principal Investigator; competitively awarded grant)

## Presentations and Panels

The Proficiency of Experts (with Brandon Garrett), University of Virginia School of Law (July 2017)

Panelist, Fact or Fiction – Implicit Bias in the Workplace and Courtroom: Psychological Tests, Screening and Jury Selection, Practising Law Institute, New York (May 2017)

Panelist, Implicit Bias, Twentieth Annual NYU Workshop on Employment Law for Federal Judges (March 2017)

Panelist, Discussion of The Psychological Foundations of Evidence Law, University of Virginia

22

School of Law (February, 2017)

Panelist, Black Law Student Association Symposium on Implicit Racial Bias, William & Mary Law School (February, 2017)

Panelist, Implicit Bias: A New Look at an Old Problem, University of Memphis Cecil C. Humphreys School of Law (November, 2016)

Libertarian Nudges, Conference on Evaluating Nudge: A Decade of Libertarian Paternalism, University of Missouri School of Law (October, 2016)

Panelist, Evidence Issues/Use of Experts/"Implicit Bias" Issues, Nineteenth Annual NYU Workshop on Employment Law for Federal Judges (March 2016)

The Danger of Closed Minds, and How to Avoid Them, Virginia Mediation Network Annual Fall Training Conference (October 2015)

The Folly of Evidence Law's Epistemic Rules, University of Nevada Las Vegas & University of Minnesota (November 2014)

Current Developments in Stereotyping Evidence, American Employment Law Council Annual Meeting (October 2013)

Improving Organizational Forecasts (with Philip E. Tetlock), University of Houston Second Annual Conference on Corporate Compliance (June 2013)

Alternative BLEs, Conference on Behavioral Law and Economics: Substance and Methodology, Notre Dame University School of Law (April 2013)

Settling Cases Brought by the EEOC, Annual Meeting of the Society of Industrial-Organizational Psychologists (April, 2012)

Lay Interpretations of Fingerprint Examiner Testimony, University of Illinois College of Law (April, 2012)

Panelist, Effective Use and Management of Social Science Evidence, American Employment Lawyer Council Annual Meeting (October 2011)

Panelist, Developments in Expert Evidence, Littler Mendelson Class Action Summit (September 2011)

Panelist, Communicating Research, and General Discussant, Future of Law & Social Science Workshop (sponsored by National Science Foundation (May 2011)

Resisting Your First Instincts: How Smart Lawyers Can Avoid Stupid Mistakes, Charlottesville-Albemarle Bar Association (April 2011)

Panelist, Translating Research into Action: A Crucial Role for the Legal Academy, 2011 AALS Annual Meeting (January 2011)

Should It Be Easier to Get Married?, E-marriage Symposium, Michigan State University College of Law (November, 2010)

Panelist, Proactive Management of Litigation Risk in Employment Litigation, American

Employment Lawyer Council Annual Meeting (October 2010)

In Defense of Thinking, Mortimer M. Caplin Chair Lecture, University of Virginia School of Law (October 2010)

Beyond Context: Social Facts as Case-Specific Evidence, Michigan State University College of Law (February 2010) & Temple University Beasley School of Law (March 2010)

Evaluating Judges, University of Virginia Faculty Workshop (November 2009)

The Legal Relevance of Psychological Research on Memory Validity, 31st Congress of the International Academy of Law and Mental Health (July 2009)

Social Framework Evidence, Olin Conference on Combating Workplace Discrimination (conference presenter, moderator and organizer, April 2009)

Metacognition and Rationality, Seminar on Law and Economics, University of Illinois School of Law (March 2009)

Commenter, Law & Psychology Roundtable, Washington University at St. Louis (March 2008)

Second Thoughts, Distinguished Speaker Lecture, McGeorge School of Law (February 2008)

The Ascendance of Social Frameworks, University of Virginia Faculty Retreat (January 2008) & St. Louis University School of Law (March 2008)

Reassessing the Predictive Validity of the Race IAT, Ohio State University Psychology Department (November 2007)

What Must Organizations Do to Check Implicit Bias?, University of Pennsylvania School of Law, Law and Economics Workshop (March 2007) & Ohio State University Moritz College of Law (November 2007)

Panelist, The Hows and Whys of Empirical Legal Scholarship, Southeastern Association of Law Schools (SEALS) Conference (July 2005)

Government Regulation of Irrationality:  Moral and Cognitive Hazards, University of Virginia Faculty Workshop (March 2005)

An Empirical Inquiry into the Relation of Corrective Justice to Distributive Justice, Vanderbilt University Law School Dean's Lunch (November 2004)
Libertarian Paternalism Is an Oxymoron, New York University, Department of Economics, Colloquium on Market Institutions and Economic Processes (November 2004)

Unconfounding Intuitions About Corrective and Distributive Justice, Florida State University College of Law Faculty Workshop (June 2004)

Case Studies, Counterfactuals, and Causal Explanations, Southeastern Association of Law Schools (SEALS) Conference, Young Scholars Workshop (July 2003)

Panelist, Construing Science in Context: What Do Judges Need to Know?, Southeastern Association of Law Schools (SEALS) Conference (July 2003)

Mapping Evidence Law, University of Florida Levin School of Law Faculty Workshop (March

24

2003) & Michigan State University DCL College of Law Conference on Visions of Rationality in Evidence Law (April 2003)

An Idiosyncratic View of Psychological Theory in the Law, MSU Clinical Psychology Group (April 2001)

Judicial Accountability and Public Perceptions of the Judicial System, MSU-DCL Law Review Forum on the Impact of the 2000 Elections on the Future of Our Courts (November 2000)

Legitimacy and Discretionary Legal Authority, Federal Judicial Center, Washington, DC (January 1994)

## **Teaching and Service**

Associate Editor, Journal of Empirical Legal Studies, 2006-2011

Occasional Referee for National Science Foundation, Israel Science Foundation, Swiss National Science Foundation, Netherlands Organisation for Scientific Research, university presses, conference programs, and journals, including AMERICAN PSYCHOLOGIST, CHILDREN & YOUTH SERVICES REVIEWS, CURRENT DIRECTIONS IN PSYCHOLOGICAL SCIENCE, GROUP PROCESSES AND INTERGROUP RELATIONS, JOURNAL OF APPLIED RESEARCH IN MEMORY AND COGNITION, JOURNAL OF EMPIRICAL LEGAL STUDIES, JOURNAL OF EXPERIMENTAL PSYCHOLOGY: APPLIED, JOURNAL OF EXPERIMENTAL PSYCHOLOGY: GENERAL, JOURNAL OF EXPERIMENTAL SOCIAL PSYCHOLOGY, JOURNAL OF LEGAL EDUCATION, JOURNAL OF PHILOSOPHY, SCIENCE AND LAW, JOURNAL OF RESEARCH IN PERSONALITY, JURIMETRICS, LAW AND HUMAN BEHAVIOR, LAW & SOCIAL INQUIRY, LAW & SOCIETY REVIEW, NEW IDEAS IN PSYCHOLOGY, PERSPECTIVES ON PSYCHOLOGICAL SCIENCE,  PSYCHOLOGICAL SCIENCE, PSYCHOLOGY, CRIME AND LAW, REVIEW OF PHILOSOPHY AND PSYCHOLOGY, SOCIAL JUSTICE RESEARCH, SOCIAL AND PERSONALITY PSYCHOLOGY COMPASS, SPANISH JOURNAL OF PSYCHOLOGY, SOCIAL PSYCHOLOGICAL AND PERSONALITY SCIENCE, and SOCIAL THEORY AND PRACTICE

**University of Virginia**

Courses:  Causation in the Law (with Barbara Spellman), Civil Procedure, Class Actions and Public Policy: Mass Torts, Employment Discrimination and Securities Fraud (with Laurens Walker), Employment Discrimination, Evidence, Judgment & Decision-Making, Law & Psychology and Moral Psychology & Law (co-taught with Jonathan Haidt & John Monahan)

Committees:  Academic Placement (2016-2017), Admissions (2007-2008), Appointments (Chair 2012-2013), Empirical Project Review (2006-2007, 2007-2008, 2010-2011, 2011-2012, 2014-1015), Faculty Enrichment (2014-2015), Faculty Retreat and Workshops (2011-2012, Chair 2015-2016), Graduation Awards (2015-2016), Junior Faculty Development (2007-2008), Lateral Appointments (2008-2009), Lecturers & Clinics (2010-2011), Lectureships and Speakers (2016-2017), Student Scholarship (2009-2010), Summer Workshops (2008), Tenure (2017-208), Tenure Subcommittee (2007-2008, 2009-2010, 2017-2018) and Women's Leadership Council (university committee, 2008-2013)

All-University Teaching Award, 2014

25

**Florida State University**

Courses:  Civil Procedure, Complex Civil Litigation, Contracts II, Evidence, and Employment Discrimination

Committees:  Academic Enrichment (2002-2003), Academic Waivers (2002-2003), Appointments (2003-2004, 2005-2006), University Library Committee (2002-2004), Library Steering Subcommittee (2003-2004), Library Patrons Subcommittee (2002-2003) and Library Resources Subcommittee (Chair, 2003-2004)

Faculty Advisor to Dispute Resolution Society and Mock Trial Team (2002-2005)

First Year Class Teacher of the Year and Co-Teacher of the Year 2003-2004; Second Year Class Teacher of the Year 2005-2006

**Michigan State University**

Courses:  Civil Procedure I, Civil Procedure II, Complex Civil Litigation and Evidence

Selected Teacher of the Year for Academic Years 2000-2001 and 2001-2002

Committees:  Faculty Appointments (2000-2002), Faculty-Student Liaison (2000-2002) and Writing Skills (2000-2001)

Faculty Advisor to Public Interest Law Society and Trial Practice Program

External Examiner for Psychology Dissertation Committees

**Vanderbilt University**

Course:  Evidence

**<u>Other Legal Experience</u>**

Doramus, Trauger & Ney                          June 1994-June 2000
Associate
Nashville, Tennessee

U.S. District Judge Thomas A. Wiseman, Jr.June 1993-June 1994
Judicial Clerk
Middle District of Tennessee, Nashville, Tennessee

Expert Consulting
                                                2006-present
LASSC, LLC
Charlottesville, Virginia

**<u>Bar Admissions</u>**

Tennessee (1994), Middle District of Tennessee (1994), U.S. Court of Appeals for the Sixth Circuit (1996), Eastern District of Tennessee (1997), and U.S. Supreme Court (1999)

**<u>Associations and Memberships</u>**

American Psychology-Law Society
Association for Psychological Science
Berkeley Law Foundation
Behavioral & Brain Sciences Associate
NBLSA Thurgood Marshall Mock Trial Competition Review Board, 2005-2006, 2010-2012
Harry Phillips American Inn of Court, 1997-1998
Board of Directors, Hands On Nashville, 1999-2000