# EXHIBIT E

# Sexual Harassment:
## Are we asking the right questions?

**Louise F. Fitzgerald**
**University of Illinois at Urbana-Champaign**

Good morning, everyone, and thank you very much for the opportunity to speak with you today. It is an honor to be here. My name is Louise Fitzgerald, and I am Professor Emeritus of Psychology and Women's Studies at the University of Illinois. I have, for better or worse, been studying sexual harassment since most of you were in middle school! I was the consultant to Professor Anita Hill's legal team and the government's witness in *U.S. v. Lanier*, ultimately decided by the Supreme Court – Judge Lanier had the unsavory habit of sexually harassing and assaulting both his female employees and the women litigants in his courtroom; we had eight victim witnesses, 3 wonderful DoJ prosecutors who, in 1993, had a difficult time believing that a judge would actually do these things and that a woman would "put up" with them and not run screaming to report. Part of my job was to help them understand those things. Part of my job was to help them understand those things. I'm very proud of that one. For his part, Judge Lanier continues to serve his 27 year term in federal prison.

To the degree I have any claim to fame in the sexual harassment world it is that I developed the Sexual Experiences Questionnaire (SEQ; Fitzgerald, et al., 1988), the only theory based, reliable and valid measure of the prevalence of sexual harassment in the workplace; over the last 25 years, the SEQ has been used by hundreds of researchers around the world, helping to inform both policy and practice. [1]

I am also the principal author of what has come to be known as the "Illinois Model" (Fitzgerald, et al., 1997), a comprehensive theory of the causes and consequences of workplace harassment, now considered the standard explanation. Finally, and close to my heart, I have worked to answer the question "Why didn't she just report him?" - an effort that has led to an understanding of the many ways that women resist and manage offensive sexual behavior at work, thus providing a challenge to the affirmative defense provided by Faragher (*Faragher vs. City of Boca Raton*, 1998).

My work has always had a practical bent as I am committed to using science to solve real problems for real people in the real world – and that is what I want to talk to you about today.

## Definitions and Data: Do we know what we're talking about?

I want to start with definitions. It has become commonplace to say that sexual harassment is widespread. I certainly don't disagree – but I do believe that we don't know exactly what that means. What are we "counting" when we count sexual harassment? Court cases? Formal complaints? Workplace surveys that document every offensive act, however minor or isolated? Such surveys count individuals who have heard one sexually offensive comment one time, along with those who have been grabbed, groped and coerced to have sex, as well as those who have been raped, rendering the overall figure difficult to understand.

<u>It is not that legally non-cognizable behavior or incidents are not important – they very clearly are</u>, if for no other reason than that a workplace rife with gender offensive behavior is far likelier than a respectful one to give rise to illegal sexual harassment claims that wind up before this Commission. It is also true that "minor" incidents matter because they cause clear, measurable damage to employees and meaningful costs to organizations through turnover, replacement and training costs, and health care usage. As long ago as 1994, Deborah Knapp and her colleagues demonstrated that sexual harassment cost the U.S. military 250 million dollars in non-litigation costs in one year alone (Knapp, et al., 1994; Knapp, et al., 1999).

But despite their arguably equal importance, these things are not the same. And this matters. Most basically, it matters because it means we don't know what we're talking about when we say SH is widespread and thus we lose credibility[2]. It matters because although the ultimate antecedents of these things may be similar, their proximal causes may be different. It matters because the men who perpetrate them, or the organizations they happen in may be different. And this means that solutions will differ.

I could go on about this for quite a while but will simply say we badly need a nationally representative survey capable of measuring both aspects of the problem. The technology is available (Fitzgerald, et al., 2010; Morrall, et al., 2014); we just need to do it.

## Training: Like Beauty, its own excuse for being

Training. I like to say that training, like beauty, is its own excuse for being. Although I'm tempted to moderate my remarks after reading Eden's very informative testimony, I'll stick to my guns and assert that we really know very little about training, partly because we don't really know what it is we want to accomplish, and for whom. Do we want to change behavior? Impart knowledge? Change attitudes? Avoid liability?

---

[2] See Morrall, et al., 2014, for a discussion of this issue as related to the biennial military studies.

A big part of the problem, to my mind, is that many of the people doing the training, that is, organizations and law firms, know exactly what they want to accomplish: the latter. Thus, the explosion of online training modules, with their accompanying "tests" that minimize cost and maximize accountability; these modules are almost certainly ineffective at anything but this practical but short-sighted organizational goal.

Psychologists actually know a great deal about how to change behavior (see, for example, the Theory of Reasoned Action; Fishbein & Ajzen, 1975); it is time to put that knowledge to work through a theory-based program of research that specifies training goals, target groups, and evidence-based methods for determining what works for each goal. Oh, and this needs to be done in the real world (that is, organizations) not on college students.

**Policies: Changing Climate or Avoiding Liability???**

Much of my remarks about training apply also to policy. What is the point of a sexual harassment policy, besides being able to say you have one? A less cynical observer might say that policies communicate the company's anti-harassment stance, educate employees as to prohibited behavior (as if they didn't already know they aren't supposed to grope their coworkers), and provide employees with avenues of redress.

I have no argument with any of that, but maintain that it's a very idealized version of how this really works. In reality, policies are too often written by attorneys, in overly legalized prose, at inappropriately high reading levels[3] and buried in employee handbooks and forgotten after the requisite employee signatures have been obtained.

<u>Despite this critique, I believe that what is done with the policy is more important than what it actually says</u>. I think of an effective policy as an ongoing dynamic intervention, introduced and reinforced at the highest, "middle-est" and lowest levels of management, with a multi-method, ongoing, and creative distribution system, and ongoing opportunities for discussion and education.

Why? What's so important about essentially "flooding" employees with the harassment (or, better, workplace respect) policy? <u>Because it communicates to employees that the organization takes this issue seriously – one of the very few things that is empirically known to reduce harassment rates</u> (Fitzgerald, et al., 1997).

---

[3] My colleagues and I recently did a reading level analysis of the policy of a mid-level restaurant chain whose employees were mainly uneducated Hispanic immigrants. It turned out that the policy prose required a university reading level, and that was for the minority who could read English.

<u>A similar approach should be taken with anti-retaliation provisions</u>, which should be given much more attention than they are. Introduced and reinforced at the highest levels and further reinforced with immediate and meaningful penalties, anti-retaliation provisions are one of the most important tools we have. Why? <u>Because they communicate to employees that it is safe to complain, that the company actually wants to hear about problems – once again, one of the few things that have been shown to reduce the incidence of sexual harassment</u>.

<u>And speaking of sanctions, they work</u> (Williams, et al., 1999). When employees understand that there are meaningful contingencies between their behavior and the organization's response, behavior changes – not just for the affected employee, but also for the entire organization. Potential perpetrators learn that the organization will not tolerate harassing behavior; possible victims learn it as well, thus strengthening their willingness to come forward, because they believe it is safe to do so, and that the organization takes this problem seriously.

Those of you who paid attention to Mindy's testimony will recognize that <u>I am talking about creating an organizational climate that does not tolerate sexual harassment</u>; in which employees believe that their company takes this issue seriously, that it is safe to complain, and there will be meaningful sanctions for those who violate the rules. As I have been saying, piecemeal, for the last few minutes, this set of perceived contingencies is one of the only two things that has ever been shown to reduce harassment.

So, while we are waiting the few millennia until the arrival of the other factor that has been shown to reduce harassment (a workforce that is meaningfully gender-integrated, both horizontally and vertically), it behooves us to search for additional ways to create a healthy organizational climate.

My wish list goes as follows:

A. National standardized survey to provide bench marks for various sorts of harassing behavior to identify scope of problem and help monitor progress.
B. Theory-based program of training-related research to determine what works for whom under what circumstances and toward what ends.
C. Revised approach to policy development, introduction, and dissemination, with an eye towards changing perceptions of organizational climate.
D. Thorough study, both survey and experimental, of factors that lead to AND inhibit retaliation.
E. For the EEOC and other pro-employee groups to take a proactive role in changing the paradigm from liability prevention to harassment

prevention through climate change. Very few business organizations will ever take this approach; if not us, who?[4]

**Thank you very much.**

---

[4] Dr. Fitzgerald can be reached at (217) 766-2064 and lff1353@gmail.com

## References

Faley, R. H., Knapp, D. E., Kustis, G. A., & DuBois, C. L. Z. (1994). Organizational costs of sexual harassment in the workplace: The case of the US Army. In *Ninth Annual Conference of the Society of Industrial and Organizational Psychology, Nashville, TN.*

**Faragher** v. City of **Boca Raton**, 524 U.S. 775 (1998)

Knapp, D. E., & Kustis, G. A. (1996). *The real" disclosure": Sexual harassment and the bottom line.* Sage Publications, Inc.

Fishbein, M. & Ajzen, I. (1975). *Belief, attitude, intention, and behavior: An introduction to theory and research.* Reading, MA: Addison-Wesley

Fitzgerald, L. F., Hulin, C. L., Drasgow, F., Gelfand, M., & Magley, V. (1997). The antecedents and consequences of sexual harassment in organizations: A test of an integrated model. *Journal of Applied Psychology, 82,* 578-589.

Morrall,

Williams, J. H., Fitzgerald L. F., & Drasgow, F. (1999). The effects of organizational practices on sexual harassment and individual outcomes in the military. *Military Psychology, 11,* 303-328.