IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTIE VAN, *et al.*, ) | |
| ) | Case No. 14-CV-08708 |
| Plaintiffs, ) | |
| ) | JUDGE ROBERT M. DOW |
| v. ) | |
| ) | MAGISTRATE SIDNEY I. SCHENKIER |
| FORD MOTOR COMPANY, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY, REPORTS, AND OPINIONS OF DR. LOUISE FITZGERALD**

Plaintiffs respond to Defendant's Motion to Exclude the testimony, reports and opinions of Dr. Louise Fitzgerald, and, and in support state:

**I.
INTRODUCTION**

Dr. Louise F. Fitzgerald, Ph.D., is highly regarded in the field of psychology as an expert on social psychology and specifically with respect to issues regarding gender and women's studies. (Ex. 1, Report of Dr. Louis Fitzgerald, PhD, at 2). Ford recognizes her as an expert in her field specializing in sexual harassment. (Doc. # 236, at 2). Dr. Fitzgerald is the Professor Emeritus of Psychology and Gender and Women's Studies at the University of Illinois at Urbana-Champaign. (Ex. 1, at p. 2). She has held appointments in the Divisions of Clinical/Community Psychology as well as Industrial/Organizational Psychology, and directed the Psychology and Law Clinic at the Psychological Services Center. (*Id.*). She has over twenty-five (25) years of experience specializing in sexual harassment, its risk factors, organizational causes, its psychological and other consequences, the ways in which victims respond to sexually

harassing situations, and how work organizations and educational institutions can prevent, discourage, and remedy this problem. (*Id.,* at pp. 2-3). She has repeatedly been qualified as an expert witness in both state and federal court. (*Id.*). Her writings, research and opinions have been cited by federal and state courts in order to explain in legal opinions psychological issues involved in sexual harassment cases. *See, e.g., Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1179 n.24 (9th Cir. 2003); *Kanzler v. Renner*, 937 P.2d 1337, 1342 (Wyo. Sup. Ct. 1997); *Retherford v. AT&T Communications of Mountain States, Inc.*, 844 P.2d 949, 978 (Utah Sup. Ct. 1992). She served on Anita Hill's legal team during the Clarence Thomas confirmation hearings, and has more recently been hired by the United States Court of Appeals for the Eighth Circuit to serve as the Senior Research Consultant for the Eighth Circuit's Gender-Fairness Task Force. (Ex. 1, at p. 3).

Federal agencies have requested she speak, testify and consult in connection with organizational sexual harassment issues, including the U.S. Departments of Justice and Defense, the U.S. Merit Systems Protection Board, the EEOC and its Select Committee on Harassment in the Workplace, and the National Institute of Health and its Advisory Committee on Sexual Harassment and Workplace Climate. *Id.*

Dr. Fitzgerald is the preeminent expert sexual harassment in the workplace and organizational behaviors. She is qualified to analyze the data and provide expert testimony relating her research and experience to the evidence obtained in discovery to better assist the fact-finder in determining issues of commonality, typicality and adequacy of representation in this case.

Dr. Fitzgerald does not offer opinions on subjective effects of sexual harassment on an individual or on damages. (Ex. 1; Ex. 2 – Rebuttal Decl. of Dr. Louise F. Fitzgerald, PhD., at ¶ 4). Rather, Dr. Fitzgerald has used methods and relied on concepts and information generally accepted as reliable by other experts in her field (Ex. 2, at ¶ 15), to formulate her opinions that if the evidence and data on the whole (documents produced in discovery and witness statements and depositions) are true, a common question that an objectively hostile workplace environment exists, and a common, meaningful injunctive remedy is required to make it stop:

1. The Chicago Ford Plants, both CAP and CSP, exhibit high levels of every indicator of risk for harassment known to social science.

2. The working environment at the Chicago Ford Plants (CAP and CSP) appears to be permeated with sexual harassment of the grossest, ugliest, and most degrading kind. . . . the harassment is so pervasive as to have inevitably exposed every female employee of the plants, to a greater or lesser degree. At the very least, every female employee works in an environment in which women, sex, and sexuality are insulted and degraded as a matter of course. These events are neither random, isolated, nor unique, but rather constitute the warp and woof of everyday life in the plant.

3. Ford is aware of this situation and has been since at least 2012 and has chosen to ignore, obscure, downplay and otherwise failed to take is obligations seriously.

4. There is an urgent need for comprehensive, long term, monitored interventions in these plants with the aim of changing behavior, behavioral contingencies, employee perceptions, management attitudes, and the entire organizational climate. Anything less constitutes a waste of time and resources, as well as a threat to organizational reputation and good will, and – most importantly – worker psychological health, physical safety, and overall wellbeing.

(Ex. 1, at p. 67-68).

Dr. Fitzgerald's opinions bear on commonality, typicality and the need for a common, meaningful injunctive remedy. (*Id.*).

Ford criticizes Dr. Fitzgerald's report is "unreliable" because it is neither a clinical study of individuals in the plant nor based on an empirical study. However, Dr. Fitzgerald did not set out to analyze individuals' credibility, subjective feelings toward harassing conduct or damages (Ex. 2, at ¶¶ 5-7) for which a clinical study may be appropriate. Nor does well established methodology in her field require that she conduct an empirical study. (Ex. 2, at ¶¶ 10-11, 13). Dr. Fitzgerald's methodology connecting the data in the case with her expert knowledge and research to formulate her opinions is a well-established methodology recognized by other professionals in her field and is reliable. (Ex. 2, at ¶ 15).

## II.
## STANDARD

### A. Expert Testimony Is Appropriate If Scientific Or Technical Knowledge Will Assist A Trier Of Fact To Understand Evidence Or Determine A Fact

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993)("*Daubert*"), govern the admissibility of expert testimony. *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 U.S. Dist. LEXIS 48792, at *7-8 (N.D. Ill. Mar. 31, 2017)(Dow, D.J.), citing *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Rule 702 permits the admission of expert opinion testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also, Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49, 119 S. Ct. 1167 (1999) (discussing Daubert and finding no "convincing need" to draw a distinction between "scientific" and "technical" knowledge).

4

Trial courts are obligated to act as gatekeepers to ensure that the expert testimony is both relevant and reliable. *In re Fluidmaster, Inc.*, 2017 U.S. Dist. LEXIS 48792, at *7-8, citing *Gayton*, 593 F.3d at 616; citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49, 119 S. Ct. 1167 (1999). However, the "basic standard of relevance . . . is a liberal one." *Daubert*, 509 U.S. at 587). When F.R.E. Rule 702 was amended in 2000 to formalize aspects of the *Daubert* decision, the amendment drafters and the courts continued to regard the admissibility standard to be permissive. *See* FED. R. EVID. 702 advisory committee's note ("[R]ejection of expert testimony is the exception rather than the rule."); *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (noting that Rule 702 declares a liberal standard of admissibility).

### III.
### ARGUMENT

In reviewing a motion to exclude testimony under Rule 702, the district court must "ascertain whether the expert is qualified, whether his or her methodology is reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue." *Smith v. Farmstand*, 2016 U.S. Dist. LEXIS 122062, at *60-63 (N.D. Ill. Sep. 9, 2016) (Dow, D.J.). Under Federal Rule of Evidence 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony: "It must determine whether the witness is qualified[1]; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.' *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

---

[1] Defendant does not contest whether Dr. Fitzgerald is "qualified" to provide expert testimony.

5

**A. Dr. Fitzgerald's Methodology Is Scientifically Reliable And Will Assist The Fact Finder In Determining Issues Related To Class Certification**

This Court recognizes that the test for reliability is "flexible" and that it has broad discretion to admit Dr. Fitzgerald's Report and opinions:

> *Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. "[T]he test of reliability is flexible," however, "and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation omitted). "Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted); see also *Pansier*, 576 F.3d at 737 (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable" (emphasis omitted) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007))); *Lewis*, 561 F.3d at 704-05 ("[T]he law grants the district court great discretion regarding the manner in which it conducts that [*Daubert*] evaluation."

*Smith v. Farmstand*, 2016 U.S. Dist. LEXIS 122062, at *61-62 (N.D. Ill. Sep. 9, 2016) (Dow, D.J.).

### 1. Dr. Fitzgerald's Reasoning And Methodology Are Accepted In The Relevant Scientific Community

In assessing the admissibility of proposed expert testimony, the Court's "focus, of course, must be solely on principles and methodology . . ." *Daubert*, 509 U.S. at 595. "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

Dr. Fitzgerald has provided opinions connecting her social science and psychological research of organizations to facts of the case obtained through her review of deposition transcripts, documents produced in discovery and pleadings in this case.

6

There is extensive history of social science testimony such as what Dr. Fitzgerald provides here, being allowed and relied upon in employment discrimination cases, in which psychological research has been applied to the facts of a specific case without clinical examinations of individual class members. *See, e.g.*, *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 855 (D. Minn. 1993); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775 (1989); *Robinson v. Jacksonville Shipyards*, 760 F. Supp. 1486, 1539 (M.D. Fla. 1991). Indeed, this methodology has been deemed acceptable ever since the advent of sexual harassment litigation. *See*, *Jenson*, 824 F. Supp. at 855; Ex. 1, at p. 2 (identifying *Jenson* as the first sexual harassment lawsuit in the United States). In *Jenson*, expert testimony was admitted based on the expert's psychological knowledge and research and his review of exhibits produced by the parties, deposition transcripts and digests of witnesses, and transcripts and observations of court proceedings. *Id.*

Dr. Fitzgerald is using a similar methodology as the one which was accepted as appropriate in *Jenson*. (Ex. 2, at ¶ 10).

One of Defendant's alleged experts, Professor Gregory Mitchell, an attorney, co-authored a law review article espousing his views on what should be and what should not be admissible ---- but those are only *his* views. Mitchell believes that an expert who evaluates an employer's policies and practices in light of the available social science research without doing an extensive and expensive workplace-specific study would be offering an unscientific opinion. (Ex. 2, at ¶ 11, citing Monahan, John, Laurens Walker & Gregory Mitchell, Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks," 94 VA. L. REV. 1715, 1718–19 (2008)).

That is precisely what Ford has hired Mitchell to say in this matter, (Ex. 2, at ¶ 11), and what Ford argues should be the standard for reliability in this case. (Doc. # 236, at p. 7). Yet, Mitchell's opinion is nothing more than legal argument – it is not a scientific argument (Ex. 2, at pp. 4-5) - and should be disregarded.

Contrary to Mitchell's view, legal scholars note that the analyses such as that performed by Dr. Fitzgerald is an acceptable methodology within the scientific community and criticize Dr. Mitchell's insistence that only he should dictate the methodology used to perform such analysis. (Ex. 4 – Melissa Hart and Paul M. Secunda, A Matter of Context: Social Framework Evidence in Employment Discrimination Class Actions, 78 Fordham L. Rev. 37 (2009), Available at: http://ir.lawnet.fordham.edu/flr/vol78/iss1/12 (last viewed, Mar. 23, 2018).

The categorical exclusion that Defendant and its expert propose is contrary to the general presumption in favor of admissibility under the Federal Rules of Evidence. *See*, *Daubert*, 509 U.S. at 595. The broad rejection of opinion testimony, absent person-by-person clinical testing, is entirely inconsistent with an expert's "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id.,* at 592. Further, "[t]rained experts commonly extrapolate from existing data" so long as the opinions generated from that data are not merely "*ipse dixit*" in nature. *General Electric Co. v. Joiner*, 522 U.S. 136 (1997).

What Ford suggests should be the standard here runs afoul of what has been allowed in other cases. Courts have regularly admitted expert testimony in which an expert applies extensive experience and research in a particular field to analyze an array of facts in a way that might assist a fact finder in better understanding a legal or

factual issue. *See, e.g., Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 705 (7th Cir. 2008); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, Nos. 1:00-1898, MDL 1358 (SAS), M21-88, 2008 U.S. Dist. LEXIS 37331, at *23 (S.D.N.Y. May 7, 2008)(finding that the expert might instead "appl[y] his extensive experience in [the subject matter of his opinion -] ethanol production and distribution logistics to analyze an array of facts").

Ford's position disregards the fit between social science expertise like that offered by Dr. Fitzgerald and the specific questions being considered at the class certification stage of employment litigation: commonality; typicality; and adequacy of class representation.

Ford and Mitchell also insist that Fitzgerald's opinion should be excluded because she performed no survey. But as Dr. Fitzgerald points out, surveys are not reliable and are not typically used in sexual harassment cases. (Ex. 2, at ¶ 14).

District courts are well within their discretion to admit social framework expertise that addresses general research on organizational behavior and social cognition theory and examines and offers opinions on the policies and practices in operation in the particular workplace. There is no requirement, either scientific or legal, that an expert must base his or her opinion only on an empirical study of the organization at issue, including a reliable and valid survey and suitable statistical analysis.

The question that ultimately must be answered in evaluating the admissibility of this expert testimony is whether it fits with the relevant scientific discipline and with the legal issue to which it is directed. In this case, it does.

9

### a. Dr. Fitzgerald did not undertake a clinical or statistical analysis; her conclusions are based on the data produced

Organizational behaviorists and social psychologists, such as Dr. Fitzgerald, who provide expert social science testimony at class certification opine on whether the plaintiffs were subject to common employer policies or practices that satisfy the Rule 23 commonality requirement. Social framework testimony offered by plaintiffs' experts in these disputes helps the fact finder to understand how an array of policies and practices in a particular workplace can operate together to create that common question.

"The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or where appropriate, on summary judgment." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability ... is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."). "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower*, 732 F.3d at 806.

"This is not to say that an expert may rely on data that has no quantitative or qualitative connection to the methodology employed." *Id.* at 808. Indeed, Rule 702 explicitly requires that expert testimony be "based on sufficient facts or data." Fed. R. Evid. 702. In the "quantitative" sense, "sufficient facts or data means that the expert considered sufficient data to employ the methodology"; "an opinion about an average gross sales price," for example, "could not be reliably supported by evidence relating to

sales to only one customer because a single observation does not provide a sufficient basis for calculating an average." *Manpower*, 732 F.3d at 808. To be "qualitatively" adequate, "an expert must employ 'those kinds of facts or data' on which experts in the field would reasonably rely." *Id.* at 809 (quoting Fed. R. Evid. 703).

Dr. Fitzgerald's approach to connecting her expert knowledge and research in the field with the facts in the case was never designed to be a clinical analysis. Rather, it is a social framework analysis based on research and experience. (Ex. 5 – Dep. of Louise Fitzgerald, at pp. 206-207).

> The scientific underpinnings of the report are drawn from peer-reviewed studies with known and specifiable error rates and are accepted as authoritative in the scientific community; the facts of the case are presented as they have been made known in the case materials made available; and my opinions represent "if-then" statements assuming the facts are shown to be largely as alleged.

(Ex. 1, at p. 2-3).

The data used in performing this analysis was the documents and the case materials, including over forty depositions and over 100,000 pages of documents that included witness reports and statements, investigation reports and disciplinary files. (*Id.*). Dr. Fitzgerald's empirical evidence is based on "sufficient data."

### b. Dr. Fitzgerald is entitled to make opinions assuming that the data and documents she reviewed were truthful

Ford claims it is somehow detrimental that Dr. Fitzgerald recognizes the validity of her opinions rely on the validity or truthfulness of the data she reviewed. However, such criticism is misplaced and contrary to the law.

"[E]xperts may rely on data and other information supplied by third parties." *In re Fluidmaster, Inc.*, 2017 U.S. Dist. LEXIS 48792, at *19-21 (N.D. Ill. 2017)(Dow, D.J.). This is true "even if the data were prepared for litigation by an interested party." *Id.*

Dr. Fitzgerald's opinion complies with the standards this Court recognized in its *Fluidmaster* opinion. She is entitled to rely on the data being correct in making her opinions – and it is off-base for Defendant to criticize her opinions as being "speculative" merely because the veracity of testimony she considered may ultimately be decided by a trier of fact. Thus, the Court should disregard Defendant's criticism that her analysis is "unreliable" because her opinions are "if-then" in nature.

Dr. Fitzgerald specifically accounts for the credibility issue and makes clear she is not opining on the truthfulness of any particular witness' testimony. (Fitzgerald Rebuttal Declaration at ¶ 5. Dr. Fitzgerald is not opining that the events and experiences reflected in testimony from the plaintiffs and other witnesses is true or that those events actually occurred. Rather, Dr. Fitzgerald has opined that *IF* that evidence is true and those events are found to have occurred *THEN* her conclusions follow.

### 2. Estoppel precludes Ford from insisting Dr. Fitzgerald should have conducted interviews with all potential class members

Ford insists that Dr. Fitzgerald should have conducted interviews with putative class members. Equitable estoppel precludes Ford from even making such an argument. Equitable estoppel is a general equity principle which prohibits a defendant from benefiting where it took active steps in stating a position to induce a plaintiff to act, from later reneging on its position for its benefit if such action is deemed inequitable (for example, promising not to plead a statute of limitations defense in order to induce a

plaintiff to delay filing suit). *See, Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990); *Holmberg v. Armbrecht*, 327 U.S. 392, 396-97, 66 S. Ct. 582 (1946).

Ford has repeatedly refused to identify the putative class members in response to Plaintiffs First and Fourth sets of interrogatories. (*See, e.g.,* Ex. 6 – Ford's Resp. to Pl's 1st Set of Interogs, at Resp. to Interrog. #10; Ex. 7 – Ford's Resp. to Pl's 4th Set of Interrogs.). Plaintiffs sought names of female current or former employees who worked in at the Ford Chicago Assembly and Stamping Plants between 2012-present. (Ex. 7, at #2, #5). Plaintiffs sought contact information for these same current or former employees. (*Id.*, at # 3, #6). Ford uniformly objected that:

> No class has been certified; as such, this request is premature and not necessary for purposes of class certification motion practice. Ford further objects to this request for identification of every such current or former employee as overbroad and not proportional, in that it seeks information on non-party employees who may have no knowledge concerning any Plaintiff's claims and/or may consider such identification inappropriate. . . .

(*Id.*).

Dr. Fitzgerald states that lack of access to the putative class members prohibits her ability to gain access to conduct such a statistical survey. (Ex. 2, at ¶ 14(a)). Consistent with this, Ford has objected to even identifying the names of the proposed putative class members it seemingly contends Dr. Fitzgerald should have surveyed in order to adequately support her opinions. (Ex. 5). Nor has Ford been willing to permit class counsel to contact individual class members by and large. Ford's actions and objections to making the possibility of a survey available should equitably estop Ford from claiming she should have conducted such a survey, and such an argument is not a valid criticism of Dr. Fitzgerald's work.

13

Furthermore, as Dr. Fitzgerald points out there are significant problems associated with the type of survey Mitchell suggests. Beyond access to a statistically significant sample size, there is a problem with bias. (Ex. 2, at ¶ 14(b)). Survey participants who are victims may over-report their experiences while others may under-report based on fear of the plant closing or fear of retaliation. (*Id.*).

### 3. Dr. Fitzgerald's Supplemental Declaration Is Admissible

Dr. Fitzgerald has opined on the propriety and efficacy on Ford's Conciliation Agreement with the EEOC. (Ex. 3 – Dr. Fitzgerald's Suppl. Decl.).

Ford effectively contends that her opinion is not relevant because she is offering an opinion to what Ford suggests is a "legal issue" – whether the Conciliation Agreement renders "certification of a class here unnecessary, wasteful and inappropriate." (Doc. # 236, at 15).

However, Dr. Fitzgerald's opinion is relevant if the "reasoning or methodology properly can be applied to the facts in issue," and "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Daubert*, 509 U.S. at 593; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); Fed. R. Evid. 702.

In this situation, Dr. Fitzgerald is not opining on the legal consequences of the EEOC Conciliation Agreement. Rather, she is providing an opinion based on her experience, research and expertise in organizational psychology, and as a social scientist as to the efficacy of the Conciliation Agreement and her opinion on whether it will remediate sexual harassment at Ford's Chicago Assembly and Stamping Plants.

Dr. Fitzgerald's reports and opinions are regularly admitted as evidence with respect to issues of sexual harassment, its causes and remedies, and courts

considering objections to her testimony have consistently ruled such objections only go to the weight of her testimony. *See, e.g., Wendt v. Charter Communs., LLC*, No. 13-1308 (RHK/TNL), 2014 U.S. Dist. LEXIS 199233, at *1-3 (D. Minn. Oct. 31, 2014)(Kyle, D.J.). The same should be true here, where Dr. Mitchell's criticisms regarding Dr. Fitzgerald's methodology is only one subset of legal discourse, rebuffed by the writings of other legal scholars, (Ex. 4), and which disregard that the extensive history of courts admitting expertise and opinions to assist triers of fact in cases like this based on the same methodology Dr. Fitzgerald uses here. (Ex. 2, at ¶ 10); *see, e.g., Jenson*, 824 F. Supp. at 855; *Price Waterhouse*, 490 U.S. 228; *Robinson*, 760 F. Supp. 1486.

To the extent any such objection exists here, it merely goes to the weight afforded to her Declaration and testimony – not its admissibility.

Accordingly, Dr. Fitzgerald's Report, Declaration and Testimony should be ruled admissible and Ford's Motion to Exclude should be denied.

## IV.
## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court deny Defendant's Motion to Exclude the Testimony, Reports and Opinions of Dr. Louise Fitzgerald, and for such further relief as this Court deems appropriate and just.

    Respectfully submitted,

    <u>/s/ Keith L. Hunt (electronic signed)</u>
    Attorney for Plaintiffs

Keith L. Hunt
Bradley E. Faber
Hunt & Associates, P.C.
Three First National Plaza

Suite 2100
Chicago, IL 60602
(312) 558-1300

## **CERTIFICATE OF SERVICE**

I hereby certify that I am an attorney in this cause and that I caused to be served Plaintiffs' Response to Defendant's Motion to Exclude the Testimony, Reports and Opinions of Dr. Louise Fitzgerald on counsel for all parties of record as listed below by email through the Court's CM/ECF system on March 23, 2018.

Timothy S. Millman
Kathleen M. Nemechek
Berkowitz Oliver Williams
Shaw & Eisenbrandt LLP
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri 64108
Tel.: (816) 561-7007

Eugene Scalia
Thomas M. Johnson, Jr.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Tel.: (202) 955-8500

Mark H. Boyle
Karen Kies DeGrand
Donohue Brown Mathewson & Smyth LLC
143 South Dearborn Street, Suite 800
Chicago, Illinois 60603
Tel.: (312) 422-0900

By: /s/ Keith L. Hunt (electronic signature)
An Attorney for Plaintiffs