IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTIE VAN, *et al.*, ) | |
| ) | Case No. 14-CV-08708 |
| Plaintiffs, ) | |
| ) | ROBERT M. DOW |
| v. ) | |
| ) | MAGISTRATE SIDNEY I. SCHENKIER |
| FORD MOTOR COMPANY, ) | |
| ) | |
| Defendant. ) | |

## REBUTTAL DECLARATION OF DR. LOUISE F. FITZGERALD, PH.D.

I, Louise F. Fitzgerald, Ph.D., declare and offer the following response to the reports of Dr. Lisa Gold and Professor Gregory Mitchell:

1. I am the Plaintiffs' expert in this case and my curriculum vitae was previously submitted with my Report which was submitted in Appendix C in support of class certification, that is, the plaintiffs' attempt to satisfy the requirements of Rule 23 (1) a, which require a showing of numerosity, commonality, typicality, and capability. (Docket No. 213)

2. I have acted as an expert in a number of class action and individual cases, including *Jensen vs. Eveleth Taconite Mines*, *130 F.3d 1287 (8th Cir. 1997)*; *Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc., 957 F. Supp.1460, 1474 (N.D. Illinois, 1997)*; *Martens v. Smith Barney Inc., 181 FRD 243 (SDNY 1998); Warnell & Rapier, et al. vs. Ford Motor Company* (98 C 1503) N. D. Ill. (J. Bucklo)*; Elkins, et al. v. American Showa, Inc.*, (*C-1-99-988)*S. D. Ohio. I have also been retained by the EEOC

to act as an expert and recently was asked to testify before the EEOC Select Task Force on Sexual Harassment.

3.  In my experience, class action litigation typically proceeds in stages: certification, liability, and damages.

4.  The validity of plaintiffs' allegations (liability) is not at issue here, nor is any psychological or other distress they may have suffered (damages). I have offered no opinions on those issues.

**A. Dr. Gold misunderstands the purpose of my report.**

5.  Dr. Gold's criticisms of my report turn on her apparent belief that I am attempting to offer substantive opinions concerning credibility, "welcomeness", and psychological harm. I am not. My purpose, as I clearly state on page 5 is:

> *The specific issue addressed by this report concerns the organizational climate for sexual harassment* at the Chicago Assembly and Stamping Plants of Ford Motor Company ("Ford") at the time covered by the complaint (2012-present)." (emphasis added)
>
> Organizational culture[1] is a system of shared assumptions, values and beliefs that governs how people in an organization behave. The culture of an organization breeds an organizational climate, which represents how members of an organization experience that organization's culture. Climate is always climate for or about "something", some aspect of the organization such as safety, honesty, respect; in this case I examined the overall climate for sexual harassment at Ford Motor Company Chicago. Such an analysis is relevant for class certification purposes as it creates a picture of the entire organization with respect to organizational policy, practices and other relevant issues. The broad sweep of a culture/climate analysis for harassment involves not only complaints, statements, and even testimony, but also organizational policies, disciplinary records, gender analysis (both horizontal and vertical) and more, grounded in the large body of well-accepted research on sexual harassment in organizations.

---

[1] (From original report) "The distinction between culture and climate need not concern us here."

2

(See Doc. No. 213 – Appendix C to Pltf. Memo in Support of Class Certification - Fitzgerald Report at 5).

**B.  Dr. Gold misrepresents my report.**

6.  Dr. Gold criticizes my work on the grounds that I am in no position to formulate reliable opinions with respect to:

   a.   the truth of the plaintiffs' allegations

   b.   whether any of the alleged behavior at Ford was "unwelcome" to the plaintiffs;

   c.   whether the plaintiffs suffered negative psychological consequences as a result of this alleged conduct.

7.  <u>This is the fallacy of the "straw man", as I did not attempt to render any of the opinions she lists.</u>[2]  Indeed, at least two of these opinions [(a) and (b)] (listed above in par. 6) are beyond the scope of any expert opinion, being solely reserved to the trier of fact.  With respect to negative psychological consequences, psychologists are indeed discouraged from offering a diagnosis or clinical opinion concerning any particular individual absent a thorough clinical evaluation, including a diagnostic interview. It is the case, however, that I offered no such diagnosis or clinical opinion about any individual plaintiff nor about the class as a whole.

8.  In sum, Dr. Gold misunderstands the purpose of what I am doing and criticizes me for opinions that I did not offer on the basis that I arrived at them in an improper manner.  Her report is irrelevant, off-point and has nothing substantive to offer

---

[2] No place in my report does there appear any such analysis; indeed, as I clearly state: *"I take no formal position on the validity of the complaints themselves but attempt to provide an overview and analysis of what the would-be class representatives are claiming, and situate this analysis within the context of the empirical research on this topic."* (p. 36)

3

the court.

### C. Professor Mitchell has offered a legal opinion, not a scientific one.

**9.** Professor Gregory Mitchell is an attorney, social psychologist and Professor of Law at the University of Virginia. He is perhaps best known for his view as expressed in his law review article that social scientists should not be allowed to offer expert testimony in discrimination and harassment cases absent an empirical study of the specific workplace, preferably including a reliable and valid survey focused on the issues of the case. (See *fn* 3 below). His opinion in this case represents nothing more than a recycling of his law review article. His opinion is not based on any fact or evidence from this case because, as Professor Mitchell readily admits in his deposition, he never reviewed a single document or piece of evidence in this case. Professor Mitchell did not read any depositions.

**10.** In this case, Professor Mitchell offers the same view he presented in his law review article – and levels his "signature" criticism at my report. Professor Mitchell is incorrect. There is extensive history of social science testimony being offered in employment discrimination cases, which testimony can and has been applied to the facts of those specific cases (see, e.g., *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989*); Lois Robinson vs. Jacksonville Shipyards Inc.* 760 F.Supp. 1486 (1991); *Jensen, et al. vs. Eveleth Taconite Mines, Inc.* 824 F. Supp. 847 (1993).

**11.** Professor Mitchell criticizes my report for being unreliable and unscientific because I did not conduct an empirical study at Ford before authoring my report; however, absent the fiat contained in the law review article co-authored with his

4

colleagues (Monahan, Walker & Mitchell, 2008)[3] there is no requirement that I do so and a long litigation history to the contrary.

12. Dr. Mitchell makes much of the fact that I utilized the term "social framework report" in my report[4] and insists that what I did was not a social framework approach because by (his and his colleagues) definition, social framework reports do not include application of scientific facts to a specific case. He then offers a laundry list of criticisms, all of which boil down to:

 a. I did not conduct an empirical study; and

 b. My work cannot be classified as social framework, according to his definition;

 c. Because I did not conduct an empirical study, my opinions are not reliable.

13. The only potentially relevant criticism here is the third. Dr. Mitchell has become well known in the psycho-legal literature for his views on this topic (c). Yet, as Hart and Secunda (2009)[5] point out, this is essentially a legal opinion concerning the type of evidence that should be admissible for class certification. There are a number of counter-arguments to his assertion, but they are also legal in nature and thus not appropriate for an organizational scientist to make. Rather, I offer the following points:

---

[3] Monahan, J., Walker, L. & Mitchell (2008). "Contextual Evidence of Gender Discrimination: The Ascendance of 'Social Frameworks'", *Virginia Law Review*, *94*, 1715, 1718-1719

[4] "In the legal and psychological literature, such a report is sometimes referred to as social framework evidence; in other words, the consultant reviews the relevant facts and psychological literature, summarizes research findings, and offers an empirically-grounded opinion that responds to the questions posed." (Fitzgerald report, p.4).

[5] Hart, M., & Secunda, P. (2009). A. matter of context: Social Framework Evidence in Employment Discrimination Class Actions. *Fordham Law Review, 78*, 37-70D

5

a. There is no requirement, either scientific or legal, that an expert must base his or her opinion on an empirical study of the organization at issue, including preferably a reliable and valid survey and suitable statistical analysis.

b. What is today referred to as "social framework analysis" existed long before Professor Mitchell's colleague (Professor John Monahan) coined the term. Originally known as a "Brandeis brief", such analysis dates (most famously) to the 1908 Supreme Court decision, *Muller v. Oregon*, and is named for then-litigator and eventual associate Supreme Court Justice Louis Brandeis, who presented it in his argument in Muller, using social science research in support of a state law restricting the number of hours women were allowed to work; This strategy of combining legal argument with scientific evidence was subsequently used in *Brown v. Board of Education* to demonstrate the harmful psychological effects of segregated education on African-American children. Not only did such evidence exist, but has subsequently been accepted in a number of high profile employment discrimination cases, as it applied to the facts of the specific case.

c. Professor Mitchell's critique of my report, which he offers without examining a single document upon which I relied nor even a single document in the case, is but another recycling of his law review articles which argue for a particular legal approach for testing discrimination. It has everything to do with his philosophical and socio-legal position, and

has nothing to say about my report and the substance of my opinions.

14. Surveys, like the one Professor Mitchell suggests, can be problematic for a number of reasons:

    a. The first and perhaps most obvious reason is access to Ford's employees. There is no way to gain access to a statistically appropriate sample of Ford's employee population at these plants. Not only would this require full access to job information for every employee to support the selection of a random sample, stratified across (at least) shift and department, Ford is not going to allow me free access to roam around its plants or to randomly select its employees to be surveyed or interviewed. Ford has not even permitted plaintiffs' counsel to directly contact many of its employees. It is also my understanding that class counsel are not permitted to contact putative class members prior to certification. How then can a survey be conducted in this case?

    b. The second and perhaps more important reason that surveys are not usually appropriate in sexual harassment cases is the inherent problem of bias. This can manifest itself in at least three (3) ways:

        i. If Ford is involved in selection which employees comprise the sample for a survey, then Ford could "cherry pick" employees to influence the outcome – much as it has done in its opposition to class certification by including the affidavits of 12 people who claim not to have been harassed;

        ii. There is a potential bias of survey subjects who believe they are

7

        victims to potentially over-report their experiences; and

   iii.  There is also the potential tendency of non-victims to under-report their experiences and observations due to fear (e.g. fear of retaliation or of the plant closing etc.).

   iv.  Although methods exist to counter such problems in many cases, it is my opinion that they are simply not powerful enough to counter these competing influences given the contentiousness, polarization and downright hostility that has developed in the Ford workforce over the course of this litigation. Surveys can be used to much better effect once litigation is complete (e.g., identify high-risk areas in the plants, track progress, summarize information for damages determination across a large number class members). Such post-determination surveys have been successfully used in other profile class action cases (see, e.g., *Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc., 957 F. Supp.1460, 1474 (N.D. Illinois, 1997*); *Martens v. Smith Barney Inc., 181 FRD 243 (SDNY 1998);*

For each of these reasons and perhaps others, in my experience, while surveys are sometimes used in class action wage or disparate impact cases (which rely primarily on document analysis), surveys are typically not used in sexual harassment cases.

    15.    Each of the opinions I expressed in my report, my Supplemental Declaration/Affidavit, my deposition and in this Rebuttal Declaration are expressed to a reasonable degree of psychological and scientific degree of certainty and are based on materials, , evidence, information, principles and sources customarily relied upon by

other experts in my field and are developed using methods and relying on concepts and information generally accepted as reliable by other experts in my field.

16. I declare under penalty of perjury and the penalties imposed under 28 U.S.C. § 1746 that the foregoing statements are true and correct.

March 22, 2018

*Louise Fitzgerald*
Dr. Louise Fitzgerald, PhD.