IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTIE VAN, CHARMELLA LEVIEGE, MARIA PRICE, HELEN ALLEN, JACQUELINE BARRON, THERESA BOSAN, SHRANDA CAMPBELL, KETURAH CARTER, MICHELLE DAHN, TONYA EXUM, JEANNETTE GARDNER, ARLENE GOFORTH, CHRISTINE HARRIS, ORISSA HENRY, LAWANDA JORDAN, DANIELLE KUDIRKA, TERRI LEWIS-BLEDSOE, CONSTANCE MADISON, CEPHANI MILLER, MIYOSHI MORRIS, STEPHANIE SZOT, SHIRLEY THOMAS-MOORE, ROSE THOMAS, TONI WILLIAMS, BERNADETTE CLYBURN, MARTHA CORBIN, ANGELA GLENN, LADWYNA HOOVER, OGERY LEDBETTER, LATRICIA SHANKLIN, ANTOINETTE SULLIVAN, DERRICKA THOMAS, and NICHEA WALLS, each individually and on behalf of all similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 1:14-CV-08708<br><br>Honorable Sharon Johnson Coleman<br>Honorable Sidney I. Schenkier |

**DECLARATION OF LOUISE FITZGERALD**

I, Louise F. Fitzgerald declare:

1. I am an expert retained by the plaintiffs in the above matter. My initial report was due on August 30, 2017 and was to be focused on the pervasiveness of sexual harassment and the work environment at Ford's two Chicago area facilities, the Chicago Stamping Plant and the Chicago Assembly Plant. Two days before my report was due, on August 28, 2017, Ford produced a Conciliation Agreement which it entered with the EEOC. I was then asked to opine of the propriety and efficacy of the Conciliation Agreement.

2. Unfortunately, given the lack of time prior to the due date, and the fact that I was forced to evacuate the state of Florida (where I reside) due to Hurricane Irma, I was unable to complete my evaluation of the Conciliation Agreement prior to releasing my report on September 8, 2017. I did not return my home in Florida until after the report was produced. Indeed, I spent most of the time between August 28, 2017 and September 8, 2017, preparing to evacuate Fr. Lauderdale (where I live) and travelling to Orlando which was originally thought to be a safe inland location. However, after arriving at Ft. Lauderdale, we were told to evacuate the State of Florida which we ultimately did. As such, I was not able to fully present my opinions regarding the efficacy and appropriateness of the Conciliation Agreement.

3. In rendering the opinions in this affidavit, I am relying the materials upon which I relied in rendering my September 8, 2017 report and in particular the 2017 conciliation agreement, the 1998 conciliation agreement, the 2000 stipulation and settlement agreement and the EEOC Monitors Reports (Both Interim and Final) issued in connection with the 2000 Stipulation and Settlement Agreement as well as body of knowledge I have amassed over an entire career spent studying sexual harassment and its effects on the workplace and workers. I am also relying on EEO – 1 reports which Ford produced during discovery regarding the number of black and female workers at Ford's Chicago plants. These are the documents on which I am relying in rendering this opinion.

4. I have reviewed the 2017 conciliation agreement and have compared it with the 1998 conciliation agreement and the 2000 stipulation and settlement. I am struck by the remarkable similarity among these documents.

5. In the 1998 agreement, Ford proposed settling EEOC for the sum of $7.5 million. The new agreement proposes $7.75 million with a possible cap of $10.125 million, but then only if the monitors need more money. One troubling aspect of the new agreement is that it purports to cover a class of both race and sexual harassment claimants, whereas the 1998 agreement, as amended by the 2000 settlement, covered only sexual harassment claims. I understand that virtually all of the settlement money in the 2000 settlement was paid out to claimants as awards through the claims process, through the settlement process (including attorneys' fees) and that what little was left over was used for scholarships and other types of relief to benefit women in the workplace. Under the new agreement, by including both race and sex claims, the potential number of claimants nearly triples (3x) the size of the class of individuals who may seek compensation (class size increases by 298%) but increases the size of the fund by between 3% ($250,000) and 35% ($2,625000)

6. Even more troubling is the fact that both race and gender/sexual harassment are being combined to a single fund. This means individuals such as Coby Millender – who was allegedly one of most flagrant sexual harassers but also testified that he was the victim of racial discrimination -- could potentially benefit from the same fund as sexual harassment victims. This is problematic not only because it dilutes the funds available to compensate sexual harassment but also dilutes the message being sent to sexual harassment victims to address their treatment and injuries. I am not aware of any situation where both victims and wrongdoers are compensated from the same fund.

7. The agreement also appears to be less focused on protecting the interests of the victims than minimizing respondent's financial responsibility to make them whole. The agreement contains the provision that if after damage awards are made by the monitors, and

3

Ford's payroll obligations are considered, the amount exceeds $10.125 million, then the monitors are directed to reduce the size of the awards to the victims to effectively "balance Ford's budget." Further, if the fund is not exhausted, any unused money reverts to Ford. Under the earlier agreement and settlement in 2000, money that did not result in awards to claimants was used to fund scholarships enrich female workers to assist them in furthering their education. This alteration undermines the goals that such an agreement should have as paramount and weakens the message to workers that their concerns will be addressed.

8. The Agreement also contains a 14 page questionnaire which laypersons are expected to complete on their own, differentiating between various types of harassment and nuances of discrimination. Ford appears to tout this Agreement as avoiding the need to retain counsel yet it is expecting victims of discrimination to effectively articulate their claims to seek compensation. This leaves victims at their peril. Not only is the language of the questionnaire arcane and overly "legalized" for laypersons, but some victims are apparently unable to adequately advocate for themselves, as evidenced by the fact that many chose not to complain fearing retaliation. Yet these same women are expected to determine the worth of their claims and advocate for their own compensation. This process is particularly unfair in that Ford may utilize its own counsel whereas victims are not advised of their right to counsel, despite the likelihood they would be required to retain (and compensate) such counsel. I note that in the 2000 stipulation and settlement, which modified the 1990 conciliation agreement, victims were provided with the benefit of counsel to assist them with making claims for the claims process at no cost. Here, victims must hire and pay for their own lawyer if they chose to use one.

9. The proposed claim form is problematic in a number of ways. As noted above, its language is both complicated and arcane; even more problematic are the many ways in which it requires victims to "prove" their character and workplace behavior, thus providing considerable opportunity for abuse.

10. A major concern is that the new agreement calls for essentially the same oversight process as the previous agreement. Although it is true that under the new agreement the monitoring period may be extended to five years, that can only happen if all three monitors unanimously agree -- including the monitor selected by Ford -- which in effect provides Ford with a veto. A three-year monitoring period did not ensure lasting change in 2000 and there is no reason it will be more effective now. There are two significant concerns with the proposed agreement: first, the monitor or monitors should be truly independent and should report directly to the Court; second, the monitoring period should be extended to 10 years at a minimum given Ford's recalcitrance and recidivism. A three (3) year period is simply too short to change Ford's entrenched organizational culture.

11. Even more troubling is the fact that essentially the same process is being used. That process was only marginally effective at 2000 settlement and there is no reason to believe it will be effective now. Indeed, the 2000 monitors warned that Ford must remain vigilant and that it cannot slack off once the monitoring period ended, yet this is exactly what happened. The monitors also specifically indicated a need for Ford to continue to train its employees -- something Ford apparently stopped doing virtually at the end of the monitoring period and until at least mid- 2012). In my September 8th report, I discussed a number of additional preventive methods that could easily be incorporated into this process, including ongoing assessment and transparent prevention methods.

12. Perhaps the most glaring deficiency in the new agreement is its failure to require Ford to revise its hiring and promotional practices. No meaningful change in the workplace environment can occur without changing the plant culture. This will never happen where the workplace -- and in particular the managerial team -- is so thoroughly male-dominated. Ford needs more women in management or things will remain the same. The new Agreement completely fails to address this need.

13. All of the opinions in this declaration are expressed to a reasonable degree of scientific certainty.

I declare under penalty of perjury and the other penalties imposed by 28 USC § 1746 at the foregoing statements are true and correct.

October 10, 2017

_____
Louise Fitzgerald