# Fordham Law Review

Volume 78 | Issue 1                                              Article 12

2009

# A Matter of Context: Social Framework Evidence in Employment Discrimination Class Actions

Melissa Hart

Paul M. Secunda

### Recommended Citation

Melissa Hart and Paul M. Secunda, *A Matter of Context: Social Framework Evidence in Employment Discrimination Class Actions*, 78 Fordham L. Rev. 37 (2009).
Available at: http://ir.lawnet.fordham.edu/flr/vol78/iss1/12

This Article is brought to you for free and open access by FLASH: The Fordham Law Archive of Scholarship and History. It has been accepted for inclusion in Fordham Law Review by an authorized editor of FLASH: The Fordham Law Archive of Scholarship and History. For more information, please contact tmelnick@law.fordham.edu.

# ESSAY

# A MATTER OF CONTEXT:  SOCIAL FRAMEWORK EVIDENCE IN EMPLOYMENT DISCRIMINATION CLASS ACTIONS

*Melissa Hart\**

*Paul M. Secunda\*\**

*In litigation disputes over the certification of employment discrimination class actions, social scientists have come to play a central, yet controversial, role.  Organizational behavioralists and social psychologists regularly testify for the plaintiffs, offering what is commonly referred to as social framework testimony.  These experts explain the general social science research on the operation of stereotyping and bias in decision making and examine the challenged workplace to identify those policies and practices that research has shown will tend to increase and those that will tend to limit the likely impact of these factors.  Defendants fight hard against the admission of social framework experts, and some courts have agreed that the testimony should not be allowed.  Because of the importance of this testimony to ferreting out large-scale discrimination in the workplace, the stakes in the debate over its admissibility are considerable.*

*This Essay puts the debate over social framework expert testimony in context, explaining what the testimony is and the role it has played in employment discrimination litigation, with a particular focus on the way the testimony has been offered in class action suits like* Dukes v. Wal-Mart Stores, Inc.  *It explains how the normal rules of evidence law should apply to social framework expert testimony and demonstrates that under the*

\* Associate Professor of Law, University of Colorado Law School.  I am grateful to Eugene Borgida, Tristin Green, David Kaufman, Scott Moss, Nantiya Ruan, Pierre Schlag, Kevin Traskos, Marianne Wesson, members of the Colorado Employment Law Faculty (CELF), and participants in the Southeastern Association of American Law Schools 2008 annual meeting and the Third Annual Labor and Employment Scholars Colloquium for their comments. Zachary Mountin provided excellent research assistance. We are grateful to the members of the *Fordham Law Review* for their great work throughout the publication process.

\*\* Associate Professor of Law, Marquette University Law School.  My thanks to Richard Bales and to participants in a faculty workshop at Marquette University Law School for helpful feedback.  Both of us are indebted to Paul Mollica for his insights and encouragement on this project.

38                    *FORDHAM LAW REVIEW*                    [Vol. 78

*flexible and permissive standards of the Federal Rules of Evidence, framework testimony offered by a qualified expert should be admissible in many employment class actions. Arguments put forward recently that this kind of evidence should always be excluded is driven as much by a particular view of employment discrimination law as by the governing evidentiary rules. Ultimately, the arguments for blanket exclusion of social framework testimony in these cases can best be understood as part of a political debate and a litigation strategy.*

TABLE OF CONTENTS

INTRODUCTION.................................................................................... 39
I. SOCIAL FRAMEWORK TESTIMONY IN EMPLOYMENT
    DISCRIMINATION LITIGATION ......................................................... 41
    A. *What Is Social Framework Expert Testimony?* .......................... 42
    B. *Social Framework Evidence in Employment Discrimination*
        *Litigation*................................................................................ 44
        1. Stereotyping, Sexual Harassment, and Frameworks in
            Gender Discrimination Litigation ...................................... 45
        2. Class Action Litigation and Social Frameworks................. 48
    C. *The Appropriate Scope of Framework Testimony* ..................... 51
II. THE WEAKNESS OF A CATEGORICAL ARGUMENT FOR EXCLUSION
    OF SOCIAL FRAMEWORKS ............................................................... 55
    A. *Social Framework Testimony May Be Both Relevant and*
        *Reliable in Employment Discrimination Class Certification*
        *Decisions and Rule 702 Does Not Permit Categorical*
        *Rules of Exclusion*................................................................. 58
        1. Rule 702 Is Flexible and Not Subject to Categorical
            Exclusions ......................................................................... 59
        2. Expert Testimony May Properly Include Opinions on
            Facts at Issue in the Particular Case .................................. 60
        3. Expert Opinion on the Policies at a Particular
            Workplace Can Be Both Relevant and Reliable in Class
            Certification Disputes........................................................ 62
    B. *There Is No Justification for a Special Rule of Appellate*
        *Scrutiny of District Court Decisions To Admit Social*
        *Framework Testimony* ............................................................ 63
III. THE DEBATE OVER THE CONTOURS OF SOCIAL FRAMEWORK
    TESTIMONY MUST BE UNDERSTOOD AS PART OF A LARGER
    DEBATE OVER THE REACH OF EMPLOYMENT DISCRIMINATION
    LAWS ............................................................................................ 66
CONCLUSION ...................................................................................... 70

INTRODUCTION

In the high-stakes world of class action employment discrimination litigation, the battle over expert testimony often determines the fate of the case. If the district court accepts the plaintiffs' social science expert testimony, chances are high that the proposed class will be certified. On the other hand, rejection of the expert evidence generally comes hand-in-hand with a denial of class certification. In the first instance, settlement of the case is likely to follow, and in the second, the defendant will probably face relatively few individual suits from employees who would have been members of the class. It is no surprise, then, that defendants pull out all the stops to convince the courts to exclude plaintiffs' experts.

The particular social science testimony that plays such a central role in this litigation is commonly referred to as "social framework" evidence. In employment litigation, an expert offering social framework testimony will explain the general social science research on the operation of stereotyping and bias in decision making and will examine the policies and practices operating in the workplace at issue to identify those that research has shown will tend to increase or limit the likely impact of these factors. For several decades now, courts have accepted social framework evidence in employment litigation, but its use has not been without controversy. Defendants fight hard against the admission of testimony by social framework experts, and some courts have agreed that the testimony should not be allowed. Because of the importance of this testimony to the success of class action suits designed to ferret out large-scale discrimination in the workplace, the stakes in the debate over its admissibility are considerable.

The debate has moved recently from the courtroom to the pages of law reviews. In an essay published last fall, three academics—one of whom also works as an expert witness and consultant for defendants opposing the admissibility of social framework evidence[1]—argued that social framework

---

1. Gregory Mitchell is one of the partners in Tetlock and Mitchell, LLC, a company that offers "expert witness and consulting services in labor and employment matters." Tetlock and Mitchell, LLC, http://www.tetmitch.net (last visited Sept. 20, 2009). In the past several years, Philip Tetlock and Gregory Mitchell have worked as experts and consultants for Eli Lilly, Cintas Corporation, Eastman Kodak, Northrop Grumman, Morgan Stanley, Wal-Mart, and BellSouth. *See, e.g.*, Defendant Eli Lilly & Co.'s Brief in Opposition to Plaintiff's Motion to Modify the Case Management Plan and Request to Suspend CMP Deadlines, Welch v. Eli Lilly & Co., No. 1:06-cv-0641-RLY-JMS (S.D. Ind. Feb. 17, 2009); Expert Report of Philip E. Tetlock, Ph.D., Serrano v. Cintas Corp., No. 04-CV-40132 (E.D. Mich. May 21, 2008); Memorandum of Law of Defendant Eastman Kodak Co. in Opposition to Plaintiff's Motion to Compel Privileged Information, Employees Committed for Justice v. Eastman Kodak Co., No. 6:04-CV-06098-CJS(F) (W.D.N.Y. Apr. 11, 2008); Plaintiff's Motion in Limine to Preclude Certain Proposed Expert Testimony of Philip E. Tetlock, Dodson v. Morgan Stanley DW Inc., No. 3:06-cv-5669RJB (W.D. Wash. Nov. 19, 2007); Report of Gregory Mitchell, Ph.D., Bridgewater v. Northrop Grumman Ship Sys., Inc., No. 1:06-cv-00769-HSO-JMR (S.D. Miss. Nov. 9, 2007), 2007 WL 4267340; Plaintiffs' Motion to Exclude Testimony of Dr. Gregory Mitchell, Anderson v. Northrop Grumman Ship Sys., Inc., No. 1:06-CV-764-HSO-JMR (S.D. Miss. Nov. 9, 2007); Expert Report of Philip E. Tetlock, Ph.D., Nelson v. Wal-Mart Stores, Inc., 245 F.R.D. 358 (E.D. Ark. 2006) (No. 2:04-

testimony as it is commonly accepted by district courts should be categorically disallowed.[2]   In *Contextual Evidence of Gender Discrimination*, authors John Monahan, Laurens Walker, and Gregory Mitchell argue that courts should never let social scientists link general social science findings to an employer's specific workplace policies unless the proffered expert has conducted his or her own empirical research in that particular workplace.[3]

As we will explain here, the arguments for categorically excluding such testimony are fundamentally flawed.  Social framework evidence, offered by qualified social scientists, plays a central role in modern employment discrimination litigation.   By offering insight into the operation of stereotyping and bias in decision making, social framework experts can help fact finders to assess other evidence more accurately.  When an expert applies her knowledge of studies in her field to an examination of the policies in place at a challenged workplace, the resulting testimony is well within what is permitted by the Federal Rules of Evidence.  There is no basis in evidence law for requiring experts to conduct firsthand empirical studies of a particular workplace.  Moreover, in the particular context of class action litigation, social framework evidence certainly satisfies the central admissibility criterion of relevance or "fit"—it is "valid for the purpose for which it is offered."[4]  In large employment class action suits like the landmark *Dukes v. Wal-Mart Stores, Inc.*[5] gender discrimination litigation, plaintiffs offer social framework testimony at the class certification stage of the litigation to address the issue of whether the plaintiffs share a common question of fact or law that will satisfy federal class action standards.   The legal question of commonality is directly addressed by the social scientist's expertise.  Thus, a categorical exclusion of this evidence is inconsistent with the Federal Rules of Evidence and U.S. Supreme Court precedent on the district courts' responsibility for assessing the admissibility of expert testimony more generally.

This essay begins by putting the debate over social framework expert testimony in context.  Part I explains what social framework testimony is and the central role it has played in numerous types of employment discrimination litigation, with a particular focus on the way the testimony has been offered in class action suits like *Dukes*.  Part II evaluates the claims made by Monahan, Walker, and Mitchell in their recent essay and

---

cv-00171-WRW); Expert Report of Philip E. Tetlock, Ph.D., Jenkins v. BellSouth Corp., No. 2:02-CV-01057-VEH (N.D. Ala. May 23, 2005).

2. John Monahan, Laurens Walker & Gregory Mitchell, *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks,"* 94 VA. L. REV. 1715, 1718–19 (2008) [hereinafter *Contextual Evidence of Gender Discrimination*].

3. *Id.* at 1736–42.

4. David L. Faigman, Nilanjana Dasgupta & Cecilia L. Ridgeway, *A Matter of Fit: The Law of Discrimination and the Science of Implicit Bias*, 59 HASTINGS L.J. 1389, 1390 (2008).

5. 222 F.R.D. 137 (N.D. Cal. 2004), *aff'd*, 509 F.3d 1168 (9th Cir. 2007), *reh'g en banc granted*, Nos. 04-16688, 04-16720, 2009 WL 365818 (9th Cir. Feb. 13, 2009).

Case: 1:14-cv-08708 Document #: 264-4 Filed: 03/23/18 Page 6 of 35 PageID #:13980

demonstrates how their arguments about the admissibility of this kind of expert testimony run contrary to basic principles regarding the admissibility of expert testimony more generally. As we explain, the normal rules of evidence law should apply to social framework expert testimony, and under the flexible and permissive standards of the Federal Rules of Evidence, framework testimony offered by a qualified expert will be admissible in many employment class actions. The argument that this kind of evidence should always be excluded is driven not by the governing evidentiary rules but by a particular view of employment discrimination law. Part III situates the arguments over social framework testimony in the context of the larger debate over what kinds of discrimination claims the law should permit. Ultimately, the arguments for exclusion of social framework testimony are best understood as part of a political debate and a litigation strategy. Ignoring either the political or the litigation context of these arguments leaves an incomplete picture.

## I. SOCIAL FRAMEWORK TESTIMONY IN EMPLOYMENT DISCRIMINATION LITIGATION

Social framework testimony has become a central element of many employment discrimination disputes over the past two decades. In these cases, a plaintiff or plaintiffs typically will put forward a social psychologist or expert in organizational behavior to testify about the widespread incidence of stereotyping and bias, and to identify within the challenged workplace those policies that tend to permit or to discourage operation of such bias.[6]  As many scholars have noted, workplace discrimination today is more subtle—often involving structural and organizational norms that are less easy to identify as discriminatory—than the explicit exclusions that characterized early civil rights litigation.[7] These more subtle forms of exclusion and denial of opportunity often involve policies or practices that permit stereotyping and bias to infect workplace decisions. In particular, scholars have pointed to excessively subjective decisionmaking structures, without sufficient guidance or monitoring, as likely to exclude or otherwise disadvantage women and minorities in the workplace.[8]  An expert offering social framework testimony can provide context and explanation of the ways in which these patterns occur. This form of expert evidence has been central in sexual harassment cases and in

---

6. *See, e.g.*, Jane Goodman & Robert T. Croyle, *Social Framework Testimony in Employment Discrimination Cases*, 7 BEHAV. SCI. & L. 227, 231 (1989).

7. *See, e.g.*, Samuel R. Bagenstos, *Implicit Bias, "Science," and Antidiscrimination Law*, 1 HARV. L. & POL'Y REV. 477, 477 (2007); Tristin K. Green, *Discrimination in Workplace Dynamics: Toward a Structural Account of Disparate Treatment Theory*, 38 HARV. C.R.-C.L. L. REV. 91, 91 (2003); Melissa Hart, *Subjective Decisionmaking and Unconscious Discrimination*, 56 ALA. L. REV. 741, 785–88 (2005); Susan Sturm, *Second Generation Employment Discrimination: A Structural Approach*, 101 COLUM. L. REV. 458, 468 (2001).

8. *See, e.g.*, Tristin K. Green & Alexandra Kalev, *Discrimination-Reducing Measures at the Relational Level*, 59 HASTINGS L.J. 1435 (2008).

both individual and class litigations challenging pay and promotion disparities. It has the potential to aid in a fuller understanding of many other kinds of discrimination.

This Part explains what social framework theory is and discusses one of the central debates over its appropriate application—the question of whether a social framework expert can draw direct connections between social science research and particular workplace policies. An examination of cases in which social framework testimony has been admitted shows that experts do regularly draw those connections in many different types of employment discrimination litigation. Of course, there are limits to the particular questions on which a social framework expert can offer opinions. As David Faigman, Nilanjana Dasgupta, and Cecilia Ridgeway recently noted, a classic single-plaintiff discrimination case presents risks for the expert who opines not only on the social science, but also on whether the particular plaintiff was in fact subject to discrimination.[9] That opinion—ultimately a judgment on causation—may well be outside the reliable area of the sociologist's expertise. In contrast to that circumstance, in debates over class certification under Federal Rule of Civil Procedure 23,[10] the question of whether the plaintiffs have identified a set of common employment policies and practices that may have significantly increased the risk of bias or stereotyping in the particular workplace is well within the range of what the social scientist can reliably testify about. In the class certification process, the legal question is not whether any individual plaintiff was in fact subject to illegal discrimination, but whether the employer's workplace policies create the necessary commonality. An assessment of the employer's structures and policies in light of relevant social science sheds light directly and appropriately on that legal question.

## A. *What Is Social Framework Expert Testimony?*

Starting about four decades ago, social scientists began offering expert testimony in a range of both civil and criminal cases, providing insight about matters such as the reliability of eyewitness identification, the effects of battered woman's syndrome or other instances of post-traumatic stress, and the significance of cross-cultural differences in understanding the meaning of particular conduct.[11] Experts offering this kind of testimony generally are psychologists, sociologists, or organizational/occupational behavioralists who study social cognitive psychology or industrial-

---

9. *See* Faigman et al., *supra* note 4.

10. FED. R. CIV. P. 23.

11. *See, e.g.*, Susan T. Fiske & Eugene Borgida, *Providing Expert Knowledge in an Adversarial Context: Social Cognitive Science in Employment Discrimination Cases*, 4 ANN. REV. L. & SOC. SCI. 123, 128 (2008); Neil J. Vidmar & Regina A. Schuller, *Juries and Expert Evidence: Social Framework Testimony*, 52 LAW & CONTEMP. PROBS. 133, 134–35 & nn.3–17 (1989) (gathering cases); Laurens Walker & John Monahan, *Social Frameworks: A New Use of Social Science in Law*, 73 VA. L. REV. 559, 563–67 (1987) (gathering cases).

organizational psychology.[12]  The function of this form of testimony is "to supply the triers with information about some aspect of human behavior to aid in interpreting disputed facts."[13]  This evidence is often offered to challenge erroneous assumptions that a fact finder is likely to make without the assistance of the expertise.[14]

While this use of social scientists as litigation experts had been occurring since the late 1970s, it was first labeled "social framework" testimony in a 1987 law review essay penned by Laurens Walker and John Monahan (two of the authors of the recent *Virginia Law Review* essay).[15]  In their 1987 essay, Walker and Monahan distinguished social framework testimony from two other uses of social science expert evidence, which they have since termed "social authority" expertise and "social fact" expertise.[16]  "Social

---

12. *See, e.g.*, R. Matthew Wise, *From* Price Waterhouse *to* Dukes *and Beyond: Bridging the Gap Between Law and Social Science by Improving the Admissibility Standard for Expert Testimony*, 26 BERKELEY J. EMP. & LAB. L. 545, 561 (2005).

13. Vidmar & Schuller, *supra* note 11, at 138; *see also* Eugene Borgida, Corrie Hunt & Anita Kim, *On the Use of Gender Stereotyping Research in Sex Discrimination Litigation*, 13 J.L. & POL'Y 613, 626 (2005) [hereinafter *On the Use of Gender Stereotyping Research*] ("Social frameworks are offered to the trier of fact through expert testimony to provide a scientifically informed context for thinking about the matters in dispute."); Eugene Borgida, Grace Deason & Anita Kim, *Stereotyping Research and Employment Discrimination: Time To See the Forest for the Trees*, 1 INDUS. & ORGANIZATIONAL PSYCHOL. 405, 406 (2008) [hereinafter *Stereotyping Research and Employment Discrimination*] ("In social framework analysis, the scientific expert typically communicates general causation findings to provide a context for factfinders' reasoning about a particular case."); Goodman & Croyle, *supra* note 6, at 231 (explaining how the expert "provides a background or framework of data in light of which legal and factual issues before the court can be better evaluated").  In the first well-known example of social framework testimony in employment litigation, for example, psychologist Susan Fiske explained to the court how the operation of stereotyping might have been at play when the partners at Price Waterhouse rejected Ann Hopkins, the only female candidate for the partnership that year. Price Waterhouse v. Hopkins, 490 U.S. 228, 233–36 (1989).  Her testimony, and similar evidence offered in other employment discrimination disputes, could be helpful to "establish the context for evaluating the facts of the . . . case. Comments or actions that might otherwise be ambiguous or seem tangential to the dispute might take on greater meaning or more resonance in light of this proof." Faigman et al., *supra* note 4, at 1399.

14. *See* Vidmar & Schuller, *supra* note 11, at 139–40; *see also* Gary Blasi, *Advocacy Against the Stereotype: Lessons from Cognitive Social Psychology*, 49 UCLA L. REV. 1241 (2002); David L. Faigman et al., *Legal Issues*, *in* 2 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY 642 (David L. Faigman et al. eds., 2008) ("One significant value of much social science research is that it makes clearer what we only dimly perceive, if we perceive it at all."); Linda Hamilton Krieger & Susan T. Fiske, *Behavioral Realism in Employment Discrimination Law: Implicit Bias and Disparate Treatment*, 94 CAL. L. REV. 997, 1062 (2006) (explaining how insights from social psychology can be essential to good legal decisions "because they often sharply contradict widely accepted psychological intuitions that judges mistakenly *think* provide a simple, elegant, predictive model of human behavior").

15. Walker & Monahan, *supra* note 11, at 559.

16. *See Contextual Evidence of Gender Discrimination*, *supra* note 2, at 1720.  These two uses of social science in litigation were first identified by Kenneth Culp Davis, who articulated a distinction between "legislative facts"—facts relevant to broad social policy questions—and "adjudicative facts"—facts relevant to the specific litigation. *See* Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 HARV. L. REV. 364, 402–03 (1942).

fact" expert testimony, the authors explained, is social science research done specifically to address a particular question presented in a specific case.[17]  So, for example, an expert in a trademark case might conduct a specific litigation-focused study to determine whether consumers can distinguish between two products when one is protected by trademark and the other is alleged to infringe the mark.[18]  "Social authority" expertise, by contrast, the authors defined as general social science evidence presented to establish the validity of a factual assumption underlying a legal standard, such as the question whether "separate" educational systems are "equal."[19]

In their 1987 essay, Walker and Monahan described "social framework" testimony as a third category of expert evidence that could be identified as distinct from these other two.[20]  In social framework testimony, "general research results are used to construct a frame of reference or background context for deciding factual issues crucial to the resolution of a specific case."[21]  Thus, the social framework expert is filling a role that is similar to an expert testifying to social fact; in both cases, the assistance provided by the expert's testimony is to help a fact finder evaluate specific facts in the case.  But social framework testimony is also similar to social authority expertise, in that both involve the expert's presentation of general research studies from within the particular field.[22]  Social framework expert testimony essentially uses general social science research to help explain why the law should be applied in a particular way to the facts of a particular case.

### B. Social Framework Evidence in Employment Discrimination Litigation

Many courts have been presented with social framework expert testimony in a range of employment discrimination contexts over the past two decades.  Research on stereotyping has been particularly valuable to plaintiffs in gender discrimination litigation.  Phenomena like the "glass ceiling" and the "maternal wall," which keep women from advancing professionally, are substantially the result of biases and stereotypes that social science experts can identify and explain for legal decision makers.[23]  There is extensive literature in social psychology on gender stereotyping and its impact on assumptions about and opportunities for women at

---

17. *Contextual Evidence of Gender Discrimination*, *supra* note 2, at 1724–25; *see also* Walker & Monahan, *supra* note 11, at 561–62.

18. *See, e.g.*, Zippo Mfg. Co. v. Rogers Imps., Inc., 216 F. Supp. 670, 690–91 (S.D.N.Y. 1963).

19. *See Contextual Evidence of Gender Discrimination*, *supra* note 2, at 1720–21 (citing Brown v. Bd. of Educ., 347 U.S. 483 (1954)).

20. Walker & Monahan, *supra* note 11, at 559.

21. *Id.*

22. *Contextual Evidence of Gender Discrimination*, *supra* note 2, at 1726.

23. *See, e.g.*, Joan C. Williams, *The Social Psychology of Stereotyping: Using Social Science To Litigate Gender Discrimination Cases and Defang the "Cluelessness" Defense*, 7 EMP. RTS. & EMP. POL'Y J. 401 (2003).

work.[24]   There is also a growing body of social science work on the mechanisms that support or discourage the stereotypes and biases that permit continued operation of race discrimination in workplace decisions.[25]

While social framework testimony has been introduced in a broad variety of discrimination suits, it is in the context of class litigation that it has received the most attention, perhaps because the scope of these suits is so large and the role of framework theory so important.  But in all of the employment discrimination contexts in which this evidence is presented, an essential element of the social framework testimony is the expert's role in identifying particular policies and practices of the employer that might tend to make decisions susceptible to stereotyping and bias.  When social framework testimony is presented appropriately, the expert does not reach the conclusion that a specific decision was made with discriminatory intent; that judgment is for the fact finder.[26]  What the expert can do is offer his or her knowledge of the social science research and identify the characteristics of policies challenged in the particular workplace that research has linked with higher likelihood of bias and stereotype or lower likelihood of correction for bias.

This Part briefly highlights some of the well-known employment discrimination cases in which social framework testimony has played a central role.  It then considers in more detail the function served by social framework experts in class action litigation.

### 1. Stereotyping, Sexual Harassment, and Frameworks in Gender Discrimination Litigation

One of the earliest and most famous cases in which social framework testimony played a pivotal role was *Price Waterhouse v. Hopkins*.[27]  Ann Hopkins was a candidate for partnership at Price Waterhouse in 1982.[28]  At

---

24. *See, e.g.*, Diana Burgess & Eugene Borgida, *Who Women Are, Who Women Should Be: Descriptive and Prescriptive Gender Stereotyping in Sex Discrimination*, 5 PSYCHOL. PUB. POL'Y & L. 665, 665 (1999).

25. *See* Fiske & Borgida, *supra* note 11.

26. *See, e.g.*, Tuli v. Brigham & Women's Hosp., Inc., 592 F. Supp. 2d 208 (D. Mass. 2009).  In admitting a social framework expert, Judge Nancy Gertner recently explained,

> Professor Glick brings the insights of established scientific inquiry and social framework analysis, as to which he is an expert, to bear on the facts of this case.  It is an area that the jury may well not have common knowledge.  But Professor Glick does so in a way that has scientific validity:  he cannot say whether a given act or word was discriminatory; he can only show the settings in which discrimination typically occurs and opine on whether the allegations in the case at bar are consistent with the observed patterns.  He allows the jury to make the final decision and expressly disclaims the capacity to draw any conclusion in this particular case.

*Id.* at 215–16 (citing Linda Hamilton Kreiger, *The Content of Our Categories:  A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity*, 47 STAN. L. REV. 1161, 1187 (1995)).

27. 490 U.S. 228 (1989).

28. *Id.* at 233.

the time she was considered, the company had only seven female partners and 655 male partners.[29] She was the only woman being considered for partnership that year.[30] Hopkins had an extremely successful business record at the firm.[31] She was, however, described by some as abrasive and particularly hard on staff members.[32] Concerns about her lack of interpersonal skills were of major importance to many evaluating her candidacy.[33] In addition, among the men considering Hopkins's partnership candidacy, she was described as "macho" and advised to take "a course at charm school," as well as to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."[34]

After reviewing the decisionmaking process used at Price Waterhouse in selecting partners, psychologist Susan Fiske provided expert testimony that included a review of the extensive literature on sex stereotyping as well as an analysis of the aspects of the Price Waterhouse partnership process that contributed to the likelihood that sex stereotyping had influenced the decision.[35] In particular, Fiske focused on Hopkins's uniqueness as the only woman in the pool of candidates, on the subjectivity of the evaluation process, and on the language—both explicitly discriminatory and more subtly biased–used to describe Hopkins.[36] While much of the evidence of discrimination in *Price Waterhouse* included explicitly sexist comments that the jury could itself understand as discriminatory, Fiske's testimony offered what the Supreme Court referred to as "icing on [the] cake" for the plaintiff,[37] explaining the operation of sex stereotyping in all aspects of the decisionmaking process.

Social framework evidence has also offered important background information and context to fact finders in a number of well-known sexual harassment cases. In these cases, experts can help the fact finder appreciate the relationship between a hostile work environment and adverse employment actions.[38] In the first sexual harassment suit brought as a class action, *Jenson v. Eveleth Taconite Co.*,[39] the court accepted social science expert testimony to "provide a framework for understanding why consistent and pervasive acts of sexual harassment occur in work environments similar to Eveleth Mines."[40] *Jenson* was a class challenge to widespread and egregious sexual harassment and discrimination at a mine in northern

---

29. *Id.*
30. *Id.*
31. *Id.* at 233–34.
32. *Id.* at 234–35.
33. *Id.* at 233–35.
34. *Id.* at 235.
35. *See* Hopkins v. Price Waterhouse, 618 F. Supp. 1109, 1117–18 (D.D.C. 1985).
36. *Price Waterhouse*, 490 U.S. at 235–36.
37. *Id.* at 256.
38. *See* Fiske and Borgida, *supra* note 11, at 132.
39. 824 F. Supp. 847 (D. Minn. 1993).
40. *Id.* at 883.

Minnesota.[41]  One of the central questions in the case was whether the acts of sexual harassment suffered by the named plaintiffs and other women working at Eveleth were simply isolated occurrences or whether they were the consequence of a broader culture at the mine.[42]   In reaching the conclusion that sex stereotyping was pervasive and influential at Eveleth Mines, the plaintiffs' expert reviewed the exhibits presented by the parties, read deposition transcripts of male and female employees and managers, and personally observed testimony offered during the trial.[43]  He evaluated the facts this information revealed about the work environment at Eveleth in light of his knowledge of the extensive social science research on sex stereotyping and sexual harassment.[44]  The expert was thus able to apply his knowledge of the literature in the field to what he learned about Eveleth Mines and to explain how the conduct at the Mines could be understood not as a series of isolated events but as part of a general culture of sex stereotyping.

In another well-known harassment dispute, *Robinson v. Jacksonville Shipyards, Inc.*,[45] social science experts similarly reviewed company policies and the evidence gathered in discovery, including deposition transcripts and company policies.  The experts were able to apply what they knew as social scientists in evaluating the facts uncovered through the litigation process to conclude that in circumstances like those in operation at Jacksonville Shipyards, "evaluation of women employees by their coworkers and supervisors takes place in terms of the sexuality of the women and their worth as sex objects rather than their merit as craft workers."[46]   In these disputes, the expert offering social framework evidence is able to provide assistance to the jury in understanding the creation of social and cultural norms within a workplace and the ways in which sexualized conduct can affect decisions (such as work evaluations) that appear on their face to be unconnected.

The potential for use of social framework testimony in employment discrimination litigation continues to expand as courts recognize the legitimacy of claims that require an understanding of the central role gender stereotyping plays in creating and limiting opportunities for both men and women.   Recent years have seen increasing attention to family responsibilities discrimination (FRD)—cases in which employers discriminate against their employees because of their obligations outside of work.[47]   These cases, which may involve pregnancy discrimination, discrimination against workers who have caretaking obligations for parents

---

41. *Id.* at 855–56.
42. *Id.* at 860.
43. *Id.* at 881.
44. *Id.* at 881–883.
45. 760 F. Supp. 1486 (M.D. Fla. 1991).
46. *Id.* at 1503.
47. Joan C. Williams & Stephanie Bornstein, *The Evolution of "FReD": Family Responsibilities Discrimination and Developments in the Law of Stereotyping and Implicit Bias*, 59 HASTINGS L.J. 1311, 1313–14 (2008).

*FORDHAM LAW REVIEW*

or children, or simply discrimination against parents, involve a wide range of stereotypes and biases that operate in the workplace.[48] The number of FRD cases has increased exponentially in the past decade.[49] While the use of social science experts in these disputes does not appear to be common, the range of psychological and sociological issues they raise make them a likely context in which social framework testimony might substantially aid the fact finder in understanding the cognitive processes that can underlie workplace decision making.[50]

### 2. Class Action Litigation and Social Frameworks

While these different contexts have seen some amount of social framework testimony and the potential for expansion of framework evidence with novel theories of discrimination, it is in the context of large class action disputes that social framework testimony has been most central.

In class action litigation like *Dukes v. Wal-Mart Stores, Inc.*,[51] plaintiffs often assert both disparate impact and disparate treatment claims,[52] challenging employer policies and practices that permit stereotyping and bias to infect decisionmaking processes and limit opportunities for women throughout the company.[53] In *Dukes*, for example, the named plaintiffs sued on behalf of current and former female employees of Wal-Mart, alleging that women at Wal-Mart stores had been paid less than their male counterparts every year and in every Wal-Mart region.[54] Plaintiffs' evidence showed that women in hourly positions made, on average, $1,100 per year less than men.[55] In salaried management positions, the average difference was $14,500.[56] This inequity had developed even though the women had, on average, greater seniority and higher performance ratings.[57] The plaintiffs further alleged that Wal-Mart's female employees had been

---

48. *See id.*; *see also* Williams, *supra* note 23, at 426–39.

49. MARY C. STILL, CTR. FOR WORKLIFE LAW, UNIV. OF CAL. HASTINGS COLL. OF LAW, LITIGATING THE MATERNAL WALL: U.S. LAWSUITS CHARGING DISCRIMINATION AGAINST WORKERS WITH FAMILY RESPONSIBILITIES 7 (2006), *available at* http://www.uchastings.edu/site_files/WLL/FRDreport.pdf.

50. *See, e.g.*, Catherine Albiston, Kathryn Burkett Dickson, Charlotte Fishman & Leslie F. Levy, *Ten Lessons for Practitioners About Family Responsibilities Discrimination and Stereotyping Evidence*, 59 HASTINGS L.J. 1285, 1302–04 (2008).

51. 222 F.R.D. 137 (N.D. Cal. 2004), *aff'd*, 509 F.3d 1168 (9th Cir. 2007), *reh'g en banc granted*, Nos. 04-16688, 04-16720, 2009 WL 365818 (9th Cir. Feb. 13, 2009).

52. Disparate impact claims challenge facially neutral policies that have a negative impact on a protected class of employees and that cannot be justified as necessary for the operation of the business. *See* 42 U.S.C. § 2000e-2(k) (2006); Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971). Disparate treatment claims challenge employer conduct as intentionally discriminatory. *See Griggs*, 401 U.S. at 431.

53. *See* Hart, *supra* note 7, at 781–88.

54. *See* Plaintiffs' Motion for Class Certification and Memorandum of Points and Authorities at 1, *Dukes*, 222 F.R.D. 137 (No. C01-02252 MJJ) [hereinafter Plaintiff's Motion for Class Certification].

55. *Id.* at 25.

56. *Id.*

57. *See Dukes*, 222 F.R.D. at 141.

promoted to management less often than comparable male employees, and that those women who were promoted had to wait longer for promotion than their male peers.[58] The evidence they presented showed that, in 2001, 67% of all hourly workers and 78% of hourly department managers were women.[59] By contrast, only 35.7% of assistant managers, 14.3% of store managers, and 9.8% of district managers were female.[60] The explanation for these inequalities, plaintiffs argued, was that Wal-Mart had adopted a system for pay and promotion decisions that permitted unguided and excessive subjectivity and thus allowed bias to infect the process.[61] Whether viewed as facially neutral (and thus challenged under disparate impact) or as intentionally discriminatory (challenged as disparate treatment), the use of excessively subjective decision making in setting pay and awarding promotions presents a clear example of a policy whose impact can be made clearer to a fact finder by a social science expert who can explain the psychological and social relationship between subjectivity and stereotyping. First, however, the across-the-board decision to permit unguided subjectivity in personnel decisions needs to be explained as a policy (rather than as simply the absence of any policy), and that is the question at issue in the class certification dispute.

In *Dukes* and other similar cases,[62] employers seeking to avoid class litigation have argued that there is no common question linking the challenges presented by thousands of women denied promotions and equal pay.[63] Social framework testimony has been introduced to explain how certain employer policies operate to introduce the requisite commonality. So, for example, when faced with a nationwide challenge to pay and promotion policies, Wal-Mart's principal line of defense was to argue that the class could not be certified because there was no evidence that the same corporate policy was affecting all class members.[64] Part of the plaintiffs' response to this assertion was the testimony of Dr. William Bielby, an organizational psychologist. Dr. Bielby is an expert in organizational behavior and personnel practices.[65] His report identified the organizational

---

58. *Id.* at 141, 146.

59. Plaintiff's Motion for Class Certification, *supra* note 54, at 7.

60. *Id.*

61. *Id.* at 19.

62. *See, e.g.*, Palmer v. Combined Ins. Co. of Am., 217 F.R.D. 430 (N.D. Ill. 2003); Beckmann v. CBS, Inc., 192 F.R.D. 608 (D. Minn. 2000); Butler v. Home Depot, Inc., 70 Fair Empl. Prac. Cas. (BNA) 51 (N.D. Cal. 1996); Stender v. Lucky Stores, Inc., 803 F. Supp. 259 (N.D. Cal. 1992); Complaint, Ellis v. Costco Wholesale Corp., 240 F.R.D. 627 (N.D. Cal. 2007) (No. C 04-03341 MHP); *see also* Tristin K. Green, *Targeting Workplace Context: Title VII as a Tool for Institutional Reform*, 72 FORDHAM L. REV. 659, 682–87 (2003) (describing a number of similar cases).

63. *See* Hart, *supra* note 7, at 779–81.

64. *See* Melissa Hart, *Learning from Wal-Mart*, 10 EMP. RTS. & EMP. POL'Y J. 355, 380–81 (2007).

65. Declaration of William T. Bielby, Ph.D in Support of Plaintiffs' Motion for Class Certification at 3, Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137 (N.D. Cal. 2004), *aff'd*, 509 F.3d 1168 (9th Cir. 2007), *reh'g en banc granted*, Nos. 04-16688, 04-16720, 2009 WL

structures and policies in place at Wal-Mart—including excessive subjectivity in promotion and pay decisions, nonposting of promotion and training opportunities, failure to review promotion and pay patterns—that were potentially affecting every plaintiff at the retail giant and that have been shown in the field of organizational psychology to be more likely to permit the intrusion of bias and stereotyping into decision making.[66]

The district court judge evaluating the standards for class certification in *Dukes* accepted Dr. Bielby's report as one of the pieces of evidence that supported the showing of commonality.[67] Other courts have similarly accepted the social framework evidence offered by plaintiffs and have relied on it as part of the rationale for class certification.[68] In some cases, however, courts have rejected the proffered expert testimony and have declined to certify the class.[69]

Given that certification of a class often effectively ends the litigation in large employment discrimination disputes, the impact of this testimony cannot be underestimated. In general, after a class is certified, the pressure on the employer to settle the dispute, rather than litigate a costly, time-consuming, and potentially embarrassing suit against a large group of employees, is substantial. So, as a practical matter, class certification operates as a kind of victory on the merits. By contrast, when a class is not certified, it is rare that many of the individual employees who were willing to be members of the class will pursue their own claims. The costs and risks to an individual of pursuing litigation are sufficiently serious that even a plaintiff with a very serious claim of discrimination might not feel able to pursue it on her own.[70] Denial of certification thus also acts as a kind of merits decision. It is no surprise then, as discussed further below, that the admissibility of social framework expert testimony is a hotly contested issue in class certification debates.

---

365818 (9th Cir. Feb. 13, 2009) (No. C-01-2252 MJJ) [hereinafter Declaration of William T. Bielby, Ph.D].

66. *See Dukes*, 222 F.R.D. at 151–55.

67. *Id.*

68. *See, e.g.*, Nelson v. Wal-Mart Stores, Inc., 245 F.R.D. 358, 368–70 (E.D. Ark. 2007); Ellis v. Costco Wholesale Corp., 240 F.R.D. 627, 638–40 (N.D. Cal. 2007); McReynolds v. Sodexho Marriott Servs., Inc., 208 F.R.D. 428, 441–44 (D.D.C. 2002); Butler v. Home Depot, Inc., 984 F. Supp. 1257, 1262–65 (N.D. Cal. 1997); Stender v. Lucky Stores, Inc., 803 F. Supp. 259, 327 (N.D. Cal. 1992); *see also* EEOC v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 462 (S.D.N.Y. 2004) ("Bielby may properly testify about gender stereotypes, and about how these stereotypes may have affected decisions at Morgan Stanley.").

69. *See, e.g.*, Serrano v. Cintas Corp., Nos. 04-40132, 06-12311, 2009 WL 910702, at *6–7 (E.D. Mich. Mar. 31, 2009); Puffer v. Allstate Ins. Co., 255 F.R.D. 450, 473–74 (N.D. Ill. 2009); *see also* Gutierrez v. Johnson & Johnson, 467 F. Supp. 2d. 403, 410–13 (D.N.J. 2006) (declining to certify class after finding that plaintiffs did not demonstrate commonality and noting that they had not provided an expert who could identify a common policy).

70. *See, e.g.*, Nantiya Ruan, *Bringing Sense to Incentives: An Examination of Incentive Payments to Named Plaintiffs in Employment Discrimination Class Actions*, 10 EMP. RTS. & EMP. POL'Y J. 395 (2006).

### C. *The Appropriate Scope of Framework Testimony*

Defendants challenging social framework expert witnesses in litigation regularly make several arguments. First, they argue that the evidence cannot truly be helpful to the jury and that it is likely to be more prejudicial than probative.[71] In the context of employment discrimination litigation, defendants have argued as well that there is not unanimity in the social sciences about stereotyping research and that this lack of consensus should preclude introduction of framework evidence;[72] that laboratory studies cannot be generalized to the workplace;[73] and that the proffered expert did not conduct empirical studies and cannot quantify how much stereotyping actually influenced decisions in a particular workplace.[74]

These criticisms of social framework evidence do not withstand much scrutiny. The Federal Rules of Evidence do not require unanimity in a field to permit introduction of expert testimony in litigation.[75] Moreover, there is in fact a substantial agreement among scientists about the operation of cognitive processes like bias and stereotyping.[76] Over the past few decades, researchers have conducted hundreds of studies and published hundreds of articles demonstrating the ways that decisions in a variety of contexts are affected by cognitive processes like stereotyping and bias. "[I]n keeping with principles of good science, researchers have utilized

---

71. *See, e.g.*, Price Waterhouse v. Hopkins, 490 U.S. 228, 255–56 (1989) (noting that the evidence of stereotyping in this case might have been so apparent from the comments made that an expert witness might not have been able to offer anything the jury could not have seen for itself); Ray v. Miller Meester Adver., Inc., 664 N.W.2d. 355, 366 (Minn. Ct. App. 2003) (excluding testimony on the grounds that the jury could have reached the same conclusion on its own); Vidmar & Schuller, *supra* note 11, at 138 (discussing the usefulness of social framework evidence to the jury).

72. *See, e.g.*, William T. Bielby, *Can I Get a Witness? Challenges of Using Expert Testimony on Cognitive Bias in Employment Discrimination Litigation*, 7 EMP. RTS. & EMP. POL'Y J. 377 (2003) (describing instances of this argument).

73. *See, e.g.*, *Ellis*, 240 F.R.D. at 650; *see also* Frank J. Landy, *The Tenuous Bridge Between Research and Reality: The Importance of Research Design in Inferences Regarding Work Behavior*, *in* BEYOND COMMON SENSE: PSYCHOLOGICAL SCIENCE IN THE COURTROOM 341 (Eugene Borgida & Susan T. Fiske eds., 2008) [hereinafter *The Tenuous Bridge Between Research and Reality*]; Bielby, *supra* note 72, at 387–88.

74. *See, e.g.*, Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 355 (S.D.N.Y. 2007); Arnold v. Cargill Inc., No. 01-2086 (DWF/AJB), 2006 WL 1716221, at *7 (D. Minn. June 20, 2006).

75. *See* Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). Indeed, the advisory committee's note to Rule 702 specifically observes that "[t]he amendment is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise." FED. R. EVID. 702 advisory committee's note; *see also infra* Part III.B.

76. *See, e.g.*, John T. Jost et al., *The Existence of Implicit Bias Is Beyond Reasonable Doubt: A Refutation of Ideological and Methodological Objections and Executive Summary of Ten Studies That No Manager Should Ignore*, *in* RESEARCH IN ORGANIZATIONAL BEHAVIOR (forthcoming 2009) (manuscript at 8, on file with authors); *see also On the Use of Gender Stereotyping Research*, *supra* note 13, at 615 ("Several reviews of the scientific literature on gender stereotyping suggest that this body of knowledge reflects a scientifically established and mature area of psychological science with areas of scientific agreement and disagreement that provide evidence-based insights into the nature of gender relations.").

multiple methods to rule out limitations of specific measurement tools and to generalize findings across many tools."[77] The broad agreement within the field is the consequence of "nearly a hundred years of cognitive psychology and more than three decades of paradigm-shifting research from dozens of the most well respected social psychological laboratories in the world."[78]

As to defendants' claims that experts should not be permitted to apply research results obtained in laboratory or other controlled studies in evaluating the operation of cognitive processes in the workplace, that is a concern that goes to the weight a fact finder should place on the evidence, not to whether the evidence is admissible in the first instance.[79] Finally, defendants sometimes complain that the expert cannot quantify the specific amount of or consequences of stereotyping in a particular workplace.[80] But this kind of quantification is not what the social framework expert is even purporting to have an expertise about. The testimony is being offered not to prove discrimination in a particular case or cases—that determination is one the fact finder will make in light of all of the evidence—but to offer a backdrop of information about how the phenomenon of stereotyping operates so that the fact finder can assess the specific case in light of that information.

Many of these challenges to the presentation of social framework testimony circle around the question of what exact purposes the information is being offered to serve. Of particular concern is the broad question of whether the expert is asserting—or will be taken by the jury to be asserting—that particular decisions *were in fact* discriminatory. A more specific iteration of this debate comes up as a question about whether the social framework expert should be permitted to provide testimony not only about stereotyping as a general social phenomenon, but also about whether the policies and practices in a particular workplace are more or less likely to permit the operation of stereotyping into the decisional process. It is this argument that Walker, Monahan, and Mitchell take on in their recent essay.[81]

These authors argue that experts offering social framework testimony should not be permitted to comment at all on the existing practices in a given workplace. Thus, for example, they assert that it was inappropriate

---

77. Faigman et al., *supra* note 4, at 1410.

78. Jost et al., *supra* note 76 (manuscript at 8).

79. *See, e.g.*, Ellis v. Costco Wholesale Corp., 240 F.R.D. 627, 649 (N.D. Cal. 2007).

80. *Cf.* Joan Williams, *Deconstructing Gender*, 87 MICH. L. REV. 797, 818–19 (1989) (discussing Judge John A. Nordberg's demand for quantification of stereotype evidence in *EEOC v. Sears, Roebuck & Co.*) ("Nordberg's insistence on quantification in effect required plaintiffs to specify the precise percentage of women interested in nontraditional jobs such as commission sales. By not requiring Sears to provide equivalent proof of the specific percentage of women who *fit* gender stereotypes, the *Sears* district court opinion in effect establishes a legal presumption that all women fit traditional gender stereotypes." (citing EEOC v. Sears, Roebuck & Co., 839 F.2d 302, 320–21 (7th Cir. 1988))).

81. *See generally Contextual Evidence of Gender Discrimination, supra* note 2.

for Dr. William Bielby, testifying in *Dukes*,[82] to have reviewed Wal-Mart's corporate policies and other information about circumstances at the company and to offer opinions about whether Wal-Mart's policies were structured in ways that would tend to limit or tend to permit the operation of stereotype and bias.[83]    Instead, Monahan, Walker, and Mitchell contend that a social framework expert may only present the results of general studies available within his field.   If a party in litigation wishes to have an expert draw any connection between the general research and any facts in the particular case, these authors assert, the expert must do an expensive, time-consuming, and particularized study of the specific workplace.[84]   On this view, the only way a social scientist testifying in an employment discrimination class action could offer opinions about particular workplace policies would be to "conduct an audit study (in which persons of different sexes with matching qualifications pose as applicants for the same job), a controlled experiment into the effects of stereotyping on managerial decisions at [an employer], or an objective observational study of conditions at [an employer]."[85]   Putting aside the serious questions about the likelihood that an employer would consent to such a study and the validity of a study done in a specific workplace while litigation over discrimination in that workplace was pending, this kind of empirical study is not required either by applicable social science standards or by relevant evidentiary rules.

The empirical requirement that Monahan, Walker, and Mitchell seek to impose on social scientific expert testimony in this context is at odds with the views of numerous psychologists and sociologists.[86]   Psychologists Susan Fiske and Eugene Borgida, for example, explain that:   "[t]he social framework approach helps educate fact-finders about the conditions under which gender stereotypes and prejudice are likely to influence impressions, evaluations, and behavior in social and organizational settings."[87]   Central to their understanding of social framework testimony is that an important part of what the social science expert is able to offer is an evaluation of the policies and practices operating at a particular workplace, measured against what the current research into organizational behavior and psychology have

---

82.  Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 151–54 (N.D. Cal. 2004), *aff'd*, 509 F.3d 1168 (9th Cir. 2007), *reh'g en banc granted*, Nos. 04-16688, 04-16720, 2009 WL 365818 (9th Cir. Feb. 13, 2009).

83.  *See Contextual Evidence of Gender Discrimination*, *supra* note 2, at 1742–48.

84.  *Id.* at 1749.

85.  *Id.* at 1747.

86.  *See, e.g.*, *On the Use of Gender Stereotyping Research*, *supra* note 13; Susan T. Fiske & Eugene Borgida, *Social Framework Analysis as Expert Testimony in Sexual Harassment Suits*, *in* SEXUAL HARASSMENT IN THE WORKPLACE:   PROCEEDINGS OF NEW YORK UNIVERSITY 51ST ANNUAL CONFERENCE ON LABOR 575 (Samuel Estreicher ed., 1999); Goodman & Croyle, *supra* note 6, at 232–33.

87.  Fiske & Borgida, *supra* note 86, at 579.

taught scientists about decisionmaking processes and outcomes.[88]   This evaluation can be undertaken by examining the policies and practices in the workplace as described in litigation materials (including written workplace policies and the depositions of managers who apply them).  As described by Dr. Bielby,

> the expert reviews testimony, documents, and other quantitative and qualitative information about a case in order to draw conclusions about how *extant* social science theory and research applies to the specific circumstances of the organizational setting where discrimination is alleged to have occurred.  She or he analyzes the specific features of the organization's policies and practices and evaluates them against what that social science scholarship has shown to be factors that create and sustain bias and those that minimize bias.[89]

This understanding of social framework analysis sees the expertise as involving two data sets that are examined by the expert.  The first is the extensive body of research in empirical social psychology, widely accepted by the scientific community.[90]  This research addresses the prevalence of stereotyping and subtle bias in decision making in our society.[91]  The second data set available to the expert is the "rich range of empirical materials that would otherwise be inaccessible to academic scholars" but that the litigation context makes available.[92]  Discovery can give the expert access to all of the employer's written policies, to the statistical information in the employer's personnel database, and to deposition testimony from a witness speaking on the company's behalf under Federal Rule of Civil Procedure 30(b)(6) or other knowledgeable employees about how they understand the company's written and unwritten policies.  Ultimately, "the richness and level of detail regarding an organization's policy, practice, and decision-making contained in the testimony, documents, and statistics generated through discovery in class action discrimination litigation far exceed what would ever be accessible to a social scientist conducting a substantive organizational case study."[93]

---

88.  *See, e.g.*, Margaret Bull Kovera & Eugene Borgida, *Social Psychology and Law*, *in* HANDBOOK OF SOCIAL PSYCHOLOGY (forthcoming 2009) (manuscript at 90–92, on file with authors).

89.  Bielby, *supra* note 72, at 390.

90.  *See, e.g.*, *On the Use of Gender Stereotyping Research*, *supra* note 13, at 615.

91.  *See id.*

92.  Bielby, *supra* note 72, at 390.

93.  *Id.* at 391.  In a response to this essay, Mitchell, Monahan, and Walker reject the utility of litigation materials as a data set for evaluating company policies.  *See* John Monahan, Laurens Walker & Gregory Mitchell, *The Limits of Social Framework Evidence*, LAW, PROBABILITY & RISK (forthcoming) (manuscript at 12), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1421235.  Their argument that discovery may create an incomplete data set, however, misses the point.  While discovery materials may not provide an evaluating expert with every piece of information about employer practice or policy, the rules of discovery do place obligations on the parties to make complete disclosures, and plaintiff employees are entitled to rely on defendants' discovery responses as information for expert analysis.  An expert can reasonably assume that workplace practices and policies are what the employer says they are.  Moreover, the

Case: 1:14-cv-08708 Document #: 264-4 Filed: 03/23/18 Page 20 of 35 PageID #:13994

Of course, this does not mean that the social framework expert can necessarily offer any expert judgment about specific causation; the question of whether discrimination in fact led to the denial of specific promotions of women at Wal-Mart, for example, is one that will ultimately be answered by the fact finder. As discussed in more detail below,[94] the risk presented by testimony from a social scientist on the specific causation question is that the assessment that is called for may well fall outside of the proffered expert's field of expertise.[95] What the social framework expert *is* doing is looking at the policies and practices operating in a workplace more generally and identifying the ways in which they may limit or permit operation of stereotype and bias. To say that some forms of "linkage"—the link to specific causation—are beyond the scope of a social scientist's expertise is very different from saying that a social scientist is engaging in impermissible "linkage" whenever he or she evaluates specific workplace policies and practices in light of current social science literature.[96]

This dispute over whether a social framework expert can evaluate the policies and practices in a particular workplace goes right to the heart of how social science expertise has been used in employment discrimination litigation and, particularly, in class action disputes. As Part II.B discusses, social framework experts have testified in a wide variety of cases, and their testimony has consistently included application of social science research to an evaluation of the challenged workplace policies. Thus, what Monahan, Walker, and Mitchell frame as a debate simply over *how* social framework evidence should be admitted is in fact a dispute over *whether* it should be admitted at all.

## II. The Weakness of a Categorical Argument for Exclusion of Social Frameworks

Attacks on the use of social framework evidence in employment discrimination class actions, generally echoing arguments presented by defendants to the courts considering the admissibility of plaintiffs' expert

---

potential flaws in a data set created by empirical testing of a workplace undertaken during the course of litigation are much more significant.

94. *See infra* Part III.A.

95. *See, e.g.*, Faigman et al., *supra* note 4, at 1432 (noting that the applicable science may not "permit an expert to say with confidence whether a given case is an instance of [a] general finding").

96. In their response to this essay, Mitchell, Monahan, and Walker make much of the final sentence in Dr. Bielby's expert report. Monahan et al., *supra* note 93 (manuscript at 7–8). The last sentence of Dr. Bielby's forty-one-page report expresses his view that Wal-Mart's policies "contribute to disparities between men and women in their compensation and career trajectories at the company." Declaration of William T. Bielby, Ph.D, *supra* note 65, at 41. This statement is a slender reed on which to hang an indictment of the social framework testimony offered in *Dukes*. Whether Dr. Bielby's assessment is characterized as an opinion on specific causation that goes beyond his expertise or not (and there is ample room for debate on that point), it is one thing to question a sentence in, or portion of, an expert report and quite another to create a categorical exclusion of any expert testimony that applies social science knowledge to examine specific workplace policies.

witnesses, have begun to appear on the pages of law reviews.[97]  The arguments against admissibility of social framework testimony go hand-in-hand with the very aggressive challenge being made to one of the core claims of social framework evidence in employment litigation—the notion that stereotyping and bias continue to influence workplace decisions, often in subtle and structural ways.

The claim that experts offering social framework testimony cannot appropriately examine the policies in a particular workplace is among these attacks.  In their recent essay, Monahan, Walker, and Mitchell assert that "experts presenting social frameworks should be prohibited from providing any linkage to the case at hand, leaving application (or not) of the general research findings entirely to the fact-finder."[98]  The authors specifically attack the testimony offered by Dr. William Bielby in the *Dukes* class action certification dispute,[99] and they argue more generally for an approach to social framework expert testimony that would call for the exclusion of all or nearly all of the framework testimony that has been offered in employment discrimination cases in the past two decades.

As Part II.A discusses, Walker and Monahan were the first legal scholars to use the term "social framework" to "capture the similarities among certain types of social science evidence."[100]  In *Contextual Evidence of Gender Discrimination*, the two, together with their coauthor, seem to suggest that their coining of this phrase gives them a unique right to define the terms and content of expert testimony offered in employment discrimination cases to provide a social framework for evaluating workplace policies.[101]  They criticize Dr. Bielby (among others) for "depart[ing] from our conception of a social framework and exceed[ing] the limits on expert framework testimony proposed above" as if the departure from their perspective itself rendered his testimony invalid.[102]  There is no justification for awarding that kind of special authority to decide the proper scope of the science.  What is now commonly referred to as social framework evidence had been offered long before these authors used the

---

97. *See, e.g.*, Allan G. King & Syeeda S. Amin, *Social Framework Analysis as Inadmissible "Character" Evidence*, 32 LAW & PSYCHOL. REV. 1 (2008); *Contextual Evidence of Gender Discrimination*, *supra* note 2.

98. *Contextual Evidence of Gender Discrimination*, *supra* note 2, at 1734.

99. *Id.* at 1742–48.

100. Vidmar & Schuller, *supra* note 11, at 134; *see supra* Part I.A.

101. *See, e.g.*, *Contextual Evidence of Gender Discrimination*, *supra* note 2, at 1719 (describing the testimony of Dr. Bielby as "exceed[ing] the limitations on expert testimony [in this area] established . . . by both the original and revised proposal of what constitutes 'social framework' evidence"); *id.* at 1745 ("Dr. Bielby's testimony in *Dukes* departs from our conception of a social framework . . . .").

102. *Id.* at 1745.  If Dr. Bielby, or others, had relied on a specific methodology or definition offered by Professors Monahan and Walker, and then instead used a different methodology, this criticism might be warranted.  However, Dr. Bielby, like many others, cites Monahan and Walker for the term "social framework analysis," but provides his own definition and explanation of what his social framework will involve. *See* Declaration of William T. Bielby, Ph.D, *supra* note 65, at 5 & n.1.

Case: 1:14-cv-08708 Document #: 264-4 Filed: 03/23/18 Page 22 of 35 PageID #:13996

particular term to describe it.[103]  Moreover, the value of the expertise offered by social framework evidence is not in its name, but in its content. Once their claim for special authority to define social framework testimony is discarded, the argument presented by the authors of *Contextual Evidence of Gender Discrimination* is simply an assertion that courts and other academics taking a particular approach to admissibility of social science research are incorrect.  For that assertion, the essay provides little concrete support.  Instead, their argument seems to be a circular reliance on the category names—social framework and social fact—that they have previously used to label social science expert testimony.[104]

Dr. Bielby's testimony in *Dukes* involved a review and presentation of extensive, well-regarded and generally accepted research into the operation of stereotype and bias in decision making.[105]  In addition to that review of the general research, Dr. Bielby reviewed the depositions of Wal-Mart managers and employees, along with extensive information offered by Wal-Mart about its corporate policies.[106]  His report identifies the policies and practices that Wal-Mart used that have been found through social science research to permit, rather than limit, the operation of sex stereotype and bias.[107]  Monahan, Mitchell, and Walker assert that this is not actually social framework analysis.  Their assertion rests on their definition of framework analysis, which they conclude cannot include any reference to the workplace policies and practices at issue in a particular case.  Instead, they conclude, because he does evaluate Wal-Mart's employment practices, Dr. Bielby is engaged in social fact analysis, which they define as social science research done specifically to prove a fact in a particular case.[108]  And, they conclude, because he is doing social fact analysis, he should have been required to conduct extensive and expensive case-specific research of individual worksites and employees at Wal-Mart, rather than examining the policies and practices that Wal-Mart had identified as those employed within the company.[109]

The categories that these authors use to challenge Dr. Bielby's admission as an expert are not social science categories.  They are categories created by a few lawyers trying to describe observed phenomena in litigation.  They offer one way to delineate types of social science expert testimony, but it is certainly not the only way.  In fact, as the authors of *Contextual Evidence of Gender Discrimination* acknowledge only briefly in a footnote at the end of

---

103. *See, e.g.*, Vidmar & Schuller, *supra* note 11, at 133 (describing the increasing use of social science evidence over the preceding "decade and a half" to provide social and psychological context for disputes and noting that Monahan and Walker had "given the generic label of 'social framework evidence'" to this particular use of social science evidence).

104. *See supra* Part I.A.

105. *See* Declaration of William T. Bielby, Ph.D, *supra* note 65, at 15–21.

106. *Id.* 21–24.

107. *Id.* 24–30.

108. *Contextual Evidence of Gender Discrimination*, *supra* note 2, at 1746–48.

109. *Id.* at 1747–48.

their essay,[110] other social scientists and lawyers describe the contours of social framework testimony quite differently. The important point is not what label the testimony has, but whether its contents meet the requirements of the Federal Rules of Evidence for admissibility of expert testimony.

This section examines and critiques the arguments made in support of the elimination of social framework expert testimony. Allowing social framework experts to give their opinions as to the relationship between the general research in their fields and the policies adopted by a particular employer is entirely consistent with Rule 702. Moreover, there is nothing in *Contextual Evidence of Gender Discrimination* itself, or in any Supreme Court or lower federal court precedent, to support the authors' novel view that appellate courts should act as fact finders in the social framework context.

### A. *Social Framework Testimony May Be Both Relevant and Reliable in Employment Discrimination Class Certification Decisions and Rule 702 Does Not Permit Categorical Rules of Exclusion*

Whether an expert witness offering social framework testimony should be admitted in a particular employment discrimination dispute is a question of evidence law that requires the district court to perform the "gatekeeping" function envisioned by the Federal Rules of Evidence.[111] Specifically, a district court must determine whether the proffered testimony meets the standards of Rule 702, which provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[112]

In *Contextual Evidence of Gender Discrimination*, the authors assert that permitting social science experts to provide "linkage" between "general research—that is, research that did not involve the parties in the case before the court"—and specific facts in the case would violate Rule 702 because the expert testimony would not be based on "sufficient facts or data" as required by the rule.[113] Their criticism is that an expert who evaluated an employer's policies and practices in light of the available social science research without doing an extensive and expensive workplace-specific study would simply be offering an unscientific opinion. This criticism is

110. *See id.* at 1746 n.84.

111. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).

112. FED. R. EVID. 702.

113. *Contextual Evidence of Gender Discrimination, supra* note 2, at 1734 (footnotes omitted).

based on their view that "general research findings cannot be linked by an expert witness to the facts of a specific case."[114]

The categorical exclusion that Monahan, Walker, and Mitchell propose is contrary to the general presumption in favor of admissibility under the Federal Rules of Evidence.[115]   The proposal ignores the oft-recognized appropriateness of expert opinion testimony and disregards the district court's well-settled role as gatekeeper in individual disputes.    Their argument also disregards the fit between social science expertise like that offered by Dr. Bielby and the specific questions being considered at the class certification stage of employment litigation.

### 1. Rule 702 Is Flexible and Not Subject to Categorical Exclusions

Over the past decade and a half, the Supreme Court has considered Rule 702 on several occasions, and its consistent message has been a focus on the permissive and flexible nature of the Federal Rules of Evidence and the wide latitude that courts should give qualified experts.  In 1993, the Court discarded the long-standing and restrictive "*Frye* Test" for admission of expert testimony,[116] which had for several decades conditioned admissibility of the proffered evidence on "general acceptance" in the particular field.[117]  Rejecting this standard, the Court instead focused on the district court's role as a gatekeeper, responsible for ensuring that experts offer testimony that is both reliable and relevant.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[118] the Court observed that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one."[119]  The categorical exclusion proposed    in    *Contextual    Evidence    of    Gender    Discrimination*    is fundamentally at odds with these standards.

---

114. *Id.* at 1718.

115. *Daubert*, 509 U.S. at 587 (The "basic standard of relevance . . . is a liberal one."). While Rule 702 was amended in 2000 to formalize aspects of the *Daubert* decision, the amendment drafters and the courts continued to regard the admissibility standard to be permissive. *See* FED. R. EVID. 702 advisory committee's note ("[R]ejection of expert testimony is the exception rather than the rule."); *see also* Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (noting that Rule 702 declares a liberal standard of admissibility); KSP Invs., Inc. v. United States, No. 1:07-CV-857, 2008 WL 182257, at *1 (N.D. Ohio Jan. 17, 2008) (citing 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 702.02, at 702–06 (2d ed. 2009)) (noting presumption of admissibility of expert testimony); Matrix Oncology, L.P. v. Priority Healthcare Corp., No. 4:05-CV-693-Y, 2007 WL 4462247, at *2 (N.D. Tex. May 30, 2007) ("Expert testimony is presumed admissible.").

116. The test drew its name from the decision in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

117. *Daubert*, 509 U.S. at 589.

118. 509 U.S. 579.

119. *Id.* at 594. Thus, while *Daubert* set forth several factors a court might consider in evaluating the admissibility of expert testimony (including empirical testability, whether the theory has been published or otherwise subject to peer review, whether the known or potential error rate is acceptable, and whether the method is generally accepted in the field), the opinion emphasized that even that list of factors was not exhaustive and might not be applicable in every instance. *See id.* at 593–95.

### 2. Expert Testimony May Properly Include Opinions on Facts at Issue in the Particular Case

Moreover, the proposed exclusion is based on the authors' apparent view that a social science expert should not be permitted to offer opinions about specific policies or practices in a workplace that he evaluates in light of his knowledge in his field of expertise. This broad rejection of opinion testimony is entirely inconsistent with an expert's "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."[120] In *General Electric Co. v. Joiner*,[121] for example, the Court specifically referenced the possibility that an expert might "link" general research data to the facts in a particular case,[122] noting that "[t]rained experts commonly extrapolate from existing data."[123] Indeed,

> [e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.' And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.'[124]

The Court's interpretation in this and other cases is consistent with the approach taken in the advisory committee's note to Rule 702, which makes clear that expert testimony can include either general statements concerning a particular area of knowledge, opinions about the application of that knowledge to the facts of the particular case, or both. The advisory committee's note starts with the observation that "[m]ost of the literature assumes that experts testify only in the form of opinions."[125] Of course, the advisory committee's note also recognizes "that an expert on the stand *may* give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts."[126] What is key in both the advisory committee's comments and in the Court's decisions on Rule 702 is that the district court holds considerable discretion to make a decision about the relevance and reliability of the evidence in the particular dispute.[127] Moreover, appellate review of the decisions made by district courts should be, in this instance, as in other evidentiary matters, reviewed only for abuse of discretion.[128]

---

120. *Id.* at 592.
121. 522 U.S. 136 (1997).
122. *Id.* at 146–47.
123. *Id.* at 146.
124. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148–49 (1999) (quoting Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 HARV. L. REV. 40, 54 (1901)).
125. FED. R. EVID. 702 advisory committee's note.
126. *Id.* (emphasis added).
127. *See Kumho Tire Co.*, 526 U.S. at 141–42.
128. *See infra* Part II.B.

Lower courts applying the standards explicated by the Supreme Court have often admitted expert opinion testimony in which a witness's career experience of studying or working in a subject area is applied to the facts of a case. For example, in *United States v. Hammoud*,[129] the court admitted the testimony of an expert in terrorist organizations "to testify that Hammoud was the leader of a Hizballah cell."[130] The witness "testified that his expertise regarding Hizballah derived from his previous experience with the FBI and his current employment with a think tank, at which he specialized in Middle Eastern terrorist groups."[131] He allowed that the process was "not scientific research,"[132] but rather the application of facts presented by the government against facts already known from his experience as an analyst: "the best way to go about making sense of something in the social sciences is to collect as much information as possible and to balance each new incoming piece of information against the body of information that you've built to that point."[133]

Similarly, in *Smith v. Wal-Mart Stores, Inc.*,[134] the district court permitted the introduction of an expert in Internet use and marketing to offer testimony as to the ways that people browse on the Internet.[135] The court rejected Wal-Mart's argument that the plaintiff's proffered expert was required to conduct his own independent study of the websites at issue.[136] Instead, the judge concluded that the expert could apply his expertise in the field more generally to offer opinions about what was more or less likely to be occurring in the particular disputed circumstances.[137]

Of course, expert testimony lacking in a method—founded on "expert intuition" alone—has no place under Rule 702. If an expert declines to use well-established methodologies within a field without explanation,[138] or if the expert's approach is in conflict with the standards in the field or lacks supporting research in the field, a district court may well exercise its discretion in evaluating the requirements of Rule 702 and exclude the expert testimony. What the Supreme Court decisions, as well as numerous opinions from the lower courts,[139] demonstrate is that the admissibility of

---

129. 381 F.3d 316 (4th Cir. 2004) (en banc), *vacated*, 543 U.S. 1097 (2005). The decision was vacated by the U.S. Supreme Court on a sentencing issue, in light of *United States v. Booker*, 543 U.S. 220 (2005), but the en banc court on remand adopted the original opinion so far as it affirmed the conviction. United States v. Hammoud, 405 F.3d 1034, 1034 (4th Cir. 2005).

130. *Hammoud*, 381 F.3d at 336.

131. *Id.* at 337.

132. *Id.*; *see also* FED. R. EVID. 702 advisory committee's note ("Some types of expert testimony will not rely on anything like a scientific method . . . .").

133. *Hammoud*, 381 F.3d at 337.

134. 537 F. Supp. 2d 1302 (N.D. Ga. 2008).

135. *Id.* at 1325.

136. *Id.* at 1324–25.

137. *Id.*

138. Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 419 (7th Cir. 2005).

139. *See, e.g.*, Boim v. Holy Land Found. for Relief and Dev., 549 F.3d 685, 705 (7th Cir. 2008) (admitting expert testimony that two figures who shot plaintiff were members of Hamas); *In re* Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., No. M21-88, 2008

*FORDHAM LAW REVIEW* [Vol. 78

expert opinion testimony linking a field of knowledge with the case facts is
an open domain, sensitive to the circumstances.

3. Expert Opinion on the Policies at a Particular Workplace Can Be Both
Relevant and Reliable in Class Certification Disputes

Applying these standards to expert testimony offered in class certification
disputes in employment litigation, district courts are well within their
discretion to admit social framework expertise that addresses the general
research on organizational behavior and social cognition theory and that
also examines and offers opinions on the policies and practices in operation
in the particular workplace.

The question that ultimately must be answered in evaluating the
admissibility of this expert testimony is whether it "fit[s]," both with the
relevant scientific discipline and with the legal issue to which it is
directed.[140] In their recent article, Faigman, Dasgupta, and Ridgeway made
a strong case for the validity of expert testimony describing the general
research findings on stereotype and bias, but they concluded that a social
scientist in an individual employment discrimination dispute cannot "state
whether the same research findings definitively explain a specific
employer's decisions in a specific circumstance."[141] The reason for the
distinction is that the existing research on bias does not, as a matter of
science, support expert conclusions about whether a particular decision was
an instance of bias.[142] Significantly, however, Dr. Bielby and other similar
experts in class certification disputes are not offering opinions as to specific
employment decisions and whether they were in fact infected by bias.
Instead, Dr. Bielby's testimony in *Dukes* involved the identification of
policies in place at Wal-Mart and consideration of whether available

WL 1971538, at *7 (S.D.N.Y. May 7, 2008) (while "Reynolds does not use social science
methodologies such as regression analysis or econometrics," he might instead "appl[y] his
extensive experience in ethanol production and distribution logistics to analyze an array of
facts"); United States v. Abu-Jihaad, 553 F. Supp. 2d 121, 125–26 (D. Conn. 2008)
(admitting expert opinion testimony about al Qaeda operations and mujahideen activities in
Europe and Asia and noting that the expert "testified that he applies to his expert testimony
the same social science methodologies that he learned at Georgetown University and that are
applied to other subjects that cannot be tested scientifically"); Hynix Semiconductor Inc. v.
Rambus Inc., Nos. CV-00-20905 RMW, C-05-00334 RMW, 2008 WL 413743, at *1–2
(N.D. Cal. Feb. 13, 2008) (witness testified about his experience in engineering and business
regarding what a reasonable engineer in the industry would have known in the 1990s)
("Reviewing contemporaneous documents appears to be one of the more reliable methods of
reconstructing what someone may have known during a specific time period"); United States
v. Paracha, No. 03 CR. 1197(SHS), 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006) (expert
testimony on al Qaeda) ("Although [the expert's] methodology is not readily subject to
testing and permits of no ready calculation of a concrete error rate, it is more reliable than a
simple cherry-picking of information from websites and other sources").

140. Faigman et al., *supra* note 4, at 1390.
141. *Id.* at 1432.
142. *Id.* at 1431–32.

research shows that they are the kinds of policies that are "vulnerable to bias."[143]

The kinds of general assessments that Dr. Bielby and others testifying in class certification disputes make are consistent with the scientific research that identifies "aggregate trends," and their testimony stops short of making claims about whether any specific decision was in fact the product of discrimination. Indeed, the legal issue for which social science testimony is being offered at class certification is not whether the employer acted with discriminatory intent, but whether the plaintiffs were subject to common employer policies or practices that satisfy the Rule 23 "commonality" requirement. Social framework testimony offered by plaintiffs' experts in these disputes helps the fact finder (in class certification, always a judge) to understand how an array of policies and practices in a particular workplace can operate together to create that common question. There may be room for other experts or litigants or fact finders to disagree with the conclusions Dr. Bielby and others reach, but those kinds of disagreements go to the weight the testimony should be accorded, not to whether their opinions are admissible.[144]

Ultimately, the arguments presented in *Contextual Evidence of Gender Discrimination* lack support in the case law or Rules. The assertion that "linkage" of general social science research to an evaluation of a particular workplace policy or practice is impermissible is contrary to Rule 702, Supreme Court interpretation of the Rule, and the vast array of district court opinions demonstrating that judges, taking seriously their gatekeeping role with regard to admission of expert testimony, permit experts from a range of fields to apply their general knowledge in evaluating particular circumstances at issue in a dispute.

### B. *There Is No Justification for a Special Rule of Appellate Scrutiny of District Court Decisions To Admit Social Framework Testimony*

Among the most surprising assertions in *Contextual Evidence of Gender Discrimination* is the suggestion that the admissibility of social framework expert testimony should be the subject of a novel and entirely unique standard of appellate review.[145]   The authors argue that district court determinations on admissibility in this one context should be subject to de

---

143. *See* Declaration of William T. Bielby, Ph.D, *supra* note 65, at 25.

144. *Daubert* "quite clearly forbids trial judges to assess the validity or strength of an expert's scientific conclusions, which is a matter for the jury." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 154 & n.9 (1997) (Stevens, J., concurring in part and dissenting in part).  As the Court explained in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993); *see also* Fiske & Borgida, *supra* note 11, at 139 ("The quality of the science should determine its weight, not its admissibility.").

145. *See* Monahan et al., *supra* note 2, at 1742.

novo review on appeal.[146]  This suggestion is contrary to Supreme Court precedent and the regular practices of courts around the country.

Just last Term, the Supreme Court decided a case that exemplifies its view of the relationship between appellate and district courts in evidentiary determinations.  The case, *Sprint/United Management Co. v. Mendelsohn*,[147] involved a recurring question of evidentiary proof in employment discrimination cases:  should evidence of discrimination against other employees by other supervisors be admitted into the record?[148]  Evidence of discrimination by other supervisors is testimony by nonparties alleging discrimination at the hands of persons who played little to no role in the adverse employment decision being challenged by the plaintiff.[149]  A split panel of the U.S. Court of Appeals for the Tenth Circuit in *Mendelsohn v. Sprint/United Management Co.*[150] held that the district court committed reversible error by appearing to adopt a blanket rule to exclude this kind of evidence.[151]

The Supreme Court reversed in a decision that evidenced the Court's commitment to the principle that district courts have broad discretion to determine the relevance, probative value, and reliability of expert testimony.[152]  The Court unanimously stated, citing twenty-five-year-old precedent, that "[a] district court is accorded *a wide discretion in determining the admissibility of evidence* under the Federal Rules."[153]  Evidentiary rulings should only be interfered with by an appellate court if there has been an abuse of discretion.[154]  The *Mendelsohn* Court went on to emphasize that "[a]n appellate court should not presume that a district court intended an incorrect legal result when the order is equally susceptible of a correct reading, particularly when the applicable standard of review is deferential."[155]  In short, the Court concluded that the Tenth Circuit was wrong when it attempted to engage in its own analysis of the relevant factors under the Federal Rules of Evidence, and remanded with instructions to have the district court clarify the basis for its evidentiary ruling under the applicable evidentiary rules.[156]

To understand why an appellate court is required to give such a wide berth to district court's evidentiary rulings, it is necessary to focus on

---

146. *Id.*
147. 128 S. Ct. 1140 (2008).
148. *Id.* at 1143.
149. *Id.*
150. 466 F.3d 1223 (10th Cir. 2006).
151. *Id.* at 1229–30.  The Tenth Circuit majority found that it should not matter whether the company terminated the employee with the same supervisor who made the inculpatory statement at issue because such testimony helped to establish a discriminatory atmosphere. *Id.* at 1230.
152. *Mendelsohn*, 128 S. Ct. at 1146.
153. *Id.* at 1145 (quoting United States v. Abel, 469 U.S. 45, 54 (1984)) (emphasis added).
154. Old Chief v. United States, 519 U.S. 172, 183 n.7 (1997).
155. *Mendelsohn*, 128 S. Ct. at 1146.
156. *Id.* at 1143.

context. Context is of the utmost importance to a court's analysis of the admissibility and significance of proffered evidence. As the Supreme Court recently explained in another employment discrimination case, a "speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."[157] Indeed, the importance of the district court's superior ability to evaluate evidence in context explains why the Supreme Court has never adopted a bright line evidentiary rule excluding evidence based on relevance under Rule 401,[158] probative value under Rule 403,[159] or reliability of expert testimony under *Daubert* and Rule 702.[160]

Evidentiary rulings should not be reversed by a reviewing court unless there has been a violation of the law or an abuse of discretion affecting the substantive right of a party.[161] This strong presumption in favor of letting the district court's decision stand runs throughout the evidentiary rules. For instance, under Rule 401, the advisory committee's note on the Federal Rules of Evidence states that "[r]elevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case."[162] Similarly, Rule 403 directs federal courts to exclude otherwise relevant evidence under Rule 401 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[163] The very nature of this balancing exercise precludes bright-line rules.[164] Relevance and prejudice under Rules 401

---

157. Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (per curiam) (stressing the importance of context in employment discrimination cases).

158. FED. R. EVID. 401.

159. FED. R. EVID. 403. "Rather than assess the relevance of the evidence itself and conduct its own balancing of its probative value and potential prejudicial effect, the Court of Appeals should have allowed the District Court to make these determinations in the first instance, explicitly and on the record." *Mendelsohn*, 128 S. Ct. at 1146 (citing Pullman-Standard v. Swint, 456 U.S. 273, 291 (1982)). The only exception to this normal course of remanding the issue back to the district court is when "the record permits only one resolution of the factual issue." *Pullman-Standard*, 456 U.S. at 292. Needless to say, this is rarely the case with complex questions under employment discrimination law.

160. FED. R. EVID. 702; Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997) ("The Court of Appeals suggested that *Daubert* somehow altered this general rule in the context of a district court's decision to exclude scientific evidence. But *Daubert* did not address the standard of appellate review for evidentiary rulings at all . . . . Thus, while the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under *Frye*, they leave in place the 'gatekeeper' role of the trial judge in screening such evidence.").

161. *Mendelsohn*, 128 S. Ct. at 1144–45.

162. FED. R. EVID. 401 advisory committee's note.

163. FED. R. EVID. 403.

164. *See* 22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5212 (1978) (noting the discretionary nature of Rule 403); Kenneth R. Kreiling, *Scientific Evidence: Toward Providing the Lay Trier with the Comprehensible and Reliable Evidence Necessary To Meet the Goals of the Rules of Evidence*, 32 ARIZ. L. REV. 915, 925 (1990) (recognizing "the nature of the Rule itself: Rule 403 is a broad rule which recognizes the large discretionary role of the judge in controlling

and 403 should therefore be determined in the context of the facts and arguments in a particular case.[165] Applying this same strong presumption of district court discretion to Rule 702 evaluations, the Supreme Court in *General Electric* stated emphatically that "[a] court of appeals applying 'abuse-of-discretion' review to such rulings *may not categorically distinguish between rulings allowing expert testimony and rulings disallowing it.*"[166] In short, a different standard of review does not apply to the district court when making a ruling on the admissibility of expert testimony.[167]

In all, Monahan, Walker, and Mitchell cite no authority for their appellate review proposal. Their mere beliefs notwithstanding, their argument goes against the great weight of precedent when they suggest that appellate courts should decide de novo whether social framework evidence should be able to be applied to the specific facts of the case. As the Court recently stated in *Mendelsohn*, "[w]ith respect to evidentiary questions in general . . . a district court *virtually always* is in the better position to assess the admissibility of the evidence in the context of the particular case before it."[168]

Therefore, once the district court decides in a social framework case that the expert can link social framework theory to the specific facts of a case in a manner which would properly assist the trier of fact to determine the specific facts of the case, that evidentiary ruling should only be disturbed in the rare instance where an abuse of discretion has occurred. An argument for categorical exclusion of this type of testimony is fundamentally contrary to both the rules of evidence and judicial application of those rules.

### III. THE DEBATE OVER THE CONTOURS OF SOCIAL FRAMEWORK TESTIMONY MUST BE UNDERSTOOD AS PART OF A LARGER DEBATE OVER THE REACH OF EMPLOYMENT DISCRIMINATION LAWS

The foregoing sections establish that social framework testimony should be admissible in employment discrimination class certification disputes, even if that testimony includes opinions about policies and practices in particular workplaces. Moreover, the decision about whether a particular expert, offering particular information in a particular context, should be admitted is one for the district court to make. Appellate courts reviewing the decisions made by judges about whether or not to admit social framework testimony should apply the same, well-established standard of

---

the introduction of evidence" (citing 2 WEINSTEIN & BERGER, *supra* note 115, § 403.012, at 403–09)).

165. *Mendelsohn*, 128 S. Ct. at 1147.

166. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997) (emphasis added).

167. *Id.* at 143 ("We hold that the Court of Appeals erred in its review of the exclusion of Joiner's experts' testimony. In applying an overly 'stringent' review to that ruling, it failed to give the trial court the deference that is the hallmark of abuse-of-discretion review." (citing Koon v. United States, 518 U.S. 81, 98–99 (1996))).

168. *Mendelsohn*, 128 S. Ct. at 1146 (emphasis added).

deferential review that is applied in all appellate review of admissibility determinations.

Of course, just as there is no support for a categorical exclusion of social framework testimony in employment discrimination litigation, no reason exists to assume that social framework experts will always be permitted to testify. Determinations as to admissibility are individualized. The Federal Rules of Evidence call on the district court judge in each case to take an active role in assessing whether proffered testimony will be reliable and relevant. Evidence law does not point to absolute admissibility; what it does clearly require is that a district judge engages in precisely the kind of evaluation that courts have appropriately been undertaking in employment discrimination cases for decades, and that the appellate courts apply precisely the kind of deferential review that has been the consistent standard in these same cases.

Given the clarity of the law in this area, the arguments made in *Contextual Evidence of Gender Discrimination* present quite a radical agenda for change of existing law. If evidence law does not require—or even support—a general exclusion of social framework testimony, then what is the rationale for these arguments? The changes proposed in the essay are best understood as part of a larger debate that is being waged both in courtrooms and on the pages of academic journals.

The litigation disputes are, in one respect, fairly straightforward: defendants want to exclude plaintiffs' witnesses in support of class certification. But, while that is the issue in each individual case, the larger battle embedded in each effort to include or exclude a witness who will testify about the operation of stereotyping and bias in the workplace is over the nature of the "intent" required by current antidiscrimination law. Thus, defendants' criticisms of social framework testimony—for example, that the expert should have to conduct an empirical study of this workplace or that the expert cannot quantify the precise amount or any specific instance of discrimination[169]—rest on an assumption that the plaintiffs can and must identify precisely each employment decision that was infected by invidious discrimination. Plaintiffs, on the other hand, are challenging the broader effect of policies and practices that have limited opportunities for women, but in ways that may be hard to prove in some specific cases.[170] The fact that the evidence plaintiffs present is clearer on an employer-wide basis than for each individual plaintiff does not mean that Title VII provides no remedy for a workplace in which an employer has chosen to use practices that systematically disadvantage women. The debate over admissibility of social framework testimony is one of a set of arguments presented to courts about which view of Title VII—that requiring identifiable, invidious intent or that requiring a demonstration of systematic and obvious disadvantage—should prevail.

---

169. *See supra* Part II.A.
170. *See, e.g.*, Hart, *supra* note 7, at 784–88.

In the academic context, the debate is not, of course, about whether plaintiffs or defendants should win any particular case. Rather, it is a debate about the existence of unconscious or implicit bias, the continued seriousness of discrimination as a force in the modern workplace, and the appropriate reach of legal remedies to challenge discrimination. The debate has drawn both legal academics and social scientists into its fray.[171]

In the social science context, it is a debate centered on the validity of research into implicit bias and its applicability outside of the laboratory context. While there do not seem to be any social science studies demonstrating the absence of implicit bias, there have been a number of recent articles challenging the research that demonstrates its existence.[172] A few of these challenges have included accusations that political bias, not scientific methodology, has fueled the challenged research. Gregory Mitchell, for example, has written several articles with coauthor Philip Tetlock excoriating both the notion of implicit bias and the scientists who claim its existence. They describe social psychology as "better classified as a form of social activism than of science,"[173] and classify the scholars in the field as "statist-interventionists" seeking to impose a set of political values through their work.[174] Researchers whose work focuses on whether and how implicit bias operates have begun to respond to these and other attacks.[175]

In the legal academic context, the debate has been more diffuse, but ultimately it boils down to a disagreement over the continued pervasiveness of discrimination and the proper scope of federal antidiscrimination laws.[176] In many ways mirroring the debate taking place in litigation, the

---

171. This is not a debate over whether plaintiffs or defendants should win in any particular case. Rather, it is a debate about the continued seriousness of discrimination as a force in the modern workplace and the appropriate reach of legal remedies to challenge discrimination.

172. *See, e.g.*, Frank J. Landy, *Stereotypes, Bias, and Personnel Decisions: Strange and Stranger*, 1 INDUS. & ORGANIZATIONAL PSYCHOL. 379 (2008); *The Tenuous Bridge Between Research and Reality*, *supra* note 73.

173. Gregory Mitchell & Philip E. Tetlock, *Antidiscrimination Law and the Perils of Mindreading*, 67 OHIO ST. L.J. 1023, 1121 (2006) [hereinafter *Antidiscrimination Law*].

174. Philip E. Tetlock & Gregory Mitchell, *Unconscious Prejudice and Accountability Systems: What Must Organizations Do To Check Implicit Bias?*, *in* RESEARCH IN ORGANIZATIONAL BEHAVIOR, *supra* note 76 (manuscript at 9–14).

175. *See, e.g.*, Anthony G. Greenwald, *Landy Is Correct: Stereotyping Can Be Moderated by Individuating the Out-Group and by Being Accountable*, 1 INDUS. & ORGANIZATIONAL PSYCHOL. 430 (2008); John T. Jost et al., *An Invitation to Tetlock and Mitchell To Conduct Empirical Research on Implicit Bias with Friends, "Adversaries," or Whomever They Please*, *in* RESEARCH IN ORGANIZATIONAL BEHAVIOR, *supra* note 76 ; Jost et al., *supra* note 76 (manuscript at 3–4).

176. *See, e.g.*, Samuel R. Bagenstos, *supra* note 7, at 479–80; Adam Benforado & Jon Hanson, *Legal Academic Backlash: The Response of Legal Theorists to Situationist Insights*, 57 EMORY L.J. 1087, 1135–40 (2008); *Antidiscrimination Law*, *supra* note 173, at 1032; Gregory Mitchell & Philip E. Tetlock, *Facts Do Matter: A Reply to Bagenstos*, 37 HOFSTRA L. REV. (forthcoming 2009); *see also* King & Amin, *supra* note 97, at 2–3 (arguing that social frameworks should be viewed as an attack on the "character" of the employer and its agents, and therefore excluded).

legal academic debate has circled around whether the law can or should provide a remedy for the harm that results from "unthinking" discrimination. It remains a subject of considerable debate whether current law does in fact—or should—provide a remedy in various contexts for employer decisions that are the result of unchecked stereotyping and bias.[177] For those who believe the law does and should protect against more subtle forms of discrimination, the legal prohibitions against discrimination demand that employers take steps to ensure that implicit bias is not operating to create unequal treatment at work. For lawyers, scholars, and judges who understand the prohibition against discrimination this way, social framework theory and the social science research that forms the base for current social framework expertise shed important light on the operation of bias in the workplace and assist legal fact finders in understanding its effects.

By contrast, the argument for extremely stringent restrictions on social framework testimony is part of a very different perspective on what the law does, can, or should prohibit. *Contextual Evidence of Gender Discrimination* can only be fully understood as part of a body of work that includes criticism of the theory of implicit bias and challenges to legal theories that provide a remedy for the kinds of subtle discrimination that infect workplace decisions without conscious awareness on the part of the decision makers.[178] As employment discrimination scholar Samuel Bagenstos recently noted in considering arguments made by Mitchell and Tetlock, "[a]lthough they ostensibly attack the 'science' of implicit bias research, Mitchell and Tetlock's real target is the normative view of antidiscrimination law as reaching beyond acts reflecting the individual fault of the discriminator."[179] Similarly, the arguments presented in *Contextual Evidence of Gender Discrimination* only make sense if they are understood as part of a broader attack on theories of implicit bias and the ways that research on stereotyping and bias has been used to support particular kinds of discrimination claims.

To be clear, understanding that the arguments presented in *Contextual Evidence of Gender Discrimination* are part of a larger political perspective does not mean that the counterarguments are divorced from any political frame. But it has become commonplace in this larger debate for opponents of a more inclusive view of discrimination law to accuse supporters of that view of political motivation, while leaving the suggestion that their perspective has no political motivation. Thus, grouping law professors with the social psychologists whose motives they question, Mitchell and Tetlock refer to implicit bias scholars as "a select group of social psychologists and law professors—with a self-declared agenda to transform American

---

177. *See, e.g.*, Hart, *supra* note 7, at 778–90.

178. *See, e.g.*, Benforado & Hanson, *supra* note 176, at 1141–43; *Antidiscrimination Law*, *supra* note 173, at 1026–28, 1116.

179. Bagenstos, *supra* note 7, at 480–81.

law."[180]   The suggestion that one side of the debate is impermissibly motivated by value preferences while the other is somehow free of political or value judgments is simply incorrect.

In fact, each of these perspectives includes a set of political preferences about what employment discrimination law should prohibit and what types of conduct are outside of the scope of legal prohibition.  Neither perspective can legitimately claim neutrality.  Instead, the best arguments will combine full disclosure of professional interests, thoroughly substantiated doctrinal analyses, and some acknowledgement of the political assumptions that motivate and frame a particular legal argument.

## CONCLUSION

Social framework testimony has played, and should continue to play, a central role in modern employment discrimination class action litigation. Social scientists who have researched the ways in which stereotyping and bias intrude into decision making can offer valuable assistance to fact finders.  How and whether that testimony is admissible is a determination that depends on the legal questions presented in the particular dispute as well as the proposed evidence offered by the expert.   In the context of disputes over the certification of employment discrimination class actions, social framework experts can appropriately offer both testimony about general social science research and opinion about whether the policies and practices in the particular workplace have features that could make them vulnerable to operation of bias.  This kind of expert testimony is directly relevant to one of the central questions the judge must assess for certification:   does the proffered class share common questions of law or fact?   Claims for the categorical exclusion of expert opinion as to the susceptibility of particular workplace policies and practices to the intrusion of stereotyping and bias are inconsistent with applicable evidentiary rules and judicial decisions.   These claims should be understood as part of a larger vision that questions the impact of implicit bias and stereotyping in the workplace and the remedial scope of antidiscrimination laws.

---

180. *Antidiscrimination Law, supra* note 173, at 1032.