**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **CHRISTIE VAN, CHARMELLA LEVIEGE, MARIA PRICE, HELEN ALLEN, JACQUELINE BARRON, THERESA BOSAN, SHRANDA CAMPBELL, KETURAH CARTER, MICHELLE DAHN, TONYA EXUM, JEANNETTE GARDNER, ARLENE GOFORTH, CHRISTINE HARRIS, ORISSA HENRY, LAWANDA JORDAN, DANIELLE KUDIRKA, TERRI LEWIS-BLEDSOE, CONSTANCE MADISON, CEPHANI MILLER, MIYOSHI MORRIS, STEPHANIE SZOT, SHIRLEY THOMAS-MOORE, ROSE THOMAS, TONI WILLIAMS, BERNADETTE CLYBURN, MARTHA CORBIN, ANGELA GLENN, LADWYNA HOOVER, OGERY LEDBETTER, LATRICIA SHANKLIN, ANTOINETTE SULLIVAN, DERRICKA THOMAS, and NICHEA WALLS, each individually and on behalf of all similarly situated persons,** | Case No. 1:14-CV-08708<br><br>Honorable Robert M. Dow, Jr.<br>Honorable Sidney I. Schenkier |
|         **Plaintiffs,** | |
|    **v.** | |
| **FORD MOTOR COMPANY,** | |
|         **Defendant.** | |

**REPLY OF DEFENDANT FORD MOTOR COMPANY IN SUPPORT OF ITS
MOTION TO EXCLUDE THE TESTIMONY, REPORTS, AND OPINIONS OF
DR. LOUISE FITZGERALD**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

ARGUMENT ....................................................................................................................2

      A.    Dr. Fitzgerald's Credentials Do Not Give Her License To Dispense With The Scientific Method...............................................................3

      B.    The Courts And Scholars Cited By Plaintiffs Have Not Endorsed The Subjective "Read-the-Case" File Methodology Employed By Fitzgerald .....................................................................................................3

      C.    Plaintiffs Have Not Shown How Fitzgerald's Conclusions Are Derived From The Application Of Scientific Principles Or Methods ..................8

      D.    Fitzgerald's Purported Difficulty Obtaining Access To Ford Employees Does Not Excuse Her Failure To Conduct A Scientifically Valid Survey .....................................................................................................10

      E.    Plaintiffs Have Failed To Articulate How Fitzgerald's Opinions Will Assist The Court In Deciding Whether To Certify A Class ..................11

      F.    Fitzgerald's Supplemental Declaration Should Be Excluded Because She Is Not A Lawyer And Is Not Qualified To Assess A Conciliation Agreement .................................................................................................13

      G.    Fitzgerald's Second Belated "Rebuttal Declaration" Should Be Stricken Because It Is Untimely And Replete With Legal Conclusions.............14

CONCLUSION...............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir. 2001) ..........................................................................10

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ...............................................................................7

*Childers v. Trs. of the Univ. of Pa.*,
2016 WL 1086669 (E.D. Pa. Mar. 21, 2016)......................................................8

*Clark v. Takata Corp.*,
192 F.3d 750 (7th Cir.1999) .................................................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 592 (1993)..............................................................................................6

*Dukes v. Wal-Mart Stores, Inc.*,
222 F.R.D. 137 (N.D. Cal. 2004)..........................................................................5

*EEOC v. Bloomberg L.P.*,
2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010)..................................................3, 8

*EEOC v. Dial Corp.*,
2002 WL 31061088 (N.D. Ill. Sept. 17, 2002) (Urbom, J.)................................11

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010)..................................................................9

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*,
2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) (Dow, J.)................................12, 13

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...............................................................................................8

*Jenson v. Eveleth Taconite Co.*,
824 F. Supp. 847 (D. Minn. 1993), *aff'd in part on other grds., vacated in part
on other grds.*, 130 F.3d 1287 (8th Cir. 1997)......................................................8

*In re MBTE Products Liability Litigation*,
2008 WL 1971538 (S.D.N.Y. May 7, 2008) .........................................................7

*Medicines Co. v. Mylan Inc.*,
2013 WL 6633085 (N.D. Ill. Dec. 16, 2013) (St. Eve, J.) .................................14

*Morris v. Ford Motor Co.*,
2012 WL 5947753 (N.D. Ind. Nov. 28, 2012)....................................................12

## TABLE OF AUTHORITIES

**Page(s)**

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)..............................................................................................6

*Robinson v. Jacksonville Shipyards, Inc.*,
    760 F. Supp. 1486 (M.D. Fla. 1991)..................................................................7

*Smith v. Union Pac. R.R.*,
    2017 WL 2656583 (N.D. Ill. June 20, 2017) (Dow, J.)................................3, 9, 10

*United States v. Hall*,
    93 F.3d 1337 (7th Cir. 1996) ............................................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).......................................................................................1, 5

*Zenith Elecs. Corp. v. WH-TV Broad., Corp.*,
    395 F.3d 416 (7th Cir. 2005) ............................................................................7

**Other Authorities**

Melissa Hart & Paul M. Secunda, *A Matter of Context: Social Framework
    Evidence in Employment Discrimination Class Actions*, 78 Fordham L. Rev.
    37 (2009)......................................................................................................4, 5

John Monahan, Laurens Walker & Gregory Mitchell, *Contextual Evidence of
    Gender Discrimination: The Ascendance of "Social Frameworks,"* 94 Va. L.
    Rev. 1715 (2008) ............................................................................................4, 5

Michael Rustad & Thomas Koenig, *The Supreme Court and Junk Social Science:
    Selective Distortion in Amicus Briefs*, 72 N.C. L. Rev. 91 (1993) .........................15

**Rules**

Fed. R. Civ. P. 26 ...............................................................................................14

Fed. R. Civ. P. 37 ...............................................................................................14

Fed. R. Evid. 702 .........................................................................................3, 9, 10

# INTRODUCTION

The opinions of Dr. Louise Fitzgerald should be excluded because they do not reflect a proper application of the "social framework" method or another valid scientific process, and they are irrelevant to the class certification inquiry currently before the Court. *See* Dkt. 236 at 1-3. Plaintiffs' arguments in opposition to Ford's *Daubert* motion fail to remedy these fatal flaws.

*First*, Plaintiffs argue that Dr. Fitzgerald's testimony should be admitted because she is a "preeminent expert" in sexual harassment. *See* Dkt. 264 at 2. But Rule 702 forbids even the most "preeminent" of experts from offering opinions that are not grounded in reliable methods.

*Second*, Plaintiffs contend that "social framework" opinions like those of Dr. Fitzgerald are routinely accepted by courts and scholars alike. *See* Dkt. 264 at 6-9. None of the cases that Plaintiffs cite, however, endorse Fitzgerald's subjective, "read-the-case-file" approach, and many were decided before *Daubert* and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Similarly, the law journal article that Plaintiffs repeatedly invoke in their brief was called into question by *Dukes*, and does not support what Plaintiffs' expert did here in any event.

*Third*, Plaintiffs assert that Dr. Fitzgerald was not required to perform a clinical evaluation or "empirical study" to justify her opinions. *See* Dkt. 264 at 9-11. That is incorrect. As a social psychologist offering Ford-specific "expert" opinions about the alleged prevalence of sexual harassment at the two Ford Plants and the alleged effects of that supposed harassment on all women, Fitzgerald was obligated to base her opinions on a Ford-specific scientific analysis— whether it be clinical evaluations, a survey, or another systematic method. She failed to do so.

*Fourth*, to the extent Plaintiffs complain that *Ford* is at fault for Fitzgerald's failure to perform a statistically valid survey or interview putative class members, *see* Dkt. 264 at 12-13, that argument must be rejected. Fitzgerald never requested Ford's permission to conduct a survey, nor did Fitzgerald even interview the 31 Plaintiffs—employees to whom she undoubtedly had full

1

access. More importantly, even if the administration of a statistically valid survey would have been difficult, "there is no hardship exception to the scientific method." Dkt. 236-6 at 152:11-13.

*Fifth*, Plaintiffs seek to justify Dr. Fitzgerald's "if-then" approach by citing cases in which experts base their opinions on specified assumptions. But Plaintiffs identify no case in which an *entirely* contingent expert report, dependent on the facts being "largely as alleged" by Plaintiffs, Dkt. 239 at 125:3-127:2, was found relevant and admissible at the class certification stage.

*Sixth*, Plaintiffs argue that Fitzgerald's declaration criticizing Ford's Conciliation Agreement with the EEOC is admissible because she is qualified to opine on "whether [the Agreement] will remediate sexual harassment." Dkt. 264 at 14. Plaintiffs fail to explain how the efficacy of remedial measures in the Conciliation Agreement is a proper subject of *scientific* testimony, particularly by a psychologist with an admitted dearth of pertinent experience.

Finally, this Court should ignore the second, belated declaration filed by Fitzgerald (Dkt. 264-2), as untimely and replete with improper legal argument. Remarkably, in this declaration Fitzgerald herself characterizes her reports in this case as a kind of "Brandeis brief," *see* Dkt. 264-2 ¶ 13(b), evidently failing to recognize that such a brief is legal advocacy of an unscientific nature.

For all these reasons, and for those set forth in Ford's *Daubert* motion, the testimony, reports, opinions, and two belated declarations of Dr. Fitzgerald should be excluded in full.

## ARGUMENT

Plaintiffs' opposition brief, and the improper "rebuttal" declaration from Fitzgerald, fails to satisfy Plaintiffs' burden to show that Fitzgerald's opinions are reliable and relevant under Federal Rule of Evidence 702. Plaintiffs do not even attempt to refute many of Ford's contentions in its *Daubert* motion—*e.g.*, that Fitzgerald "cherry picked" evidence to support her "expert" theory of the case, *see* Dkt. 236 at 10; *see also* Dkt. 239 at 183:5-6 ("I knew what I wanted . . . to see"); that her conclusions are not based on a statistically valid, representative data-set, *see*

Dkt. 236 at 15; or that she has no expertise that would give her a valid basis to opine as to who at Ford had knowledge of what and when, *see id.* at 14. Rather than defend Fitzgerald's "methodology" on the merits, Plaintiffs lean heavily on her qualifications, mischaracterize proper "social framework" testimony, and contend that Ford ought to be estopped from arguing that Dr. Fitzgerald should have performed a more rigorous analysis. None of these arguments has merit.

**A.  Dr. Fitzgerald's Credentials Do Not Give Her License To Dispense With The Scientific Method**

The first two pages of Plaintiffs' opposition consist of a recitation of Dr. Fitzgerald's credentials, which are not in dispute. *See* Dkt. 264 at 1-2. Ford agrees that Fitzgerald has conducted peer-reviewed research on various issues related to sexual harassment. But as she admits, she "did not do any research *for this case*." Dkt. 239 at 300:20-24 (emphasis added); *see also* Dkt. 264-2 ¶ 12(a) (conceding she "did not conduct an empirical study"). No expert, no matter how qualified, is immune from the requirement of Rule 702 that expert testimony be grounded in "'reliable principles and methods.'" *Smith v. Union Pac. R.R.*, 2017 WL 2656583, at *3 (N.D. Ill. June 20, 2017) (Dow, J.) (quoting Fed. R. Evid. 702). In other words, even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). While Fitzgerald's credentials may render her "qualified to analyze" data in the abstract, Dkt. 264 at 2, her opinions here must be excluded, because she failed to use any scientific method to analyze the only "data" (discovery materials) upon which she relied, *see, e.g.*, *EEOC v. Bloomberg L.P.*, 2010 WL 3466370, at *14-16 (S.D.N.Y. Aug. 31, 2010) (testimony excluded where expert did not undertake "systematic approach" to reviewing case documents).

**B.  The Courts And Scholars Cited By Plaintiffs Have Not Endorsed The Subjective "Read-the-Case" File Methodology Employed By Fitzgerald**

Plaintiffs next argue that Fitzgerald's methodology—which consists of "connecting her

social science and psychological research of organizations to facts of the case obtained through her review of deposition transcripts, documents produced in discovery and pleadings"—is generally accepted by courts and scholars. Dkt. 264 at 6. However, the lone journal article and handful of cases that Plaintiffs cite do not actually endorse the brand of "social framework" analysis that Fitzgerald employed—that is, providing case-specific conclusions based on no more than a selective, unsystematic review of documents produced in discovery.

To justify Dr. Fitzgerald's methodology, Plaintiffs rely heavily on an article authored by Law Professors Melissa Hart and Paul M. Secunda (*see* Dkt. 264 at 8), *A Matter of Context: Social Framework Evidence in Employment Discrimination Class Actions*, 78 Fordham L. Rev. 37 (2009), which was written in response to the article authored by one of Ford's experts, Dr. Gregory Mitchell, J.D., Ph.D., and his colleagues John Monahan and Laurens Walker, *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks,"* 94 Va. L. Rev. 1715 (2008).[1] Professors Hart and Secunda disagree with Professor Mitchell's view that social framework evidence should be excluded in all cases where an expert purports to use general research to draw case-specific conclusions without an empirical study. Instead, they maintain, "expert opinion testimony linking a field of knowledge with the case facts is an open domain, sensitive to the circumstances." Hart & Secunda, *supra*, at 62. In their article, Hart and Secunda defend the opinions of social psychologist Dr. William Bielby, offered in support of the plaintiffs'

---

[1]    Hart is a Professor at the University of Colorado Law School, while Secunda is a Professor at Marquette University Law School. In contrast to Professor Mitchell—who is "a social psychologist by training," Dkt. 236-5 ¶ 2, and has offered his opinions in *this* case in his capacity as a social scientist, *see* Dkt. 265-1 at 139:1-3—neither Hart nor Secunda have degrees in social psychology. *See* M. Hart Curriculum Vitae, *available at* https://lawweb.colorado.edu/files/vitae/hart.pdf (last visited Apr. 6, 2018); *see also* P.M. Secunda Curriculum Vitae, *available at* https://law.marquette.edu/faculty-and-staff-directory/detail/5431766 (last visited Apr. 6, 2018). Their arguments regarding the admissibility of social framework evidence are therefore purely legal ones.

motion for class certification in *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004) as a proper form of social framework evidence. *See* Hart & Secunda, *supra*, at 62-63.

The Supreme Court in *Dukes* disagreed, and cast significant doubt on the viability of the kind of case-specific social framework evidence that Hart and Secunda endorse. *See Dukes*, 564 U.S. at 353-54. The Court approvingly cited the criticisms of Bielby made by Professor Mitchell and his colleagues—namely, that Bielby had "'no verifiable method for measuring and testing any of the variables that were crucial to his conclusions,'" and that his report reflected "'nothing more than [his] expert judgment,'" *id.* at 354 n.8 (quoting Monahan, Mitchell *et al.*, *supra*, at 1747-48). In short, in the debate over the propriety of case-specific "social framework" evidence, the Court sided with Mitchell and his colleagues, not Hart and Secunda.

Even assuming that Hart and Secunda's view remains viable post-*Dukes*—that is, that in certain circumstances, an expert can link "social framework" evidence to case-specific facts absent empirical analysis—that does not help Plaintiffs, because this case presents the kind of circumstances where Hart and Secunda agree with Professor Mitchell that social framework testimony *should* be excluded. As they explain, an expert opinion "lacking in a method—founded on 'expert intuition' alone—has no place under Rule 702," Hart & Secunda, *supra*, at 62, and expert opinions likewise must be excluded when the expert invades the province of the fact-finder, for example, by concluding "a specific decision was made with discriminatory intent," *id.* at 45, or by offering an "expert judgment about specific causation," *id.* at 55.

Dr. Fitzgerald's opinions suffer from these exact flaws. They are grounded in "expert intuition" and "expert intuition" alone: Fitzgerald admits they are not based on a personal visit to the Ford Plants, on interviews or clinical evaluations of Ford employees, on a survey, or even on a systematic review and coding of case documents. *See* Dkt. 239 at 88:11-12; *id.* at 30:23-31:15;

*id.* at 53:12-15; *id.* at 182:6-18. Nevertheless, she offers sweeping conclusions about a host of Ford-specific issues—including those within the purview of the fact-finder and beyond the scope of her expertise. For instance, Fitzgerald opines that a "substantial number of (high level) supervisors and managers [at Ford] tolerate, ignore, and condone sexual harassment," Dkt. 238 at 67; that Ford's anti-harassment policies "are poorly implemented," *id.*; that Ford "displays a high level of tolerance for sexual harassment," *id.*; that "Ford is aware of this situation and has been since at least 2012," *id.* at 68; and that the Plants are "permeated with sexual harassment of the grossest, ugliest, and most degrading kind," *id*. As Dr. Mitchell has explained, while Hart and Secunda may disagree with him regarding the propriety of certain types of "social framework" evidence, there is no disagreement "that an expert who's simply giving case-specific opinions based on personal judgments or intuitive judgments . . . [is] inappropriate." Ex. A (Addt'l Mitchell Dep. Excerpts) 38:16-39:7; *see also id*. at 39:25-40:16 (explaining that he and his colleagues "actually don't disagree [with Hart and Secunda] on the fact that an expert who has simply read a case file and given subjective judgments should not be allowed to give those judgments").

Tellingly, Plaintiffs fail to cite *Dukes* anywhere in their brief, and instead, cite the Supreme Court's 1989 decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) for the proposition that courts allow testimony in which "psychological research has been applied to the facts of a specific case." Dkt. 264 at 7. There, a four-member plurality of the Court held only that the defendant's objections to the social psychologist's testimony came "too late" since they were not raised at trial. *Price Waterhouse*, 490 U.S. at 255. The Court did *not* undertake a detailed analysis of whether the expert's methods were reliable under *Daubert*, nor could it have, since the decision pre-dated *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 592 (1993). Moreover, the narrow opinion that the social psychologist in *Price Waterhouse* offered—that there was evidence

of sexual stereotyping in certain written performance evaluations, which she personally reviewed—is a far cry from the sweeping opinions that Fitzgerald attempts to offer here regarding the alleged prevalence of sexual harassment at two Ford Plants, neither of which she ever visited.

The only Seventh Circuit case Plaintiffs cite in support of "read-the-case-file" expert opinions like Fitzgerald's is equally unhelpful to their cause. *See* Dkt. 264 at 9 (citing *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 705 (7th Cir. 2008)). *Boim* did not involve the admissibility of "social framework" evidence at all; the question there was whether a counter-terrorism expert could rely on non-admissible evidence to form opinions. *See Boim*, 549 F.3d at 704-05. That obviously has no bearing on Ford's challenges to Fitzgerald here.

Similarly unpersuasive are the three remaining out-of-circuit, district court decisions Plaintiffs offer to claim that courts "regularly admit[] expert testimony" like Fitzgerald's. *See* Dkt. 264 at 8. Plaintiffs cite *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486 (M.D. Fla. 1991), to argue that there is an "extensive history of social science testimony" being admitted under Rule 702. *See* Dkt. 264 at 7. *Robinson*, however, never mentions Rule 702 and contains no analysis as to whether the proffered experts were employing reliable methods. Plaintiffs next cite *In re MBTE Products Liability Litigation*, 2008 WL 1971538 (S.D.N.Y. May 7, 2008), in arguing that experts can draw upon their "extensive experience" in analyzing a particular "array of facts" and need not use scientific methods to render case-specific opinions. *Id.* at *7. But the expert in *In re MBTE* was not a scientist and did not purport to "use social science methodologies." *Id.* Dr. Fitzgerald, by contrast, purports to offer opinions to a "reasonable degree of psychological and scientific certainty." *See, e.g.*, Dkt. 264-2 ¶ 15. Unlike the non-scientist expert in *In re MBTE*, then, Fitzgerald must ground her supposedly scientific conclusions in scientific methods. *See, e.g.*, *Zenith Elecs. Corp. v. WH-TV Broad., Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

Finally, Plaintiffs claim that the pre-*Daubert*, pre-*Dukes* decision in *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847 (D. Minn. 1993), *aff'd in part on other grds., vacated in part on other grds.*, 130 F.3d 1287 (8th Cir. 1997) validates Fitzgerald's methodology. *See* Dkt. 264 at 7. The district court in that case did take a less stringent approach to the admissibility of social framework evidence than courts have followed since *Daubert* and *Dukes*. *See, e.g.*, *Childers v. Trs. of the Univ. of Pa.*, 2016 WL 1086669, at *5-6 (E.D. Pa. Mar. 21, 2016) (excluding "social framework" testimony where expert "sift[ed] through evidence to find passages that support[ed] the Plaintiff's theory of the case"); *see also Bloomberg*, 2010 WL 3466370, at *14-16 (same). Indeed, the very social psychologist whose testimony was admitted in *Jenson* has since been excluded when he has sought to provide similar testimony. *Compare Jenson*, 824 F. Supp. at 880-81 *with Bloomberg*, 2010 WL 3466370, at *14-16. Moreover, even the court in *Jenson* appeared to cabin the purposes for which it admitted the "social framework" evidence, allowing expert testimony on "sexual stereotyping and its relationship to acts of sexual harassment which occurred," *id.* at 880-81, while emphasizing that the testimony was being used only as a "theoretical framework" against which the court drew its *own* conclusions about the case-specific evidence, *id.* at 882-83.

In short, none of the cases upon which Plaintiffs rely validate the "social framework" testimony that Fitzgerald has offered here, and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## C. Plaintiffs Have Not Shown How Fitzgerald's Conclusions Are Derived From The Application Of Scientific Principles Or Methods

Plaintiffs next argue that "[t]here is no requirement, either scientific or legal, that an expert must base his or her opinion only on an empirical study of the organization at issue, including a

reliable and valid survey and a suitable statistical analysis." Dkt. 264 at 8-9. But there *is* a legal requirement that an expert's opinions be grounded in "'reliable principles and methods.'" *Smith*, 2017 WL 2656583, at *3 (Dow, J.) (quoting Fed. R. Evid. 702). While Dr. Fitzgerald was not required to use the particular method of a statistically valid survey, she *was* required to ground her conclusions in some reliable method—and she failed to do so.

Despite Plaintiffs' claim that Fitzgerald based her report and opinions on a review of "over 100,000 pages" of documents, Dkt. 264 at 11, Fitzgerald conceded she did not read each and every document produced in discovery, *see* Dkt. 239 at 181:16-20. Instead of deriving a scientific sampling plan or following a discernable, systematic method to decide which discovery materials to review, Fitzgerald typed various search terms into a document review platform containing the case materials and "ones that appeared to be relevant [she] would read." *Id.* at 182:6-18. She could not recall the search terms she used, *id.* at 182:19-20, and conceded that she was actively looking for documents that would support her own prejudgment of the case, *see id.* at 183:5-6 ("I knew what I needed to see"). Fitzgerald also admitted that her underlying data-set (discovery materials) was not "representative" of the population of women about whom she ultimately opined. *See* Dkt. 329 at 198:2-13. Although Fitzgerald draws conclusions about "all" female employees throughout her report, *see, e.g.*, Dkt. 238 at 17, her opinions are based almost exclusively on deposition testimony from *Plaintiffs*, *see id.* at 36-47, who, she concedes, likely had "more severe" experiences than other women who have not sued Ford, *see* Dkt. 239 at 200:9-17, 201:17-23; *see also* Dkt. 236-8 at 11.

Fitzgerald's use of unrepresentative data, haphazard searching of case documents and "'cherry picking' of the evidence . . . 'fails to satisfy the scientific method and *Daubert*.'" *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) (citation omitted);

9

*see also Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (expert testimony excluded where expert "accepted some of the testimony and . . . data that suited his theory and ignored other portions of it that did not"). Nothing in Plaintiffs' opposition shows otherwise.

**D.  Fitzgerald's Purported Difficulty Obtaining Access To Ford Employees Does Not Excuse Her Failure To Conduct A Scientifically Valid Survey**

Plaintiffs' contention that Ford should be "equitably estop[ped]" from criticizing Dr. Fitzgerald's failure to "conduct[] interviews with putative class members" or to conduct a scientifically valid survey must be rejected for several reasons. *See* Dkt. 264 at 12-13.

According to Plaintiffs, Ford is "estop[ped]" from making this argument because Ford objected to Plaintiffs' interrogatory requesting that it identify all putative class members by name. *See* Dkt. 264 at 13. Significantly, however, Plaintiffs never challenged Ford's objection or moved to compel the production of such a list of putative class members. Indeed, Plaintiffs never raised with Ford the possibility of obtaining access to Ford employees so their expert could conduct a survey. Although Dr. Fitzgerald speculated at deposition that "you guys aren't going to let us come in" to the Plants to perform a survey, Dkt. 239 at 58:6-8, neither she nor Plaintiffs' counsel ever asked. And Fitzgerald made no effort to survey or interview the 31 female Ford employees to whom she indisputably *did* have unfettered access: the Plaintiffs. Fitzgerald cannot credibly claim she would have interviewed or surveyed a putative class of over two thousand women when she did not bother to contact the 31 Plaintiffs who engaged her as an expert.

Plaintiffs' "equitable estoppel" argument also is entirely irrelevant to the issue before the Court now: whether *Plaintiffs* have satisfied their burden to show that the methodology Fitzgerald *did use* is reliable. *See Smith*, 2017 WL 2656583, at *3 (Dow, J.) (proponent of expert testimony bears the burden of showing "it is 'the product of reliable principles and methods'") (quoting Fed. R. Evid. 702). Plaintiffs' assertions about the difficulty of conducting a survey or interviewing

10

putative class members—even if true—do not provide Fitzgerald with *carte blanche* to rely on unscientific methods and non-representative data. As explained at deposition by Dr. Mitchell, who is a Ph.D. psychologist with expertise in "social framework" and "social fact" studies specifically, "there is no hardship exception to the scientific method": while proper data collection "may be expensive and difficult to do . . . it's only if we collected data properly . . . that we can form reliable opinions." Ex. A at 152:11-17. And *Daubert* does not lower the bar for the admissibility of expert testimony simply because it purportedly would have been burdensome or difficult for an expert to utilize the appropriately rigorous methodology.[2]

### E. Plaintiffs Have Failed To Articulate How Fitzgerald's Opinions Will Assist The Court In Deciding Whether To Certify A Class

Separate and apart from their failure to show that Fitzgerald employed a reliable method, Plaintiffs also fail to show how Fitzgerald will assist the Court in ruling on class certification. This Court must resolve the issue of class certification *before* the merits of Plaintiffs' claims are adjudicated by the trier-of-fact. Expert opinions submitted in connection with class certification briefing, which the expert herself concedes hold only if the facts are later proven to be "largely as alleged," Dkt. 239 at 124:4-127:2, cannot assist this Court in making the threshold determination of whether the requirements of Rule 23 have been satisfied.

---

[2] Dr. Fitzgerald's comments in her rebuttal declaration that surveys "are typically not used in sexual harassment cases," and that they can be "problematic" due to the "inherent problem of bias" when seeking information from individuals in the context of litigation, *see* Dkt. 264-2 ¶¶ 14 & 14(b)(ii), ring hollow for several reasons. *First*, Fitzgerald admitted during her deposition that she would have "very much have loved" to do a survey in this case. *See* Dkt. 239 at 58:3-8. *Second*, Fitzgerald has—in other cases—employed the very surveys that she now criticizes. *See, e.g.*, *EEOC v. Dial Corp.*, 2002 WL 31061088, at *11 (N.D. Ill. Sept. 17, 2002) (Urbom, J.). *Third*, any litigation biases present in surveys are undoubtedly present—and greater—in the Plaintiff deposition testimony on which Fitzgerald relied. *See, e.g.*, Dkt. 236-8 at 11 (Fitzgerald article in which she states that where "women have . . . filed legal complaints," their experiences are likely "far more severe than nonreporting victims").

Plaintiffs' attempt to explain the relevance of Fitzgerald's opinions only underscores the inadmissibility of those opinions. According to Plaintiffs, Dr. Fitzgerald offers the supposedly relevant opinion that "if the evidence and data on the whole [] are true, [there is] a common question that an objectively hostile workplace environment exists" at the Ford Plants. Dkt. 264 at 3. Even assuming that were a proper characterization of Fitzgerald's testimony, that testimony would be an improper legal conclusion. It is for this Court—not Dr. Fitzgerald—to determine whether there is a "common question" in this case (and whether the other elements of Rule 23 are satisfied). *See, e.g.*, *Morris v. Ford Motor Co.*, 2012 WL 5947753, at *6 (N.D. Ind. Nov. 28, 2012) (experts may not offer "legal definitions" or "legal conclusions").

Plaintiffs also seek to justify the entirely speculative nature of Fitzgerald's opinions by arguing that this Court's decision in *In re Fluidmaster, Inc., Water Connector Components Products Liability Litigation*, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) (Dow, J.) shows she "is entitled to" assume the data upon which she relied—cherry-picked discovery materials—is "correct." Dkt. 264 at 11, 12. But Plaintiffs misunderstand both *Fluidmaster* and the nature of Ford's critique of Fitzgerald. In *Fluidmaster*, the plaintiffs sought to bar expert testimony by arguing that one of the expert's factual assumptions was speculative. This Court found that challenges to the expert's assumptions went to the "persuasiveness" of his conclusions, but did "not render the methodology accepting those assumptions unreliable." 2017 WL 1196990, at *20 (Dow, J.). Unlike in *Fluidmaster*, Ford's objection to Fitzgerald's *methodology* is not premised on her reliance on assumptions—it is premised on the fact that, as discussed above, her report is not a proper social framework analysis or the product of any other valid, scientific process. Ford *separately* objects to Fitzgerald's opinions as irrelevant to class certification, because she has conceded they are hypothetical unless and until the fact-finder determines that the facts are "largely

12

as alleged," which will not occur until *after* class certification is resolved. While Fitzgerald's reliance on the facts being "largely as alleged" by Plaintiffs does not in and of itself render her methodology unreliable (although it is, as set forth above), such reliance *does* render her opinions irrelevant for purposes of class certification, and *Fluidmaster* is not to the contrary.

## F.     Fitzgerald's Supplemental Declaration Should Be Excluded Because She Is Not A Lawyer And Is Not Qualified To Assess A Conciliation Agreement

Plaintiffs continue to maintain that Fitzgerald's belated, supplemental declaration in which she opines as to the "propriety and efficacy" of Ford's Conciliation Agreement with the EEOC reflects admissible expert testimony. *See* Dkt. 264 at 14-15. But Plaintiffs fail to identify any aspect of this declaration that is grounded in science. Likewise, Plaintiffs fail to explain how Fitzgerald's training and credentials as a social psychologist render her qualified to offer opinions as to the "propriety" of a company's conciliation agreement with the EEOC.

Perhaps agreeing with Fitzgerald's own statement that her decision to opine as to the "propriety" of the Agreement was "an unfortunate word choice," Dkt. 239 at 203:23-204:7, Plaintiffs now seek to recast Fitzgerald's declaration as offering opinions solely on "the *efficacy* of the Conciliation Agreement and . . . *whether it will remediate* sexual harassment." Dkt. 264 at 14 (emphasis added). But this re-characterization fails as well. Fitzgerald has not identified any scientific means by which she examined the remedial measures set forth in the Conciliation Agreement to determine their efficacy to "a reasonable degree of scientific certainty," as she purports to do. *See* Dkt. 264-3 ¶ 13. Nor have Plaintiffs identified any case in which the "efficacy" of a conciliation agreement was found to be a proper subject of scientific expert testimony. Fitzgerald characterizes various aspects of the Agreement as "unfair," *id.* ¶ 8, or as posing "concern," *id.* ¶ 10, but these bare assertions lack any scientific underpinning, *see, e.g.*, *id.* (asserting, with no citation or explanation, that the monitor period in the Agreement "is simply too

13

short to change Ford's entrenched organizational culture"). Ford's objection to Fitzgerald offering these supposedly "scientific" opinions does not, as Plaintiffs argue, bear on the "weight" that the opinions should be given; it bears on whether she is qualified to give any "scientific" opinions on this topic at all. She is not, and her supplemental declaration should be stricken in full. *See United States v. Hall*, 93 F.3d 1337, 1344 (7th Cir. 1996) (expert opinion cannot be "given divorced from the scientific, medical, or other expert basis that qualified the witness in the first place").

## G. Fitzgerald's Second Belated "Rebuttal Declaration" Should Be Stricken Because It Is Untimely And Replete With Legal Conclusions

Finally, this Court also should strike Fitzgerald's belated "rebuttal declaration" submitted as an exhibit to Plaintiffs' brief (Dkt. 264-2) because it is procedurally and substantively defective.

Ford submitted its two expert reports on November 17, 2017. Absent an order to the contrary, the Federal Rules require rebuttal reports to be submitted "within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii). There was no order altering that deadline for any rebuttal report that Plaintiffs sought to offer. Yet Fitzgerald's rebuttal declaration was not submitted until March 23—nearly four months after Ford's expert reports, weeks after Ford filed its last brief regarding class certification, and nearly six months after her initial report. Plaintiffs have not argued that Fitzgerald's belated declaration is necessary because her prior report was "incomplete or incorrect," Fed. R. Civ. P. 26(e)(1)(A), nor have they offered a "substantial justifi[cation]" for the late report, *see* Fed. R. Civ. P. 37(c)(1). Accordingly, the rebuttal declaration—which is the *second* belated declaration Fitzgerald has submitted—should be excluded on procedural grounds alone. *See, e.g., Medicines Co. v. Mylan Inc.*, 2013 WL 6633085, at *11 (N.D. Ill. Dec. 16, 2013) (St. Eve, J.) (excluding additional late-filed expert report).

In addition to its procedural deficiencies, the rebuttal declaration should be stricken because it amounts to an extra nine pages of legal argument, which is beyond the scope of

14

Fitzgerald's expertise. Notwithstanding Fitzgerald's acknowledgment that she is "not a lawyer" and has no "legal training," Dkt. 239 at 117:8-15, her declaration is littered with legal conclusions and speculative contentions. For example, she (1) discusses a supposed extensive litigation "history of social science testimony" being admitted in employment discrimination cases, Dkt. 264-2 ¶ 10; (2) (incorrectly) describes Dr. Mitchell's report as "essentially a legal opinion concerning the type of evidence that should be admissible for class certification," *id*. ¶ 13; (3) claims there is "no requirement, either scientific *or legal*, that an expert must base his or her opinion on an empirical study," *id.* ¶ 13(a) (emphasis added); *see also id.* ¶ 11; (4) proffers her views on "Brandeis briefs" and the Supreme Court's decision in *Brown v. Board of Education*, *id.* ¶ 13(b); and (5) asserts that Professor Mitchell's critique of her report results from "his philosophical and socio-legal position," *id.* ¶ 13(c). Fitzgerald has no basis to opine on Mitchell's supposed "philosophical and socio-legal position," nor is she qualified to offer an analysis of legal precedent, or opine on the legal requirements that must be satisfied for expert testimony to be admitted. And Fitzgerald's comparison of her own "social framework analysis" to a "Brandeis brief," *id.* ¶ 13(b), is actually fatal to her cause, since a Brandeis brief is by definition legal advocacy, not expert scientific testimony. While undoubtedly pioneering legal advocacy in its day, moreover, Brandeis's classic brief in *Muller v. Oregon* was, "like all parties' briefs . . . designed to further the interests of the client," and "would be assessed harshly as junk social science by today's standards." Michael Rustad & Thomas Koenig, *The Supreme Court and Junk Social Science: Selective Distortion in Amicus Briefs*, 72 N.C. L. Rev. 91, 106 & n.63 (1993). Dr. Fitzgerald's modern-day analogies merit the same judgment.

## CONCLUSION

For all the foregoing reasons, Ford's motion to exclude Dr. Fitzgerald's testimony, reports, and opinions, as well as her two belated declarations, should be granted.

DATED:  April 6, 2018

Kathleen M. Nemechek  N.D. Ill. No. 50139
Timothy S. Millman  N.D. Ill. No. 44398
BERKOWITZ OLIVER LLP
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri 64108
Telephone:  816.561.7007
Facsimile:  816.561.1888

Mark H. Boyle
Karen Kies DeGrand
DONOHUE BROWN MATHEWSON &
SMYTH LLC
140 South Dearborn Street, Suite 800
Chicago, Illinois 60603
Telephone:  312.422.0900
Facsimile:  312.422.0909

Respectfully submitted,

/s/ Eugene Scalia
Eugene Scalia (admitted *pro hac vice*)
Katherine V.A. Smith (admitted *pro hac vice*)
Molly T. Senger (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Counsel for Ford Motor Company*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of April, 2018, I electronically filed the foregoing with

the clerk of the court by using the CM/ECF system, which provided electronic service upon:

Keith L. Hunt
Bradley E. Faber
Hunt & Associates, P.C.
Three First National Plaza, Suite 2100
Chicago, Illinois 60602
(312) 558-1300

bfaber@huntassoclaw.com
*Counsel for Plaintiffs*

/s/ Eugene Scalia
*Counsel for Defendant Ford Motor Company*