# EXHIBIT J

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3   ----------------------------------------x
    CHRISTIE VAN, CHARMELLA LEVIEGE,
4   MARIA PRICE, HELEN ALLEN,
    JACQUELINE BARRON, THERESA BOSAN,
5   SHRANDA CAMPBELL, KETURAH CARTER,
    MICHELLE DAHN, TONYA EXUM, JEANNETTE
6   GARDNER, ARLENE GOFORTH, CHRISTINE
    HARRIS, ORISSA HENRY, LAWANDA JORDAN,
7   DANIELLE KUDIRKA, TERRI LEWIS-BLEDSOE,
    CONSTANCE MADISON, CEPHANI MILLER,
8   MIYOSHI MORRIS, STEPHANIE SZOT, SHIRLEY
    THOMAS-MOORE, ROSE THOMAS, TONI WILLIAMS,
9   BERNADETTE CLYBURN, ANGELA GLENN,
    LADWYNA HOOVER, LATRICIA SHANKLIN,
10  ANTOINETTE SULLIVAN, DERRICKA THOMAS,
    and NICHEA WALLS, each individually
11  and on behalf of all similarly
    situated persons,
12
                          Plaintiffs,
13
           v.                           Case No.
14                                      1:14-CV-08708
    FORD MOTOR COMPANY,
15
                          Defendant.
16  ----------------------------------------x

17       Deposition of PAUL GREGORY MITCHELL, Ph.D.

18                    Washington, D.C.

19               Thursday, January 25, 2018

20                       9:25 a.m.

21

22

23  Job No.: 27155
    Pages: 1 - 189
24

25  Reported by:  Amy E. Sikora-Trapp, RPR, CRR, CLR
```

```
 1        Deposition of PAUL GREGORY MITCHELL, Ph.D.,
 2   held at the offices of:
 3        Intelligent Office (DC)
 4        1775 I Street, Northwest
 5        Suite 1150
 6        Washington, D.C.   20006
 7
 8        Pursuant to notice, before Amy E.
 9   Sikora-Trapp, Registered Professional Reporter,
10   Certified Realtime Reporter, Certified LiveNote
11   Reporter, and Notary Public in and for the
12   District of Columbia.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  if I may?
2      Q.    Go ahead.
3      A.    I think she needs to disclose more
4  details about how the research is generated and
5  the limits on its generalizability before a judge
6  or a jury can have a proper understanding of
7  how -- what, if any, application that research
8  may have to a case.
9          And so I believe there are many
10 areas of the research that are simply not
11 adequately explained in her report.  So that's --
12 I guess that's my general answer.
13     Q.    Okay.  In your 2008 publication,
14 Contextual Evidence of Gender Discrimination, The
15 Ascendance of Social Frameworks, don't you
16 essentially argue that social framework evidence
17 should never be admitted?
18     MS. SENGER:  Objection.
19 Mischaracterizes.
20     A.    No.  I don't think we make that
21 argument at all.
22     Q.    Okay.  To your knowledge, have any
23 other social scientists or law professors taken
24 issue with the positions that you have advanced
25 on the use and/or admissibility of social

1  framework evidence?
2              MS. SENGER:  Objection.  Vague.
3       A.    Again, I don't think anyone has
4  actually disagreed with the positions that we
5  have taken with respect to the limits of social
6  science evidence and when it should be used in
7  litigation.  I think there have been
8  disagreements about what experts have done in
9  cases and how far they have gone.
10             But in terms of actual merits of
11 our argument about the limits of what social
12 science can do and what answers it can give
13 reliably and accurately, I actually don't think
14 anybody has actually disagreed with us on the
15 limits.
16      Q.    Are you familiar with the Fordham
17 Law Review article that was written by Melissa
18 Hart and Paul Secunda?
19      A.    Yes.  That's one of the ones I had
20 in mind where I think they don't have a full
21 appreciation of what some the experts are doing,
22 particularly Dr. Bielby.  And so I think a number
23 of their arguments were just founded on false
24 assumptions about what happens.
25             If you look at the article, they

1  ultimately agree with us that an expert who's
2  simply giving case-specific opinions based on
3  personal judgments or intuitive judgments would
4  be inappropriate.  And so that's why I'm saying
5  at the end of day I actually don't think that
6  Professors Secunda and Hart disagree with us on
7  if an expert does that, it should not be allowed.
8              But I agree that they argue with
9  our ability to define what social framework
10 evidence is, which we never tried to claim that
11 we had that ability even.
12         Q.   Well, reading your article and then
13 their article, it would appear that you are on
14 opposite sides of this issue.  Would you agree
15 with that?
16              MS. SENGER:  Objection.
17 Mischaracterizes.
18         A.   I would agree that they had a
19 conception of what Dr. Bielby had done that I do
20 not think was accurate and led them to view his
21 testimony in a different light than we did.
22         Q.   Okay.
23         A.   I definitely agree that -- that
24 there was a -- differences between us, yes.
25         Q.   Okay.  So then it would be fair to

1　　say that not all social scientists or scholars in
2　　this area necessarily agree with all of the
3　　opinions that you express here?
4　　　　　　　　MS. SENGER: Objection. Vague.
5　　Mischaracterizes.
6　　　　　A.　　Well, I don't think anybody has an
7　　opinion on the opinions I gave here.  I don't
8　　know of anyone else who has given opinions on the
9　　opinions I have in this case.
10　　　　　　　　And, as I say, I mean, we responded
11　　to Professors Secunda and Hart, and I think we
12　　show that on the crucial issues we actually don't
13　　disagree on the fact that an expert who has
14　　simply read a case file and given subjective
15　　judgments should not be allowed to give those
16　　judgments.
17　　　　　Q.　　And how and where did you respond
18　　to that Fordham Law Review article?  Was there a
19　　particular publication that's listed here that is
20　　where you responded, or did you just write them a
21　　private letter and saw you're nuts?
22　　　　　A.　　I don't think we ever said they
23　　were nuts.  We did formally respond in the
24　　publication that's found --
25　　　　　Q.　　What year are you on?

1   persons who have experienced sexual harassment as
2   if they're representative of all of the class.
3   That's one thing I'm saying.
4           Q.   Okay.  I got that.  But you're also
5   saying that the only way you can reach those
6   conclusions is if you go out and independently
7   test to determine whether the hypothesis, being
8   that there is or is not sexual harassment in the
9   workplace, is a valid hypothesis looking at a
10  different data set than what the plaintiffs have
11  testified?
12          A.   Well, I'm not sure what you have in
13  mind with this alternative test.  There are a lot
14  of different ways, as a social scientific matter,
15  one might go about trying to determine what kinds
16  of behaviors are occurring at a location with
17  what frequency and to what extent management is
18  or is not responding to those behaviors.
19               And I'm saying that, in my opinion,
20  based on what I understand Dr. Fitzgerald did,
21  she did none of the things that as a social
22  scientist we would need to do to reach reliable
23  opinions about the prevalence of sexual
24  harassment at those plants and how management
25  responded.

1                    I understand that she has given a
2     lot of opinions here after reviewing the -- the
3     data, the plaintiffs' testimony, and some
4     documents, maybe a lot of the documents from the
5     case.  That, in my opinion, is simply not
6     sufficient.
7           Q.    She still would have had to go do
8     some other form of study or analysis or
9     evaluation, other than just the evidence and what
10    the plaintiffs were saying?
11          A.    Well, I mean, in my opinion, there
12    is no hardship exception to the scientific
13    method.  I understand your concern as a litigant
14    that it may be expensive and difficult to do.
15    But as a social scientist it's only if we
16    collected data properly and analyzed it properly
17    that we can form reliable opinions.  And in my
18    opinion she did not do that here.
19          Q.    And you don't know whether Ford
20    would have allowed her to do it either, do you?
21          A.    No, sir.  I do not.
22          Q.    In paragraph 14 you talk about
23    Dr. Fitzgerald's if-then methodology?
24          A.    Yes, sir.
25          Q.    Is it ever appropriate to use an

```
 1              CERTIFICATE OF SHORTHAND REPORTER
 2        I, AMY E. SIKORA-TRAPP, RPR, CRR, CLR, and
 3   Notary Public in and for the District of
 4   Columbia, hereby certify that the foregoing
 5   deposition of PAUL GREGORY MITCHELL, Ph.D. was
 6   taken before me on the 25th day of January, 2018.
 7        That the said witness was duly sworn before
 8   the commencement of the testimony; that the said
 9   testimony was taken stenographically by me and
10   then transcribed.
11        I further certify that I am not kin to any
12   of the parties to this action nor am I interested
13   directly or indirectly in the matter in
14   controversy; nor am I in the employ of any of the
15   counsel in this action.
16         IN WITNESS WHEREOF, I have hereunto set my
17   hand this 30th day of January, 2018.
18
19
20
21
22        _____
          AMY E. SIKORA-TRAPP, RPR, CRR, CLR
23                   Notary Public
            in and for the District of Columbia
24
     My Commission expires:  7/31/19
25
```