**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHRISTIE VAN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | )    Case No. 14-cv-8708 |
| v. | ) |
| | )    Judge Robert M. Dow, Jr. |
| FORD MOTOR COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' motion for class certification [182], Defendant's motion to deny class certification [222], Defendant's motion to exclude the testimony, reports, and opinions of Dr. Louise Fitzgerald [235], Plaintiffs' motion to bar the testimony and expert reports of Dr. Liza Gold, M.D. and Dr. Gregory Mitchell, PhD. [255], and Plaintiffs' motion for leave to file supplemental memorandum in support of the Plaintiff's motion for class certification [302]. For the reasons set forth below, the Court denies Plaintiffs' motion for class certification [182] and Defendant's motion to deny class certification [222], both without prejudice. The Court further denies without prejudice as premature Defendant's motion to exclude the testimony, reports, and opinions of Dr. Louise Fitzgerald [235], and Plaintiffs' motion to bar the testimony and expert reports of Dr. Liza Gold, M.D. and Dr. Gregory Mitchell, Ph.D. [255]. Finally, the Court grants Plaintiffs' motion for leave to file supplemental memorandum in support of the Plaintiff's motion for class certification [302], but defers consideration of the supplemental materials until they can be assessed through the adversary process—presumably in the briefing on a renewed motion for

class certification that addresses all of the concerns set out below. This case is set for further status hearing on October 17, 2018 at 9:00 a.m.

## I. Background

Plaintiffs are women who currently are employed or who were employed at one of the two Chicago-area Ford Motor Company facilities (the "Plants")—the Chicago Assembly Plant ("Assembly Plant") and the Chicago Stamping Plant ("Stamping Plant"). Plaintiffs seek to represent a class of all present and former female employees who worked at the Assembly Plant or the Stamping Plant between February 14, 2012 and present. The allegations before the Court— if proven at trial—indicate that Plaintiffs and other members of the putative class have been subjected to a pervasively sexual, hostile, intimidating, and abusive work environment at Defendant's Plants. Female employees at the Plants have been forced to work in an environment containing sexually explicit graffiti, carvings, and drawings. [209, at 9.] Pornographic images have been displayed in lockers and common areas of the Plants. *Id*. at 9-10. Male employees have shown pornographic images to female employees and to other men in the presence of female employees. *Id*. at 10. Supervisors and team leaders view pornography at their computers. *Id*. Male employees have taken pictures of their genitalia on their mobile phones and shown the pictures to female employees. *Id*. Male employees also have texted offensive, graphic and/or sexually explicit requests to female employees. *Id*.

In addition to these egregious allegations, Plaintiffs have presented evidence that certain Plaintiffs and putative class members have been subjected to unwelcome physical contact. Plaintiffs motion for class certification lists just some of their allegations of unwanted physical contact, including the following examples:

- Chandler Stevens attempted to sexually assault Michelle Dahn. "He forced me down to my knees and pulled his penis out and tried sticking it in my mouth"

2

- Colby Millender forcibly touched Michelle Dahn, and on one occasion, tried locking her in a conference room. He "would put his hands on me, he would try to touch my breasts or my butt. He would forcibly try kissing me." "[H]e forced his hand down my pants and started trying to kiss on my neck and I was trying to pull away from him."

- Orissa Henry was groped on the breast while going up the escalator.

- John Bratton bit Derricka Thomas on the butt after he did the same to LeDarra Clayton a year earlier. Artez Duke told the EEOC that he witnessed Derricka Thomas being bitten.

- Myron Alexander physically assaulted Jeanette Gardener when he grabbed her right arm and twisted it behind her back. "He physically bent me down with my chest against a desk. He grabbed my neck with his other hand and firmly held me down. He pushed himself up against my backside. I felt like I was being sexually assaulted and that I was about to be raped. I cried, but Myron just whispered in my ear 'try and say something else.' I was scared and felt powerless."

- Myron Alexander got Latricia Shanklin her alone in his office, locked the door, then began grabbing her breasts, and kissing her all over and then tried to unzip her pants. He took her hand and forced it on his penis, saying "'You feel this? You feel this?'" Struggling to get away, Ms. Shanklin insisted "I got to go; I'll get in trouble"; Mr. Alexander reportedly replied, "'I'm not letting you go. I'm not letting you go' * * * at that time, he pulled his thing out. He was, like, he hard, and he came * * * I had to jag him off for him to let me out * * * He was like * * * 'Since I can't f*** you, you gotta give me a hand job.'"

- Shanklin was d [sic] sexually assaulted by Human Resources Manager Terrence McClain who allegedly had protected Ms. Shanklin's daughter and gotten her job back after she was terminated; he then asserted she owed him sex in return. He reportedly said to her "I'm not waiting. I been waiting. I been waiting, and you owe me." I "just couldn't fight no more. I couldn't fight no more." McClain held her down and sexually assaulted her. "He raped me."

- Lance Coldman attempted to rape Michelle Dahn: "He forcefully unzipped my coveralls, pulled my shirt up as high as he could and forced his hand down my pants. He also unzipped his pants and attempted to put his penis inside me while telling me to stop fighting and 'just let me get some.'" Dahn escaped and allegedly immediately told her UAW Rep., Marcus Carpenter, but he told her not to report it as she would not be believed.

[209, 42-43 (internal citations omitted).] Plaintiffs argue that these conditions objectively amount

to a sexually hostile work environment for all Plaintiffs and putative class members. Plaintiffs

further argue that Defendant was on notice of the sexually hostile work environment as early as 2012, when female employees filed written grievances and filed charges with EEOC relating to the challenged conduct.

According to Plaintiffs, Defendant failed to promptly correct the sexually hostile work environment at the Plants. In support of this argument, Plaintiffs identify numerous deficiencies in Defendant's handling of complaints. First, Plaintiffs assert that there is no centralized system for tracking complaints made directly to Supervisors or to Labor Relations personnel. Plaintiffs document instances of women complaining multiple times without any record of the complaints. [209, at 47-49.] Second, Plaintiffs argue that Ford failed sufficiently to discipline wrongdoers. For example, Plaintiffs identify one wrongdoer who twice bit women on the buttocks, but was not punished for the first instance and was only given "coaching and counseling" for the second instance. *Id*. at 50. Third, Plaintiffs argue that Defendant's management and HR personnel discouraged complaints and, in some instances, conspired to suppress or undermine complaints. In support of this argument, Plaintiffs submitted evidence that supervisors asked complaining employees to drop complaints in order to be transferred to a new position away from their harassers. *Id*. at 54-55.

Finally, Plaintiffs argue that Ford's attempts to cure decades of sexual harassment at the Plants have failed. Several multi-plaintiff lawsuits have been brought against Defendant, including a nine-person lawsuit captioned *Rivera v. Ford Motor Company*, No. 95-cv-2990 ("*Rivera*"), and a fourteen-person class action captioned *Warnell v. Ford Motor Company*, No. 98-cv-1503 ("*Warnell*"), both of which were filed in this district. In both cases, the plaintiffs alleged sexual harassment, sex discrimination, race discrimination, assault, battery and intentional infliction of emotional distress. After a class was certified in *Warnell*, Defendant entered into a

conciliation agreement with EEOC (the "1999 Conciliation Agreement"). [210-16.] The 1999 Conciliation Agreement involved an EEOC monitoring period that was to run for three years. *Id*. The 1999 Conciliation Agreement also required the creation of new policies to prevent and remedy sexual harassment and retaliation and established a settlement fund of $7.5 million. *Id*. The parties in *Warnell* ultimately entered into a settlement agreement that provided an addition $9 million for the benefit of class members and that incorporated portions of the 1999 Conciliation Agreement. [207-3.] Plaintiffs argue that after the EEOC left the Plants at the conclusion of the monitoring period, so did Ford's commitment to provide a safe workplace environment for women. Angela Stanfield testifies in her declaration that nothing has changed and that after the 2000-2004 monitoring period, sexual harassment and hostile treatment continued to be normal at the Stamping Plant. [207-30, at ¶4.] Gwajuana Gray testifies that Defendant's training stopped almost immediately after the EEOC concluded its monitoring process and that nothing changed at the Assembly Plant after the sexual harassment cases or EEOC investigations. [207-13, at ¶¶ 3, 18.]

Plaintiffs filed a 123-Count Second Amended Complaint on behalf of themselves and all similarly situated persons, alleging sexual harassment and hostile work environment, gender/sex discrimination, race discrimination, retaliation, national origin discrimination, failure to accommodate under the Americans with Disabilities Act, battery, and assault. On August 1, 2017, Defendant and the EEOC entered into a conciliation agreement (the "2017 Conciliation Agreement"). [223-1.] In that agreement, Defendant has agreed to (1) a panel of independent monitors to ensure equal employment opportunity at the Plants, (2) a series of commitments by Defendant to prevent sexual or racial harassment or discrimination at the plants, and (3) a fund of at least $7.75 million, and up to $10.125 million, to provide monetary relief to the individuals discriminated against on account of sex and/or race. *Id*. Defendant has moved for denial of class

certification based on the 2017 Conciliation Agreement.   [222.]   Plaintiffs have moved for class certification on their sexual harassment claim.   [182, at ¶ 4.]

Before the Court are Plaintiffs' motion for class certification [182], Defendant's motion to deny class certification [222], Defendant's motion to exclude the testimony, reports, and opinions of Dr. Louise Fitzgerald [235], Plaintiffs' motion to bar the testimony and expert reports of Dr. Liza Gold, M.D. and Dr. Gregory Mitchell, PhD. [255], and Plaintiffs' motion for leave to file supplemental memorandum in support of the Plaintiff's motion for class certification [302].

## II.    **Legal Standard**

To be certified as a class action, "a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)."   *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).   Rule 23(a) provides that a named party may sue on behalf of individuals who are similarly situated if: (1) the class is so numerous that joinder of all putative class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the putative class ("commonality"); (3) the claims or defenses of the named party are typical of the claims or defenses of the putative class members ("typicality"); and (4) the named party will fairly and adequately protect the interests of the class ("adequacy").   Fed. R. Civ. P. 23(a).   "[A] proposed class must always meet the Rule 23(a) requirements."   *Messner*, 669 F.3d at 811.   "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily [courts] begin there and only turn * * * to Rule 23(b) after [the court is] certain that all of Rule 23(a)'s requirements had been met."   *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

Rule 23(b) sets forth the circumstances under which a class action may be maintained, two of which Plaintiffs rely on here, Rule 23(b)(2) and Rule 23(b)(3).   Rule 23(b)(2) permits class

certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(3) permits class certification if: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods of resolving the controversy ("superiority"). *Messner*, 669 F.3d at 811. The class also must meet Rule 23's "implicit requirement of 'ascertainability,'" meaning that the class is "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

Plaintiffs bear the burden of proving that they are entitled to class certification. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *Messner*, 669 F.3d at 811, for purposes of deciding the certification question, the Court does not presume that all well-pleaded allegations are true. See *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001). Rather, before it allows a case to proceed as a class action, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Id*. at 676. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811 (citation omitted). The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

### III.   Analysis

#### A.   Motion for Class Certification

Plaintiffs contend that they "and the other putative Class members have been, and are subjected to a pervasively sexual, hostile, intimidating and abusive work environment at Ford." [209, at 9.]   The parties do not dispute that Plaintiffs' proposed class satisfies Rule 23(a)'s numerosity requirement or Rule 23's implicit ascertainability requirement.   Defendant argues, however, that Plaintiffs fail to satisfy Rule 23(a)'s commonality, typicality, and adequacy requirements.   Defendant further argues that Plaintiffs cannot satisfy the requirements of either Rule 23(b)(2) or 23(b)(3).

Before a class can be certified, Rule 23(a)(4) requires that named plaintiffs show that "the representative parties will fairly and adequately protect the interests of the class."   For the adequacy requirement to be satisfied, the claims and interests of the named Plaintiffs must not conflict with those of the class, the class representatives must have sufficient interest in the outcome of the case, and class counsel must be experienced and competent.   *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993).   Defendant argues that Plaintiffs fail to satisfy Rule 23(a)(4)'s adequacy requirement because (1) class counsel is not sufficiently experienced or competent, (2) the class is permeated with conflicts of interest, and (3) Plaintiffs seek relief that merely duplicates a remedy already available to the putative class.   The Court agrees that Plaintiffs have failed to establish the adequacy of class counsel.   Thus, Plaintiffs' motion for class certification [182] is denied *without prejudice* on that basis.

In assessing the adequacy of class counsel, the Court considers "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case."   *Reliable Money Order, Inc. v. McKnight Sales Co.*,

704 F.3d 489, 498 n.7 (7th Cir. 2013) (citing Fed. R. Civ. P. 23(g)(1)(A)). Furthermore, the Court must have confidence that counsel will "prosecute the case in the interest of the class, of which they are fiduciaries[.]" *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (citations omitted). "When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Id.* at 918.

Plaintiffs' lead counsel Keith L. Hunt has been approved as class counsel in just one federal class action, which resulted in disciplinary sanctions from the Illinois Attorney Registration and Disciplinary Committee (or the "Illinois ARDC") and malpractice suits by his clients. In *Warnell*—the only federal class action in which Mr. Hunt has been found adequate to serve as class counsel—another judge in this district preliminarily approved a class-wide settlement of sexual harassment claims by female employees at the same facilities at issue in this case. See *Warnell v. Ford Motor Co.*, 205 F. Supp. 2d 956, 957-58 (N.D. Ill. 2002). The settlement established separate funds for payments to class members and for attorney's fees. *Id.* at 957- 58. The application for attorneys' fees represented that counsel would "not be paid out of the Settlement Fund[,]" and that the amount of fees would not affect the monetary awards to members of the class or the class representatives. *Id.* at 959. Still, Mr. Hunt enforced contingency fee agreements with the plaintiffs—collecting an additional $635,000 from the portion of the settlement fund intended for the class. *Id.* at 958. Eleven of the named plaintiffs filed motions to stop the settlement, "complaining of unfair results of the claims process and raising a number of other grievances related to the administration of the settlement." *Id.* The court "reject[ed] the assertion that the failure to disclose the intent to enforce the contingent fee agreements was innocent[,]" and concluded that the failure to disclose such information was "intentionally

deceptive." *Id.* Accordingly, the court ordered class counsel to disgorge all contingent fees collected from the named plaintiffs and transmitted a copy of its opinion to the Illinois ARDC and the New York State Bar Association's Committee on Professional Discipline. *Id.*

As a result of the misconduct identified above, named plaintiffs in *Warnell* brought malpractice actions against Mr. Hunt, alleging that they had been misled as to their fee arrangement and pressured into signing agreements that they did not understand and that had not been properly explained. [244-15, at 15-56.] Furthermore, Mr. Hunt was disciplined by the Illinois ARDC and his license to practice law "was suspended for [30] days for filing pleadings in federal class action litigation in which he omitted and misrepresented information regarding his intent to collect contingent fees from his clients." Attorney Registration & Disciplinary Commission of the Supreme Court of Illinois, Lawyer Search, http://www.iardc.org/lawyersearch.asp (search last name "Hunt" and first name "Keith"). In the proceedings before the ARDC, Mr. Hunt's attorney represented that *Warnell* was Mr. Hunt's first and only class action case, and that Mr. Hunt had decided not to do class actions again because they "are especially difficult." [244-15, at 21:16-22:3.]

Mr. Hunt attempts to defend his actions by arguing that he deferred to experienced class action counsel—implying that he lacked expertise in the area. This argument does not instill great confidence in the Court, as it indicates that counsel either intentionally misled the court and his clients or lacked the class action expertise that would trigger recognition of the misrepresentations. Mr. Hunt further argues that his role in the *Warnell* case after the Bernstein Litowitz firm became involved was really just "local counsel." [266, at 20.] But Mr. Hunt relied heavily on his work in the *Warnell* case in arguing that he has the experience necessary to serve as class counsel. [209, at 71.] He cannot have it both ways.

It also troubles the Court that counsel's characterizations of the disciplinary proceedings do not appear to be entirely forthright. Counsel represents that the ARDC Hearing Panel found that "like [Mr.] Hunt, [his colleague] relied on the Bernstein Litowitz representations regarding the propriety of collecting both court awarded and contingent fees." [266, at 20.] However, the portion of the decision cited by counsel is not the panel's findings of fact. Rather, it is a summary of the evidence presented. The findings and conclusions of the panel recognized that counsel's colleague may not have been an active participant in drafting the document at issue, but nonetheless concluded that she "had an opportunity to read and reflect" upon the settlement documents and "had reason to know of the false impression created by those documents." [38-12, Ex. 225, at 12.] Contrary to Plaintiffs' representations, the ARDC Panel did not conclude that either Mr. Hunt or his colleague merely relied on the representations of another firm. To his credit, however, Mr. Hunt appropriately acknowledged his prior misconduct at oral argument. Still, given the Court's obligations to the putative class representatives and the absent class members, the record must provide some basis for reposing confidence in proposed lead counsel's ability to prosecute the case in the interests of the class.

Plaintiffs argue that any concerns the Court may have about counsel's adequacy is mooted by the addition of attorneys from the law firm of Romanucci & Blandin LLC as class counsel. However, attorneys from Romanucci & Blandin appeared after Defendant filed its response to Plaintiffs' motion for class certification. [See 249; 250; 251; 252; 253.] Defendant therefore has not had the opportunity to address the adequacy of counsel as currently structured. At the hearing on the pending class certification motions, Plaintiffs argued that Defendant could have filed a supplemental brief addressing the adequacy of counsel as currently structured, but Plaintiffs have the burden on this issue and they did not file any documentary support (for example, affidavits,

curricula vitae, etc.) regarding the qualifications and class action experience of the attorneys from Romanucci & Blandin until September 20, 2018—after the Court held argument on the pending class motions and months after the parties completed briefing the motions.

Although the Court grants Plaintiffs' motion to file a supplemental memorandum addressing the adequacy of counsel [302], Plaintiffs' last-minute effort to establish adequacy of counsel is insufficient. To begin, the class certification process is adversarial. Defendant must be given the opportunity to research and respond to the additional information presented by Plaintiffs. Furthermore, part of the Court's assessment of the adequacy of counsel is the Court's own experience with counsel in advancing the matter to the class certification stage. In order to put their best foot forward in a revised motion for class certification, proposed class counsel from both Mr. Hunt's firm and Romanucci & Blandin should address the roles that are envisioned for each principal lawyer and firm and why the team that is thereby presented satisfies the standard for adequate representation under Rule 23. Finally, as noted by Defendant at oral argument, Mr. Hunt had co-counsel in his prior federal class-action lawsuit. It therefore is unclear whether the addition of attorneys from Romanucci & Blandin negates the concerns regarding the adequacy of Mr. Hunt to serve as class counsel.[1] In sum, Plaintiffs have not met their burden of establishing

---

[1] The Court notes that at oral argument, Plaintiffs' counsel made what (perhaps charitably) can be described as an error in judgment. In Exhibit 54 of Appendix A from the briefing on class certification, Plaintiffs presented a chart purporting to identify all the individuals who had harassed Plaintiffs. The chart included numerous female employees among the perpetrators. After Defendant argued that Plaintiffs could not certify their proposed class because it included women who are alleged to have engaged in misconduct, Plaintiff presented the Court at oral argument with an updated Exhibit 54. Defense counsel noted in response, and the Court later confirmed, that the updated chart excluded the female names (and one male name). Parties are expected to squarely confront facts (or legal authority) that undermine their arguments, not attempt to sweep such facts under the rug. This unfortunate maneuver only underscores the Court's ongoing obligation to give careful consideration to the class counsel issues in this case.

the adequacy of class counsel on this substantial class action, and Plaintiffs' motion for class certification [182] is denied without prejudice on that basis.

Since all of Rule 23(a)'s requirements must be satisfied before class certification can be granted, the inability of Plaintiffs to come forward with adequate class counsel alone disposes of their motion and the Court's opinion could end here. However, given that the denial of class certification is without prejudice and the likelihood that Plaintiffs will seek to renew their motion, the Court will note several other concerns that it has regarding Plaintiffs' motion for class certification and reply in support thereof. Many of these concerns have been previewed through the questions that the Court asked both sides to address at last week's hearing.

To begin, the Court is concerned about potential conflicts of interest in Plaintiffs proposed class. Specifically, Defendants argue that Plaintiffs' proposed class is inadequate because it includes persons who allegedly engaged in the misconduct at issue. Illinois Rule of Professional Conduct 1.7 expressly prohibits undertaking a representation of one client that is "directly adverse to another client." Accordingly, courts have found inadequate representation where the putative class includes those who allegedly participated in the wrongful conduct. *Lee v. Children's Place Retail Stores, Inc.*, 2014 WL 5100608, at *3 (N.D. Ill. Oct. 8, 2014); *Wright v. Family Dollar, Inc.*, 2010 WL 4962838, at *3 (N.D. Ill. Nov. 30, 2010); *Mateo v. V.F. Corp.*, 2009 WL 3561539, at *5 (N.D. Cal. Oct. 27, 2009); *Sample v. Aldi Inc.*, 1994 WL 48780, at *4 (N.D. Ill. Feb. 15, 1994). Plaintiffs have made no effort to distinguish these cases.

Instead, Plaintiffs argue that Defendant "misstates deposition testimony in order to create a conflict of interest where none exists." [266, at 15; see also 289.] Specifically, Plaintiffs contest Defendant's characterizations of the testimony offered by Plaintiffs Christie Van, Jeannette

Gardener, and Gwajuana Gray.[2]   But Defendant identified many more examples of allegations that putative class members engaged in the misconduct alleged.   [244, at 27.]   Indeed, Plaintiffs appear to admit that at least some putative class members have "fought to preserve the sexually harassing culture at Ford."[3]   [266, at 17.]   Plaintiffs nonetheless argue that class certification is appropriate because they are seeking class-wide relief on behalf of all women.[4]   This argument does not sufficiently address the case law and facts cited by Defendant.

With respect to Plaintiffs request for certification pursuant to Rule 23(b)(3), Plaintiffs do not sufficiently address the predominance requirement, which requires that "that the questions of law or fact common to class members predominate over any questions affecting only individual members."   Fed. R. Civ. P. 23(b)(3).   The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation."   *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).   Plaintiffs satisfy the predominance requirement only if they can show that "'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.'"   *Messner*, 669 F.3d at 815 (citation omitted).   "'If, to make a prima facie showing on a given question, the members of a proposed

---

[2] Defendant filed a notice of post-briefing developments identifying portions of the deposition of Gwajuana Gray's deposition in which she indicated that she felt like she was being harassed by named Plaintiff Shranda Campbell.   [289., at 2-3.]   Although Ms. Gray did not testify that Ms. Campbell was *sexually* harassing her, she did testify that Ms. Campbell constantly was calling her to tell her not to hire another attorney and to keep Mr. Hunt as her attorney.   [300-1, at 12:7-15.]

[3] Plaintiffs attempt to explain away the testimony of Orissa Henry, who testified that Supervisor Galinda Lee contributed to the sexually hostile work environment, by arguing that because her husband was terminated for having sex with female coworkers, "it is easy to see why such circumstances could offend Ms. Lee, and how the subsequent disruption of her family's income could create confusion or animosity by her toward her complaining female workers."   [266, at 17.]

[4] In challenging the EEOC conciliation agreement, Plaintiffs argued before the Court that the conciliation agreement is against the interests of the class because it compensates African American male employees who engaged in misconduct.   It is unclear how Plaintiffs can reconcile that argument with their contention that women who fought to preserve the sexually harassing culture at Ford can be included in this class.

class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Id.* (citation omitted); see also *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (common questions exist where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof").

Plaintiffs recognize that analysis of the predominance requirement begins with the elements of the cause of action, but Plaintiffs do not discuss the elements of their Title VII hostile work environment claim in their analysis of the predominance requirement. "In order to establish a prima facie case of hostile work environment based on sexual harassment under Title VII, the plaintiff must allege (i) she was subjected to unwelcome sexual harassment; (ii) the harassment was based on her sex; (iii) the sexual harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment that affected the psychological well-being of the plaintiff; and (iv) there is a basis for employer liability." *Van v. Ford Motor Co.*, 2016 WL 1182001, at *6 (N.D. Ill. Mar. 28, 2016) (citing *Boumehdi v. Plastag Holdings, LLC*, 439 F.3d 781, 788 (7th Cir. 2007); *McPherson v. City of Waukegan*, 379 F.3d 430, 437-38 (7th Cir. 2004)). Should Plaintiffs file a subsequent motion for class certification, they should address to what extent these elements can be decided on a class-wide basis.[5]

---

[5] Plaintiffs background section provides an overview of Ford's allegedly deficient sexual harassment policies. The lack of a policy might be grounds for finding commonality. See, *e.g., Sellars v. CRST Expedited, Inc.*, 321 F.R.D. 578, 600-01 (N.D. Iowa 2017) (employer had a uniform policy of refusing to credit a sexual harassment complaint absent an admission by the accused or an eyewitness account and a pattern and practice of failing to impose discipline). It would be helpful if Plaintiffs clearly articulate any claimed lack of policy in its argument section, should Plaintiffs again move for class certification.

Furthermore, "[t]o qualify as hostile, the work environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *McPherson*, 379 F.3d at 438 (quoting *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 462–63 (7th Cir. 2002)). Thus, although it is true that the necessity of some individualized damages determinations alone will not defeat a finding of commonality and predominance under Rule 23(b)(3), *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017), there may well be a need for individualized merits determinations in this case as well. Indeed, in *Sellars v. CRST Expedited, Inc.*, 321 F.R.D. 578, 609 (N.D. Iowa 2017)—upon which Plaintiffs rely extensively—the court concluded that individualized questions would predominate with respect to the subjective element and the damages element of the hostile work environment claim. *Id.* Should Plaintiffs file a subsequent motion for class certification, they also should address how liability issues such as the subjectively offensive requirement could be addressed on a class-wide basis.[6]

Related to this argument is whether a class action would be manageable. Plaintiff's reply brief fails to sufficiently address this requirement.[7] Although many class actions do settle, the Court and the parties must assume that the case will proceed to trial. Plaintiffs have not explained how this case could proceed through trial without holding a separate evidentiary hearing for each putative class member. As the Seventh Circuit has noted, where there are a large number "of class members each harmed to a different extent (and many not harmed at all)[,]" a Rule 23(b)(3) class

---

[6] Plaintiffs' reply in support of class certification argues that "individual damage questions do not preclude a [Rule 23](b)(2) class action when liability issues are common to the class." [266, at 25 (citing *Mulvania*, 850 F.3d at 859).] Plaintiffs therefore appear to be proceeding on the assumption that the liability issue can be determined on a class-wide basis.

[7] As noted by Defendant at oral argument, the section of Plaintiffs' reply brief purporting to address manageability does not do so. [266, at 28.] Instead, that section of the brief addresses whether managing the case will be difficult for class counsel.

would be unmanageable. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013) (citing *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008)). If Plaintiffs again move for class certification, they should submit a feasible litigation plan. *Id*. Any such plan would explain how bifurcation—or any other trial plan proposed—would eliminate the need for hundreds or even thousands of individualized hearings at both the liability and damages phases.

With respect to typicality, the Court has concerns regarding whether named Plaintiffs can satisfy the requirement given the wide range of misconduct at issue. Claims of the class representatives and class members are typical if they arise from the same practice or course of conduct and are based on the same legal theory. *Keele*, 149 F.3d at 595. Typicality and commonality are closely related. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Typicality is meant to ensure that the claims of the class representatives have the "same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). Furthermore, the Court must "ensure that class members with stronger claims are not prejudiced by a representative with a weak one." *Osada v. Experian Info. Sols., Inc.*, 2012 WL 1050067, at *7 (N.D. Ill. Mar. 28, 2012) (citing *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011)); see also *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (affirming denial of class certification because named plaintiffs' claims were weaker than the claims of other class members).

"Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Courts therefore have found that Rule 23(a)'s typicality requirement can be satisfied despite the fact that Plaintiffs and putative class members were not exposed to the exact same misconduct. See, *e.g., Brand v. Comcast*

*Corp., Inc.*, 302 F.R.D. 201, 222 (N.D. Ill. 2014) (certifying class for racially hostile work environment claim); *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 438 (N.D. Ill. 2003) (finding typicality requirement satisfied for sexually hostile work environment claim). Still, the facts before the Court indicate a wide-range of exposure to alleged misconduct. The Court recognizes that the allegations advanced by Plaintiffs include that many Plaintiffs were subjected to egregious sexual harassment, including repeated sexual assault and even rape. [See, *e.g.*, 209, at 42-43.] As the Court noted at last week's argument, if these allegations can be proven at trial, the Plaintiffs advancing them have very strong individual claims to relief that could result in substantial damages awards. Yet at least a dozen putative class members attest that they "suffered no injury," in that they never experienced or witnessed sexually harassing conduct. [See 244, Exs. 9-20.] Another dozen women attest that they may have experienced or witnessed an isolated instance of inappropriate conduct, but either they were not bothered by the conduct; they handled it themselves in a manner that they found satisfactory (*e.g.*, by telling the offender to stop); or they reported the conduct to Defendant and considered Defendant's remedial action appropriate. [See 244, Exs. 21-32.]

Plaintiffs fail to sufficiently address these factual variances. Instead, Plaintiffs' typicality argument appears to be premised on the assumption that the sexually hostile work environment claim requires a purely objective standard. [266, at 14.] As discussed above, that is not the case. Accordingly, the Court questions whether—given the wide-range of exposure to misconduct— Plaintiffs claims can be typical of the claims of putative class members. *Coleman v. Watt*, 40 F.3d 255, 259 (8th Cir. 1994) ("In light of the widely varying circumstances which might trigger the order's mandatory impoundment provisions, Coleman failed to meet the requirements of commonality and typicality.").

Finally, Plaintiffs are seeking hybrid certification under Rule 23(b)(2) and (3). The Seventh Circuit has indicated that certification under Rule 23(b)(2) is an option "only when monetary relief is incidental to the equitable remedy" sought by the Plaintiffs. *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999). That being said, the Seventh Circuit also has indicated that hybrid certification under Rule 23(b)(2) and (3) may be appropriate when at least some issues bearing on damages—such as the existence of an unlawful employment practice—could be treated on a class basis. *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004). Should Plaintiffs again move for class certification, the parties should address whether these cases are still good law and, if so, whether hybrid certification is appropriate in this case.

In sum, the Court concludes that Plaintiffs have not met their burden of establishing the adequacy of class counsel. The Court defers consideration of whether Plaintiffs have satisfied the remaining requirements of Rule 23. Although the Court has identified concerns regarding whether Plaintiffs can satisfy the remaining Rule 23 requirements, nothing in this order should be construed to limit the parties' arguments as to those requirements in any subsequent motion for class certification.[8]

### B.    Motion to Deny Class Certification

Defendant has moved for a denial of class certification based on the 2017 Conciliation Agreement entered into between Defendant and the EEOC, which Defendant contends largely will

---

[8] Still, the Court expects that the parties will fully address all relevant arguments, including the arguments discussed above. Briefing on any future motion for class certification also should seek to address important cases relied upon by the opposing party, especially cases from the Seventh Circuit. That was not consistently done in the briefing on the motions currently before the Court. For example, in support of its commonality argument, Defendant cites *Bolden v. Walsh Constr. Co.,* which reversed class certification of multi-site hostile work environment class based on a lack of commonality. 688 F.3d 893, 898 (7th Cir. 2012). But Plaintiffs do not discuss that case in the portion of their reply addressing the commonality requirement.

moot the relief Plaintiffs seek in this case. "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 12(c)(1)(A). Accordingly, "a court may deny class certification even before the plaintiff files a motion requesting certification." *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) (citations omitted). Defendant argues that the Court should determine that Plaintiffs' class may not be certified because the 2017 Conciliation Agreement provides "virtually all the relief that plaintiffs have demanded[.]" Specifically, Defendant has agreed "to comply fully with Title VII, to maintain robust, EEOC-approved anti-harassment and mutual respect training programs, to appoint a Human Resources professional to oversee the plants' handling of harassment and retaliation claims, and to a panel of independent monitors for at least three years to oversee the plants." [223, at 8 (internal citations omitted).] "In addition, Ford has agreed to establish an administrative claims process for all women and African-Americans who were employed by Ford at [the Plants] at any time from January 1, 2010 to August 1, 2017, making all of these individuals eligible to receive monetary compensation from a settlement fund of at least $7.75 million and up to $10.125 million." *Id*. (citation omitted).

On the basis of the EEOC agreement, Defendant argues that Plaintiffs cannot satisfy Rule 23(a)'s adequacy requirement because Plaintiffs "seek relief that merely 'duplicates a remedy' already available to the putative class." [239, at 19 (quoting *In re Aqua Dots*, 654 F.3d 748, 752 (7th Cir. 2011).] However, based on the information currently before the Court, it is not clear that the relief sought by Plaintiffs merely duplicates the relief sought in the 2017 Conciliation Agreement. To begin, the total amount of funds available for monetary awards pursuant to the 2017 Conciliation Agreement is capped at $10.125 million dollars. [9] [139-1, at ¶ 39.]

---

[9] The 2017 Conciliation Agreement requires that Defendant put $7.75 million in a trust for monetary awards. [139-1, at ¶ 38-39.] However, if monetary awards exceed that amount, Defendant is required to

Furthermore, putative class members only will be entitled to a portion of the available $10.125 million dollars, as the 2017 Conciliation Agreement also encompasses employees with race discrimination claims as well as employees with sexual harassment claims and includes a total of 3,477 female and African American employees. [207, at 1, 7.] If the total amount of monetary awards (together with any required taxes) exceeds the $10.125 million cap, the awards will be "reduced at relatively the same percentage of each recipient's overall award amount." *Id*. at ¶ 39. Given the egregious conduct alleged in this lawsuit, it is not at all clear that the monetary awards sought in this case are "already available to the putative class." This case therefore is unlike *In re Aqua Dots Product Liability Litigation*, in which plaintiffs sought the exact refund amount already being offered to members of the putative class by the defendant. 654 F.3d 748, 752 (7th Cir. 2011) ("A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests." (citation omitted)).

It also is not yet clear that the monitoring mechanisms set forth in the 2017 Conciliation Agreement would duplicate the relief sought in this case. With respect to Defendant's agreement to comply fully with Title VII, the EEOC Agreement notes that the relevant provision of the agreement "gives [the EEOC] no greater rights or additional enforcement mechanisms than otherwise exist independent of [the] Agreement." [223-1, at ¶ 5.] It is unclear how an agreement to comply with already existing law does anything to protect the interests of the putative class. With respect to Ford's agreement to maintain robust, EEOC-approved anti-harassment and mutual respect training programs, the Court agrees that the 2017 Conciliation Agreement is a step in the right direction. Still, as noted by Plaintiffs, the EEOC agreement only requires training during

contribute additional funds not to exceed a total of $10.125 million. *Id*. at ¶ 39.

the monitoring period. Given that Plaintiffs have pointed to evidence indicating that Defendant abandoned training programs after the monitoring period of the previous EEOC agreement ended [see, *e.g.*, 207, at 6], it is not clear that Plaintiffs' pursuit of injunctive relief is duplicative of the relief obtained through the EEOC Agreement.[10] The Court has the same concerns with respect to Ford's agreement to appoint a Human Resources professional to oversee the plants' handling of harassment and to have a panel of independent monitors oversee the plant for at least three years.[11] Although these concerns are in tension with the reasonable assumption that the EEOC is acting in the best interests of those whom it is tasked with protecting, see *Thornton v. State Farm Mut. Auto Ins. Co.*, 2006 WL 3359482, at *3 (N.D. Ohio Nov. 17, 2006) ("Proceedings by the state, whether in a judicial or an administrative forum, are presumably taken with the best interests of state residents in mind. Reasonable settlement by the accused should be encouraged. Indeed, potential class members will often recover more than they would in a private action when costs and attorneys' fees are factored in"), the allegations of Ford's recidivism provide a basis for some skepticism (and a corresponding degree of caution and due diligence) in this area.

Defendant also contends that Plaintiffs cannot establish an indispensable element of class certification under Rule 23(b)(3): "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In support of this argument, Defendant cites

---

[10] Indeed, Plaintiffs assert that a monitor similar to the monitor appointed in *Shakman v. Democratic Organization of Cook County*, Case No. 69-cv-2145 (N.D. Ill.), should be appointed to rectify the sexual harassment and hostile work environment that Defendant has been unable to fix for decades. [See 207, at 10; see also 207-32.]

[11] The Court notes that the monitors have authority to extend the period up to five years total, if they find that Ford has not substantially complied with the terms of the EEOC Agreement. [139-1, at ¶ 35.] Given the qualifications of the independent monitors chosen by the parties, the Court has no reason to doubt that the monitors would make this determination in good faith. Still, it is possible that Defendant would substantially comply with the agreement within the three-year term, but then abandon establish programs after the conclusion of the three-year term.

to *Kamm v. California City Development Corporation*, 509 F.2d 205 (9th Cir. 1975), which held

that a federal class action was not superior to a state class action in which significant relief—

including a permanent injunction—had already been realized.[12]   In reaching that conclusion, the

court in *Kamm* considered:

> 1) whether the class action would require substantial judicial resources that would duplicate and/or negate the results of the state action;
> 2) the complexity of the class action;
> 3) the relief already realized in the state action;
> 4) whether the state court retained jurisdiction;
> 5) whether any members of the class were barred from initiating suit on their own behalf;
> 6) whether plaintiffs' individual claims remain viable, and
> 7) whether defending the class action would prove costly.

*Id.*  Plaintiffs argue that *Kamm* is inapplicable because it never has been cited by, much less

formally adopted by, the Seventh Circuit.   While that is true, the factors considered in *Kamm*

certainly are relevant to considering whether a class action is the "superior" to other methods of

adjudication.   See, *e.g., Thornton v. State Farm Mut. Auto Ins. Co.*, 2006 WL 3359482, at *3

(N.D. Ohio Nov. 17, 2006); *Brown v. Blue Cross & Blue Shield of Michigan, Inc.*, 167 F.R.D. 40,

46 (E.D. Mich. 1996).   Plaintiffs have not made any effort to address these cases.   Nor have

Plaintiffs offered any alternative analysis.

Still, application of the *Kamm* factors is by no means a formulaic, mechanical process.

Although some factors weight against class certification in this case (*e.g.* whether Plaintiffs'

individual claims remain viable), other factors weigh in favor of class certification (*e.g.* retained

---

[12] Defendant also relies heavily on *Mach Mining, LLC v. E.E.O.C.*, which held that the EEOC was required to attempt conciliation prior to filing a lawsuit because "cooperation and voluntary compliance" are the "preferred means" for resolving Title VII, employment discrimination cases.   135 S. Ct. 1645, 1651 (2015).   As noted in *Mach Mining*, however, the statute's preference for conciliation was reflected by the express statutory requirement that the EEOC "shall endeavor to eliminate [an] alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion."   *Id.* (citing § 2000e–5(b)).   Thus, in that case, the Supreme Court was enforcing a statutory directive.   However, there is no statutory mandate requiring the dismissal of Plaintiffs' class action.

jurisdiction).  Given that the Court is denying Plaintiffs' motion for class certification on adequacy grounds, the Court finds it prudent to defer making a conclusive decision on the effect of the 2017 Conciliation Agreement on the viability of class certification.  As Defendant notes, the Panel is in the process of assessing over 600 claim forms submitted pursuant to the 2017 Conciliation Agreement.  [244, at 68.]  Information regarding how this claims process plays out will help the Court assess the extent to which the relief Plaintiffs seek can be realized through the process set forth in the 2017 Conciliation Agreement.  Indeed, the parties should provide a detailed update on the claims process in the briefing on any renewed motion for class certification that Plaintiffs may file.

### C. Daubert Motions

Also before the Court are the parties motions [235; 255] to exclude expert testimony. Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony.  See *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011); *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).  Rule 702 requires that the district judge act as a "'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert."  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741-42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)); see also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589.

In reviewing a motion to exclude testimony under Rule 702, the district court must "ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine

a fact in issue.'" *Bielskis*, 663 F.3d at 893-94 (quoting Fed. R. Evid. 702); see also *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (outlining the "three-step analysis" for assessing the admissibility of expert testimony). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); see also *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997) (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony).

In their motion for class certification, Plaintiffs rely in part on the expert report of Dr. Louise Fitzgerald, who Plaintiffs contend is "highly regarded in the field of psychology as expert ion social psychology—specifically focusing on issues relating to gender and women's studies." [264, at 1.] Dr. Fitzgerald purports to ground her opinions in the social framework methodology. [239, at 300:15-301:4.] Defendant recognizes that Dr. Fitzgerald is an expert in her field of sexual harassment. However, Defendant argues that Dr. Fitzgerald's testimony should be excluded because it is not based on the "social framework" method that she purports to use, or on any other reliable scientific method. Specifically, Defendant argues that "[a] proper social framework report summarizes general academic research in a subject-matter area to provide context for the fact-finder's interpretation of case-specific evidence" [236, at 7]—not to apply the research to the facts of the case. *Id*. at 11 ("[A] valid social framework opinion may 'not tell the jury what to decide in any given case'—only 'what to consider.'" (quoting *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 211 (D. Mass. 2009)). According to Defendant,

because Dr. Fitzgerald seeks to tell the jury what to decide in this case, her opinion fails to properly apply the social framework methodology.

Plaintiffs' response fails sufficiently to address Defendant's objection. In response, Plaintiffs rely primarily on pre-*Daubert* cases and an article discussing the social framework methodology that actually supports Defendant's objection. Melissa Hart & Paul M. Secunda, *A Matter of Context: Social Framework Evidence in Employment Discrimination Class Actions*, 78 Fordham L. Rev. 37, 52 (2009) ("The testimony is being offered not to prove discrimination in a particular case or cases—that determination is one the fact finder will make in light of all of the evidence—but to offer a backdrop of information about how the phenomenon of stereotyping operates so that the fact finder can assess the specific case in light of that information.").

Although the Court has doubts about the admissibility of the opinions propounded by Dr. Fitzgerald,[13] the Court denies Defendant's motion to exclude her testimony, reports, and opinions as premature. In the context of a motion for class certification, "[i]f a district court has doubts about whether an expert's opinions may be critical for a class certification decision, the court should make an explicit *Daubert* ruling." *Messner v. Northshore Univ. HealthSystems*, 669 F.3d 802, 812 (7th Cir. 2012) (quotation marks omitted). Here, Dr. Fitzgerald's report plays no role in the Court's ruling on the pending motions denying class certification on adequacy grounds, and the Court denies the motion [235] without prejudice as premature on that basis. The Court denies Plaintiffs' motion [255] to bar the testimony and expert reports of Dr. Liza Gold, M.D. and Dr. Gregory Mitchell, Ph. D. without prejudice for the same reason.

---

[13] Should the admissibility of Dr. Fitzgerald's opinions again come before the Court, the Court expects that the parties will sufficiently address Defendant's argument. Furthermore, because the Court is deferring its decision on the admissibility of the challenged expert reports, it has not fully considered all of the arguments raised by the parties. Thus, the Court's omission of any arguments for or against the admissibility of the challenged experts' opinions should not be interpreted as approval or disapproval of those arguments.

* * *

Although the Court has significant questions regarding whether a class action can be certified in this case, Plaintiffs will be given another opportunity to move for class certification as the denial of the instant motion for certification is without prejudice. The serious allegations in this case warrant a complete and fulsome class certification analysis, which cannot be made based on the record and arguments before the Court. That being said, Plaintiffs cannot be given unlimited opportunities to move for class certification. With the Court having identified its major concerns, the Court expects that any renewed motion that Plaintiffs may file will make their best case for class certification, not only on the issue of adequate of class counsel on which this motion founders, but also on all of the other issues expressed in this opinion and at the hearing last week. The Court recognizes that the both sides may well prefer a conclusive ruling on the class certification issue at this time, but a denial without prejudice is not uncommon, especially after one try. See, *e.g, Osada v. Experian Info. Sols., Inc.*, 290 F.R.D. 485, 490 (N.D. Ill. 2012) (granting second motion for class certification after plaintiffs' first attempt at class certification was denied based on an insufficient showing of adequacy); *G.M. Sign, Inc. v. Brink's Mfg. Co.*, 2011 WL 248511, at *11 (N.D. Ill. Jan. 25, 2011) (denying motion for class certification without prejudice). Indeed, Rule 23(c)(1)(C) itself recognizes that "[a]n order that grants or denies class certification may be altered or amended before final judgment." And this is a two-way street, for just as a plaintiff may succeed in obtaining certification on the second try, a defendant may convince a court to later decertify a class based on changed circumstances.

## III. Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion for class certification [182] and Defendant's motion to deny class certification [222] without prejudice. The Court further

denies without prejudice as premature Defendant's motion to exclude the testimony, reports, and opinions of Dr. Louise Fitzgerald [235], and Plaintiffs' motion to bar the testimony and expert reports of Dr. Liza Gold, M.D. and Dr. Gregory Mitchell, PhD. [255]. Finally, the Court grants Plaintiffs' motion for leave to file supplemental memorandum in support of the Plaintiff's motion for class certification [302], but defers consideration of the supplemental materials until they can be assessed through the adversary process—presumably in the briefing on a renewed motion for class certification that addresses all of the concerns set out above. This case is set for further status hearing on October 17, 2018 at 9:00 a.m.

Dated: September 27, 2018

_____
Robert M. Dow, Jr.
United States District Judge