**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHRISTIE VAN, et al.,           )
                                   )
       Plaintiffs,          )
                                   )     Case No. 14-cv-8708
       v.                    )
                                   )     Judge Robert M. Dow, Jr.
FORD MOTOR COMPANY,     )
                                   )
       Defendant.        )
                                   )

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' motion for class certification [318], Defendant's motion to exclude the testimony, reports, and opinions of Dr. Louise Fitzgerald [352], and Plaintiffs' motion to bar the testimony and expert reports of Dr. Liza Gold, M.D. and Dr. Gregory Mitchell, PhD. [370]. For the reasons set forth below, the Court denies Plaintiffs' motion for class certification [318]. The Court grants in part and denies in part Defendant's motion to exclude the testimony, reports, and opinions of Dr. Louise Fitzgerald [352], and grants in part and denies in part Plaintiffs' motion to bar the testimony and expert report of Dr. Liza Gold and Dr. Gregory Mitchell, PhD. [370]. This case is set for further status hearing on September 12, 2019 at 10:30 a.m.

I. **Background**

Plaintiffs are women who currently are employed or who were employed at one of the two Chicago-area Ford Motor Company facilities (the "Plants")—the Chicago Assembly Plant ("Assembly Plant") and the Chicago Stamping Plant ("Stamping Plant"). Plaintiffs seek to represent a class of all present and former female employees who worked at the Assembly Plant or the Stamping Plant between February 14, 2012 and present. The evidence before the Court—if

credited at trial—indicates that named Plaintiffs and other putative class members have been subjected to a pervasively sexual, hostile, intimidating and abusive work environment at Defendant's Plants. Female employees at the Plants have been forced to work in an environment containing sexually explicit graffiti, carvings, and drawings. [323, at 33.] Pornographic images have been displayed in lockers and common areas of the Plants. [*Id*. at 30-33.] Supervisors and team leaders view pornography at their computers. [*Id*. at 31.] Pornographic and sexual images and videos are shown to women or are passed among male employees (both hourly and salaried) in the presence of women. [*Id*.] Male employees have taken pictures of their genitalia on their mobile phones and shown the pictures to female employees. [*Id*.] Male employees also have texted offensive, graphic and/or sexually explicit requests to female employees. [*Id*.]

In addition to these egregious allegations, Plaintiffs have presented evidence that certain Plaintiffs and putative class members have been subjected to unwelcome physical contact, including rape. Named Plaintiff Jeanette Gardener provided the following account of an interaction with superintendent Myron Alexander in an EEOC charge of discrimination:

> He physically bent me down with my chest against a desk. He grabbed my neck with his other hand and firmly held me down. He pushed himself up against my backside. I felt like I was being sexually assaulted and that I was about to be raped. I cried, but Myron just whispered in my ear "try and say something else." I was scared and felt powerless.

[324-160 (Pls.'s Ex. 160), at 5.] Another named Plaintiff, Latricia Shanklin, testified that she was in the office of that same superintendent when he locked the door and began inappropriately touching her. [325-23 (Shanklin Dep. Tr.), at 32-33.] After Ms. Shanklin rejected Mr. Alexander's attempt to unzip her pants, he then grabbed her hand and forced it on his penis. [*Id*. at 33.] According to Ms. Shanklin, Mr. Alexander would not let her leave his office until Ms. Shanklin performed a sex act on him. [*Id*.] Ms. Shanklin also testified that she was raped by

Human Resources Manager Terrence McClain who allegedly forced himself on Ms. Shanklin after he got Ms. Shanklin's daughter her job back after she was terminated. [*Id*. at 41-44.] These are just a few examples of the many instances of misconduct alleged by named Plaintiffs.

Plaintiffs also have identified numerous examples of putative class members who claim to have been subjected to similar conduct. For example, a putative class member who submitted a claim as part of the EEOC conciliation process (discussed below) indicated on her claim form that she was harassed and assaulted by numerous employees, including a manager. [407-15 (Def.'s Ex. 8).] The putative class member indicates that an area manager threatened her, hit her, choked her, and forced her into a sexual relationship. [*Id*. at 5.] She also indicates that she was inappropriately touched while on Defendant's premises at least weekly from 2015 to early 2017. [*Id*. at 6.] The putative class member goes on to allege additional harassment by numerous employees of Defendant.

As noted by Defendant, the allegations of misconduct are not limited to male employees. Plaintiff Christie Van accuses her then-supervisor and co-Plaintiff Cephani Miller of making inappropriate comments. Specifically, Ms. Van testified that Ms. Miller retaliated against her and asked Ms. Van whether she thought everyone was sexually harassing her because she's so sexy. [358-13 (Def.'s Ex. 54 – Van Dep. Tr.), at 146-47.] Ms. Van, in turn, was accused of engaging in misconduct by putative class member Shanetta Myles. Specifically, Ms. Myles indicated in an interview that Ms. Van commented on Ms. Myles's weight and body parts. [358-16 (Def.'s Ex. 106), at 12.] According to Ms. Myles, Ms. Van also stated "give me some of those [titties]." [*Id*.] Similarly, a putative class member Rosetta Smith submitted an affidavit indicating that Maria Price openly discussed her sexual preferences in the workplace. [358-11 (Def.'s Ex. 30 – Smith Decl.), at 101, ¶ 21.] Ms. Price also would greet male employees with a hug and often

would blow kisses at them.  [*Id.* at 102, ¶ 22.]  Ms. Price testified that Carmel Gregory "was interested in a romantic relationship" with Ms. Price and "would constantly call [Ms. Price] to the office upstairs and tell [her] how pretty [she] was and stop giving [Ms. Gregory] the [baby doll] eyes and just to get to know her."  [358-13 (Def.'s Ex. 50 – Price Dep. Tr.), at 126.]  Indeed, in Ms. Price's EEOC Charge, Ms. Price listed Ms. Gregory as one of her sexual harassers.  [29-21, at 2.]  Plaintiff Helen Allen-Amos accused Monique Johnson of acting inappropriately by "always grabbing on men, sitting on their laps," and squeezing their butts when she hugged the men. [358-13 (Def.'s Ex. 36), at 8.]  Defendant's response brief outlines numerous other examples of allegations of misconduct against women working at the Plants.

Although the allegations of misconduct against Defendant are abundant, the putative class contains at least a dozen women who swear they "suffered no injury" because they never experienced sexually harassing conduct.  [358-11 (Def.'s Exs. 9-20).]  Yet another dozen women attest that they may have experienced an isolated instance of inappropriate conduct, but either were not bothered by the conduct; handled it themselves in a satisfactory manner (*e.g.*, by telling the offender to stop); or found Defendant's response to the reported misconduct to be appropriate.  [358-11 (Def.'s Exs. 21-32).]

Plaintiffs contend that Defendant was aware that women at the Plants were being subjected to pervasive sexual harassment and sex discrimination for at least two years before Plaintiffs filed this lawsuit in 2014 but that Defendant failed sufficiently to remedy the issue.  Plaintiffs identify a number of purported deficiencies with Defendant's response to known complaints of sexual harassment.  Plaintiffs identify complaints that were made to Defendant but that were never documented in Defendant's records.  [323, at 40-42.]  Plaintiffs also contend that Defendant failed sufficiently to discipline those who were the subject of complaints.  For example, Plaintiffs

identify one wrongdoer who twice bit women on the buttocks, but who was not punished for the first instance and was only given "coaching and counseling" for the second instance. [*Id*. at 35.] To take another example, Plaintiffs note that it took Defendant nearly a year to discipline an employee for making improper comments to numerous women in violation of Defendant's anti-harassment policies. [*Id*. at 43.] Plaintiffs outline additional examples of known harassers who Plaintiffs contend Defendant failed to discipline in a timely and/or appropriate manner. [*Id*. at 43-46.]

Plaintiffs also contend that Defendant's management and human resources departments discouraged complaints, including complaints to Defendant's harassment hotlines. For example, named Plaintiff Ms. Van testified that Human Resources supervisor Mr. McClain threatened Ms. Van for calling the hotline. [325-29 (Van Dep. Tr.), at 39.] By way of another example, union chairman Grant Morton testified that—on multiple occasions in or about 2012 and early 2013—he was told by labor relations representative Natalie Dahringer that women needed to drop complaints before accommodations would be approved to reassign a woman to a different job or department or shift. [325-46 (Morton Dep. Tr.), at 16-17.] Mr. Morton testified that this happened with complaints made by named Plaintiff Ms. Van. [*Id*.] Although Ms. Dahringer denies this, there is conflicting testimony on the issue.

Plaintiffs further contend that several women have been retaliated against by co-workers and supervisors for complaining about sexual harassment, as well as rejecting sexual advances of male supervisors. [323, 48-49.] For example, when named Plaintiff Maria Price complained about sexual harassment to Coby Millender, he told her to "bring [her] pretty lips" to his office to discuss her complaint and threatened that he would put her on a worse shift if she did not go. [325-22 (Price Dep. Tr.), at 13.]

This alleged misconduct occurred at Defendant's Chicago Assembly Plant and Stamping Plant, both of which are massive in size. The Assembly Plant has four standalone buildings totaling more than 2,813,260 square feet on 113 acres. [358, at 16-17; see also Ford Motor Co., Plant Detail—Chicago Assembly Plant, available at https://corporate.ford.com/company/plant-detail-pages/chicago-assembly-plant.html (last visited August 21, 2019).] A single vehicle travels roughly 6.5 miles from the start of the production cycle to the end. [358-10 (Def.'s Ex. 2), at 18, ¶ 18.] Since 2012, the Assembly Plant has run three production shifts: the A Crew (day), the B Crew (night), and the C Crew (weekend), with more than 1,000 employees per shift. [358-10 (Def.'s Ex. 4 – Kantautas Decl.), at 43, ¶ 19.] The Assembly Plaint also has five general production areas—body, paint, final, quality, and material planning & logistics (MP&L)—each of which is overseen by its own area manager. [358-10. (Def.'s Ex. 3 – Pipkins Decl.), at 21, ¶ 12.] Several of these "areas" themselves have multiple departments—which, in some cases, are in separate buildings. [*Id*. at 21, ¶ 14.]

Fifteen miles away from the Assembly Plant is the Stamping Plant—a 2.5 million square foot building on 139 acres. [358-10 (Def.'s Ex. 5 – Zaborowski Decl.), at 50, ¶ 5; see also Ford Motor Co., Plant Detail—Chicago Stamping Plant, available at https://corporate.ford.com/company/plant-detail-pages/chicago-stamping-plant.html (last visited August 21, 2019).] One named Plaintiff described the Stamping Plant as a "mini city." [358-13 (Ex. 42 – Exum Dep. Tr.), at 78-79.] Since May 2012, the Stamping Plant has had three production crews, each with 300-500 hourly employees. [358-10 (Def.'s Ex. 6 – Taylor Decl.), at 56, ¶¶ 16, 19.] The process at the Stamping Plant begins with sheets of blank steel, which are loaded into the Stamping Plant by employees of the MP&L department. From there, the steel enters the stamping or "press" side of the plant and is transported to one of 16 stamping machines

spread over 600,000 square feet, which are separated into six zones. [358-10 (Def.'s Ex. 5 - Zaborowski Decl.), at 50, ¶ 7.] These zones are overseen by four first-level salaried employees or "Process Coaches." [*Id*. at 50, ¶ 8.] From the press side, the steel moves to the assembly portion of the Stamping Plant, which covers 1,000,000 square feet and includes 45 separate assembly lines spread across five zones. [*Id*. at 50, ¶ 9.] Each zone is overseen by a Process Coach. [*Id*.] Employees in the assembly side of the Stamping Plant cannot see those on the press side. [358-13 (Exum Dep. Tr.), at 78.]

Both Plants are subject to various of Defendant's anti-harassment corporate directives and policy letters, which are implemented by local Human Resources and Labor Relations personnel. [358-10 (Def.'s Ex. 1 – Lavender Decl.), at 7-8, ¶¶ 28-30.] Defendant's Anti-Harassment Directive sets forth Defendant's "prohibition of harassment and its commitment to fostering a respectful, inclusive work environment" at all facilities. [358-14 (Def.'s Ex. 62), at 2-4.] Defendant's Anti-Harassment Policy (the "Policy") provides employees with examples of behavior that Defendant considers harassing and makes clear that all employees should "immediately report" any violation. [358-14 (Def.'s Ex. 67), at 22-24.] Employees are told they can report violations to (1) their supervisor; (2) their local Human Resources representative(s); (3) Defendant's anti-harassment hotline; (4) or Personnel Relations. [*Id*.] The Policy warns that violations will result in discipline, up to and including termination "even for a first offense." [*Id*.] The Policy also explains that Defendant strictly prohibits "retaliatory actions" against those who make good-faith complaints of harassment or cooperate in a harassment investigation. [*Id*.] Defendant trains all new hires on its anti-harassment Policy at orientation [358-10 (Def.'s Ex. 4 – Kantautas Decl.) at 43, ¶ 17; 358-10 (Def.'s Ex. 6 – Taylor Decl.), at 56, ¶ 13], and every new employee receives a copy of the Policy. [See, *e.g.*, 358-14 (Def.'s Ex. 70 – Barron Policy

Acknowledgment), at 35.]    During the class period, Defendant repeatedly conducted anti-harassment and diversity training at the Plants.   [See 358-6 (Def.'s App. E – Part 1); 358-7 (Def.'s App. E – Part 2); 358-8 (Def.'s App. E – Part 3).]   However, Plaintiffs have identified evidence indicating that training programs at the Plants may have provided contradictory information.   For example, Plaintiffs submit the affidavit of Bernadette Clyburn, which states that although Defendant's Policy was on the table in a training program she attended, "the instructor contradicted that written policy and focused on intimidating and threatening consequences of reporting workplace sexual harassment."   [324-230 (Pls.'s Ex. 231 – Clyburn Decl.), at 2, ¶¶ 12-13.]   In connection with the EEOC Conciliation Agreement discussed below, Defendant also has implemented a new comprehensive anti-harassment training program, which is delivered at work by a third-party vendor, Seyfarth Shaw.   [358-10 (Def.'s Ex. 1 - Lavender Decl.), at 11-12, ¶¶ 42-45.]

Although Plaintiffs assert in a conclusory fashion that Defendant maintained a uniform "policy of declining to find sexual harassment claims corroborated without corroborating witnesses" [323 at 55], Defendant's representatives expressly disclaim the existence of any such policy.   [358-16 (Def.'s Ex. 108 - Washington Decl.), at 25, ¶¶ 6-7; 358-16 (Def.'s Ex. 109 - Taylor Suppl. Decl.), at 28, ¶ 6.]   Defendant's actual guidance provides that when confronted with only "testimonials from the complainant and the accused," the investigator should use her best judgment to "consider the credibility" of each; whether one version of events seems "far-fetched"; whether anyone had "a reason to lie"; whether one person's account "conflict[s] with any other evidence"; and whether there is a "pattern of behavior" at issue (*e.g.*, prior disciplinary action). [358-14 (Def.'s Ex. 69), at 32.]   Defendant also notes that there have been many instances in which individuals have been disciplined for sexual harassment absent corroborating witnesses,

even when the accused has denied the alleged harassing conduct.  [358, at 33 n.23 (citing Def.'s Ex. 80).]

Plaintiffs argue that Defendant's attempts to cure decades of sexual harassment at the Plants have failed.  Several multi-plaintiff lawsuits have been brought against Defendant, including a lawsuit captioned *Rivera v. Ford Motor Company*, No. 95-cv-2990 ("*Rivera*"), and a class action captioned *Warnell v. Ford Motor Company*, No. 98-cv-1503 ("*Warnell*"), both of which were filed in this district.  In both cases, the plaintiffs alleged sexual harassment, sex discrimination, race discrimination, assault, battery and intentional infliction of emotional distress.  After a class was certified in *Warnell*, Defendant entered into a conciliation agreement with EEOC (the "1999 Conciliation Agreement").  [324-15 (Pls.'s Ex. 16 – 1999 Conciliation Agreement).] As indicated by the allegations in this lawsuit, according to Plaintiffs, the problems have persisted.

In August 2017, Defendant entered into another Conciliation Agreement with the EEOC (the "2017 Conciliation Agreement").  In the 2017 Conciliation Agreement, without admitting wrongdoing, Defendant committed to maintaining robust, EEOC-approved anti-harassment training programs at the Plants [139-1, at 4-5, ¶¶ 11-16], appointing a Human Resources professional to oversee the Plants' handling of harassment and retaliation claims [*id*. at 6-7, ¶¶ 19-22], and appointing a panel of independent monitors (the "Panel") to oversee the Plants for at least three years.  [*Id*. at 7-10, ¶¶ 25-37.]  Defendant also agreed to establish a claims process for all women and African-Americans employed at the Plants from January 1, 2010 to August 1, 2017, making these individuals eligible to receive compensation from a fund of up to $10.125 million to the extent they were found by the Panel to have experienced sex or race harassment, discrimination, or retaliation.  [*Id*. at 10-11, ¶¶ 38-39.]  The 2017 Conciliation Agreement established three tiers of award amounts, with anticipated award targets of $10,000, $20,000, and

$30,000.   The 2017 Conciliation Agreement initially identified 170 individuals (78 male and 92 female), that received a settlement or were deemed eligible for an award without needing to complete or submit a claim form.   [407, at 3.]   An additional 736 women submitted claims forms.   [335-4 (Def.'s Ex. D - Rust Decl.), at 3, ¶ 4.]   As of May 20, 2019, 556 women were offered an award in connection with the 2017 Conciliation Agreement and 522 of those women chose to accept their awards.   [396-1 (Mills Decl.), at 2, ¶¶ 7-8.]   As of that date, the aggregate value of the awards accepted by women was $6,376,364.50.   [*Id*. at 2, ¶ 10.]   The amounts recoverable by those in each tier, however, were lower than the target amounts identified in the 2017 Conciliation Agreement because the total amount of compensation awarded and associated taxes exceeded the contractually agreed-upon total amount of the settlement fund ($10.25 million).   [402-1, at 9-11, ¶¶ 39, 47; see also 409, at 3.]

## II.   Legal Standard

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternative requirements in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).   Rule 23(a) provides that a named party may sue on behalf of individuals who are similarly situated if: (1) the class is so numerous that joinder of all putative class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the putative class ("commonality"); (3) the claims or defenses of the named party are typical of the claims or defenses of the putative class members ("typicality"); and (4) the named party will fairly and adequately protect the interests of the class ("adequacy").   Fed. R. Civ. P. 23(a).   "[A] proposed class must always meet the Rule 23(a) requirements."   *Messner*, 669 F.3d at 811.   "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily [courts] begin there and only turn * * * to Rule 23(b) after

[the court is] certain that all of Rule 23(a)'s requirements had been met." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

Rule 23(b) sets forth four circumstances under which a class action may be maintained, two of which Plaintiffs rely on here: Rule 23(b)(2) and Rule 23(b)(3). Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(3) permits class certification if: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods of resolving the controversy ("superiority"). *Messner*, 669 F.3d at 811. Moreover, the class must also meet Rule 23's "implicit requirement of 'ascertainability,'" meaning that the class is "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

Plaintiffs bear the burden of proving that they are entitled to class certification. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *Messner*, 669 F.3d at 811, for purposes of deciding the certification question, the Court does not presume that all well-pleaded allegations are true. See *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001). Rather, before it allows a case to proceed as a class action, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Id*. at 676. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). But the showing need not be "to a degree of

absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811 (citation omitted). The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

## III. Analysis

Plaintiffs have moved for class certification on their Title VII sexual harassment and hostile work environment claims. Specifically, Plaintiffs propose that the class be defined as:

> All women working at the Ford Chicago Assembly Plant and Chicago Stamping Plant from January 2012 to present.

[318, at ¶¶ 3, 5.] The parties do not dispute that Plaintiffs' proposed class satisfies Rule 23(a)'s numerosity requirement or Rule 23's implicit ascertainability requirement. Defendant argues, however, that Plaintiffs fail to satisfy Rule 23(a)'s commonality, typicality, and adequacy requirements. Defendant further argues that Plaintiffs cannot satisfy the requirements of any Rule 23(b) subsection. The Court addresses each of these arguments in turn. Before doing so, however, the Court addresses the pending motions to exclude expert testimony. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2018) (explaining that the district court "'must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion,' if the 'expert's report or testimony is critical to class certification'" (quoting *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 814-15 (7th Cir. 2010)).

### A. *Daubert* Motions

Before the Court are the parties' motions [352; 370] to exclude expert testimony. Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony. See *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011);

*United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 requires that the district judge act as a "'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741-42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)); see also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589.

In reviewing a motion to exclude testimony under Rule 702, the district court must "ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis*, 663 F.3d at 893-94 (quoting Fed. R. Evid. 702); see also *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (outlining the "three-step analysis" for assessing the admissibility of expert testimony). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); see also *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997) (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony).

Defendant has moved to exclude the expert testimony of Plaintiffs' expert witness Dr. Louise Fitzgerald. [352.] Plaintiffs have moved to exclude the expert testimony of Defendant's rebuttal expert witnesses—social psychologist and law professor Dr. Gregory Mitchell, J.D., Ph.D., and psychiatrist Dr. Liza Gold, M.D. [370.]

### i. Dr. Louise Fitzgerald

In their motion for class certification, Plaintiffs rely in part on the expert report of Dr. Louise Fitzgerald, who Plaintiffs contend is "highly regarded in the field of psychology as expert on social psychology" focusing on "issues regarding gender and women's studies." [373, at 1.] Dr. Fitzgerald purports to ground her opinions in the social framework methodology. [355 (Fitzgerald Dep. Tr.), at 200.] Defendant recognizes Dr. Fitzgerald as an expert in her field specializing in sexual harassment. However, Defendant argues that Dr. Fitzgerald's testimony should be excluded because it is not actually based on the "social framework" method that she purports to use, or on any other reliable scientific method. Specifically, Defendant argues that "[a] proper social framework report summarizes general research in a subject-matter area and provides context for the *fact-finder* to interpret case-specific evidence" [353, at 11-12]—and does not apply the research to the facts of the case. *Id*. at 12 ("[A] valid social framework opinion may 'not tell the jury what to decide in any given case'—only 'what to consider.'" (quoting *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 211 (D. Mass. 2009)). Because Dr. Fitzgerald seeks to tell the jury what to decide in this case—according to Defendant—her opinion fails to properly apply the social framework methodology. Defendant also argues that Dr. Fitzgerald's opinions will not assist the trier of fact. Thus, although Defendant does not dispute Dr. Fitzgerald's qualifications at the first step of the Rule 702/*Daubert* analysis, Defendant argues that Dr. Fitzgerald's opinions do not satisfy the second and third steps of the analysis.

Plaintiffs assert that "Dr. Fitzgerald has used methods and relied on concepts and information generally accepted as reliable by other experts in her field * * * to formulate her opinions that if the evidence and data on the whole (documents produced in discovery and witness statements and depositions) are true, a common question that an objectively hostile workplace

environment exists, and a common, meaningful injunctive remedy is required to make it stop."

[373, at 3.] Specifically, Plaintiffs provide the following overview of the opinions offered by

Dr. Fitzgerald:

1. The Chicago Ford Plants, both CAP and CSP, exhibit high levels of every indicator of risk for harassment known to social science.

2. The working environment at the Chicago Ford Plants (CAP and CSP) appears to be permeated with sexual harassment of the grossest, ugliest, and most degrading kind. * * * the harassment is so pervasive as to have inevitably exposed every female employee of the plants, to a greater or lesser degree. At the very least, every female employee works in an environment in which women, sex, and sexuality are insulted and degraded as a matter of course. These events are neither random, isolated, nor unique, but rather constitute the warp and woof of everyday life in the plant.

3. Defendant is aware of this situation and has been since at least 2012 and has chosen to ignore, obscure, downplay and otherwise failed to take is obligations seriously.

4. There is an urgent need for comprehensive, long-term, monitored interventions in the Plants with the aim of changing behavior, behavioral contingencies, employee perceptions, management attitudes, and the entire organizational climate. Anything less constitutes a waste of time and resources, as well as a threat to organizational reputation and good will, and—most importantly—worker psychological health, physical safety, and overall wellbeing.

[373, at 3.]

The Court first will address Rule 702's reliability requirement. "Rule 702 was substantially revised in 2000 to affirm the trial court's role as gatekeeper and provide some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." *Lees v. Carthage Coll.*, 714 F.3d 516, 521-22 (7th Cir. 2013) (internal quotation marks, citations, and alterations omitted); see also *United States v. Parra*, 402 F.3d 752, 758 (7th Cir.2005) ("At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate."). In order to evaluate the reliability of an expert's testimony, courts should the following factors: "(1) whether the proffered theory can be

and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017)) (internal quotation marks omitted). "In addition, the Rule 702 advisory committee's note to the 2000 amendment outlines other benchmarks relevant in assessing an expert's reliability: (5) whether 'maintenance standards and controls' exist; (6) whether the testimony relates to 'matters growing naturally and directly out of research they have conducted independent of the litigation,' or developed 'expressly for purposes of testifying'; (7) '[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion'; (8) '[w]hether the expert has adequately accounted for obvious alternative explanations'; (9) '[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting'; and (10) '[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.'" *Id*. (citation omitted).

"Importantly, this list is neither exhaustive nor mandatory." *Id*. (quoting *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015)) (internal quotation marks omitted). Because "there are many different kinds of experts, and many different kinds of expertise," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999), the test for reliability is "flexible" and "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (quoting *Kumho*, 526 U.S. at 137). "Ultimately, reliability is determined on a case-by-case basis." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015) (citing *Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007)).

Although the parties do not address these factors as such, the Court must apply the law of the circuit, and thus will address them. The Court begins by considering whether Dr. Fitzgerald actually employed the "social framework" methodology she purports to have used in reaching her opinions, as this is Defendant's primary objection to Dr. Fitzgerald's opinions. As noted by Defendant, numerous scholars have noted that the "a social framework necessarily contains only general statements about reliable patterns of relations among variables as discovered within social scientific research * * * and goes no further." John Monahan et. al., *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks"*, 94 Va. L. Rev. 1715, 1745 (2008). Indeed, Professor Monahan—the individual who by Dr. Fitzgerald's own admission coined the term "social framework" [373-2, at 6, ¶ 13(b)]—takes this position.[1] Even an article relied upon by Plaintiffs in their response to Defendant's initial *Daubert* motion recognized that, under the "social framework" methodology, testimony is "offered not to prove discrimination in a particular case or cases—that determination is one the fact finder will make in light of all of the evidence—but to offer a backdrop of information about how the phenomenon of stereotyping operates so that the fact finder can assess the specific case in light of that information." Melissa Hart & Paul M. Secunda, *A Matter of Context: Social Framework Evidence in Employment Discrimination Class Actions*, 78 Fordham L. Rev. 37, 52 (2009).[2]

In defense of her report, Dr. Fitzgerald argues that what today is referred to as the social framework methodology was used long before the term was coined, citing the use of social science

---

[1] Although Dr. Fitzgerald's affidavit indicates that John Monahan simply coined the term, in her deposition she testified that she believed that it was Professor Monahan who invented the concept of the social framework methodology. [355 (Fitzgerald Dep. Tr.), at 200.]

[2] After the Court noted—in denying Defendant's initial *Daubert* motion as premature—that the article did not support Plaintiffs' position, Plaintiffs simply removed reference to the article in their response to Defendant's renewed *Daubert* motion.

evidence in litigation.[3]  [373-2 (Dr. Fitzgerald Rebuttal Aff.), at 6, ¶ 13(b).]  For example, Dr.

Fitzgerald notes that the strategy of combining legal argument with scientific evidence was used in

*Brown v. Board of Education*, 347 U.S. 483, 495 (1954).  [373-2 (Dr. Fitzgerald Rebuttal Aff.), at

6, ¶ 13(b).]  This argument misses the mark, as Defendant is not arguing that social science

evidence is a categorically improper basis for expert testimony.  Rather, Defendant contends that

Dr. Fitzgerald improperly applied the social science methodology.  Apart from Dr. Fitzgerald's

unsupported testimony, Plaintiffs have not identified any evidence supporting the conclusion that

Dr. Fitzgerald properly applied the "social framework" methodology that she purports to apply.

Moreover, even putting aside the question of whether Dr. Fitzgerald properly applied the

social framework methodology, Plaintiffs fail to establish that Dr. Fitzgerald's opinions regarding

the prevalence of sexual harassment at the Plants otherwise are reliable.  To begin, even if the

underlying social science evidence upon which Dr. Fitzgerald bases her opinions is reliable and

accepted in the relevant scientific community, Dr. Fitzgerald may not extrapolate unfounded

conclusions from that evidence.[4]  Expert testimony should be excluded when "there is simply too

great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522

U.S. 136, 146 (1997).  Based on the evidence cited by Plaintiffs, the Court is unable to determine

how Dr. Fitzgerald reached her opinions regarding the prevalence of sexual harassment at the

Plants from that research.  In other words, Plaintiffs fail to identify *any* reliable methodology used

by Dr. Fitzgerald.

Plaintiffs repeatedly note that "reliability" primarily is "a question of the validity of the

methodology employed by an expert, not the quality of the data used in applying the methodology

---

[3] The Court notes that this argument more properly would have been raised by counsel in a brief than by a
proposed expert in her report or affidavit, as the admissibility of evidence in court presents a legal issue.

[4] Although Defendant does not purport to address this factor specifically, many of Defendant's arguments
are relevant to discussing this factor.

or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). The Court recognizes that "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id*. (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). "Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce—that is, whether the conclusions are unimpeachable." *Id*. (quoting *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (internal quotation marks omitted). However, other than citing to the social framework methodology, Plaintiffs do not explain the process by which Dr. Fitzgerald reached her conclusions regarding the prevalence of sexual harassment at the plants. And *Joiner* expressly requires proposed experts to supply that connective reasoning before obtaining judicial permission to present their conclusions in a courtroom. 522 U.S. at 146.

The only evidence Plaintiffs have presented regarding Dr. Fitzgerald's methodology for reaching this conclusion is Dr. Fitzgerald's affidavit, which states:

> Each of the opinions I expressed in my report, my Supplemental Declaration/Affidavit, my deposition and in this Rebuttal Declaration are expressed to a reasonable degree of psychological and scientific degree of certainty and are based on materials, , [sic] evidence, information, principles and sources customarily relied upon by other experts in my field and are developed using methods and relying on concepts and information generally accepted as reliable by other experts in my field.

[373-2 (Dr. Fitzgerald Rebuttal Aff.), at ¶ 15.] However, this assertion provides no additional clarity. Although exclusion of "expert testimony is the exception rather than the rule," *Woods v. Amazon.com, LLC*, 2019 WL 2323874, at *15 (N.D. Ill. May 30, 2019) (quoting Fed. R. Evid. 702, advisory committee notes (2000 Amendments)), the Court cannot satisfy its gatekeeping function

by simply accepting an expert's conclusory assertion that she reached her conclusions by using methods and relying on concepts and information generally accepted as reliable by other experts in her field. *Robinson v. Davol Inc.*, 913 F.3d 690, 696 (7th Cir. 2019) ("Rule 702 and *Daubert* require the judge to act as a vigorous gatekeeper to ensure the reliability of expert testimony." (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)); *Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Plaintiffs further argue that Dr. Fitzgerald's testimony should be allowed because courts regularly allow (including in employment discrimination cases) social science testimony in which psychological research has been applied to the facts of a specific case without clinical examinations of individual class members. The Court acknowledges the potential import of social science evidence in litigation and recognizes that courts have allowed such testimony when Rule 702 and *Daubert* otherwise are satisfied. As the Seventh Circuit has noted, "social science testimony is an integral part of many cases, ranging from employment discrimination actions, to family law matters, to criminal proceedings." *United States v. Hall*, 93 F.3d 1337, 1342-43 (7th Cir. 1996). Still, *Daubert*'s "framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (citations omitted). As Judge St. Eve has written, "the methodology used by social science experts to reach their conclusions must 'adhere to the same standards of intellectual rigor that are demanded in [their] professional work' in order to be reliable." *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1024 (N.D. Ill. 2011) (quoting *Chapman v. Maytag Corp.,* 297 F.3d 682, 688 (7th Cir. 2002)). Plaintiffs do not sufficiently

explain how Dr. Fitzgerald's testimony satisfies this standard with respect to her testimony regarding the prevalence of sexual harassment at the Plants.

Defendant has identified a number of problems with Dr. Fitzgerald's methods independent of whether Dr. Fitzgerald is properly applying the social framework methodology.[5] First, Defendant argues that the opinions of Dr. Fitzgerald should be excluded because she improperly draws generalizations about the putative class based on an unrepresentative sample. Dr. Fitzgerald herself has noted that "you cannot generalize from a litigation sample to a non-litigation sample to an organization sample." [355 (Dr. Fitzgerald Dep. Tr.), at 190.] During her deposition, Dr. Fitzgerald could not say how many women were in the putative class (she believed there are over one thousand, but she was not sure). [*Id*. at 141.] Dr. Fitzgerald also testified that her opinions do not represent a research study and that her opinions therefore were not based on any sample size. [*Id*. at 171.] Yet Dr. Fitzgerald attempts to make generalizations about the experiences of every putative class member based on the experiences of named Plaintiffs and certain other complainants. Although the Court agrees that clinical testing is not a prerequisite to providing expert social science testimony,[6] expert social science testimony still must comply with Rule 702 and *Daubert*. *Obrycka*, 792 F. Supp. 2d at 1024.

---

[5] In addition to the arguments addressed below, Defendant argues that Dr. Fitzgerald's opinions should be excluded because she accepted as true the testimony and reports provided by Plaintiffs. This is not a valid criticism, for "it is well-settled that experts can base their opinions on disputed facts because the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.'" *Harris v. City of Chicago*, 2017 WL 2436316, at *12 (N.D. Ill. June 5, 2017) (quoting *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015)).

[6] Plaintiffs also argue that Defendant should be equitably estopped from arguing that Dr. Fitzgerald should have done clinical testing, asserting that it was Defendant that prevented Dr. Fitzgerald from doing so. Plaintiffs do not cite—and the Court is not aware of—any cases making an equitable exception to the Court's gatekeeping function. Plaintiffs also note that clinical testing has its own limitations. The Court will not fault Dr. Fitzgerald for not conducting a clinical examination. However, the Court still must address whether the methods actually used by Dr. Fitzgerald were reliable.

Defendant also argues that the opinions of Dr. Fitzgerald should be excluded because she "cherry picked" the data she used to support her opinions. For example, her report does not even mention the dozen declarations from women who swear they never experienced or witnessed any sexually harassing conduct at the Plants. Nor does Dr. Fitzgerald address EEOC interviews with putative class members indicating that they may have been exposed to isolated incidents of sexual harassment, but that the workplace nonetheless was not permeated with sexually offensive and degrading behavior.[7] For example, in an EEOC interview, one putative class member indicated that she once was inappropriately touched by a co-worker but that she never heard any sexual comments or saw any sexual pictures, carvings, graffiti, or the like. [See 324-90 (Pls.'s Ex. 90 – Putative Class Member Questionnaire).] It is problematic that Dr. Fitzgerald does not address this evidence.[8] Experts who engage in cherry-picking of the evidence fail to satisfy the scientific method and *Daubert*. *Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010); see also *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (testimony excluded where expert "merely accepted some of the testimony and * * * data that suited his theory and ignored other portions of it that did not"). Plaintiffs have offered no response to this argument.

Based on the arguments presented by the parties, the Court concludes that Plaintiffs have not met their burden of establishing that Dr. Fitzgerald's opinions regarding the prevalence of sexual harassment at the Plants—including Dr. Fitzgerald's testimony regarding each putative

---

[7] Dr. Fitzgerald states that "ambient harassment" refers "to the experience of working in an environment permeated with sexually offensive and degrading behavior, that is, a highly sexualized atmosphere in which crude and offensive materials are common and employees see harassing behavior as normative, whether specifically directed at them or not." [326-1 (Dr. Fitzgerald Rep.), at 13.]

[8] Defendant asserted that Dr. Fitzgerald failed to address this evidence, and Plaintiffs have not identified anything in the record indicating that Dr. Fitzgerald did consider this evidence. The Court therefore accepts Defendant's uncontroverted representation that this evidence was not addressed without combing the record to confirm it.

class members exposure to sexual harassment and/or ambient sexual harassment—are based on reliable methods.   Thus, to the extent that Dr. Fitzgerald offers opinions regarding the prevalence of sexual harassment at the Plants, Defendant's motion to exclude the testimony of Dr. Fitzgerald is granted.

Plaintiffs also have not demonstrated that Dr. Fitzgerald's testimony—to the extent relied upon in their motion for class certification—would assist the trier of fact.   To be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, and an "expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion."   *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991), am. on unrelated grds., 957 F.2d 301 (7th Cir. 1992).

In their motion for class certification, Plaintiffs rely on the expert report of Dr. Fitzgerald to establish the following:[9]

1.  The work force numerically is dominated by men and that a great majority of supervisors are male [323, at 26];

2.  Female employees at the Plaints do not know where to go to complain [*id*. at 37];

3.  Defendant's failure to properly record and track certain complaints about sexual harassment demonstrates the lack of importance that Defendant placed on the issue [*id*. at 42];

4.  Defendant has been on notice for years that women are being harassed at these Plants, and pornographic graffiti and materials have been evident in public areas throughout the plants, yet Defendant has failed to take effective remedial action [*id*. at 68];

---

[9]  Plaintiffs also cite to Dr. Fitzgerald's report generally for the proposition that Defendant knew or should have known about the hostile work environment at the Plants and failed to take appropriate action to prevent sexual harassment.   [323, at 36.]   Without specific citations as to what portions of Dr. Fitzgerald's report support this broad proposition, the Court is unable adequately to address Plaintiff's argument as to this point.   Again, it is not the Court's role to scour Dr. Fitzgerald's report for arguments that support Plaintiffs' positions; Plaintiffs must at least provide proper citations.

5. Managers at all levels of the Plants not only tolerated but modeled the crudest sort of sexual harassment during the period of complaint [*id*. at 68];

6. Training on sexual harassment policies and implementation of disciplinary measures virtually disappeared following the prior EEOC monitoring period that began in 1999 [*id*.];

7. Defendant maintained a policy of declining to find sexual harassment claims corroborated without corroborating witnesses, resulting in the vast majority of complaints being determined to be unfounded [*id*.];

8. The work environment at "the Plaints is highly sexualized, leading to high levels of ambient harassment" [326-1 (Dr. Fitzgerald Rep.), at 67];

9. Harassment at the Plaints "is so pervasive" that every female employee of the plants "inevitably" has been exposed to sexual harassment, to a greater or lesser degree [*id*. at 68];

10. That the new Conciliation Agreement is essentially a reprint of the old agreement [323, at 110].

To the extent that Dr. Fitzgerald offers legal opinions or conclusions regarding Plaintiffs' sexual harassment claims, the Court agrees that Dr. Fitzgerald's testimony is unhelpful. The Seventh Circuit has explained that experts may provide "concrete information against which to measure abstract legal concepts" but cannot merely state "a legal conclusion." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007). Consistent with that approach, courts have concluded that expert testimony in the form of legal conclusions is not helpful to the trier of fact and that such testimony therefore should be exclude under Rule 702. See *RLJCS Enterprises, Inc. v. Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir.2007) ("Argument about the meaning of * * * contracts * * * belongs in briefs, not in 'experts' reports'"); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 330 (N.D.Ill.2008) ("expert testimony that contains a legal conclusion that determines the outcome of a case is inadmissible"); *Apotex Corp. v. Merck & Co., Inc.*, 2006 WL 1155954, at *8 (N.D. Ill. Apr.25, 2006) (excluding expert testimony that consisted of "plainly inadmissible legal conclusions" that "would be

completely unhelpful to the fact finder"); *Clintec Nutrition Co. v. Baxa Corp.*, 1998 WL 560284, at *9 (N.D. Ill. Aug.26, 1998) ("Legal conclusions are not admissible because they are not helpful to the trier of fact"). Here, certain of Dr. Fitzgerald's opinions are in the form of legal conclusions—specifically, Dr. Fitzgerald's opinions regarding the exposure of putative class members to actionable sexual harassment. Because these opinions are unhelpful to the trier of fact, the Court grants Defendant's motion to exclude such testimony on that basis.

To the extent that Dr. Fitzgerald's testimony is cited in support of factual assertions that can be established without resort to expert testimony, Dr. Fitzgerald's opinions—as they relate to Plaintiffs' motion for class certification—also do not help the trier of fact to understand the evidence or to determine a fact in issue. For example, Dr. Fitzgerald's expertise is not helpful for determining whether the work force numerically is dominated by men.[10] Similarly, to the extent that Dr. Fitzgerald's testimony is cited in an attempt to explain Defendant's corporate state of mind, her opinions do not help the trier of fact. In support of their motion for class certification, Plaintiffs cite generally to Dr. Fitzgerald's entire report and assert that "[b]eyond evidence of a common practices of sexual harassment against women at the [Plants], [Dr. Fitzgerald's] report implicates common questions relating to [Defendant's] knowledge of toleration of this pervasive, systematic practice of sexual harassment against women and a policy of retaliation against those who oppose it." [323, at 67-68.] However, it is not clear to the Court why scientific, technical,

---

[10] Had Dr. Fitzgerald done some kind of statistical analysis to determine this fact, such an analysis might be relevant if she were properly qualified to apply specialized knowledge and training as a statistician. However, Dr. Fitzgerald appears to rely on underlying data to establish this fact. [326-1 (Dr. Fitzgerald Rep.), at 17-18.] The data speaks for itself and can be introduced through lay witnesses with first-hand observations, rather than by an expert who parrots what others have told her. To be sure, Rule 703 allows experts to rely on facts provided by others, even lawyers. But, as noted above, the expert provides testimony of value to the trier of fact only if she then applies those facts, using a reliable methodology and supplying a logical chain of reasoning, to reach a conclusion that is relevant to an issue in the case. Determining whether a proposed expert has followed that path is the essence of the *Daubert*/Rule 702 "gatekeeping" inquiry required of district judges.

or specialized knowledge is necessary, or even helpful, in determining when Defendant and Defendant's employees knew or should have known about certain actions and/or conditions. Finally, to the extent that Dr. Fitzgerald provides opinions regarding similarities between the 1999 Conciliation Agreement and the 2017 Conciliation Agreement, the Court also finds Dr. Fitzgerald's testimony to be unhelpful, as the Court and/or the trier of fact are equally capable of comparing the terms of the agreements.[11]   To the extent that Dr. Fitzgerald's opinions address these issues, Defendant's motion to exclude the expert testimony of Dr. Fitzgerald is granted.

Still, based on the materials before the Court, Dr. Fitzgerald may be able to offer proper expert testimony regarding the proper procedures to prevent and respond to sexual harassment. Dr. Fitzgerald also may be able to offer proper expert testimony regarding whether and to what extent Defendant's procedures and responses are consistent with those proper procedures. Defendant's arguments for excluding Dr. Fitzgerald's testimony do not focus on that testimony. Thus, to the extent that Defendant's move to exclude that testimony, Defendant's motion to exclude the testimony of Dr. Fitzgerald is denied without prejudice to renewal later in the case. Finally, it bears repeating that just because Plaintiffs may not introduce certain facts through Dr. Fitzgerald, those facts remain independently admissible through fact witnesses—and thus remain before the Court in its consideration of whether Plaintiffs can satisfy the Rule 23 requirements for class certification.

      *ii.*       *Dr. Gregory Mitchell and Dr. Liza Gold*

Plaintiffs have moved to exclude the expert testimony of Defendant's rebuttal expert witnesses—social psychologist and law professor Dr. Gregory Mitchell, J.D., Ph.D., and

---

[11] In any event, as discussed below, the Court rejects many of Defendant's arguments regarding the 2017 Conciliation Agreement obviating the need for an alternative legal remedy.   Thus, the Court's analysis of Plaintiffs' motion for class certification would not change even if the Court credited Dr. Fitzgerald's opinions on this issue.

psychiatrist Dr. Liza Gold, M.D. [370.] First, Plaintiffs argue that the expert testimony of Dr. Mitchell and Dr. Gold should be excluded because their testimony is irrelevant to the facts in this case. Second, Plaintiffs argue that the expert testimony of these witnesses should be excluded because neither offer testimony relevant to the issue of class certification. Third, as to Dr. Gold, Plaintiffs raise substantive challenges to her opinions.

With respect to the first argument, Plaintiffs mischaracterize Defendant's position. Defendant does not argue that expert testimony need not comply with the requirements of Rule of 702 and *Daubert*, as Plaintiffs contend. [387, at 2-3.] Rather, Defendant argues that the expert testimony of Dr. Mitchell and Dr. Gold is relevant to understanding the testimony of Dr. Fitzgerald, which Plaintiffs have made an issue in this case by relying on her testimony in support of their motion for class certification. Even if Defendant's experts did not analyze evidence in this case, Plaintiffs fail to explain why their testimony is not relevant to understanding and analyzing Dr. Fitzgerald's proposed testimony.

That leads to Plaintiffs' second argument—that the testimony of Defendant's rebuttal experts should be excluded because it is not relevant to class certification issues. Again, this argument misses the mark. Defendant rely on their experts to rebut the testimony of Dr. Fitzgerald, upon which Plaintiffs rely in their motion for class certification.

That leaves Plaintiffs' substantive challenges to Dr. Gold's opinions.[12] In her rebuttal report, Dr. Gold concludes that (1) Dr. Fitzgerald does not have a scientific basis to offer conclusions as to whether particular plaintiffs or a class experienced the conduct alleged, (2) Dr. Fitzgerald's implication that all sexual conduct in the workplace is offensive and unwelcome to all women also is scientifically invalid, (3) Dr. Fitzgerald does not have a scientific

---

[12] Although Plaintiffs challenge the qualifications of Dr. Gold as well as the substance of her opinions, they do not make similar challenges as to Dr. Mitchell.

basis to offer conclusions as to whether any plaintiff suffered psychological consequences as a result of the conduct alleged, and (4) Dr. Fitzgerald does not have a valid scientific basis to offer conclusions as to whether Plaintiffs' experiences were in fact similar to each other or to other women working at the Plants. [See 371-4.] As discussed above, because the Court is granting Defendant's motion to exclude with respect to the portions of Dr. Fitzgerald's testimony relating to these issues without reliance on the rebuttal report of Dr. Gold, the Court denies Plaintiffs' motion to exclude the testimony of Dr. Gold as moot. The Court also denies Defendant's motion to exclude the testimony of Dr. Mitchell, as the Court rejected the two objections Plaintiffs raised as to his testimony. Finally—and perhaps obviously—given that Drs. Gold and Mitchell have been offered as *rebuttal* witnesses, the exclusion of portions of Dr. Fitzgerald's proposed testimony diminishes the significance of the testimony proposed to rebut Dr. Fitzgerald's inadmissible opinions.

### B. Commonality under Rule 23(a)(2)

For a class to be certified, questions of law or fact must exist common to the class. Fed. R. Civ. P. 23(a)(2). Only one common question is necessary to satisfy Rule 23(a)'s commonality requirement. See *Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do." (citation, internal quotation marks, and alterations omitted)); *Walker v. Bankers Life & Cas. Co.*, 2007 WL 2903180, *4 (N.D. Ill. Oct. 1, 2007) ("Not all factual or legal questions raised in a lawsuit need be common so long as a single issue is common to all class members." (citation and internal quotation marks omitted)). However, superficial common questions—like whether each class member shares a characteristic or "suffered a violation of the same provision of law"—are not enough. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Dukes*, 564 U.S. 350). Commonality thus

requires a common issue capable of class-wide resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. In order to bring otherwise highly individualized claims as a class, the class must establish systemic violations or an illegal policy. *Jamie S.*, 668 F.3d at 497. "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Messner*, 669 F.3d at 815 (citation and internal quotation marks omitted); see also *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (Common questions exist where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." (citation omitted)).

Plaintiffs contend that they have met their burden of establishing commonality by identifying significant proof that Defendant "operated under a general policy of discrimination," which is an acceptable method of establishing commonality. *Dukes*, 564 U.S. at 353. As was the case in *Dukes*, proof of commonality in this case necessarily overlaps with Plaintiffs' merits contention that Defendant engaged in a pattern or practice of sexual harassment. 564 U.S. at 351-52. The Court therefore addresses the merits of Plaintiffs' claims to the extent necessary to evaluate Rule 23(a)'s commonality requirement. Plaintiffs argue that they have alleged severe and ongoing harassing behavior throughout their employment with Defendant. In particular, Plaintiffs allege that Defendant has:

- Maintained a policy of failing to take prompt remedial action in response to credible allegations of harassment, despite reports to Defendant's Human Resources departments, supervisors, and sexual harassment hotline;

- As a rule, allowed known harassers to remain in the workplace;

- Failed to discipline harassers despite the harassment being witnessed by supervisors;

- Threatened female complainants with termination or other adverse actions;

- Assigned female employees who rejected sexual advances to less desirable tasks; and

- Engaged in other misconduct.

[323, at 65.]   Plaintiff asserts that "[t]hese common questions and issues regarding the extensive and far-reaching practice of sexual harassment and retaliation at the [Plants] are at the core of all the Title VII claims held by the proposed class in this case."   [323, at 66.]   However, in their opening brief, Plaintiffs fail to connect these purported questions to the elements of their claims. As noted in Defendant's response brief, the Court specifically directed that—should Plaintiffs again move for class certification—Plaintiffs should address to what extent the elements of their claims can be decided on a class-wide basis.   [306, at 15.]   "Analysis of predominance under Rule 23(b)(3),' and thus of commonality under Rule 23(a)(2), 'begins * * * with the elements of the underlying cause of action.'"   *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 413 (N.D. Ill. 2012) (quoting *Messner,* 669 F.3d at 815).   The Court therefore turns to an analysis of the elements of the sexual harassment claims that Plaintiffs seek to bring.

### i.    *Pattern-and-Practice Analysis*

Plaintiffs' opening brief addresses the pattern-or-practice method of establishing discrimination under the framework set forth in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977).   "Pattern-or-practice claims * * * represent a theory of intentional discrimination."   *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716-17 (7th Cir. 2012) (citing *Council 31, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Ward*, 978 F.2d 373, 378 (7th Cir. 1992)).   "Pattern-or-practice claims require a 'showing that an employer regularly and

purposefully discriminates against a protected group.'" *Id*. (quoting *Ward*, 978 F.2d at 378). To establish discrimination under such a theory, "Plaintiffs must prove that discrimination 'was the company's standard operating procedure—the regular rather than the unusual practice.'" *Id*. (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 336).

This method of proving discrimination often comes up in the context of hiring practices. *E.E.O.C. v. Int'l Profit Assocs., Inc.*, 2007 WL 3120069, at *2 (N.D. Ill. Oct. 23, 2007) ("[T]he traditional 'pattern or practice' framework was developed by the Supreme Court in *Teamsters*, a case dealing with racially discriminatory hiring and promotion practices."). For example, "[i]f an employer has an established policy of making employment decisions with racial animus in violation of Title VII, it is likely that any specific employment decision also violates Title VII, and if a particular decision was not discriminatory, the employer is in the best position to show why." *Id*.; see also *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 441 (7th Cir. 2015) (concluding that class of African-American teachers could bring a class action challenging employer's turnaround policy on the basis that policy resulted in a disparate impact on African-American teachers). Thus, as noted by Plaintiffs, the liability phase in a pattern-and-practice case does not require showing that each individual member of the class was a victim of the employer's discriminatory policy, since proof of the pattern or practice supports an inference that any particular employment decision during the period in which the discriminatory policy was in force was made pursuant to that policy. [323, at 62-63.]

However, it is not clear to the Court that such a claim can be brought in the context of this case. Plaintiffs claim that Defendant has maintained a policy of failing to take prompt remedial action in response to credible allegations of harassment. [323, at 65.] Specifically, Plaintiffs contend that Defendant as a rule has allowed known harassers to remain in the workplace, failed to

discipline harassers despite the harassment being witnessed by supervisors, threatened female complainants with termination or otherwise reprimanded female complainants, assigned less desirable tasks to women who did not submit to sexual advances, among other conduct. [*Id.* (citing Second Amended Complaint).] Although Plaintiffs cite to allegations in the second amended complaint to support these assertions, which are insufficient to carry Defendant's burden of satisfying Rule 23, Plaintiffs renewed motion for class certification elsewhere identifies anecdotal evidence that certain of Defendant's employees have engaged in such conduct.

Even assuming these facts to be true, however, "a finding that an employer had a pattern or practice of tolerating sexual harassment in violation of Title VII does not necessarily establish that an individual claimant was exposed to harassment or that the harassment an individual claimant suffered violates Title VII." *Int'l Profit Assocs., Inc.*, 2007 WL 3120069, at *3. The *Teamsters* pattern-or-practice framework can "assist a court's analysis of whether a defendant has engaged in a pattern or practice of discrimination prohibited under Title VII," but it is Title VII itself "that defines the scope of prohibited discrimination and sets the substantive boundaries within which the method of proof must operate."[13] *Hohider v. United Parcel Servs., Inc.*, 574 F.3d 169, 183 (3d Cir. 2009) (citing *Teamsters*, 431 U.S. at 336). In other words, "adopting the *Teamsters* method of proof to adjudicate plaintiffs' claims does not obviate the need to consider the * * * statutory elements" of the specific cause of action pled. *Id.* at 177.

Relying on cases that held that "the landscape of the total work environment, rather than the subjective experiences of each individual claimant, is the focus for establishing a pattern or practice of unwelcome sexual harassment which is severe and pervasive," *Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 387 (N.D. Ill. 1999) (citing *EEOC v. Mitsubishi Motor Mfg. of America, Inc.*,

---

[13] Plaintiffs fail to explain how establishing the pattern and practice identified above relates to the elements of their hostile work environment claims.

990 F. Supp. 1059, 1074 (C.D. Ill. 1998)), Plaintiffs also argue that "the sexual harassment [is] the common issue." [323, at 66 (quoting *Warnell*, 189 F.R.D. at 385).] To the extent that these cases hold that plaintiffs can establish hostile work environment claims without reference to the subjective experience of each individual claimant, the Court respectfully disagrees.[14] As Judge Gottschall explained in *International Profit Associates, Inc.*, these cases are inconsistent with the Supreme Court's hostile work environment jurisprudence. 2007 WL 3120069, at *12. Specifically, they overlook the requirement that conduct subjectively be perceived by the victim to be abusive in order to be actionable. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). The Court therefore concludes that Plaintiffs cannot establish liability on their individual sexual hostile work environment claims based on a pattern-and-practice theory.[15] Instead, the Court will look to whether any of the elements of Plaintiffs' sexual hostile work environment claims can be addressed on a class-wide basis.[16]

---

[14] Although Plaintiffs cite these cases, Plaintiffs do not discuss them extensively. Instead, Plaintiffs rely heavily on *Sellars v. CRST Expedited, Inc.*, in which the court certified a sexual harassment hostile work environment class. *Sellars v. CRST Expedited, Inc. (Sellers I)*, 321 F.R.D. 578 (N.D. Iowa 2017). However, relying in part on the reasoning in *International Profit Associations, Inc.*, the same court recently decertified the class, concluding that "[i]t would be unfair to conclude that a work environment as a whole is hostile by tallying up all instances of sexual misconduct when each person in the class may have been subject to only one of those instances and unaware of the others." *Sellars v. CRST Expedited, Inc. (Sellers II)*, 359 F. Supp. 3d 633, 678 (N.D. Iowa 2019).

[15] The Court leaves open the possibility that a smaller group of Plaintiffs may be able to use the *Teamsters* standard to establish the objective element of their hostile work environment claim, if the group was exposed to the same conduct.

[16] The Court also leaves open the possibility that Plaintiffs can establish that they are entitled to injunctive relief based on Defendant's alleged misconduct, as a policy of tolerating sexual harassment is itself a violation. *Int'l Profit Assocs., Inc.*, 2007 WL 3120069, at *14. Because Plaintiffs primarily are seeking damages, however, the Court focuses its analysis regarding Plaintiffs' pattern and practice argument on the damages claims and whether those claims can be brought as a class.

Although Plaintiffs opening brief focuses on the *Teamsters* analysis, Plaintiffs do address the elements of their *prima facie* hostile work environment claim in their reply brief.[17]   [384, at 28-29.]   "To establish a hostile work environment claim, a plaintiff must show that she was '(1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability.'"   *Equal Employment Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (quoting *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008)). "Under Title VII, an employer can avoid liability for hostile environment sexual harassment if it promptly investigates a complaint when made and then, if warranted, 'takes steps reasonably likely to stop the harassment.'"   *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731 (7th Cir. 2009) (quoting *Saxton v. AT&T,* 10 F.3d 526, 536 (7th Cir. 1993)).

Plaintiffs argue that there is a common question with respect to whether Plaintiffs are women and therefore part of a protected class because this can be established by answering "a single common question of whether women make up the [proposed] class."   [384, at 29.] However, even if the proposed class definition limits the class to women, putative class members still would need to show that they fall within the scope of the class definition.   Moreover, it is well established that superficial common questions—like whether each class member shares a characteristic or "suffered a violation of the same provision of law"—are not enough to establish commonality.   *Jamie S.*, 668 F.3d at 497 (noting that whether each putative class member was a

---

[17] Plaintiffs fail to explain the interplay between their pattern and practice arguments and their arguments regarding the elements of their sexual harassment hostile work environment claims, making it difficult for the Court to determine under what theory Plaintiffs are proceeding.   In ruling on Plaintiffs' initial motion for class certification, the Court instructed that Plaintiffs to address how the elements of their claims can be established on a class-wide basis if they again moved for class certification.   However, Plaintiffs did not do so with respect to the elements of their hostile work environment claims until their reply brief.

Milwaukee Public School student was a superficial common question insufficient to establish commonality).

Plaintiffs also argue that there are common questions with respect to whether harassment was severe or pervasive enough to establish a hostile work environment (*i.e.*, to affect a term, condition, or privilege of employment). [384, at 30.] As noted by Plaintiffs, this element requires that Plaintiffs establish that they were subjected to sufficiently severe and pervasive conditions that were both subjectively and objectively hostile. [*Id.*] "To qualify as hostile, the work environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004) (quoting *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002)). Plaintiffs contend that "[i]t is obvious that the objective hostility component can be addressed as a common question because the reasonableness standard can be applied to the conduct and the environmental factors that make up the hostile work environment." [384, at 30-31.] Plaintiffs further contend that "[q]uestions such as whether sexual batteries and assaults, requests for sexual favors, stories of sexual conquests, constantly staring and requiring women to bend over, and threats of sexual assault were commonplace, are subject to common proof." [*Id.* at 31.] However, because the objective hostility component still depends on the specific conduct to which each named Plaintiff and putative class member was exposed, Plaintiffs' arguments miss the mark. Although Plaintiffs have presented the Court with evidence indicating that named Plaintiffs and putative class members were exposed to a wide-range of conduct that certainly would support hostile work environment claims, the evidence does not suggest that named Plaintiffs and putative class members all were exposed to the same

conduct.[18]   To the contrary, the evidence indicates that named Plaintiffs and putative class

members were exposed to a wide range of purported misconduct—from exposure to sexual

graffiti, to *quid pro quo* sexual propositions, to rape.[19]

Plaintiffs appear to be arguing that improper conduct was so pervasive at the Plants that

every woman necessarily was exposed to a hostile work environment.   In support of that

argument, Plaintiffs cite to the expert report of Dr. Louise Fitzgerald.   Specifically, Plaintiffs

---

[18] Plaintiffs recently filed a notice of supplemental authority, citing to two recent decisions in which Judge
Kennelly certified hostile work environment classes.  [See 417-1; 417-2.]  In *Brown v. Cook County*
(Case No. 15-cv-8085), Judge Kennelly concluded that the following issues presented common questions:
"whether the attacks by inmates were so severe or pervasive as to alter the conditions of employment and
create a hostile or abusive working environment; whether the defendants' policies led to the rapid
proliferation of masturbation attacks against public defenders and law clerks across the Cook County Jail
system; whether the defendants discouraged the plaintiffs from reporting when they were attacked; and
whether the defendants' delay in making effective changes to reduce the rate of violence constituted an
unreasonable delay in discovering and remedying the situation.  [417-1, at 19-20.]  Similarly, in *Howard
v. Cook County Sheriff's Office* (Case No. 17-cv-8146), Judge Kennelly concluded that "whether the work
environment at the jail and the courthouse is objectively offensive" presented a common question sufficient
to satisfy Rule 23(a)'s commonality requirement.  [417-2, at 13.]  In *Brown*, the plaintiffs were
challenging a specific kind of sexual harassment—incidents of "masturbation attacks" by detainees.  [See
417-1, at 3.]  In *Howard*, the plaintiffs presented evidence that each putative class member would have
been exposed to the challenged conduct because each putative class member would have been in the areas
where the challenged conduct was occurring.  [See 417-2, at 15 ("[T]he putative class members all work
within a single complex and class members generally must travel through multiple different parts of that
complex in the course of their employment.   The defendants acknowledge this feature of the
jail/courthouse complex.").]   Given that these cases addressed more focused allegations of a hostile work
environment, the Court finds these cases to be distinguishable.   In addition, the Court notes that Judge
Kennelly's commonality analyses in *Brown* and *Howard* relied significantly on *Chicago Teachers Union,
Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015).   As discussed herein, the
Court concludes that Plaintiffs' case here is distinguishable from that case, which also involved more
focused allegations of misconduct.   Specifically, the plaintiffs in that case asserted "that a uniform
employment practice ([a specific] set of criteria used to evaluate the school) used by the same
decision-making body to evaluate schools was discriminatory."   *Id*. at 440.   There is no such specific
policy at issue here.   Although the Court has reviewed *Howard* and *Brown* in their entirety, the Court only
addresses the commonality analyses, which is most pertinent to the Court's analysis here.

[19] For example, Plaintiffs cite to a questionnaire completed by a putative class member who indicated that
she was exposed to sexual comments, jokes and innuendo, and derogatory terms.  [324-141 (Pls.'s Ex. 141
– Putative Class Member Questionnaire).]   However, this same putative class member denies ever having
been touched in an inappropriate manner during her employment.   [*Id*.]   This putative class member also
denies ever having seen inappropriate touching during her employment.   [*Id*.]   By contrast, another
putative class member discussed above indicated that she had inappropriately been touched but had not
heard inappropriate comments.

argue that Dr. Fitzgerald's report establishes "evidence of a common practice of sexual harassment against women at the [Plants]." For the reasons discussed above, however, the Court is excluding Dr. Fitzgerald's opinions relating to that issue. Even if the Court were to accept Dr. Fitzgerald's testimony on that issue, Dr. Fitzgerald's conclusions do not establish a common issue with respect each plaintiffs' exposure to sexual harassment. Dr. Fitzgerald concludes that the work environment at "the Plants is highly sexualized, leading to high levels of ambient harassment."[20] [326-1 (Dr. Fitzgerald Rep.), at 67.] Dr. Fitzgerald further concludes that harassment at the Plaints "is so pervasive" that every female employee of the Plants "inevitably" has been exposed to sexual harassment, "*to a greater or lesser degree.*" [*Id.* at 68 (emphasis added).] This analysis highlights the varying levels of alleged misconduct to which named Plaintiffs and putative class members have been exposed. While some women allege that they have been physically assaulted or even raped, others may only have been exposed to "ambient harassment."[21] Thus, even if the Court categorically denied Defendant's motion to exclude the testimony of Dr. Fitzgerald, the Court still would conclude that Plaintiffs have not established that the objectively offensive element of their hostile work environment claims can be proven on a class-wide basis.[22]

---

[20] Dr. Fitzgerald states that "ambient harassment" refers "to the experience of working in an environment permeated with sexually offensive and degrading behavior, that is, a highly sexualized atmosphere in which crude and offensive materials are common and employees see harassing behavior as normative, whether specifically directed at them or not. [326-1 (Dr. Fitzgerald Rep.), at 13.]

[21] To the extent that Dr. Fitzgerald purports to equate "ambient harassment" to "actionable harassment," the Court agrees with Defendant that such testimony also would properly be excluded as confusing and misleading under Rule 403.

[22] Plaintiffs also argue that their "anecdotal evidence likewise supports their allegations and a finding of commonality." However, as discussed already, the anecdotal evidence before the Court actually indicates that women at the Plants were exposed to a wide-range of misconduct. In fact, Defendant has submitted declarations from twelve women averring that they never experienced or witnessed sexually harassing conduct at the Plants. [358-11 (Def.'s Exs. 9-20).] Another twelve women have submitted affidavits stating that while they may have been subjected to or may have witnessed such conduct, they either were not bothered by the conduct or they believed that the conduct was addressed appropriately (either by the affiant or by Defendant. [358-11 (Def.'s Exs. 21-32).] While Plaintiffs may contend that Defendant

Furthermore, given the size of the Plants and the fact that named Plaintiffs have not worked in many of the Plants different departments and crews during all relevant time frames [358, at 19-21], the Court does not see how Plaintiffs' anecdotal evidence of misconduct—though abundant—establishes that such conduct universally was occurring in all areas of the Plants at all times.

Although Plaintiffs concede that the subjective element of their hostile work environment claim will require at least some individualized proof, Plaintiffs argue that the subjective element still can be answered to some extent through common questions.   Specifically, Plaintiffs submit that certain types of harassment such as assault, rape, and/or unwanted touching by their very nature are unwelcome.   However, the Court cannot first determine that touching is unwanted without first establishing that the conduct occurred and then looking to the subjective intent of the person being touched.[23]   The Court therefore concludes that the subjective element of Plaintiffs' hostile work environment claim does not present common issues appropriate for class-wide determination.

Plaintiffs similarly argue that they can establish on a class-wise basis that they and putative class members were exposed to harassment on the basis of sex.   However, if named Plaintiffs and putative class members cannot establish that they even were exposed to the same conduct on a class-wide basis, they cannot address on a class-wide basis whether the differing conduct to which they were exposed was based on sex.

---

pressured these women to give statements, even Plaintiffs' own evidence demonstrates the wide range of misconduct to which women working at the Plants claim to have been exposed.  For example, in an interview with a putative class member, the putative class member indicated that she inappropriately had been touched but that she never had heard any improper sexual comments.   [324-90 (Pl.'s Ex. 90).]

[23] Plaintiffs also argue that any putative class members who did not find the environment hostile could always opt out of the class.   However, the Court cannot conclude that an issue presents a common question simply because those with differing claims can opt out.

Finally, Plaintiffs argue that there is a common issue with respect to whether there is a basis for employer liability. Specifically, Plaintiffs argue that "whether [Defendant] knew or should have known of the hostile work environment, whether [Defendant] encouraged the environment, whether [Defendant] took any action to remedy the environment, whether [Defendant] was negligent, whether [Defendant] had notice of the hostile work environment, whether [Defendant] took prompt remedial action in response to credible allegations of harassment, whether [Defendant] had a policy of permitting harassers to remain in the work place, whether [Defendant] failed to discipline harassers, and whether [Defendant] eradicated sexual harassment and gender-based discrimination in its Chicago Plants." [384, at 29-30.] While these questions may very well be relevant to determining whether there is a basis for employer liability, Plaintiffs do not address what showing is necessary to establish employer liability. "It is not the obligation of [the] court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 408-09 (7th Cir. 1988); see also *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." (citation omitted)).

In any event, based on the evidence presented by Plaintiffs, the Court concludes that employer liability is not a common question in this case.[24] "An employer is vicariously liable for a hostile environment created by a supervisor 'subject to certain defenses.'" *Wilson v. Chrysler Corp.*, 172 F.3d 500, 508 (7th Cir. 1999) (quoting *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998)). "An employer is liable for harassment by coworkers only when it has been

---

[24] The Court can conceive of scenarios where this element could be established on a class-wide basis. For example, if named Plaintiffs and putative class members all were challenging misconduct by the same supervisor and a critical mass of employees sufficient to satisfy the numerosity requirement were victims of that misconduct.

'negligent either in discovering or remedying the harassment.'" *Jarvis v. Sigmatron Int'l Inc.*, 223 F. Supp. 2d 981, 986 (N.D. Ill. 2002) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998)). "Notice or knowledge by the employer of the harassment is a prerequisite for liability." *Id*. (citing *Parkins*, 163 F.3d at 1035). "An employer can generally avoid liability for a hostile work environment if it promptly investigated complaints made by the plaintiff and acted to stop the harassing behavior." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 392 (7th Cir. 2010) (citing *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731 (7th Cir. 2009)).

Although this analysis might depend on Defendant's response to specific allegations of harassment made known to Defendant, which would require individual analysis, Plaintiffs contend that they can establish a basis for employer liability by demonstrating that Defendant has a policy of failing to take prompt remedial action in response to credible allegations of improper conduct. [323, at 65.] Specifically, Plaintiffs contend that Defendant has (1) allowed known harassers to remain in the workplace, (2) failed to discipline harassers despite the harassment being witnessed by supervisors, (3) threatened female complainants with termination or written reprimands, and (4) assigned less desirable tasks to employees who did not submit to sexual advances. [*Id*.]

However, the only corporate policies that have been established relate to Defendant's anti-harassment corporate directives and policy letters, which are implemented by local Human Resources and Labor Relations personnel. Plaintiffs do not contend that Defendant's corporate directives and policy letters are discriminatory or improper. Rather, Plaintiffs argue that certain of Defendant's employees have acted improperly despite (and in violation of) these policies. Plaintiffs have not, however, established "significant proof" that Defendant acted under a general policy that manifested itself in the same general fashion. *Dukes*, 564 U.S. at 353 ("Significant

proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decision-making.").   The Seventh Circuit has held that "subjective, discretionary decisions can be the source of a common claim if they are, for example, the outcome of employment practices or policies controlled by higher-level directors, if all decision-makers exercise discretion in a common way because of a company policy or practice, or if all decision-makers act together as one unit."  *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 438 (7th Cir. 2015).   Plaintiffs have not established that any of these circumstances is present here.

Although both Plants have the same grievance procedures and are governed by the same collective bargaining agreement, as noted by Defendant, the Human Resources departments in the Plants are separate and distinct from the corporate-level Personnel Relations Department at Defendant's headquarters in Dearborn, Michigan.   [358-10 (Def.'s Ex. 1 – Lavender Decl.), at 3, 5, ¶¶ 2, 9.]   While Plaintiffs assert that "the personnel overseeing the complaints, discipline and termination of hourly employees (Jim Larese, or other employees designated from his Personnel Relations office) was [sic] common" [323, at 17-18], Defendant argues that this assertion is incorrect, noting that Jim Larese never oversaw Personnel Relations.   [358, at 19.]   Plaintiffs fail to respond to that point.   Plaintiffs do identify evidence indicating that Personnel Relations became involved in actually conducting investigations into allegations of misconduct at the Plants around 2014.   [325-39 (Larese Dep.), at 11-12.]   Indeed, Defendant recognizes that beginning in September 2014 and continuing until approximately July 1, 2016, a Personnel Relations-led team supported Human Resources and Labor Relations personnel at the Plants in conducting

investigations of sexual harassment allegations. [358-10 (Def.'s Ex. 1 – Lavender Decl.), at 6, ¶ 19.] And members of the Personnel Relations Department have continued to provide limited investigative support on an as needed basis since July 1, 2016. [*Id*. at 6, ¶ 20.] However, the Plants retained ultimate decision-making authority for disciplinary issues involving hourly employees throughout the entire period. [*Id*. at 6, ¶ 21.] As noted by Defendant, there were approximately 42 different Human Resources and Labor Relations personnel who investigated and disciplined hourly employees for harassment. [*Id*. at 6, ¶ 17.] Under such circumstances, Plaintiffs have not shown that Defendant acted under a general policy that manifested itself in the same general fashion. *Dukes*, 564 U.S. at 353. *Dukes* "directs courts to examine whether all managers exercise discretion in a common way with some common direction." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 437 (7th Cir. 2015) (quoting *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 113 (4th Cir. 2013)) (internal quotation marks omitted). There is no indication that the investigative and disciplinary decisions made with respect to hourly employees were made "with some common direction."

Unlike discipline involving hourly employees, discipline of salaried employees for violations of Defendant's anti-harassment policies is reviewed and ultimately determined by staff in the Personnel Relations Department. [358-10 (Def.'s Ex. 1 – Lavender Decl.), at 6, ¶ 22.] "[I]f a general policy that is enforced at the corporate level rather than by individual supervisors is claimed to be discriminatory, even if some discretion exists, commonality may be found." *Chicago Teachers Union, Local No. 1*, 797 F.3d at 440 (citation omitted)). Still, Plaintiffs have not established that an actionable corporate policy existed. Plaintiffs have not presented statistical evidence on that point. And Plaintiffs' anecdotal evidence is insufficient to establish an actionable policy of failing to take prompt remedial action in response to credible allegations of

improper conduct, especially in light of the fact that Defendant did discipline salaried employees for sexual harassment. [See 358-9 (chart summarizing discipline and corrective actions at the Plants from 2012-2018).] The Court therefore concludes that Plaintiffs have not met their burden of satisfying Rule 23(a)'s commonality requirement.

### C.      Typicality under Rule 23(a)(3)

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Claims of class representatives and class members are typical if they arise from the same practice or course of conduct and are based on the same legal theory. *Keele*, 149 F.3d at 595. Typicality and commonality are closely related. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Typicality is meant to ensure that the claims of the class representatives have the "same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993) (citation and internal quotation marks omitted). "[T]here must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011).

Defendant argues that named Plaintiffs' claims are not typical because named Plaintiffs account for a disproportionately large number of all sexual harassment complaints at the Plants. "[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677-78 (7th Cir. 2009). That being said, the Seventh Circuit also has recognized that "'a class will often include persons who have not been injured by the defendant's conduct; indeed this is

almost inevitable,' given that a class can be certified yet fail to prove its case on the merits." *Lacy v. Cook Cty., Ill.*, 897 F.3d 847, 864 (7th Cir. 2018) (quoting *Kohen*, 571 at 677). Although Defendant has identified evidence indicating that some members of the putative class suffered no injury, it has not shown that "a great many" here were not injured, as necessary to find typicality lacking on that basis. *Id*.

Defendant asks the Court to infer that a great many putative class members have not been injured because named Plaintiffs account for a significant portion of sexual harassment claims made by employees of the Plants. Defendant's calculation was based on the number of documented complaints made by female employees at the Plants to Defendant's harassment hotline, as well as to Human Resources, Labor Relations, the Equal Employment Opportunity Commission, or the Illinois Department of Human Rights that were arguably sexual-harassment-related for 2012-15. [358-4, at 1 n.1.] However, these numbers do not appear to account for all of the women who submitted claims forms as part of the EEOC conciliation process. These numbers therefore appear to undercount the number of women who claim to have been subjected to sexual harassment. Furthermore, based on the egregious allegations in this case (including allegations against those in management and those involved in handling complaints), it is understandable why women may have refrained from reporting sexual harassment, especially if the women did not believe Defendant adequately would address the complaints and/or feared retaliation. Because it is reasonable to assume that those willing to act as named Plaintiffs also were more willing to make documented complaints, it is not surprising that named Plaintiffs make up a significant percentage of those who made documented complaints.

Still, the Court must "ensure that class members with stronger claims are not prejudiced by a representative with a weak one." *Osada v. Experian Info. Sols., Inc.*, 2012 WL 1050067, at *7

(N.D. Ill. Mar. 28, 2012) (citing *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011)); see also *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (affirming denial of class certification because named plaintiffs' claims were weaker than the claims of other class members).   Based on the facts of this case and the arguments advanced by Plaintiffs, the Court is unable to do so in this case.

Named Plaintiffs and putative class members allegedly have been exposed to a wide-range of misconduct—ranging from rape, to *quid pro quo* propositions, to exposure to improper comments and/or sexual graffiti.   Furthermore, the putative class contains at least a dozen women who swear they "suffered no injury" because they never experienced sexually harassing conduct. [358-11 (Def.'s Exs. 9-20).]   Another dozen women attest that they may have experienced an isolated instance of inappropriate conduct, but either were not bothered by the conduct; handled it themselves in a satisfactory manner (*e.g.*, by telling the offender to stop); or reported the conduct to Defendant and considered Defendant's response appropriate.   [358-11 (Def.'s Exs. 21-32).]

Plaintiffs recognize that each class member may have witnessed and/or been subjected to different styles of sexual harassment, depending on the individual perpetrator and their own reaction.   [323, at 76.]   Still, Plaintiffs argue that "minor variations in their experiences cannot defeat typicality."   [*Id.*]   However, as discussed above, the wide range of allegations at issue in this case cannot accurately be characterized as "minor variations."   With such wide-ranging allegations, named Plaintiffs' claims cannot be said to have the same essential characteristics as the claims of the class at large.   Named Plaintiffs' and putative class members' claims depend on exposure to differing conduct, by different employees of Defendant, in different areas of the Plants, on different shifts, and with different resolutions (*i.e.*, whether the victim complained, how the complaint was handled, etc.).   Under such circumstances, named Plaintiffs cannot be expected

to vigorously litigate issues relating to these crucial aspects of all putative class members' claims, making denial of class certification for lack of typicality appropriate. *Muro v. Target Corp.*, 580 F.3d 485, 493 (7th Cir. 2009) (affirming denial of class certification and concluding that typicality was lacking where named plaintiff's claims were different from putative class members' claims such that the named plaintiff did not have the incentive to litigate vigorously certain issues). For example, with no named Plaintiffs from the MP&L department at the Assembly Plant, it is not clear to the Court why any named Plaintiff would have the incentive to establish the extent to which improper conduct was occurring in that department.

Finally, the Court is concerned that named Plaintiffs and putative class members with stronger claims may be prejudiced by the fact that Plaintiffs are seeking to lump stronger claims with weaker claims. This concern is highlighted by Plaintiffs' argument that "if it turns out that few members of the class were harmed—which is not the case—that is not an argument for refusing to certify the class, but rather, for certifying it and then entering judgment on the merits that exonerates [Defendant]." [384, at 18.] As noted by the Seventh Circuit in *Butler v. Sears, Roebuck and Co.*, if a class is certified and then judgment is entered exonerating a defendant, "all class members who did not opt out of the class action would be bound by the judgment." 727 F.3d 796, 799 (7th Cir. 2013). In other words, according to Plaintiffs, if it turns out that only a few putative class members exposed to a hostile work environment, then Defendant should want a class to be certified because Defendant then would be entitled to a favorable judgment with respect to all class members who did not opt out of the class. However, if Plaintiffs' allegations are true, there are numerous named Plaintiffs and putative class members who have strong claims against Defendant.

By attempting to tie together the claims of all named Plaintiffs and putative class members by using an objective hostile work environment analysis, Plaintiffs undermine the claims of those who were exposed to the most egregious misconduct.   As the Court has observed at prior hearings in this case, if the Plaintiffs who experienced the most severe misconduct identified in the allegations and deposition testimony in this case can convince a jury that Defendant was aware of that misconduct and did nothing to stop and/or punish it, they may be entitled to a large verdict—far larger than any reasonable verdict based on proven allegations of exposure to sexist graffiti or exposure to isolated comments that did not bother them.   To date, Plaintiffs have not made a showing that any two individuals—much less the class they seek to certify—experienced the same misconduct in the same way.   As noted above, perhaps they can with further effort.   But for all of these reasons, the Court concludes that Plaintiffs have not at this juncture satisfied Rule 23(a)'s typicality requirement.

**D.      Adequacy of Representation under Rule 23(a)(4)**

Before a class will be certified, Rule 23(a)(4) requires that named plaintiffs show that "the representative parties will fairly and adequately protect the interests of the class."   For the adequacy requirement to be satisfied, the claims and interests of the named Plaintiffs must not conflict with those of the class, the class representatives must have sufficient interest in the outcome of the case, and class counsel must be experienced and competent.  *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993).   Defendant argues that Plaintiffs fail to satisfy Rule 23(a)(4)'s adequacy requirement because (1) the class is permeated by conflicts of interest, (2) Plaintiffs' pursuit of this case in the face of the EEOC Conciliation Agreement and their attempted interreference with that agreement render them inadequate class representatives, and (3) Plaintiffs' counsel is not adequate.   The Court addresses each of these arguments in turn.

Defendant argues that conflicts of interest among named Plaintiffs and putative class members bars class certification.   Specifically, Defendant argues that Plaintiffs cannot satisfy the adequacy requirement because certain named Plaintiffs' and putative class members also are accused of engaging in the misconduct at issue in this case.   "[D]ue process requires that absent class members be adequately represented in order to be bound by a court's judgment."   *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977) (citations and footnote omitted). Furthermore, Illinois Rule of Professional Conduct 1.7 expressly prohibits undertaking a representation of one client that is "directly adverse to another client."   Accordingly, courts have found inadequate representation where plaintiffs sought to represent a class that included those who allegedly participated in the wrongful conduct.   *Lee v. Children's Place Retail Stores, Inc.*, 2014 WL 5100608, at *3 (N.D. Ill. Oct. 8, 2014); *Wright v. Family Dollar, Inc.*, 2010 WL 4962838, at *3 (N.D. Ill. Nov. 30, 2010); *Mateo v. V.F. Corp.*, 2009 WL 3561539, at *5 (N.D. Cal. Oct. 27, 2009); *Sample v. Aldi Inc.*, 1994 WL 48780, at *4 (N.D. Ill. Feb. 15, 1994).   Although Plaintiffs attempt to distinguish these cases, they fail to do so in any meaningful way.   For example, Plaintiffs note that in *Wright* the named plaintiff was "a manager who actually took the actions complained of in the case."   [384, at 23 (citing *Wright*, 2010 WL 4962838).]   However, Defendant has identified such a conflict in this case.   Specifically, Defendant has identified allegations of misconduct against named Plaintiffs.   In any event, the Court agrees that it is a conflict of interest to include those who allegedly have engaged in the misconduct at issue in the class.

Indeed, the cases relied upon by Plaintiffs support the conclusion that wrongdoers should not be included in the class when they are part of the problem.   *Brown v. Yellow Transp., Inc.*,

2011 WL 1838741, at *4 (N.D. Ill. May 11, 2011). In *Brown*, the court certified a class that included supervisors. *Id*. at *7. Before doing so, however, the court noted that "[i]n some cases, the inclusion of supervisors as part of the class when they are also part of the problem renders class certification inappropriate." *Id*. at *4. Because there was no indication that the African-American supervisors were part of the racial discrimination at the heart of that case, the inclusion of African-American supervisors in the class did not amount to a conflict. *Id*.

In this case, on the other hand, Defendant has identified evidence that named Plaintiffs and putative class members contributed to the sexually hostile work environment that Plaintiffs challenge. Plaintiff Van accuses her then supervisor and co-Plaintiff Cephani Miller of making inappropriate comments. Specifically, Ms. Van testified that Ms. Miller retaliated against her and asked Ms. Van whether she thought everyone was sexually harassing her because she's so sexy. [358-13 (Def.'s Ex. 54 – Van Dep. Tr.), at 146-47.] Ms. Van in turn was accused of engaging in misconduct by putative class member Shanetta Myles. Specifically, Ms. Myles indicated in an interview that Ms. Van commented on Ms. Myles's weight and body parts. [358-16 (Def.'s Ex. 106), at 12.] According to Ms. Myles, Ms. Van also stated "give me some of those [titties]." [*Id*.] Similarly, putative class member Rosetta Smith submitted an affidavit indicating that Maria Price openly discussed her sexual preferences in the workplace. [358-11 (Def.'s Ex. 30 – Smith Decl.), at 101, ¶ 21.] Ms. Price also would greet male employees with a hug and often would blow kisses at them. [*Id*. at 102, ¶ 22.] Ms. Price testified that Carmel Gregory "was interested in a romantic relationship" with Ms. Price and "would constantly call [Ms. Price] to the office upstairs and tell [her] how pretty [she] was and stop giving [Ms. Gregory] the babydoll eyes and just to get to know her." [358-13 (Def.'s Ex. 50 – Price Dep. Tr.), at 126.] Indeed, in Ms. Price's EEOC Charge, Ms. Price listed Ms. Gregory as one of her sexual harassers. [29-21, at 2.]

Plaintiffs also note that an employee of Defendant testified that Labor Relations representative Natalie Dahringer told him that Plaintiff Van would need to drop her case before she would be moved out of her location where she was being harassed. [325-46 (Morton Dep. Tr.), at 16-17.] Although Ms. Dahringer denies this, there is conflicting testimony on the issue. Plaintiff Helen Allen-Amos accused Monique Johnson of acting inappropriately by "always grabbing on men, sitting on their laps," and squeezing their butts when she hugged the men. [358-13 (Def.'s Ex. 36 – Allen-Amos Dep. Tr.), at 8.] Defendant's response brief outlines numerous other examples of allegations of misconduct against women working at the Plants.

Plaintiffs themselves apparently have recognized conflicts. At her deposition, Gwajuana Gray provided the following testimony regarding her inability to proceed with her deposition on the scheduled day:

> I am sitting here today under a lot of duress and overwhelmed due to the harassment of some of the named plaintiffs whose counsel is here today and that I have just recently separated from. I just recently found out that Mr. Hunt is representing some management staff that I see on a daily basis. My concern is that they will share what I say with my immediate harasser. I am not in a good place where I believe that I can handle this deposition truthfully or remember all of the events because my mind is focused on what may happen to me at work at Ford Motor Company. I reserve my right to seek counsel to protect me from my case against Ford. I'm afraid of the retaliation that might occur.

[358-14 (Gray Dep. Tr.), at 140.] The conflicts in this case therefore are not merely speculative as Plaintiffs contend. *Cf. Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 680 (7th Cir. 2009) (affirming class certification where the existence of conflicts of interest was "hypothetical").

Plaintiffs argue that certain of this alleged misconduct is not relevant because "female harassment is not at issue" in this case. [323, at 82.] However, "sex discrimination consisting of same-sex sexual harassment is actionable under Title VII." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998). The fact that Plaintiffs are asking that the Court simply

ignore allegations of "female harassment" that arguably could strengthen the claims of certain plaintiffs demonstrates how the conflict identified by Defendant likely will manifest in this case. "[A] conflict of interest arises when an attorney has an incentive to reject lines of inquiry or argument that might help his client's case." *Doe v. Nielsen*, 883 F.3d 716, 719 (7th Cir. 2018) (citing *United States v. Algee*, 309 F.3d 1011, 1014 (7th Cir. 2002)). Plaintiffs appear to be doing so here with respect to the "female harassment" allegations identified by Defendant.

Plaintiffs next argue that there is no actual conflict because mere "anecdotal allegations of sexual comments or innuendo made by the class members, by itself does not constitute sexual harassment." [323, at 81 (citation omitted).] However, Plaintiffs rely on similar anecdotal evidence to support their claims. [See 323, at 55 ("Plaintiffs' anecdotal evidence likewise supports their allegations and a finding of commonality.").] Indeed, in Exhibit 54 to Plaintiffs' initial motion for class certification, Plaintiffs themselves categorized some of these allegations as sexual harassment. Although Plaintiffs now claim to disavow any intent to pursue claims based alleged misconduct by women, this does not change the character of the conduct that Plaintiffs themselves categorized as improper. As noted by Defendant, the fact that Plaintiffs and counsel argue both sides of this issue underscores the serious conflict within the class.

Furthermore, Plaintiffs themselves have argued that it is improper to allow those who have engaged in misconduct to be compensated for misconduct. In support of their argument that the EEOC conciliation process is flawed, Plaintiffs argue that it is troubling that victims and harassers are compensated from the same fund, as male African-American employees who allegedly engaged in sexual harassment are being compensated for racial harassment. But Plaintiffs nonetheless ask that the Court certify a class containing women who are accused of engaging in the misconduct alleged in this lawsuit. In their briefing on their initial motion for class certification,

Plaintiffs asserted that it "is true" that "there are a few women who have been victims of the ambient sexually harassing workplace environment, but who have also fought to preserve the sexually harassing culture" in the Plants. [266, at 17.] Plaintiffs also attempted to explain away the testimony of Orissa Henry, who testified that Supervisor Galinda Lee contributed to the sexually hostile work environment, by arguing that because Ms. Lee's husband was terminated for having sex with female coworkers, "it is easy to see why such circumstances could offend Ms. Lee, and how the subsequent disruption of her family's income could create confusion or animosity by her toward her complaining female workers." [266, at 17.] Plaintiffs continue to make such statements in their briefing on their pending class certification motion. Plaintiffs assert that Plaintiffs and putative class members were forced "to become part of the sexually harassing culture or ignore the sexual harassment entirely to be successful and not ostracized, adding to the hostility." [384, at 21.] This defense of persons who Plaintiffs admit sought to preserve the sexually hostile work environment demonstrates there is not simply a speculative conflict of interest, but an actual conflict of interest.[25]

Finally, Plaintiffs argue that it is not categorically improper to certify a class that includes employees at different levels of employment. But that argument misses the mark. Defendant is not arguing that conflicts exist merely because the proposed class includes both managers and non-managers. Defendant is arguing that conflicts exist because the proposed class includes individuals who allegedly engaged in the misconduct at issue. Plaintiffs also argue that the Court has authority to resolve any potential conflicts between representatives and the class by creating structural protections, such as formal subclasses, or appointing separate counsel for members who

---

[25] Plaintiffs also argue that Defendant only has pointed to few isolated incidents in which Plaintiffs and putative class members have been accused of sexual harassment by another woman. However, the examples discussed above and in Defendant's briefing demonstrate that conflicts exist. Again, given the arguments being made by Plaintiffs as a result of these identified conflicts, the conflicts make class certification inappropriate.

may have divergent interests.  Plaintiffs therefore argue that if the Court concludes that managers cannot adequately represent the interests of non-managers, the Court could certify two subclasses (*i.e.*, a class of managers and a class of non-managers) to remedy any intra-class conflicts.  Again, this argument misses the mark.  As Defendant notes, such a division would not eliminate conflicts of interest because there are allegations of sexual harassment by non-managers against non-managers.  Furthermore, there is no indication that all female managers are alleged to have engaged in misconduct.  It therefore still would be problematic to have managers accused of misconduct in the same subclass as managers who are not alleged to have committed any wrongdoing.

Plaintiffs propose that the Court also could eliminate conflicts of interest by certifying a subclass of women who have been accused of engaging in sexual harassment and/or contributing to a sexually hostile work environment.  However, such a definition would be impermissible vague.  "Avoiding vagueness is important 'because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment.'"  *Steimel v. Wernert*, 823 F.3d 902, 918 (7th Cir. 2016) (quoting *Mullins*, 795 F.3d at 659).  "To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way."  *Mullins*, 795 F.3d at 660 (citations omitted).  The Court has no way of knowing at this time whether any named Plaintiff or putative class member will be accused of engaging in misconduct.  In addition to the vagueness problem, conflicts would still remain within the group of class members accused of misconduct.  Specifically, that group still would include women who allege that they were harassed by other women within the sub-class.  For example, Ms. Van, who has been accused of misconduct, presumably would be in that sub-class with Ms. Miller, against whom Ms. Van has made

allegations of misconduct. Plaintiffs' proposed subclasses do not eliminate the conflicts identified by Defendant. The Court therefore concludes that Plaintiffs fail to satisfy Rule 23(a)'s adequacy requirement and denies Plaintiffs' motion for class certification on that basis.

ii.    *EEOC Conciliation Agreement*

Defendant argues that Plaintiffs' pursuit of this case in the face of the 2017 EEOC Conciliation Agreement and their attempted interference with that agreement render them inadequate class representatives. Rule 23(a)(4)'s adequacy requirement is not met where class representatives fail to act "in the best interests of the unnamed members of the class" and do not "keep the interests of the entire class at the forefront." *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539-40 (7th Cir. 2017) (citing *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 752, 748 (7th Cir. 2011)). Where there are "remedies already in place" for putative class members, adequacy may be lacking because named plaintiffs cannot "bring any significant extra value to the absentee class members" and therefore may not be acting in the best interest of the unnamed members of the class. *Id*. However, this is not a case where it is clear that litigation cannot bring any significant extra value to absent class members. As noted by Plaintiffs, many claimants had their claims denied through the EEOC conciliation process. To the extent that these putative class members have viable claims, it cannot be said that these putative class members already have adequate remedies in place. Furthermore, although a significant percentage of claimants who were offered awards accepted them, some did not. Again, to the extent that these putative class members have viable claims—including claims that might be valued at an amount well in excess of any conceivable remedy offered by the EEOC—it cannot be said that these putative class members already have remedies in place. This case therefore is unlike *In re Aqua Dots Product Liability Litigation*, in which plaintiffs sought the exact refund amount already being offered to members of

the putative class by the defendant.  654 F.3d 748, 752 (7th Cir. 2011) ("A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests." (citation omitted)).

Similarly, to the extent that Plaintiffs seek injunctive relief, the Court reiterates the concerns it identified in its prior order on Plaintiffs' initial class certification motion.  It still is not yet clear that the monitoring mechanisms set forth in the 2017 Conciliation Agreement would duplicate the relief sought in this case.  The Court recognizes the reasonable assumption that the EEOC is acting in the best interests of those whom it is tasked with protecting.  See *Thornton v. State Farm Mut. Auto Ins. Co.*, 2006 WL 3359482, at *3 (N.D. Ohio Nov. 17, 2006) ("Proceedings by the state, whether in a judicial or an administrative forum, are presumably taken with the best interests of state residents in mind.  Reasonable settlement by the accused should be encouraged. Indeed, potential class members will often recover more than they would in a private action when costs and attorneys' fees are factored in.").  Still, the allegations of Defendant's recidivism provide a basis for some skepticism (and a corresponding degree of caution and due diligence) in this area.

Defendant also argues that Plaintiffs and Plaintiffs' counsel have proven their inadequacy by opposing the interests of putative class members—first by filing an "emergency motion" to prevent their co-workers from even receiving the Claims Forms that would enable them to benefit from the Agreement that the EEOC negotiated on their behalf, and later by filing a motion to stay the distribution of award notices to those whom the Panel identified as eligible for an award. Plaintiffs have identified reasons for having concerns regarding the EEOC claims process. Although the Court previously declined to interfere with the EEOC claims process, noting that

there was no reason why putative class members who decided to file claims forms should not be permitted to determine for themselves whether they want to settle their claims as part of the conciliation process or pursue other avenues of relief [348, at 9-10], the Court is not persuaded that Plaintiffs' efforts relating to the EEOC claims process demonstrate a failure to act in the best interests of putative class members.

### iii.     Adequacy of Counsel

In assessing the adequacy of class counsel, the Court considers "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case." *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n. 7 (7th Cir. 2013) (citing Fed. R. Civ. P. 23(g)(1)(A)).   Furthermore, the Court must have confidence that counsel will "prosecute the case in the interest of the class, of which they are fiduciaries[.]" *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (citations omitted).   "When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Id.* at 918.

The Court denied Plaintiffs' initial motion for class certification based on Plaintiffs' failure to establish the adequacy of class counsel.   [See 306.]   Since Plaintiffs filed their initial motion for class certification, however, Plaintiffs have added attorneys from the law firm of Romanucci & Blandin LLC as class counsel.[26]   Although the qualifications of the attorneys from Romanucci & Blandin LLC are not disputed, the Court continues to have concerns regarding the adequacy of counsel as structured.

---

[26] Plaintiffs added Romanucci & Blandin LLC as counsel before the Court ruled on Plaintiffs' prior motion for class certification.   However, because Defendant was not given the opportunity to research and respond to the addition of counsel, the Court did not decide at that time whether the addition of Romanucci & Blandin LLC was sufficient to establish the adequacy of counsel.

To begin, Plaintiffs indicate that Mr. Hunt will continue to control pivotal aspects of this case. Specifically, Plaintiffs indicate that Mr. Hunt "will continue his lead role in client communication, motion practice, and arguments" with "the company of Mr. Romanucci." Although attorneys from Romanucci & Blandin LLC will act as co-counsel, Mr. Hunt had co-counsel in *Warnell*, Mr. Hunt's prior federal class-action lawsuit in which he was sanctioned and which resulted in numerous malpractice lawsuits. [306, at 9-11.] The Court therefore is not satisfied that the addition of Romanucci & Blandin LLC eliminates the adequacy concerns the Court outlined in its prior decision denying Plaintiffs' initial motion for class certification.

Plaintiffs argue that the Court's concerns regarding the conduct of Mr. Hunt in the *Warnell* matter should no longer be of concern to the Court because there is no indication that Mr. Hunt has committed any of the same mistakes or engaged in misconduct in this case. However, in this case, Mr. Hunt has made missteps that call into question his ability adequately to represent the class. For example, at oral argument on Plaintiffs' initial motion for class certification, Plaintiffs' counsel made what the Court (perhaps charitably) characterized as an error in judgment. In Exhibit 54 of Appendix A to Plaintiffs' initial motion for class certification, Plaintiffs presented a chart purporting to identify all the individuals who had harassed Plaintiffs. The chart included numerous female employees among the perpetrators. After Defendant argued that Plaintiffs could not certify their proposed class because it included women who are alleged to have engaged in misconduct, Plaintiffs presented the Court an updated Exhibit 54 at oral argument. Defense counsel noted (and the Court later confirmed) that the updated chart excluded the female names (and one male name). In their briefing on the pending motion for class certification, Plaintiffs try to explain this occurrence by asserting that Exhibit 54 originally was prepared for internal

purposes. [323, at 71.] Even if that is true, the Court is troubled that counsel would modify its internal document to omit evidence that might demonstrate an intra-class conflict.

Plaintiffs also contend that they removed examples of female on female harassment from Exhibit 54 because—at least for the purposes of class certification—they are not claiming that females sexually harassed them. [*Id*. at 71-72.] This raises another concern for the Court. By excluding instances of female-on-female harassment, Plaintiffs are weakening the claims of named Plaintiffs and putative class members who have been subject to such harassment. The fact that Plaintiffs' counsel would reject a theory of harassment that could support the claims of certain named Plaintiffs and putative class members suggests that counsel may be more interested in certifying a class than in protecting the interests of putative class members.

This is not the only argument made by Plaintiffs' counsel that may be prejudicial to certain named Plaintiffs and putative class members. Plaintiffs also argue that "if it turns out that few members of the class were harmed—which is not the case—that is not an argument for refusing to certify the class, but rather, for certifying it and then entering judgment on the merits that exonerates [Defendant]." [384, at 18.] As discussed above, if Plaintiffs' allegations are true, there are numerous Plaintiffs and putative class members who have strong claims. Lumping these Plaintiffs and putative class members with others with weak claims may adversely affect those with stronger claims. *Butler*, 727 F.3d at 799 (noting that if a class is certified and then judgment is entered exonerating a defendant, "all class members who did not opt out of the class action would be bound by the judgment").

The Court notes that Plaintiffs' counsel also fail to raise arguments available to Plaintiffs. For example, Defendant argues that Plaintiffs could not certify any issue for class treatment under Rule 23(c)(4) because that rule still requires that the requirements of Rule 23(a) and (b) be met.

[358, at 85.] The Court agrees with Defendant's characterization of the law with respect to the Rule 23(a) requirements. "Rule 23(c)(4) does not exempt class representatives from the threshold requirements of Rule 23(a)." *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at \*49 (N.D. Ill. Mar. 31, 2017). However, in an opinion cited by Defendant, this Court concluded that "the Seventh Circuit likely would follow the trend of authority holding that a court may employ Rule 23(c)(4) 'to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement.'" *Id*. at \*61 (citing *Nassau County*, 461 F.3d at 227). In that decision, the Court discussed the split of authority on the issue. Plaintiffs fail entirely to address that authority, even though it could be helpful to their case for certification under Rule 23(c)(4). Instead, Plaintiffs simply respond that they have satisfied the requirements of Rule 23(a) and (b). [384, at 40.] In sum, the Court still has concerns regarding the adequacy of class counsel. Although these concerns about counsel would not alone be sufficient to deny certification on adequacy grounds, coupled with the significant conflicts of interest identified above, the Court concludes that Plaintiffs have not satisfied Rule 23(a)'s adequacy requirement.

E. **Rule 23(b) Requirements**

     *i.*     *Rule 23(b)(3)*

To certify a Rule 23(b)(3) class, Plaintiffs must demonstrate predominance and superiority. Although related to the commonality requirement, "the predominance criterion is far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). It requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521

U.S. at 623. Plaintiffs satisfy predominance requirement only if they can show that "'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669 F.3d at 815 (citation and internal quotation marks omitted). "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Id*. (citation omitted); see also *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (Common questions are where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." (citation and internal quotation marks omitted)).

As the Supreme Court recently explained, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods*, 136 S. Ct. at 1045 (citation omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id*. (citation omitted).

Here, the Court agrees that Plaintiffs fail to meet their burden of establishing that common issues predominate. As discussed above, Plaintiffs cannot proceed on a pattern and practice theory for their damages claims. Furthermore, Plaintiffs have not identified any common issues in this case. Even if Plaintiffs could proceed on a pattern and practice theory or could otherwise establish employer liability on a class-wide basis, the Court still would conclude that common issues do not predominate, as highly-individualized hearings still would be necessary for each

named Plaintiff and each putative class member.[27]  Plaintiffs argue that—to the extent that individual issues remain—they can be handled through "streamlined mechanisms" such as affidavits and proper auditing procedures.  See *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1030 (7th Cir. 2018), cert. denied, 139 S. Ct. 1465 (2019).  Although the Seventh Circuit has approved the use of such streamlined mechanisms, to certify a class under Rule 23(b)(3), the Court still must consider whether common issues predominate over individual issues.  In *Beaton*, the Seventh Circuit affirmed the district court's conclusion that common issues predominated because the individual questions were "sufficiently simple" that "streamlined mechanisms" were available to determine which class members had a viable claim.  *Beaton v. Software*, 2017 WL 4740628, at *8 (N.D. Ill. Oct. 19, 2017), aff'd sub nom. *Beaton v. SpeedyPC Software*, 907 F.3d 1018 (7th Cir. 2018), cert. denied, 139 S. Ct. 1465 (2019).  As the district court in that case noted, the individual questions had "straightforward binary answers" and "the parties could utilize a form affidavit, with accompanying audit procedures, to address" those questions.  *Id*.  The individual questions here are much more complex.[28]  Even assuming that Plaintiffs could establish a basis for employer liability on a class-wide basis, hundreds (if not thousands) of individual hearings still would be necessary to resolve the remaining elements of Plaintiffs' hostile work environment claims.  Unlike in *Beaton*, however, there are not streamlined ways to resolve these individual issues.  The

---

[27] Because individual issues relate to liability, this case is unlike the cases relied upon by Plaintiffs in which courts have concluded that the predominance requirement is satisfied despite the need to make individualized damages inquiries.  See, *e.g., Butler*, 727 F.3d at 801 ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.").

[28] Plaintiffs argue that "[i]f these streamlined mechanisms are available to plaintiffs in a consumer fraud class action—which have historically been frowned up as well—certainly these same mechanisms are available to a class of female workers seeking redress for vile workplace, sex-based discrimination."  [384, at 32.]  However, the Court's analysis of Rule 23's requirements does not depend on the Court's assessment of the importance of the type of claim being brought.  Consumer fraud claims often involve simpler issues, making them more susceptible to class treatment.

Court therefore concludes that common issues do not predominate. *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) ("If the class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims.").

Turning to the second prong of Rule 23(b)(3), which is satisfied when "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." A class action is "the superior method for managing litigation if no realistic alternative exists." *Valentino v. Carter Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996). Defendant argues that Plaintiffs here have two superior methods for evaluating adjudicating class claims—the EEOC conciliation process and individual damages suits.

Plaintiffs respond that the EEOC conciliation process is inadequate. Specifically, Plaintiffs contend that (1) the awards given were lower than the tier amounts identified in the agreement, (2) the conciliation process resulted in the denial of more than one-third of the claims submitted by women, and (3) the claims process was mechanical and inflexible. [See 409.] With respect to the first argument, although the awards given were lower than the tier amounts identified ($10,000, $20,000, or $30,000, depending on the seriousness of the claim), the awards still were consistent with the terms of the 2017 Conciliation Agreement. [409, at 3.] Furthermore, claimants were informed of the amount of their awards before they decided whether they would accept their respective awards. The fact that the award amounts are lower than the presumptive tier amounts does not itself make the EEOC conciliation process inadequate.

Plaintiffs' third argument—that the claims process was mechanical and inflexible because it "failed to adequately distinguish claimants based on the relative severity of the conduct they

experienced" [407, at 7-8]—likewise is unpersuasive.   In making this argument, Plaintiffs cite to

the fact that a putative class member who submitted a claim describing egregious sexual

harassment only was offered an award of $24,086.80.   [402, at 7-8.]   Specifically, this putative

class member's claim form indicates that she was harassed and assaulted by numerous employees,

including a manager.   [407-15.]   By way of example, the putative class member indicates that an

area manager threatened her, hit her, choked her, and forced her into a sexual relationship.   [*Id*. at

5.]   In another example, the putative class member indicates that she inappropriately was touched

while on Defendant's premises at least weekly from 2015 to early 2017.   [407-15, at 6.]   The

putative class member goes on to allege additional harassment by numerous employees of

Defendant.   The Court agrees that the alleged conduct identified by this putative class member is

appalling.   However, for such severe claims—and there may be many such claims in the putative

class here—individual Title VII lawsuits are a very viable option, with significant money damages

and attorneys' fees providing the incentive to litigate.   *Cf. Herkert v. MRC Receivables Corp.*, 254

F.R.D. 344, 353 (N.D. Ill. 2008) ("A class action is superior where potential damages may be too

insignificant to provide class members with incentive to pursue a claim individually." (quoting

*Jackson v. Nat'l Action Fin. Servs., Inc.*, 227 F.R.D. 284, 290 (N.D. Ill. 2005))).   And those who

entered the conciliation process were under no obligation to take the money offered if they felt

they could do better in litigation.

That leaves Plaintiffs' second argument, that the conciliation process resulted in the denial

of more than one-third of the claims submitted by women.   Without more information regarding

why these claims were denied, the Court is unable fully to evaluate this argument.   In other words,

Plaintiffs have not shown that the damages available to any of the putative class members whose

claims were denied as part of the EEOC conciliation process were "too insignificant" to provide them the incentive to pursue their claims individually.

In any event, manageability concerns wholly independent of the availability of this or any other EEOC remedy counsel against finding a class action to be superior to individual Title VII claims in this case. "A central question" for evaluating Rule 23(b)(3)'s superiority requirement is the issue of "manageability." *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000) (citations omitted); see also Fed. R. Civ. P. 23(b)(3)(D) (noting that "the likely difficulties in managing a class action" are a pertinent consideration). Plaintiffs' proposed litigation plan "involves bifurcation with Phase I addressing [Defendant's] Liability and defenses as to [its] liability through a jury trial and Phase II addressing the more subjective elements through hearings and affidavits." [384, at 10.] But this proposed litigation plan presumes that liability can be addressed on a class-wide basis. As already discussed, however, that is not the case here. Even assuming that liability could be established on a class-wide basis in Phase I (a conclusion the Court already has rejected), Plaintiffs' proposed litigation plan still would be unmanageable because it would necessitate hundreds of separate hearings. Although Plaintiffs have proposed dividing the class into five damages groups in Phase II, that proposal still would not eliminate the need for separate hearings. For example, it would be difficult to determine the proper amount of damages for all individuals who experienced unwanted touching without conducting individualized inquiries. Furthermore, as discussed above, it is not clear to the Court that the inquiries necessary in this case can be resolved through streamlined methods such as affidavits. Plaintiffs' failure to submit a viable litigation plan (as the Court requested in its denial of Plaintiffs' initial motion for class certification) therefore is an additional ground for denying their motion for class certification. See, *e.g., Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013)

("[I]f class counsel is incapable of proposing a feasible litigation plan though asked to do so, the judge's duty is at an end."); see also *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439 (N.D. Ill. 2003) (denying motion for class certification because the need to conduct thousands of individual determinations "would render [the] case totally unmanageable as a class action"). Accordingly, Plaintiffs have not met their burden of demonstrating that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" as required to certify a class under Rule 23(b)(3).

ii.     *Rule 23(b)(2)*

Plaintiffs move for certification of a Rule 23(b)(2) class for injunctive relief. "Rule 23(b)(2) declares that class certification under that subsection is appropriate when 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.'" *Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000) (quoting Fed. R. Civ. P. 23(b)(2)). "By virtue of its requirement that the plaintiffs seek to redress a common injury properly addressed by a class-wide injunctive or declaratory remedy, Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Id*. Because "Rule 23(b)(2) provides for binding litigation on all class members without guarantees of personal notice and the opportunity to opt out of the suit," that subsection "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *Id*. (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's note) (internal quotation marks omitted).

In their opening brief, Plaintiffs argue that certification under Rule 23(b)(2) is appropriate "because the requested relief is primarily injunctive." [323, at 104.] However, "[a] suit for money damages, even if the plaintiffs seek uniform, class-wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual plaintiff's claim." *Lemon*, 216 F.3d at 580. "That [Plaintiffs] have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final." *Jamie S.*, 668 F.3d at 499.

The Court concludes that Plaintiffs' pursuit of monetary relief is not incidental to their pursuit of injunctive relief. Plaintiffs' own litigation plan indicates that the injunctive relief sought would merely initiate a process through which highly individualized determinations of liability and remedy will be made. Thus, injunctive relief here "would not provide 'final' relief as required by Rule 23(b)(2)." *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 826 (7th Cir. 2011) (quoting *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011)). In such circumstances, "[t]he monetary tail would be wagging the injunction dog." *Id.* (quoting *Kartman*, 634 F.3d at 893).

Indeed, Plaintiffs' contention that their "requested relief is primarily injunctive" is belied by the fact that they devote more than 10 pages of their reply brief to addressing Defendant's arguments regarding Rule 23(b)(3)'s requirements but only mention Rule 23(b)(2) in the opening and concluding sentences of their reply brief. Plaintiffs do not even attempt to respond to the

arguments raised by Defendant with respect to Rule 23(b)(2). Furthermore, as discussed below,

Plaintiffs request that certain issues be certified under Rule 23(c)(4) if the Court denies class

certification under Rule 23(b)(3). But Plaintiffs do not request such alternative relief with respect

to their motion for class certification under Rule 23(b)(2). Similarly, in support of their argument

that Rule 23(a) tolerates a degree of variance among claims, Plaintiffs argue that to the extent that

the Court has "concerns regarding these claims, Plaintiffs submit that these class members, should

Plaintiffs' proposed class be certified pursuant to Fed. R. Civ. P. 23(b)(3), may freely opt out of the

class upon receipt of notice and pursue their own individualized claims." [323, at 73.] If

Plaintiffs' requested relief is primarily injunctive, it is questionable why Plaintiffs would make this

argument, as "there is no opt-out right" for classes certified under Rule 23(b)(2). *Gray v. Hardy*,

826 F.3d 1000, 1009 (7th Cir. 2016). The Court therefore denies Plaintiffs' motion for class

certification under Rule 23(b)(2).

### iii. *Hybrid Certification*

Plaintiffs also move for hybrid certification pursuant to both Rule 23(b)(2) and (3). A

hybrid class action is one in which the court certifies "a Rule 23(b)(2) class for the portion of the

case addressing equitable relief and a Rule 23(b)(3) class for the portion of the case addressing

damages." *Lemon*, 216 F.3d at 581. Defendant argues that such a class action is improper here

because certifying a hybrid class action does not relieve Plaintiffs of satisfying the requirements of

Rule 23(b)(2) and (3). Plaintiffs do not respond to that argument and therefore have waived any

argument in opposition. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). In any

event, the Court agrees that Plaintiffs must satisfy both Rule 23(b)(2) and (b)(3) in order to certify

a hybrid class under both provisions. See *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 470 (N.D.

Ill. 2009), aff'd, 675 F.3d 709 (7th Cir. 2012). Although the Seventh Circuit has left open the

possibility of "divided" or "hybrid" certification under Rule 23(b)(2) and (3), *Lemon*, 216 F.3d at 581, the Seventh Circuit has never suggested that "divided" or "hybrid" certification would excuse plaintiffs from satisfying Rule 23(b)'s requirements. Nor would such a rule make sense, as plaintiffs could avoid Rule 23(b)'s requirements simply by seeking both monetary and equitable relief. Because Plaintiffs fail to satisfy the requirements of both Rule 23(b)(2) and (3), Plaintiffs' motion for hybrid certification under those provisions is denied.

### F.  Rule 23(c)(4)

In the alternative to class certification under Rule 23(b)(3), Plaintiffs ask that the Court certify particular issues under Rule 23(c)(4), which provides that "an action may be brought or maintained as a class action with respect to particular issues" when appropriate. "The district court is not obligated to grant partial certification if particular issues are common to a class," but may do so in its discretion. *Clark v. Experian Info. Sols., Inc.*, 256 Fed. App'x 818, 822 (7th Cir. 2007). Plaintiffs have not demonstrated that certification of any issue under Rule 23(c)(4) is appropriate.

To begin, Plaintiffs have not demonstrated that sufficient "efficiency would be gained by certifying a class for only particular issues." *Clark*, 256 Fed. App'x at 822. Plaintiffs argue that the following issues could be certified under Rule 23(c)(4):

1. Whether Defendant created and condoned a hostile work environment;

2. Whether Defendant failed to take prompt remedial action in response to credible allegations of harassment;

3. Whether Defendant has allowed known harassers to remain in the workplace; and

4. Whether Defendant has failed to discipline harassers despite the harassment being witnessed by supervisors.

[323, at 115.] However, Plaintiffs fail to connect these issues to the elements of their claims. Although Defendant noted this deficiency in its response brief, Plaintiffs again failed to address the elements of their claims in their reply brief with respect to this issue. Instead, Plaintiffs identify additional issues and argue that certification of those issues under Rule 23(c)(4) would "on a smaller scale establish all of the required elements as they would be predominately proven by common proof and go to the elements required to each individual's claim of a hostile work environment created by sexual harassment." [384, at 40.] To the extent that Plaintiffs raise new issues for certification under Rule 23(c)(4) in their reply brief, they waived any argument with respect to those issues.[29] *West v. MeadWestvaco Corp.*, 81 F. App'x 74, 75 (7th Cir. 2003) ("[A]rguments presented for the first time in a reply brief are waived." (citation omitted)). Furthermore, as discussed above, Plaintiffs have not met their burden of demonstrating that these questions can be addressed on a class-wide basis. In any event, "Rule 23(c)(4) does not exempt class representatives from the threshold requirements of Rule 23(a)." *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *49 (N.D. Ill. Mar. 31, 2017). Because Plaintiffs do not satisfy the requirements of Rule 23(a), the Court denies Plaintiffs' request to certify any issue under Rule 23(c)(4).[30]

### III. Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion for class certification [318]. The Court grants Defendant's motion to exclude the testimony, reports, and opinions of Dr. Louise Fitzgerald [352], and grants in part and denies in part Plaintiffs' motion to bar the testimony and

---

[29] In addition, Plaintiffs also fail to connect the questions raised for the first time in their reply brief to the elements of their claims.

[30] As discussed above, the Court rejects Defendant's contention that Plaintiffs also have to satisfy the predominance requirement of Rule 23(b). *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *62 (N.D. Ill. Mar. 31, 2017).

expert report of Dr. Liza Gold and Dr. Gregory Mitchell, PhD. [370].   This case is set for further status hearing on September 12, 2019 at 10:30 a.m.

Dated: August 22, 2019

_____
Robert M. Dow, Jr.
United States District Judge